# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

BEVERLY PORT MARINA, INC. )
and LESLIE S. RAY INSURANCE )
AGENCY, INC., ) Civil Action No. 1:05-cv-10883-WGY
 )
   Plaintiffs )
 )
   vs. )
 )
ACADIA INSURANCE COMPANY, )
 )
   Defendant )
 )

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS

 NOW COMES Defendant, Acadia Insurance Company, by and through its

counsel, Tompkins, Clough, Hirshon & Langer, P.A., and pursuant to Rule 7,

F.R. Civ. P., and Rule 7.1, Local Rules of the United States District Court for the District

of Massachusetts, submits the following Memorandum of Law in support of its Motion to

Dismiss.

## BACKGROUND

 Starting in 1996, Plaintiff Leslie S. Ray Insurance Agency, Inc. ("LRIA") acted as

the insurance agent for Plaintiff Beverly Port Marina, Inc. ("BPM"), procuring various

insurance coverage for BPM's marina and boat sale business (Exhibit E, ¶¶7-9, to

accompanying Affidavit of Leonard W. Langer ("Langer Aff.")).  In or about May of

2000, at BPM's request, LRIA obtained for BPM a one-year renewable Marina

Operator's Legal Liability Boat Dealer's Policy (Policy No. MOA 0061540-11) (*see* Complaint, ¶7).  The policy was renewed in May of 2001 for a period of one year (*id.*).

On October 1, 2000, Carlos Johnson was seriously injured while operating a boat owned by BPM (*id.* at 5-6).  On October 30, 2001, he filed suit against BPM for his injuries (*id.*).  BPM notified Acadia, but Acadia's policy afforded no coverage for the claim, regardless of whether Mr. Johnson was acting as an employee of BPM or a potential purchaser of the vessel, as he alleged in the alternative (*see id.*, ¶6).  As LRIA's principal, David L. Ray, testified, at no time prior to the date of Mr. Johnson's injury was there ever a discussion of the liabilities associated with BPM's customers test-driving or moving boats (*see* deposition excerpt, p. 151, attached to Exhibit I to Langer Aff.).  Acadia denied coverage in November of 2001 (*see* Exhibit B, ¶7 and attached exhibits to Langer Aff.).

In January 2002, Acadia commenced a declaratory judgment action against both BPM and Carlos Johnson in this Court, seeking a determination that it had "no duty to defend and/or indemnify [BPM] under [the Policy] in connection with claims of Johnson" (Complaint, ¶13; Exhibit A to Langer Aff.).  On March 27, 2002, BPM served its Answer and a two-count Counterclaim asserting theories of breach of contract and violation of Chapters 93A and 176D of the Massachusetts General Laws (Exhibit B to Langer Aff.).  Among other things, BPM alleged that Acadia had misrepresented available coverage (*id.*, ¶21).

The parties each sought summary judgment.  In the course of the summary judgment proceedings, BPM filed an affidavit of its president, Suzanne G. Kinzie, dated October 25, 2002, claiming that she had explained the marina's relevant operations and

practices to David Ray of LRIA, who then advised that he was able to bind coverage to protect BPM from potential risks of liability (Exhibit C to Langer Aff.).  In its Supplemental Memorandum of December 20, 2002, BPM argued that before Acadia's policy was issued, Acadia "was fully aware that vessel demonstrations, testing and delivery were part of the overall operations of the assured marina"; that Acadia "was aware that vessel demonstrations were performed in the ordinary course of [BPM's] business"; that BPM advised LIRA of BPM's business risks, including vessel demonstrations and testing; that LRIA acted as Acadia's representative; that David Ray represented to BPM that he could bind coverage and protect BPM from the risks associated with its business; and that Acadia should be held responsible for LRIA's actions (Exhibit D to Langer Aff.).

On July 25, 2003, Chief Judge Young granted summary judgment in favor of Acadia (Exhibit F to Langer Aff.).  The Court determined that Acadia's policy furnished no liability coverage for Mr. Johnson's claims and held that the coverage could not be extended under the doctrine of "essential operations."

By a third-party complaint filed in April 2003, Carlos Johnson sued LRIA for negligence and breach of third-party contract, alleging that LRIA "was negligent in that it breached its duty by failing to procure appropriate marine insurance to provide coverage for injuries" sustained by Johnson and breached its promise to BPM "by failing to procure the appropriate marine insurance coverage" (Exhibit E to Langer Aff.).  BPM subsequently brought its own third-party complaint against LRIA for negligence and breach of contract (Exhibit G to Langer Aff.).  After observing that the Court had ruled that Acadia "had no obligation to defend or indemnify BPM," BPM alleged that Ray was

3

negligent and had breached its contract by "without limitation, (a) misrepresenting its expertise, (b) failing to obtain insurance for BPM for all potential claims; and (c) failing to inform BPM that it was not covered for certain types of claims." (*Id.*, ¶¶14, 18 & 22).

By letter to Acadia's counsel dated February 11, 2004, LRIA's attorney claimed that Acadia had breached a duty owed to both LRIA and BPM to exercise reasonable care in underwriting and somehow misrepresented the coverage (*see* attachment to Exhibit J to Langer Aff.). On March 3, 2004, LRIA's attorney advised that he would seek to assert cross-claims against Acadia "shortly" (*id.*). Instead, however, LRIA, BPM and Johnson settled all claims between and among them (*see* Exhibit I, p. 4, to Langer Aff.). In February 2005, BPM and LRIA, having settled BPM's claims, filed a joint motion to assert claims against Acadia substantially identical to the claims now being asserted (Exhibit H to Langer Aff.). Acadia opposed that motion on the grounds of untimeliness, prejudice and futility (Exhibit I to Langer Aff.). BPM's and LRIA's motion was denied. On March 23, 2005, the Court entered final judgment in favor of Acadia and against BPM and LRIA (Exhibit J to Langer Aff.).

On March 24, 2005, BPM and LRIA filed their Complaint, consisting of the same claims against Acadia, in the Suffolk County Superior Court. Acadia removed the action to this Court pursuant to 28 U.S.C. §1441.

## ARGUMENT

### I.    The Court should dismiss BPM's claims.

#### A.    BPM's claims are barred by *res judicata*.

The Court may grant a Rule 12(b)(6) motion to dismiss on the basis of the affirmative defense of *res judicata* or claim preclusion. *Banco Santander de Puerto Rico v. Lopez-Stubbe* (*In re Colonial Mortgage Banker's Corp.*), 324 F.3d 12, 16 (1st Cir. 2003). In so doing, the Court may consider not only the complaint but also such public records as the pleadings and orders in a prior judicial proceeding and other matters susceptible to judicial notice. *Id.*; *Boateng v. InterAmerican University, Inc.*, 210 F.3d 56, 60 (1st Cir. 2000). Even without a motion, "a court on notice that it has previously decided an issue may dismiss the action *sua sponte*, consistent with the *res judicata* policy of avoiding judicial waste." *Banco Santander*, 324 F.3d at 16; *Bezanson v. Bayside Enterprises, Inc.*, 922 F.2d 895, 904 (1st Cir. 1990).

Federal law determines whether an earlier federal court judgment bars the maintenance of a subsequent action pending in federal court. *Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n*, 142 F.3d 26, 37 (1st Cir. 1998). Under the federal law of *res judicata*, "a final judgment on the merits of an action precludes the parties or their privies from relitgating claims that were raised or could have been raised in that action." *Breneman v. United States ex rel. FAA*, 381 F.3d 33, 38 (1st Cir. 2004); *Apparel Art Int'l, Inc. v. Amertex Enterprises Ltd.*, 48 F.3d 576, 583 (1st Cir. 1995). "*Res judicata* prevents litigation of all grounds for … recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior

proceeding." *Brown v. Felsen*, 442 U.S. 127, 131, 99 S. Ct. 2205, 60 L. Ed. 2d 767 (1979).  The elements of *res judicata* are:  (1) a final judgment on the merits in an earlier proceeding, (2) sufficient identicality between the causes of action asserted in the earlier and  later suits, and (3) sufficient identicality between the parties in the two actions." *Breneman,* 381 F.3d at 38; *Bancos Santander*, 324 F.3d at 16.

Here, this Court clearly entered final judgment in the earlier action, in which Acadia and BPM were adversaries, thereby disposing of the first and third prongs.  *See Breneman,* 381 F.3d at 38.  The second prong hinges on a "transactional approach": "The necessary identity will be found to exist if both sets of claims – those asserted in the earlier action and those asserted in the subsequent action – derive from a common nucleus of operative facts."  *Id., quoting Gonzalez v. Banco Central Corp.*, 27 F.3d 751, 755 (1st Cir. 1994).  In other words, a final judgment in an action will extinguish subsequent claims "with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose."  *United States v. Cunan*, 156 F.3d 110, 114 (1st Cir. 1998); *Gonzalez*, 27 F.3d at 755; *Restatement (Second) of Judgments* §24 (1992).

"One major function of claim preclusion is to force a plaintiff to explore all the facts, develop all the theories, and demand all the remedies in the first suit."  18 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction 2d*, §4408 at 185 (2002). Because BPM asserted counterclaims in the earlier action, it must be treated as a plaintiff for purposes of *res judicata*.  *See Baker v. Thomas*, 522 U.S. 222, 238, 118 S. Ct. 657, 666, 139 L. Ed. 2d 580 (1998) ("A defendant who interposes a counterclaim is, in substance, a plaintiff, as far as the counterclaim is concerned, and the plaintiff is, in

substance, a defendant.), *quoting Restatement (Second) of Judgments,* §23, comment a. A decision against a defendant on its counterclaim bars that party's entire claim. Wright, Miller & Cooper, *supra*, §4414 at 338.

BPM's pending claims undoubtedly arise from the same transaction or series of transactions as its unsuccessful counterclaim. Both sets of claims arise from the same insurance policy issued by Acadia to BPM; and in both instances BPM is seeking indemnification from its insurer for the same personal injury claim of Carlos Johnson. Moreover, the earlier claims, like those in the instant case, are premised on allegations that Acadia knew or should have known of BPM's business practices and insurance needs. BPM has simply attempted to restate its claims under different legal theories. This is precisely what *res judicata* bars. *See Havercombe v. Dept. of Education*, 250 F.3d 1, 3-4 (1st Cir. 2001); *Manego v. Orleans Board of Trade*, 773 F.2d 1, 6 (1st Cir. 1985), *cert. denied*, 475 U.S. 1084 (1986).

The dismissal of BPM's claims will advance the important policy objectives of *res judicata*. The doctrine "relieves parties of the cost and vexation of multiple lawsuits, conserves judicial resources, and … encourages reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980); *Breneman*, 381 F.3d at 38. It serves "vital public interests" and is "a rule of fundamental and substantial justice," embodying "public policy and private peace, which should be cordially regarded and enforced by the courts … ." *See Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 401, 101 S. Ct. 2424, 69 L. Ed. 2d 103 (1981); *Hart Steel Co. v. Railroad Supply Co.*, 244 U.S. 294, 299, 37 S. Ct. 506, 61 L. Ed. 1148 (1917); 18 *Moore's Federal*

*Practice* §131.12[1] (2004).  Because all three prongs of the *res judicata* test are

satisfied, the Court should dismiss the claims of BPM.

### B.        **BPM fails to state a claim for which relief can be granted.**

#### 1. **Introduction**

Dismissal for failure to state a claim is appropriate if the pleadings fail to set forth

"factual allegations, either direct or inferential, respecting each material element

necessary to sustain recovery under some actionable legal theory."  *Centro Medico del*

*Turabo, Inc. v. Feliciano de Melecio*, 2005 U.S. App. LEXIS 6627, *6 (1st Cir. Apr. 19,

2005); *Berner v. Delahanty*, 129 F.3d 20, 25 (1st Cir. 1997).  The Court must "assume the

truth of all well-pleaded facts and indulge all reasonable inferences that fit the plaintiff's

stated theory of liability."  *Banco Santander*, 324 F.3d at 15.  Nevertheless, the Court is

not obliged to credit bald assertions or unsubstantiated conclusions.  *Berner*, 129 F.3d at

25; *Correa-Martinez v. Arrillaga-Belendez*, 903 F.2d 49, 52 (1st Cir. 1990)  Nor are legal

conclusions entitled to any weight.  *See Resolution Trust Corp. v. Driscoll*, 985 F.2d 44,

48 (1st Cir. 1993).

#### 2.        **Contract claims (Counts I and IV)**

BPM claims to be a third-party beneficiary of the Agency Agreement between

LRIA and Acadia.  To recover as a third-party beneficiary, BPM must show that Acadia

and LRIA "clearly and definitely" intended BPM to benefit from their agreement.  *See,*

*e.g.*, *Rymes Heating Oils, Inc. v. Springfield Terminal Railway, Inc.*, 265 F. Supp. 2d 147,

151 (D. Mass. 2003); *Miller v. Mooney*, 431 Mass. 57, 725 N.E.2d 545, 550 (2000);

*Anderson v. Fox Hill Village Homeowners Corp.*, 424 Mass. 365, 676 N.E.2d 821, 822

(1997).  Nothing in the language of the Agency Agreement indicates that BPM was

meant to be a third-party beneficiary. *See Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 399 F.3d 360, 371 (1st Cir. 2005).

It is appropriate to examine the Agency Agreement, since BPM relies on it, even though it is not annexed to the Complaint. *Jorge v. Rumsfeld*, 2005 U.S. App. LEXIS 6847, *3 (1st Cir. Apr. 21, 2005); *Clorox Co. P.R. v. Proctor & Gamble Commercial Co.*, 228 F.3d, 24, 32 (1st Cir. 2000); *see also Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998) ("When, as now, a complaint's factual allegations are expressly linked to – and admittedly dependent upon – a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).")  An examination of the Agency Agreement makes it clear that BPM's contract claims cannot stand.

### 3.    BPM's tort claims (Counts II, III, V and VI)

BPM's tort claims are remarkably similar to the allegations BPM asserted unsuccessfully in 2002.  Then, as now, BPM claimed that it had disclosed its "test driving" practices in connection with the risks for which it required coverage; that Acadia was aware of those practices; and that the extent of the coverage furnished by Acadia was misrepresented.  This Court has already ruled that notwithstanding these allegations, Acadia, as a matter of law, was not required to defend or indemnify BPM on a claim that was outside the policy's unambiguous coverage.  BPM's assertions to the contrary are barred not only by claim preclusion but also by issue preclusion.  *See* Wright, Miller & Cooper*, supra*, §4408 at 189-90 ("Efforts to recast an unsuccessful contract case into a second tort action commonly fail").

9

Negligence entails the breach of a legal duty.  In issuing an insurance contract, an insurer is under no duty to anticipate coverage requirements that the insured never specified.  *Cf. Oksa v. American Employer's Insurance Co.*, 218 F.2d 585 (2d Cir. 1955) (where insured sued insurer, under theories of breach of contract, negligence and fraud, for failing to increase limits of liability so as to conform with financial responsibility statute, it was "beyond comprehension" how the insured "could have hoped to succeed").  If the scope of coverage is unsatisfactory, the insured's remedy is to read the policy and either reject it or seek modification.  The Complaint shows that BPM had seventeen months to do so before Carlos Johnson's claim arose.  If the insured was relying on its agent, it may also have a claim against the agent.  However, the law does not provide for a negligence claim against the underwriter in such circumstances.

As for BPM's fraud claim, the claim must be dismissed for failure to allege the circumstances with particularity.  *See* F.R. Civ. P. 9(b).  BPM has violated the rule, because it does not specify what the alleged misrepresentations were, who made them, to whom they were made, where they were made, when they occurred, and what actions were engendered.  *See Alternative System Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29-30 (1st Cir. 2004).

Moreover, the tort claims are subject to a three-year statute of limitations.  *John Beaudette, Inc. v. Sentry Insurance*, 94 F. Supp. 2d 77, 97; G. L. ch. 260, §2A.  The tort claims would have accrued, at the latest, by November of 2001, after Johnson had asserted his claim and Acadia had denied coverage.  *See Massachusetts Electric Co. v. Fletcher, Tilton & Whipple, P.C.*, 394 Mass. 265, 475 N.E.2d 390, 392 (1985) ("cause of action accrues when some harm has occurred even though the full extent and nature of

that harm has not been and cannot be established immediately"). Consequently, BPM's tort claims are time-barred.

### 4.    **Chapter 93A claim (Count VII)**

In Count VII, BPM repeats, in a conclusory fashion, allegations of misconduct which have been previously shown not to give rise to a valid cause of action. The boundaries of what may qualify for consideration as a Chapter 93A violation is a question of law. *St. Gobain Industrial Ceramics, Inc. v. Wellons, Inc.*, 246 F.3d 64, 73 (1st Cir. 2001); *R. W. Granger & Sons v. J & S Insulation, Inc.*, 435 Mass. 66, 73, 754 N.E.2d 668, 676 (2001). The conduct must be unfair or deceptive. G.L. ch. 93A, §2. This means that the "objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 769 (1st Cir. 1996); *Leavings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 396 N.E. 2d 146, 153 (1979). It must fall "within at least the prunumbra of some common-law, statutory, or other established concept of unfairness" or be "immoral, unethical, oppressive or unscrupulous." *Commercial Union Insurance Co. v. Seven Provinces Insurance Co.*, 217 F.3d 33, 40 (1st Cir. 2000); *PMP Assocs., Inc. v. Globe Newspapers Co.*, 366 Mass. 593, 321 N.E.2d 915,917 (1975).

There is no common-law or statutory impediment to an insurance company's issuance of a policy that does not necessarily protect the insured against all likely business risks, even assuming *arguendo* that the insurer was aware of those risks. Nor is there anything immoral, unethical, oppressive or unscrupulous about such conduct. Massachusetts recognizes freedom of contract. *See, e.g.*, *Beacon Hill Civic Ass'n v. Ristorante Toscano*, 422 Mass. 318, 320, 662 N.E.2d 1015, 1017 (1996). The Complaint

does not give rise to a viable Chapter 93A claim. In addition, this Court has already rejected BPM's Chapter 93A claim predicated on essentially the same allegations.

II.     **The Court Should Dismiss LRIA's Claims.**

A.     **LRIA's claims are barred by *res judicata*.**

*Res judicata* precludes LRIA's claims for the same reasons that it precludes those of BPM: LRIA and Acadia were both parties in the earlier suit; final judgment was entered in favor of Acadia and against LRIA; and the claims arise out of the same transaction or series of transactions.

There is scant case law on the application of *res judicata* to claims between a plaintiff and third-party defendant. *See* 18A Wright, Miller & Cooper, *supra*, § 4450 at 367. It should be noted that as a practical matter, Acadia and LRIA may be viewed as co-defendants in the earlier action, since BPM was asserting claims against both its insurer and insurance agent. The approach adopted by a number of federal decisions and endorsed by several commentators is that co-parties are precluded from re-litigating any issue that they had a full and fair opportunity to litigate, without regard to whether they were in any sense adversaries in the prior action. *See id*. at 357-58.

LRIA can scarcely argue that it lacked an opportunity to litigate its claims in the earlier action, having asserted its right and intention to do so, by correspondence to Acadia's counsel, as early as February 11, 2004. If it had sought leave to assert such claims at that time, it doubtless would have been allowed to do so. Instead, however, for reasons that LRIA has never explained, it waited for over a year. By then, it was too late.

12

Acadia objected that it would be unfairly prejudiced by the late filing (*see* exhibit I to Langer aff.).  LRIA cannot circumvent this objection by simply filing a subsequent lawsuit.  Its untimely claims will still result in duplication of discovery and the need to re-depose the same witnesses (including the officers of BPM and LRIA's officers and former employees); and Acadia will still be at a severe disadvantage because nearly all of its employees who were involved with the BPM policy have by now left Acadia's employment and may be difficult to locate (*see id*. at 9-10).  *Res judicata* is designed to avoid just such prejudice, as well as to relieve parties of the cost and vexation of multiple lawsuits, to conserve judicial resources, and to encourage reliance on finalized adjudication.  *See Allen*, 449 U.S. at 94; *Montana v. United States*, 440 U.S. 147, 153-54, 99 S. Ct. 970, 59 L. Ed. 2d 210 (1979).  Under that doctrine, LRIA's claim should be dismissed.

**B.      LRIA claims fails to state a claim for which relief can be granted.**

**1.  Breach of Contract (Count VIII)**

In Count VIII, LRIA alleges, in conclusory fashion, that Acadia breached the Agency Agreement "by its actionable conduct outlined above."  Such a bald assertion, in itself, is entitled to no weight.

LRIA cites three provisions of the Agency Agreement.  The first gives LRIA authority to "solicit, receive, bind, execute, and transmit proposals for insurance contracts (including bonds)" to Acadia subject to Acadia's written guidelines (Complaint, ¶9; exhibit L to Langer aff.).  Nothing in the Complaint suggests that Acadia violated this provision.

The second provision cited by LRIA is that Acadia "will be responsible for preparation of all policies, endorsements, renewals, and collection of all direct bill premiums" (Complaint, ¶10).  It should be noted that this provision appears under the "Direct Bill" section of the Agency Agreement and simply allocates the task of preparing policies to Acadia (Exhibit L to Langer Aff.).  Again, the Complaint fails to allege any action in violation of this provision.  Acadia did, in fact, prepare the policy in question.

The final provision states that Acadia "shall defend and indemnity [LRIA] against liability, including reasonable cost of defense and settlements, imposed on it by law for damages caused by acts or omissions of [Acadia], provided [LRIA] has not caused or contributed to such liability by its own acts or omissions" (*id.,* ¶11).  This provision clearly applies only to derivative claims based solely on Acadia's fault.  However, all of the claims asserted against LRIA by both BPM and Carlos Johnson were predicated solely on LRIA's own alleged misconduct, either in failing to procure requested coverage or in misrepresenting the scope of that coverage.  Hence, the Agency Agreement unambiguously precludes indemnification in this instance.  *See Art Goebel, Inc. v. North Suburban Agencies, Inc.*, 567 N.W.2d 511 (Minn. 1997) (identical clause unambiguously required both that the insurer's acts or omissions caused the damages and that the agent did not cause or contribute to the damages by its own acts or omissions).  Therefore, LRIA's contract claim must fail.

## 2.    Negligence (Count IX)

LRIA's claim is premised on the notion that an underwriter somehow owes a duty to its agent to make sure that an insurance policy fully covers the customer's needs, whatever they may be.  In seeking to assert this claim in the earlier litigation, LRIA never

cited any authority for this novel proposition, which would turn the usual allocation of responsibilities between the underwriter and the agent on its head.

### 3.   Implied Covenant of Good Faith and Fair Dealing (Count X)

As demonstrated above, LRIA fails to allege any breach of the actual terms of the Agency Agreement.  Accordingly, LRIA seeks to insert new terms into the contract, under the rubric of "implied covenant of good faith and fair dealing."  However, in an agency agreement, terms will not be read into a contract so as to permit the insurance agent to recover damages for breach of such implied terms.  4 *Couch on Insurance 3d* § 5:61 (1997).

