UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BEVERLY PORT MARINA, INC. ) <br> and LESLIE S. RAY INSURANCE ) <br> AGENCY, INC., ) <br> ) <br> Plaintiffs ) <br> ) <br> vs. ) <br> ) <br> ACADIA INSURANCE COMPANY, ) <br> ) <br> Defendant ) <br> ) | Civil Action No. 1:05-cv-10883-WGY |

### REPLY MEMORANDUM IN SUPPORT OF
### DEFENDANT'S MOTION TO DISMISS

NOW COMES Defendant Acadia Insurance Company, by and through its counsel, Tompkins, Clough, Hirshon & Langer, P.A., and submits the following Reply Memorandum in support of its Motion to Dismiss.

### ARGUMENT

*Res judicata* bars each of Plaintiffs' claims, notwithstanding Plaintiffs' efforts to find a loophole in the doctrine. Each of their claims in this action amounts to an assertion, by and against the parties to the earlier action, after final judgment, that Acadia owes indemnification to Plaintiffs for Carlos Johnson's October 1, 2001 personal injury claim, by reason of Acadia's issuance of its insurance policy to Beverly Port Marina ("BPM"), as claimed in the earlier suit.

Plaintiffs cite three cases for their contention that the causes of action are not sufficiently similar for purposes of *res judicata*; but their reliance is misplaced. *Landrigan v. City of Warwick*, 628 F.2d 736 (1st Cir. 1980), besides being factually

dissimilar, was decided before the First Circuit adopted the "part of the transaction, or series of connected transactions" standard of the *Restatement (Second) of Judgments* §24 (1982). Indeed, the case was decided before the *Restatement (Second) of Judgments* was even published. *Landrigan*'s narrower test, requiring the same "factual bases," *see id.* at 741, no longer has any vitality in this Circuit. *See Kale v. Combined Insurance Co. of America*, 924 F.2d 1161 (1st Cir. 1991).

Similarly, in *Household Int'l, Inc. v. Westchester Fire Insurance Co.*, 286 F. Supp. 2d 369 (D. Del. 2003), the court applied a much narrower four-prong test, apparently prescribed by the Third Circuit, which required, *inter alia*, the same material facts, the same wrong, and the same theory of recovery. *See id.* at 374-75, *citing United States v. Athlone Industries*, 746 F.2d 977, 984 (3d Cir. 1984). *Robinson v. MFA Mutual Insurance Co.*, 629 F.2d 497, 502 (8th Cir. 1980) likewise turned on the narrow test of whether the subsequent action would require substantially different proof or would involve the same "primary right." *See id.* at 502, *citing Robbins v. District Court of Worth County*, 592 F.2d 1015, 1017 (8th Cir. 1979). The First Circuit has expressly distinguished *Robinson*, on the ground that it applied significantly different *res judicata* principles. *Porn v. National Grange Mutual Insurance Co.*, 93 F.3d 31, 35 n. 3 (1st Cir. 1996).

In *Porn*, the insured successfully sued his carrier for breach of contract and then commenced a new action for breach of the covenant of good faith, intentional infliction of emotional distress, negligent infliction of emotional distress, and unfair trade practices. The court held that the second action was barred by *res judicata*, because the same set of transactions was involved. The court rejected the policyholder's arguments that the two actions involved different circumstances and time frames, reasoning that, at bottom, both actions hinged on the insurer's refusal to make payment under its policy for the same

accident. *Id.* at 34-35. The court indicated that even though the facts most critical to each legal theory differed, the overall factual matrix pointed to a single transaction. *See id.* at 35.

The First Circuit further observed that a majority of the courts that have considered whether the facts underlying a breach of insurance contract claim and a bad-faith claim are sufficiently related have concluded that the latter claim is barred by *res judicata. Id.* at 35 n. 3, *citing McCarty v. First of Georgia Insurance Co.*, 713 F.2d 609, 612 (10th Cir. 1983); *Duhaime v. American Reserve Life Insurance Co.*, 200 Conn. 360, 511 A.2d 333, 334 (1986); *Chandler v. Commercial Union Insurance Co.*, 467 So. 2d 244, 250 (Ala. 1985); *Hubbell v. Trans World Life Insurance Co.*, 50 N.Y.2d 899, 408 N.E.2d 918, 919, 430 N.Y.S. 2d 589 (1980); *Stone v. Beneficial Standard Life Insurance Co.*, 273 Or. 594, 542 P.2d 892, 894 (1975). Most of the courts that have held otherwise, such as *Robinson*, applied theories of *res judicata* that differed significantly from the governing principles in this Circuit. *Id*.

