UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * * * * * * * * * * *
                                        *    1:05-cv-10883-WGY
BEVERLY PORT MARINA, INC., and          *
LESLIE S. RAY INSURANCE AGENCY, INC.,   *
                                        *
        Plaintiffs,                     *
v.                                      *
                                        *
ACADIA INSURANCE COMPANY,               *
                                        *
        Defendant.                      *
                                        *
* * * * * * * * * * * * * * * * * * * * * * * * * *
```

## MEMORANDUM IN SUPPORT OF MOTION OF THE PLAINTIFFS TO AMEND CASE MANAGEMENT SCHEDULING ORDER AND FOR RECONSIDERATION WITH RESPECT TO EXPERT ISSUES

This Court's order precluding the plaintiff's expert should be vacated as the defendant suffered no harm from the timing of the plaintiffs' expert disclosure and the plaintiffs were substantially justified in producing the expert report as planned. The plaintiffs understood the final expert disclosure deadline to be November 3, 2005 and complied with that deadline. The plaintiffs lacked intent to deceive or surprise the defendant, or to delay this matter. Discovery is ongoing and a pre-trial conference has not been held. Given the circumstances presented here, a ruling to preclude the plaintiffs' expert serves only to unjustly benefit the defendant from what appears to be a misunderstanding between the parties. This preclusion impacts the ability of the parties to fairly resolve this matter on the merits, and tips the scales of justice by providing the defendant an unfair and unjustified advantage at trial when it suffered no harm. Justice requires the Court to vacate its order and allow the parties a minimal extension of time to complete discovery and exchange expert disclosures.

## I. BRIEF SUMMARY OF THE FACTS

This action arises from the underwriting and issuance of a marina operator's insurance policy issued to the plaintiff, Beverly Port Marina, Inc. ("BPM"), by the defendant, Acadia Insurance Company ("Acadia"). (Complaint, ¶ 7)  BPM obtained the insurance policy through the co-plaintiff, Leslie S. Ray Insurance Agency, Inc. ("LRIA"). (Complaint, ¶ 7)  After sustaining serious injuries while aboard and operating a vessel owned by BPM, Carlos Johnson made claims against BPM, Acadia, and LRIA. (Complaint, ¶ ¶  5, 6)  The federal court ruled that the Acadia policy did not provide coverage for Mr. Johnson's claims. (Complaint, ¶ 14) Thereafter, BPM and LRIA settled all of Johnson's claims for $750,000.00. (Complaint, ¶ 21) Acadia declined to participate in that settlement. (Complaint, ¶ 21)  The plaintiffs now seek to recover their loss payments and legal fees from Acadia on the basis that Acadia, in breach of its contract and other duties owed to the plaintiffs, improperly marketed and underwrote a speciality line of insurance coverage, that in doing so knew of BPM's significant uninsured exposure, knew or should have known that coverage was available, yet failed to disclose significant uninsured exposure or the availability elsewhere of such coverage to BPM and LRIA, in order to obtain BPM's premium, proximately causing the plaintiffs' damages. (Complaint, ¶ ¶ 29, 30, 45, 46)

## II. PROCEDURAL HISTORY

The defendant removed this action from Suffolk Superior Court on April 29, 2005.  On May 5, 2005, defendant filed a motion to dismiss.  On May 19, 2005, plaintiffs filed their opposition to the defendant's motion to dismiss.  The court held a hearing on July 7, 2005, which ruled that the case would proceed as to counts 3, 8 and 9.

The parties filed a Joint Case Management Proposal (JCMP) on July 20, 2005. (Affidavit

2

of William D. Chapman, ¶ 2) (Exhibit A).  Prior to filing, counsel conferred with respect to establishing deadlines for disclosures pursuant to Fed. R. Civ. P. 26(a)(2)(c). (Affidavit of William D. Chapman, ¶ 3) (Exhibit A).  In an effort to comply with the requirements of the rule, plaintiffs' counsel agreed to provide *initial* expert disclosures by September 6, 2005, with defendant's initial disclosures due by October13, 2005.[1] (Affidavit of William D. Chapman, ¶ 4) (Exhibit A).  Counsel understood that the parties agreed that these dates referred to the preliminary disclosure, i.e. the names and credentials of the experts only, as discovery would be ongoing. (Affidavit of William D. Chapman, ¶ 5) (Exhibit A).  It was never the plaintiffs' intention to require full expert reports by either party as part of the preliminary expert disclosures referenced in the JCMP. (Affidavit of William D. Chapman, ¶ 9) (Exhibit A).  Counsel understood that the parties agreed that a full disclosure, i.e. the expert report, would be made by the parties by November 3, 2005. (Affidavit of William D. Chapman, ¶ 6) (Exhibit A).  The JCMP reflects this understanding.

Relying on this agreement and understanding, plaintiffs served their preliminary disclosure, their expert's name and credentials only, on September 7, 2005. (Affidavit of William D. Chapman, ¶ 7) (Exhibit A) (Exhibit B).  The plaintiffs intended to comply with the JCMP disclosure deadlines as they understood them to be and as intended by the wording of the JCMP. (Affidavit of William D. Chapman, ¶ 8) (Exhibit A).  In light of the complexity of issues raised in this case and the depositions yet to be taken, comprehensive expert reports would not have been feasible within the preliminary expert disclosure dates set forth in the JCMP, and thus were

---

[1]Plaintiff's associate counsel, in reading the rule, understood some expert disclosure was required 90 days in advance of the trial date and thus, in an effort to comply, included this preliminary disclosure deadline in the JCMP.

not contemplated by the parties in agreeing to those dates.[2] (Affidavit of William D. Chapman, ¶ 9) (Exhibit A). This is further reflected in the language of the parties' JCMP wherein the parties set November 3, 2005 as the date by which "[e]xpert disclosures and discovery" would be completed.

Subsequently, in a further effort to supplement their preliminary disclosure, the plaintiffs provided the defendant with a further disclosure of their expert's expected testimony on October 17, 2005. (Affidavit of William D. Chapman, ¶ 10) (Exhibit A) (Exhibit C). Ultimately, as set forth in the parties' JCMP and incorporated into this Court's Order, the plaintiffs provided a full disclosure of anticipated expert testimony pursuant to Fed. R. Civ. P. 26(a)(2)(B) on November 3, 2005. (Affidavit of William D. Chapman, ¶ 11) (Exhibit A) (Exhibit D). Plaintiffs complied with this deadline as they always intended. (Affidavit of William D. Chapman, ¶ 12) (Exhibit A).

The plaintiffs intended to comply with the order regarding discovery, and in fact believe that they complied with the JCMP as drafted and intended by the parties. (Affidavit of William D. Chapman, ¶ 13) (Exhibit A). The plaintiffs proceeded in good faith and without any intent to deceive or surprise the defendant, or to effect any delay in this litigation. (Affidavit of William D. Chapman, ¶ 14) (Exhibit A). The defendant has not accused the plaintiffs of bad faith. The defendant filed its motion when the October 2005 deadline for the defendant's preliminary disclosure had passed and it did not provide the name and credentials of its expert. The

---

[2]Additionally, plaintiff received the defendant's Answers to Interrogatories on October 6, 2005. The first deposition in this case occurred on October 17, 2005, with additional depositions on October 27, October 31, November 1, November 2. More depositions have been scheduled for November 22, 2005 and more are yet to be re-scheduled. The pre-trial conference scheduled for November 3, 2005 was postponed. It has not been rescheduled. The above discovery schedule contributed to the timing of the expert report as it would have been illogical to produce the report prior to the depositions of the defendant's representatives. The fact that a pre-trial conference has not occurred further supports that no harm could have resulted from the timing of the discovery. The defendant still has time to conduct expert discovery.

defendant sought in its motion, in the alternative, leave to file its expert disclosures late. This would have been a fair result.

## III. ARGUMENT

A. <u>The Timing of the Plaintiff's Expert Disclosure was Harmless and Substantially Justified.</u>

The Court's order precluding the plaintiffs' expert should be vacated as the defendant suffered no harm by the timing of the disclosure of the plaintiffs' expert report, and the plaintiffs were substantially justified in producing the expert report as planned. The plaintiffs understood the expert disclosure deadline to be November 3, 2005 and complied with that deadline. Where the plaintiffs lacked intent to deceive or to surprise the defendant, or intent to delay, and the result did not in fact cause any harm or prejudice, the Court's order only serves to prejudice the plaintiffs. The Court's order should be vacated.

As set forth above, plaintiffs intended to comply with the rules of this Court when providing their expert disclosures. Any error in disclosure was substantially justified by the plaintiffs' understanding of the parties' agreement when drafting the JCMP. Additionally, there is no evidence of any harm. Simply asserting one "suffered harm" does not make it so. The facts do not support any allegation of harm. The defendant could have undertaken a number of steps to respond to the plaintiffs' disclosure, such as requesting an extension of time for its expert disclosure, requesting expert discovery, or notifying the plaintiffs in advance of filing their motion to preclude that they considered the plaintiffs preliminary disclosure to have been inadequate. Instead, in order to gain an advantage at trial and impact the plaintiffs' ability to support their claims with expert testimony, the defendant moved for the most extreme sanction possible - preclusion. This drastic punishment does not fit the crime as there was justification