The implied covenant of good faith and fair dealing simply means that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *AccuSoft Corp. v. Palo*, 237 F.3d, 31, 45 (1st Cir. 2001); *Realty Central, LLC v. Re-Max of New England, Inc.*, 16 Mass. L. Rep. 709 (2003).  LRIA does not allege any conduct by Acadia that prevented LRIA from receiving the fruits of the Agency Agreement.  Other unexpressed terms and conditions will not be imputed into a contract under the implied covenant. *AccuSoft*, 237 F.3d at 45; *FDIC v. LeBlanc*, 85 F.3d 815, 822 (1st Cir. 1996).

### 4.   Negligent misrepresentation (Count XI)

LRIA alleges that Acadia misrepresented that "liability insurance did not exist and was not available in the market to cover claims such as the Johnson claim" (Complaint, ¶51).  However, David Ray made it clear in his deposition, a portion of which was submitted to the Court in the earlier litigation and is a public record that may

be consulted in connection with a motion to dismiss, that the only representation made by an Acadia employee in that regard occurred *after* Johnson's claim arose and consisted of the statement that "they [Acadia] don't offer that type of coverage because they essentially don't have the opportunity to do an underwriting investigation of every potential customer" (*see* attachment to Exhibit I to Langer Aff.).  LRIA could not have relied on this *post hoc* statement in placing coverage.

#### 5.    Intentional misrepresentation (Count XII)

Like BPM's claim for intentional misrepresentation, LRIA's claim should be dismissed for failure to comply with the particularity requirement of Rule 9(b).

#### 6.    Chapter 93A (Count XIII)

In Count XIII, LRIA repeats, in a conclusory fashion, allegations of misconduct which have been previously shown not to give rise to a valid cause of action.  These claims are insufficient to constitute a claim under Chapter 93A.

Moreover, to allow LRIA's non-contractual claims (including both the Chapter 93A claim and the various tort claims) would permit LRIA to circumvent the terms of the Agency Agreement.  The indemnification clause clearly specifies the *only* circumstances whereby Acadia would be responsible for indemnifying LRIA due to an insured's claim.  *See Art Goebel*, 567 N.W.2d at 516.  This precludes non-contractual theories of liability.  *Id.*

Consequently, LRIA has failed to assert any claim on which relief can be granted.

**CONCLUSION**

For the foregoing reasons, the Court should grant Acadia's Motion to Dismiss.


Dated at Portland, Maine this 5th day of May, 2005.

ACADIA INSURANCE COMPANY

By its counsel:


/s/   Leonard W. Langer

/s/   Marshall J. Tinkle
BBO#565513


TOMPKINS, CLOUGH, HIRSHON
  & LANGER, P.A.
Three Canal Plaza
P. O. Box 15060
Portland, ME  04112-5060
  (207) 874-6700
lwlanger@tchl.com


**CERTIFICATE OF SERVICE**


     I, Leonard W. Langer, hereby certify that on May 5, 2005, I electronically filed the within document with the Clerk of the Court using the CM/ECF system which will send a notification of such filing(s) to the following:  William D. Chapman, Esq., Melick, Porter & Shea, LLP, 28 State Street, Boston, MA  02109 counsel for Plaintiffs Beverly Port Marina, Inc. and Leslie S. Ray Insurance Agency.


/s/   Leonard W. Langer_____


Acadia/Bev Port
Memo/Mot Dism

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BEVERLY PORT MARINA, INC.          )
and LESLIE S. RAY INSURANCE        )
AGENCY, INC.,                      )    Civil Action No. 1:05-cv-10883-WGY
                                   )
                  Plaintiffs       )
                                   )
          vs.                      )
                                   )
ACADIA INSURANCE COMPANY,          )
                                   )
                  Defendant        )
                                   )

## AFFIDAVIT OF LEONARD W. LANGER

LEONARD W. LANGER, first being duly sworn, deposes and says as follows:

1.      My name is Leonard W. Langer, and I am an attorney practicing law in Portland, Maine.  I am a member of the law firm of Tompkins, Clough, Hirshon & Langer, P.A.

2.      I represented Acadia Insurance Company in an action captioned Acadia Insurance Company v. Beverly Port Marina, Inc. and Carlos Johnson v. Leslie S. Ray Insurance Agency, Inc., Docket No. 02-CV-10153-WGY, in the United States District Court for the District of Massachusetts.

3.      Attached hereto as **Exhibit A** is a true copy of the Complaint for Declaratory Judgment Pursuant to 28 U.S.C. §2201, *et seq.* and F.R. Civ. P. 57, without exhibits, in said action.

4.      Attached hereto as **Exhibit B** is a true copy of Defendant Beverly Port Marina, Inc's Answer to Plaintiff's Complaint for Declaratory Judgment and

Counterclaim for Declaratory Judgment, Breach of Contract, and for Violations of Chapters 93A and 176D of the Massachusetts General Laws in said action.

5.     Attached hereto as **Exhibit C** is a true copy of the Affidavit of Suzanne G. Kinzie dated October 23, 2000 in said action.

6.     Attached hereto as **Exhibit D** is a true copy of Defendant Beverly Port Marina, Inc.'s Supplemental Memorandum of Law in Support of its Motion for Summary Judgment in said action.

7.     Attached hereto as **Exhibit E** is a true copy of Third-Party Defendant Carlos Johnson's Complaint for Declaratory Judgment pursuant to 28 U.S.C. 2201, *et seq.*, and F. R. Civ. P. 57 against Third-Party Defendant, Leslie S. Ray Insurance Agency, Inc. in said action.

8.     Attached hereto as **Exhibit F** is a true copy of the Court's Memorandum and Order dated July 25, 2003 in said action.

9.     Attached hereto as **Exhibit G** is a true copy of Defendant/Third Party Plaintiff Beverly Port Marina, Inc.'s Third Party Complaint against Leslie S. Ray Insurance Agency, Inc. in said action.

10.    Attached hereto as **Exhibit H** is a true copy of the Joint Motion by Beverly Port Marina, Inc. and Leslie S. Ray Insurance Agency, Inc. to Amend Pleadings to Assert Claims against Acadia Insurance Company in said action.

11.    Attached hereto as **Exhibit I** is a true copy of Plaintiff's Opposition to Joint Motion by Beverly Port Marina, Inc. and Leslie S. Ray Insurance Agency, Inc. to Amend Pleadings, with Incorporated Memorandum of Law, with attachment, in said action.

2

12.     Attached hereto as **Exhibit J** is a true copy of the Supplemental Affidavit of William D. Chapman in support of Motion to Amend, with attachments, in said action.

13.     Attached hereto as **Exhibit K** is a true copy of the Court's electronic notice of entry of judgment in said action, dated March 23, 2005.

14.     Attached hereto as **Exhibit L** is a true copy of the Agency Agreement between Acadia Insurance Company and Leslie S. Ray Insurance Agency, Inc.

DATE:        May 5, 2005


                            /s/   Leonard W. Langer, Esq.



STATE OF MAINE
CUMBERLAND, SS.                                May 5, 2005

        Personally appeared the above-named Leonard W. Langer and made oath that the foregoing Affidavit is based on his knowledge and is true.

                        Before me,


                        /s/   Karen Belton
                        Notary Public
                        My Commission Expires 8/26/06



Acadia/Bev Port/LWL Aff'd

**EXHIBIT**

A

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 01-CV-

| | |
|---|---|
| ACADIA INSURANCE COMPANY, | ) |
| Plaintiff | ) |
| v. | ) |
| | ) |
| BEVERLY PORT MARINA, INC. | ) |
| and | ) |
| CARLOS JOHNSON, | ) |
| Defendants | ) |

## COMPLAINT FOR DECLARATORY JUDGMENT
## PURSUANT TO 28 U.S.C. § 2201, ET SEQ. AND F.R. CIV. P. 57

NOW COMES the Plaintiff, Acadia Insurance Company, by and through its

counsel, Tompkins, Clough, Hirshon & Langer, P.A., and Tucker, Heifetz & Saltzman, and

as and for its Complaint for Declaratory Judgment states as follows:

### JURISDICTION

1.      This is an action brought pursuant to the Court's admiralty jurisdiction,

28 U.S.C. § 1333, and is a matter within the meaning of Rule 9(h), F.R.Civ.P.

### VENUE

2.      Venue is properly laid in this Court pursuant to 28 U.S.C. §1391(b), in that

Defendant Beverly Port Marina, Inc. ("Beverly") is a Massachusetts corporation with its

principal place of business in Beverly, Massachusetts, and Defendant Carlos Johnson

("Johnson") is a resident of Danvers, Massachusetts.

## PARTIES

3.      Plaintiff Acadia Insurance Company ("Acadia") is, and at all times relevant to this matter was, a corporation duly authorized to transact business in the Commonwealth of Massachusetts.

4.      Defendant Beverly is a corporation duly organized and existing pursuant to the laws of the Commonwealth of Massachusetts, with a principal place of business in the Town of Beverly, County of Essex and Commonwealth of Massachusetts.

5.      Defendant Johnson is a resident of the Town of Danvers, County of Essex and Commonwealth of Massachusetts.

## CLAIM FOR RELIEF

6.      This is an action brought pursuant to 28 U.S.C. § 2201, et seq., and Rule 57, F.R.Civ.P., in which Acadia seeks a declaration that it has no duty to defend and/or indemnify Beverly under certain insurance policies issued by Acadia to Beverly in connection with claims of Johnson as described below.

## COUNT I

7.      Acadia repeats and realleges its allegations contained in Paragraphs 1 through 6, above, with the same force and effect as if more fully set forth herein.

8.      Acadia issued to Beverly in May, 2000, a Marina Operator's Legal Liability Boat Dealer's Policy, renewed in May, 2001, by Policy No. MOA 0061540-11, for a policy period from May 22, 2001 to May 22, 2002. A copy of the policy is attached hereto as Exhibit "A".

9.      Johnson has instituted a civil action against Beverly for personal injuries allegedly resulting from an accident on or about October 1, 2001 while Johnson was allegedly in the employ of Beverly and aboard a vessel owned by Beverly.

10.    Said civil action is currently pending in the Essex County Superior Court, Docket No. 01-2037-B.  A copy of the Complaint is attached hereto as Exhibit "B".

11.    Beverly has demanded that Acadia defend and indemnify it in connection with the said civil action.

12.    Pursuant to the terms and conditions of the aforesaid policy of insurance, Acadia is not obligated either to defend or indemnify Beverly in the said action.

WHEREFORE, Plaintiff, Acadia Insurance Company, prays for a judgment declaring that Acadia is not obligated to defend and/or indemnify Beverly with respect to any and all claims in the civil suit commenced by Johnson, and for such other and further relief as this honorable Court deems just and proper.

## COUNT II

13.    Acadia repeats and realleges its allegations contained in Paragraphs 1 through 12, above, with the same force and effect as if more fully set forth herein.

14.    Acadia issued to Beverly in May, 2000, a commercial general liability policy, renewed in May, 2001, by Policy No. CPA 0061462-11 for a policy period from May 22, 2001 to May 22, 2002.  A copy of the policy is attached hereto as Exhibit "C".

15.    Pursuant to the terms and conditions of the aforesaid policy of insurance, Acadia is not obligated either to defend or indemnify Beverly in the said action.

WHEREFORE, Plaintiff, Acadia Insurance Company, prays for a judgment declaring that Acadia is not obligated to defend and/or indemnify Beverly with respect to any and all claims in the civil suit commenced by Johnson, and for such other and further relief as this honorable Court deems just and proper.

## COUNT III

16.    Acadia repeats and realleges its allegations contained in Paragraphs 1 through 15 above with the same force and effect as if more fully set forth herein.

3

17.     Acadia issued to Beverly in May, 2000, a commercial umbrella policy, renewed in May, 2001, by policy No. CUA 0061463-11 for a policy period from May 22, 2001 to May 22, 2002.  A copy of the policy is attached hereto as Exhibit "D".

18.     Pursuant to the terms and conditions of the aforesaid policy of insurance, Acadia is not obligated either to defend or indemnify Beverly in the said action.

WHEREFORE, Plaintiff, Acadia Insurance Company, prays for a judgment declaring that Acadia is not obligated to defend and/or indemnify Beverly with respect to any and all claims in the civil suit commenced by Johnson, and for such other and further relief as this honorable Court deems just and proper.

DATED at Portland, Maine, this _21st_ day of January, 2002.


ACADIA INSURANCE COMPANY

By its Counsel:


Marshall J. Tinkle, Esq.     BBO 565513



James T. Scamby, Esq.     BBO 629144


Tompkins, Clough, Hirshon
    & Langer, P. A.
Three Canal Plaza
P. O. Box 15060
Portland, ME  04112-5060
    207-874-6700


Tucker, Heifetz & Saltzman
Three School St.
Boston, MA  02108
    617-557-9696


ComplaintDeclJdgmt.doc

4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.
02-10153 WGY

ACADIA INSURANCE
COMPANY,
                    Plaintiff,

VS.

BEVERLY PORT MARINA, INC.
and
CARLOS JOHNSON,
                    Defendants.



DEFENDANT, BEVERLY PORT MARINA, INC.'S ANSWER
TO PLAINTIFF'S COMPLAINT FOR DECLARATORY JUDGMENT
PURSUANT TO 28 U.S.C. § 2201, ET SEQ. and F.R.CIV.P.57
and
COUNTERCLAIM FOR DECLARATORY JUDGMENT, BREACH
OF CONTRACT, AND FOR VIOLATION OF CHAPTERS 93A AND 176D
OF THE MASSACHUSETTS GENERAL LAWS

Now comes the defendant, Beverly Port Marina, Inc., in

the above entitled action, by and through its undersigned

counsel, Clinton & Muzyka, P.C., and submits its Answer to

Plaintiff's Complaint for Declaratory Judgment pursuant to 28

U.S.C. § 2201, et seq. and F.R.Civ.P.57 as follows:

JURISDICTION

1.    The defendant denies the allegations contained in

      Paragraph 1.

VENUE

2.    The defendant admits the allegations contained in

      Paragraph 2.

## PARTIES

3.  The defendant is without personal knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 3 and therefore denies same.

4.  The defendant admits the allegations contained in Paragraph 4.

5.  The defendant is without personal knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 5 and therefore denies same.

## CLAIM FOR RELIEF

6.  Paragraph 6 contains allegations of law and relief claim to which a response is not required, but to the extent that a response is required, the defendant denies all the allegations contained therein.

## COUNT I

7.  The defendant reiterates and reaffirms its answers to the allegations set forth in Paragraphs 1 through 6 inclusive and incorporates same as if fully set forth herein.

8.  The defendant admits the allegations contained in Paragraph 8 to the extent that they exist.  The

defendant denies that Exhibit "A" is a complete copy of the referenced insurance policy.

9.   The defendant neither admits or denies the description of the civil action contained in Paragraph 9 and states that the Complaint which is attached as Exhibit "B" speaks for itself.

10.   The defendant admits the allegations contained in Paragraph 10.

11.   The defendant admits the allegations contained in Paragraph 11.

12.   The defendant denies the allegations contained in Paragraph 12.

**WHEREFORE**, Defendant, Beverly Port Marina, Inc., prays for a judgment declaring that Acadia Insurance Company is obligated to defend and indemnify Beverly Port Marina, Inc. with respect to all claims in the civil suit commenced by Carlos Johnson, and for such other and future relief this Honorable Court deems just and proper.

## COUNT II

13.   The defendant reiterates and reaffirms its answers to the allegations set forth in Paragraphs 1 through 12 inclusive and incorporates same as if fully set forth herein.

14.  The defendant admits the allegations contained in
     Paragraph 14 to the extent that they exist.  The
     defendant denies that Exhibit "C" is a complete copy of
     the referenced insurance policy.

15.  The defendant is without personal knowledge or
     information sufficient to form a belief as to the truth
     of the allegations contained in Paragraph 15 and
     therefore denies same.

     **WHEREFORE,** Defendant, Beverly Port Marina, Inc., prays
for a judgment declaring that Acadia Insurance Company is
obligated to defend and indemnify Beverly Port Marina, Inc.
with respect to all claims in the civil suit commenced by
Carlos Johnson, and for such other and future relief this
Honorable Court deems just and proper.

                            COUNT III

16.  The defendant reiterates and reaffirms its answers to
     the allegations set forth in Paragraphs 1 through 15
     inclusive and incorporates same as if fully set forth
     herein.

17.  The defendant admits the allegations contained in
     Paragraph 17 to the extent that they exist.  The
     defendant denies that Exhibit "D" is a complete copy of
     the referenced insurance policy.

18.   The defendant is without personal knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18 and therefore denies same.

**WHEREFORE,** Defendant, Beverly Port Marina, Inc., prays for a judgment declaring that Acadia Insurance Company is obligated to defend and indemnify Beverly Port Marina, Inc. with respect to all claims in the civil suit commenced by Carlos Johnson, and for such other and future relief this Honorable Court deems just and proper.

## AFFIRMATIVE DEFENSES

Now comes the defendant and incorporates the following Affirmative Defenses into each Count of its Answer as more fully appears below.

**AND FURTHER ANSWERING AND AS A COMPLETE AND SEPARATE DEFENSE,** the defendant says that this action is premature.

**AND FURTHER ANSWERING AND AS A COMPLETE AND SEPARATE DEFENSE,** the defendant says that Acadia is estopped from prosecuting this Declaratory Judgment action based upon its conduct and investigation activities.

**AND FURTHER ANSWERING AND AS A COMPLETE AND SEPARATE DEFENSE,** the defendant says that Acadia has waived its right to prosecute this Declaratory Judgment action based upon its conduct and investigation activities.

AND FURTHER ANSWERING AND AS A COMPLETE AND SEPARATE
**DEFENSE,** the defendant says that there exist factual disputes
that need to be resolved prior to this determination and
request for declaration by Acadia.

AND FURTHER ANSWERING AND AS A COMPLETE AND SEPARATE
**DEFENSE,** the defendant says that the subject insurance
policies issued by Acadia fail to define employee and are
ambiguous on their face.

AND FURTHER ANSWERING AND AS A COMPLETE AND SEPARATE
**DEFENSE,** the defendant says that it reserves the right to
raise additional affirmative defenses as discovery
progresses.

**WHEREFORE,** Defendant, Beverly Port Marina, Inc., prays
for a judgment declaring that Acadia Insurance Company is
obligated to defend and indemnify Beverly Port Marina, Inc.
with respect to all claims in the civil suit commenced by
Carlos Johnson, and for such other and future relief this
Honorable Court deems just and proper.

### COUNTER-CLAIM

Now comes the defendant, Beverly Port Marina, Inc., in
the above-entitled action, by and through its undersigned
counsel, Clinton & Muzyka, P.C., and asserts its Counterclaim
against the plaintiff, Acadia Insurance Company, as follows.

## PARTIES

1. Beverly Port Marina, Inc. (hereinafter referred to as "Beverly Port") is a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts with a usual place of business at 43 Water Street, Beverly, MA. 01915.

2. Acadia Insurance Company (hereinafter referred to as "Acadia"), upon information and belief, is a corporation duly organized and existing under law and authorized to transact business in the Commonwealth of Massachusetts with a usual place of business at One Acadia Commons, Westbrook, ME. 04098-5010.

## FACTS

3. In May of 2000, Acadia issued a one-year renewable Marina Operator's Legal Liability Boat Dealer's Policy (Policy No. MOA 0061540-11). The policy was renewed in May of 2001 and, at all material times herein, was in full force and effect.

4. The section of the policy entitled "COVERAGE D – PROTECTION AND INDEMNITY MARINA OPERATORS AND BOAT DEALERS" provides:

"In consideration of the premium shown opposite Coverage D in the Declarations and with respect to only to property covered under the Boat Dealers, Marina Operators Legal Liability, or Owned Watercraft Sections of this policy:

(a)   Which are being operated IN THE WATER by the
      Insured or by authorized employees of the Insured
      in conjunction with the normal conduct of business
      of a Boat Dealer or Marina Operator, or;

(b)   Which may break away from moorings at covered
      premises;

the company agrees to pay on behalf of the Insured all
sums which the Insured shall become obligated to pay by
reason of liability imposed upon him for:

(1)   Loss of life or Bodily Injury to any person;

(2)   Loss of or damage to or expense in connection with
      any fixed or moveable object or property of
      whatsoever nature;

(3)   Costs or expenses of, or incidental to, the removal
      of the Wreck of a covered vessel when such removal
      is compulsory by law;

5.   The specific exclusions that apply to the aforementioned

     coverage state:

     EXCLUDING, HOWEVER, LIABILITY FOR:

     (1)   Any claim arising with respect to any employee of
           the Insured.

     (2)   Any claim arising directly or indirectly under the
           Longshoremen's and Harborworker's Compensation Act
           or any worker's compensation act of any state or
           nation;

     (3)   Any loss, damages or expense which may be
           recoverable in whole or in part under any other
           Coverage Section.

6.   On or about October 30, 2001, Carlos Johnson commenced

     an action in the Essex Superior Court alleging that, at

     the time he sustained personal injuries, he was a Jones

     Act seaman in the employ of the Beverly Port.  He has

     also alleged, in the alternative, that he was lawfully

aboard and operating a Beverly Port vessel at the time of his injury.

7.   On November 15, 2001, Acadia issued a Reservation of Rights letter to Beverly Port on the issue of coverage for the action commenced by Carlos Johnson.  Acadia maintained therein that that there was no coverage for the counts in the Complaint alleging seaman status i.e. Jones Act negligence, Unseaworthiness and Maintenance & Cure.  Acadia also contended that, based upon its investigation, Carlos Johnson was operating a vessel owned by Beverly Port at the time of the incident and that the coverage only applied to "property being operated in the water by the Insured or an authorized employee."  Acadia agreed to provide a defense under a Reservation of Rights because of the possibility that the policy will afford coverage based upon the evidence at trial.  *A copy of the Reservation of Rights letter is attached hereto as Exhibit "A"*.

8.   On November 29, 2001, Beverly Port, through its counsel, requested a meeting with Mr. Patrick O'Toole, the Ocean Marine Specialist handling this matter on behalf of Acadia.  The purpose of the meeting was to discuss the coverage issue in general and in particular the vague and ambiguous language of the policy exclusions.

9.    On November 30, 2002, Mr. O'Toole on behalf of Acadia
      refused to meet and discuss the coverage issue and
      indicated a preference to proceed with a Declaratory
      Judgment action.

## COUNT I
## Breach of Contract and Declaratory Judgment

10.   Beverly Port reiterates and alleges the allegations
      contained in Paragraph Nos. 1 through 9 inclusive and
      incorporates same by reference herein.

11.   This counter-claim is filed pursuant to 28 U.S.C. §
      2201, et. seq. and Rule 57, F.R.Civ.P. in which Beverly
      Port seeks a declaration that Acadia has a duty to
      defend and to indemnify Beverly Port under the Marina
      Operator's Legal Liability policy issued by Acadia in
      connection with the claims of Carlos Johnson as
      described herein.  This counter-claim also seeks
      attorney's fees and costs for breach of contract by
      Acadia.

12.   The parties entered into a valid and enforceable
      contract for insurance in May of 2000.  The contract was
      renewed in May of 2001 and, at all material times
      herein, was in full force and effect.

13.   The contract requires Acadia to defend and indemnify
      Beverly Port for all sums which the Insured shall become

    legally obligated to pay for personal injuries sustained by third parties.