Hence, *Porn* makes it clear that, at least in this Circuit, judgment on a breach of insurance contract claim will bar all other claims (including tort claims and Chapter 93A-type claims) arising from the denial of coverage for the same insurance claim. *See also Hamilton v. State Farm Fire & Casualty Co.*, 1997 U.S. App. LEXIS 30065 (6th Cir. 1997); *Hammel v. State Farm Mutual Auto. Insurance Co*, 114 F. Supp. 2d 478 (W.D.N.C. 2000) (after judgment on insurance contract claims, *res judicata* barred RICO claim as well as tort claims).

Contrary to Plaintiffs' allegations, the earlier suit did not merely entail interpretation of Acadia's policy. Then, as now, BPM had asserted that, among other things, Acadia had actual or constructive knowledge of BPM's business practices, risks,

3

and insurance needs; that BPM had been told that Acadia's policy would fully protect BPM from its business risks; that consequently Acadia should be held liable, irrespective of the actual terms of the policy; and that Acadia had violated Chapters 93A and 176D of the General Laws. *See* Beverly Port Marina's Supplemental Memorandum dated December 20, 2002 (Exhibit D to Langer Affidavit). There can be no question that the pending claims, though based on different legal theories, are essentially identical.

Plaintiffs also argue, even less persuasively, that Acadia and LRIA were not parties to the earlier action, because Acadia was granted summary judgment a couple of months after LRIA was impleaded. This ignores the fact that Acadia remained a party to the suit for the next twenty months until final judgment. During that time, LRIA sought and obtained documents from Acadia and served Acadia with copies of all of its pleadings, discovery papers, and other documents that must be served on a party. Acadia had to respond to other discovery requests as well, and its counsel attended depositions. As Plaintiffs note, LRIA threatened to bring claims against Acadia more than once, beginning on February 11, 2004, and ultimately sought leave to do so, albeit tardily, in February of 2005. Thus, LRIA treated Acadia as an adverse party. LRIA therefore is not exempt from *res judicata*.

Plaintiffs suggest that they somehow lacked the opportunity to assert their pending claims against Acadia in the earlier action. They claim, for instance, that Acadia did not produce its underwriting file until after the entry of summary judgment. This is palpably untrue. Acadia first produced its underwriting file as part of its response to BPM's document requests in May of 2002, more than a year before the court's summary judgment decision (*see* transmittal letter dated May 15, 2002, a copy of which is attached hereto as Exhibit A). Plaintiffs' purported "brief window of time" for filing their new

4

claims against Acadia actually extended for months and months (nearly three years in the case of BPM, well over a year for LRIA).

According to Plaintiffs, their "instant claims" were "immediately tendered to Acadia," but Acadia "refused to acknowledge them" and "refused to participate." It is difficult to follow Plaintiffs' logic. If they mean to suggest that by not "acknowledging" unasserted claims, Acadia somehow prevented Plaintiffs from litigating them, this would indeed be a novel argument. If they are suggesting that their law firm, with approximately thirty attorneys, simply lacked time to assert their claims during that three-year litigation, this would be even more astonishing.

Furthermore, apart from *res judicata*, Plaintiffs have failed to demonstrate that they have asserted any claims for which relief can be granted. Plaintiffs have now clarified that their misrepresentation claims are predicated on the deposition testimony of LRIA's Rule 30(b)(6) witness (David Ray) that he understood from Acadia that coverage for a customer operating a BPM vessel was "unavailable." However, it is crystal clear from Mr. Ray's deposition that the only such discussion he had with Acadia occurred *after* Acadia's denial of coverage for the Carlos Johnson claim (*see* deposition excerpts attached hereto as Exhibit B). At BPM's request, Mr. Ray did an independent investigation on whether such coverage was available from leading marine underwriters, inquiring not only of Acadia but also of Hanover and OneBeacon, none of whom would offer such coverage. *See* letter from David L. Ray dated November 20, 2001, initially filed with the Court in December 2002, and attached hereto as Exhibit C. Obviously, any statement made by Acadia concerning available coverage in November 2001 could not have been relied on by either BPM or LRIA in procuring coverage through Acadia in May of 2000.