and no harm.

The intent of Rule 26(a)(2) is to "aid the court in its fact-finding mission by allowing both sides to prepare their cases adequately and efficiently and to prevent the tactic of surprise from affecting the outcome of the case. Sherrod v. Lingle, 223 F.3d 605, 613 (1st Cir. 2000); see also Licciardo v. TIG Insurance Group, 140 F.3d 357, 363 (1st Cir. 1998) (stating the purpose of the disclosure requirement is to alleviate the burden and surprise of learning an opponent's expert testimony in open court). Expert disclosure rules were designed to facilitate a "fair contest with the basic issues and facts disclosed to the fullest practical extent." Thibeault v. Square D. Co., 960 F.2d 239, 244 (1st Cir. 1992).

Expert preclusion is not appropriate here. Expert preclusion "is a grave step, and by no means an automatic response to a delayed disclosure" or something to be undertaken lightly. Freeman v. Package Machinery Co., 865 F.2d 1331, 1341 (1st Cir. 1988); see also Thibeault v. Square D. Co., 960 F.2d at 247; Jackson v. Harvard Univ., 900 F.2d 464, 469 (1st Cir. 1990). Preclusion is an "extreme" sanction that only applies to willful or deliberate misconduct. Yang v. Brown Univ., 149 F.R.D. 440, 443 (D. RI. 1993) ("my reading of existing First Circuit case law reveals that willful or deliberate misconduct is necessary for the preclusion of testimony or the barring of witnesses..."). The "drastic" sanction of expert preclusion is unjustified when the plaintiff's failure to comply with the discovery order was harmless. Sherrod v. Lingle, 223 F.3d at 613.

Courts preclude expert testimony when its delayed disclosure is with the intent to deceive or surprise the opposing party days before or during trial. Macaulay v. Anas, 321 F.3d 45, 52 (1st Cir. 2003) (expert preclusion upheld where disclosure of new theory of liability made days before

6

anticipated trial date); Lohnes v. Level 3 Comm., 272 F.3d 49, 60 (1st Cir. 2001) (finding failure

to disclose expert under after opposing party moved for summary judgment type of unfair tactical

advantage rules designed to eradicate). The facts here are distinguished from those where expert

preclusion was warranted by willful misconduct. Here, the facts do not support expert

preclusion.

A Court can admit expert testimony "belatedly" offered if the proponent's failure to

reveal it was either substantially justified or harmless. Lohnes v. Level 3 Comm., 272 F.3d at 60.

The focus of the preclusion inquiry is "mainly upon surprise and prejudice, including the

opponent's ability to palliate the ill effects stemming from the late disclosure." Licciardo, 140

F.3d at 363, quoting Thibeault, 960 F.2d at 246. Courts must also consider the plaintiff's need

for the challenged evidence when determining the appropriateness of a remedy. Macaulay v.

Anas, 321 F.3d 45, 51 (1st Cir. 2003); Johnson v. H.K. Webster, 775 F.2d 1, 8 (1st Cir. 1985)

(stating courts should look at the importance of the evidence to its proponent and the ability of

the defendant to formulate a response when determining whether to preclude expert evidence).

Preclusion should only be used when less severe remedies, such as a brief continuance, are not

possible. The "sanction need only be one appropriate to the truth-finding process, not one

that...served only further to suppress evidence." Jackson, 900 F.2d at 469, quoting Jackson v.

Harvard Univ., 721 F. Supp. 1397, 1414 (D. Mass. 1989).

When the Court considers the above factors, preclusion is not appropriate. Here, expert

testimony aids the plaintiffs in establishing their case, especially given the unique nature of the

issues. The plaintiffs' need for the expert testimony must be considered by the Court. Upon

examination of the substantial justification for the timing of the disclosure, the lack of surprise,

harm or intent to delay, the plaintiff's need for the testimony, and the defendant's ability to palliate the effect of the disclosure, the Court's ruling is excessive.

A minimal continuance and extension of the case management order is the appropriate remedy here. Continuances are commended by courts. Licciardo, 140 F.3d. at 367. A minimal continuance is a remedy that does not cause harm to either party. A minimal continuance will provide a solution which will ensure that neither party suffers harm and the case can be decided on the merits. Jackson v. Harvard Univ., 900 F.2d at 469 (stating that lower court's decision to apply lesser sanction than preclusion based upon their unwillingness to decide the case on evidentiary constructs was within the court's discretion). Where there is no harm and no intent to deceive or surprise and a substantial justification for the timing of the disclosure, a continuance is an effective and appropriate solution. The court in Licciardo concluded: "We stress that the solution of a continuance where the continuance would be effective, is generally to be commended." Licciardo, 140 F.3d. at 367. Courts disfavor parties who claim surprise and prejudice but who do not ask for a continuance. Johnson, 775 F.2d at 8.

It should be noted that this is not a case that has been lingering on the Court's docket. It was filed on April 29, 2005 and given a short discovery time-line. The pre-trial conference, previously scheduled to be held one month in advance of the case being placed on the running trial list for December was postponed. According to the online docket, it has not been rescheduled. The allowance of additional time to fairly exchange expert information and allow all parties to submit expert testimony at trial will not substantially impact the Court's docket. See Macaulay v. Anas, 321 F.3d at 51.

B.    The Case Management Order Should be Extended to Allow the Parties to Conclude
      Discovery and Expert Disclosures in a Fair and Orderly Manner.

A short continuance of the case management order would allow the parties to complete

discovery and to disclose expert reports in a fair and orderly manner.  A short continuance will

not harm or prejudice the defendant.  In fact, in its original motion to preclude, the defendant

implied that leave to serve its expert report would be an acceptable solution.  Defendant's Motion

to Preclude, p. 5.  The defendant stated "In the alternative, should the Court allow Mr. Stanovich

to testify, Defendant respectfully requests leave to serve its expert disclosure within a reasonable

time after Plaintiffs' produce his report."

A short continuance is in the best interest of the parties as they continue to conduct

discovery.  The parties are cooperating to finish discovery and have several more depositions to

conduct.  A short continuance would allow the parties to complete this discovery, which will

serve to narrow the issues before trial and determine whether certain witnesses need to be called

at trial.  The plaintiff requests that the Court modify the JCMP as follows:  depositions and

written discovery to be completed by December 15, 2005; plaintiffs' expert report(s) by January

3, 2006; defendant's expert report(s) and/or summary judgment by January 16, 2005; and final

pretrial conference in early February, 2006, with the case placed on the trial list at that time.

## V. CONCLUSION

Although the Court has broad discretion to administer its docket, it must keep in mind

that the Rules of Civil Procedure were promulgated to facilitate a fair contest between the parties.

The timing of the disclosure by the plaintiffs did not harm the defendant, but precluding the

plaintiffs' expert may harm the plaintiffs at trial.  The fair and appropriate remedy, one

9

mentioned by the defendant, is an extension of time for the defendant's disclosure and a

continuance of the case management order to allow the parties to resolve this matter fairly on the

merits.

## VI. REQUEST FOR ORAL ARGUMENT

The plaintiffs requests an oral argument on this important issue.


Beverly Port Marina, Inc., and
Leslie Ray Insurance Agency, Inc.
By their attorney:


/s/ William D. Chapman
William D. Chapman, BBO# 551261
Melick, Porter & Shea, LLP
28 State Street
Boston, MA 02109
(617) 523-6200

Date: 11/18/05

10

CERTIFICATE OF SERVICE

I, William D. Chapman, hereby certify that on this day, I electronically served the foregoing document(s) on:

Leonard W. Langer, Esq.
Tompkins, Clough, Hirshon & Langer, PA
Three Canal Plaza
P.O. Box 15060
Portland, ME 04112-5060


/s/ William D. Chapman
William D. Chapman


Date:  11/18/05

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * * * * * * * * * * *
                                           *
BEVERLY PORT MARINA, INC., and             *
LESLIE S. RAY INSURANCE AGENCY, INC.,      *     Civil Action No. 1:05-cv-10883-WGY
                                           *
        Plaintiffs,                        *
v.                                         *
                                           *
ACADIA INSURANCE COMPANY,                  *
                                           *
        Defendant.                         *
                                           *
* * * * * * * * * * * * * * * * * * * * * * * * * *
```