14.  There are no applicable exclusions or coverage limiting provisions which warrant denial of coverage concerning the Carlos Johnson claim.

15.  Acadia has breached its contract by denying coverage, by instituting a Declaratory Judgment, by exposing its Insured to financial liability, and by causing its Insured to incur expenses in defending this Declaratory Judgment action.

16.  As a result of Acadia's actions, Beverly Port was forced to engage counsel and defend and prosecute this Declaratory Judgment at its own expense.

**WHEREFORE**, the Counterclaim plaintiff, Beverly Port Marina, Inc., prays that this Honorable Court enter Judgment in its favor finding coverage under the policy and award it costs and reasonable attorney's fees for defending and proceeding forward with defense of this action.

### COUNT II
### Violation of Chapters 93A & 176D of the Massachusetts General Laws

17.  Beverly Port reiterates and alleges the allegations contained in Paragraph Nos. 1 through 9 inclusive and incorporates same by reference herein.

18.   At all material times herein, Acadia was engaged in
      trade or commerce, specifically insuring risks in the
      Commonwealth of Massachusetts.

19.   Upon information and belief, Acadia has denied coverage
      under policies issued to Beverly Port and has issued a
      Reservation of Rights letter when coverage is clear for
      the Carlos Johnson claims of personal injury and where
      there is no applicable exclusion, which actions
      constitute an unfair or deceptive act or practice within
      the meaning of G.L.c. 93A and G.L.c. 176D.

20.   Upon information and belief, Acadia failed to conduct a
      thorough investigation into the factual circumstances
      and legal authority controlling policy coverage for the
      underlying action (i.e. Carlos Johnson's claim for
      personal injury) which constitutes an unfair or
      deceptive practice within the meaning of G.L.c. 93A and
      G.L.c. 176D.

21.   Upon information and belief, Acadia issued a policy of
      insurance to Beverly Port which misrepresented the class
      of insurance and the true nature of the coverage which
      constitutes an unfair or deceptive act or practice
      within the meaning of G.L.c. 93A and G.L.c. 176D.

22.   Upon information and belief, Acadia willfully and
      knowingly performed a coverage investigation without

identifying the nature of the investigation to Beverly Port which constitutes an unfair or deceptive act or practice within the meaning of G.L.c. 93A and G.L.c. 176D.

23. As a result of the above-described unfair or deceptive acts or practices, Beverly Port has sustained injury, including but not limited to, expenses incurred in defending and proceeding forthwith with this action.

**WHEREFORE,** the Counterclaim plaintiff, Beverly Port Marina, Inc., prays that this Court:

(1)    enter Judgment in its favor against the plaintiff;

(2)    award damages to it in an amount determined by the Court;

(3)    treble such amount as provided by G.L.c.93A and G.L.c. 176D;

(4)    award interest, costs and attorney fees in defending and proceeding forthwith with this action, and

(5)    award such other relief as this Court deems just and proper.

*The defendant counter-claimant demands trial by jury on all issues and claims to which a trial by jury is permitted.*

By its attorneys,

CLINTON & MUZYKA, P.C.

Thomas J. Muzyka
BBO NO. 365540
One Washington Mall
Suite 1400
Boston, MA 02108
(617) 723-9165

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above
document was served upon the attorney of record
for each party by hand, mail, overnight and
facsimile, on ___



Acadia Insurance®

November 15, 2001

Beverly Port Marina, Inc.
Attn: Sue and Frank Kinzie
43-67 Water Street
Beverly, MA 01915

**VIA FACSIMILE AT 978-331-3499 &**
**VIA FEDERAL EXPRESS - OVERNIGHT DELIVERY**

RE:   Our Insured:          Beverly Port Marina, Inc.
      Policy #              MOA 0061540-11
                            CPA 0061462-11 &
                            CUA 0061463-11
      Claimant:            Carlos Johnson
      Claim #              5117185
      Date of Loss:        10/1/01

Dear Mr. and Ms. Kinzie:

Thank you for forwarding the summons and complaint recently filed by Carlos Johnson against Beverly Port Marina. We have reviewed the allegations in the complaint, and unfortunately, our position as to coverage remains unchanged.

The complaint does, however, make explicit the allegation that Mr. Johnson was an employee of Beverly Port Marina. In Count I, which seeks recovery under the Jones Act, Mr. Johnson alleges that on or about October 1, 2001, he "was in the employ of the defendant, Beverly Port Marina, Inc. as a seaman aboard the M/V UNNAMED." This allegation is incorporated by reference in the remaining four counts of the complaint. While this does not comport with our understanding of the facts of the case, we are obligated to consider the allegations as set forth in the complaint in determining whether Acadia has a duty to defend the Beverly Port Marina in this matter. We have therefore reviewed each of the above-referenced Acadia policies to determine whether there would be coverage, if the allegation of employee status were proven.

We also note that there is a seeming inconsistency within the complaint. The first three counts of the complaint (Jones Act Negligence, Unseaworthiness, and Maintenance and Cure) can be maintained only if Mr. Johnson was an employee of the Beverly Port Marina. Counts IV and V, on the other hand, are brought in negligence. Under Massachusetts' law, an employee may not sue his or her employer in negligence for

Acadia Insurance Companies
One Acadia Commons  P.O. Box 9010  Westbrook, Maine 04098-5010
207 772-4300  800 773-4300  Auto: 207 772-1170  800 870-1170  Fax: 207 772-6104
www.acadiainsurance.com

A Berkley Company

work-related injuries. Although these counts incorporate by reference the allegation that Mr. Johnson was an employee of the Beverly Port Marina at the time of this incident, we have also reviewed the Acadia policies to determine whether there would be coverage if Mr. Johnson was *not* an employee. We will address each of these policies in order.

### Marina Operators Legal Liability and Boat Dealers Policy

We call your attention to the following language of the COVERAGE D – PROTECTION AND INDEMNITY section of this policy:

> In consideration of the premium shown opposite Coverage D in the Declarations, and with respect only to property covered under the Boat Dealers, Marina Operators Legal Liability, or Owned Watercraft Sections of this policy:
>
> (a) Which are being operated IN THE WATER by the Insured or by authorized employees of the Insured in conjunction with the normal conduct of business of a Boat Dealer or Marina Operator; or
>
> (b) Which may break away from moorings at covered premises;

This section further provides that:

> the Company agrees to pay on behalf of the Insured all sums which the Insured shall become obligated to pay by reason of liability imposed upon him for:
>
> (1) Loss of Life or Bodily Injury to any person;
>
> (2) Loss of or damage to or expense in connection with any fixed or moveable object or property of whatsoever nature;
>
> (3) Costs or expenses of, or incidental to, the removal of the wreck of a covered vessel when such removal is compulsory by law;

EXCLUDING, HOWEVER, LIABILITY FOR:

> (1) Any claim arising with respect to any employee of the Insured.
>
> (2) Any claim arising directly or indirectly under the Longshoremen's and Harborworker's Compensation Act or any worker's compensation act of any state or nation...

It is Acadia's position that these Exclusions would operate to bar coverage under this Policy. If Mr. Johnson was acting as an employee of Beverly Port Marina, as alleged in the complaint, then the two exclusions referenced above would operate to bar coverage. If, on the other hand, Mr. Johnson was *not* acting as an employee, there would still be no coverage because of the particular facts of this case. Our understanding, which is consistent with the facts set forth in the complaint, is that Mr. Johnson was operating a vessel owned by the Beverly Port Marina at the time of the incident. As set forth above,

this coverage applies *only* with respect to covered property being operated in the water by the Insured or an authorized employee.

Mr. Johnson's claims, as set forth in Counts IV and V of his complaint, allege negligence on the part of the Beverly Port Marina. He claims that particular acts and omissions of the Marina were negligent, including its failure to ensure that he was properly instructed and supervised; failing to supervise him; and failing to ensure that he would not be placed in a dangerous situation. These specific claims, standing alone, do not alter our coverage position as set forth herein.

There is, however, a vague, broadly-worded claim in both Counts IV and V that the Beverly Port Marina was negligent "in other respects that will be shown at trial." Depending upon the factual basis for these claims, which is unknown at this time, there is at least the possibility that this policy may afford coverage. To that end, under a full reservation of rights, Acadia will furnish the Beverly Port Marina with a defense in this case. An explanation of this will be set forth in greater detail at the conclusion of this letter.

## Commercial General Liability Policy

The **SECTION I – COVERAGES, COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** portion of the policy reads, under **Exclusions:**

    d.    Workers' Compensation And Similar Laws

        Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

    e.    Employer's Liability

        "Bodily Injury" to:

        (1)    An "employee" of the insured arising out of and in the course of:

            (a)    Employment by the insured; or

            (b)    Performing duties related to the conduct of the insured's business; or

        (2)    The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

g.    Aircraft, Auto, Or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto," or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

This exclusion does not apply to:

(1)    A watercraft while ashore on premises you own or rent;

(2)    A watercraft that you do not own that is:

    (a)    Less than 26 feet long; and

    (b)    Not being used to carry persons or property for a charge;

(3)    Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4)    Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5)    "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Paragraph f. (2) or f. (3) of the definition of "mobile equipment."

This policy excludes coverage for Mr. Johnson's claims regardless of whether he is found to be an employee. As an employee, Exclusions (d) and (e) would operate to bar coverage for his claims. As a non-employee, Exclusion (g) would foreclose the possibility of coverage because his claims concern bodily injury arising out of the Beverly Port Marina's ownership, maintenance, use or entrustment to others of watercraft that it owns.

Commercial Umbrella Policy

The Umbrella Policy Exclusions state that this insurance does not apply to:

2.    Liability Imposed on the Insured

    a.    Under any workers compensation, unemployment compensation or disability benefits law, occupational disease or any similar law...

5.    Bodily injury or property damage arising out of the ownership, maintenance, use or entrustment to others of any watercraft owned or operated by or rented or loaned to any insured. Use includes operation and loading and unloading.

This exclusion does not apply to:

a.    A watercraft while ashore on premises you own or rent;

b.    A watercraft that you do not own that is:

(1)    Less than 50 feet long; and

(2)    Not being used to carry persons or property for charge;

c.    Bodily injury to any of your employees arising out of and in the course of their employment by you;

d.    The extent that you are obligated to pay damages by reason of the assumption of liability in an insured contract or agreement.

Finally, this policy contains an Employers' Liability Following Form Endorsement, which modifies the Commercial Umbrella Liability Coverage Part as follows:

Except to the extent coverage is provided in the "underlying policies" as listed in the Schedule of Underlying Insurances for the full limit shown, this insurance does not apply to "bodily injury," "personal injury," sickness, disease, disability or shock including death at any time resulting therefrom, and, if arising out of the foregoing, mental anguish or mental injury, sustained by:

1.    An employee of the insured arising out of and in the course of employment by the insured; or

2.    The spouse, child, parent, brother or sister of that employee as a consequence of 1. above.

Like the Commercial General Liability policy, this policy excludes coverage for Mr. Johnson's claims regardless of whether he is found to be an employee of Beverly Port Marina. If he is an employee, coverage for his claims is barred by Exclusion 2(a) and the Employers' Liability Following Form Endorsement. If he is not an employee, coverage for his claims is precluded by Exclusion 5.

We believe that the facts of this case will ultimately cause this claim to be excluded by the terms of the various policies. Because the plaintiff has, however, alleged general negligence against the Beverly Port Marina, it is possible – though not, in our view, probable – that some of the allegations in the lawsuit, if proven true, could result in a claim that would be covered under the Marina Operators Legal Liability and Boat Dealers Policy. It remains Acadia's position that if Mr. Johnson is found to have been an employee of Beverly Port Marina at the time of this incident, then none of the three policies provides coverage for his claims. It remains Acadia's position that regardless of his status as an employee or non-employee, there is no coverage for his claims available under either the Commercial General Liability or Commercial Umbrella policies.

To provide you, our insured, with the benefit of any doubt regarding interpretation of the complaint, and to protect both your rights and ours under the policy, we have decided to provide you with an interim defense of the suit, at our expense, despite the fact that we believe these claims to be excluded. This defense will be undertaken under a full and complete reservation of rights, including, but not limited to, the right to deny coverage for both defense and indemnity of the claim.

At the same time, however, because we believe the claims to be excluded, we intend to seek a judicial determination of the applicability of the Acadia policies to Mr. Johnson's claims. The method for seeking such a determination is through a judicial proceeding called a Declaratory Judgment action. Acadia will be initiating such an action shortly, and I, through counsel, will be handling the file for this coverage-related action. Our Marlborough, Massachusetts office will handle the claim for costs of defending Mr. Johnson's suit against you, under the Marina Operators Legal Liability and Boat Dealers Policy. Please direct any questions you may have related to the defense of the suit to the Massachusetts office.

To summarize, Acadia Insurance Company will assume the reasonable and necessary costs of defense of the lawsuit against you, under the Marina Operators Legal Liability and Boat Dealers Policy, with those costs to be paid and administered through our Massachusetts office. For the reasons cited above, however, and for each of the reasons set forth in our earlier correspondence of October 19 and October 25 of this year, Acadia Insurance Company reserves each and all of its rights under the policies, and under applicable law, including the right to deny coverage. Further, in order to determine the nature and extent of any possible coverage under the Acadia policies, we will be initiating a Declaratory Judgment action to request judicial review.

Please be advised that nothing set forth in this letter is to be construed as a waiver or relinquishment of any right or rights of the Acadia Insurance Company, its agents, servants, employees, or attorneys, whether specified within this letter or not, and no act or acts of the Acadia Insurance Company, its agents, servants, employees, or attorneys is to be so construed. Acadia expressly reserves the right to rely upon such additional policy terms, conditions, and exclusions as may be applicable.

Finally, please be advised that in issuing this response, Acadia has constrained itself to the information that you have provided, including the complaint. New or additional information could impact Acadia's decision in this matter, so I would ask you to provide such information to the extent that it exists. If new or different factual allegations arise, or if the Plaintiff files an amended complaint, we would want to review that information. Acadia expressly reserves the right to amend or supplement this response, or to issue a further response, based upon the discovery of new or additional information.

Thank you for the opportunity to review this claim. If you have any questions regarding the ongoing review of coverage issues, please give me a call. For questions regarding defense of Mr. Johnson's claim, please contact Greg Putnam in our Marlborough office, at 1-888-665-1170. Mr. Putnam is out until next Monday, and in his absence, Jim Coderre of that office has already contacted Mr. Johnson's attorney, David Smith, and received an extension to answer the complaint until December 8.

Sincerely,

Patrick O'Toole
Ocean Marine Specialist


cc:    Leslie Ray Insurance Agency

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 02-10153-WGY

ACADIA INSURANCE COMPANY,
    Plaintiff,

VS.

BEVERLY PORT MARINA, INC.
and
CARLOS JOHNSON,
    Defendants



EXHIBIT

C

## AFFIDAVIT OF SUZANNE G. KINZIE

I, Suzanne G. Kinzie, being duly sworn under oath hereby depose and say as follows:

1.    I am the President of Beverly Port Marina, Inc.

2.    Beverly Port Marina, Inc. is a corporation which provides marina services to the commercial and recreational boating industry, including but not limited to, in-water and shore storage, service and repairs to vessels, sales of equipment and fuel, and sales of new and used vessels.

3.    As part of the sale of new vessels, prospective buyers are permitted to test drive vessels which Beverly Port Marina, Inc. is authorized to sell. Beverly Port Marina, Inc. also exhibits vessels at boat shows, including the In-Water Boston Boat Show held annually at the World Trade Center in Boston, Massachusetts. The boats are delivered to and from the Boston In-Water Boat Show by sea.

4.    Carlos Johnson, a sailor and yacht owner, slip lessee at the Beverly Port Marina, Inc., and attendee of the 2001 Boat Show, viewed a number of boats at the Boat Show, including Beverly Port Marina, Inc.'s Monterey 298S Bowrider, which was being offered for sale.

5.    On October 1, 2001, Beverly Port Marina, Inc. was returning 17 boats from the 2001 In-Water Boston Boat Show by navigating the boats by sea from Boston to its facility in Beverly, Massachusetts.  Mr. Johnson telephoned to ask whether he could drive one of the Beverly Port Marina, Inc.'s boats to the marina after the show.  Since he appeared interested in the Monterey 298S Bowrider, he was authorized to drive it back to the marina as part of the flotilla of other Beverly Port Marina, Inc. boats.

6.    During the trip to Beverly, he allegedly sustained personal injuries onboard the boat.

7.    As President of Beverly Port Marina, Inc., I engaged the services of Leslie S. Ray Insurance Agency, Inc. to provide the necessary insurances to cover all of Beverly Port Marina, Inc.'s operations and property.

8.    When Beverly Port Marina, Inc. commenced selling vessels to customers, the insurance coverage was modified to include a Boat Dealers coverage.  At that time, I explained the activities involved in being a boat dealer to David Ray of Leslie S. Ray Insurance Agency, Inc. so that

he could determine the appropriate insurance coverage.
This included liability for customers and vessels while at
the marina, while being test driven by customers, and while
at, to, or from boat shows within 250 miles of Beverly,
Massachusetts.

9.    Upon explaining the marina's operation and
practices, including allowing customers to test drive boats
and the need to move boats to and from boat shows, Mr.
David Ray advised that he was able to bind the coverage and
to protect Beverly Port Marina, Inc. from potential risks
of liability.

As a result, Leslie S. Ray Insurance Agency, Inc.
forwarded policies of insurance to Beverly Port Marina,
Inc. consisting of a Marina Operations Legal Liability and
Boat Dealers Policy; a Commercial General Liability Policy;
and a Commercial Umbrella Policy issued by Acadia Insurance
Company for the period May 22, 2000 to May 22, 2001.   The
same policies were renewed with Acadia Insurance Company
for the period May 22, 2001 to May 22, 2002.

10.    As a result of representations made to me by Mr.
David Ray, I understood Beverly Port Marina, Inc. was
properly insured for personal injuries sustained by non-
employee customers operating vessels owned by Beverly Port
Marina, Inc. and held for sale.

11.  In the Civil Action entitled "Carlos Johnson v. Beverly Port Marina, Inc.", commenced in Essex Superior Court bearing Docket Number 01-2037-B, Mr. Johnson alleges that he is an employee of Beverly Port Marina, Inc.  As the defendant in that case, Beverly Port Marina, Inc. is contesting the status of employee since Mr. Johnson was not hired to transport the vessel, was not paid by Beverly Port Marina, Inc., and at no time was employed by Beverly Port Marina, Inc. for any purposes.  This litigation is still pending and I understand the status of Mr. Johnson's relationship with Beverly Port Marina, Inc. has not been determined.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 23rd DAY OF OCTOBER, 2002.

By:  _Suzanne G. Kinzie_
Suzanne G. Kinzie
President - Beverly Port Marina Inc.



CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by hand, mail, overnight mail, facsimile on 10/23/...

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ACADIA INSURANCE COMPANY,
        Plaintiff,

VS.

BEVERLY PORT MARINA, INC. and
CARLOS JOHNSON,
        Defendants.

CIVIL ACTION
NO: 02-10153-WGY



EXHIBIT

D

DEFENDANT, BEVERLY PORT MARINA, INC.'s, SUPPLEMENTAL
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY
JUDGMENT

Now comes the defendant, Beverly Port Marina, Inc.,
in the above-entitled action, by and through its
undersigned counsel, Clinton & Muzyka, P.C., and in
accordance with this Honorable Court's instruction
respectfully submits its Supplemental Memorandum of Law in
Support of its Motion for Summary Judgment.

I.    SATEMENT OF MATERIAL FACTS

    1.    The defendant is a corporation that provides
          marina services to the commercial and
          recreational boating industry including, but not
          limited to, in-water and shore storage, service
          and repairs to vessels, sales of equipment and
          fuel, and sales of new and used vessels.  ¶2 of
          *Affidavit of Suzanne Kinzie attached hereto as
          Exhibit A.*

    2.    As part of the sale of new vessels, prospective
          buyers are permitted to test-drive the vessels
          the defendant is authorized to sell.  The
          defendant also exhibits vessels at boat shows,

RECEIVED
DEC 27 2002

2

including the annual In-Water Boston Boat Show at the World Trade Center in Boston, Massachusetts. ¶3 of Exhibit A.

3. Carlos Johnson, a sailor, yacht owner, slip lessee at the defendant's facility, and attendee of the In-Water Boat Show, viewed a number of vessels at the 2001 show including a Monterey 298S Bowrider, which the defendant was offering for sale. ¶4 of Exhibit A.

4. On October 1, 2001, the defendant was returning 17 boats from the show by navigating them from Boston to its facility in Beverly, Massachusetts. Mr. Johnson telephoned the defendant and requested to drive one of the vessels to the marina following the show. Since he appeared interested in the Monterey 298S Bowrider, he was authorized by the defendant to drive it back to the marina as part of the flotilla of the defendant's other vessels. ¶5 of Exhibit A.

5. During the return trip to the defendant's facility, Mr. Johnson allegedly sustained personal injuries onboard the vessel. ¶6 of Exhibit A.

6. The defendant previously engaged the services of Leslie S. Ray Insurance Agency, Inc. to provide the necessary insurances to cover all of its operations and property. ¶7 of Exhibit A.

7. When the defendant started selling vessels to customers, the insurance coverage was modified to include a Boat Dealers coverage. ¶8 of Exhibit A.

8. At that time, the defendant's President explained the operations of a boat dealer to David Ray of Leslie S. Ray Insurance Agency, Inc. so that he could determine the necessary insurance. This included liability for customers and vessels while stored at the marina, and liability for customers test-driving the vessels for sale within 250 miles of the defendant's facility. ¶8 of Exhibit A.

9.   Upon explaining the marina's operation and
     practice of allowing prospective buyers to test-
     drive vessels offered for sale, the insurance
     agent advised that he would be able to bind the
     coverage and protect Beverly Port Marina, Inc.
     from potential risks of liability.  ¶9 of
     Exhibit A.

10.  By correspondence dated May 26, 2000, the
     insurance agent advised the defendant, in
     pertinent part, that the "Acadia Insurance
     Company contract provides liability coverage for
     boat operations and delivery of boats up to 250
     miles from your premises."  ¶5 of *Second
     Affidavit of Thomas J. Muzyka attached hereto as
     Exhibit B.*

11.  The insurance agent forwarded a Marina Operators
     Legal Liability and Boat Dealers Policy, a
     Commercial General Liability Policy, and a
     Commercial Umbrella Policy all of which were
     issued by the plaintiff for the period May 22,
     2000 to May 22, 2001.  These policies were
     subsequently renewed for a one-year period.  ¶9
     *of Exhibit A.*

12.  The Commercial General Liability Policy provided
     coverage for personal injuries and property
     damage, as well as other coverages including
     personal and advertising injury.  The policy
     excluded coverage for personal injuries
     sustained by the insured's employees and also
     contained a watercraft exclusion.

13.  The Commercial Umbrella Policy essentially
     provided the same coverages as the Commercial
     General Liability Policy, and also contained a
     watercraft exclusion.

14.  In November 2000, the plaintiff issued a one-
     year Automobile Policy to the defendant.
     Between May 200 and the present, the plaintiff
     has collected approximately $83,000.00 in
     premiums.  ¶5 *of Exhibit B.*

15.  As a result of representations made the
     insurance agent, the defendant understood that

4

it was properly insured for personal injuries sustained by customers operating vessels that it offered for sale.   ¶10 of *Exhibit A*.