5

LRIA's remaining claims are predicated on the unheard-of notion that an underwriter owes a legal duty to an insurance agent (irrespective of the terms of their agency agreement) to write policies that fully protect the customer against all foreseeable risks. Under that theory, an insurer violates its legal duty every time it places exclusions in a policy. This is a maximalist iteration of the "essential operations" theory extended for the benefit of a broker. This court has already rejected that doctrine, when it was touted by both BPM and Carlos Johnson. If the insured cannot prevail on such a theory, *a fortiori* neither can its agent.

LRIA does not offer any legal authority in support of its theory. Instead, it cites only a private manual, *Best's Underwriting Guide*. A legal duty cannot be derived from such a source. Even if it could be, it is a gross misreading of the guide to take it as suggesting that an insurer of boat dealers ought to provide the type of coverage that Plaintiffs blame Acadia for not offering. The guide says just the opposite:

> Although the basic policy *normally excludes coverage for demonstration of watercraft*, this coverage *can* [not should] be added. *If* it is, the underwriter should know whether boats are demonstrated or tested on or away from the premises and whether an employee experienced in boat control and water safety is present.

Thus, the guide acknowledges at the outset that the industry norm is to exclude such coverage. It then cautions that if an underwriter chooses to deviate from the norm, it should, for its *own* protection, learn as much as it can about the extent of its exposure and be fully cognizant of the many risks inherent in such coverage. Of course, it is precisely because these risks are so difficult to quantify that most companies, including Acadia, refuse to offer such coverage, as Acadia told LRIA after denying coverage for the Carlos Johnson claim. *See* LRIA's letter to BPM dated November 20, 2001, attached hereto as Exhibit C ("The underwriters cited the difficulty in assessing the experience of boating

abilities of unknown operators."). Under established principles of state and federal insurance law, courts may not require insurers to offer coverage that they did not contract to provide, under either a tort or contract theory.

## CONCLUSION

For the foregoing reasons, the court should grant Acadia's Motion to Dismiss.

Dated at Portland, Maine this 25th day of May, 2005.

>ACADIA INSURANCE COMPANY
>
>By its counsel:
>
>/s/   Leonard W. Langer
>
>/s/   Marshall J. Tinkle
>BBO#565513

TOMPKINS, CLOUGH, HIRSHON
  & LANGER, P.A.
Three Canal Plaza
P. O. Box 15060
Portland, ME  04112-5060
  (207) 874-6700
lwlanger@tchl.com

## CERTIFICATE OF SERVICE

I, Leonard W. Langer, hereby certify that on May 25, 2005, I electronically filed the within document with the Clerk of the Court using the CM/ECF system which will send a notification of such filing(s) to the following:  William D. Chapman, Esq., Melick, Porter & Shea, LLP, 28 State Street, Boston, MA  02109 counsel for Plaintiffs Beverly Port Marina, Inc. and Leslie S. Ray Insurance Agency.

>/s/   Leonard W. Langer_____

Acadia/Bev Port/Reply Memo re Mot Dism

# EXHIBIT A

# Tompkins, Clough, Hirshon & Langer, P.A.
COUNSELORS AT LAW
Three Canal Plaza
Post Office Box 15060
Portland, Maine 04112-5060

Bruce M. Tompkins
Lawrence R. Clough
David M. Hirshon
Leonard W. Langer
Marshall J. Tinkle*

Tel (207) 874-6700
Fax (207) 874-6705
E-Mail  lwlanger@tchl.com
*also licensed in MA
and DC

May 15, 2002

Thomas J. Muzyka, Esq.
Clinton & Muzyka, P.C.
One Washington Mall, Suite 1400
Boston, MA  02108

RE: Acadia Insurance Company v. Beverly Port Marina, Inc., et al.
    Docket No. 02-10153 WGY

Dear Mr. Muzyka:

Enclosed please find Plaintiff Acadia Insurance Company's Response to Defendant Beverly Port Marina, Inc.'s Request for Production of Documents.