## AFFIDAVIT OF WILLIAM D. CHAPMAN
## IN SUPPORT OF MOTION TO RECONSIDER

I, William D. Chapman, hereby state under oath and based on my own personal knowledge that:

1. I am an attorney admitted to practice law in Massachusetts and before this court. I represent the interests of Leslie Ray Insurance Agency, Inc. and Beverly Port Marina with respect to this matter.

2. The parties filed a Joint Case Management Proposal (JCMP) on July 20, 2005.

3. Prior to filing, counsel conferred with respect to establishing deadlines for disclosures pursuant to Fed. R. Civ. P. 26(a)(2)(c).

4. In an effort to comply with the requirements of the rule, plaintiffs' counsel agreed to provide *initial* expert disclosures by September 6, 2005, with defendant's initial disclosures due by October 13, 2005.

5. Counsel understood that the parties agreed that these dates referred to the preliminary disclosure, i.e. the names and credentials of the experts only, as discovery would be ongoing.

6. Counsel understood that the parties agreed that a full disclosure, i.e. the expert report, would be made by the parties by November 3, 2005.

7.  Relying on this agreement and understanding, plaintiffs served their preliminary disclosure, their expert's name and credentials only, on September 7, 2005.

8.  The plaintiffs intended to comply with the JCMP disclosure deadlines as they understood it to be and as intended by the wording of the JCMP.

9.  It was never the plaintiffs' intention to require full expert reports by either party as part of the preliminary expert disclosures referenced in the JCMP. In light of the complexity of issues raised in this case and the depositions yet to be taken, comprehensive expert reports would not have been feasible within the preliminary expert disclosure dates set forth in the JCMP, and thus were not contemplated by the parties in agreeing to those dates.

10. In a further effort to supplement their preliminary disclosure, the plaintiffs provided the defendant with a further disclosure of their expert's expected testimony on October 17, 2005.

11. Ultimately, however, as set forth in the parties' JCMP and incorporated into this Court's Order, the plaintiffs provided a full disclosure of anticipated expert testimony pursuant to Fed. R. Civ. P. 26(a)(2)(B) on November 3, 2005.

12. Plaintiffs complied with this deadline as they always intended.

13. The plaintiffs intended to comply with the order regarding discovery, and in fact believe that they complied with the JCMP as drafted and intended by the parties.

14. The plaintiffs proceeded in good faith and without any intent to deceive or surprise the defendants, or to effect any delay in this litigation.

SIGNED UNDER PENALTIES OF PERJURY.


Date:   11/18/05                    /s/ William D. Chapman
                                   William D. Chapman

# EXHIBIT B

# MELICK, PORTER & SHEA, LLP

Counsellors at Law

28 State Street
Boston, Massachusetts 02109-1775
(617) 523-6200
Fax (617) 523-8130
www.melicklaw.com

Richard J. Shea
Robert P. Powers
John F. Rooney, III *(DC & NH)
William D. Chapman
Michael J. Mazurczak *(WI)
Robert T. Treat
William L. Keville, Jr.
Michael R. Byrne
Andre A. Sansoucy
Amy E. Goganian
Robert W. Healy
Jennifer B. Hardy
Allen J. McCarthy
Angela L. Lackard
Maureen E. Lane *(NH)
Christine C. Heshion
Adam M. Gutin *(RI)
T. Dos Urbanski *(RI)
Megan E. Kures
Matthew Grygorcewicz
Margaret M. Carleen
Kerry D. Florio
Jessica M. Farrelly *(FL)
Stephen D. Eldridge
Johnathan P. Diggin
Debra I. Lerner *(DC & TX)
Joseph M. Alden *(NH & MD)
Alexandra Clark
Jeremy Y. Weltman
Erin J.M. Alarcon *(NH)
J. Paul Vance (CT Only)

Of Counsel
Thomas W. Porter, Jr.
Robert R. Hamel, Jr.
Donna D. Convicer (CT only)

*Also Admitted

369 South Main Street
Providence, Rhode Island 02903
(401) 941-0909
Fax (401) 941-6269

77 Central Avenue
Waterbury, Connecticut  06702

65 Main Street
Plymouth, Massachusetts  02360
(508) 746-5976

September 7, 2005

**By Fax: 207.874.6705**

Leonard W. Langer
Tompkins, Clough, Hirshon & Langer, PA
Three Canal Plaza
P.O. Box 15060
Portland, ME 04112-5060

>       Re:    *Beverly Port Marina, Inc. and Leslie S. Ray Insurance*
>              *Agency, Inc. v. Acadia Insurance Company*
>              Civil Action: 05-10883 WGY

Dear Mr. Langer:

Please be advised that the plaintiffs, Beverly Port Marina, Inc. and Leslie S. Ray Insurance Agency, Inc., intend to call the following expert witness at the trial of the above-referenced action:

Craig F. Stanovich, CPCU, CIC, AU
Austin & Stanovich Risk Managers, LLC
15 West Street, Suite 204
Douglas, MA 01516

A copy of Mr. Stanovich's curriculum vitae is attached hereto and a copy of his report regarding will be produced upon its completion.

Thank you for your attention to this matter.  Please feel free to contact us if you have any question.

Very truly yours,

*Stephen Eldridge*

William D. Chapman
Stephen D. Eldridge

Enclosure
I:\122 Utica\Acadia v. Beverly Port Marina\Misc. Corresp\LT Langer 9.6.05.wpd

# AUSTIN & STANOVICH
### RISK MANAGERS LLC

CRAIG F. STANOVICH, CPCU, CIC, AU
PRINCIPAL AND CONSULTANT

## EMPLOYMENT HISTORY

**Austin & Stanovich Risk Managers, LLC**
Douglas, MA/Providence RI
May 2002 to Present

**Stanovich Risk Managers, LLC**
Holden, MA
January 2002 to May 2002

**Braley & Wellington Insurance Agency Corp.**
Worcester, MA

Chief Operating Officer
Manage all commercial insurance operations
January 2000 to December 31, 2001

Vice President, Commercial Insurance
November 1988 to January 2000

Account Executive
November 1986 to November 1988

**J.H. Albert International Insurance Advisors, Inc.**
Needham Heights, MA

Assistant Vice President/Senior Consultant
October 1985 to November 1986

Assistant Vice President/Staff Consultant
March 1984 to October 1985

Insurance Analyst
November 1983 to March 1984

**Hanover Insurance Company (Allmerica Insurance)**
Worcester, MA

Senior Staff Underwriter – Commercial Casualty
Supervisor
July 1982 to November 1983

Underwriter – Commercial Casualty
September 1978 to July 1982

## Education

*Bridgewater State College*
Bachelor of Science-Education
June 1978

## Risk and Insurance Education
Certified Insurance Counselor Designation (CIC) -1995

Chartered Property and Casualty Underwriter designation
(CPCU)-1987

Associate in Underwriting designation (AU)-1982

## Licenses

*Massachusetts Insurance Broker*
November 1987 to present

*Massachusetts Insurance Advisor*
April 1984 to present

## Selected Recent Speaking Engagements

*"Essentials of Legal Liability and the CGL Policy"*
Certified Insurance Counselors