## II.   ARGUMENT

The defendant submits that the MOLL policy should properly provide coverage for the personal injuries sustained by Carlos Johnson.

Coverage **A** of the MOLL policy provides coverage for *property damage* to third-party's vessels and property while in the defendant's care, custody and control.

Coverage **B** provides all risk coverage for *property damage* to the defendant's inventory offered for sale (i.e. vessels and marine supplies) including and during *vessel demonstrations, testing or delivery*.

Coverage **C** provides hull or *property damage* coverage for the defendant's listed vessels, including machinery and all other equipment onboard, for the operation and maintenance of the vessel.

Coverage **D** is the only section of the MOLL policy providing *liability protection* for damages sustained by third parties. This includes personal injuries.   The policy provides in pertinent part:

COVERAGE   In consideration of the premium shown opposite Coverage D in the Declarations and with respect only to property covered under the Boat Dealers, Marina Operators Legal Liability, or Owned Watercraft Sections of this policy:

5

(a)  Which are being operated IN THE WATER by the Insured or by authorized employees of the Insured in conjunction with the normal conduct of business of a Boat Dealer or Marina Operator, or;

(b)  Which may break away from moorings at covered premises;

the Company agrees to pay on behalf of the Insured all sums which the insured shall become obligated to pay by reason of liability imposed upon him for:

(1)  Loss of Life or Bodily Injury to any person;

(2)  Loss of or damage to or expense in connection with any fixed or moveable object or property of whatsoever nature;

(3)  Costs of expenses of, or incidental to, the removal of the wreck of a covered vessel when such removal is compulsory by law;

**EXCLUSIONS**   EXCLUDING, HOWEVER, LIABILITY FOR:

(1)  Any claim arising with respect to any employee of the Insured;

(2)  Any claim arising directly or indirectly under the Longshoremen's and Harborworker's Compensation Act or any worker's compensation act of any state or nation;

(3)  Any loss, damage or expense which may be recoverable in whole or in part under any other Coverage Section;

## A.   OBJECTIVELY REASONABLE INSURED

The Supreme Judicial Court has held that an insurance policy should be construed in light of "what an objectively reasonable insured, in reading the relevant policy language, would expect to be covered." *Hakim v. Massachusetts Insurers' Insolvency Fund*, 424 Mass. 275,

6

282 ((1997), see also *Hazen Paper Co. v. United States Fidelity & Guar. Co.*, 407 Mass. 689 (1990) and *Ruggerio Ambulance Serv., Inc. v. National Garage Mut. Ins. Co.*, 430 Mass. 794 (2000).

An objectively reasonable insured reading the MOLL policy would not interpret Coverages A, B, and C to provide protection for personal injuries arising from marina operations. Under Coverage A, there is a specific exclusion "for loss of Life, Bodily Injury, or Illness."

An objectively reasonable insured would also not interpret Coverages B and C to provide coverage for personal injuries arising from the marina operations because each section is limited to property damage or hull insurance.

However, an *objectively reasonable insured should interpret Coverage D to afford coverage for personal injuries arising from the operations identified in Coverage B*. Coverage B provides for **property damage** coverage arising out vessel demonstrations, testing and delivery. It does not contain a specific exclusion for personal injuries. Because there is no exclusion in Coverage B, there is no prohibition against extending coverage for personal injuries arising out of vessel demonstrations, testing and delivery.

7

Coverage D specifically and intentionally provides for protection for liability risk, including personal injuries "to any person." There is no specific exclusion contained in Coverage D for liabilities arising out of vessel demonstrations, testing and delivery.

Because there is a specific and intentional providing of liability coverage for personal injuries and because there is no specific exclusions, **an *objectively reasonable insured would interpret Coverage D as providing coverage for the personal injury arising from the operations identified in Coverage B.*** The coverage provided in Coverage B in conjunction with the lack of exclusion in Coverage D, provides "internal documentary support for the insured's interpretation." *Marston v. American Employers Ins. Co.*, 439 F.2d 1035 (1st Cir. 1971).

There is no dispute that the intent of the MOLL policy is to protect the defendant from vicarious liability. There is no question that the defendant may be vicariously liable for the acts of its customers or agents. Based upon an objectively reasonable interpretation of the policy provisions, coverage should be properly found for Mr. Johnson's injuries. An objectively reasonable interpretation of the policy is consistent with the intent of the policy, to wit, to

8

provide coverage for situations where the defendant may be held vicariously liable.

## B.    REASONABLE EXPECTATION DOCTRINE

The defendant further submits that, based upon the circumstances of this matter, a reasonable marina operator would expect coverage for Mr. Johnson's injuries.

Through Leslie S. Ray Insurance Company, the plaintiff issued a complete package policy for the defendant's business operations.  This consisted of four (4) policies.  The purpose of issuing a package policy, with the exception of Worker's Compensation which the plaintiff does not underwrite, was to properly **_protect the insured against all liabilities arising from the operation of its business._**

Before the policies were issued, the plaintiff was fully aware that vessel demonstrations, testing and delivery were part of the overall operations of the assured marina.  This is demonstrated by the fact that Mrs. Kinzie described all of the Boat Dealer operations in which a customer would purchase a vessel to plaintiff's insurance agent.  The Yacht Dealers/Marina Operators Application[1] provided to the plaintiff confirms that the

---

[1] The defendant has attached hereto as Exhibit "C" a copy of the Yacht Dealers/Marina Operators Application.  This document is not in Beverly Port Marina, Inc.'s president's handwriting, nor in the documents

9

plaintiff was aware that vessel demonstrations were performed in the ordinary course of its business, and that customers would be onboard for those demonstrations.

The plaintiff issued CGL and Umbrella polices which provide for liability coverage arising from personal injuries. These policies are, however, limited by specific watercraft exclusions. The only policy addressing watercraft liabilities arising out of the operations of the marina, including vessel demonstrations, testing and delivery, is the MOLL policy. It is not unreasonable for the defendant to expect that the only policy addressing watercraft related liability would provide coverage for the risks associated with its operations, including vessel demonstrations, testing and delivery. This is a sound, logical business expectation when one package policy is provided for all the anticipated risks.

This is especially true given the fact that (1) Coverage B addresses the property risks associated with vessel demonstrations, testing and delivery, (2) Coverage D does not specifically exclude liabilities associated with vessel demonstrations, testing and delivery, and (3)

---

produced by Leslie S. Ray Insurance Agency, Inc. It is unsigned and undated. It is presumably a document authored by an employee of either Leslie S. Ray Insurance Agency, Inc., or Acadia Insurance Company.

10

the insurance agent represented that the policy included
"liability coverage for boat operations."  Based upon the
totality of the circumstances, the defendant properly
expected and relied to its detriment that there would be
coverage for Mr. Johnson's injuries.  See, *Davenport
Peters Co. v. Royal Globe Ins. Co.*, 490 F.Supp. 286 (1980)
citing *Marston v. American Employers Ins. Co.*, 439 F.2d
1035 (1st Cir. 1970) (recognizing the reasonable
expectation doctrine).

## C.    DETRIMENTAL RELIANCE

The defendant further submits that the plaintiff is
estopped from denying coverage because of the
representations of its agent, Leslie S. Ray Insurance
Agency.  A licensed agent is considered a representative
of an insurance company[2].  The agent's authority gives rise
to a principal-agency relationship in which an insurance
company can be held responsible for the actions of its
agents.  *New England Acceptance Corp., v. American
Manufactures, Mutual Ins. Co.*, 4 Mass.App.Ct. 172 (1976).
An insurance company is generally required to pay the
claims of an insured and then move against the agent for

---

[2] The defendant has attached hereto as Exhibit "D" a copy of the Agency
Agreement between Leslie S. Ray Insurance Agency, Inc. and Acadia
Insurance Company.

indemnification. *Franchi v. Stella*, 42 Mass.App.Ct. 251 (1997).

Insurance agents are liable for failing to obtain insurance when they are requested to procure a particular type of policy and fail to obtain the appropriate coverage. *Rae v. Air-Speed, Inc.*, 386 Mass. 187 (1982). "When the insured makes an agreement with a broker calling for the purchase of particular coverage, the insured may reasonably rely on the broker's superior expertise and may assume that the broker has performed his duty." *Campione v. Wilson*, 422 Mass. 185, 195 (1996); see also *R.E. Levellee Woodworking, Inc. v. Costello*, 14 Mass.L.Rptr. 300 (2002).

In the case *sub judice*, the defendant advised the plaintiff's agent, Leslie S. Ray Insurance Agemcy, of the Boat Dealer risks associated with the selling of vessels, which included vessel demonstrations, testing and delivery. Shortly after obtaining this information, Mr. Ray represented that he would be able to bind the coverage and protect the defendant from the risks associated with the selling of Boat Dealer vessels. He later confirmed in writing that the MOLL policy he intended to secure "provides liability coverage for boat operations and delivery of boats up to 250 miles from your premises."

12

Based upon the plaintiff's agent's oral and then written representations concerning the "binding" of coverage, Beverly Port Marina, Inc. believed, to its detriment, that coverage for the potential risks associated with selling vessels was in place.

The defendant has submitted an Affidavit of its President, which satisfies the necessary elements of detrimental reliance[3]. The plaintiff has not offered any evidence to refute the allegations contained in that Affidavit. The defendant submits that, based upon the Affidavit and the defendant's previously submitted material facts that have not been rebutted, the plaintiff as a matter of law is estopped from denying coverage based upon the representations of its authorized agent.

III. CONCLUSION

For the aforementioned reasons, the defendant respectfully requests that this Court find that the MOLL policy, under the present circumstances, provides coverage to the defendant for the injuries sustained by Mr. Johnson, that the defendant's insurance expectations are

---

[3] "The basis of an estoppel is a representation . . . intended to induce a course of action on the part of the person to whom the representation is made, and where, as a consequence, there is detriment to the person relying on the representation and taking the action." Capozzi's Case, 4 Mass.App.Ct. 342 (1976) quoting DeSisto's Case, 351 Mass. 348 (1966), Cellucci v. Sun Oil Co., 2 Mass.App.Ct. 722 (1974).

13

reasonable, that the plaintiff is estopped from denying coverage, and that the defendant be required to provide a defense pursuant to the provisions of the MOLL policy.

In the alternative the defendant submits that, if there are insufficient facts to support a finding of coverage or material facts remain, then the parties should be permitted to conduct discovery.  The plaintiff has presented several Affidavits concerning the basis of its decisions (i.e. statements relied upon and its custom and practice in underwriting policies) in issuing the policies to the defendant.  The defendant should properly be allowed to cross-examine the Affiants before a determination is made concerning coverage.

Similarly, both parties have submitted correspondence from the insurance agent.  The plaintiff submitted the Yacht Dealers/Marina Operators Application and the defendant submitted a May 26, 2002 correspondence confirming the existence of liability coverage for the marina.  The parties should properly have an opportunity to depose the insurance agent, and any other person connected with the decision and issuance of the MOLL policy.  This is especially true in light of the representations made by both parties concerning the request for coverage.

14

WHEREFORE, the defendant, Beverly Port Marina, Inc.,
prays that this Honorable Court conclude that the MOLL
policy provides coverage for Mr. Johnson's injuries.  If
there are insufficient facts to conclude that coverage
exists, then the defendant prays that the parties be
allowed to properly conduct discovery.

By its attorneys,

CLINTON & MUZYKA, P.C.

Thomas J. Muzyka
BBO NO. 365540
Kenneth M. Chiarello
BBO NO 639274
One Washington Mall
Suite 1400
Boston, MA 02108
(617) 723-9165

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above
document was served upon the attorney of record
for each party by: hand, mail, overnight mail,
facsimile on

EXHIBIT

E

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ACADIA INSURANCE COMPANY,　　　)
　　　　Plaintiff,　　　　　　　　　)
　　　　　　　　　　　　　　　　　)　　　CIVIL ACTION
v.　　　　　　　　　　　　　　　　)　　　NO.: 02-CV-10153-WGY
　　　　　　　　　　　　　　　　　)
BEVERLY PORT MARINA, INC.,　　　)
　　　　Defendant,　　　　　　　　　)
and　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
CARLOS JOHNSON,　　　　　　　　　)
　　　　Defendant and Third-Party　)
　　　　Defendant.　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
LESLIE S. RAY INSURANCE　　　　　)
AGENCY, INC.,　　　　　　　　　　)
　　　　Third-Party Defendant.　　 )

## THIRD-PARTY DEFENDANT, CARLOS JOHNSON'S COMPLAINT FOR DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. 2201, ET. SEQ. AND F.R.CIV.P. 57 AGAINST THIRD-PARTY DEFENDANT, LESLIE S. RAY INSURANCE AGENCY, INC.

NOW COMES the Third-Party Plaintiff, Carlos Johnson, by and through his Counsel and for his Complaint for Declaratory Judgment states as follows:

### PARTIES

1.　　The Plaintiff, Acadia Insurance Company (Acadia), has commenced a declaratory judgment action against Defendant Beverly Port Marina, Inc. (BPM) and Defendant/Third Party Plaintiff Carlos Johnson (Johnson). See Exhibit "1" attached hereto.

2.　　Defendant/Third Party Plaintiff Johnson is a resident of Danvers, Massachusetts.

thirdpartycomplaint.doc

3.  Defendant BPM is a Massachusetts corporation with a principal place of business located at Water Street, Beverly, Massachusetts.

4.  Leslie S. Ray Insurance Agency, Inc. (Ray) is a Massachusetts corporation with a principal place of business located at 129 Dodge Street, Beverly, Massachusetts.

<u>JURISDICTION</u>

5.  This is an action brought pursuant to the Court's admiralty jurisdiction, 28 U.S.C. §1333, and is a matter within the meaning of Rule 9(h), F.R.Civ.P.

<u>VENUE</u>

6.  Venue is properly laid in this Court pursuant to Rule 28 U.S.C. §1391(b), in that Third-Party Defendant is a Massachusetts corporation.

<u>FACTS</u>

7.  BPM was provided with various insurance quotes by Ray from 1996 through to the May 2002.

8.  Ray bound various insurance coverage for BPM's benefits from 1996 through to the May of 2002.

9.  Ray informed BPM in May of 2000 that Acadia's insurance coverage provided liability coverage for boat operations and delivery up to 250 miles, including out of state, from BPM's only facility in Beverly, Massachusetts.

10. As a result of Ray's representations, BPM selected the coverage offered by Acadia.

11. Ray did not bind coverage for claims involving a Jones Act seamen, maintenance and cure, unseaworthiness, or any other marine employment based claims.

12. Ray knew that BPM wanted to obtain proper insurance for the benefit of its employees.

thirdpartycomplaint.doc

13.   Ray knew that BPM wanted to be able to operate its vessels outside of the state of Massachusetts.

14.   Ray knew that BPM was engaged in selling boats at various boat shows to individuals from outside of Massachusetts.

15.   Ray is either an agent of BPM or Acadia.

16.   Johnson has filed suit in Superior Court of the Commonwealth of Massachusetts in an action captioned *Johnson v. Beverly Port Marina, Inc.*, Civil Action No.: 01-2037 (state court action).  See Exhibit "B" of Exhibit "1" attached hereto.

17.   Johnson was an intended beneficiary of insurance policies that were issued or should have been issued to BPM.

<u>COUNT I</u>

18.   Third-Party Plaintiff restates and realleges paragraphs 1 through 17 as if fully set forth herein.

19.   Ray had a duty to bind appropriate marine insurance coverage for the benefit of BPM's employees while said employees were operating vessels that were engaged in interstate commerce.

20.   Ray also had a duty to bind appropriate marine insurance coverage for the benefit of BPM for losses incurred while potential customers or other permissive users were operating BPM's vessels.

21.   Ray was negligent in that it breached its duty by failing to procure appropriate marine insurance to provide coverage for injuries sustained by a master or crew member of a vessel engaged in interstate commerce.

22.   Ray was also negligent in that it also breached its duty by failing to procure appropriate marine insurance to provide coverage for injuries sustained by a potential customer or other permissive users while operating a BPM vessel.

23.   As a result of Ray's negligence, Johnson has been harmed in that appropriate insurance coverage will not be available to satisfy any judgment or award for most if not all of his claims raised in the state court action.

WHEREFORE, Third-Party Plaintiff, Carlos Johnson, prays for a judgment declaring that in the event Acadia is found to be not obligated to defend and/or indemnify BPM with respect to any and all claims in the civil suit commenced by Johnson as Johnson is an intended beneficiary of said insurance, that Ray be declared to have negligently failed to procure appropriate insurance for BPM and as such must indemnify Beverly Port Marina, Inc. with respect to any and all claims in the civil suit commenced by Johnson, and for such other and further relief as this Honorable Court deems just and proper.

<div align="center">COUNT II</div>

24.   Third-Party Plaintiff restates and realleges paragraphs 1 through 23 as if fully set forth herein.

25.   Ray promised BPM that the insurance coverage supplied by Acaida provided insurance for all boat operations and delivery up to 250 miles, including out of state, from BPM's only facility in Beverly, Massachusetts.

26.   Ray breached that promise by failing to procure the appropriate marine insurance coverage.

27.   Johnson was an intended beneficiary of that Ray's promise.

thirdpartycomplaint.doc

28.    As a result of Ray's breach, Johnson, is harmed in that there will not be appropriate insurance coverage to satisfy any judgment, award, for most if not all of his claims raised in the state court action.

WHEREFORE, Third-Party Plaintiff, Carlos Johnson, prays for a judgment declaring that in the event Acadia is found to be not obligated to defend and/or indemnify BPM with respect to any and all claims in the civil suit commenced by Johnson, that Ray be declared to have breached an implied promise to procure appropriate insurance for BPM and as such must indemnify Beverly Port Marina, Inc. with respect to any and all claims in the civil suit commenced by Johnson as Johnson is an intended beneficiary of said insurance, and for such other and further relief as this Honorable Court deems just and proper.

Respectfully submitted
Carlos Johnson
By his attorneys

David S. Smith, Esq.
BBO# 634865
Cianciulli & Ouellette
163 Cabot Street
Beverly, MA 01915
(978) 922-9933

CERTIFICATE OF SERVICE

I, David S. Smith, attorney for the defendant herein caused the foregoing document to be served upon the plaintiff's attorney, Leonard Langer, Esq. Tompkins, Clough, Hirshon & Langer, P.A. Three Canal Plaza, P.O. Box 15060 Portland, ME 04112-5060, BPM's attorney Thomas Muzyka Clinton & Muzyka One Washington Square Mall Suite 1400 Boston, Massachusetts 02108-2603, Leslie S. Ray Insurance Agency, Inc. 129 Dodge Street, Beverly, Massachusetts 01915 by regular mail, postage prepaid, this 25th day of April, 2003.

David S. Smith, Esq.

thirdpartycomplaint.doc

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**EXHIBIT**

tabbies*    F

ACADIA INSURANCE COMPANY    )
                            )
        Plaintiff,          )
                            )
        v.                  )    CIVIL ACTION
                            )    NO. 02-10153-WGY
BEVERLY PORT MARINA, INC.,  )
                            )
and                         )
                            )
CARLOS JOHNSON              )
                            )
        Defendants.         )

MEMORANDUM AND ORDER

YOUNG, C.J.                                    July 25, 2003

After consideration of the Supplemental Memoranda submitted by both parties, this Court holds that the doctrine of essential operations does not extend insurance coverage to the Beverly Port Marina, Inc. (the "Marina") for the personal injuries incurred by Carlos Johnson. Accordingly, this Court ALLOWS Acadia Insurance Company's Motion for Summary Judgment [Docket No. 24] and DENIES the Marina's Motion for Summary Judgment [Docket No. 28].

SO ORDERED.

_William G. Young_
WILLIAM G. YOUNG
CHIEF JUDGE

DOCKETED

58

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

EXHIBIT

tabbies®

G

ACADIA INSURANCE COMPANY,
    Plaintiff             )

v.

BEVERLY PORT MARINA, INC.,
    Defendant

and

CARLOS JOHNSON,
    Defendant and Third-Party
    Plaintiff

v.

LESLIE RAY INSURANCE AGENCY,
    Third-Party Defendant

02-CV-10153 WGY

## DEFENDANT/THIRD-PARTY PLAINTIFF BEVERLY PORT MARINA, INC.'S THIRD PARTY COMPLAINT AGAINST LESLIE S. RAY INSURANCE AGENCY, INC.

Defendant/third-party plaintiff Beverly Port Marina, Inc. ("BPM") hereby asserts this third-party complaint against Leslie S. Ray Insurance Agency, Inc. ("Ray") seeking a judgment that Ray, an insurance agent, was inter alia, negligent, in that it obtained insurance for BPM that was inadequate to cover claims made against BPM in a separate lawsuit pending against BPM.

### PARTIES

1. BPM is a Massachusetts corporation with a principal place of business in Beverly, Massachusetts.

2. Defendant Ray is a Massachusetts corporation with a principal place of business in

Beverly, Massachusetts.

## JURISDICTION AND VENUE

3. Jurisdiction is proper in this Court pursuant to the Court's admiralty jurisdiction, 28 U.S.C. §1333.

4. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b).

## FACTS

5. BPM owns and operates a marina located in Beverly, Massachusetts.

6. Ray is in the business of operating an insurance agency in Beverly, Massachusetts.

7. In the spring of 2000, BPM contacted Ray to determine if Ray was interested in and capable of handling the insurance for BPM's business and operations.

8. Ray, through its employees, agents and/or officers, represented to BPM that it was experienced in the field of obtaining insurance for marinas. Ray further represented to BPM that it could obtain insurance for BPM covering all of BPM's insurance needs.

9. In the spring of 2000, Ray obtained insurance for BPM through Acadia Insurance Company and others. Ray represented to BPM that the Acadia and other insurance policies would cover all of BPM's insurance needs and potential claims.

10. On October 1, 2001, Carlos Johnson was injured while transporting a BPM boat from a boat show back to the BPM facility.

11. Johnson has brought claims against BPM arising out of his injuries (the "Underlying Action"). The Underlying Action is currently pending in Essex Superior Court, C.A. No. 01-2037-B.

2

12. Before Johnson filed the Underlying Action, BPM notified Ray of Johnson's incident, and Ray placed BPM's various insurance carriers on notice of Johnson's potential claim.

13. Shortly thereafter, Acadia notified BPM that Acadia believed it had no obligation to defend or indemnify BPM in the Underlying Action. Nevertheless, Acadia undertook BPM's defense in the Underlying Action under a reservation of rights.

14. Subsequently, Acadia filed this action seeking a declaration from this court that it had no obligation to defend or indemnify BPM. After cross-motions for summary judgment were filed, the Court ruled that Acadia had no obligation to defend or indemnify BPM.

15. Shortly after the court issued its ruling, Acadia withdrew its defense of BPM in the Underlying Action and a related action. Thus, BPM is now left without any insurance coverage for the Underlying Action.

16. The failure of Ray to obtain sufficient insurance to cover BPM in the Underlying Action was both negligent and a breach of contract.