Also enclosed please find Plaintiff Acadia Insurance Company's Answers to Interrogatories Propounded by Beverly Port Marina, Inc.

Sincerely,

TOMPKINS, CLOUGH, HIRSHON & LANGER, P.A.

By: _____
    Leonard W. Langer

LWL/rrc
Enclosures

cc:  Stephen Ouellette, Esq.
     (w/Enclosures)

# EXHIBIT B

Page 49

1    A. Before I got involved with Beverly Port
2 Marina?
3    Q. Yes.
4    A. Yes, you could argue that.
5    Q. And that would be a fair argument?
6        MR. CHAPMAN: Objection.
7    A. You could make a fair argument about that.
8    Q. Did you have any conversations with the
9 Kinzies -- well, who brought the Beverly Port Marina
10 business in? Was it any producer or was one of the
11 CSRs?
12    A. I don't know.
13    Q. Was it you?
14    A. No.
15    Q. Did you have any conversation with Frank
16 or Sue about the experience of your agency with
17 regard to marinas at or around the time Beverly Port
18 Marina became a customer?
19    A. I don't recall having any conversations in
20 that regard.
21    Q. Do you recall ever representing that your
22 agency was experienced in representing marinas to
23 the Kinzies?
24    A. I don't recall having those conversations.

Page 50

1    Q. And you believed at the time Maureen
2 Kerans left that she was more knowledgeable about
3 insurance for marinas than Candy Howard was at the
4 time she was working with Beverly Port Marina?
5        MR. CHAPMAN: Objection.
6    A. I believe that.
7    Q. Are you aware that there are some
8 insurance agencies that specialize in writing
9 insurance for marinas?
10       MR. CHAPMAN: Objection.
11    A. I'm sure that there are.
12    Q. Are you aware of any?
13    A. Not by name.
14    Q. Have you done any research to find out --
15    A. I'm sorry, I do know one by name.
16    Q. What is that?
17    A. Blackadar (phonetic). I believe they're
18 in New Hampshire.
19    Q. How do you spell that?
20    A. I'm not sure.
21    Q. Did you ever -- do you know where in New
22 Hampshire they are?
23    A. I don't.
24    Q. Did you ever try to contact Blackadar to

Page 51

1 see -- this is before the incident -- whether they
2 could assist you in writing insurance for Beverly
3 Port Marina?
4        MR. CHAPMAN: Objection.
5    A. No.
6    Q. Did anyone from Leslie Ray ever contact
7 Blackadar to see if they could assist in writing
8 insurance for Beverly Port Marina?
9        MR. CHAPMAN: Objection.
10    A. Not to my knowledge.
11    Q. After the incident I know that you made
12 some inquiries about further coverage for Beverly
13 Port Marina to Acadia and possibly others, is that
14 accurate?
15    A. That's accurate.
16    Q. Did you ever contact Blackadar or any
17 other insurance agency to determine if Beverly Port
18 Marina could get broader coverage than what it had
19 through Acadia?
20    A. I did find a note in the file that I
21 contacted an agency in Florida that had sent out an
22 advertisement, I believe by e-mail, that said that
23 they specialized in marina coverage and I made
24 contact with them, had a discussion.

Page 52

1    Q. Do you remember the conversation?
2    A. I only remember from the conversation that
3 the coverage that we had in question was not
4 available.
5    Q. The coverage, what do you mean by that?
6    A. I believe -- well, let me ask you. You
7 were inferring some type of coverage after the loss
8 that I was seeking?
9    Q. Right. Well, let me ask you this. We'll
10 get to the documents, but at some point you went to
11 Acadia, I know there's in e-mails going back and
12 forth between you and Acadia about getting coverage
13 for customers test-driving boats?
14    A. Correct.
15    Q. Was that the type of coverage you
16 discussed with the Florida agency?
17    A. Yes.
18    Q. And what were you told?
19    A. They do not have that available and it's
20 generally not available.
21    Q. Not available, okay.
22        Did you do anything after the
23 incident to try to get coverage for Beverly Port
24 Marina for employees' injuries while operating