Miami, FL – August, 2005
Albuquerque, NM – February, 2005
Costa Mesa, CA – October, 2004
Boise, ID – October, 2004
Omaha, NE – June, 2004
Mansfield, MA – March, 2004
Des Moines, IA – February, 2004
Jackson, MS – February, 2004

*"Business Auto, Umbrella, Workers' Compensation and
Employment Practices Liability"*
Certified Insurance Counselors

New Orleans, LA – May, 2005
Dallas, TX – January, 2005
Chicago, IL – August, 2004
Portsmouth, NH – July, 2004
Macon, GA – June, 2004

James K. Ruble Seminars- Certified Insurance Counselors

Cambridge, MA – August, 2005 - *Legal Concepts for Insurance
Professionals*
Falmouth, MA – June, 2005 – *Pollution Liability Coverage in
ISO Policies*
Nashville, TN – February, 2005 – *Legal Concepts for
Insurance Professionals*
Pittsburgh, PA – May, 2005 - *Pollution Liability Coverage in
ISO Policies*
Baton Rouge, LA – October, 2004 - *Pollution Liability
Coverage in ISO Policies*
Chicago, IL – August, 2004 - *Pollution Liability Coverage in
ISO Policies*

## Insurance/Risk Management Organizations

*Expert Commentator – IRMI.com*
April 2002 to present

Member, *Massachusetts Risk and Insurance Management
Society*
January 2002 to present

Member, *National Faculty, Society of Certified Insurance
Counselors*
2000 to present

Member, *Massachusetts Society of Licensed Insurance Advisors*
1995 to present

*Member, Society of Certified Insurance Counselors*
1994 to present

*Member, Society of CPCU*
1987 to present

Board of Governors – Society of Certified Insurance Counselors
2005 to present

## Training/Instructor

Chartered Property and Casualty Underwriter
1987 to present

Massachusetts Association of Insurance Agents
1995 to present

## Publications

Books:

- Author – Commercial General Liability (Dearborn Financial Publishing, Inc. 2003)
- Co-author – Terrorism Coverage for Commercial Lines (Dearborn Financial Publishing, Inc. 2003)

Recent Articles:

- Faulty Work and the CGL (International Risk Management Institute 2005)
- CGL – Fire Legal (International Risk Management Institute 2005)
- Subrogation and Risk Management (Risk Management Magazine 2005)
- A Summary of the December, 2004 ISO Policy Changes (International Risk Management Institute 2004)
- How the Limits Apply in the CGL (International Risk Management Institute, Inc. 2004)
- Additional Insured Changes in the CGL (International Risk Management Institute, Inc. 2004)
- Duty to Defend in the CGL Policy (International Risk Management Institute, Inc. 2002)
- Contractual Liability (International Risk Management Institute, Inc. 2002)
- Auto v. Mobile Equipment in the CGL (International Risk Management Institute, Inc. 2003)
- The CGL Pollution Exclusion (International Risk Management Institute, Inc. 2003)
- Known Injury or Damage (International Risk Management Institute, Inc. 2003)
- Some Common Coverage Misconceptions of the CGL Policy (International Risk Management Institute, Inc. 2003)

Additional Articles Provided Upon Requested

## Previous Trial Testimony

- Superior Court of Suffolk County – 2000
- Superior Court of Bristol County – 2004

## Description of Cases Previously Handled Include:

- Questions of reasonable reliance by insurer on underwriting information

- Scope of Classification Limitation and Assault and Battery exclusion on CGL policy

- Scope of coverage provided for lead poisoning exclusion in Business Owners Policy

- Coverage analysis of property damage and business interruption loss caused by damage to utility servicing premises of insured

- The general duties of agents and brokers to their clients, their insurance companies, and to intended beneficiaries (lenders)

- Terms and conditions of premium "rate lock" agreement (Binding Arbitration)

- The extent of coverage provided by manuscript "errors and omissions clause" in a property policy as well as the meaning of "blanket limit"

- Status of an insured, named insured, and additional insured under a CGL policy

- Extent of pollution clean-up coverage provided by CGL policy

- Issues of rating and experience rating commercial automobile policies (Arbitration)

- Duty of agent to notify mortgagee of removal of interest (Federal Court)

- Standard and care of reasonably prudent insurance broker in preparing an application and Certificate of Insurance

- Material misrepresentation in commercial property insurance application (Florida)

- Meaning of Exclusions (m), j.(5), j.(6) and (k) and (l) in the CGL policy (Texas arbitration applying New Jersey Law)

## Contact:

Craig F. Stanovich, CPCU, CIC, AU
Austin & Stanovich Risk Managers LLC
15 West Street, Suite 204, Douglas, MA 01516
508-476-3347 (Phone) 508-476-3047 (FAX)
email: cstanovich@austinstanovich.com
Web: www.austinstanovich.com

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                                    \*
BEVERLY PORT MARINA, INC., and                      \*
LESLIE S. RAY INSURANCE                             \*
AGENCY, INC.,                                       \*    Civil Action No. 1:05-cv-10883-WGY
        plaintiffs,                                 \*
                                                    \*
v.                                                  \*
                                                    \*
ACADIA INSURANCE COMPANY                            \*
        defendant                                   \*
                                                    \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PLAINTIFFS' PRELIMINARY EXPERT DISCLOSURE

In furtherance of the parties Joint Case Management Proposal, the plaintiffs Beverly Port Marina Inc. and Leslie S. Ray Insurance Agency, Inc. hereby make their preliminary expert disclosure, and reserve their right, as comtemplated in the parties' proposal and the scheduling order applicable to this case, to supplement this disclosure as appropriate pending the completion of discovery which is currently ongoing.

Craig Stanovich, CPCU, CIC, AU
34 Pioneer Road
Holden, MA 01520

Mr. Stanovich's qualifications are set forth in the attached Curriculum Vitae, which is incorporated herein by reference.

Mr. Stanovich is expected to testify as to the respective roles and duties of the parties involved with the subject marine insurance policy which was issued by the insurer, the defendant Acadia Insurance Company, through its agent, Leslie S. Ray Insurance Agency, Inc., to the insured,

the plaintiff, Beverly Port Marina, Inc. Mr. Stanovich is expected to testify as to the standards of care applicable to these parties in the context of the subject placement of the marine insurance policy, and the departure from the standard of care on the part of Acadia, with respect to both Leslie Ray and Beverly Port, in connection with its marketing of its marine insurance program, and its underwriting of the particular policy at issue in this case. Mr. Stanovich's testimony is expected to be based on his qualifications as outlined in his attached CV, his experience in the insurance industry, applicable insurance industry standards, and on his review of the discovery materials, pleadings, and documents pertaining to this case. The plaintiffs reserve their right to supplement this response seasonably prior to trial, as compemplated by the current scheduling order.

BEVERLY PORT MARINA, INC. and
LESLIE S. RAY INSURANCE AGENCY, INC.
By its attorneys,


/s/ Stephen D. Eldridge
William D. Chapman, BBO# 551261
Stephen D. Eldridge, BBO# 651855
Melick, Porter & Shea, LLP
28 State Street
Boston MA 02109
(617) 523-6200

Dated: 10/17/05

# EXHIBIT D

# MELICK, PORTER & SHEA, LLP

Counsellors at Law

28 State Street
Boston, Massachusetts 02109-1775
(617) 523-6200
Fax (617) 523-8130
www.melicklaw.com

Richard J. Shea
Robert P. Powers
John F. Rooney, III *(CT, DC & NH)
William D. Chapman
Michael J. Mazurczak *(NY & WI)
Robert T. Treat
William L. Keville, Jr.
Michael R. Byrne
Andre A. Sansoucy
Amy E. Goganian
Robert W. Healy
Jennifer B. Hardy
Allen J. McCarthy
Angela L. Lackard
Maureen E. Lane *(NH)
Christine C. Hebison
Adam M. Guttin *(RI)
T. Dos Urbanski *(RI)
Megan E. Kures
Matthew Grygorcewicz
Margaret M. Carleen
Kerry D. Florio
Jessica M. Farrelly *(FL)
Johnathan P. Diggin
Debra I. Lerner *(DC & TX)
Joseph M. Alden *(NH & MD)
Alexandra Clark
Jeremy V. Weltman
Erin J.M. Alarcon *(NH)
J. Paul Vance (CT only)
Erin K. Desmarais (NH only)