## COUNT I
## NEGLIGENCE/ERRORS AND OMISSIONS

17. The defendant/third party plaintiff repeats and realleges the allegations contained in paragraphs 1 through 16 of the complaint.

18. Defendant Ray was negligent by, without limitation, (a) misrepresenting its expertise, (b) failing to obtain insurance for BPM for all potential claims; and ©) failing to inform BPM that it was not covered for certain types of claims.

19. As a result of defendant Ray's negligence, BPM has been severely harmed.

3

## COUNT II
## BREACH OF CONTRACT

20. The defendant/third party plaintiff repeats and realleges the allegations contained in paragraphs 1 through 19 of the complaint.

21. Ray and BPM entered into a contract whereby Ray agreed to obtain appropriate insurance for BPM.

22. Ray breached its contract with BPM by, without limitation, (a) misrepresenting its expertise, (b) failing to obtain insurance for BPM for all potential claims; and ©) failing to inform BPM that it was not covered for certain types of claims.

23. As a result of Ray's breach of contract, BPM has been severely harmed.

WHEREFORE, third-party plaintiff Beverly Port Marina, Inc. hereby prays that this Court, after hearing,

1. Award all damages BPM has suffered;

2. Require Ray to pay to BPM all of BPM's damages, including, without limitation, its attorneys' fees and costs expended in the defense of the Underlying Action, as well as any payments BPM may make to Johnson, if any;

3. Award BPM attorneys' fees, interest and costs; and

4. Award such other relief as the Court deems just.

4

### JURY DEMAND

The defendant/third party plaintiff hereby demands a trial by jury on all issues so triable.

BEVERLY PORT MARINA, INC.,
By its attorneys,

Robert R. Pierce (BBO#549172)
Pierce & Mandell, P.C.
11 Beacon Street, Suite 800
Boston, MA 02108
(617) 720-2444

5

## CERTIFICATE OF SERVICE

I, Robert R. Pierce hereby certify that on this 17th day of September, 2003, I have served the foregoing Defendant Beverly Port Marina, Inc.'s Motion for Leave to File Third-Party Complaint, and proposed Third-Party Complaint, upon the following counsel of record by first class mail, postage prepaid:

William D. Chapman, Esq.
Melick, Porter & Shea, LLP
28 State Street
Boston, MA 02109-1775

Leonard W. Langer, Esq.
Tompkins, Clough Hishon & Langer, PA
Three Canal Plaza
PO Box 15060
Portland, ME 04112-5060

David S. Smith, Esq.
Cianciulli & Ouellette
163 Cabot Street
Beverly, MA 01915

Robert R. Pierce

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EXHIBIT

tabbies®    H
_____

* * * * * * * * * * * * * *

|  |  |
|---|---|
| ACADIA INSURANCE COMPANY, Plaintiff, | Civil Action No.: 02-CV-10153-WGY |

ACADIA INSURANCE COMPANY,
  Plaintiff,

vs.

BEVERLY PORT MARINA, INC.,
  Defendant

and

CARLOS JOHNSON,

  Defendant and Third-party

  Plaintiff,

vs.

LESLIE S. RAY INSURANCE
AGENCY, INC.,

  Third-party Defendant.

Civil Action No.:
02-CV-10153-WGY

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

* * * * * * * * * * * * * *

**JOINT MOTION BY BEVERLY PORT MARINA, INC. and
LESLIE S. RAY INSURANCE AGENCY, INC.,
TO AMEND PLEADINGS TO ASSERT CLAIMS AGAINST
ACADIA INSURANCE COMPANY**

NOW COMES the Defendant/Third-Party Plaintiff, Beverly Port Marina, Inc. ("Beverly

Port") and the Third-Party Defendant, Leslie S. Ray Insurance Agency, Inc. ("LRIA")

("Defendants" collectively), and respectfully move this Honorable Court to grant leave pursuant

to Fed. R. Civ. P. 15(a) to amend the Defendants' respective pleadings to assert claims[1] against the Plaintiff, Acadia Insurance Company ("Acadia").

As grounds for this motion, the Defendants state that the proposed amendment of the Defendants' pleadings serves the interests of justice insofar as Acadia has, to date, wrongfully avoided its responsibilities as a liability insurer pursuant to a policy of liability insurance it issued, relative to a significant paraplegia claim asserted by the underlying claimant, Carlos Johnson. Acadia's wrongful avoidance was ostensibly supported by this court's allowance of summary judgment in Acadia's favor on certain narrow issues, in July 2003, prior to the involvement in the case by Acadia's agent, the third party defendant Leslie Ray Insurance Agency, Inc. After this court's narrow ruling, the parties (including Acadia, notwithstanding the allowance of its summary judgment motion) engaged in significant discovery on the insurance issues raised in this matter. This motion and the instant proposed amended pleadings by the defendants arise from that discovery. The settlement of the Johnson claims was reached after Acadia was placed on notice of the proposed new claims by BPM and LRIA against it. Acadia wrongfully refused to participate in such settlement, notwithstanding the proposed new claims. As a result, the defendants were compelled to settle the Johnson claim on their own, in March, 2004. Between the amount of the underlying settlement and the legal fees and costs, the amount now sought from Acadia is in the range of One Million Dollars ($1,000,000).

The defendants now seek to recover their significant loss and legal payments from Acadia, by virtue of these proposed new claims. The allowance of this motion will therefore (a) foster the full adjudication of the rights of the parties, (b) prevent Acadia from avoiding its

---

[1] In the case of Beverly Port Marina, the proposed amended claim is a counterclaim acquired after pleading under Fed. Rule Civ. P. 13(e). In the case of Leslie Ray, the proposed amended claim is a cross claim against a co-party under Rule 13(g).

liability for the Johnson claim and thereby reaping a significant unjust windfall, (c) result in no

unfair prejudice to Acadia, insofar as Acadia was afforded notice of the settlement and proposed

claims on multiple occasions both before and after the underlying settlement was reached but

declined to participate, and (d) will prevent severe injustice to Beverly Port and Leslie Ray.

The defendants attach and incorporate herein their joint memorandum of law, Affidavit

of William D. Chapman in support, as well as the proposed new amended claims against Acadia.

BEVERLY PORT MARINA, INC., and
LESLIE RAY INSURANCE AGENCY, INC.;
By their attorneys:


/s/ William D. Chapman
William D. Chapman, BBO# 551261
Stephen D. Eldridge, BBO# 651855
Melick, Porter & Shea, LLP
28 State Street
Boston MA 02109
(617) 523-6200

CERTIFICATE OF SERVICE: I hereby certify that the foregoing was served on counsel of record for Acadia, the
sole remaining party in interest in this case, on this date: 2/04/05

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **EXHIBIT** | | |
| **I** | | |

ACADIA INSURANCE COMPANY,   )
     Plaintiff,                      )
                                   )
v.                                    )
                                   )
BEVERLY PORT MARINA, INC.,     )
     Defendant,               )
and                                 )
                                   )
CARLOS JOHNSON,              )
     Defendant and Third-Party    )
     Plaintiff,                )

CIVIL ACTION
NO.: 02-CV-10153-WGY

v.                                    )

LESLIE S. RAY INSURANCE
AGENCY, INC.,                     )
     Third-Party Defendant.     )

## PLAINTIFF'S OPPOSITION TO JOINT MOTION BY BEVERLY PORT MARINA, INC. AND LESLIE S. RAY INSURANCE AGENCY, INC. TO AMEND PLEADINGS, WITH INCORPORATED MEMORANDUM OF LAW

NOW COMES Plaintiff, Acadia Insurance Company, by and through its counsel, Tompkins, Clough, Hirshon & Langer, P.A., and pursuant to Local Rule 7.1(B)(2), Rules of the United States District Court for the District of Massachusetts, opposes the Joint Motion by Beverly Port Marina, Inc. and Leslie S. Ray Insurance Agency, Inc. to Amend Pleadings to Assert Claims Against Acadia Insurance Company, on the following grounds:

### BACKGROUND

It is undisputed that at least since 1996, Third-Party Defendant Leslie S. Ray Insurance Agency, Inc. ("Ray") acted as the insurance agent for Defendant Beverly Port

Marina, Inc. ("BPM"), procuring insurance coverage from a number of different carriers

for BPM's marina and boat sale business. In May, 2000, Ray procured from Plaintiff a

series of insurance policies issued to BPM and renewed the following year for the period

from May 22, 2001 to May 22, 2002 (collectively, the "Policy").

On October 1, 2001, Defendant Carlos Johnson ("Johnson") was injured while

operating a boat owned by BPM. On October 19, 2001, Plaintiff advised BPM that there

was no coverage for Johnson's claim under the Policy. On October 31, 2001, Johnson

sued BPM in state court. Under a reservation of rights, Plaintiff undertook BPM's

defense until such time as it could obtain a judicial ruling confirming that there indeed

was no coverage for Johnson's claim.

In January 2002, Plaintiff commenced this declaratory judgment action to

determine whether it had any duty to defend or indemnify BPM under its policy with

respect to Johnson's lawsuit. Defendants each filed an Answer, and BPM asserted a two-

count counterclaim, served on March 27, 2002, asserting theories of breach of contract

and violation of Chapters 93A and 176D of the Massachusetts General Laws. BPM filed

an Amended Answer and Counterclaim in July 2002.

On September 17, 2002, Plaintiff moved for summary judgment on all claims and

counterclaims. On April 25, 2003, after that motion and cross-motions for summary

judgment had been extensively briefed and argued, Johnson moved to implead Ray,

primarily on the theory that Ray had negligently failed to procure appropriate liability

coverage for BPM or negligently advised BPM concerning such coverage. Plaintiff

opposed the motion, as did Ray, which argued that the motion came too late, pointing out

that the case was in "the closing stages of the litigation" and that the "parties will have to 'start over' from a discovery perspective."

On May 13, 2003, the Court granted the motion over the objections.[1] Then, by decision dated July 25, 2003, the Court granted Plaintiff's Motion for Summary Judgment in its entirety.

On August 25, 2003, Plaintiff filed a Request for Entry of Judgment Pursuant to Rule 54(b), F.R. Civ. P., there being no claims pending by or against Plaintiff. BPM objected, on the grounds that it was still litigating Johnson's state court claims, that it would be prejudiced if it had to defend such claims and prosecute an appeal at the same time, and that if such claims were resolved, "the appeal likely would be rendered moot." On September 12, 2003, the Court denied the Request for Entry of Final Judgment *until such time as the entire case could be resolved.*

On September 12, 2003, Ray served its Answer to Johnson's Third-Party Complaint. Ray asserted no claim against Plaintiff at that time. On September 17, 2003, BPM sought leave (which was granted) to file its own third-party complaint against Ray. BPM did not assert any new claim against Plaintiff. On December 11, 2003, Ray answered BPM's Third-Party Complaint. Again, no claim was asserted against Plaintiff.

All the while, both before and after the Court's summary judgment order, the parties engaged in extensive discovery. BPM and Ray correctly note that after Plaintiff obtained summary judgment, its counsel attended many (though not all) of the numerous depositions that were taken. Plaintiff did not examine any of the deponents and simply observed the proceedings as a precautionary measure. There were no claims for Plaintiff

---

[1] It appears from the docket entries that the Court granted Johnson's motion without the benefit of Ray's opposing memorandum, which was filed on the date of the Court's order but not entered until May 15, 2003.

to defend against. Nevertheless, Plaintiff deemed it prudent to be present, in the unlikely event that anything occurred that might conceivably prejudice its interests. Discovery ended in December, 2003.

It is also true, as BPM and Ray note, that Plaintiff did not participate in settlement discussions. Plaintiff made it clear to both BPM and Ray that it had no stake in such negotiations, as there were no claims pending against it. BPM and Ray still made no effort to assert any new claims against Plaintiff. Instead, Plaintiff is advised that the third-party claims of both Johnson and BPM against Ray were settled in March, 2004. The underlying state-court action between Johnson and BPM was likewise settled at that time, as was the related federal-court limitation-of-liability action. Remarkably, however, the Court was never apprised of this settlement, and the settling parties neglected to file a stipulation of dismissal, though they had a manifest obligation to do so. *See* Local Rule 68.2. On or about September 17, 2004, counsel for Defendant Johnson circulated a stipulation of dismissal, yet BPM and Ray appear to have ignored the request to sign and file it.

Now, nearly a year after all claims had been resolved and should have been dismissed, BPM and Ray seek for the first time to amend their pleadings so as to add new claims against Plaintiff. Tellingly, they are now jointly represented by the same counsel. Plaintiff has filed a motion to dismiss the remaining claims, which have been settled, and for the entry of final judgment, in accordance with the Court's Order of September 12, 2003.

4

**ARGUMENT**

I.    **Leave should be denied due to inexcusable delay.**

Absent from the Joint Motion is any attempt to explain or justify the Movants'
egregious delay in seeking to assert their new claims. BPM and Ray waited two-and-a-
half years after Plaintiff requested summary judgment, nearly two years after claims were
first asserted against Ray in this action, nineteen months after all claims involving
Plaintiff were resolved in its favor by summary judgment, fourteen months after the
completion of discovery, and almost a full year after all remaining claims had been
settled. If Ray had any valid claim against Acadia, Ray certainly should have been aware
of them as soon as it was sued and it was faced with allegations that it failed to procure
from Acadia the necessary coverage requested by BPM.

As for BPM, in the course of the summary judgment proceedings, it filed an
affidavit of its president, Suzanne G. Kinzie, dated October 25, 2002, claiming that she
had explained the marina's relevant operations and practices to Ray's executive vice
president, David Ray, who then advised that he was able to bind coverage to protect BPM
from potential risks of liability. In its Supplemental Memorandum of December 20,
2002, BPM argued that before Plaintiff's policies were issued, "the plaintiff was fully
aware that vessel demonstrations, testing and delivery were part of the overall operations
of the assured marina"; that "the plaintiff was aware that vessel demonstrations were
performed in the ordinary course of [BPM's] business"; that BPM advised Ray of its
business risks, including vessel demonstrations and testing; that Ray acted as Plaintiff's
representative; that David Ray represented to BPM that he could bind coverage and
protect BPM from the risks associated with its business; and that Plaintiff should be held

responsible for its agent's actions.  On December 20, 2002, Johnson likewise argued (unavailingly) that BPM had disclosed on its insurance application that boats were demonstrated with customers on board, and that "Acadia clearly new [sic] prior to issuing the subject [policy] that BPM was in the business of selling boats to prospective buyers. ... And it was the intent of Acadia to issue complete coverage."  Hence, the theories underlying the Movants' proposed claims were articulated at least as early as December 2002; yet BPM and Ray waited another twenty-six months before attempting to bring those claims.

Notwithstanding the general rule that leave to amend the pleadings is to be freely given "when justice so requires," *see* F.R Civ. P. 15(a), leave may be denied by reason of "undue delay" in filing the motion. *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 227, 9 L. Ed. 2d 222 (1962); *Invest Almaz v. Temple-Inland Forest Products Corp.*, 243 F.3d 57, 71 (1st Cir. 2001).  It is well established that "in keeping with the purpose of Rule 15(a), ... a motion to amend should be made as soon as the necessity for altering the pleading becomes apparent.  A party who delays in seeking an amendment is acting contrary to the spirit of the rule and runs the risk of the court denying permission because of the passage of time."  6 Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* §1488 at 659 (1990).

Though it is sometimes said that "mere delay" is not a sufficient basis for denying leave to amend, this cliché must be rejected as "contrary to Supreme Court and circuit precedent holding that, especially where allowing the amendment will cause further delay in the proceedings, 'undue delay' in seeking the amendment may be a sufficient basis for denying leave to amend." *Larocca v. Borden, Inc.*, 276 F.3d 22, 32 (1st Cir. 2002);

*Acosta-Mestre v. Hilton Int'l of Puerto Rico, Inc.*, 156 F.3d 49, 52 (1st Cir. 1998). Thus, delay alone has frequently constituted the basis for denying a motion to amend. *See, e.g., Acosta-Mestre*, 156 F.3d at 52 (fifteen-month delay); *Grant v. News Group Boston, Inc.*, 55 F.3d 1, 5 (1st Cir. 1995) (fourteen-month delay); *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 933 (1st Cir. 1983) (seventeen-month delay); *see also Hayes v. New England Millwork Distributors, Inc.*, 602 F.2d 15, 19 (1st Cir. 1979) ("It is clear that 'undue delay' can be a basis for denial.").

"As a case progresses, and the issues are joined, the burden on a [party] seeking to amend ... becomes more exacting." *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004). Regardless of the context, the longer a party delays, "the more likely the motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend." *Id.*

The concern regarding undue delay is heightened where a litigant proposes to add entirely new claims or parties. This Court requires that "[a]mendments adding parties shall be sought as soon as an attorney reasonably can be expected to have become aware of the identity of the proposed new party." *See* Local Rule 15.1. As a practical matter, Plaintiff was taken out of this case on July 25, 2003, when the Court disposed of all claims involving Plaintiff. Hence, for purposes of the Local Rule, BPM and Ray are seeking to add a "new" party in an untimely manner. Noncompliance with the local rule justifies denial of leave to amend. *See Data General Corp. v. Gruman Systems Support Corp.*, 825 F. Supp. 340, 345 (D. Mass. 1993).

7

Furthermore, "when considerable time has elapsed between the filing of the complaint and the motion to amend, the movant has the burden of showing some valid reason for his neglect and delay." *Invest Almaz*, 243 F.3d at 71; *Acosta-Mestre*, 156 F.3d at 52. "Where the motion to amend is filed after the opposing party has timely moved for summary judgment, a [party] is required to show 'substantial and convincing evidence' to justify a belated attempt to amend a [pleading]." *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 2005 U.S. App. LEXIS 2912, *32 (1st Cir. Feb. 18, 2005); *Steir*, 383 F.3d at 12, quoting *Resolution Trust Crop. v. Gold*, 30 F.3d 251, 253 (1st Cir. 1994). *A fortiori*, a party has a heavy burden of justification when a motion for summary judgment has not only been filed, but has also been granted. *See Fraser v. Major League Soccer, LLC.*, 284 F.3d 47, 60 (1st Cir. 2002); *see also Larocca*, 276 F.3d at 32 (trial court properly denied motion to amend after court "had issued an all-but-dispositive ruling on cross-motions for summary judgment"). Leave to amend will rarely be granted in such circumstances because "[m]uch of the value of a summary judgment motion is lost if parties are allowed to test one theory at a time by obtaining consecutive leaves to amend." 3 *Moore's Federal Practice* ¶15.12[3] at 15-22 (3d ed. 2004).

BPM and Ray have utterly failed to justify their inordinate delay in seeking leave to assert new claims against Plaintiff at this late date. For this reason alone, their Motion to Amend should be denied.

## II.   Leave should be denied due to unfair prejudice.

Apart from undue delay, undue prejudice to the opposing party is an independent ground for denying leave to amend. *See Foman*, 371 U.S. at 182; *Invest Almaz*, 243 F.3d

8

at 71. "Particularly disfavored are motions to amend whose timing prejudices the opposing party by 'requiring a re-opening of discovery with additional costs, a significant postponement of the trial, and a likely major alteration in trial tactics and strategy ... .'" *Steir*, 383 F.3d at 12, quoting *Acosta-Mestre*, 156 F.3d at 52; *see also* 3 *Moore's Federal Practice*, §15.15[2] ("Prejudice is especially likely to exist if the amendment involves new theories of recovery or would require additional discovery.").

If the Joint Motion to Amend is granted, discovery, which was completed more than fourteen months ago, would have to be re-commenced and recapitulated. Because the Movants' proposed claims raise new questions as to what information was communicated directly between BPM and Plaintiff and between Ray and Plaintiff, the same witnesses whose lengthy depositions have already been taken – including BPM's principals, Frank and Suzanne Kinzie; Ray's executive vice president, David Ray; and former Ray employees who worked on the BPM account – would all have to be re-deposed. Additionally, the parties would have to retain, disclose, and depose expert witnesses with respect to whether Plaintiff violated any applicable standard of care. All of this obviously would further protract this drawn-out litigation.

As Ray argued in May 2003, such considerations demonstrate unfair prejudice and strongly militate against allowing additional claims. Since the time Ray pressed this argument, the scope of this litigation was twice expanded, the great bulk of the discovery in this litigation took place, all of the depositions were taken, discovery was completed, and all claims involving Plaintiff were resolved. Hence, the unfair prejudice that would result now is far more compelling than in May 2003.

Secondly, several of Plaintiff's employees who were involved with the BPM

Policy no longer work for Plaintiff. Had the proposed claims been timely raised in 2002,

or even in 2003, it would have been far easier for Plaintiff to assemble its witnesses and

prepare its defense.

Even more significantly, allowance of the proposed claims would defeat the very

purpose of this lawsuit, which Plaintiff brought in order to ensure that it could refuse to

defend and indemnify BPM without incurring liability therefor. Plaintiff was willing to

undertake BPM's defense, under a reservation of rights, until this Court ruled

dispositively that there was no coverage for Johnson's underlying lawsuit and that

Plaintiff was entitled to judgment on all pending claims against it. Acting in reasonable

reliance on the Court's summary judgment decision, Plaintiff terminated its defense of

BPM and put the marina on notice that thenceforth BPM would have to pay its own

litigation costs. Plaintiff also reasonably declined to participate in the settlement of

Johnson's claims, there being no pending causes of action for which Plaintiff had

exposure. (Though Ray claims it threatened Plaintiff with litigation in February 2004,

there is a world of difference between threatened litigation – especially after the Movants

had sat on their hands for two years – and pending claims.) Now, incredibly, nearly a

year after BPM and Ray chose to settle Johnson's claims and nineteen months after it was

determined that Plaintiff had no settlement obligation, BPM and Ray seek to assert new

theories for holding Plaintiff responsible for that settlement.

In the posture of this case, it would be highly prejudicial to allow Plaintiff to be

confronted with such new theories at this late date. Rule 15(a) "does not excuse a lack of

diligence that imposes additional and unwarranted burdens on an opponent and the

Court." *Acosta-Mestre*, 156 F.3d at 53; *see Data General*, 825 F. Supp. at 345.

### III.    Leave should be denied due to futility.

"Where an amendment would be futile or would serve no legitimate purpose, the

district court should not needlessly prolong matters." *Correa-Martinez v. Arrillaga-*

*Belendez*, 903 F.2d 49, 59 (1st Cir. 1990), citing *Foman*, 371 U.S. at 182. "Futility," in

the present context, means more than simply that the amendment would not survive a

Rule 12(b)(6) motion.  When leave to amend is not sought until after discovery has

closed and a summary judgment motion has been filed, "the proposed amendment must

be not only theoretically viable but also solidly grounded in the record." *Gonzalez-Perez*

*v. Hospital Intermericano de Medicina Avanzada (HIMA)*, 355 F.3d 1, 5 (1st Cir. 2004);

*Watson v. Deaconess Waltham Hospital*, 298 F.3d 102, 109 (1st Cir. 2002).  "In that type

of situation, an amendment is properly classified as futile unless the allegations of the

proposed amended complaint are supported by substantial evidence." *Hatch v.*

*Department for Children, Youth & Their Families*, 274 F.3d 12, 19 (1st Cir. 2001); *see*

*Resolution Trust Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir. 1994).