Page 53

1  boats?
2       MR. CHAPMAN: Objection.
3  A. Anything additional?
4  Q. Yeah, anything additional to what you had
5  already done before the incident.
6  A. Nothing additional.
7  Q. So you believed at the time of the
8  incident that if Carlos Johnson was an employee, his
9  claims should be covered by the Eastern Casualty
10 policy?
11      MR. CHAPMAN: Object. Go ahead.
12 A. I believe that.
13 Q. Do you still believe it?
14 A. Yes.
15      MR. CHAPMAN: Objection. Go ahead.
16 Q. Were you aware before the incident that
17 employees acting in the scope of their employment on
18 boats have different remedies than a typical
19 Massachusetts employee --
20 A. Yes.
21 Q. -- who's injured, you knew that?
22 A. Yes.
23 Q. Were you aware of the Jones Act before the
24 incident?

Page 54

1  A. Yes.
2       MR. CHAPMAN: Objection. Go ahead.
3  Q. What was your -- as of 2001 but prior to
4  the incident what was your understanding of what the
5  Jones Act was?
6  A. Jones Act is a --
7       MR. CHAPMAN: Object. Go ahead.
8  A. Jones Act is a federal statute that goes
9  back many years, I believe, to approximately 1920 or
10 so, that allows a maritime employee to sue their
11 employer.
12 Q. Beyond typical worker's compensation laws?
13 A. Correct.
14 Q. And that's an understanding you had prior
15 to the incident?
16 A. Yes.
17 Q. Did you believe that Beverly Port Marina
18 had Jones Act coverage at the time of the incident?
19      MR. CHAPMAN: Objection.
20 Q. I'm talking about your understanding as of
21 that time.
22 A. Yes.
23 Q. As you sit here today do you believe they
24 had Jones Act coverage?

Page 55

1       MR. CHAPMAN: Objection.
2  A. Yes.
3  Q. Through Eastern Casualty?
4  A. Yes.
5  Q. What's the basis of your belief that
6  Eastern Casualty provided Jones Act coverage?
7       MR. CHAPMAN: Objection.
8  A. First of all, there's a voluntary coverage
9  endorsement on the policy. There are conversations
10 that Candy had with the Eastern Casualty
11 underwriter, including an e-mail correspondence
12 between Candy and the underwriter, that discussed
13 that coverage, discussed that exposure.
14 Q. But your understanding that -- are there
15 any documents that you saw from Eastern Casualty
16 that suggest that Jones Act coverage was provided
17 under the Eastern Casualty policy?
18      MR. CHAPMAN: Object. Go ahead.
19 A. There's the endorsement.
20 Q. What does the endorsement say?
21      MR. CHAPMAN: Object.
22 A. Voluntary coverage endorsement. I would
23 have to look at it to determine exactly what it
24 says.

Page 56

1  Q. We'll see if we can find it as we go
2  through. Does it say Jones Act coverage or is there
3  some other term?
4  A. I don't believe the word "Jones Act" is on
5  the endorsement.
6  Q. Do you know what it says?
7  A. I'd like to see it.
8  Q. I don't know what it is. But we'll see
9  that we go through it.
10       All right. Let's go to Exhibit 1
11 from Kerans. We'll probably be able to plow these
12 through pretty quickly since you said you didn't
13 have much involvement while Maureen was involved.
14 A. Okay.
15 Q. This looks like an application that was
16 sent from Maureen Kerans to CU and it's the CU
17 application. What was your involvement in this, if
18 any?
19       (Document handed to witness.)
20 A. None.
21 Q. All right. Let's go to Exhibit 2.
22      MR. CHAPMAN: Just, did you look at
23 all the pages of this? Because we established
24 yesterday that some pages don't necessarily go with

**Page 129**

1  A. I believe that I did. I believe that I
2  did.
3  Q. What do you remember telling them?
4  First of all, who did you speak to?
5  A. I couldn't tell you which one I spoke to.
6  I don't recall the conversation.
7  Q. But you did relay to them --
8  A. I can't recall is probably a better
9  answer.
10  Q. Well, obviously that's bad news for the
11  insured, right, if a carrier is taking the position
12  that they're not going to cover a claim?
13  A. Absolutely.
14  Q. And I presume you wanted to bring the bad
15  news as quickly as possible so they could do
16  whatever they had to do?
17  A. I don't think I wanted to, but I think it
18  was -- yes, I would want to relay that information.
19  MR. CHAPMAN: I object to the form.
20  MR. PIERCE: Too late. It's waived.
21  MR. CHAPMAN: I'm not sure if it was
22  established in there that there was a claim. I know
23  there was a loss notice. I'm not sure they're the
24  same thing.