Of Counsel
Thomas W. Porter, Jr.
Robert R. Hamel, Jr.
Donna D. Convicer (CT only)

*Also Admitted

369 South Main Street
Providence, Rhode Island 02903
(401) 941-0909
Fax (401) 941-6269

77 Central Avenue
Waterbury, Connecticut  06702
(203) 596-0500
Fax (203) 596-0040

1087 Elm Street, Suite 302
Manchester, NH 03101
(603) 627-4278

65 Main Street
Plymouth, Massachusetts  02360
(508) 746-5976

November 3, 2005

**By Telecopier:**
**207.874.6705**
And First Class Mail

Leonard W. Langer
Tompkins, Clough, Hirshon & Langer, PA
Three Canal Plaza
P.O. Box 15060
Portland, ME 04112-5060

> Re:  *Beverly Port Marina, Inc. and Leslie S. Ray Insurance*
> *Agency, Inc. v. Acadia Insurance Company*
> Civil Action: 05-10883 WGY

Dear Mr. Langer:

Pursuant to the dates set forth in the parties' original Joint Case Management Plan, attached hereto please find the report of the plaintiffs' expert, Craig Stanovich.  As discussed, it is my intention to proceed further with the expert issue in court.

At your earliest convenience, please advise as to when Gretyl Lewit will be available to be deposed.  I understand you are going to provide a date for next week for this.  I agreed to continue her deposition from the date noticed (November 1st) to a mutually agreeable date, based on your representation that she still worked for Acadia and was under its control. Insofar as her deposition was noticed first, I will want to complete her testimony before we proceed with the Kinzies' depositions.

Also, at your request, I agreed to continue the Kinzies' depositions to a mutually agreeable date, also with the expectation that this will be a day next week.  I will be agreeable to going forward with the Kinzies'

**MELICK, PORTER & SHEA, LLP**

November 3, 2005
Page 2.

depositions on the same day as the Kinzies', provided that the Lewit deposition proceeds first. I understand we will undertake to proceed with all of these depositions at Yasi & Yasi, where Mr. Ray's deposition was taken yesterday.

I also intend to proceed with the deposition of Acadia underwriter Molly Welsh, which was originally noticed for November 1st. I understand you do not have control over Ms. Welsh, and am proceeding to locate and serve her. I am currently planning to proceed with her deposition on Friday, November 11th at my office in Boston.

Please forward copies of all exhibits marked at David Ray's deposition yesterday.

I expect to be filing a motion for an amendment to the JCMP. We have discussed this, and I understand you do not wish to join in this. If your position on this changes, please let me know.

Please advise, at your earliest convenience, with respect to the discovery issues outlined in my letter to you of October 28th.

Thank you for your attention to these various matters.

Very truly yours,

William P. Chapman

enc. (Stanovich Report 11-3-05)

**Beverly Port Marina, Inc. and Leslie S. Ray Insurance Agency, Inc.**

**v.**

**Acadia Insurance Company**

**Expert Report**

**Respectfully Submitted by:**

**Mr. Craig F. Stanovich, CPCU, CIC, AU**
**Principal Consultant**
**Austin & Stanovich Risk Managers LLC**
**15 West Street, Suite 204**
**Douglas, MA 01516**
**508-476-3347**
**Email: cstanovich@austinstanovich.com**

## Section I – Opinions to be Rendered

I have been asked by Melick, Porter & Shea, LLP to opine as to the standards of care applicable to Acadia Insurance Company ("Acadia") in its marketing, underwriting and claim handling of its Ocean Marine insurance policies as respects Beverly Port Marina, Inc. ("BPM") and Leslie Ray Insurance Agency, Inc. ("LRIA") and to further opine as to whether Acadia departed from the applicable standards of care.

## Section II – Data or Information Considered

- Plaintiff's Amended Complaint and Jury Trial Demand – October 30, 2001
- Complaint for Declaratory Judgment - January 21, 2002
- Limitation of Complaint - March 25, 2002
- Third Party Defendant, Carlos Johnson's Complaint for Declaratory Judgment Pursuant Against Third-Party Defendant Leslie S. Ray Insurance Agency, Inc. – April 25, 2002
- Complaint of the Plaintiffs, Beverly Port Marina, Inc and Leslie S. Ray Insurance Agency, Inc. Against Defendant Acadia Insurance Company – March 24, 2005
- Letter of January 8, 2004 from Pierce & Mandell, P.C.
- Letter of July 11, 2000 to Beverly Port Marina, Inc. for LRIA including 5/22/00 to 5/22/01 Acadia Ocean Marine Policy
- Correspondence in the late fall of 2001 from LRIA to insurers seeking coverage for "blanket" non-employee coverage for operation of covered watercraft under the P&I policy
- Letter of November 1, 1996 from Beverly Insurance Agency to BPM soliciting Marina Insurance on behalf of CNA (Marine Retailers Association of America)

- LRIA ACORD Claim Notice for October 1, 2001 injury to Carlos Johnson
- Various Correspondence between LRIA and workers' compensation insurers
- Memo dated May 26, 2000 to Sue Kinzie of BPM

- May 22, 2002 LRIA Comparison of insurance coverages from LRIA
- No Loss Letter of June 7, 2000
- Commercial Union marine coverage from November 22, 1996 to May 22, 1997
- Hanover Insurance Company May 19, 2000 quotation of marine insurance to LRIA for BPM
- Hanover Loss Control Survey 10/31/97 (36 pages)
- National Marina Program- CU Application for BPM completed by LRIA November, 1996
- Marina Operator's Coverage Application – September, 1997
- Acadia Yacht Dealers/Marina Operators application – May, 2000

- Acadia Loss Control Survey – May 10, 2000

- Acadia Commercial Package Policy/Umbrella Policy – Effective May 22, 2001
- Hanover Insurance Company Commercial Package and Inland Marine Policy - Effective May 22, 1999 to 2000
- Hanover Insurance Company Commercial Package and Inland Marine Policy Effective May 22, 1998 to 1999

- Hanover Insurance Company Umbrella Policy – Effective May 22, 1998 to 1999

- Documents Produced by Acadia

- Acadia Agency Agreement with LRIA including amendments

- Acadia's Businessowners Program Manual

- Deposition of David L. Ray of December 4, 2003 including Exhibits 1-13

- Deposition of Frank Kinzie of January 9, 2004 including Exhibits 1-4
- Deposition of Sue Kinzie of December 5, 2003 including Exhibits 1-31
- Deposition of Maureen Kerans of December 3, 2003 including Exhibits 1-16
- North American Marine Underwriters – Boat Dealer's/Marina Operators Supplemental Application
- Documents produced by Acadia Insurance Co. including underwriting and claim file documents with respect to Beverly Port Marina and Carlos Johnson

Craig F. Stanovich, CPCU, CIC, AU
Austin & Stanovich Risk Managers LLC
cstanovich@austinstanovich.com

**Section III – Qualifications**

I have been providing in depth insurance and risk advice to businesses and organizations for over 27 years. As an insurance broker and insurance advisor, I have been involved in the marine risks of various clients, including Protection & Indemnity and Jones Act coverage. I have the attained the designation of CPCU (Chartered Property and Casualty Underwriter) CIC (Certified Insurance Counselor) and AU (Associate in Underwriting) and regularly speak as a National Faculty member for the Society of Certified Insurance Counselors. As an Expert Commentator for the International Risk Management Institute (IRMI), I research and write articles on various coverage issues. In addition, I was an underwriter for Hanover Insurance Company for five years from 1978 to 1983. For additional information on my qualifications, see the attached Curriculum Vitae.

**Section IV – List of Publications**

See the attached Curriculum Vitae.

**Section V – Other Cases – Testified As Expert**

See the attached Curriculum Vitae.

**Section VI - Compensation**

I am being compensated for my time at a rate of $250.00 per hour plus out of pocket expenses.