The Movants have failed to proffer substantial evidence (or, indeed, any evidence

at all) to support their new claims.  In any event, their claims are unavailing on their face.

The first count of Ray's proposed cross-claim is for breach of contract.  However,

the indemnification provision on which Ray relies clearly applies only to derivative

11

claims based solely on Plaintiff's fault.[2]  All of the claims asserted against Ray by both

BPM and Johnson are predicated solely on Ray's own alleged misconduct, either in

failing to procure the requested coverage or in misrepresenting the scope of that

coverage.  Hence, the Agency Agreement unambiguously precludes indemnification in

this instance. *See Art Goebel, Inc. v. North Suburban Agencies, Inc.*, 567 N.W.2d 511

(Minn. 1997) (identical clause unambiguously required both that the insurer's acts or

omissions caused the damages and that the agent did not cause or contribute to the

damages by its own acts or omissions).

Apparently recognizing the weakness of its contract claim, Ray further alleges

breach of an implied covenant of good faith and fair dealing (Count III).  However, in an

agency agreement, terms will not be read into a contract so as to permit the insurance

agent to recover damages for breach of such implied terms.  4 *Couch on Insurance 3d*

§5:61 (1997).

Ray's remaining claims are premised on the notion that an underwriter somehow

owes a duty to its agent to make sure that an insurance policy fully covers the customer's

needs.  Ray cites no authority for this novel proposition, which would turn the usual

allocation of responsibilities between the underwriter and the agent on its head.  David

Ray has testified that there was never a discussion of the specific liabilities associated

with BPM's customers' test-driving or moving boats (Deposition of David Ray at 151).

He also testified that after Johnson's accident, he checked not only with Plaintiff, but also

with other marine insurers as well and learned that no liability coverage for "test-driving"

---

[2] The Agency Agreement provides that Plaintiff "shall defend and indemnify the Agent against liability ...
imposed on it by law for damages caused by acts or omissions of the Company, provided the Agent has not
caused or contributed to such liability by its own acts or omissions."

boats was available (*id.* at 136-37). Under these circumstances, it is difficult to see how Plaintiff could be liable for failing to provide nonexistent coverage for an unknown risk.

Moreover, to allow Ray's noncontractual claims would permit Ray to circumvent the terms of the Agency Agreement. The indemnification clause clearly specifies the *only* circumstances whereby Plaintiff would be responsible for indemnifying Ray due to an insured's claim. *See Art Goebel*, 567 N.W.2d at 516. This precludes noncontractual theories of liability. *Id.*

The claims of BPM are even more tenuous. BPM first claims to be a third-party beneficiary of the Agency Agreement between Ray and Plaintiff; but to recover as a third-party beneficiary, BPM must show that Plaintiff and Ray "clearly and definitely" intended BPM to benefit from their agreement. *See, e.g. Rymes Heating Oils, Inc. v. Springfield Terminal Railway, Inc.*, 265 F. Supp. 2d 147, 151 (D. Mass. 2003); *Miller v. Mooney*, 431 Mass. 57, 725 N.E.2d 545, 550 (2000); *Anderson v. Fox Hill Village Homeowners Corp.*, 424 Mass. 365, 676 N.E.2d 821, 822 (1997). Nothing in the language of the Agency Agreement indicates that BPM was meant to be a third-party beneficiary. *See Mass. Eye & Ear Infirmary*, 2005 U.S. App. LEXIS 2912 at *26.

BPM's remaining claims appear remarkably similar to the allegations BPM asserted unsuccessfully in 2002. Then, as now, BPM claimed that it had disclosed its "test-driving" practices in connection with the risks for which it required coverage; that Plaintiff was aware of these practices; that the extent of the coverage furnished by Plaintiff was misrepresented; and that Plaintiff committed unfair and deceptive trade practices, in violation of Chapter 93A. In order to differentiate its proposed claims from the claims on which summary judgment has been entered against BPM, BPM must limit

the proposed claims to Plaintiff's acts in initially furnishing coverage in the spring of

2000, as opposed to the denial of coverage in 2001. Yet, because such claims necessarily

arise from a different set of events, they cannot "relate back" to BPM's initial

Counterclaim. *See generally* 6A Wright, Miller & Kane, *supra*, §1497. BPM's tort

claims are thus barred by the three-year statute of limitations, and the Chapter 93A claim

is barred by the four-year statute of limitations. *See John Beaudette, Inc. v. Sentry

Insurance*, 94 F. Supp. 2d 77, 97, 100 (D. Mass. 1999); G.L. ch. 260, §§ 2A, 5A.[3]

Furthermore, particularly where an insured has had ample opportunity to review

the policy, the carrier's liability *vel non* should be based on the terms of the policy, not on

hypothetical coverage which, in 20-20 hindsight, the insured would like to have had. *Cf.

Oksa v. American Employer's Insurance Co.*, 218 F.2d 585 (2d Cir. 1955) (where insured

sued insurer, under theories of breach of contract, negligence and fraud, for failing to

increase limits of liability so as to conform with financial responsibility statute, it was

"beyond comprehension" how the insured "could have hoped to succeed"). BPM

accepted and paid for the policy, the terms of which were found by this Court to be

unambiguous. As Plaintiff has previously demonstrated (*see* Affidavit of Theodore G.

Wirth, dated December 13, 2002), Plaintiff specifically relied on BPM's representation

that only three persons, all with "good experience," would operate the marina's vessels,

and never would have agreed to cover the risk of a customer of the boat dealer injuring

himself while personally operating one of the vessels.

For all of these reasons, the proposed amendments are futile.

---

[3] Ray's tort and Chapter 93A claims may likewise be barred for the same reason.

**CONCLUSION**

No fewer than three independent grounds exist for denying the Joint Motion:

undue delay, unfair prejudice, and futility.  Any one of these would be sufficient to deny

leave to amend; but their cumulative effect is overwhelming.  Consequently, the Court

should deny leave to BPM and Ray to amend the pleadings to assert claims against

Plaintiff.

Dated at Portland, Maine this 22nd day of February, 2005.

ACADIA INSURANCE COMPANY

By its Counsel:

/s/   Leonard W. Langer

/s/   Marshall J. Tinkle
BBO# 565513

TOMPKINS, CLOUGH, HIRSHON & LANGER, P.A.
Three Canal Plaza
P. O. Box 15060
Portland, ME  04112-5060
(207) 874-6700

## CERTIFICATE OF SERVICE

I, Leonard W. Langer, hereby certify that on February 22, 2005, I electronically filed the within document with the Clerk of the Court using the CM/ECF system which will send a notification of such filing(s) to the following:  Robert R. Pierce, Esq., Pierce & Mandell, P.C., 11 Beacon Street, Suite 800, Boston, MA 02108, counsel for Beverly Port Marina, Inc.; to David S. Smith, Esq., Cianciulli & Ouellette, 163 Cabot Street, Beverly, MA 01915, counsel for Carlos Johnson; and to William D. Chapman, Esq., Melick, Porter & Shea, LLP, 28 State Street, Boston, MA  02109 counsel for Leslie S. Ray Insurance Agency.

/s/   Leonard W. Langer_____

Pl's Oppos. to Joint Motion to Amend Pleadings 2.22.05

1

1                                          Volume: I
                                        Pages: 1-181
2                                          Exhibits: 1-13

3                 UNITED STATES DISTRICT COURT

4                 DISTRICT OF MASSACHUSETTS

5        _____

6    ACADIA INSURANCE COMPANY,
                         Plaintiff
7
              vs.                        Docket No.
8                                        CA 02-CV-10153
     BEVERLY PORT MARINA, INC. AND
9    CARLOS JOHNSON,
     Defendants/Third-Party
10   Plaintiffs

11            vs.

12   LESLIE S. RAY INSURANCE AGENCY,
     INC.,
13        Third-Party Defendant
     _____
14

15

16            DEPOSITION of DAVID L. RAY, a
     witness called by and on behalf of the
17   Defendant/Third Party Plaintiff Beverly Port Marina,
     Inc., taken pursuant to the Federal Rules of Civil
18   Procedure, before Heidi B. Stutz, Certified
     Shorthand Reporter No. 146599S and Notary Public in
19   and for the Commonwealth of Massachusetts, at the
     offices of Cianciulli & Ouellette, 163 Cabot Street,
20   Beverly, Massachusetts, on Thursday, December 4,
     2003, commencing at 10:05 a.m.
21

22               Hennessey Corp., d/b/a

23            Robert H. Lange Company
                 50 Congress Street
24             Boston, Massachusetts 02109
     617-523-1874 °°° 800-645-6807 °°° Fax 617-523-7343

1      Q.   I didn't see an e-mail to him, although I

2    may have missed it.  Do you remember whether there

3    was a written communication to him to which the

4    bottom half of Exhibit 4 is a response?

5      A.   I believe there was a telephone

6    conversation to Ted Wirth.

7      Q.   I see.  And then he responded with this?

8      A.   Right.

9      Q.   Basically telling you that -- the upshot

10   of all this, if I may paraphrase, is that Beverly

11   Port Marina wanted to get coverage for customers who

12   wanted to try out boats and Acadia, through Wirth,

13   basically said they don't offer that type of

14   coverage because they essentially don't have the

15   opportunity to do an underwriting investigation of

16   every potential customer, is that a fair

17   characterization?

18               MR. CHAPMAN:  Objection.  Go ahead.

19     A.   Yes.

20     Q.   Now, who else did you go to to see if this

21   type of coverage could be available?

22     A.   I went to Commercial Union.

23     Q.   Who did you speak to there?

24     A.   Meredith Atwood.  I went to Hanover, and

137

1    spoke with a gentleman named Al Chicoyne (phonetic),

2    and then I noted in the file that we also, that I

3    also contacted a specialty agency that I referred to

4    earlier down in Florida, but I think this was later

5    on, I believe it was later on, and inquired of them

6    if they offered that coverage.

7         Q.    Was the response from Commercial Union and

8    Hanover the same?

9         A.    Virtually the same, yes, that there would

10   be no coverage and that it was unavailable.

11        Q.    And with Hanover and Commercial Union, was

12   that just one phone call apiece?

13        A.    One or two.  It was quick.

14        Q.    Did you report back the results of your

15   research?

16        A.    Yes, I did.

17        Q.    And other than contacting the three

18   carriers, Acadia, Hanover and Commercial Union, and

19   the agency in Florida, was there anything else you

20   did to see if there was coverage for potential

21   customers test-driving boats,

22        A.    No.

23                MR. PIERCE:    Let's get this next one

24   marked, please.

1      A.    The sentence "At no time prior to the date

2    of Mr. Johnson's injury on October 1st, 2002 was

3    there ever a discussion of the specific liabilities

4    associated with Beverly's customers test-driving or

5    moving boats" is accurate.

6      Q.    Before we go any further, it says, "At no

7    time....was there a discussion of the specific

8    liabilities associated with customers test-driving."

9    Was there a general discussion of that?

10      A.    No.

11      Q.    Go on.

12      A.    That last sentence in paragraph 4 would be

13    accurate.

14      Q.    Let me stop you there.  You're saying that

15    the sentence that says, "Rather, during my

16    discussions with Ms. Kinzie regarding boat dealers

17    insurance she represented to me that the only

18    operators of Beverly's boats would be two or three

19    employees with good experience and that the vast

20    majority of such operation would be inside the

21    harbor."  You say that that sentence is accurate?

22      A.    You know, to be fair, not entirely.

23      Q.    What's not accurate about it?

24      A.    On the application that we reviewed a

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \*

Civil Action No.:
02-CV-10153-WGY

ACADIA INSURANCE COMPANY,
  Plaintiff,

vs.

BEVERLY PORT MARINA, INC.,
  Defendant

and

CARLOS JOHNSON,

  Defendant and Third-party

  Plaintiff,

vs.

LESLIE S. RAY INSURANCE
AGENCY, INC.,

  Third-party Defendant.

\* \* \* \* \* \* \* \* \* \* \* \*



**EXHIBIT**

J

## SUPPLEMENTAL AFFIDAVIT OF WILLIAM D. CHAPMAN IN SUPPORT OF MOTION TO AMEND

I, William D. Chapman, hereby state under oath and based on my own personal knowledge that:

1.     Attached hereto are true and accurate copies of letters and enclosures I sent to Acadia's counsel Leonard Langer on February 11, 2004, and March 3, 2004, respectively, with regard to the proposed amended claims against Acadia, as well as Attorney Langer's letter of February 23, 2004 to me.

2.      As reflected in my letter of February 11, 2004, it was not until January, 2004, that evidence surfaced in this case that insurance coverage is and was available in the insurance industry to cover claims like the one made by Mr. Johnson.   Until that time, Ray had been defending the case in part on causation, on the basis that such coverage was unavailable in the insurance industry based on what Ray had been led to believe by Acadia.  It was at that time that Acadia's representations concerning the availability of such coverage became of key significance.

3.      In response to the arguments raised by Acadia in its opposition to the motions to amend, I believe it is important to consider the following facts:

   a.      The amendment by which Leslie Ray was brought into this case was allowed 19 months after the original suit was filed, 19 months after Acadia's denial of coverage which formed the basis of the claims against Ray, as well as many months after both discovery and summary judgment motions were argued without Ray's participation or involvement.

   b.      On the other hand, the proposed amendment against Acadia would assert claims against Acadia only 4 months after the settlement of the claims between Beverly Port Marina and Leslie Ray, 10 months after the settlement with Johnson, 12 months after Acadia refused to acknowledge the new evidence or participate in the settlement with Johnson, and 13 months after the discovery of the new evidence in support of the claims.

SIGNED UNDER PENALTIES OF PERJURY.


Date:   3/23/05             /s/ William D. Chapman
                            William D. Chapman

# MELICK, PORTER & SHEA, LLP

Counsellors at Law

28 State Street
Boston, Massachusetts 02109-1775
(617) 523-6200
Fax (617) 523-8130
www.melicklaw.com

<div style="float:left">

Richard J. Shea
Robert P. Powers
John F. Rooney, III *(DC & NH)
William D. Chapman
Michael J. Mazurczak *(WI)
Robert T. Treat
William L. Keville, Jr.
Michael R. Byrne
Andre A. Sansoucy
Amy E. Goganian
Keith L. Sachs
Robert W. Healy
Allen J. McCarthy
Carly K. Wee *(NY)
Angela L. Lackard
Maureen E. Lane *(NH)
Nancy J. Puleo *(CT)
Christine C. Heshion
Adam M. Guttin *(RI)
T. Dos Urbanski *(RI)
Megan E. Kures
Jill M. Brannelly
Brian J. Cann *(CA)
John B. DeWick
Heather M. Spellman *(CT & RI)
Matthew Grygorcewicz
Margaret M. Carleen

Of Counsel
Thomas W. Porter, Jr.

*so Admitted

</div>

Two Richmond Square - Suite 104
Providence, Rhode Island   02906
(401) 941-0909
Fax (401) 941-6269

65 Main Street
Plymouth, Massachusetts   02360
(508) 746-5976

February 11, 2004

<u>Via Telecopier: (207) 874-6705</u>

Leonard W. Langer
Tompkins, Clough, Hirshon & Langer, PA
Three Canal Plaza
P.O. Box 15060
Portland, ME 04112-5060

Re:   *Acadia Insurance Company v. Beverly Port Marina, Inc. and*
*Carols Johnson v. Leslie S. Ray Insurance Agency, Inc.*
<u>Civil Action No.: 02 CV 10153 WGY</u>

Dear Mr. Langer:

As you know, I represent Acadia's agent, Leslie Ray Insurance Agency, Inc. ("Ray"). The parties in these three cases will proceed with a court-sponsored mediation before Judge Mazzone on Tuesday, February 17, in Boston.

As you may also be aware, Ray recently received a demand from Acadia's insured, Beverly Port Marina, Inc., to indemnify and defend it in the underlying litigation. This demand is based on Beverly Port's contention that Ray knew or should have known that Beverly Port had liability exposure arising out of third party operation of its boats, and should have obtained coverage for that exposure. Beverly Port further contends that such coverage was readily available, and has produced policy forms from CNA and New Hampshire Insurance Company which it contends prove this point.

As you know, David Ray testified that based on what he was told by Acadia, he believed that coverage for a claim like Johnson's was "unavailable". As you further know, after the loss, Acadia drafted two

MELICK, PORTER & SHEA, LLP

February 11, 2004
Page 2.

affidavits which it asked David Ray to sign, in which Acadia asserted that such coverage was "unavailable". Additionally, Acadia took the position, in arguing for summary judgment before Judge Young, that the "generally followed underwriting rule in the industry" is that protection and indemnity coverage only extends to the operation of boat dealer's vessels by its employees.

In reviewing the Acadia underwriting file, which was produced to us recently, it is readily apparent that Acadia understood and appreciated Beverly Port's operations, at least as much and apparently more than Ray did. For example, before the loss Acadia knew that Beverly Port's annual boat dealer sales were in the $2,000,000 range. Acadia conducted a Loss Control Survey, through its underwriters Molly Welsh and Grettyl Lewit, which involved among other tasks a direct interview of Frank Kinzie and a survey of the Beverly Port facilities. Acadia specifically recognized that Beverly Port was engaged in the business of boat sales, and that in this regard it would transport its boats by water to boat shows in Boston. In June of 2001, Acadia's marine underwriter Kristine McLaughlin asked Acadia's auditors to "please be sure that the account is classified correctly and is not missing any classifications". She further stated "I just want to be sure that we are picking up all of the correct exposures". Despite these facts, neither the initial Loss Control Survey Report, dated May 10, 2000, or any other underwriting material we have seen, addresses Beverly Port's exposures relative to test drives or third party operation of its boats.

In the wake of receiving Beverly Port's demand, we investigated the availability issue further, and learned that the liability risk associated with third party operation of the insured's boats, and/or test drives, is one which is specifically understood and reflected in the underwriting classification for "Boat Dealers". I have enclosed a copy of the *Best's Underwriting Guide* classification, risk description, and liability overview relative to Boat Dealers. This provides, in part, that:

> Boats are displayed in boat houses, showrooms or open yards and at docks. In-water demonstrations may be provided. ... Displays at boat shows and conventions are a regular part of some dealers' operations.

> The hazards common to any retail operation are present. Additional exposures in some cases are doing business at water's edge and, when demonstrating boats or equipment, taking the customer on water.

> Although the basic policy normally excludes coverage for demonstration of watercraft, this coverage can be added. If it is, *the underwriter should know* whether boats are demonstrated or tested on or away from the premises and whether an employee

MELICK, PORTER & SHEA, LLP

February 11, 2004
Page 3.

experienced in boat control and water safety is present.  ....  Tests and demonstrations present a hazardous potential: ... an individual may fall within the boat or may fall overboard.  All of these possibilities *must be considered*; and it is important to remember that admiralty law differs from ordinary law.

Does the dealer sponsor races? Does the firm participate in boat shows or conventions? The extent of these exposures *should be determined*.  (Emphasis added).

At no time during the two policy periods leading up to Mr. Johnson's accident did Acadia address these underwriting issues in any way.  Acadia owed a duty, to both Ray and to Beverly Port, to exercise reasonable care in its underwriting of the risk.  Acadia breached its duty by not addressing the underwriting issues which generally accepted authorities, such as AM Best's, indicate should be addressed by the insurer in the performance of its underwriting function.  If Acadia had performed its duty, Ray would have in turn addressed the insurance options and issues with Beverly Port, and thereby would have avoided the instant claims against it.  Instead, as a direct consequence of Acadia's breaches, Ray has been sued by Johnson and by Beverly Port, and faces significant potential exposure.

If Beverly Port is correct in its assertions in this case, then Acadia misrepresented to Ray the benefits to Ray's and Acadia's insured, Beverly Port, in switching the marina liability coverages to Acadia from the prior insurer, and the availability of coverage for exposures which Acadia knew Beverly Port had with regard to non-employee operation of its boats. Acadia, as the underwriter of marine, marina, and boat dealer risks, and as an insurer which received greater underwriting information from Beverly Port than Ray did with regard to its boat dealer operations, was certainly in the better position, as compared to Ray, to determine appropriate classifications, understand the scope of available coverages, and then communicate to the insured which coverages it would provide and which it would not.

Further, if Beverly Port is correct in its allegation that Ray failed to obtain coverage for it which was "necessary and available", then that failure is attributable solely to (a) Acadia's misrepresentations of the benefits associated with its marine coverages, (b) Acadia's misrepresentations as to the availability of coverages in the marine insurance industry, (c) Acadia's failure to properly and reasonably underwrite the risk, (d) Acadia's failure to fulfill the duties owed to Ray under the Ray-Acadia agency agreement, (e) Acadia's failure to properly inform Ray of the coverages which it would provide and would not provide, so that Ray could inform Beverly Port, (f) Acadia's failure to properly inform Ray of the availability of coverage in the industry, so that Ray could inform Beverly Port.

MELICK, PORTER & SHEA, LLP

February 11, 2004
Page 4.


The Acadia-Ray Agency Agreement, dated December 23, 1997, requires that Acadia "shall defend and indemnify the Agent against liability, including reasonable cost of defense and settlements, imposed on it by law for damages caused by acts or omissions of the Company, provided that the Agent has not caused or contributed to such liability by its own acts or omissions".   Ray has been sued for not offering or obtaining "necessary and available" coverage for Beverly Port.  If Ray did not offer or obtain such coverage, the sole cause of that was Acadia's failure to properly perform its underwriting function.  The instant claims of Beverly Port against Ray are precisely the sort contemplated by the indemnification provision of the Agency Agreement.

Ray hereby demands that Acadia defend and indemnify it, relative to all claims asserted against it in this matter, by Mr. Johnson and by Beverly Port Marina, Inc., pursuant to Section VII of the Agency Agreement.  If Acadia refuses this demand, Ray will assert claims against Acadia, probably by a separate action, which will include but may not be limited to claims for contractual indemnification and breach of contract.   We are also in the process of retaining expert(s) to testify in support of Ray on its claims against Acadia.

Would you kindly call me to discuss this at your earliest convenience.  I am under the impression that Acadia will be attending the mediation next week.  I would like to confirm this with you.  I would respectfully suggest that it would be appropriate for Acadia to seriously and substantively participate in the mediation.  Such participation *may* be a way for Acadia to resolve Ray's claims against it.  On the other hand, Acadia's failure to participate in the mediation will surely result in claims being asserted against it by Ray.

Very truly yours,



William D. Chapman


enc. (Best's Underwriting Guide - Boat Dealers)

# TOMPKINS, CLOUGH, HIRSHON & LANGER, P.A.

### COUNSELORS AT LAW
Three Canal Plaza
Post Office Box 15060
Portland, Maine  04112-5060

RECEIVED

Lawrence R. Clough
David M. Hirshon
Leonard W. Langer
Marshall J. Tinkle*

Tel (207) 874-6700
Fax (207) 874-6705
E-Mail  lwlanger@tchl.com
*also licensed in MA
and DC

February 23, 2004

**VIA FAX & REGULAR MAIL**
**(617) 523-8130**

William D. Chapman
Melick Porter & Shea LLP
28 State Street
Boston, MA  02109-1775

*resp.*
*3-3-04*
*WDC*

**RE:**   *Acadia Insurance Company v. Beverly Port Marina Inc., et al v. Leslie S. Ray*
         *Insurance Agency, Inc.*
         **Docket No. 02-CV-10153WGY**

Dear Mr. Chapman:

I acknowledge receipt of your letter of February 12, 2004 in the above captioned matter. In your letter you state that "Beverly Port further contends that such coverage was readily available, and has produced policy forms from CNA and New Hampshire Insurance Company which it contends prove this point." Would you please provide me with copies of the forms produced by Beverly Port. If they were marked as exhibits at a deposition, would you please provide me with the name of the deposition and the exhibit number so that I can locate the subject forms.