**Page 130**

1  MR. PIERCE: Okay.
2  Q. Did you ever tell Sue or Frank that there
3  was a gap in the coverage?
4  MR. CHAPMAN: Object.
5  A. No.
6  Q. Did you ever tell Sue or Frank words to
7  that effect?
8  MR. CHAPMAN: Object.
9  A. I informed Sue or Frank that there was no
10  coverage for this instance and why for the same
11  reason that Pat O'Toole explained to me.
12  Q. When did you do that?
13  A. When?
14  Q. When, yeah.
15  A. Soon after my conversation with Pat. I
16  don't know the exact date.
17  Q. And do you have any recollection of the
18  Kinzies' reaction, whichever one you spoke to?
19  A. No specific recollection.
20  Q. And at some point did you get a copy of
21  the complaint, summons and complaint?
22  A. Yes.
23  Q. Did the Kinzies forward that to you, I
24  take it?

**Page 131**

1  A. Yes.
2  MR. CHAPMAN: Excuse me. It's
3  obvious, but we do have three complaints. I assume
4  you're talking about the one from Johnson against
5  Beverly Port Marina.
6  MR. PIERCE: Correct.
7  Q. That's what you understood me to mean,
8  correct?
9  A. Yes.
10  Q. And did you forward that on to Acadia?
11  A. Yes.
12  Q. Now, before we start talking about that,
13  I'd like to take a look at Exhibits 9 and 10 from
14  Howard deposition.
15  THE WITNESS: May I break for one
16  minute?
17  MR. PIERCE: Sure.
18  THE WITNESS: Thank you.
19  (Recess.)
20  Q. Why don't you read Howard Exhibits 9 and
21  10, please? Just read them to yourself and then
22  we'll talk.
23  A. Thank you. I thought you wanted me to
24  read them aloud.

**Page 132**

1  Q. Actually, just read 9 first. Forget 10.
2  A. Okay.
3  Q. It looks like you almost have to read
4  these e-mails from the bottom up.
5  A. Yeah, I understand that.
6  Q. Chronologically. Candy Howard was writing
7  to Acadia on October 3rd, 2001 requesting US L&H,
8  asking if Acadia could add that exposure. Is that a
9  fair --
10  A. Yes.
11  Q. -- characterization?
12  And then Candy got a response from
13  Acadia saying that Acadia doesn't offer US L&H, is
14  that right?
15  A. Yes.
16  Q. Is that you, ddone.com?
17  A. Where?
18  Q. Under Candy's name.
19  A. Candyh@onceanddone.com. That's her
20  external e-mail.
21  Q. At home, you mean?
22  A. No, here, at the agency.
23  Q. Okay. So you weren't copied on that
24  e-mail?

Page 133

1　　MR. CHAPMAN: The bottom one, right?
2　　MR. PIERCE: The bottom one.
3　　A. Doesn't look like I was copied on that
4　bottom one.
5　　Q. Do you know why she was looking for that
6　type of coverage two days after the accident?
7　　A. We at that time, I believe, were aware
8　that Eastern Casualty was going out of business. I
9　know we were aware that Eastern Casualty was going
10　out of business and that we would need to replace
11　that coverage at renewal. Coincidentally, I don't
12　think this had anything to do with the loss. I
13　think it had to do with the remarketing of the
14　account on January 1st.
15　　Q. And the same goes for the top e-mail?
16　　A. Correct.
17　　Q. So it has nothing to do with the loss?
18　　A. Correct.
19　　Q. Okay. Now, the next Exhibit 10, you were
20　telling Candy Howard that you need a first report of
21　injury form for Eastern Casualty?
22　　A. Yes.
23　　Q. Why was that?
24　　A. Because we had become aware that the