Craig F. Stanovich, CPCU, CIC, AU
Austin & Stanovich Risk Managers LLC
cstanovich@austinstanovich.com

3

**Section VII – Opinions**

**Opinion #1 – Marine Insurance is specialty coverage and differs from standard property and liability insurance in several ways - including the use of unique terms, the insurers' ability to draft their own policy wording, and coverage that may not follow standard insurance principles**

Marine Insurance is specialty coverage. Marine insurers cover a wide range of unusual risks such as bridges, ocean going vessels and specialized equipment. Because of the unique nature of the risks being insured, Marine Insurance policy wording is very different from other property and liability insurance. For example, terms such as General Average, Particular Average and Protection & Indemnity have special meaning and are rarely, if ever, found in non-marine insurance.

Marine insurers also do not use standard policy forms – insurers use their judgment as to the coverage they wish to offer any particular policyholder. In fact, Marine Insurance is an "uncontrolled" insurance line - a marine insurer can draft policy wording "on the spot" to fit a certain need or risk. Unlike other property or liability insurance, there is no requirement to obtain state approval of marine insurance policy wording. Thus, marine insurers are free to draft policy wording as they see fit.

The result is that, while marine insurance policies may share similarities, each marine policy will be different – sometimes greatly different. In addition, the approach to insurance taken by marine insurers often differs markedly from the approach of standard property and liability insurers.

For example, the principle of coverage for a "permissive user" is well established in standard property and liability insurance – a personal or commercial auto policy will provide coverage to the owner of a motor vehicle for their liability arising out of the use of the vehicle by *anyone the owner permits to use that vehicle* even if that person is a non-employee. More specifically, an auto dealership that permits a prospective customer to test drive a vehicle held for sale is covered by the standard Garage Liability policy for liability that may arise out of the use of the vehicle the dealership is covered even if that prospective customer is not accompanied by a sales employee of the dealership.

This approach is in sharp contrast to the Boat Dealers – Protection & Indemnity coverage provided to Beverly Port Marina, Inc. ("BPM") by Acadia Insurance Company ("Acadia") in which coverage for BPM only applied if the watercraft owned and held for sale by BPM was operated by an insured or an authorized employee of BPM.

In summary, Marine Insurance can be hard to understand – it is specialty coverage that uses unique terms and policy language. In addition, insurers often draft their own policy wording, making comparisons among insurers' policies difficult at best. Further, marine insurers may approach insurance in a manner that is foreign to all but those who have specialized knowledge in Marine Insurance.

4

Craig F. Stanovich, CPCU, CIC, AU
Austin & Stanovich Risk Managers LLC
cstanovich@austinstanovich.com

**Opinion #2 – Acadia Insurance Company possesses specialized knowledge of Marine Insurance far superior to the Leslie Ray Insurance Agency**

Because of the knowledge required to effectively market and underwrite Marine Insurance (particularly Ocean Marine Insurance), insurers develop or obtain expertise in this area by marketing and underwriting Marine Insurance through specialists – often by either forming a separate marine division or outsourcing some or all of the operation to marine insurance experts.

For example, the Marine Retailers Association of America endorsed program (through CNA) was marketed and underwritten by Norman-Spencer, Inc., a wholesale insurance agent out of Dayton, Ohio. The One Beacon program (formerly Commercial Union) is currently marketed and underwritten by International Marine Underwriters of Boston, a division of One Beacon. The Hanover Insurance Company marine insurance program is marketed and underwritten (with limited authority) by North American Marine Underwriters, LLC of Lynnfield. All of this points to the insurer's desire to use personnel that have an in-depth knowledge and understanding of Marine Insurance.

Similarly, Acadia has an Ocean Marine department located at their home office in Westbrook, Maine. In early 2000, the department consisted of a director of underwriting (Matt Pedersen), and five additional underwriting employees ranging from senior underwriter to associate underwriter to underwriting assistant, all of whom concentrate exclusively on the marketing and underwriting of Ocean Marine insurance.

On the other hand, the vast majority of insurance agents and brokers do not specialize in Marine Insurance. Most insurance agents, such as Leslie Ray Insurance Agency, are generalists who provide insurance services to a wide array of businesses – including a few who require Marine Insurance. Marine insurers recognize the level of focus and expertise of the typical agent or broker and thus, to effectively market marine coverage, routinely act as important resources to brokers who need help in understanding the marine marketplace and its unique coverage.

In summary, Acadia has specialized knowledge and experience in Ocean Marine marketing and underwriting that is far superior to their agent, Leslie Ray Insurance Agency ("LRIA")

**Opinion #3 – Acadia not only knew of the limitation in the Protection & Indemnity Coverage for non-employee operators but also understood the significance of the limitation**

The Marina Operators Legal Liability Policy and Boat Dealers Policy ("MOLL/BD"), including Boat Dealers Insurance, Owned Watercraft (Hull Insurance), and Protection and Indemnity Marina Operators and Boat Dealers, was drafted by Matt Pedersen, Director Ocean Marine Underwriting for Acadia. Neither LRIA nor BPM had any input into the drafting of the policy wording. There can be no serious question that Acadia knew full well that BPM was not protected for liability arising out of a non-employee's operation of watercraft held for sale by BPM.

Acadia also understood the significance of eliminating any coverage for a boat dealer for demonstrations or "test drives" by non-employees – particularly a boat dealer located on the water as is BPM. As a boat dealer is in the business of selling boats – and people may want to first test drive the boats – the potential exposure of customer test drives is evident.

A news release of August 27, 2002 from a J.D. Power and Associates Reports study reports satisfaction among boat owners. In particular, the release states:

> Additionally, the study finds that those who test-drive their boat prior to purchase are significantly more satisfied than those who do not. However, only one-third of all boat buyers report having an opportunity to test drive-their boats. By comparison, in the automobile industry, more than two-thirds of buyers test-drive their new vehicle.
>
> "Many boat dealers point to logistical concerns – they're not located on or near water – and liability issues," Forkin said. "Those that make the effort to get their customers out in the boat for a pre-sale spin usually end up with a more satisfied customer."

A recent article (November 1, 2005) published on the Bluestreak Media website is entitled "How to Test Drive a Boat." The article strongly suggests that customers should test drive watercraft, and suggests the following:

> Tell the dealer that you agree to purchase the boat if it passes your test run. This gives you a way out as well as a giving the dealer a reasonable commitment to making a sale. It's important that you let the salesperson drive the boat away from the dock; once it's clear, you should take over and check everything, and that means everything.

Therefore, every boat dealer (particularly those located on the water) is faced with the risk of having customer test drives. This exposure is noted in the widely used *Best's Underwriting Guide*, which offers the following regarding boat dealers:

> The hazards common to any retail operation are present. Additional exposures in some cases are doing business at water's edge and, when demonstrating boats or equipment, taking the customer on water.
>
> Although the basic policy normally excludes coverage for demonstrations of watercraft, this coverage can be added. If it is, the underwriter should know whether boats are demonstrated or tested away from the premises and whether an employee experienced in boat control and water safety is present. Tests and demonstrations present a hazardous potential…. All of these possibilities must be considered.

It is important to note that the BPM was a sizeable boat dealer, reporting $2.4 million of boat sales on the May 22, 2000 Acadia Yacht/Marina Operators application. In other words, BPM boat sales were not incidental to their operations; boat sales represented the large majority of BPM's operations in year 2000 – presenting a very real potential for customer or non-employee operation of watercraft held for sale. Acadia's solution to the risk presented by a boat dealer's test drive risk was to not make any inquiry about the risk with either LRIA or BPM, but simply eliminate any possibility of coverage.

Craig F. Stanovich, CPCU, CIC, AU
Austin & Stanovich Risk Managers LLC
cstanovich@austinstanovich.com

It should be noted that the Marine Retailers Association of America (MRAA) marina insurance program, marketed through Norman-Spencer, Inc. and insured by CNA, did provide liability coverage for the boat dealer for non-employees operating watercraft held for sale. Specifically, to the extent a boat is an insured boat under the Boat Dealers Coverage Form, the CNA Watercraft Liability Coverage Form does *not* restrict the boat dealer's liability coverage to watercraft being operated by an insured or authorized employees.