I would also appreciate your forwarding to me all documents from Acadia Insurance Company's files on which you rely for the allegations contained in your letter.

I look forward to hearing from you with regard to the above.

Sincerely,

TOMPKINS CLOUGH HIRSHON
& LANGER, P.A.

By: _____
        Leonard W. Langer

lwl.02.23.04b.doc

# MELICK, PORTER & SHEA, LLP

Counsellors at Law

28 State Street
Boston, Massachusetts 02109-1775
(617) 523-6200
Fax (617) 523-8130
www.melicklaw.com

Richard J. Shea
Robert P. Powers
John F. Rooney, III *(DC & NH)
William D. Chapman
Michael J. Mazurczak *(WI)
Robert T. Treat
William L. Keville, Jr
Michael R. Byrne
Andre A. Sansoucy
Amy E. Goganian
Keith L. Sachs
Robert W. Healy
Jennifer B. Hardy
Allen J. McCarthy
Carly K. Wee *(NY)
Angela L. Lackard
Maureen E. Lane *(NH)
Nancy J. Puleo *(CT)
Christine C. Heshion
Adam M. Guttin *(RI)
T. Dos Urbanski *(RI)
Megan E. Kures
Jill M. Brannelly
Brian J. Cann *(CA)
John E. DeWick
Heather M. Spellman *(CT & RI)
Matthew Grygorcewicz
Margaret M. Carleen

Of Counsel
Thomas W. Porter, Jr.

*Also Admitted

Two Richmond Square - Suite 104
Providence, Rhode Island  02906
(401) 941-0909
Fax (401) 941-6269

65 Main Street
Plymouth, Massachusetts  02360
(508) 746-5976

March 3, 2004

Leonard W. Langer
Tompkins, Clough, Hirshon & Langer, PA
Three Canal Plaza
P.O. Box 15060
Portland, ME 04112-5060

Re:  *Acadia Insurance Company v. Beverly Port Marina, Inc. and
Carols Johnson v. Leslie S. Ray Insurance Agency, Inc.*
<u>Civil Action No.: 02 CV 10153 WGY</u>

Dear Mr. Langer:

Please allow me to respond to your letter dated February 23, 2004. I have enclosed copies of the policy forms provided by Beverly Port's attorney. The documents from Acadia to which I referred, I believe, are self-explanatory, and are documents I recently obtained from you.

Please be advised that I will shortly be filing a motion in the Federal Court action to amend my client's answer to assert cross claims against Acadia, as outlined in my letter of February 12th. I will, of course, forward a copy of this motion to you when I file it.

Please let me know if you have any questions.

Very truly yours,

William D. Chapman

WDC/rtm
Enclosures (Policy forms)



# WATERCRAFT LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing the insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section F – DEFINITIONS.

## A. COVERAGE

### 1. Insuring Agreement

We will pay those sums which you shall become legally obligated to pay as damage because of "bodily injury" or "property damage" to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided under Additional Coverages

This insurance applies only to "bodily injury" and "property damage" which results because of the operation, maintenance, use or servicing of an "insured boat" while such boat is afloat.

### 2. Additional Coverages

#### a. Supplementary Payments

We will pay, with respect to any claim or "suit" we defend:

**(1)** All expenses we incur;

**(2)** The cost of bonds to release attachments, but only for bond amounts within the applicable Limit of Insurance. We do not have to furnish these bonds;

**(3)** All reasonable expenses you incur at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $100 a day because of time off from work;

**(4)** All cost taxed against you in the "suit";

**(5)** Pre-judgment interest awarded against you on that part of the judgment we pay. If we make an offer to pay the applicable Limit of Insurance, we will not pay any pre-judgment interest based on that period of time after the offer;

**(6)** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court that part of the judgment that is within the applicable Limit of Insurance;

These payments will not reduce the Limits of Insurance.

#### b. Wreck Removal

We will pay the cost of removing the wreck of an "insured boat" when such removal is required by law.

## B. EXCLUSIONS

This insurance does not apply to:

### 1. Contractual

"Bodily injury" or "property damage" assumed under contract or otherwise in extension of the liability imposed upon you by law.

### 2. Owned Property

Physical damage to property owned, leased or used by you.

### 3. Workers' Compensation

Any obligation for which the insured or the insured's insurer may be held liable under any workers compensation, disability benefits or unemployment compensation law or any similar law.

### 4. Employee Indemnification and Employer's Liability

"Bodily injury" to:

**a.** An employee of the insured arising out of and in course of employment by the insured; or

**b.** The spouse, child, parent, brother or sister of that employee as a consequence of paragraph a. above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

### 5. Pollution

**a.** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time;

b.  Any loss, cost or expense arising out of any:

    (1)  Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

    (2)  Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants."

## C.  TERRITORIAL LIMITS

This insurance applies only:

1.  Within the Continental United States of America, the District of Columbia and Canada (excluding Alaska); and

2.  Coastal waters not more than twelve (12) miles from the nearest shoreline and inland waters of the Continental United States, the District of Columbia and Canada (excluding Alaska).

## D.  LIMITS OF INSURANCE

The most we will pay for "loss" in any one "occurrence" is the applicable Limit of Insurance shown in the Boat Dealers Coverage Form Supplemental Schedule.

## E.  DEDUCTIBLE

We will not pay for "loss" in any "occurrence" until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible shown in the Boat Dealers Coverage Form Supplemental Schedule. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

## F.  ADDITIONAL CONDITIONS

The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions:

1.  **Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligation under this Coverage Form.

2.  **Duties in the Event of Occurrence, Claim or Suit**

    a.  You must see to it that we are notified promptly of an "occurrence" which may result in a claim;

    b.  If a claim is made or "suit" is brought against you, you must see to it that we receive prompt written notice of the claim or "suit";

    c.  You and any others involved must:

      (1)  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2)  Authorize us to obtain records and other information;

      (3)  Cooperate with us in the investigation, settlement or defense of the claim or "suit"; and

      (4)  Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of "loss" or damage to which this insurance may also apply;

    d.  No insured will, except at their own cost voluntarily make a payment, assume any obligation, or incur any expense without our consent.

## G.  DEFINITIONS

1.  "Loss" means accidental loss or damage:

2.  "Insured boat" means any boat insured under any of the following Coverage Forms attached to this policy:

    a.  Boat Dealers Coverage Form;

    b.  Marina Operators Coverage Form;

    c.  Work Boat Coverage Form; or

    d.  Rental Boat Coverage Form;

3.  "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed;

4.  "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time;

5.  "Property damage" means:

    a.  Physical injury to tangible property, including all resulting loss of use of that property; or

    b.  Loss of use of tangible property that is not physically injured;

6.  "Suit" means a civil proceeding in which damages because of "bodily injury" or "property damage" to which this insurance applies are alleged. "Suit" includes an arbitration proceeding alleging such damages to which you must submit or submit with our consent;

7.  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions

PROTECTION AND INDEMNITY COVERAGE FORM
YACHT DEALERS — MARINA OPERATIONS
SECTION C

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and what is not covered.

Throughout this policy, the words "you " and "your" refer to the Named Insured shown in the Declaration. The words "we" and "our" refer to the Company providing this insurance. In addition, certain words and phrases are defined in Paragraph 6.

The provisions of the policy to which this form is attached apply to this form also. Where there is a conflict of provisions, the provisions of this form apply.

WARRANTED: NO COVERAGE SHALL APPLY UNDER THIS FORM ON ANY VESSEL FOR WHICH COVERAGE IS NOT PROVIDED UNDER THE PHYSICAL DAMAGE SECTION(S) OF THIS POLICY.

1.    LIABILITY INSURANCE

This coverage form applies only to "bodily injury" or "property damage" which occurs during the policy period and only if involving any "insured vessel", such vessel being held for sale by you or in your care, custody or control but only while such vessel is afloat.

We will pay for all sums which you shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, due to an "occurrence". We shall have the right and duty to defend any suit against you seeking damages on account of such "bodily injury" or "property damage", even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but we shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of our liability has been exhausted by payment of judgment or settlements.

It is agreed that this insurance applies to damages because of "bodily injury" or "property damage" due to an "occurrence" arising out of "Marina Operations" or "Yacht Dealer Operations" subject to the conditions and exclusions of this form.

2.    SUPPLEMENTARY PAYMENTS

With respect to this coverage, we will pay, in addition to the limit of liability for Protection and Indemnity coverage stated in the Declarations:

A.    All expenses incurred by us, all costs taxed against you in any suit defended by us and all interest on the entire amount of any judgment therein which accrues after the entry of the judgment and before we have paid or tendered or deposited in court that part of the judgment which does not exceed our limit of liability thereon;

B.    Expenses incurred by you at our request in assisting us in the investigation or defense of any claim or suit, including the actual loss of earnings not to exceed $50 per day.

This insurance applies separately to each insured against whom claim is made or suit is brought, but the inclusion herein of more than one "insured" shall not operate to increase the applicable limit of our liability.

3.    LIMITS OF LIABILITY

Regardless of the number of:

(A)   persons or organizations who are "insureds" under this policy,

(B)   persons or organizations who sustain "bodily injury" or "property damage", or

(C)   claims made or suits brought on account of "bodily injury" or "property damage":

the Limits of Liability stated in the Protection and Indemnity Coverage portion in the Declarations as applicable to each "occurrence" is the total limits of our liability for all damages as a result of any one "occurrence". The respective limits of liability apply separately to "Marina Operations" and "Yacht Dealer Operations".

For the purpose of determining the limits of our liability all "bodily injury" or "property damage" claims, during the policy period:

(1)   arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one "occurrence".

(2)   arising out of any related series or combination of exposures shall be considered as arising out of one "occurrence".

4.    MEDICAL PAYMENTS:

We agree to pay to or for each person, excluding you or your employees, who sustains "bodily injury" caused by an "occurrence" during the policy period, the reasonable expenses of necessary medical, surgical, ambulance, hospital and professional nursing services and, in the event of death resulting from such injury, the reasonable funeral expense, all incurred within one year from the date of "occurrence". Subject to the following conditions.

IMO-661 (3/91)

© New Hampshire Insurance Company 1991

Medical Payments insurance shall not apply:

(A)   To "bodily injury" to or death of any person:

(1)   to or for whom benefits are payable under any Worker's Compensation or under the Federal Longshoremen's and Harbor Worker's Compensation Act;

(2)   who is a trespasser in or upon or boarding or leaving any yacht insured hereunder;

(3)   who is your employee while engaged in your employment;

(4)   to liability assumed by you under any contractual agreement;

(5)   while the yacht is being used for purposes other than those allowed under the policy form;

6.   EXCLUSIONS

THIS INSURANCE DOES NOT COVER LOSS, DAMAGE OR EXPENSE CAUSED BY, RESULTING FROM, CONTRIBUTED TO OR AGGRAVATED BY ANY OF THE FOLLOWING. SUCH LOSS, DAMAGE OR EXPENSE IS EXCLUDED REGARDLESS OF ANY OTHER CAUSE OR EVENT CONTRIBUTING CONCURRENTLY OR IN ANY SEQUENCE TO THE LOSS OR DAMAGE.

(A)   "BODILY INJURY" OR "PROPERTY DAMAGE" ARISING OUT OF THE ACTUAL, ALLEGED OR THREATENED DISCHARGE, DISPERSAL, RELEASE OR ESCAPE OF "POLLUTANTS".

(1)   AT OR FROM PREMISES YOU OWN, RENT OR OCCUPY,

(2)   AT OR FROM ANY SITE OR LOCATION USED BY OR FOR YOU OR OTHERS FOR THE HANDLING, STORAGE, DISPOSAL, PROCESSING OR TREATMENT OF WASTE;

(3)   WHICH ARE AT ANY TIME TRANSPORTED, HANDLED, STORED, TREATED, DISPOSED OF, OR PROCESSED AS WASTE BY OR FOR YOU OR ANY PERSON OR ORGANIZATION FOR WHOM YOU MAY BE LEGALLY RESPONSIBLE; OR

(4)   AT OR FROM ANY SITE OR LOCATION ON WHICH YOU OR ANY CONTRACTORS OR SUBCONTRACTORS WORKING DIRECTLY OR INDIRECTLY ON YOUR BEHALF ARE PERFORMING OPERATIONS:

(a)   IF THE "POLLUTANTS" ARE BROUGHT ON OR TO THE SITE OR LOCATION IN CONNECTION WITH SUCH OPERATIONS, OR

(b)   IF TH EOPERATIONS ARE TO TEST FOR, MONITOR, CLEAN UP, REMOVE, CONTAIN, TREAT, DETOXIFY OR NEUTRALIZE THE POLLUTANTS.

ANY LOSS, COST OR EXPENSE ARISING OUT OF ANY GOVERNMENTAL DIRECTION OR REQUEST THAT YOU TEST FOR, MONITOR, CLEAN UP, REMOVE, CONTAIN, TREAT, DETOXIFY OR NEUTRALIZE "POLLUTANTS."

(B)   TO BODILY INJURY TO ANY OF YOUR EMPLOYEES ARISING OUT OF AND IN THE COURSE OF THEIR EMPLOYMENT BY YOU OR ANY OF YOUR OBLIGAIONS TO INDEMNIFY ANOTHER BECAUSE OF DAMAGES ARISING OUT OF SUCH INJURY.

(C)   TO BODILY INJURY TO YOU OR, IF YOU ARE A PARTNERSHIP OR A JOINT VENTURE, ANY PARTNER OR MEMBER THEREOF.

(D)   TO ANY OBLIGATION FOR WHICH YOU OR ANY CARRIER AS YOUR INSURER MAY BE HELD LIABLE UNDER ANY WORKER'S COMPENSATION, UNEMPLOYMENT COMPENSATION OR DISABILITY BENEFITS LAW, OR UNDER ANY SIMILAR LAW.

(E)   TO PROPERTY DAMAGE TO (A) PROPERTY OWNED OR OCCUPIED BY OR RENTED TO YOU (B) PROPERTY USED BY YOU OR (C) TO PROPERTY DAMAGE TO YOUR PRODUCTS.

(F)   TO THAT AMOUNT OF ANY EXPENSE FOR MEDICAL SERVICES WHICH IS PAID OR PAYABLE TO OR ON BEGALF OF THE INJURED PERSON UNDER THE PROVISIONS OF ANY (A) AUTOMOBILE OR OTHER INSURANCE AFFORDING BENEFITS FOR MEDICAL EXPENSES, (B) INDIVIDUAL, BLANKET OR GROUP ACCIDENT, DISABILITY OR HOSPITALIZATION INSURANCE (C) MEICAL, SURGICAL, OR HOSPITAL BENEFIT, SERVICE OR REIMBURSEMENT PLAN, (D) WORKER'S COMPENSATION OR DISABILITY BENEFRITS LAW OR SIMILAR LAW, OR (E) ORGANIZATION'S BENEFIT PROGRAM OR FROM ANY OTHER PERSON OR ASSOCIATION.

(G)   TO BODILY INJURY OR PROPERTY DAMAGE ARISING OUT OF (A) THE INSUREDS PRODUCTS, OR (B) PRODUCTS SOLD BY THE INSURED OR (C) COMPLETED OPERATIONS PERFORMED BY OR ON BEHALF OF THE INSURED.

(H)   TO BODILY INJURY OR PROPERTY DAMAGE ARISING OUT OF THE USE AND OPERATION OF ANY VESSEL, RENTED, LEASED OR CHARTERED BY YOU OR ANY USE OF AN INSURED VESSEL FOR THE PURPOSE OF TOWING ANY PERSON OR VESSEL.

© New Hampshire Insurance Company, 1991

8.   DEFINITIONS

"Marine Operations" means (1) repair, alterations, maintenance or restoration, (2) storage (3) mooring at slips, spaces or buoys rented by the insured, (4) hauling out or launching not in connection with operations (1) and (2) above, (5) fueling and miscellaneous servicing of a transient nature with respect to pleasure craft covered by the policy which are being operated by the insured or his employees within a 500 mile radius of the insured's premises, in conjunction with the above operations or which may break away from the insured's premises.

"Marine Dealer Operations" means the sale, demonstration operation or delivery of any private pleasure watercraft by the insured or his employees, which is offered or held for sale or property sold by the insured, while such watercraft is afloat.

"Insured Vessel" shall be construed as a vessel for which coverage is provided under the physical damage section of this policy.

"Bodily Injury" means loss of life of, or injury to, any person.

"Property Damage" means (1) loss of, or damage to, or expense in connection with any fixed or movable object or property of whatever nature, (2) costs or expenses of, or incidental to, the removal of wreck, of any insured Vessel when such removal is compulsory by law.

"Occurrence" means exposure of persons or property to conditions which result in bodily injury or property damage; provided such bodily injury or property damage is neither expected nor intended by the insured

"Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

"Limit of Liability" The limits(s) of liability as stated above shall be the maximum amount this Company shall pay on behalf of the insured arising out of any occurrence covered by this form.

**Len Langer**

EXHIBIT

K

From:        ECFnotice@mad.uscourts.gov
Sent:        Wednesday, March 23, 2005 4:52 PM
To:          CourtCopy@mad.uscourts.gov
Subject:     Activity in Case 1:02-cv-10153-WGY Acadia Insurance Co. v. Beverly Port Marina, et al
             "Judgment"


\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To
avoid later charges, download a copy of each document during this first viewing.
<!-- rcsid='\$Header: /ecf/district/html/TextHead,v 3.1 2003-04-25 07:56:43-04 loy Exp
\$' --> United States District Court District of Massachusetts

Notice of Electronic Filing
The following transaction was entered on 3/23/2005 at 4:52 PM EST and filed on 3/23/2005

#ident 'rcsid=\$Header: /ecf/district/server/TextBody,v 3.1 2003-04-25 07:52:35-04 loy Exp
\$'
Case Name: Acadia Insurance Co. v. Beverly Port Marina, et al Case Number: 1:02-cv-10153
https://ecf.mad.uscourts.gov/cgi-bin/DktRpt.pl?9688
WARNING: CASE CLOSED on 12/20/2002

Document Number: 81
Copy the URL address from the line below into the location bar of your Web browser to view
the document: https://ecf.mad.uscourts.gov/cgi-bin/show_case_doc?81,9688,,50962094,

Docket Text:
Judge William G. Young : Electronic  ORDER entered.  FINAL JUDGMENT in favor of Acadia
Ins. Co.  against Beverly Port Marina and Leslie Ray Insurance Agency, entered.(Johnson,
Mary)

The following document(s) are associated with this transaction:
Document description: Main Document
 Original filename: yes
 Electronic document Stamp:
 [STAMP dcecfStamp_ID=1029851931 [Date=3/23/2005] [FileNumber=904901-0]
[aa5d1c70b2c946281d6532d9ff1ac4f1c92a82bad0086e900d151a76c6703d111204e20ce376a293a56c344d2
923adcef21dfd8c1b9572bf560ab23e16cc4b45]]


<!-- rcsid='\$Header: /ecf/district/server/TextAtyList,v 3.2 2003-06-02 17:37:56-04 bibeau
Exp \$' -->
1:02-cv-10153 Notice will be electronically mailed to:
William D. Chapman                          wchapman@melicklaw.com

Leonard W. Langer                            lwlanger@tchl.com

Thomas J. Muzyka                            tmuzyka@clinmuzyka.com

Stephen M. Ouellette                         fishlaw@aol.com

Robert R. Pierce                            bob@piercemandell.com

David S. Smith                             maritimeattorney@aol.com

Bertram E. Snyder                           bertsnyder@lgllp.com

Marshall J. Tinkle                           mjtinkle@tchl.com


1:02-cv-10153 Notice will not be electronically mailed to:
Heather M. Spellman
Melick, Porter & Shea, LLP

28 State Street
Boston, MA 02109-1775

(F. L)

# Agency Agreement

EXHIBIT

tabbies®

L

Agent's name  ·Leslie S. Ray
Insurance Agency, Inc.

Agent's address    129 Dodge Street

Beverly, MA  01915

This Agreement is made this 23 day of Dec. ,1997
by and between the Agent indicated above and the Company(ies)
designated below.

☒ Acadia Insurance Company
☒ Berkley Regional Insurance Company
☒ Firemen's Insurance Company of Washington, D.C.
which Company(ies) shall be hereinafter referred to as the
"Company." Notwithstanding the foregoing it is hereby
acknowledged that any liability of each of the preceding
companies is several and not joint and this Agreement is
respectively made with each such Company.

When used in this Agreement the term "Agent" means one or more
persons and any business entity licensed by a state to act as a
representative of the Company, directly or through legally
authorized personnel, in negotiating, servicing or effecting policies
of insurance issued in the name of the Company. The terms "you"
and "your" mean the Agent; the terms "we," "us," and "our" mean
the Company.

The above-designated parties hereby agree to the following terms:

## I.  Authority/Responsibility

A.  The Agent is an independent contractor, not an employee of
the Company, exercising exclusive and independent control
of the Agency:  The Agent may represent more than one
company.

B.  Authority is hereby granted to solicit, receive, bind, execute,
and transmit proposals for insurance contracts (including
bonds) to the Company subject to the written guidelines
issued by the Company.  Agent agrees to forward to the
Company written copies of applications, binders, policies,
endorsements, and certificates within five (5) business days
after execution or issuance.  Agent will promptly report all
claims to the Company Home Office or its authorized
representative.

C.  The Agent is hereby granted authority to collect, receive, and
provide receipts for premiums as herein provided.

D.  All Agent records pertaining to Company business shall be
available for inspection by the Company.  All Company
records pertaining to the business of the Agent shall be
available for Agent's inspection. All powers of attorney,
policies, company seals, and other supplies, manuals,
documents, and forms provided to the Agent by the Company
shall remain Company property and shall be promptly
returned to the Company on demand.

E.  The Company reserves the right to cancel (subject to state
law) at any time any policy or bond placed by the Agent with
the Company.

## II.  Commissions

A.  The Company will pay the Agent commissions at the rates
specified in the Commission Schedule which may be
amended from time to time by the Company.  The Company
will give at least 90 days notice of proposed revisions of
these rates.  The Company will not propose rate revisions at
intervals of less than one year.

B.  Whenever the Company refunds premiums on insurance, the
Agent shall refund the commission to the Company at the
same rate of commission as was paid on that insurance,
regardless of whether the refund occurs during or after the
termination of this Agreement.

C.  The terms of this Agreement shall not prohibit the negotiation
of special commission rates on individual policies by express
mutual agreement between Agent and Company.

## III. Direct Bill

A.  The Agent is responsible for the prompt submission of
completed applications or original policies to the Company,
including the initial premium, without deduction of
commission, on those policies requiring payment with the
application.

B.  The Company will be responsible for preparation of all
polices, endorsements, renewals, and collection of all direct
bill premiums.