Page 134

1　attorney for Carlos Johnson was also taking the
2　point of view that he could be an employee of
3　Beverly Port Marina, and therefore we'd need to file
4　a claim under the worker's comp. policy.
5　　Q. Now, did you have conversations with the
6　Kinzies about -- strike that.
7　　You had a conversation with O'Toole.
8　O'Toole told you it wouldn't be covered or there
9　were some coverage issues, at least, is that fair to
10　say?
11　　MR. LANGER: Objection to the form.
12　　A. Fair.
13　　Q. And then you transferred that information
14　to the Kinzies, correct?
15　　A. Yes.
16　　Q. And they asked you to see if you could
17　find coverage for the future for the type of claims
18　such as a potential customer trying a boat, is that
19　fair to say?
20　　A. Yes, I remember a conversation with Frank
21　concerning that.
22　　MR. PIERCE: Why don't we mark as
23　the next exhibit -- well, we can mark two exhibits
24　now.

Page 135

1　　(Deposition Exhibit Nos. 3-4
2　　marked for identification.)
3　　Q. Read 4 first. They're not chronological.
4　　A. I just want to make sure I'm reading these
5　in chronological order here.
6　　Q. 4 should go first.
7　　A. 4 should go first from the bottom up.
8　　Q. I would think so. Let me know when you're
9　done reading 4 and 3.
10　　A. Okay.
11　　Q. You've now read these two?
12　　A. Yes.
13　　Q. Okay. Exhibit 4, the first message which
14　is at the bottom --
15　　MR. LANGER: 4 has --
16　　MR. PIERCE: Is November 6th.
17　　MR. LANGER: 4 is November 6th?
18　　MR. PIERCE: Yeah.
19　　MR. LANGER: All right.
20　　Q. It appears, tell me if you disagree, but
21　Ted Wirth, W-I-R-T-H, of Acadia appears to be
22　responding to something you contacted him about, is
23　that fair to say?
24　　A. Yes.

Page 136

1　　Q. I didn't see an e-mail to him, although I
2　may have missed it. Do you remember whether there
3　was a written communication to him to which the
4　bottom half of Exhibit 4 is a response?
5　　A. I believe there was a telephone
6　conversation to Ted Wirth.
7　　Q. I see. And then he responded with this?
8　　A. Right.
9　　Q. Basically telling you that -- the upshot
10　of all this, if I may paraphrase, is that Beverly
11　Port Marina wanted to get coverage for customers who
12　wanted to try out boats and Acadia, through Wirth,
13　basically said they don't offer that type of
14　coverage because they essentially don't have the
15　opportunity to do an underwriting investigation of
16　every potential customer, is that a fair
17　characterization?
18　　MR. CHAPMAN: Objection. Go ahead.
19　　A. Yes.
20　　Q. Now, who else did you go to to see if this
21　type of coverage could be available?
22　　A. I went to Commercial Union.
23　　Q. Who did you speak to there?
24　　A. Meredith Atwood. I went to Hanover, and

# EXHIBIT C

# Leslie S. Ray Insurance Agency, Inc.

A TRUE COPY
ATTEST

EXHIBIT A

November 20, 2001

Mr. Frank Kinzie
Beverly Port Marina
43-67 Water Street
Beverly, MA 01915

Dear Frank:

Per your request, I am enclosing a copy of Hanover Insurance Company's Protection and Indemnity coverage form.

Acadia Insurance Company has also turned down our request to add blanketed protection and indemnity coverage for when a Beverly Port Marina boat is being operated by a non-owner or non-employee. The underwriter cited the difficulty in assessing the experience and boating abilities of unknown operators. Please note that I received a similar response when I inquired to underwriters at Hanover Insurance Company and OneBeacon (formerly Commercial Union) Insurance Company about adding this coverage (assuming that you would elect to place the marina insurance through them.)

Frank, please call me if you would like to review.

Respectfully,

David L. Ray, CIC
Executive Vice President
Leslie S. Ray Insurance Agency, Inc.



129 Dodge Street • Beverly, MA 01915 • (978) 927-2600
Personal Lines Fax (978) 921-2349
Commercial Lines Fax (978) 927-8938
LEE, FRASER, AND PATCH INSURANCE AGENCY, INC.