In summary, Acadia drafted the wording of the MOLL/BD policy and knew coverage was eliminated for a risk that they understood was significant to a boat dealer – in this case a boat dealer located on the water - BPM.

### Opinion #4 – Acadia failed to use due care in the marketing its MOLL/BD policy.

Considering the superior knowledge Acadia possessed regarding Ocean Marine insurance, and in light of the nature of Marine Insurance (non-standard unique coverage), a reasonably prudent insurer would provide a basic level of informational or educational support to its agents. While Acadia produced two lengthy manuals regarding Acadia's Businessowners Program, complete with the various programs, including descriptions of optional coverage and endorsements, no manual, brochure or other advertising material providing a basic description of Acadia's MOLL/BD program has been produced.

Testimony in evidence does indicate that Matt Pedersen, at the time Director Ocean Marine Underwriting for Acadia, did visit LRIA in the late 1990's to discuss Ocean Marine insurance in general and did provide a brochure and some applications to be used in applying for certain marine coverage. The literature provided appears to be primarily sales literature and provided no MOLL/BD policy forms for review by LRIA and little or no general description of Acadia's MOLL/BD program features and limitations.

In addition, Mr. Pedersen apparently also visited LRIA in early 2000 to encourage LRIA to sell Acadia marine insurance products, going so far as to provide David Ray with a list of local marinas and suggest that he solicit the marine coverage from the list of marinas furnished.

Urging agents to solicit marine insurance on their behalf without providing basic information describing the marine insurance that is being offered falls below the standard of care that a reasonably prudent insurer, exercising due care, would use in marketing its insurance products.

### Opinion #5 – Acadia failed to use due care in the underwriting its MOLL/BD policy.

Acadia did not underwrite a risk that they knew was typical to boat dealers – they simply ignored the exposure and eliminated all coverage from their policy for non-employees operating boats.

A reasonably prudent insurance company underwriting marine insurance, exercising reasonable care, would appreciate the problems facing a boat dealer when customers test drive boats. In turn, they would attempt to identify and evaluate the risk the boat dealer actually faced. Acadia made no such attempt.

For example, the Marine Retailers Association of American (MRAA) Supplemental Application asks following of the boat dealer:

13. Are customers allowed to demo boats unaccompanied?

Likewise, the National Marina Program Application used by International Marine Underwriters on behalf of One Beacon (formerly Commercial Union) asks the following on page 6, under the heading Demonstrations:

Is boat under command of competent employee?

The North American Marine Underwriter – Boat Dealer's/Marina Operations Supplemental Application (underwriting for Hanover Insurance) asks the following questions on page 4, under the heading Protection & Indemnity:

If Boat Dealer, number of demos annually?      Who operates boats during demos?

All of the above insurers have attempted to identify and evaluate the risk of non-employees operating boats.

By contrast, Acadia's Yacht Dealers/Marina Operators Application asks the following on page 1:

Do you do demonstrations with customers aboard?   How often?

This was answered in the affirmative on the Acadia application dated May 22, 2000, with the note "incidental" under the question "How often?"

Unlike the other insurers, the question does not inquire as to who is operating the boat or suggest that an employee be in command of the boat.

Acadia's question on page 2 of the application, under the heading Protection and Indemnity, asks the following (in the context of both Yacht dealers and Marina Operators):

Number of persons who will operate the watercraft and their experience?

The question was answered "3 – good experience – only within harbor."

Once again, the question does not ask if customers or non-employees are operating boats.

---

Craig F. Stanovich, CPCU, CIC, AU
Austin & Stanovich Risk Managers LLC
cstanovich@austinstanovich.com

8

The Loss Control Survey of May 10, 2000 conducted by Grettyl Lewit demonstrates a complete failure on the part of Acadia to consider *any of the marine exposure*.

First, the survey is not requested by the Ocean Marine department but by Molly Welsh, who, according to a May 23, 2000 letter quoting Commercial Property and Commercial General Liability for BPM through LRIA, lists her title as Commercial Lines Senior Underwriter. At that time (May, 2000), she was based in the Marlboro, Massachusetts office of Acadia and is clearly not a marine underwriter.

Second, the Loss Control Survey notes that it covers "Property, Liability." No mention is made of marine insurance and it is unlikely that marine insurance risks and exposures were asked to be surveyed by Ms. Lewit. The request to quote the marine insurance was not sent to the Ocean Marine department's Matt Pedersen until May 9, 2000 (fax to Matt Pedersen from Heidi Bassett dated May 9, 2000 – 10 pages faxed 9:36 AM May 9, 2000), the day before the survey was actually conducted. It is apparent that the marine portion of BPM was handled as an afterthought by Acadia.

Finally, in a general discussion of BPM's operations, Ms. Lewit does mention under Liability:

> They [BPM] would transport boats for the Bayside Expo, or the Boat Show with Portland, ME. There is a world trade center exposition which they actually drove some boats to.

Here, Acadia is made aware of a specific exposure of BPM - taking boats *by water* to boat shows. Yet, no further inquiry or underwriting of this exposure is conducted - no questions are asked of BPM as to who "drove the boats."

As noted earlier, in their application of May 22, 2000, Acadia specifically asked under the heading Protection and Indemnity "Number of persons who will operate watercraft and their experience?" Yet, the Loss Control Survey of May 10, 2000 seemingly made no attempt to answer this marine question – despite the apparent opportunity to ask who operated watercraft.

Had Acadia asked this question, the non-employee operation of BPM owned boats may have been brought to light in May, 2000. In Frank Kinzie's deposition of January 9, 2004, he testified (pages 87 & 88) that he had allowed non-employees to test drive boats to and from the Boston Boat show prior to October, 2001    specifically naming Peter Silva. Identifying the exposure of non-employee operation of boats could have been brought to the attention of both LRIA and BPM at that time – possibly prompting a recommendation that such practices are problematic – ant that Acadia provided no coverage to BPM for the exposure.

In summary, Acadia knew of the exposure of a typical boat dealer located on the water as respects customers operating boats held for sale. In their application, Acadia failed, unlike other marine insurers, to inquire as to who is operating the boats. In addition, the Loss Control Survey of May 10, 2000 fails to survey the marine exposures – the evidence strongly suggests that the survey was requested with no thought given to the marine exposures as the application for marine coverage was sent to the Ocean Marine underwriting department the day before the survey was done.

9

Craig F. Stanovich, CPCU, CIC, AU
Austin & Stanovich Risk Managers LLC
cstanovich@austinstanovich.com

In addition, the specific exposure of operating boats to a boat show is identified, but not followed up by the loss control representative. In short, Acadia did not make any attempt at identifying or evaluating the customer's operations of boats – and failed completely to underwrite this risk. The actions by Acadia in underwriting BPM fall below the standard of care that a reasonably prudent insurer, using reasonable care, would adhere to in underwriting a boat dealer.

## Opinion #6 – Acadia failed to use due care handling the Carlos Johnson claim

In their zeal to deny the coverage to BPM for the Carlos Johnson claim, Acadia took an unusual step –request David Ray of LRIA to sign an affidavit prepared by Acadia's legal counsel and sent to Mr. Ray by Ocean Marine Specialist Patrick O'Toole.

The stated purpose was to offset the affidavit of Sue Kinzie in which she contended David Ray was able to bind coverage from potential risks of liability.

The proposed affidavit, which according to Mr. Ray's deposition of December 4, 2003 he never signed (page 161), *begins* with a statement that Mr. Ray was aware that LRIA had no binding authority for commercial ocean marines risks without the approval of Acadia.

Had the court believed Sue Kinzie's statement regarding Mr. Ray's ability to bind coverage (and therefore found coverage for the Johnson claim), the affidavit requested by Acadia would have been an express admission by Mr. Ray that he had exceeded his binding authority.

The first sentence of Mr. O'Toole's letter of January 30, 2003 asks for Mr. Ray's *help* in the case that is to help Acadia deny coverage to Mr. Ray's customer. With the ostensible purpose of helping Acadia, Mr. Ray is requested to admit what might very well be his liability – a highly unusual step. This is not the custom and practice of the insurance industry in claim handling – and falls below what a reasonable insurance company, using due care, would consider fair dealings with their agent in the handling of a claim.