C.  The Company will clearly, and prominently, identify Agent
by name when transmitting policies, endorsements, premium
and collection notices.

D.  Commissions on premiums shall be paid to Agent no later
than 30 days after the end of the month in which the
premiums are received by the Company.  Such commissions
shall be offset by Company for any return commissions due
from Agent.

E.  In the event of termination of the Agreement, the Company
will, at the Agent's request, furnish a list of policyholders
with the expiration dates of the policies.

F.  The Company will not use its records of direct billed business
placed by the Agent with the Company, to solicit insured(s)
for other lines of insurance, products or services without the
prior approval of the Agent, unless the Company becomes
entitled to control the expirations.

## IV. Agency Bill

A.  Agent shall hold as a fiduciary trust, all premiums collected
by or paid to Agent for insurance issued in Company's name,
separate and apart from any money belonging to the Agent.
Agent shall pay Company all such premiums due according
to the terms of this Agreement.  All premiums are the
property of the Company and commissions payable to the
Agent are debts owned by the Company.  Keeping an account

with the Agent on our books is only a record of business transacted and neither the keeping of such an account, nor the privilege of deducting commissions from such premiums shall be deemed to waive the understanding of that trust.

B. Premiums that have been determined by audits, retro adjustments, and interim reports will be fully earned. The Agent shall exert diligence to collect such premiums.

C. Any credit extended by the Agent shall be the sole risk of the Agent. The Agent has no authority whatsoever to finance premiums with any entity as an Agent of the Company. In securing financing for policies or bonds written under this Agreement, the Agent will act only as the representative of the insured, and the Company will not be responsible for any representations made on its behalf.

## V.  Premium Accounting

A. Itemized statements of money due shall be prepared monthly by the Company, or when agreed upon, by the Agent. The statement is to be received by the Agent or by the Company no later than the 15th day following the account month reported.

B. All premium balances due the Company shall be paid no later than 45 days after the end of the account month for which the statement was prepared.

C. The omission of any items from a monthly statement shall not affect the responsibility of either party to account for and pay all amounts due the other.

D. If Agent fails to collect any premiums in accordance with this Agreement, or if Agent is relieved of the responsibility as specifically provided in item E of this section below:

1. Company shall have the right to collect those premiums in any manner it may see fit;
2. no commissions shall be paid on any such premiums collected by the Company;
3. such action by Company shall not relieve Agent of any liability under this Agreement to pay the Company all other premiums due; and
4. the Agent will have no further responsibility for collection of these premiums.

E. Company will relieve Agent from responsibility for payment due to inability to collect earned premiums disclosed by audits providing the following:
1. written request for relief is made by Agent within 45 days from the end of the month in which the audit or report bill is rendered;
2. Agent has issued a bill for such additional premiums and has made genuine and reasonable attempts to collect those premiums, including written demand for payment; and
3. failure of Agent to give the Company such notice shall constitute acceptance by the Agent of responsibility to pay such premiums.

## VI. Ownership of Expirations

A. The use and control of expirations and the records thereof, including insurance which was submitted by the Agent pursuant to the Company billing procedures, shall be Agent's property and left in the Agent's undisputed possession provided that the Agent has paid and continues to pay to the Company any and all premiums due in accordance with this Agreement.

B. In the event that the Agent fails to pay the Company any and all premiums due in accordance with this Agreement, the use and control of all expirations, and all right, title, and interest in and to the records thereof, including insurance which was submitted by Agent pursuant to the Company billing procedures, shall be vested in the Company.

C. Any difference of opinion with respect to Agent's liability to Company shall not affect the ownership of expirations clause provided the Agent promptly furnished acceptable collateral security equal to the disputed amount, to be held by the Company until the difference is resolved. Company shall have the authority to utilize the collateral to the extent necessary to cover the indebtedness, interest, and expenses due the Company as finally resolved.

D. The Company may, at its discretion, sell at private and public sale such expirations and records, and if sufficient money is not realized to fully discharge Agent's indebtedness to the Company, Agent shall remain liable for the balance of the money owned to the Company. Any amount realized by the Company is excess of the Agent's indebtedness, after deduction of the expenses of selling such expirations and records, shall be returned to the Agent.

E. Notwithstanding anything to the contrary, nothing in this section shall interfere with the Company's obligation to renew polices containing contractual renewal guarantees or which must be renewed by order of governmental authority, and the Agent shall be entitled to receive commissions on such policies at the prevailing rate of commission then in effect, unless the Company is furnished with a written designation of another Agent signed by the insured.

## VII.    Indemnification

The Company shall defend and indemnify the Agent against liability, including reasonable cost of defense and settlements, imposed on it by law for damages caused by acts or omissions of the Company, provided the Agent has not caused or contributed to such liability by its own acts or omissions. The Agent agrees, as a condition to such indemnification, to notify the Company promptly of any claim or suit against it and to allow the Company to make such investigation, settlement or defense thereof as the Company deems prudent.

Acadia Insurance

## VIII.  Sale of Agency

A.  This Agreement shall not be assigned by the Agent.

B.  The Agent agrees to give at least 60 days advance written notice to the Company of any pledging or granting of a security interest in the business of its expirations. The Agent agrees to give notice when reasonably practicable with respect to substantial sale (i.e. change in ownership of more than 40%), transfer, merger or consolidation. Upon receipt of this notice the Company may at it's sole discretion:

   1.  Approve the assignment of this Agreement to the successor;

   2.  Execute new agreement with the successor; or

   3.  Terminate this Agreement as provided in the "Termination" section of this Agreement.

C.  There shall not be any interruption in service to policyholders upon the sale or transfer of the Agent's business.

## IX.  Termination/Suspension

A.  Subject to requirements which may be imposed by law, this Agreement shall terminate:

   1.  Automatically if any public authority cancels or declines to renew the Agent's license or certificate of authority, or

   2.  Upon either party giving at least 90 days written notice in advance to the other; or

   3.  Immediately upon either party giving written notice to the other in the event of abandonment, fraud, insolvency or gross and willful misconduct on the part of such other party.

B.  If the Agent is delinquent, in either accounting or payment of monies due the Company, the Company may, by notice to the Agent, immediately suspend or terminate the Agent's authority to: submit, issue, or bind any new or renewal business, or change any existing policy during the suspension or termination. This provision shall not apply to routine differences in accounting records of the Agent and the Company which are minor in amount and do not involve premiums collected and willfully withheld by the Agent.

C.  The Company may at its discretion suspend rather than terminate this agreement for violation of the provisions of this Agreement. In the event of suspension the Company agrees to make every effort to work with the Agent on a mutually agreed upon plan of rehabilitation for a period of 90 days to one year depending on the reasons for suspension. Such plan will specify what the Agent must do to avoid termination and how the Company intends to assist the Agent to avoid termination.

D.  In the event of termination of the Agreement:

   1.  The Agent's records, use and control of expirations, including direct billed business shall remain in the undisputed possession of the Agent, provided the Agent has then rendered and continues to render timely accounts and payments of all amounts due the Company, or provides security acceptable to the Company. Otherwise, the records, use, control and ownership of all expirations of business placed with the Company shall become vested in the Company.

   2.  The Company may retain all commissions, or any other funds which are or may become payable to the Agent, and apply same against the Agent's indebtedness to the Company.

   3.  If in disposing of such records and expirations the Company does not realize sufficient money to discharge in full the Agent's debt to the Company, the Agent shall remain liable for the balanced of such indebtedness. Fees and any other expenses incurred in the collection of premiums for these polices shall be added to me debt. Any amount realized in excess of the debt, less expenses of disposing of such records and expirations, shall be returned to the Agent.

   4.  Should it become necessary for the Company to institute legal action to enforce an arbitration award to achieve compliance with the arbitration provisions of the agreement. Agent agrees to pay all reasonable costs of such actions, including attorneys' fees and interest.

E.  In the event this Agreement is terminated, the method of accounting will be automatically changed to Company statements and all future premium payments hall be paid no later than 45 days after the end of the account month for which the statement was prepared.

F.  In the event of termination, the Company agrees to notify all direct bill policyholders of the Company's intents not to renew. This notice shall be forwarded directly the policy holder 30 days prior to renewal or such other time as required by law. The notice to the policyholder shall make no reference to the reasons for the termination of the Agreement. The Agent will receive a copy of the letter to be sent to all insureds.

## X.  Changes in Agreement

A.  This agreement may be revised at any time by mutual written agreement of the Agent and the Company.

B.  Revisions of this Agreement and Commission schedule, unless otherwise mutually agreed to by the Company and the Agent, will be communicated to the Agent in writing by the Company representative 90 days in advance of the change.

## XI. Arbitration

In the event of any dispute arising out of or under this Agreement between the Agent and the Company, both agree to submit such dispute to arbitration, and the expenses will be borne equally by the Company and the Agent.

A. There will be three arbitrators, one will be selected by the Company, one will be selected by the Agent and a third will be selected by those two arbitrators.

B. The decision of the arbitrators will be final and binding on all parties hereto.

## XII. Designation of Agent by Policyholder

If a conflict exists as to which Agent or Broker represents an existing or prospective policyholder with respect to any insurance matter subject to this Agreement, the policyholder's written statement designating his agent or broker shall control.

## XIII. Conditions

A. The provisions of this Agreement shall not apply to business administered by underwriting associations, syndicates, pools, plans, or other non-voluntary programs.

B. The Agent shall not broadcast, publish or distribute advertisements or other matter referring to the Company or the Company's contract of insurance without first securing the Company's written approval.

C. The Agent has no authority to admit liability on the part of the Company in any manner or make any payments on behalf of the Company, except in accordance with specific claim settlement authority extended to the Agent in writing.

D. The Company will credit the Agent's experience records for subrogation and salvage recoveries received in computing the Agent's loss ratios.

E. The Company shall not be responsible for any expenses incurred by the Agent, on his behalf or on behalf of the Company, unless specifically authorized by the Company in writing.

## XIV. Effective Date and Term

This Agreement supersedes any and all previous Agreements, written or oral, and together with the attached Commission Schedule, represents the complete and exclusive Agreement between the Company and the Agent. This Agreement shall be effective on __12/23/97__ and shall continue in full force and effect until amended, terminated, or superseded.

or

shall be effective on _____ and shall remain in full force and effect to a term of ( ) months, unless earlier amended, terminated or superseded.

Witness: _____

Agent: **Leslie S. Ray Insurance Agency, Inc.**

By: _____

Title: _____

Witness: _____

Company:  ☒ Acadia Insurance Company
          ☒ Berkley Regional Insurance Company
          ☒ Firemen's Insurance Company of Washington, D.C.

By: _____

Title: **President**

7/1/97

# First Amendment to Agency Agreement

Agent's name: **Leslie S. Ray Insurance Agency, Inc.**

Agent's address: **129 Dodge Street**

**Beverly, MA  01915**

This First Amendment to Agency Agreement is made this ___23rd___ day of ___December___, 1997 by and between the Agent indicated above and the Company(ies) designated below.

☒ Acadia Insurance Company
☒ Berkley Regional Insurance Company
☒ Firemen's Insurance Company of Washington, D.C.

which Company(ies) shall be hereinafter referred to as the "Company."

The above designated parties agree to amend the Agency Agreement executed between the parties as of the ___23rd___ day of ___December___, 1997

---

Witness: _____

Agent: **Leslie S. Ray Insurance Agency, Inc.**

By: _____

Title: _____

Witness: _____

Company: ☒ Acadia Insurance Company
☒ Berkley Regional Insurance Company
☒ Firemen's Insurance Company of Washington, D.C.

By: _Richard A. Sawyer_

Title: _President_

---

## I. Premium Accounting

Section V(B) of the Agency Agreement is amended to read as follows: "All premium balances due the Company shall be paid no later than forty-five (45) days after the end of the account month for which the statement was prepared, except that, with respect to policies written in the Commonwealth of Massachusetts, all premium balances due the company shall be paid no later than fifty (50) days after the end of the account month for which the statement was prepared."

## II. Miscellaneous

A. This First Amendment becomes effective immediately upon execution by both parties to this agreement.

B. This First Amendment contains the entire agreement between the parties with respect to the subject matter of this First Amendment.

C. In all other respects, the Agency Agreement previously identified is hereby ratified and confirmed and shall remain in full force and effect.

9/97


# Profit Sharing Agreement

☑ Acadia Insurance Company
☑ Berkley Regional Insurance Company
☑ Firemen's Insurance Company of Washington, D.C.

Each of the Insurance Companies designated above, severally and hereinafter called the Company, provide this Profit Sharing Agreement based upon the profits of the business written and produced through the agency as shown by the Home Office records of the Company for each contingent period and during the time this agreement is in force; the first such period beginning on January 1, 1994 and ending on December 31, 1994 and each calendar year thereafter.

The Company agrees to pay the Agency a Profit Sharing Payout calculated by the Company in accordance with the formula set forth below and subject to the terms and conditions of this Agreement. This payout is in addition to any commissions payable pursuant to the Agency Agreement.

## Minimum Volume Requirement
Profit sharing payments shall not be payable to the Agency for any profit sharing year unless the Agency's **Written Premiums** for the year are at least TWO HUNDRED THOUSAND DOLLARS ($200,000); otherwise this agreement will be inoperative.

## Eligible Business
The provisions of this agreement do not pertain to premium production of Mass Marketing, all Retrospectively Rated Risks, Risks of Special Classes mutually agreed upon between Company and Agency, Excess and Surplus Lines, Auto Insurance Plans, Auto Reinsurance Facility Business, Workers' Compensation Plans or Pools or any other Pools, Associations or other involuntary business.

For the purpose of this agreement, the profit on the business produced by the Agency during the year under consideration shall be a combination of the business of all companies designated herein.

## Definitions
**Profit Sharing Year** means the calendar year for which the Company calculates the Agency as eligible for a profit commission, and/or growth bonus.

**Written Premium** means the insurance premiums recorded by the Company on the Agency's Eligible Business during the Profit Sharing Year less premiums returned as a result of cancellation or adjustment.

**Commission Earned** means the commission percentage shown on the producer results times the written premium also shown on the producer results report

**Outgo** means the sum of the following items:
1. Loss and Loss Expenses Incurred as defined below.
2. Commissions earned by the Agency.

**Premiums Earned** represent the actual premiums earned on the Agency's eligible business during the Profit Sharing Year as shown by the records of Company, less premiums charged off by the Company.

**Profit Sharing Payout** means the amount payable to Agency under this agreement as calculated pursuant to the formula set forth above.

**Losses and Loss Expenses Incurred** means the sum of:
1. losses and loss adjustment expenses paid during the Profit Sharing Year less any recoveries for salvage or subrogation realized by the Company during the Profit Sharing Year.
2. case reserves outstanding at the end of the Profit Sharing Year minus case reserves outstanding at the beginning of the Profit Sharing Year,
3. the reserves established by the Company for the development of known claims during the Profit Sharing Year,
4. the reserves established for loss adjustment expenses as established by the Company during the Profit Sharing Year. However, loss adjustment expenses are limited to a maximum of $100,000 for any one loss.

The profit sharing payout due the Agency under this agreement shall be determined by the following formula.

| Profit Sharing Year Income | | |
|---|---|---|
| Premiums earned | $ | |
| **Profit Sharing Year Outgo** | | |
| Losses & Loss Expense Incurred | $ | |
| Commissions Earned | $ | |
| Total OUTGO | $ | |

| Current Year Net Profit or Loss | | |
|---|---|---|
| Premiums Earned Less Total Outgo | $ | |
| Profit Sharing % as per Table 1 | | % |
| Profit Sharing Amount Due Agency | $ | |
| Growth Bonus | % | $ |
| Less Delinquency Charges | % | $ |
| Net Profit Sharing Amount Due | | $ |
| Less Profit Sharing Guarantee | % | $ |
| Profit Sharing Payout | | $ |

## Growth Bonus

If the agency has produced an annual growth in Written Premiums of $50,000 or more (excluding mass marketing and retrospectively rated policies, special classes agreed upon between company and agency, excess and surplus lines, and all involuntary business and comparing the current years written premium to the previous year's written premiums), the Net Profit Sharing Amount due calculated above shall be multiplied by the Growth Bonus percentage displayed in Table 2.

In the event the business of two or more agencies is combined during the profit sharing year through sale, merger, consolidation or otherwise, the annual growth in Written Premium shall be calculated by comparing the current years written premium for the combined Agency with the previous year's Written Premium volume of the various separate Agencies.

## Stop Loss

Incurred losses shall be limited to the first $100,000 of a loss or losses as a result of a single event or any occurrence which causes a loss or a series of losses during the calendar year. This limitation applies only to an event or occurrence that occurs on or after the effective date of this agreement. If salvage recovery or adjustment of reserve on a loss in excess of the amount stated above reduces the loss below the loss limitation amount, a credit shall be allowed equal to the difference between the loss limitation amount and the loss as recorded on the Company's books at the end of the calendar year in which salvage was recovered or adjustment of reserve was made.

## General Provisions

If a Profit Sharing Plan Payout is due pursuant to this agreement, the Company will remit it to the Agent within 90 days after the end of the year if all premiums and other current indebtedness for the Profit Sharing Year have been paid. No charge or deduction for Profit Sharing payout shall be made or claimed by the Agency in his accounts, and is payable only by the Company check.

If the Agency is delinquent in the payment of any monies due the Company or in rendering an account current statement, any amount due the Agency under this Agreement will not be paid to the Agency. When the delinquency has been eliminated, payment of monies due the Agency under this Agreement will be adjusted to reflect any unreimbursed costs incurred by the Company in collecting any delinquent amounts. In addition, the Company may apply any monies due under this Agreement against any other amounts due Company by the Agency, including but not limited to, any costs of collection incurred by Company.

For each occasion that the Agency is delinquent in payment of any monies due Company during the Profit Sharing Agreement period, exceeding the credit terms as stated in the Agency Agreement, the final Profit Sharing Amount Due the Agency will be reduced by 10%.

Minor differences between the Agency's and Company's records or an honest difference of opinion with respect to balances owed to the Company shall not constitute delinquency under this provision.

This agreement shall continue in force until terminated in writing by either party or by termination of the agency agreement. If terminated by the Company, the Company agrees to continue the benefits of this agreement through the full contingent period during which written notice of termination is given to the Agency. If terminated by the Agency, or if any public authority cancels or declines to renew the Agency's license or certificate of authority, the Company's obligation to compute a Profit Sharing Payout due or to pay such amount under this agreement ceases immediately.

In the event of a change in Agency ownership during the Profit Sharing Year, any Share Payout earned during that plan period shall be payable by the company to the Agency owner shown on the Company records at the close of that period. Unless otherwise agreed in writing, for the purpose of computing profit sharing, the purchaser receives credit for all the premiums and is charged with all the losses of the purchased Agency for that current year ending December 31.

Neither this agreement, nor any rights hereunder shall be assignable, but the agreement may be altered or amended by the Company by written instrument to that effect, any such revision to be effective on and after January 1 of the next contingent year.

The Agency will not be eligible for any payment pursuant to this agreement in any Profit Sharing Year unless the Agency has fully complied with the Agency Agreement and all other rules and regulations of the Company.

This Agreement is the complete and final agreement of the parties and it supersedes any other profit sharing agreement between the parties.

## Arbitration

In case of misunderstanding as to the interpretation or application of any provision of this agreement which the Company and the Agency are unable to resolve, the disagreement shall be submitted to arbitration at the request of either party in the following manner:

1.  The party requesting arbitration shall so notify the other party in writing, and shall specify the question or questions to be arbitrated.

2.  Within fifteen (15) days after receipt of such notification, the Company and the Agency shall each select an arbitrator and give the name and address thereof to the other.

3.  The two arbitrators shall promptly select a competent and disinterested party as a third arbitrator.

4.  The decision of any two of the three arbitrators so chosen shall be final and conclusive to both the Company and the Agency. The decision shall be in writing and a copy thereof given to both the Company and the Agency within sixty (60) days after the request for arbitration.

5.  All arbitration expenses shall be borne equally by the Company and the Agency.

## Amendment

1.  This agreement may be amended at any time by a written agreement signed by both parties.

2.  The Company may amend this agreement at any time after giving the Agency thirty (30) days advance written notice of the proposed change.

In Witness Whereof, this Profit Sharing Agreement is signed

this _____ day of _____ ,19____

Agency  Leslie S. Ray Insurance Agency, Inc.

For Agency _____

Company Representative _____

Title  President

Table 1

### Profit Sharing Percentage

| Written Premium* | | Net Profit Percentage | | | | |
|---|---|---|---|---|---|---|
| | | 20% to 25% | 25.1% to 30% | 30.1% to 35% | 35.1% to 40% | Over 40% |
| $50,000 to | $499,999 | 4% | 5% | 6% | 7% | 8% |
| $500,000 to | $749,999 | 5% | 6% | 7% | 8% | 9% |
| $750,000 to | $999,999 | 6% | 7% | 8% | 9% | 10% |
| $1,000,000 to | $1,499,999 | 8% | 9% | 10% | 11% | 12% |
| $1,500,000 to | $1,999,999 | 9% | 10% | 11% | 12% | 13% |
| Over $2,000,000 | | 10% | 10% | 12% | 13% | 14% |

*Include premiums from mass marketing and retrospectively rated risks.

Table 2

### Premium Growth Bonus

| Growth in Voluntary Premium Written | Growth Multiplier |
|---|---|
| Less than $50,000 | 1.05 |
| $50,000 to $149,999 | 1.10 |
| $150,000 to $299,999 | 1.125 |
| $300,000 to $499,999 | 1.175 |
| Over $500,000 | 1.20 |

## Profit Sharing Guarantee

between   Acadia Insurance Company
          Leslie S. Ray
Agency   Insurance Agency, Inc.
and the Companies listed on the Profit Sharing Plan

As of September 30 of each year, a computation shall be made under this agreement using September 30 as the end of the current year and disregarding for this computation, the Annual Minimum Volume Requirements. This computation will include the growth bonus.

If on this basis there is a Net Profit Sharing amount due the Agency, the Company guarantees to pay the Agency at least this amount, provided that it meets the Minimum Volume Requirements by the end of the year. Otherwise there shall be no guarantee by the Company hereunder.

In consideration for such guarantee, there will be a charge equivalent to fifteen percent (15%) of the Agency's Net Profit Sharing Amount including the growth bonus as of September 30.

As of the end of such year, the normal computation shall be made under this Profit Sharing Agreement. The Company shall then pay the Agency the greater of the amount guaranteed or the amount determined by the foregoing normal computation, in each case less the consideration owed by the Agency for the guarantee.

The Agency may terminate this Profit Sharing Guarantee by giving notice to the Company on or before August 31 of the year in which such termination is to be effective. Having elected to terminate the Profit Sharing Guarantee, however, it is understood that these Profit Sharing Guarantee provisions will not be reinstated for that profit sharing year. The Profit Sharing Guarantee may be reinstated for future profit sharing years if the Agency requests such reinstatement in writing prior to August 31 of that Profit Sharing Year.

In Witness Whereof, this addendum is signed this

_____ day of _____ ,19 ___

Leslie S. Ray
Agency  Insurance Agency, Inc.

For Agency _____

Company Representative _Richard A. Sawyer_

Title        President