In addition, item 7 of the affidavit requested Mr. Ray to state that, while they attempted to obtain coverage for customers test driving boats, such coverage was not available. This statement does not appear to be true of Acadia and was not true at the time of the marine market in general. As previously noted CNA, through Norman-Spencer, Inc. and the endorsed MRAA program, did provide coverage for non-employees/customers who operated watercraft to the extent the craft was an insured craft being held for sale by the boat dealer.

10

Craig F. Stanovich, CPCU, CIC, AU
Austin & Stanovich Risk Managers LLC
cstanovich@austinstanovich.com

Even as respects Acadia, the correspondence with Ted Wirth, Director Ocean Marine Underwriting, coverage was unavailable only for "blanketed coverage" of non-employees. In his email to Mr. Ray dated November 7, 2001, Mr. Wirth did state that he could consider coverage for a "finite number of known non-employee operators." Therefore, the unqualified statement contained in the proposed Ray affidavit that coverage for customers test driving or moving boats was unavailable is false. As above, the request that Mr. Ray "help" Acadia by swearing to a statement that Acadia knew or should have known was false is highly unusual and does not comport with the custom and practice of a reasonably prudent insurance company using due care in claim handling.

I would like to reserve the right to supplement this report, and the materials upon which this report is based, once the transcripts of the ongoing depositions have been prepared, insofar as discovery is currently continuing in this case as of the time this report has been prepared.

Signature_____

Date___11/3/2005_____

11

Craig F. Stanovich, CPCU, CIC, AU
Austin & Stanovich Risk Managers LLC
cstanovich@austinstanovich.com



CRAIG F. STANOVICH, CPCU, CIC, AU
PRINCIPAL AND CONSULTANT

## EMPLOYMENT HISTORY

**Austin & Stanovich Risk Managers, LLC**
Douglas, MA/Providence RI
May 2002 to Present

**Stanovich Risk Managers, LLC**
Holden, MA
January 2002 to May 2002

**Braley & Wellington Insurance Agency Corp.**
*Worcester, MA*

> Chief Operating Officer
> Manage all commercial insurance operations
> January 2000 to December 31, 2001

> Vice President, Commercial Insurance
> November 1988 to January 2000

> Account Executive
> November 1986 to November 1988

**J.H. Albert International Insurance Advisors, Inc.**
*Needham Heights, MA*

> Assistant Vice President/Senior Consultant
> October 1985 to November 1986

> Assistant Vice President/Staff Consultant
> March 1984 to October 1985

> Insurance Analyst
> November 1983 to March 1984

**Hanover Insurance Company (Allmerica Insurance)**
*Worcester, MA*

> Senior Staff Underwriter – Commercial Casualty
> Supervisor
> July 1982 to November 1983

> Underwriter – Commercial Casualty
> September 1978 to July 1982

## Education

*Bridgewater State College*
Bachelor of Science-Education
June 1978

## Risk and Insurance Education
Certified Insurance Counselor Designation (CIC) -1995

Chartered Property and Casualty Underwriter designation
(CPCU)-1987

Associate in Underwriting designation (AU)-1982

## Licenses

*Massachusetts Insurance Broker*
November 1987 to present

*Massachusetts Insurance Advisor*
April 1984 to present

## Selected Recent Speaking Engagements

*"Essentials of Legal Liability and the CGL Policy"*
Certified Insurance Counselors

Miami, FL – August, 2005
Albuquerque, NM – February, 2005
Costa Mesa, CA – October, 2004
Boise, ID – October, 2004
Omaha, NE – June, 2004
Mansfield, MA – March, 2004
Des Moines, IA – February, 2004
Jackson, MS – February, 2004

*"Business Auto, Umbrella, Workers' Compensation and
Employment Practices Liability"*
Certified Insurance Counselors

New Orleans, LA – May, 2005
Dallas, TX – January, 2005
Chicago, IL – August, 2004
Portsmouth, NH – July, 2004
Macon, GA – June, 2004

James K. Ruble Seminars- Certified Insurance Counselors

Cambridge, MA – August, 2005 - *Legal Concepts for Insurance
Professionals*
Falmouth, MA – June, 2005 – *Pollution Liability Coverage in
ISO Policies*
Nashville, TN – February, 2005 – *Legal Concepts for
Insurance Professionals*
Pittsburgh, PA – May, 2005 - *Pollution Liability Coverage in
ISO Policies*
Baton Rouge, LA – October, 2004 - *Pollution Liability
Coverage in ISO Policies*
Chicago, IL – August, 2004 - *Pollution Liability Coverage in
ISO Policies*

## Insurance/Risk Management Organizations

*Expert Commentator – IRMI.com*
April 2002 to present

Member, *Massachusetts Risk and Insurance Management
Society*
January 2002 to present

Member, *National Faculty, Society of Certified Insurance
Counselors*
2000 to present

Member, *Massachusetts Society of Licensed Insurance Advisors*
1995 to present

Member, *Society of Certified Insurance Counselors*
1994 to present

Member, *Society of CPCU*
1987 to present

Board of Governors – Society of Certified Insurance Counselors
2005 to present

## Training/Instructor

Chartered Property and Casualty Underwriter
1987 to present

Massachusetts Association of Insurance Agents
1995 to present

## Publications

Books:

- Author – Commercial General Liability (Dearborn Financial Publishing, Inc. 2003)
- Co-author – Terrorism Coverage for Commercial Lines (Dearborn Financial Publishing, Inc. 2003)

Recent Articles:

- Faulty Work and the CGL (International Risk Management Institute 2005)
- CGL – Fire Legal (International Risk Management Institute 2005)
- Subrogation and Risk Management (Risk Management Magazine 2005)
- A Summary of the December, 2004 ISO Policy Changes (International Risk Management Institute 2004)
- How the Limits Apply in the CGL (International Risk Management Institute, Inc. 2004)
- Additional Insured Changes in the CGL (International Risk Management Institute, Inc. 2004)
- Duty to Defend in the CGL Policy (International Risk Management Institute, Inc. 2002)
- Contractual Liability (International Risk Management Institute, Inc. 2002)
- Auto v. Mobile Equipment in the CGL (International Risk Management Institute, Inc. 2003)
- The CGL Pollution Exclusion (International Risk Management Institute, Inc. 2003)
- Known Injury or Damage (International Risk Management Institute, Inc. 2003)
- Some Common Coverage Misconceptions of the CGL Policy (International Risk Management Institute, Inc. 2003)

Additional Articles Provided Upon Requested

## Previous Trial Testimony

- Superior Court of Suffolk County – 2000
- Superior Court of Bristol County – 2004

## Description of Cases Previously Handled Include:

- Questions of reasonable reliance by insurer on underwriting information
- Scope of Classification Limitation and Assault and Battery exclusion on CGL policy
- Scope of coverage provided for lead poisoning exclusion in Business Owners Policy
- Coverage analysis of property damage and business interruption loss caused by damage to utility servicing premises of insured
- The general duties of agents and brokers to their clients, their insurance companies, and to intended beneficiaries (lenders)
- Terms and conditions of premium "rate lock" agreement (Binding Arbitration)
- The extent of coverage provided by manuscript "errors and omissions clause" in a property policy as well as the meaning of "blanket limit"
- Status of an insured, named insured, and additional insured under a CGL policy
- Extent of pollution clean-up coverage provided by CGL policy
- Issues of rating and experience rating commercial automobile policies (Arbitration)
- Duty of agent to notify mortgagee of removal of interest (Federal Court)
- Standard and care of reasonably prudent insurance broker in preparing an application and Certificate of Insurance
- Material misrepresentation in commercial property insurance application (Florida)
- Meaning of Exclusions (m), j.(5), j.(6) and (k) and (l) in the CGL policy (Texas arbitration applying New Jersey Law)
- Issues of Misrepresentation in Commercial Property Policy (Florida Law)
- Agent's duty to disclose information to insurer

## Contact:

Craig F. Stanovich, CPCU, CIC, AU
Austin & Stanovich Risk Managers LLC
15 West Street, Suite 204, Douglas, MA 01516
508-476-3347 (Phone) 508-476-3047 (FAX)
email: cstanovich@austinstanovich.com
Web: www.austinstanovich.com

2