# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BEVERLY PORT MARINA, INC. | ) | |
| and LESLIE S. RAY INSURANCE | ) | |
| AGENCY, INC., | ) | Civil Action No. 1:05-cv-10883-WGY |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ACADIA INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant | ) | |

## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, WITH INCORPORATED STATEMENT OF MATERIAL FACTS</u>

NOW COMES Defendant, Acadia Insurance Company ("Acadia"), by and through its counsel, Tompkins, Clough, Hirshon & Langer, P.A., and pursuant to Rule 56, F.R.Civ.P. and Rule 56.1, Local Rules of the United States District Court for the District of Massachusetts, moves this Honorable Court for summary judgment in its favor and against Plaintiffs, Beverly Port Marina, Inc. ("Beverly Port") and Leslie S. Ray Insurance Agency, Inc. ("Leslie Ray").

The grounds for this motion are that there is no genuine issue of material fact and that Acadia is entitled to judgment as a matter of law, as set forth more fully in Acadia's accompanying Memorandum of Law.

In support of it Motion, Acadia relies on the pleadings in this case and in the related case of *Acadia Insurance Company v. Beverly Port Marina, Inc., et al.*, Docket No. 02-cv-10153-WGY, and the depositions of David L. Ray, Frank Kinzie, Suzanne Kinzie, Acadia Insurance Company, Theodore Wirth, and Matthew Pedersen, with exhibits, as cited below.

## STATEMENT OF MATERIAL FACTS

1.     Frank and Suzanne Kinzie, the owners of Beverly Port, have been customers of Leslie Ray since the 1980's.  *See* Deposition of Suzanne Kinzie ("S. Kinzie Dep." at 62; Deposition of David L. Ray, Dec. 4, 2003 ("Ray Dep. 1") at 5; Deposition of Frank Kinzie ("F. Kinzie Dep.") at 12.

2.     The Kinzies and Beverly Port have obtained virtually all of their insurance coverages through Leslie Ray.  *See* S. Kinzie Dep. at 64-65; F. Kinzie Dep. at 11-14.

3.     The Kinzies purchased the Beverly Port Marina in November of 1996.  *See* S. Kinzie Dep. at 54.

4.     Leslie Ray procured insurance coverage for Beverly Port from Commercial Union Insurance Company for the policy period November 22, 1996 to May 22, 1997.  *See* Deposition of David L. Ray, Nov. 2, 2005 ("Ray Dep. 2") at 91, Exhibits 1, 2.

5.     Leslie Ray subsequently procured insurance coverage from Hanover Insurance Company for Beverly Port for the policy period May 22, 1997 to May 22, 1998. *See id.* at 97, Exhibit 3.

6.     Leslie Ray procured renewals of the Hanover policy for Beverly Port for the policy periods May 22, 1998 to May 22, 1999 and May 22, 1999 to May 22, 2000.  *See id.* at 99.

7.     The terms of coverage did not change when the Hanover policy was renewed. *See id.* at 100.

8.     In addition to obtaining insurance for Beverly Port, Leslie Ray had been procuring insurance for two marinas, Danversport Yacht Club and Pike Marine (which also sells boats) for many years.  *See* Ray Dep. 1 at 31-34; Ray Dep. 2 at 101.

9.      In December of 1997, Leslie Ray entered into an agency agreement with Acadia.  *See* Ray Dep. 1 at 35-36.

10.     The only provision in the agreement relating either to indemnification or Acadia's liability to Leslie Ray states:

> The Company shall defend and indemnify the Agent against liability, including reasonable cost of defense and settlements, imposed on it by law for damages caused by acts or omissions of the Company, provided the Agent has not caused or contributed to such liability by its own acts or omissions.

*See* Exhibit 3 to deposition of Acadia Insurance Company.

11.     The Agency Agreement does not state that Acadia has a duty to explain the scope or meaning of the terms of any coverage to Leslie Ray.  *Id.*

12.     It is not and has not been Acadia's practice to explain the scope or meaning of the terms of Acadia's coverage to its agents or to advise them on the advantages or disadvantages of Acadia's insurance.  *See* deposition of Matthew Pedersen ("Pedersen Dep.") at 26-27; deposition of Theodore Wirth ("Wirth Dep.") at 62-63.

13.     In May 2000, Leslie Ray submitted a Yacht Dealer/Marina Operators Application for insurance to Matthew Pedersen, then director of Acadia's Ocean Marine Underwriting Department.  *See* Pedersen Dep. at 40; Wirth Dep., Exhibit 9.

14.     The application states, in response to the question, "Number of persons who will operate watercraft and their experience":  "3 – good experience."  *See* Wirth Dep., Exhibit 9.

15.     Based on that application, Mr. Pedersen provided Leslie Ray with a quotation for insurance coverage.  *See id.*; Ray Dep. 1 at 42, 117; Pedersen Dep. at 62.

16.    Leslie Ray prepared a comparison chart of the Hanover and Acadia coverages for Beverly Port. *See* Ray Dep. 2 at 114, 117.

17.    Beverly Port and Leslie Ray decided to switch insurance coverage from Hanover to Acadia, and consequently, Acadia issued its marina operators legal liability/boat dealers policy (among other policies) to Beverly Port for the policy period May 22, 2000 to May 22, 2001. *See* Ray Dep. 2 at 87, 118-19; S. Kinzie Dep., Exhibit 26.

18.    Leslie Ray received a copy of the Acadia policy and reviewed it. *See* Ray Dep. 2 at 121.

19.    A copy of the Acadia policy was provided to Beverly Port. *See id.* at 129.

20.    The Acadia coverage for marina operators/boat dealers was equal to or greater than the Hanover and Commercial Union coverages. *See* Ray Dep. 2 at 194.

21.    The Acadia policy was renewed for the period May 22, 2001 to May 22, 2002. *See id.* at 125; F. Kinzie Dep., Exhibit 1.

22.    The renewal policy did not change the terms of coverage. *Id.*

23.    In the Fall of 2001, a Beverly Port customer named Carlos Johnson asked Beverly Port if he could help drive one of Beverly Port's boats back to the marina from a boat show in Boston. *See* S. Kinzie Dep. at 23, 28.

24.    On October 1, 2001, Beverly Port allowed Mr. Johnson to operate one of its boats from the Boston boat show, during which trip he was injured. *See id.* at 27, 42-43.

25.    On or about October 30, 2001, Johnson filed suit against Beverly Port in the Superior Court of Essex County Massachusetts, Docket No. ESCV2001-02037, alleging that he sustained injuries in the course of operating Beverly Port's boat on October 1, 2001. *See* Complaint of Beverly Port and Leslie Ray, para. 6.

26.    On or about January 29, 2002, Acadia filed a complaint in this Court, seeking a declaration that there was no coverage for the Johnson claim. *See* Complaint in *Acadia Insurance Company v. Beverly Port Marina, Inc.*, *et al.*, Docket No. 02-CV-10153-WGY (the "DJ Action").

27.    Beverly Port asserted counterclaims against Acadia in the DJ Action. *See* Answer and Counterclaim, DJ Action.

28.    In connection with its counterclaims and its defense of the DJ Action, Beverly Port argued that Acadia should be deemed to have provided coverage for the Johnson claim because Beverly Port allegedly told Leslie Ray before May 2000 that Beverly Port allowed its customers to "test drive" its boats. *See* Affidavit of Suzanne G. Kinzie dated October 23, 2002, DJ Action; Defendant Beverly Port Marina's Supplemental Memorandum of Law in Support of its Motion for Summary Judgment dated December 20, 2002, DJ Action.

29.    On or about July 25, 2003, the Court granted summary judgment on all claims between Acadia and Beverly Port. *See* Memorandum and Order dated July 25, 2003, DJ Action.

30.    Leslie Ray became a party to the DJ Action. *See* Third-Party Complaints, DJ Action.

31.    The claims against Leslie Ray were based on allegations that Leslie Ray (a) misrepresented its expertise, (b) negligently failed to obtain adequate insurance for Beverly Port, and (c) negligently failed to inform Beverly Port about lack of coverage for certain types of claims. *See id.*

32.    The Court entered final judgment in favor of Acadia in the DJ Action on or about March 23, 2005. *See* Entry of Judgment, DJ Action.

33.     The Acadia policy unambiguously limited protection and indemnity coverage to liability with respect to vessels owned by Beverly Port and operated "by the Insured or by authorized employees of the Insured."  *See* F. Kinzie Dep., Exhibit l; Memorandum and Order dated July 25, 2003, DJ Action.

34.     The Acadia policy did not provide coverage for the Johnson claim.  *See id.*

35.     The Hanover policies issued to Beverly Port and in effect from May 1997 through May 2000 similarly limited P & I coverage to vessels operated "by the insured or his employees."  *See* Ray Dep. 2 at 99 and Exhibit 3.

36.     The Hanover policy would not have covered the Johnson claim.  *Id.* at 133.

37.     The Commercial Union policy issued to Beverly Port similarly limited P & I coverage to vessels "operated by the insured or a competent employee."  *See id.* at 91 and Exhibit 2, p. 5.

38.     The Commercial Union policy would not have covered the Johnson claim. *See id.* at 132.

39.     Frank Kinzie read at least the Commercial Union policy when Beverly Port first obtained insurance.  *See* F. Kinzie Dep. at 40.

40.     Mr. Kinzie holds a law degree from Harvard Law School, as well as both an MBA and a bachelors degree from Harvard and a master's degree from the University of Louvain in Belgium.  *See id.* at 7.

41.     Mr. Kinzie is a management consultant for large corporations, both foreign and domestic.  *See id.* at 6-7.

42.     Before the Johnson claim arose, Beverly Port never asked Leslie Ray for insurance coverage for liability exposure arising out of customer "test drives."  *See id.* at 96.

43.     Though Leslie Ray (through its Executive Vice President, David Ray) says that it had discussions with Matthew Pedersen in the Spring of 2000 regarding the P & I coverage part in Acadia's policy and "most likely" had a conversation with him to the effect that the limitations on the insuring agreement for Acadia's P & I coverage were similar to those in Hanover's P & I coverage, Leslie Ray never raised any questions with Mr. Pedersen that the P & I coverage was not broad enough for Beverly Port's operations.  *See* Ray Dep. 2 at 123-24.

44.     At no time before the Johnson claim arose was Acadia ever informed that Beverly Port let customers operate its vessels or ever asked to provide liability coverage for such a practice.  *See* Pedersen Dep. at 48; S. Kinzie Dep. at 174.

45.     Matthew Pedersen has worked as a marine underwriter for One Beacon/International Marine Underwriters, INAMAR, CIGNA, North American Specialty, Royal Insurance Company, and Fireman's Fund Insurance Company, in addition to Acadia. *See* Pederson Dep. at 6-7, 10-11.

46.     Mr. Pedersen dealt with marina operators legal liability/boat dealers insurance for all of the above companies except for CIGNA.  *See id.* at 11-12.

47.     Mr. Pedersen is not familiar with any insurance companies that provide liability coverage for customers operating an insured's vessels.  *See id.*  at 35.

48.     Mr. Pedersen's understanding (based not only on his underwriting experience, but also in his experience of purchasing many boats from dealers) was that boat dealers do not allow customer "test drives."  *See id.* at 45-46, 49-50.

49.    The 2001-2002 renewal of the Acadia policy was issued by Theodore Wirth, who replaced Mr. Pedersen as Acadia's director of ocean marine underwriting.  *See* Wirth Dep. at 6, 25, 26.

50.    Before joining Acadia, Mr. Wirth had been an insurance broker and in that capacity had procured marina operators legal liability/boat dealers insurance coverage from such companies as Hanover, International Marine Underwriters, New Hampshire Insurance Company, CIGNA, AIG and St. Paul.  *See id.* at 10.

51.    All of the above companies used wording similar to the insuring agreement in the P & I coverage part of the Acadia policy.  *See id.*

52.    Mr. Wirth was not aware of any insurers that cover liability arising from customers operating insured's vessels.  *See id.* at 30, 50, 63-64.

53.    Mr. Wirth (based on his experience not only in the marine insurance field but also as the buyer of many boats from dealers) was not aware of any boat dealers allowing "customer test drives."  *See id.* at 32, 95-96.

54.    The condition that a boat be operated by either the insured or its employee has always been a prerequisite to P & I coverage in Acadia's marina operators/boat dealers policy.  *See* Wirth Dep. at 50; Pedersen Dep. at 35.

55.    No insurance agent had ever raised a question with Mr. Wirth concerning liability exposure for boat dealers arising out of "test drives."  *See* Wirth Dep. at 96.

56.    Because Acadia was not aware of boat dealers in general, or of Beverly Port in particular, allowing customer "test drives," Acadia had no reason to recognize a potential for liability exposure in allowing customer "test drives."  *See id.* at 32, 63, 95-96; Pedersen Dep. at 48.

57.    Acadia never gave Leslie Ray false information.  *See* Ray Dep. 2 at 176.

58.    After Acadia advised that there was no coverage for the Johnson claim, Beverly Port asked Leslie Ray for the first time to procure coverage for customer "test drives."  *See* Ray Dep. 2 at 136 and Exhibit 7.

59.    In November 2001, Leslie Ray asked if Acadia could provide such coverage.  *See id.*

60.    Acadia advised that it could not provide such coverage.  *Id.* at 139-40 and Exhibits 8-9.

61.    At the same time, Leslie Ray asked Hanover if they would provide such coverage.  *Id.* at 140 and Exhibit 10.

62.    Hanover responded that it did not offer such coverage because the exposure was "too difficult to control," adding that it did "not believe that any standard market will offer this coverage."  *Id.* at 140-41 and Exhibit 11.

63.    At the same time, Leslie Ray asked Commercial Union/One Beacon/International Marine Underwriters if they would offer such coverage.  *See id.* at 144-45 and Exhibits 12-13.

64.    Commercial Union/One Beacon/International Marine Underwriters responded that it would not consider writing such coverage.  *See id.* at 145-46 and Exhibits 12, 14.

65.    Additionally, Leslie Ray contacted a Florida insurance agency that specialized in marine coverage and still was unable to procure such coverage.  *See* Ray Dep. 1 at 52.

66.    After investigating the issue "fairly extensively," Leslie Ray found that coverage for customer "test drives" was not available.  *See id.* at 110, 136-37, 158; Ray Dep. 2 at 148.

Dated at Portland, Maine this 27th day of November, 2005.

ACADIA INSURANCE COMPANY

By its counsel:

/s/   Leonard W. Langer_____

/s/   Marshall J. Tinkle_____
(BBO# 565513)

TOMPKINS, CLOUGH, HIRSHON
   & LANGER, P.A.
Three Canal Plaza
P. O. Box 15060
Portland, ME  04112-5060
   (207) 874-6700
lwlanger@tchl.com

## CERTIFICATE OF SERVICE

I, Leonard W. Langer, hereby certify that on November 27, 2005, I electronically filed the within document with the Clerk of the Court using the CM/ECF system which will send a notification of such filing(s) to the following:  William D. Chapman, Esq., Melick, Porter & Shea, LLP, 28 State Street, Boston, MA  02109 counsel for Plaintiffs Beverly Port Marina, Inc. and Leslie S. Ray Insurance Agency.

/s/   Leonard W. Langer_____

Acadia/BPM/LRIA
Mot For Sum J

10

1

1            Volume: I
             Pages: 1-181
2            Exhibits: 1-13

3        UNITED STATES DISTRICT COURT

4        DISTRICT OF MASSACHUSETTS

5    _____

6    ACADIA INSURANCE COMPANY,
              Plaintiff
7
         vs.                    Docket No.
8                               CA 02-CV-10153
     BEVERLY PORT MARINA, INC. AND
9    CARLOS JOHNSON,
     Defendants/Third-Party
10   Plaintiffs

11            vs.

12   LESLIE S. RAY INSURANCE AGENCY,
     INC.,
13        Third-Party Defendant

14   _____

15

16            DEPOSITION of DAVID L. RAY, a
     witness called by and on behalf of the
17   Defendant/Third Party Plaintiff Beverly Port Marina,
     Inc., taken pursuant to the Federal Rules of Civil
18   Procedure, before Heidi B. Stutz, Certified
     Shorthand Reporter No. 146599S and Notary Public in
19   and for the Commonwealth of Massachusetts, at the
     offices of Cianciulli & Ouellette, 163 Cabot Street,
20   Beverly, Massachusetts, on Thursday, December 4,
     2003, commencing at 10:05 a.m.
21

22            Hennessey Corp., d/b/a

23            Robert H. Lange Company

24            50 Congress Street
              Boston, Massachusetts 02109
     617-523-1874 °°° 800-645-6807 °°° Fax 617-523-7343



5

1      A.    Yes, I do.

2      Q.    Okay.  And the Kinzies and Beverly Port

3  Marina have been long-term customers of the Leslie

4  Ray Insurance Agency, is that fair to say?

5              MR. CHAPMAN:  Object to the form.

6  Go ahead.

7      Q.    Fair to say?

8      A.    Fair to say since I believe 1996 or

9  somewhere in that area.

10     Q.    Well, Beverly Port Marina became a

11 customer in '96, but the Kinzies were customers

12 before that, were they not?

13     A.    You know, I believe they were.

14     Q.    You did personal lines?

15     A.    Yes, we did.

16     Q.    And insured a house of theirs?

17     A.    Yes.

18     Q.    Or real estate generally?

19     A.    Yes.

20     Q.    Okay.  Now, you understand that Mr.

21 Johnson has sued Beverly Port Marina seeking money

22 as a result of his paralysis and injuries?

23     A.    Yes.

24              MR. CHAPMAN:  Let me just say for

HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
617-523-1874

31

1      Q.   Do you have any recollection of what you

2   learned in the marina class, portion of the class?

3      A.   No.  I would say it was a broad overview

4   on marina coverages, if anything.  I really don't

5   recall how much we did touch on that.  I'm sure that

6   it was not a major subject.

7      Q.   Okay.  Now, what about the AAI, what is

8   that?

9      A.   It's really a junior designation that

10  touches upon personal lines and small commercial

11  lines.  It was the first group of insurance classes

12  that I took when I came into the business.  As I

13  recall, they were three classes to get, that I had

14  to take and three exams to pass that designation.

15     Q.   Any study on marinas, to your

16  recollection?

17     A.   Not to my recollection.

18     Q.   Now, in answers to interrogatories there

19  are some marinas that have been named as customers

20  of Leslie Ray.  Can you tell me from memory all of

21  the customers that you recall that have been

22  marinas, yacht clubs at Leslie Ray?

23     A.   Currently or before the loss?

24     Q.   Any time.

32

1        A.    Do you want me to list them?

2        Q.    Please.

3        A.    Danversport Yacht Club, Pike Marine.

4              MR. LANGER:  I'm sorry, Pipe?

5              THE WITNESS:  Pike, P-I-K-E.

6        A.    And Lighthouse Marina, sometimes referred

7    to as Parker Street Marina.

8        Q.    Any others?  Beverly Port Marina,

9    obviously.

10       A.    Beverly Port Marina.

11       Q.    I think that was all that was in your

12   answers to interrogatories.

13       A.    That's all that I can recall.

14       Q.    How many of those -- let's take it one at

15   a time.  Is Danversport Yacht Club a customer now?

16       A.    Yes.

17       Q.    When did they become a customer?

18       A.    Many years before my time in the agency.

19   Before 1987.

20       Q.    Who handled this account?

21       A.    Richard Jones handles, has handled it for

22   as long as I've been with the agency.

23       Q.    Is he the producer on the account?

24       A.    Yes.

33

1          Q.    If an account -- from time to time people

2    simply call the agency and say I'm looking for

3    insurance, is that fair to say?

4          A.    Yes.

5          Q.    Without asking for any particular

6    individual?

7          A.    Yes.

8          Q.    Is that account then assigned to a

9    producer?

10         A.    It depends on the account.

11         Q.    If it's a personal lines account, will it

12   be assigned to a producer?

13         A.    No.

14         Q.    It will just be assigned to the agency and

15   a customer service representative will handle it?

16         A.    Yes.

17         Q.    What about a commercial account, will that

18   be assigned to a producer?

19         A.    It depends on the -- generally, no.

20   Generally, no.

21         Q.    What has been your involvement in

22   procuring insurance for Danversport Yacht Club?

23   When I say "your," personally.

24         A.    My personal involvement?

34

1          Q.    Yes.

2          A.    Virtually nil.

3          Q.    And so they've been a customer for many

4    years, before Beverly Port Marina, and continue now,

5    correct?

6          A.    Yes.

7          Q.    Do you know the types of coverages that

8    they have?

9          A.    I do.  I'm not familiar with the details

10   of that account, I really do not handle it, but they

11   have property and general liability and marina

12   operator's legal liability, as I understand.

13         Q.    Who's their carrier?  Is it Acadia?

14         A.    I can't recall offhand.

15         Q.    Tell me about Pike.  Are they still a

16   customer?

17         A.    Yes.

18         Q.    How long has Pike been a customer?

19         A.    Let me just say more than five years.  I

20   don't know.  Many years.  Possibly more than ten.

21         Q.    So in context with Beverly Port Marina,

22   were they a customer before or after Beverly Port

23   Marina?

24         A.    I believe they were a customer before

35

1    Beverly Port Marina.

2        Q.    Okay.  And are you the producer on that

3    account?

4        A.    No.

5        Q.    Who is that?

6        A.    Richard Jones.

7        Q.    And what involvement have you had with

8    Pike?

9        A.    Virtually nil.

10       Q.    And how about -- do you know who they're

11   insured with?

12       A.    I believe they are with Hanover Insurance

13   Company.

14       Q.    And this Lighthouse/Parker Street, are

15   they a current customer?

16       A.    Yes.

17       Q.    How long have they been a customer?

18       A.    Less than two years.

19       Q.    Now, the accident occurred on October 1st,

20   2001, correct?

21       A.    Correct.

22       Q.    So they became a customer after the

23   accident?

24       A.    I'm not sure.

36

1        Q.    Does the Danversport Yacht Club sell

2   boats?

3        A.    No, they don't.

4        Q.    Does Pike sell boats?

5        A.    Yes, they do.

6        Q.    Does Lighthouse/Parker Street?

7        A.    No.

8        Q.    So the only marinas that have sold boats,

9   to your knowledge, that Leslie Ray has insured are

10   Pike and Beverly Port Marina?

11        A.    Yes.

12        Q.    And just to make it clear, those are all

13   the marinas you can think of that you've insured?

14        A.    Yes.

15        Q.    Have you represented any boat dealers?

16        A.    No.

17        Q.    When I say "represent," is that the proper

18   term for an agent?  I represent Beverly Port Marina.

19   What would you say, how would you describe your

20   relationship?

21        A.    Have I provided insurance coverages, have

22   I sold coverages to any boat dealers?  The answer

23   would be no.

24        Q.    Okay.  Thank you.

42

1    P-E-D-E-R-S-O-N.

2                 MR. CHAPMAN:  Could be S-E-N, I'm

3    not sure.  Not to split hairs or anything.

4                 MR. PIERCE:  Could be.

5                 THE WITNESS:  I think it is S-E-N.

6         A.    We had, we had several conversations

7    regarding the operations of Beverly Port Marina.  We

8    discussed the coverages that were on the Hanover

9    Insurance policy.  I had asked Matt if he felt that

10   he could in essence do a better job, provide a

11   better insurance program for Beverly Port Marina.

12   He felt that he could, and we then worked together

13   after we acquired some information in order to quote

14   the coverage with Acadia.

15        Q.    Did you have a prior relationship with

16   Acadia before this time?

17        A.    We've had a relationship.  The

18   relationship with Acadia was relatively new,

19   especially if you compare it especially to Hanover

20   or Commercial Union.

21        Q.    But it existed prior to the time of

22   Beverly Port Marina?

23        A.    Yes, sure.  In other words, you're asking

24   is Beverly Port Marina the first policy that we

52

1          Q.    Do you remember the conversation?

2          A.    I only remember from the conversation that

3    the coverage that we had in question was not

4    available.

5          Q.    The coverage, what do you mean by that?

6          A.    I believe -- well, let me ask you.  You

7    were inferring some type of coverage after the loss

8    that I was seeking?

9          Q.    Right.  Well, let me ask you this.  We'll

10   get to the documents, but at some point you went to

11   Acadia, I know there's in e-mails going back and

12   forth between you and Acadia about getting coverage

13   for customers test-driving boats?

14         A.    Correct.

15         Q.    Was that the type of coverage you

16   discussed with the Florida agency?

17         A.    Yes.

18         Q.    And what were you told?

19         A.    They do not have that available and it's

20   generally not available.

21         Q.    Not available, okay.

22               Did you do anything after the

23   incident to try to get coverage for Beverly Port

24   Marina for employees' injuries while operating

110

1    for that, or discuss with them possibly that

2    coverage could not be obtained.

3        Q.    So if they looked for coverage for certain

4    exposures, you might look into it and come back to

5    them saying I can't get you the coverage?

6        A.    That could happen.

7        Q.    Has that happened to you before?

8        A.    Absolutely.

9        Q.    Has it happened with Beverly Port Marina?

10       A.    I can't recall it happening with Beverly

11   Port Marina.

12               MR. CHAPMAN:  Are you talking before

13   the loss or after the loss?

14       A.    Before the loss -- well, that's a fair

15   question.  Are you talking before the loss or after?

16       Q.    Do you want to clarify your answer?

17       A.    Well, after the loss Frank and I had a

18   conversation about acquiring that coverage, and at

19   that time I looked into it fairly extensively and

20   discovered that that coverage was not obtainable.

21       Q.    Do you mean that as a blanket statement or

22   do you mean was not obtainable through the markets

23   you looked at?

24               MR. CHAPMAN:  Object to the form.

117

1        A.    No, it's an Acadia Insurance Company form.

2        Q.    And how did it come that you had this --

3    strike that.

4              How did it happen that you filled

5    this first page out?

6        A.    Well, we were trying to obtain a quote for

7    an insurance proposal from Acadia Insurance, so we

8    collected information from the file and collected

9    receipt information most likely from the Kinzies.

10       Q.    Is this from a meeting you had with the

11   Kinzies?

12       A.    I don't believe so.

13       Q.    Telephone call?

14       A.    Probably, yes.

15       Q.    Did you obtain this information directly

16   from the Kinzies that you wrote down or did you

17   obtain it from someone else?

18       A.    I can't tell from this.

19       Q.    So it's possible Candy obtained it and

20   then you wrote it down?

21              MR. CHAPMAN:   Objection.

22       A.    That's possible.

23       Q.    Okay.   Let's look on the second page Bates

24   stamped 418.

136

1       Q.    I didn't see an e-mail to him, although I

2   may have missed it.  Do you remember whether there

3   was a written communication to him to which the

4   bottom half of Exhibit 4 is a response?

5       A.    I believe there was a telephone

6   conversation to Ted Wirth.

7       Q.    I see.  And then he responded with this?

8       A.    Right.

9       Q.    Basically telling you that -- the upshot

10  of all this, if I may paraphrase, is that Beverly

11  Port Marina wanted to get coverage for customers who

12  wanted to try out boats and Acadia, through Wirth,

13  basically said they don't offer that type of

14  coverage because they essentially don't have the

15  opportunity to do an underwriting investigation of

16  every potential customer, is that a fair

17  characterization?

18              MR. CHAPMAN:  Objection.  Go ahead.

19      A.    Yes.

20      Q.    Now, who else did you go to to see if this

21  type of coverage could be available?

22      A.    I went to Commercial Union.

23      Q.    Who did you speak to there?

24      A.    Meredith Atwood.  I went to Hanover, and

137

1    spoke with a gentleman named Al Chicoyne (phonetic),

2    and then I noted in the file that we also, that I

3    also contacted a specialty agency that I referred to

4    earlier down in Florida, but I think this was later

5    on, I believe it was later on, and inquired of them

6    if they offered that coverage.

7         Q.   Was the response from Commercial Union and

8    Hanover the same?

9         A.   Virtually the same, yes, that there would

10   be no coverage and that it was unavailable.

11        Q.   And with Hanover and Commercial Union, was

12   that just one phone call apiece?

13        A.   One or two.  It was quick.

14        Q.   Did you report back the results of your

15   research?

16        A.   Yes, I did.

17        Q.   And other than contacting the three

18   carriers, Acadia, Hanover and Commercial Union, and

19   the agency in Florida, was there anything else you

20   did to see if there was coverage for potential

21   customers test-driving boats,

22        A.   No.

23             MR. PIERCE:  Let's get this next one

24   marked, please.

HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
617-523-1874

158

1              MR. SMITH:  Yeah.

2              MR. CHAPMAN:  I do.

3              MR. SMITH:  I'm wondering why you're

4    raising it as a defense.

5              MR. CHAPMAN:  It's the exoneration

6    statute.

7              MR. PIERCE:  Good.

8              Let me just talk to Frank and Sue

9    for a minute.  I think I'm just about done.

10              (Discussion off the record.)

11        BY MR. PIERCE:

12        Q.   Have you investigated with any other boat

13   marinas other than Beverly Port Marina whether they

14   allow customers to test-drive boats?

15        A.   I have not.

16        Q.   Have you come to any understanding about

17   that issue since the accident, about the general

18   practice of marinas allowing customers to test-drive

19   boats?

20              MR. CHAPMAN:  Objection.  Go ahead.

21        A.   Yes, I have.

22        Q.   What's that understanding?

23        A.   The general understanding is that

24   customers are not allowed to test-drive boats.

HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
617-523-1874

1

1          Volume: I
           Pages: 1-200
2          Exhibits: 1-17

3          UNITED STATES DISTRICT COURT

4          DISTRICT OF MASSACHUSETTS

5

6    BEVERLY PORT MARINA, INC., AND
     LESLIE S. RAY INSURANCE AGENCY,
7    INC.,
                    Plaintiffs      Docket No.
8                                   CA 1:05-CV-10883
          vs.                       WGY
9
     ACADIA INSURANCE COMPANY,
10                  Defendant       ORIGINAL

11

12

13          DEPOSITION of DAVID L. RAY, a
     witness called by and on behalf of the Defendant,
14   taken pursuant to the Federal Rules of Civil
     Procedure, before Heidi B. Stutz, Certified
15   Shorthand Reporter No. 146599S and Notary Public in
     and for the Commonwealth of Massachusetts, at the
16   offices of Yasi & Yasi, Two Salem Green, Salem,
     Massachusetts, on Wednesday, November 2, 2005,
17   commencing at 10:29 a.m.

18

19

20

21

22          Hennessey Corp., d/b/a

23          Robert H. Lange Company

             50 Congress Street
24          Boston, Massachusetts 02109
     617-523-1874 °°° 800-645-6807 °°° Fax 617-523-7343

1    where they are.  But I've heard the name Blackadar

2    Insurance Agency (phonetic).

3         Q.    Prior to May of 2000 did you ever attempt

4    to contact anyone at Blackadar regarding coverages

5    that you were writing for Beverly Port?

6                   MR. CHAPMAN:   Object.

7         A.    No.

8         Q.    When you first became the producer for

9    Beverly Port Marine upon Ms. Kerans' departure who

10   did you meet with at Beverly Port?

11        A.    I met with Frank and Sue Kinzie at

12   different times.  Sometimes it would be one of them,

13   sometimes it would be both together.

14        Q.    Did you take anybody from the agency with

15   you when you met with them?

16        A.    I believe that when we transferred the

17   business from Hanover to Acadia and we went down to

18   discuss that with Sue Kinzie, I seem to remember

19   that Candy Howard went with me.

20        Q.    Prior to your first meeting with the

21   Kinzies did you have an opportunity or take the

22   opportunity to review the file at the agency

23   regarding policies that had been issued to the

24   marina prior to your involvement?

91

1    recognize that handwriting?

2               MR. CHAPMAN:  He's not asking you to

3    read it now.  He's asking if you recognize it.

4         A.    I don't recognize it.  I don't know if

5    that is Maureen's handwriting or not.

6         Q.    Will you agree with me that the

7    handwriting reads, "Company is revising this page to

8    show business income is included on pumps"?

9               MR. CHAPMAN:  Object.  It says what

10   it says.  Go ahead.

11        A.    Yes, that is what it says.

12        Q.    Now, let me refer you to coverage section

13   Roman numeral II, Protection and Indemnity.  Are you

14   familiar with protection and indemnity coverage?

15               MR. CHAPMAN:  Object.

16        A.    Somewhat familiar, yes.

17        Q.    And would you please read to yourself

18   paragraph number 1 and 1.1?

19               Have you read that?

20        A.    I have.

21        Q.    And in your experience would this

22   typically be termed the insuring agreement portion

23   of this coverage?

24        A.    Uh-huh.

97

1        Q.    Mr. Ray, I'm going to show you what has

2    been marked as Ray Exhibit 3 and ask if you

3    recognize this document.

4                (Document handed to witness.)

5        A.    Yes.

6        Q.    This is the insurance policy, the marina

7    operator's legal liability policy issued by Hanover

8    Insurance to Beverly Port Marine for the period

9    May 22, 1997 to May 22, 1998, is that correct?

10        A.    That is correct.

11        Q.    This would be the policy that replaced

12    what has been marked as Exhibit No. 2?

13        A.    That is correct.

14        Q.    Did you have any involvement at all in

15    arranging for what's been marked as Exhibit No. 3?

16        A.    Are you asking me if I had any involvement

17    in obtaining copies of this file for this legal

18    procedure?

19        Q.    No.  My question was were you involved at

20    all in discussions with Beverly Port Marine

21    regarding the renewal policy and arranging for the

22    renewal policy in May of 1997?

23        A.    No.

24        Q.    So would that indicate to you that Miss

99

1    document speaks for itself.  Go ahead.

2         A.   Yes.

3         Q.   And would you agree with me that paragraph

4    1(A)(1) of the insuring agreement limits coverage

5    under the protection and indemnity form to incidents

6    involving vessels, in water operation of water craft

7    by the insured or his employees in connection with

8    customary operations of marine operator or boat

9    dealer -- excuse me -- correct -- of a marine

10   operator or boat dealer?

11                MR. CHAPMAN:  Objection to the form

12   and insofar as it calls for a legal opinion.

13        Q.   Again, I'm not asking for a legal opinion.

14   Do you agree with me that that's in fact what it

15   says?

16                MR. CHAPMAN:  Object.

17        A.   Yes.

18        Q.   Now, this policy was renewed again in May

19   of 1998 for the policy period May '98 through May

20   '99, is that correct?

21        A.   Yes.

22        Q.   And it was subsequently renewed again with

23   Hanover during the period May 22, 1999 to May 22,

24   2000?

100

1       A.    Correct.

2       Q.    Were you involved in your capacity as a

3    producer at the Leslie Ray Insurance Agency with the

4    renewal of the Hanover policy for the period May '98

5    to May '99?

6       A.    I don't recall that I was.

7       Q.    What about May '99 to May 2000?

8       A.    I don't recall that I was.

9       Q.    When you started your duties with regard

10   to Beverly Port did you go back and review the

11   marina operator's legal liability policy issued by

12   Hanover to Beverly Port Marine?

13      A.    I did review the coverage declaration

14   page.

15      Q.    Just the declaration page, not the

16   coverages?

17      A.    I don't recall, I don't recall.

18      Q.    To your knowledge, did the coverages

19   provided by Ray Exhibit 3 change at all from May of

20   1997 to May of 2000?

21      A.    Not to my knowledge.

22                  (Deposition Exhibit No. 4

23                   marked for identification.)

24      Q.    Now, when the policy Exhibit No. 3 was

1    renewed in May of 1998 Leslie Ray at that point had

2    an agency agreement with Acadia, is that true, to

3    your knowledge?

4        A.    Can you give me the date that we signed

5    the agreement?

6        Q.    I'm not trying to be secretive.  I believe

7    --

8        A.    I believe it was in December of 1997.

9        Q.    I believe that's correct.

10       A.    Okay.  Then if that was the case, then

11   yes, as of May 1998 we would have had a contract

12   with Acadia Insurance Company.

13       Q.    Do you know whether anybody at the Leslie

14   Ray agency sought a quote from Acadia in the spring

15   of 1998 with regard to the Beverly Port Marina

16   coverage?

17       A.    I don't know that.

18       Q.    In May of 1999 do you know whether anybody

19   at the Leslie Ray agency sought a quote from Acadia

20   for the Beverly Port Marine coverage?

21       A.    I'm not aware of us doing so.

22       Q.    Do you know whether anybody at the Leslie

23   Ray Insurance Agency sought a quote from Commercial

24   Union in May of 1998 for the Beverly Port coverage?

114

1      Q.   I'm sorry, I didn't mean to cut you off.

2           Do you remember preparing any sort

3    of comparison chart with regard to either coverages

4    or premium for coverages between the Hanover and

5    Acadia policies?

6      A.   Yes.

7      Q.   And do you believe that that comparison is

8    contained in Leslie Ray's files?

9      A.   Yes.

10     Q.   Have you seen a copy of that comparison in

11   preparation for either this deposition or any other

12   deposition?

13     A.   I did not see it in preparation for this

14   deposition, but I recall seeing it in preparation

15   for the last deposition.

16          Pardon me, I did see it briefly in

17   preparation for this deposition, but I didn't really

18   review it.

19     Q.   Was it marked as an exhibit at a prior

20   deposition?

21     A.   I don't know.

22          (Deposition Exhibit No. 5

23           marked for identification.)

24     Q.   I'm going to show you what's been marked

117

Q.   Okay.  Fair enough.  But fair to say that
your best recollection is that you prepared a
similar document with regard to the Hanover Acadia
coverages?

A.   Fair to say.

Q.   Now, I'm turning to page 2 of Exhibit 5
that talks about marina operations.  In the
comparison that you had made for the Hanover to
Acadia coverages would you have gone into any
greater detail as to specific coverages that were
being provided or would it have been limited to just
talking about premiums as you have on Exhibit 5?

MR. CHAPMAN:  Objection.  Go ahead.

A.   I would have to see a copy of it, but I
believe it was very similar to what we have here.

Q.   Similar to Exhibit 5?

A.   Similar to Exhibit 5.

(Deposition Exhibit No. 6
marked for identification.)

Q.   Let me show you what's been marked as
Exhibit No. 6 and ask if you can identify that
document.

(Document handed to witness.)

A.   Yes.

1          Q.    What is Exhibit 6?

2          A.    It is just to summarize answers to some

3     questions that Sue Kinzie posed to me when we were

4     reviewing coverages in May of 2000.  These are the

5     answers to those questions after I researched them.

6          Q.    So this was after the policy had been

7     moved to Acadia, is that correct?

8          A.    I believe this is days after we had moved

9     the account from Hanover to Acadia.

10          Q.    And were the questions that Ms. Kinzie was

11     raising the result of discussions you had with her

12     regarding the Acadia coverages?

13          A.    Yes.

14          Q.    Did you have any discussions with either

15     -- strike that.

16               Did you have any discussions with

17     anybody at Beverly Port Marine regarding the

18     insuring agreements in the Acadia policy for the

19     protection and indemnity coverage for either the

20     marina operator's legal liability or boat dealer's

21     coverages during the discussions leading up to

22     moving the policy?

23          A.    No.

24          Q.    When you were making a decision, you in

119

1    conjunction with Beverly Port, to move the coverage

2    from Hanover to Acadia did you seek a quote from

3    Commercial Union?

4        A.    I don't recall doing so.  I don't think

5    that we did.

6        Q.    Was there a reason?

7        A.    Looking back at that letter from Russell

8    Bond that I had kind of forgotten about, it didn't

9    look like we had a good working relationship.

10       Q.    Turnabout is fair play, huh?

11             Did you seek a quote from anybody

12   else other than Acadia and Hanover?

13       A.    I don't believe so.

14             MR. CHAPMAN:  Belated objection to

15   the form.

16       Q.    Prior to actually receiving the Acadia

17   policy had you ever seen the Acadia form of marina

18   operator's legal liability boat dealer coverages?

19       A.    No.

20       Q.    Do you recall having any discussions with

21   anybody at Beverly Port Marina regarding your memo

22   of May 26, 2000 which has been marked as Exhibit 6?

23             MR. CHAPMAN:  Just so I'm clear on

24   what you're asking, conversations with Beverly Port

121

1    dealer's policy that was issued to Beverly Port

2    Marine for the period May of 2000 through May 2001?

3        A.    Yes.

4        Q.    Do you recall when the policy was received

5    by Leslie Ray?

6        A.    I don't recall the exact date that it was

7    received.

8        Q.    Would it have been received within 30 days

9    of the inception?

10            MR. CHAPMAN:  Hold on.  Objection.

11    I'm going to instruct you on that one don't guess.

12        A.    I don't know.

13        Q.    When do you recall first seeing Pedersen

14    Exhibit No. 1?

15        A.    When the policy came into the agency,

16    whenever that was.

17        Q.    New policy, new company, would you have

18    taken the time to read through it cover to cover

19    when it arrived?

20            MR. CHAPMAN:  Objection to the form.

21    Go ahead.

22        A.    The policy would have been reviewed by

23    myself and most likely by Candace Howard.  Whether

24    it was reviewed cover to cover, as you say, implying

1    covered under the boat dealer's marina operator's

2    legal liability for owned water craft sections of

3    this policy which are being operated in the water by

4    the insured or by authorized employees of the

5    insured in conjunction with the normal conduct of

6    business of a boat dealer or marina operator or, B,

7    which may break away from moorings and covered

8    premises."  Did I read that correctly?

9              MR. CHAPMAN:  Objection.  Go ahead.

10       A.    Yes.

11       Q.    Do you recall having any conversations

12   with Matt Pedersen in the spring of 2000 regarding

13   coverage D of the Acadia marina operator's boat

14   dealer's policy?

15       A.    Yes, Matt and I did have conversations

16   regarding coverage D as we had -- conversations

17   regarding coverage D, as we had conversations

18   regarding the other coverage parts of the marina

19   operator's legal liability policy.

20       Q.    Can you provide me with any specifics of

21   the conversations you had with Mr. Pedersen

22   regarding coverage D?

23       A.    It was a general review of coverages and

24   exposures with Matt.  I can't get into any more

124

1    specifics than that.

2        Q.   Did you have a conversation with Mr.

3    Pedersen to the effect that the limitations on the

4    insuring agreement in coverage D of the Acadia

5    policy was similar to those contained in the

6    protection and indemnity coverage provided by

7    Hanover?

8                MR. CHAPMAN:  Objection.  Go ahead.

9        A.   Most likely I did, yes.

10       Q.   Did you ever raise any questions with Mr.

11   Pedersen that the language in coverage D was not

12   broad enough for what was going on at Beverly Port

13   Marine?

14               MR. CHAPMAN:  Objection.  Go ahead.

15       A.   No.

16               MR. CHAPMAN:  Len, could you indulge

17   me in a -- I'm assuming you've still got a ways to

18   go.  Off the record.

19               (Discussion off the record.)

20               (Recess 2:39-2:51 p.m.)

21       Q.   Did you ever have any conversations with

22   anybody at Leslie Ray about the breadth of coverage

23   in section D of the Acadia policy?

24       A.   No.

HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
617-523-1874

125

1          Q.   Do you remember discussing the breadth of

2     the coverage provided by coverage D of the Acadia

3     policy with anybody at Beverly Port Marine?

4          A.   No.

5          Q.   In your discussions with people at Acadia

6     regarding the ocean marine coverages did you find

7     them helpful?

8          A.   Very helpful.  They were my resource.

9          Q.   And their responses were timely?

10         A.   I would say yes.

11         Q.   The Acadia policy was renewed again --

12    excuse me, let me be more specific.  The Acadia

13    marina operator's legal liability boat dealer's

14    policy was renewed again in May of 2001, is that

15    correct?

16         A.   That is correct.

17         Q.   Were you involved in the renewal of the

18    policy?

19         A.   Yes, I was.

20         Q.   To your knowledge, did coverage D change

21    at all between the policy running from May 2000 to

22    2001 as compared to the '01-'02 policy?

23         A.   I was not aware of any changes or informed

24    of any changes.

129

1    series of applications with another company, unless

2    they felt that they really wanted me to do that,

3    it's just something that they probably would not

4    want to do.   It seems their time is oftentimes

5    precious.

6         Q.    Did you ever advise Acadia that you

7    weren't seeking quotes from anybody else?

8         A.    I may have, I may not have, I don't

9    recall.

10        Q.    You indicated a moment ago that when you

11   first wrote the Acadia policy, Pedersen number 1,

12   that you had had no conversations with anybody at

13   Beverly Port regarding coverage D.   Would that be

14   true also for the renewal in May of 2001?

15        A.    That would be true, as well.

16        Q.    Was a copy of the Acadia policy for the

17   period 2000 to 2001 provided to the Kinzies at

18   Beverly Port Marine?

19        A.    Yes.

20        Q.    Did they ever call you with any questions

21   about the coverage contained by the policy?

22        A.    No.

23        Q.    When the renewal policy came in for the

24   period 2001-2002 did you provide a copy to the

132

1    something or doesn't cover something?

2         A.    My asking that question.

3                   MR. CHAPMAN:  Object to the form.

4    Go ahead.

5         Q.    And if you didn't know the answer to that

6    question, you would go to the underwriter and ask?

7         A.    That is correct.

8         Q.    And with that in mind, do you think that

9    the Commercial Union policy, if you were reading it

10   in response to a question from your customer as to

11   whether this policy would cover an incident

12   involving a customer of a marina operating a boat,

13   do you believe that the Commercial Union policy

14   would cover that?

15                  MR. CHAPMAN:  Objection.  Same

16   objections.

17        A.    It's my opinion that it would not.

18        Q.    And in fact, again, there's a specific

19   exclusion, is there not, in the Commercial Union

20   policy that goes even beyond that and says that

21   either the insured or a competent employee of the

22   insured has to be in charge of the water craft for

23   demonstrations, is that correct?

24                  MR. CHAPMAN:  Objection.  Same

133

1    objections.

2         A.    That is a correct statement according to

3    item 2.8 in the coverage form.

4         Q.    And you would agree with me also that the

5    Hanover policy would not cover injuries to customers

6    of a marina that were a result of the customer's

7    operation of a water craft?

8              MR. CHAPMAN:    Objection.    Same

9    objections, form, foundation, coverage opinion,

10   legal opinion.

11        Q.    Would you agree with me?

12        A.    I would agree with that.

13        Q.    And that in fact the Acadia policy has the

14   same language and also does not, would not and does

15   not cover injuries to customers of a marina

16   operating a vessel?

17             MR. CHAPMAN:    Objection.    Same

18   objections.

19        A.    The Acadia policy I don't think has the

20   exact same language, but the same result.

21        Q.    And in fact, that was the result in one of

22   the earlier lawsuits in this case where the federal

23   court ruled that Acadia had no obligation to defend

24   or indemnify Beverly Port with regard to Mr.

136

1          MR. LANGER:  I think I have a right

2   to lead a party opponent and this is a deposition of

3   the Leslie Ray Insurance Agency, so I think I have a

4   right to lead.

5          MR. CHAPMAN:  I'll object to the

6   form of those.

7          MR. LANGER:  Fine.

8      Q.   During the period shortly after you had

9   reported the loss Mr. O'Toole talked with you and

10  indicated that Acadia had some question about

11  coverage because Mr. Johnson was neither an insured

12  or a competent employee of the insured?

13     A.   That is correct.

14     Q.   Now, when you first heard from Mr. O'Toole

15  did you have discussions with Beverly Port Marina

16  about Acadia's position?

17     A.   After I heard from Mr. O'Toole?

18     Q.   Yes.

19     A.   I did.

20     Q.   And who did you talk to?

21     A.   I can't recall if it was Frank or Sue.  I

22  just would have to go back to the file on that.

23     Q.   Do you know roughly when you discussed

24  Acadia's position with either Frank or Sue Kinzie?

HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
617-523-1874

1          Q.    And fair to say that you were asking Mr.

2     Worth in response to a request from the Kinzies as

3     to whether Acadia would write blanket coverage for

4     customers test-driving Beverly Port's vessels?

5          A.    That is correct.

6          Q.    And let me show you what's been marked as

7     Exhibit No. 8, which is actually two e-mails, one a

8     response from Mr. Worth and then your response to

9     Mr. Worth, is that correct?

10         A.    Yes, that is correct.

11         Q.    These are both, again, on November 6th?

12         A.    That is correct.

13         Q.    Are those true and accurate copies, to the

14    best of your knowledge, of the e-mails that were

15    sent and received, sent to Mr. Worth and received

16    from Mr. Worth on November 6th?

17         A.    Yes, they are.

18         Q.    And the following day on November 7th Mr.

19    Worth advised you that in fact Acadia would not

20    provide the blanket coverage that the Kinzies were

21    requesting, is that correct?

22         A.    That is correct.

23         Q.    Let me show you what's been marked as

24    Exhibit No. 9.

140

1                (Document handed to witness.)

2        Q.   Is that a true and accurate copy of the

3    e-mail that you received from Mr. Worth indicating

4    that Acadia would not write the blanket coverage

5    being requested?

6        A.   Yes, that is correct.

7        Q.   Now, the same day that you wrote to Mr.

8    Worth you also sent a similar request off to

9    Hanover?

10       A.   That is correct.

11               (Deposition Exhibit Nos. 10-11

12                marked for identification.)

13       Q.   Mr. Ray, let me show you what's been

14   marked as Exhibit No. 10.

15               (Document handed to witness.)

16       Q.   It's not the best copy, but it's the only

17   one I got.  This is, is this a true and accurate

18   copy of an e-mail that you sent to Mr. Al Chicoine?

19       A.   It's a fax.

20       Q.   Excuse me, a fax that you sent to Mr.

21   Chicoine at Hanover on November 6th, 2001?

22       A.   Yes.

23       Q.   And the purpose of the fax was to see

24   whether Hanover would provide the same type of

141

1    blanket coverage that you had asked Acadia to

2    provide?

3         A.    That's correct.

4         Q.    And let me show you what's been marked as

5    Exhibit No. 11.

6              (Document handed to witness.)

7         Q.    Is that a true and accurate copy of the

8    fax you received back from Mr. Chicoine on November

9    8th of 2001?

10        A.    That is correct.

11        Q.    And Mr. Chicoine indicated that Hanover

12   would not write blanket coverage that you had

13   requested?

14        A.    That is correct.

15        Q.    And Mr. Chicoine also states, does he not,

16   in the last paragraph of this fax that "I do not

17   believe that any standard market will offer this

18   coverage"?

19        A.    That is correct.

20        Q.    Did you have any phone conversations with

21   Mr. Chicoine regarding the coverage?

22        A.    I may or may not have talked to him to let

23   him know this fax was coming and that I was

24   requested to place this coverage for the owners of

144

1    he had a similar comment to Al Chicoine, that he did

2    not believe that coverage could be placed, that is

3    correct.

4        Q.   And that would have been either on

5    November 6th or November 7th, the dates of the

6    e-mails?

7        A.   Most likely.

8        Q.   Do you remember making any notes of that

9    conversation?

10       A.   I don't remember making any notes of that

11   conversation.  I remember following up with the

12   e-mails that you do see.

13                 (Deposition Exhibit Nos. 12-14

14                  marked for identification.)

15       Q.   In addition to talking to Mr. Worth and

16   Mr. Chicoine, did you also speak with Meredith

17   Atwood at CU OneBeacon?

18       A.   I believe that I did.

19       Q.   Let me show you what's been marked as

20   Exhibit No. 12.

21                 (Document handed to witness.)

22       Q.   Is that your handwriting?

23       A.   Yes, it is.

24       Q.   Are those notes you took of a conversation

145

1    you had with Meredith Atwood on October 29th, 2001?

2        A.    Yes.

3        Q.    And the purpose of the call was similar,

4    to ask her whether or not CU/OneBeacon would provide

5    the blanket coverage for customer test drives?

6        A.    Yes.

7        Q.    What did she tell you?

8        A.    According to my notes, she told me that

9    there was no coverage under the Commercial Union

10   form and that she would not consider writing

11   coverage, blanket coverage for any operator

12   undergoing test drives.

13       Q.    Let me show you what's been marked as

14   Exhibit No. 13 which -- can you identify that

15   document?

16                 (Document handed to witness.)

17       A.    Yes.  It's a follow-up letter to Meredith,

18   Meredith Atwood, regarding the conversation that we

19   had on 10/29.

20       Q.    Is that a true and accurate copy of the

21   letter you sent or the fax you sent?

22       A.    Yes, it is.

23       Q.    You start out by saying that you're

24   considering placing the coverage with them.  Was

146

1    that in fact correct?

2        A.    Absolutely.

3        Q.    And you then ask about the blanket

4    coverage and did you ever get a fax back from

5    Meredith Atwood?

6        A.    You know, I don't recall.  If we don't

7    have a copy of it, I don't know if we did or not.

8    Do you have a copy of one?

9        Q.    Let me show you a copy of a two-page

10   document that I've marked as Exhibit No. 14 and ask

11   if you can identify that document.

12               (Document handed to witness.)

13       A.    That appears to be the response to my fax

14   from a gentleman named Earl Posey.

15       Q.    Is Exhibit 14 a true and accurate copy of

16   the letter you received from Mr. Posey and the

17   attachment?

18       A.    It appears to be.

19       Q.    Did you know Mr. Posey before November

20   9th, 2001?

21       A.    I don't believe I had ever met him or

22   heard his name.

23       Q.    Fair to say that Mr. Posey was indicating

24   to you not only that Commercial Union wouldn't write

HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
617-523-1874

148

1    got, Hanover, Acadia and IMU/CU/OneBeacon, did you

2    seek to try and get coverage anywhere else?

3         A.    I recall making inquiries or doing some

4    research to find other marine insurance markets, but

5    I don't recall the exact conversations or I'd have

6    to refer back to my files to determine what the

7    results of that were.  It really wasn't anything

8    that ended up with any result.

9         Q.    Do you remember who else you made an

10   inquiry to?

11        A.    I don't offhand.

12        Q.    The result was the same, you didn't find

13   anybody that would provide the blanket coverage you

14   were looking for?

15        A.    That is correct.

16                   (Deposition Exhibit No. 15

17                    marked for identification.)

18        Q.    Do you remember trying to get ahold of

19   anybody at Marine MGA with regard to the type of

20   blanket coverage we were talking about?

21        A.    I don't recall the specifics of it.

22        Q.    Let me show you what's been marked as

23   Exhibit 15 and ask if you recognize that document.

24                   (Document handed to witness.)

HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
617-523-1874

176

1    that you are now making that you should have had

2    more counsel?

3              MR. CHAPMAN:  Object.  Go ahead.

4        A.   I'm not so sure that I would word that

5    they misrepresented themselves.  I'm not so sure

6    that's the proper wording.

7        Q.   Do you believe that Acadia ever gave you

8    false information in the spring of 2001 during your

9    conversations leading up to the writing of the ocean

10   marine policy?

11             MR. CHAPMAN:  Object.

12       A.   No, I don't believe that Acadia ever gave

13   me false information.

14       Q.   Do you believe they ever gave you

15   incorrect information?

16             MR. CHAPMAN:  Object.

17       A.   I don't know that.  I would have to refer

18   to my files.

19       Q.   Isn't it fair to say that your claim is --

20   I'm not asking for a legal conclusion, but your

21   claim is they didn't give you enough information?

22       A.   That is absolutely correct.

23       Q.   Would you read paragraph 20?

24       A.   Okay.

194

1        Q.    The question was is it your position that

2    the either the Hanover or CU policies provided more

3    coverage than the Acadia marina operator's policy?

4        A.    Is it my position that Hanover or

5    Commercial Union provided more coverage than Acadia?

6        Q.    Yes.

7                  MR. CHAPMAN:   Object.

8        A.    That is not my position.

9        Q.    So you would agree with me that the Acadia

10   policy provided equal or greater coverage than

11   either the Hanover or CU marina operator legal

12   liability boat dealer policies?

13                 MR. CHAPMAN:   Objection.  Legal

14   opinion.  It's a matter of law.  Go ahead.

15       A.    As an opinion, I would say yes.

16                 MR. LANGER:   I have no other

17   questions.

18                 CROSS EXAMINATION

19      BY MR. CHAPMAN:

20       Q.    Do you recall a short while ago, Mr. Ray,

21   that you wanted to give a complete answer on a

22   question that Mr. Langer declined to let you do

23   that?

24                 MR. LANGER:   Object to the form of



## Leslie S. Ray Insurance Agency, Inc.

December 20, 1996

# Insurance Proposal
# For

# *Beverly Port Marina, Inc.*
# *43-67 Water Street*
# *Beverly, MA  01915*

By

## Richard P. Jones, CPCU, CIC
## Executive Vice President
## Leslie S. Ray Insurance Agency, Inc.



EXHIBIT

Ray #1
11/1/05  HBS

EXHIBIT

Kerans #3
12/3/03  HBS



129 DODGE ST. • BEVERLY, MA 01915-1897 • TEL (508) 927-2600 • FAX (508) 927-8938



# MARINA PACKAGE POLICY

| | |
|---|---|
| Company: | Commercial Union |
| Policy Number: | Pending |
| Policy Term: | 11/22/96 to 5/22/97 |
| Annual Premium: | $14,800 short term prem |

| Coverage Sections | Deductible | Limit | Premium |
|---|---|---|---|
| **Section I** | | | |
| **Marina Operator"s** | | | |
| A. Any one vessel | | $1,000,000 | $19,548 (annual) |
| B. Any one accident/ | | | minimum & deposit |
| occurrence | $5,000 | $3,000,000 | receipts adj.@1.81% |
| | | | Sales adj. @ 0.325% |
| **Section II** | | | |
| **Protection & Indemnity** | $1,000 | $1,000,000 | $1,150 |
| Including coverage for one crew | | | |
| **Section III** | | | |
| **General Liability** | | | |
| A.General Aggregate Except Products | | $2,000,000 | Included in above |
| B.Products Completed ops. aggregate | | $1,000,000 | |
| C.Personal & Advertising Injury | | $1,000,000 | |
| D.Each Occurrence Limit | | $1,000,000 | |
| E.Fire Damage Limit | | $50,000 | |

**Section IV**
Boat Dealers Insurance  NO COVERAGE

**Section V** Piers Wharves, Docks- NO COVERAGE

| Section VI | | | |
|---|---|---|---|
| **Property Coverage** | | | |
| Bldg. Boat Storage | $5000 90% coins | $382,000 | $1566 |
| Bldg. Bath House | $5000 90% coins | $80,000 | $472 |
| Bldg. office/apts/ | | | $2832 |
| service | $5000 90% coins | $480,000 | |
| Above Ground Fuel | | | |
| Tanks and Pumps | $5000 90% coins | $100,000 | $750 |
| BII/Extra Expense | 80% coins | $300,000 | $1140 |

**Section VI**
**Equipment & Tools**  (ACTUAL CASH VALUE 80% Coins)
```
Marine Travel Lift     $1000 SN23051289  $70,000        $525
Marine Travel Lift     $1000 SN2244888   $80,000        $600
Grandall Lift Truck    $1000 SN014002    $50,000        $375
Wiggins Marina Bull    $1000 MOD#W200    $75,000        $562.50
Clark Fork Lift        $1000 SNY685-0048 $12,000         $90
Hyd. Adj. Cradle       $1000             $22,500        $168.75
```

Section VIII
Owned Watercraft
1983 24' Boston Whaler
```
1990 175hp Yamaha       $500              $3,000          $60
```

MARINA OPERATORS LEGAL LIABILITY

This policy is used to insure the various bailment exposures for which you might be responsible.  These include repairs, alterations, maintenance, restoration, storage, mooring of ships, launching or hauling (within the specified mileage limits 100 miles, fueling and any miscellaneous servicing done in conjunction with these operations.

MARINA P & I COVERAGE

This coverage is used to insure against claims arising out of the servicing and usage of watercraft while the vessels are afloat. This is necessary since the General Liability policy excludes most operations involving watercraft.

# G E N E R A L   L I A B I L I T Y
# D E F I N I T I O N S

### OCCURRENCE FORM

This form provides coverage for claims arising out of an accident which results in bodily injury or property damage neither expected nor intended.   The form covers such claims that occur during the policy period irrespective of when the claim is made against you.

### LIABILITY LIMITS EXPLAINED

The PER OCCURRENCE limit is the maximum amount available for claims arising out of any one occurrence.  The GENERAL AGGREGATE limit is the maximum payable amount for all claims during the policy year arising out of occurrences, except products and completed operations claims.   The PRODUCTS AGGREGATE limit is the maximum amount available for products and completed operations claims.

### PREMISES/OPERATIONS COVERAGE

This coverage will insure against claims arising from your ownership, maintenance or use of premises and your operations in progress.

### PRODUCTS/COMPLETED OPERATIONS COVERAGE

This coverage is used to insure against claims arising out of bodily injury and property damage that results from products you have sold, manufactured, handled, distributed or disposed of, or for work you have performed, provided the accident occurs away from premises you own or rent.

### CONTRACTUAL LIABILITY

This coverage is used to insure against bodily injury and property damage claims arising out of the liability of others that you assume in an "insured contract" as defined in the policy.

### PERSONAL INJURY LIABILITY

This coverage will protect you against claims alleging false arrest, libel, slander, malicious prosecution, or wrongful entry or eviction.

### ADVERTISING LIABILITY

This coverage is used to insure against claims of libel, slander, product disparagement, piracy, infringement of copyrights, etc., that arise out of the advertising of your goods, products or services.

## HOST LIQUOR LIABILITY

This coverage is used to insure against claims arising from the serving of liquor at meetings or functions as long as you do not sell, manufacture or distribute alcoholic beverages as a business.

## INCIDENTAL MEDICAL MALPRACTICE

This coverage is used to protect against claims arising out of you or your employees rendering or failing to render proper incidental medical assistance (first aid).

## NONOWNED WATERCRAFT COVERAGE

This coverage is used to insure against liability claims arising out of the use of nonowned watercraft under 26 feet in length and not being used to carry persons or property for a charge.

## FIRE LEGAL LIABILITY

This coverage is used to insure against your legal liability arising from damage to structures rented to you, for the peril of fire.

## MEDICAL PAYMENTS

This coverage will reimburse, without regard to your liability, all reasonable medical expenses incurred by persons as a result of bodily injury sustained by accident as defined in your policy.

## EMPLOYEE BENEFITS ERRORS AND OMISSIONS (NOT COVERED)

This coverage is used to insure against negligent acts, errors or omissions committed by you or any person for whose acts you are legally responsible for while engaging in the management of public employee benefits or private employee benefits plans. Coverage does not extend to the liabilities of employee related risk such as wrongful termination, age discrimination, disability discrimination, sexual harrassment, etc.

# PROPERTY  DEFINITIONS

## BASIC PERILS COVERAGE
This coverage is used to provide protection for the following named perils: fire, lightning, explosion, windstorm, hail, smoke (except from agricultural smudging or industrial operations), aircraft, vehicles, riot, civil commotion, vandalism, sprinkler leakage, sinkhole collapse and volcanic action.

## BROAD PERILS COVERAGE
This coverage is used to provide protection for the following named perils: fire, lighting, explosion, windstorm, hail, smoke (except from agricultural smudging or industrial operations), aircraft or vehicles, riot, civil commotion, vandalism, sprinkler leakage, sinkhole collapse, volcanic action, breakage of glass, falling objects, weight of snow, ice or sleet (except for damage to gutters, downspouts or personal property outside of buildings) and limited water damage.

## SPECIAL PERILS COVERAGE
This coverage will protect covered property against direct loss arising from any cause not specifically excluded. The advantage of this form is that the insurance company must prove that a loss is specifically excluded in order to deny coverage under the policy.

## REPLACEMENT COST VALUATION
This loss valuation method pays for the cost to repair or replace damaged items with like kind and quality without deduction for depreciation. This is important since you could face a substantial loss if you must replace property at today's prices but receive only the depreciated value of the property that was destroyed.

## ACTUAL CASH VALUE VALUATION
This valuation method pays for the cost to replace or rebuild damaged property, less depreciation of that damaged property.

## COINSURANCE
A policy may contain a coinsurance clause requiring that the limit of coverage be a minimum percentage (usually 80%) of the insurable value of your property. If the amount of insurance carried is less than what is required by this clause, any claim payment may be reduced by the same percentage as the deficiency. For example, covered property worth $100,000 may require a minimum of 80%, or $80,000, of coverage for compliance with the policy's coinsurance requirement. If only $60,000 of coverage is carried (25% less than the required $80,000), then any loss payment would be reduced by 25%.

## DEDUCTIBLE
A policy may include a deductible in its provisions. This limit specifies the amount that will be deducted from any payment made to you because of a covered loss.

BUSINESS INCOME INCLUDING EXTRA EXPENSE

This insurance is used to cover the loss of income that results from a suspension of business when the insured property has been damaged by a covered peril. Under this form extra expenses are included and rental value can be included without monthly limitations. An extended period of indemnity endorsement is added to provide coverage after you resume operations, and until your business returns to its normal level of activities, up to a maximum of 30 days.

Commercial Union Limited Pollution Coverage:

Commercial union has a Pollution Exclusion on all sections of the policy with the exception of the limited coverage given back under the Marina Operator's Legal and the Protection and Indemnity forms.

The coverage given back is as follows:

General exclusion # 4 (total pollution exclusion) is extended to cover any loss, damage,cost,liability or expense the insured shall become liable to pay and shall pay in consequence of the actual or potential discharge,emission,seepage,spillage or leakage into the seas,waters,land or air of oil,fuel,cargo,petroleum products chemicals or other substances of any kind or nature whatsoever.

For this coverage to respond:

The loss must be caused by fault not constituting willful negligence or willful misconduct within the privity and knowledge of the insured or his managing agents.

The loss must be sudden, accidental,unexpected and unintended

The loss must be identified as commencing at a specific point in time and must become known to the insured within 48 hours thereafter.

This policy will not pay for pollution liability in connection with any waste disposal site or any disposal or dumping of any material or waste substance of any nature whatsoever.

This policy will not pay fines, penalties and punitive damages.

# C O M M E R C I A L   U M B R E L L A

```
Company:        Commercial Union
Policy Number:  Pending
Policy Term:    11/22/96 to 05/22/97
Annual Premium: $1042 short term prem
```

COVERAGE SECTION
* * * * * * * * * * * * * * * *

            Limit of Liability - $2,000,000

PURPOSE OF COVERAGE
* * * * * * * * * * * * * * * * * * *

This coverage provides additional liability coverage in excess of
underlying general liability, commercial automobile, and workers'
compensation coverages

            General Liability:$1,000,000
            Commercial Auto  :$1,000,000
            Workers' Comp.   : $500,000

Conditions:
Follow form of underlying policies
Exclude: Care,Custody & Control, Pollution and Asbestos

RECOMENDATIONS & COST CONSIDERATIONS

1.  We recommend that you review this coverage to determine if
    adequate for your company.

# B U S I N E S S' A U T O M O B I L E

| | |
|---|---|
| Company: | Commercial Union |
| Policy Number: | Pending |
| Policy Term: | 11/22/96 to 11/22/97 |
| Annual Premium: | $200.00 |

Non owned and hired car coverage:
Bodily injury          $1,000,000 CSL
Property damage        Included

## HIRED AUTOMOBILE COVERAGE

This coverage is used to protect against claims arising out of the use of vehicles leased, hired, rented or borrowed by you, or your employees, while in the course of business.

## NONOWNED AUTOMOBILE COVERAGE

This coverage is used to provide liability protection for autos used in your business that are not owned, leased, hired, rented or borrowed. This includes autos of employees and subcontractors that are used on your behalf.

# W O R K E R S '     C O M P E N S A T I O N

```
Company:              Pending Assignment
Policy Number:        Pending
Policy Term:          11/22/96 to 11/22/97
Annual Premium:       $4540
```

Statutory          Coverage A - Workers' Compensation
$ 500,000          Coverage B - Employers Liability - each accident
$ 500,000          Coverage B - Employers Liability - Disease limit
$ 500,000          Coverage B - Employers Liability - Disease employee


The proposed premium is based on the following estimates of annual
exposures.  They are subject to audit after expiration of the policy.

| DESCRIPTION | CODE | RATE | PAYROLL |
|---|---|---|---|
| Marina Drivers State Act | 6836 | 4.64 | 50,000 |
| Voluntary Comp. Endt | | | |
| Yacht provate sail/power | 7089 | | |
| Clerical | 8810 | .30 | 10,400 |

Maritime coverage endorsement
Long Shore and Harbor Workers Endorsement included

Experience Modification History
*******************************
Pending actual loss runs and experience modification

C o m m e r c i a l   F l o o d   P o l i c y

```
Company:          First Community Ins. Co
Policy Number:    Pending
Policy Term:      11/22/96 to 11/22/97
Annual Premium:   $1125
```

Covering: Building **11-25 Water St.** Beverly, **MA**  $450,000/$5000 ded.

```
Company:          First Community Ins. Co
Policy Number:    Pending
Policy Term:      11/22/96 to11/22/97
Annual Premium:   $1125
```

Covering Building **43-67 Water St. Beverly, MA** $450,000/$5000 ded.

**FLOOD COVERAGE**

The coverage is used to provide protection against loss due to damage by flood.

Flood Means:
A general and temporary condition of partial or complete inundation of normally dry land areas from:

The overflow of inland or tidal waters
The unusual and rapid accumulation of surface waters from any source
Mudslides which are proximately caused by flooding

RECOMMENDATIONS AND COVERAGES NOT PROVIDED SUMMARY

1. No coverage provided for Piers, Wharfs and Docks- Coverage form attached for your review.

2. No coverage provided for the inventory of the marine store.  As we discussed you are going to self insure at this time because the store is non operational.  You may want to re evaluate this if the store does become operational.

3. No coverage for the personal property of the Marina.   You may want to reassess the value of the office contents and computer equipment once you are in.

4. You decided to self insure the equipment purchased in lot #8. and the utility shed.  Please let me know if you change your mind.

5. As we discussed you have a pollution liability exposure for fueling and repair operation.  I will get pollution liability quotes for you so you can decide if you want to purchase the coverage. Most marinas do not purchase this coverage.

6. As discussed I will pursue a voluntary Workers Compensation quote for you over the next month.

7. Any values and limits may be adjusted if need be once you have had a chance to actually put together your business plan.

8. CU will renew this policy 5/22/97 based on the current rates and values.  At that time you will then have an annual policy that runs from 5/22/97 to 5/22/98.

ANOVER INSURANCE       POLICY NUMBER: HN   524 58 20

MARINE DECLARATIONS

MARINA "PORTFOLIO"

Insured's Name:  Beverly Port Marina Inc.

Street Address:  11-25 Water St.

City:  Beverly                State:  MA   Zip Code  01915

Policy Period:      From     5/ 22 / 97      To    5/ 22 /98

                       Month  Day   Year       Month  Day   Year

Agency Code:   32-0915          Agent:  Leslie S. Ray Insurance Agency Inc.

| Class of Property | Deductible Amount | Limit of Insurance | Rate | Premium | |
|---|---|---|---|---|---|
| A. BOAT DEALERS | $ | $ | $ | $ | |
| B. MARINA OPERATORS LEGAL LIABILITY | $ 5,000 | $ 3,000,000 | $ .67 | $ 7,250 | Deposit |
| C. PIERS, DOCKS, WHARVES | $ | $ | $ | $ | |
| D. MACHINERY & EQUIPMENT | $ 1,000 | $ 309,500 | $ 1.18 | $ 3,651 | |
| E. PROTECTION & INDEMNITY | $ N/A | $ 1,000,000 | $ Flat | $ 2,650 | |
| F. OWNED WORKBOATS | $ 1,000 | $ 3,000 | $ 1.18 | $ 35 | |

TOTAL PREMIUM  $ 13,586

SCHEDULE

| No. | Full Description | Amount or limit of Insurance |
|---|---|---|
| | | |

* See Marine Declarations SUBLIMIT(S) Attachment
** Boat Dealers Reporting Period:  ☐ Monthly   ☐ Quarterly   ☐ Semi-Annually   ☐ Annually

Covered Locations:
1.  11-25 Water St., Beverly, MA
2.  43-67 Water St., Beverly, MA
3.

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue: OCEM-0162, OCEM-0164, OCEM-0166, OCEM-0167, OCEM-0169, Sublimit(s) Attachment

OCEM-DEC

EXHIBIT

Ray # 3
11/1/05  4EH

SUBLIMIT(S) ATTACHMENT

It is understood and agreed that the Company shall not be liable for more than the following limit(s) for the Boat Dealers Coverage:

$_____ Aggregate Limit any one loss at the above described premises

$_____ On any one vessel while afloat or ashore.

$_____ While in transit by land.

$_____ While on exhibit at _____

$_____ Incoming from Manufacturer/Dealer at risk of insured.

MARINA OPERATORS' LEGAL LIABILITY COVERAGE FORM

$ __1,000,000_____ On any one vessel while afloat.

$ ___500,000_____ While in transit by land.

$ __3,000,000_____ While on premises at __Per Declaration Page__

$ __1,000,000_____ Away from premises.

## COMMERCIAL MARINA CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and applicable Additional Conditions in the Coverage Forms.

### A.    ABANDONMENT

There can be no abandonment of any property to us.

### B.    APPRAISAL

If we and you do not agree on the value of the property or the amount of "loss", either may make written demand for an appraisal of the "loss". In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of "loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two (2) will be binding. Each party will:

1. Pay its appraiser; and
2. Bear the other expenses of appraisal and umpire equally.

If we submit to an appraisal, we will still retain our right to deny the claim.

### C.    DUTIES IN EVENT OF LOSS

You must see that the following are done in the event of "loss" to Covered Property:

1. Notify the police if a law may have been broken.
2. Give us prompt notice of the "loss". Include a description of the property involved.
3. As soon as possible, give us a description of how, when and where the "loss" occurred.
4. Take all reasonable steps to protect the Covered Property from further damage. If feasible, set the damaged property aside and in the best possible order for examination. Also keep a record of your expenses, for consideration in the settlement of the claim.
5. Make no statement that will assume any obligation or admit any liability, for any "loss" for which we may be liable, without our consent.
6. Permit us to inspect the property and records proving "loss".
7. If requested, permit us to question you under oath, at such times as may be reasonably required, about any matter relating to this insurance or your claim, including your books and records. In such event, your answers must be signed.

1

8. Send us a signed, sworn statement of "loss" containing the information we request to settle the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

9. Promptly send us any legal papers or notices received concerning the "loss".

10. Cooperate with us in the investigation or settlement of the claim.

## D.  INSURANCE UNDER TWO OR MORE COVERAGES

If two or more of this policy's coverages apply to the same "loss", we will not pay more than the actual amount of the "loss".

## E.  LOSS PAYMENT

We will pay or make good any "loss" covered under this Coverage Part within 30 days after:

1. We reach agreement with you;

2. The entry of final judgement; or

3. The filing of an appraisal award.

We will not be liable for any part of a "loss" that has been paid or made good by others.

## F.  OTHER INSURANCE PROHIBITED

You may not have other insurance, whether primary, contributing or excess. If you have other insurance covering the same "loss" as the insurance under this Coverage Part, we will pay only the excess over what you should have received from the other insurance. We will pay the excess whether you can collect on the other insurance or not.

## G.  PAIR, SETS OR PARTS

1. Pair or Set. In case of "loss" to any part of a pair or set we may:
   a. Repair or replace any part to restore the pair or set to its value before the "loss"; or
   b. Pay the difference between the value of the pair or set before and after the "loss".

2. Parts. In case of "loss" to any part of Covered Property consisting of several parts when complete, we will only pay for the value of the lost or damaged part.

## H.  PRIVILEGE TO ADJUST WITH OWNER

In the event of "loss" involving property of others in your care, custody or control, we have the right to:

2

1.    Settle the "loss" with the owners of the property. A receipt for payment from the owners of that property will satisfy any claim of yours.

2.    Provide a defense for legal proceedings brought against you. If provided, the expense of this defense will be at our cost and will not reduce the applicable Limit of Insurance under this insurance.

## I.    RECOVERIES

Any recovery or salvage on a "loss" will accrue <u>entirely</u> to our benefit until the sum paid by us has been made up.

## J.    TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If any person or organization to or for whom we make payment under this insurance has rights to recover damages from another, those rights are transferred to us. That person or organization must do everything necessary to secure our rights and must do nothing after "loss" to impair them.

## GENERAL CONDITIONS

## A.    <u>UTMOST GOOD FAITH</u> [Uberrimae fidei]

CONCEALMENT, MISREPRESENTATION OR FRAUD
This Coverage Part is void in any csc of fraud, intentional concealment or misrepresentation of a material fact, by you or any other insured, at any time, concerning:

1.    This Coverage Part;
2.    The Covered Property;
3.    Your interest in the Covered Property; or
4.    A claim under this Coverage Part.

## B.    LEGAL ACTION AGAINST US

No one may bring a legal action against us under this Coverage Part unless:

1.    There has been full compliance with all the terms of this Coverage Part; and
2.    The action is brought within one (1) year after you <u>first</u> have knowledge of the "loss".

## C.    NO BENEFIT TO BAILEE

No person or organization, other than you, having custody of Covered Property, will benefit from this insurance.

3

**D.    POLICY PERIOD**

We cover "loss" commencing during the policy period shown in the Declarations.

**E.    VALUATION**

The value of property will be the <u>least</u> of the following amounts:

1. The actual cash value of that property;
2. The cost of reasonably restoring that property to its condition immediately before "loss"; or
3. The cost of replacing that property with substantially identical property.

In the event of "loss", the value of property will be determined as of the time of "loss".

OCEM-0162

4

# MARINA OPERATORS LEGAL LIABILITY
## COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section G - DEFINITIONS.

## A.  COVERAGE

We will pay for "loss" to Covered Property from any Covered Cause of Loss.

### 1.    Covered Property

We cover your legal liability as a bailee or warehouseman for loss of or damage to watercraft including spars, tenders, furniture & fixtures, machinery, equipment and fittings relating thereto and all other personal property on board which is in your care, custody and control for the following operations and activities while conducted at locations described in the Declarations:

    a.    Alteration(s), repair(s) or maintenance both afloat or ashore;
    b.    Storage afloat;
    c.    Storage ashore;
    d.    Docking at slips or spaces rented or provided by you;
    e.    Mooring or anchoring at buoys or areas you provide;
    f.    Fueling supervised by you;
    g.    Fueling performed by you;
    h.    Launching performed by you;
    i.    Hauling performed by you or for you by others;
    j.    Consigned to you from other than boat dealers.

### 2.    Property Not Covered

Covered Property does not include:

    a.    Property while in the care, custody or control of other bailees (carriers excepted), unless specifically endorsed hereon.
    b.    Gratuitous bailment(s);
    c.    Property that you accept for storage for which you make no storage charge;

    d.     Property in storage, afloat or ashore for which no storage receipt has been issued;

    e.     Property you lease, rent, hire or charter from or to others;

    f.     Property to or for which you have assumed liability in excess of that imposed on you by law as a warehouseman or bailee;

    g.     Property in storage, when your relationship to the owner, or storer, is that of a lessor of storage space.

This does not apply to 1 "d" (above) mooring - anchoring, or 1 "e" (above) docking at slips and spaces.

## B.    COVERED CAUSES OF LOSS

Covered Causes of Loss means RISKS OF DIRECT PHYSICAL "LOSS" to Covered Property except for those causes of "loss" listed in the Exclusions.

## C.    EXCLUSIONS

1.    We will not pay for a "loss" caused directly or indirectly by any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss."

    **a.    Governmental Action**

        Seizure or destruction of property by order of governmental authority.

        But we will pay for acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

    **b.    Nuclear Hazard**

        1.    Any weapon employing atomic fission or fusion; or

        2.    Nuclear reaction or radiation, or radioactive contamination from any other cause. But we will pay for direct "loss" caused by resulting fire if the fire would be covered under this Coverage Form.

    **c.    War and Military Action**

        1.    War, including undeclared or civil war;

        2.    Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or .

        3.    Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

2.    We will not pay for a "loss" caused by or resulting from any of the following:

    a.    Wear and tear, gradual deterioration, latent defect, inherent vice or any condition of or within the property which causes it to destroy itself;

    b.    Insects, vermin, rodent or other pest(s);

    c.    Unexplained disappearance or "loss" when the only proof that a loss occurred is an inventory shortage;

    d.    Misappropriation, secretion, conversion, infidelity or any dishonest act by you or other party of interest, his or their employees, agents or servants, whether committed during regular hours of employment or otherwise, or others entrusted with Covered Property.

        This exclusion does not apply to Covered Property in the custody of common carriers;

    e.    Loss of market or use, delay, indirect or consequential loss of any kind or nature;

## D.    LIMITS OF INSURANCE

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

## E.    DEDUCTIBLE

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss", before applying the applicable Limits of Insurance, exceeds the Deductible shown in the declarations. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

## F.    ADDITIONAL CONDITIONS

1.    **Coverage Territory**

    We cover property while:
    a.    At any premises described in the Declarations; and
    b.    In transit, wherever located within:
        1.    The forty-eight contiguous states of the United States;
        2.    The District of Columbia; and
        3.    Canada.

2.      **Records and Inspection**

It is a condition precedent to recovery that you will keep accurate records of all Covered Property. These records will include a copy of each receipt you issue for operations covered under this Form. You will retain these records for three years after the policy ends.

We may examine or audit your books and records at any time during the policy period and for three years thereafter. Examination or audit by us does not waive any of our rights or alter any of the terms and conditions of this policy.

3.      **Other Insurance**

This insurance applies only as excess insurance over any other available insurance on Covered Property.

4.      **Transfer Of Rights Of Recovery Against Others To Us**

The following is added to Commercial Inland Marine Conditions K - Transfer Of Rights Of Recovery Against Others To Us:

If you make any agreement or do anything else to impair our right to recover damages from others, we will not cover the "loss"; nor will we cover any "loss" which you settle or compromise without our written consent.

5.      **Reporting Requirements**

You agree to send us a written report within thirty(30) days after the expiration of this policy showing the gross receipts paid to you for operations covered oby this Form for the past year. The reporting basis under this coverage is on an annual basis.

4.      **Premium Adjustment**

The premium shown is only an estimate. To determine the earned premium at the end of the reporting period, we will multiply the gross receipts reported to us by the rate shown in the Declarations. The earned premium will be applied against the estimated premium. All earned premium that exceeds the estimated premium will be due at the time the premium is adjusted. If the earned premium for each twelve(12) month period does not exceed the estimated premium, we will return the difference to you.

G.    **DEFINITIONS**

"Loss" means accidental loss or damage.

OCEM-0164 (6/95)

## MARINA MACHINERY AND EQUIPMENT
## BROAD COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties, and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section F..Definitions.

A.    **COVERAGE**

We will pay for "loss" to covered property from any of the Covered Causes of Loss.

1.    **Covered Property.** as used in this Coverage Form, means:
      The Contractor's Equipment described in the Declarations.

2.    **Property Not Covered**
      a.    Automobiles, trucks, tractors, trailers, semi-trailers or similar self-propelled vehicles designed <u>or</u> licensed for use on public roads and which are designed or used to transport persons or property;
      b.    Motorcycles;
      c.    Aircraft;
      d.    Property while waterborne, except by public ferry; and
      e.    Property which you have loaned, hired, leased or rented to others.

3.    **Covered Causes of Loss**
      Covered Causes of Loss means RISK OF DIRECT PHYSICAL "LOSS" to Covered Property except for those causes of "loss" listed in the Exclusions.

4.    **Coverage Extension - Newly Purchased Property**
      We will cover additional property of a type covered by this Coverage Form that you purchase during the policy period.

      This extension applies only:
      a.    When items are individually listed and described in the Declarations; and
      b.    Up to 45 days after purchase.

      The most we will pay for "loss" under this Extension is 25 percent(%) of the total of the Limits of Insurance shown in the Declarations for all individually listed and described items. This limit is in addition to any other applicable Limit of Insurance shown in the Declarations.

      You will report any property covered by this Extension within 45 days from date

of purchase and pay additional premium that is due. If you fail to report the property to us, coverage under this Extension will end automatically 45 days after the date you purchased the property.

The Coinsurance Additional Condition does not apply to this Coverage Extension.

**B.    EXCLUSIONS**

1.    We will not pay for a "loss" caused directly or indirectly by any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

    a.    Governmental Action
        Seizure or destruction of property by order of governmental authority.

        But we will pay for acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

    b.    Nuclear Hazard
        1.    Any weapon employing atomic fission or fusion; or
        2.    Nuclear reaction or radiation, or radioactive contamination from any other cause. But we will pay for direct "loss" caused by resulting fire if the fire would be covered under this Coverage Form.

    c.    War and Military Action
        1.    War, including undeclared or civil war;
        2.    Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or
        3.    Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

2.    We will not pay for a "loss" caused by resulting form any of the following:

    a.    Delay, loss of market or use, or other consequential loss of any nature.
    b.    Dishonest acts by you, anyone else with an interest in the property, you or their employees, agents, servants, authorized representatives or anyone entrusted with the property, whether or not acting alone or in collusion with other persons or occurring during hours of employment, agency, service or representation.
    c.    Voluntarily parting with any property by you or anyone entrusted with the property if induced to do so by any fraudulent scheme trick, device or

false pretense.

    d.    Unauthorized instructions to transfer property to any place.

    e.    Unexplained disappearance or shortage found or discovered upon taking inventory.

## C.    LIMIT OF INSURANCE

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance.

## D.    DEDUCTIBLE

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" exceeds the Deductible shown in the Declarations. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

## E.    ADDITIONAL CONDITIONS

The following conditions apply in addition to the Inland Marine Conditions and the Common Policy Conditions:

1.    **Coverage Territory**

    We cover property where ever located within:

    a.    The forty-eight contiguous states;

    b.    The District of Columbia; and

    c.    Canada

2.    **Coinsurance**

    All Covered Property must be insured for its "actual cash value" which is the cost to replace with property of like kind, condition and quality, at a price negotiated between a willing buyer and a willing seller as of the time of "loss" or you will incur a penalty.

    The penalty is that we will not pay the full amount of any loss. Instead we will determine the <u>most</u> we will pay using the following steps:

    (a)    Divide the amount actually insured by the amount that should have been insured.

    (b)    Multiply the adjusted loss, before application of the Deductible, by the figure determined in step (a).

    EXAMPLE:

    The value insured was $50,000. The "actual cash value" immediately prior to the loss was $100,000. The amount of the loss (agreed to by

"us" and "you") is $10,000.

$50,000 X $10,000 = $5,000 the amount we will pay $100,000 minus the Deductible.

F.    **DEFINITIONS**

"LOSS" means accidental loss or damage.

OCEM-0166

**ALLMERICA FINANCIAL**
HANOVER INSURANCE

## PROTECTION AND INDEMNITY COVERAGE FORM

Various provisions in this policy restrict coverage.  Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "Insured" means any person or organization qualifying as such under SECTION II - WHO IS AN INSURED.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION IV - DEFINITIONS.

## SECTION I - COVERAGES

## BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.    **Insuring Agreement**

   a.    We will pay on behalf of the insured, all sums which the insured shall become legally obligated to pay as damages because of "bodily injury" or "property damage" if caused by or resulting from:

   (1)  in water operation of watercraft by the insured or his employees in connection with customary operations of a marina operator or boat dealer; or
   (2)  watercraft insured under any Coverage Form of this policy which break away from the premises scheduled in the Declarations.

   We will have the right and duty to defend any "suit" seeking those damages. But:

   (1)  The amount we will pay for damages is limited as described in the Declarations LIMITS OF INSURANCE;
   (2)  We may investigate and settle any claim or "suit" at our discretion; and
   (3)  Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments and settlements.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS.

   b.    This insurance applies to "bodily injury" and "property damage" only if:

   (1)  The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

OCEM-0167    (6-95)                                                                        1

(2)  The "bodily injury" or "property damage" occurs during the policy period.

2.    **Exclusions**

This insurance does not apply to:

a.    "bodily injury" to any person which may reasonably be expected to result from the intentional or criminal acts of the Insured or which are in fact intended or expected by the Insured.

b.    "bodily injury" for which the Insured is obligated to pay damages by reason of the assumption of liability in a contract (oral or written) or agreement. However, this exclusion does not apply to liability for damages that the Insured would have in the absence of the contract or agreement.

c.    "bodily injury" to an employee of the Insured arising out of and in the course of employment by the Insured.

d.    any obligation of the Insured under the Longshoremen's and Harbor Workers' Compensation Act or any other workers compensation, disability benefits or unemployment compensation law or similar law.

e.    "property damage" to property owned, leased or rented to you.

f.    "property damage" to property in the care, custody or control of the Insured.

g.    (1) "bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants";

(2)  any loss, cost or expense arising out of any request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants;

(3)  any loss, cost or expense arising out of any claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

3.    **Supplementary Payments**

We will pay, with respect to any claim or "suit" we defend:

a.    all expenses we incur.

b.    expenses you incur in your defense at our request.

c.    the cost to remove the wreckage of covered property when such removal is required by law.

These payments will not reduce the Limits of Insurance.

**SECTION II- WHO IS AN INSURED**

1.    If you are designated in the Declarations as:

a.    An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b.    A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c.    An organization other than a partnership or joint venture, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers and directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

OCEM-0167    (6-95)                                                                                    2

2.      Each of your employees is also an insured, other than your executive officers, but only for acts within the scope of their employment by you. However, none of these employees is an insured for "bodily injury" to you or a co-employee while in the course of his or her employment.


## SECTION III - LIMITS OF INSURANCE

The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

1.      Insureds;
2.      Claims made or "suits" brought; or
3.      Persons or organizations making claims or bringing "suits".


## SECTION IV – PROTECTION AND INDEMNITY GENERAL CONDITIONS

1.      **Bankruptcy.**
        Bankruptcy or insolvency of the insured's estate will not relieve us of our obligations under this Coverage Form.

2.      **Duties In The Event of Occurrence, Claim or "Suit".**
        a.      You must see to it that we are notified promptly of an "occurrence" which may result in a claim. Notice shall include:
                (1) How, when and where the "occurrence" took place; and
                (2) The names and addresses of any injured persons and witnesses.
        b.      If a claim is made or "suit" is brought against any insured, you must see to it that we receive prompt written notice of claim or "suit".
        c.      You and any other involved insured must:
                (1) Immediately send us copies of any demands, notices, summonses, or legal papers received in connection with the claim or "suit";
                (2) Authorize us to obtain records and other information;
                (3) Cooperate with us in the investigation, settlement or defense of the claim or "suit"; and
                (4) Assist us, upon written request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.
        d.      No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3.      **Legal Action Against Us.**
        No person or organization has a right under this Coverage Form:
        a.      To join us as a party or otherwise bring us into a "suit" asking for damages from an insured.
        b.      To sue us under this Coverage Form unless all of its terms have been fully complied with.

        A person or organization may sue us to recover on an agreed settlement or on a final judgement against an insured obtained after an actual trial; but, we will not be liable for damages that are not payable under the terms of this Coverage Form or that are in excess of the applicable Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the insured's legal representative.


OCEM-0167      (6-95)                                                                                    3

4.    **Other Insurance.**
If other valid and collectible insurance is available to the Insured for a loss we cover under this Coverage Form, our obligations are limited as follows:

a.    **Primary Insurance**
This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all other insurance by the method described in b. below.

b.    **Method of Sharing**
If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach, each insurer contributes equal amounts until it has paid its applicable Limit of Insurance or none of the loss remains, whichever comes first. If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable Limit of Insurance to the total applicable Limits of Insurance of all insurers.

5.    **Representations.**
By accepting this policy, you agree:

a.    That you have fully disclosed all material facts and conditions of which you are aware, relating to this policy and have withheld nothing;

b.    The statements in the Declarations are accurate and complete; and

c.    We have issued this policy in reliance upon your representations.

6.    **Separation of Insurance**
Except with respect to the Limits of Insurance and any rights or duties specifically assigned in this Coverage Form to the first Named Insured, this insurance applies:

a.    As if each Named Insured were the only Named Insured; and

b.    Separately to each insured against whom claim is made or " Suit" is brought.

7.    **Transfer of Rights of Recovery Against Others To Us.**
If the Insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. Any agreement, contract or act, past or future, expressed or implied, by the Insured whereby any right of recovery of the Insured against any vessel, person or corporation is released, decreased, transferred, impaired or lost which would, on payment of claim by us belong to us but for such agreement, contract or act shall render this policy null and void as to the amount of any such claims, but only to the extent and to the amount that said agreement, contract or act releases, decreases, transfers, impairs or causes the loss or any right of recovery of this Company, but our right to retain or recover the full premium shall not be affected.

**SECTION IV - DEFINITIONS**

1.    "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

2.    "Coverage territory" means within the coastal waters of the contiguous United States, Alaska and Canada. Coastal waters is hereby defined to be waters within 100 miles of the shoreline of the aforementioned territories. Any exception to this will be stated in the Declarations.

3.    "Occurrence" means an accident.

OCEM-0167    (6-95)                                                                                    4

4.      "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

5.      "Property damage" means physical injury to tangible property, including all resulting loss of use of that property.

6.      "Suit" means a civil proceeding in which damages because of "bodily injury" or "property damage" to which this insurance applies are alleged. "Suit" includes:
  a.     an arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or
  b.     any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

OCEM-0167     (6-95)

5

## OWNED WORKBOATS
### (Hull Coverage Form)

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section F. Definitions.

**A.    COVERAGE**

We will pay for "loss" to covered property from any of the Covered Causes of Loss.

1.    **Covered Property**, as used in this Coverage Form, means those vessels you own and use in conjunction with the normal conduct of a marina, boat yard or boat dealership which are specifically described in the Declarations.

Covered Property includes the hull, machinery, fittings and other equipment necessary to be on board for the safe operation and maintenance of the vessel.

2.    **Property Not Covered**
Covered Property does not include:
a.    items of personal property, personal effects or wearing apparel which are not required for the vessel's safe operation or maintenance;
b.    property used for pleasure or recreational use, such as, but not limited to, waterskiing, aquaplaning or fishing;
c.    property more than 50 nautical miles from described premises;
d.    boat, hull or motor combinations designed, rated, advertised or capable of in-water speeds in excess of 40 statute [non-nautical] miles per hour;
e.    property which you have chartered, loaned, hired, leased, or rented to others.

3.    **Covered Causes of Loss**

Covered Causes of Loss means RISKS OF DIRECT PHYSICAL "LOSS" to Covered Property except for those causes of "loss" listed in the Exclusions.

**B.    EXCLUSIONS**

1.    We will not pay for a "loss" caused directly or indirectly by any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss."

a.   **Governmental Action**
     Seizure or destruction of property by order of governmental authority.
     But we will pay for acts of destruction ordered by governmental authority
     and taken at the time of a fire to prevent its spread.

b.   **Nuclear Hazard**
     1.   Any weapon employing atomic fission or fusion; or
     2.   Nuclear reaction or radiation, or radioactive contamination from
          any other cause. But we will pay for direct "loss" caused by
          resulting fire.

c.   **War and Military Action**
     1.   War, including undeclared or civil war;
     2.   Warlike action by a military force, including action in hindering
          or defending against an actual or expected attack, by any
          government, sovereign or other authority using military personnel
          or other agents; or
     3.   Insurrection, rebellion, revolution, usurped power or action taken
          by governmental authority in hindering or defending against any
          of these.

2.   We will not pay for a "loss" caused by or resulting from any of the following:

     a.   Delay, loss of market or use, or other consequential loss of any kind or
          nature;
     b.   ice, sleet, snow, freezing or other extremes of temperature, while afloat;
     c.   Theft or mysterious disappearance of equipment, accessories or other
          items of personal property unless occurring in conjunction with theft of
          the entire vessel, and then only where there is visible evidence of forcible
          entry or forcible removal;
     d.   Dishonest acts by you, anyone else with an interest in the property, you
          or their employees, agents, servants, authorized representatives or anyone
          entrusted with Covered Property, whether or not acting alone or in
          collusion with other persons or occurring during hours of employment,
          agency, service or representation;
     e.   Voluntarily parting with any property by you or anyone entrusted with the
          property if induced to do so by any fraudulent scheme, trick, device or
          false pretense;
     f.   Unauthorized instructions to transfer property to any person or to any
          place;
     g.   Unexplained disappearance or shortage found or discovered upon taking
          inventory.
     h.   Cosmetic damage or injury which does not affect the vessel's safety or
          seaworthiness, consisting of, but not limited to, wear and tear, gradual
          deterioration, marine borers (as well as all other marine life forms
          responsible for or causing deterioration or destruction), marring, denting,

scratching, chipping, electrolysis, osmotic blistering, mechanical breakdown, corrosion, rust, dampness or dryness of atmosphere or bleaching from sunlight or weathering;

3.  We will not pay for a "loss" caused by or resulting from any of the following. The entire loss is excluded notwithstanding any additional damage which may arise out of or resulting from: wear and tear, gradual deterioration, depreciation, insects, rodents or other vermin, mechanical breakdown or failure, inherent vice, latent defect or any other condition of or within the property which causes it to destroy itself.

## C.    LIMIT OF INSURANCE

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

## D.    DEDUCTIBLE

We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" exceeds the Deductible shown in the Declarations.   We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

## E.    ADDITIONAL CONDITIONS

The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions:

1.    **Coinsurance**
All Covered Property must be insured for its "actual cash value" which is the cost to replace with property of like kind, condition and quality, at a price negotiated between a willing buyer and a willing seller as of the time of "loss" or you will incur a penalty.

The penalty is that we will not pay the full amount of any loss. Instead, we will determine the most we will pay using the following steps:
(a)    Divide the amount actually insured by the amount that should have been insured;
(b)    Multiply the adjusted loss, before application of the Deductible, by the figure determined in step (a).

EXAMPLE:
The value insured was $50,000. The "actual cash value" immediately prior to the loss was $100.000. The amount of the loss (agreed to by "us" and "you") is $10.000.

$\dfrac{\$\ 50,000}{\$100,000}$  X  $\$10,000$  =  $\$5,000$  the amount we will pay minus the Deductible.

## F.     DEFINITIONS

"Loss" means accidental loss or damage



**"Dave"**
**<davidr@onceanddone**
**.com>**

11/06/01 03:57 PM

To: <theodore.wirth@acadia-ins.com>
cc:
Subject: Beverly Port Marina

Ted - The owners of Beverly Port Marina have requested that the MOLL policy
be endorsed to cover liability incurred by the operation of one of their
owned boats by a non-owner / non-employee.   Generally the operation will be
to test drive boats being sold.   As we discussed, the marina sells boats
and, unbeknownst to me, has let potential customers (or non-owners /
non-employees) operate owned boats.  Please provide a quote for this
coverage.  If you require further underwriting information than please let
me know.

Thank you.

David L. Ray, CIC
Leslie S. Ray Insurance Agency, Inc.

EXHIBIT

Ray #7
11/1/05  HBS

000481



**"Dave"**
**<davidr@onceanddone**
**.com>**

11/06/01 06:19 PM

To: <Theodore.Wirth@acadia-ins.com>
cc:
Subject: RE: Beverly Port Marina

Ted - It is my understanding that the insured would prefer to have Acadia provide bodily injury and property damage coverage for a blanket group of non-owners/non-employees, i.e prospective buyers of boats. The insured would screen the operators to ensure that they had proper experience operating a similar type vehicle. It would be impractical, however, to fax underwriting details on every prospective boat buyer and then sit by and wait for your approval. Blanketed coverage is what they desire.

David L. Ray, CIC
Leslie S. Ray Insurance Agency, Inc.


-----Original Message-----
From:                   Theodore.Wirth@acadia-ins.com
[mailto:Theodore.Wirth@acadia-ins.com]
Sent:        Tuesday, November 06, 2001 5:08 PM
To:          Dave
Subject:           Re: Beverly Port Marina

David: we, as a company, need to underwrite all operators of vessels we insure. Can the assured provide us with a list of all operators and details of each person's vessel operating experience and loss history? How frequently do non-employees operate the assured's vessels? This exposure is not in the realm of our normal coverage.

Are you and the assured requesting Bodily Injury for these non-employee operators?

Ted Wirth
Director Ocean Marine Underwriting
Acadia Insurance Company
800-773-4300  extension 1646



EXHIBIT

Ray #8
11/1/05  HBS

000480



**"Dave"**
**<davidr@onceanddone**
**.com>**

11/07/01 11:12 AM

To: <Theodore.Wirth@acadia-ins.com>
cc:
Subject: RE: Beverly Port Marina

Ted,

Thank you for your consideration.

Dave Ray

```
  -----Original Message-----
From:              Theodore.Wirth@acadia-ins.com
[mailto:Theodore.Wirth@acadia-ins.com]
Sent:         Wednesday, November 07, 2001 11:02 AM
To:           Dave
Subject:         RE: Beverly Port Marina
```

Dave: The only was I could have considered offering this coverage would
have been for a finite number of known non-employee operators (for example:
individuals ferrying boats for the assured).
Unlike road-use vehicles, there is no way of checking a "boating MVR" (nor
am I aware if such a document exist!).
As such, I am unable to offer you blanketed coverage.
Ted Wirth
Director Ocean Marine Underwriting
Acadia Insurance Company
800-773-4300  extension 1646

**EXHIBIT**

Ray #9
11/1/05 HBS

000478

P. 1

* * * Transmission Result Report(MemoryTX) ( Nov. 7. 2001 11:14AM) * * *
LESLIE S. RAY INS.

| No. Mode | Destination | P.(s) | Result | Page Not Sent |
|---|---|---|---|---|
| 3799 Memory TX | 915088594210 | P. 1 | OK | |

Reason for error
E.1) Hang up or line fail                    E.2) Busy
E.3) No answer                               E.4) No facsimile connection

## LSR

### Leslie S. Ray Insurance Agency
129 DODGE STREET
BEVERLY, MA 01915
978-927-2600    978-927-8938 FAX

## FAX COVER SHEET

No. of Pages_____

| | |
|---|---|
| **Date:** | 11/6/2001 |
| **To:** | Al Chicoine<br>Hanover Insurance Company |
| **From:** | David L. Ray |
| **Re:** | Beverly Port Marina, Inc. |

Al --

We are considering placing MOLL coverage for Beverly Port Marina with you at its upcoming renewal. Your records may show that Hanover insured this marina previously.

The owners of Beverly Port Marina have requested that the MOLL policy be endorsed to cover liability incurred by the operation of one of their owned boats by a non-owner / non-employee. Their specific need is to provide liability coverage for bodily injury or property damage caused by prospective customers who will be test driving the boats that they are selling.

Per our conversation, I understand that your form does not provide this coverage unless the boat is operated by a marina owner or employee.

I realize that you will require significant underwriting information in order to offer a quote on this and other marina coverages. Could you please respond, however, as to whether your company would be in a position to offer this coverage via endorsement.

Thank you.

David L. Ray, CIC
Leslie S. Ray Insurance Agency, Inc.

**EXHIBIT**

Ray #10
11/1/05 HBS

11/08/01  13:24 FAX 1800 850 3073          SPEC ACCT CLAIMS NERO                    ☑001/001

1800 850 3073

# Hanover Insurance

100 Century Drive
Worcester, MA 01615
Fax: 508-853-4210

## Fax Transmittal

To:        David L. Ray CIC

Company:   Leslie Ray Insurance

Fax Number:  978-927-8938

---

From:          Al Chicoine

Company:       Hanover Insurance

Phone Number:  (508) 855-8261

Fax Number:    (508) 853-4210

Date:          11-8-01

Number of Pages:  1

---

CONFIDENTIALITY NOTE:
*This fax is intended for the exclusive use of the addressee and may contain proprietary, confidential or privileged
information. If you are not the intended recipient, any dissemination, use, distribution or copying is strictly prohibited.
If you have received this fax in error, please notify me by telephone or via return fax and destroy the original and all
copies.*

Dave, we do not offer coverage for liability incurred by the operation of a boat by
a non-owner/non-employee. We believe that this exposure, even with a knowledgeable
customer, is too difficult to control. An owner or competent employee should be present
on all test drives.

I do not believe that any standard market will offer this coverage. If you have any
questions, please do not hesitate to call.

Thanks  AL



EXHIBIT
Ray #11
11/1/05

Recieved Time Nov. 8. 12:13PM

10/29:    Meredith Atwood — CGU / One Beacon.
          No coverage. under CGU form
          would not consider writing coverage
          blanket for "any operator"


Al Chicone — Hanover


Letters requesting formal declination

EXHIBIT
Ray #12
11/1/85



# Leslie S. Ray Insurance Agency
### 129 DODGE STREET
### BEVERLY, MA 01915
### 978-927-2600  . 978-927-8938 FAX

# FAX COVER SHEET

**No. of Pages** _____

Date:         11/6/2001

To:           Meredith Atwood
              OneBeacon Insurance Company / IMU

From:         David L. Ray

Re:           Beverly Port Marina, Inc.


Meredith –

We are considering placing MOLL coverage for this marina with you at its
upcoming renewal.

The owners of Beverly Port Marina have requested that the MOLL policy be
endorsed to cover liability incurred by the operation of one of their owned boats by
a non-owner / non-employee.   Their specific need is to provide liability coverage for
bodily injury or property damage caused by prospective customers who will be test
driving the boats that they are selling.

Per our conversation, I understand that your form does not provide this coverage
unless the boat is operated by a marina owner or employee.

I realize that you will require significant underwriting information in order to offer
a quote on this and other marina coverages.  Could you please respond, however, as
to whether your company would be in a position to offer this coverage via
endorsement.


Thank you.

David L. Ray, CIC
Leslie S. Ray Insurance Agency, Inc.

**EXHIBIT**

Ray #13
11/1/05 4HB4



INTERNATIONAL
MARINE ✉ ✖
UNDERWRITERS

A Member of the
OneBeacon Insurance Group

One Beacon Street
Boston, MA 02108-3100
t 617.725.6717
t 800.762.1127
f 617.725.6709

November 9, 2001

David L. Ray
Leslie S. Ray Insurance Agency
129 Dodge Street
Beverly, MA 01915

RECEIVED NOV 1 3 2001

     RE:     Beverly Port Marina, Inc.
             MOLL Coverage

Dear David,

This will confirm that we are not a market for a Boat Dealer who lets prospective customers test drive the boats the dealer is selling without the assured or a competent employee of the assured in charge while being navigated.

A copy of the relevant clause is on the enclosed Page 5 of our policy.

Yours very truly,

Earl A. Posey
Underwriter

cb/EAP
Encl.

EXHIBIT

Ray #14
11/1/05 4REA

Page 5

# MARINA POLICY

### General Conditions and Exclusions Applying to All Coverage Sections

**Operator Warranty**

It is warranted that the Assured or a competent employee of the assured shall at all times be in charge of any vessel being navigated hereunder, and it is further warranted that when any vessel is used for demonstration the Assured will at all times comply with the Federal, State and local rules pertaining to carrying of passengers for hire.

**Assignment**

Assignment of this Policy shall not be valid without the written consent of this Company.

**Notice of Accident**

It is agreed by the Assured that in the event of any occurrence likely to give rise to a claim hereunder, immediate notice thereof shall be given this Company, and that permanent repairs shall not be commenced without consent of this Company.

This Company shall have the option of naming the attorneys who shall represent the Assured in the prosecution or defense of any litigation or negotiations between the Assured and third parties concerning any claim covered by this Policy, and shall have the direction of such litigation or negotiations.  If the Assured shall fail or refuse to settle any claim as authorized by this Company, the liability

of this Company shall be limited to the amount for which settlement could have been made.  The Assured shall, at the option of this Company, permit this Company to conduct, with an attorney of this Company's selection, at this Company's cost and expense and under its exclusive control, a proceeding in the Assured's name to limit the Assured's liability to the extent, and in the manner provided by the present and future statutes relative to the limitation of a shipowner's liability.

**Assistance of Assured**

Whenever required by this Company, the Assured shall aid in securing information, evidence, obtaining of witnesses, and cooperate with this Company (except in a pecuniary way) in all matters which this Company may deem necessary in the defense of any claim or suit or appeal from any judgement in respect of any occurrence as hereinbefore provided.

**Payment of Loss**

Loss, if any, shall be paid within thirty (30) days after presentation of proof of interest and loss.

**Deductible Clause**

All claims arising from any one accident under each section of this Policy shall be reduced by the amount shown under "Deductible" in the schedule of coverages.  A sequence of damages arising from the same accident shall be treated as due to that accident, but the deductibles shown shall apply separately to each section of this Policy involved.

**Compromise by Assured**

This Company shall not be liable for any loss or damage which, without the express consent of this Company, shall be the subject of a settlement or compromise by the Assured with others who may be liable therefore.

**Other Insurance**

Where any specific insurance exists, in the name of the Assured or in which the Assured may have an interest, on property which this insurance covers or for which the Assured may be legally liable, the insurance hereunder shall be considered as excess insurance and shall not apply or contribute to the payment of any loss until the amount collectible from all such specific insurance shall have been exhausted and then shall be liable, subject to the terms and conditions of this Policy, only for the excess of the amount collectible from such other insurance.

**Suit**

No suit, action or proceeding for the recovery of any claim under this Policy, shall be sustainable in any court of law or equity unless the same be commenced within twelve (12) months next after discovery by the Assured of the occurrence which gives rise to the claim.  Provided, however, that if by the laws of the state within which this Policy is issued such limitation is invalid, then any such claims shall be void unless such action, suit or proceeding be commenced within the shortest limit of time permitted by the laws of such state to be fixed herein.

**Cancellation**

This Policy may be cancelled by the Assured at any time or by this Company by giving the Assured fifteen (15) days notice in writing.  In event of cancellation, reports are to be rendered to the date of cancellation, in accordance with the reporting conditions hereunder, and additional premium paid as may be required.

**Subrogation**

This Company shall be subrogated to all rights which the Assured may have against any other person or entity, in respect of any claim or payment made under this Policy, to the extent of such payment, and the Assured shall, upon the request of this Company, execute all documents necessary to secure such rights to this Company.

# PARAMOUNT EXCLUSIONS

**Unless physically deleted by the Company, the following exclusions shall be paramount and shall supersede and nullify any contrary provisions of this Policy.**



*International*
*Marine*
*Underwriters*

The Company issuing this policy is indicated by the
first letter in the POLICY Number as follows:

C  Commercial Union Insurance Company
A  American Employers Insurance Company
F  The Employers Fire Insurance Company
N  The Northern Assurance Company Of America
M  American Central Insurance Company

A Stock Company

**Policy Number**

CBH 623066

REPORT ALL CLAIMS TO:
IMU
One Beacon Street
10th FLR
Boston, MA 02108-3100
617-725-6710

Insured   *BEVERLY PORT MARINA, INC.*

Street   *43-67 WATER STREET*
City   *BEVERLY*
State   *MA*          Zip          *01915*

**Renewal of**

New

**Policy Period**
At place of Issuance from

*Noon Standard Time*
11/22/96   TO:   5/22/97

Representative:
Producer #        *20-22152*

*Renewed Hanover Ins Co*

Producer   *LESLIE RAY INSURANCE AGENCY, INC.*
Street     *129 DODGE STREET*
City       *BEVERLY*
State      *MA*          Zip          *01915*

*Paid in full 3/14/9*

*NAMED LOCATIONS*

A. *11-25 WATER STREET, BEVERLY, MA*
B. *43-67 WATER STREET, BEVERLY, MA*
C. *N/A*
   **COVERAGE SECTION**

D. *N/A*
E. *N/A*
F. *N/A*

**PREMIUM**

| Coverage | Status | Premium | |
|---|---|---|---|
| *Marina Operator's Legal Liability* | Covered | $9,696 | *Minimum & Deposit* |
| *Protection & Indemnity* | Covered | $570 | |
| *General Liability* | Covered | *Incl.* | |
| *Boat Dealer's Insurance* | Not Covered | $0 | |
| *Piers, Wharves,& Docks Insurance* | Not Covered | $0 | |
| *Property Insurance* | Covered | $3,353 | |
| *Equipment/Tools* | Covered | $1,151 | |
| *Owned Watercraft* | Covered | $30 | |

| DATE | AGENCY | COMM |
|---|---|---|
| *12-30-96* | | *6%* |
| | DIRECT | PROD COMM |
| | ✓ | |

*TOTAL PREMIUM*   $14,800
*STATE SURCHARGE*   $0

*For account of themselves*
*Loss, if any payable to:*      *Insured and as attached, or order*

*SUBJECT TO CONDITIONS OF FORM ATTACHED HERETO.*
*IMU Manuscript Policy Forms as attached*
*ISO CGL Form CG 00 01*
*ISO Property Forms CP 00 10, CP 00 90,CP 10 30, CU Endorsements G12226, and G12227*

*LIMITS OF LIABILITY, AMOUNTS OF INSURANCE, AND DEDUCTIBLES AS PER THE DECLARATIONS PAGE*
*THIS POLICY IS MADE AND ACCEPTED SUBJECT TO THE FOREGOING PROVISIONS AND STIPULATIONS AND THOSE*
*HEREINAFTER STATED, WHICH ARE HEREBY MADE A PART OF THIS POLICY TOGETHER WITH OTHER SUCH*
*PROVISIONS, STIPULATIONS AND AGREEMENTS AS MAY BE ADDED HERETO, AS PROVIDED IN THIS POLICY.*

*IN WITNESS WHEREOF, this Company has caused this Policy to be executed below, but this*
*Policy shall not be valid unless countersigned by a duly authorized representative of the Company.*

**EXHIBIT**

*Ray #2*
11/1/05 AB

*Dennis R. Smith*
*Secretary*
*Countersigned by*
*this date*

*ROBERT C. GOWDY*
*President*

13-Dec-96

Authorized Representative

BEVERLY PORT MARINA, INC.    *Declarations*    DEC 3 1996    *Page 2*

| | Coverage Section | | | Deductible | Limit | | Premium |
|---|---|---|---|---|---|---|---|
| I | Marina Operator's | | I | | | | $9,696 |
| | A. Any One Vessel | | | | $1,000,000 | | Minimum & Depos |
| | B. Any One Accident or Occurrence | | | $5,000 | $3,000,000 | Receipts, adjustable @ | 1.81% |
| | | | | | | Sales, adjustable @ | 0.325% |
| II | Protection & Indemnity | | II | $1,000 | $1,000,000 | | $570 |
| | A. Any One Accident or Occurrence | | | | | | |
| III | Commercial General Liability | | III | N/A | | | Included |
| | A. General Aggregate Limit (Other than Products/ Comp Ops) | | | | $2,000,000 | | |
| | B. Products-Completed Operations Aggregate Limit | | | | $1,000,000 | | |
| | C. Personal and Advertising Injury Limit | | | | $1,000,000 | | |
| | D. Each Occurrence Limit | | | | $1,000,000 | | |
| | E. Fire Damage Limit | | | | $50,000 | | |
| | F. Medical Expense Limit | | | | $5,000 | | |
| IV | Boat Dealers Insurance | | IV | | | | Not Covered |
| | A. Any One Vessel | | | | Not Covered | | |
| | B. Any One Location | | | | | Reporting Annually @ | |
| | C. Any One Accident or Occurrence | | | | | | |

| | Piers, Wharves, and Docks | | V | Valuation- | Actual Cash Value - Co-Insurance 80% | | |
|---|---|---|---|---|---|---|---|
| V | | Description | | | Insured Value | D/A | Rate |
| | Location | Not Covered | | | | | |
| | Location | Not Covered | | | | | |
| | Location | Not Covered | | | | | |
| | Location | Not Covered | | | | | |
| | Location | Not Covered | | | | | |
| | Location | Not Covered | | | | | |

PWD Total    $0

| | Property Insurance | Excl Earthquake | VI | Valuation- | Replacment Cost Co-Insurance 90% | | | |
|---|---|---|---|---|---|---|---|---|
| VI | | Description | | Insured Value | Rate | Premium | Location D/A | |
| Bldg 1 | Building | STEEL STORAGE BUILDING | | $382,000 | 0.41% | $777 | $5,000 | |
| | Contents | | | $0 | 0.00% | $0 | | |
| | Business Income & Extra Exp 80% Co-Insurance | | | $300,000 | 0.38% | $565 | Location Total | $1,342 |
| Bldg 2 | Building | FRAME BATH HOUSE | | $80,000 | 0.59% | $234 | Location D/A | |
| | Contents | | | $0 | 0.00% | $0 | $5,000 | |
| | Business Income & Extra Exp 80% Co-Insurance | | | Included | N/A | | Location Total | $234 |
| Bldg 3 | Building | FRAME OFFICE/REPAIR BUILDING | | $480,000 | 0.59% | $1,405 | Location D/A | |
| | Contents | | | $0 | 0.00% | $0 | $5,000 | |
| | Business Income & Extra Exp 80% Co-Insurance | | | Included | N/A | | Location Total | $1,405 |
| Bldg 4 | Building | (2) FUEL TANKS, LINES, (3) PUMPS | | $100,000 | 0.75% | $372 | Location D/A | |
| | Contents | | | $0 | 0.00% | $0 | $5,000 | |
| | Business Income & Extra Exp 80% Co-Insurance | | | Included | N/A | | Location Total | $372 |
| | | | | | | | Add'l Property | $0 |
| | | | | | | | Pr Sub Total | $3,353 |

| | | | | | |
|---|---|---|---|---|---|
| VII | Equipment/Tools | | VII | As per Schedule | $1,151 |
| VIII | Owned Watercraft | | VIII | As per Schedule | $30 |

Grand Total    $14,800

BEVERLY PORT MARINA, INC.                 Declarations                                              Page 2

| Coverage Section | | Deductible | Limit | | Premium |
|---|---|---|---|---|---|
| I | Marina Operator's | I | | | $9,696 |
| | A. Any One Vessel | | | $1,000,000 | Minimum & Depos |
| | B. Any One Accident or Occurrence | | $5,000 | $3,000,000 | Receipts, adjustable @ 1.81% |
| | | | | | Sales, adjustable @ 0.125% |
| II | Protection & Indemnity | II | $1,000 | $1,000,000 | $570 |
| | A. Any One Accident or Occurrence | | | | |
| III | Commercial General Liability | III | N/A | | Included |
| | A. General Aggregate Limit (Other than Products/ Comp Ops) | | | $2,000,000 | |
| | B. Products-Completed Operations Aggregate Limit | | | $1,000,000 | |
| | C. Personal and Advertising Injury Limit | | | $1,000,000 | |
| | D. Each Occurrence Limit | | | $1,000,000 | |
| | E. Fire Damage Limit | | | $50,000 | |
| | F. Medical Expense Limit | | | $5,000 | |
| IV | Boat Dealers Insurance | IV | | | Not Covered |
| | A. Any One Vessel | | | Not Covered | |
| | B. Any One Location | | | | Reporting Annually @ |
| | C. Any One Accident or Occurrence | | | | |

| V | Piers, Wharves, and Docks | V | Valuation- | Actual Cash Value - Co-Insurance 80% | | |
|---|---|---|---|---|---|---|
| | Description | | | Insured Value | D/A | Rate |
| | Location   Not Covered | | | | | |
| | Location   Not Covered | | | | | |
| | Location   Not Covered | | | | | |
| | Location   Not Covered | | | | | |
| | Location   Not Covered | | | | | |
| | Location   Not Covered | | | | | |

PWD Total   $0

| VI | Property Insurance   Excl Earthquake | VI | Valuation- | Replacment Cost Co-Insurance 90% | | | |
|---|---|---|---|---|---|---|---|
| | Description | | Insured Value | Rate | Premium | Location D/A | |
| Bldg 1 | Building   STEEL STORAGE BUILDING | | $382,000 | 0.41% | $777 | $5,000 | |
| | Contents | | $0 | 0.00% | $0 | | |
| | Business Income & Extra Exp  80% Co-Insurance | | $300,000 | 0.38% | $565 | Location Total | $1,342 |
| Bldg 2 | Building   FRAME BATH HOUSE | | $80,000 | 0.59% | $234 | Location D/A | |
| | Contents | | $0 | 0.00% | $0 | $5,000 | |
| | Business Income & Extra Exp  80% Co-Insurance | | Included | N/A | | Location Total | $234 |
| Bldg 3 | Building   FRAME OFFICE/REPAIR BUILDING | | $480,000 | 0.59% | $1,405 | Location D/A | |
| | Contents | | $0 | 0.00% | $0 | $5,000 | |
| | Business Income & Extra Exp  80% Co-Insurance | | Included | N/A | | Location Total | $1,405 |
| Bldg 4 | Building   (2) FUEL TANKS, LINES, (3) PUMPS | | $100,000 | 0.75% | $372 | Location D/A | |
| | Contents | | $0 | 0.00% | $0 | $5,000 | |
| | Business Income & Extra Exp | | *Included  Not Covered | | | Location Total | $372 |

Add'l Property   $0
Pr Sub Total   $3,353

| VII | Equipment/Tools | VII | | As per Schedule | $1,151 |
|---|---|---|---|---|---|
| VIII | Owned Watercraft | VIII | | As per Schedule | $30 |

Grand Total   $14,800

*Company is revising
this page to show
Business Income is
included on Pumps

Schedule of Equipment/Tool...                    Actual Cash Value - Co-Insu... 80%

| | Description | Value | D/A | Rate | Premium | Serial Number |
|---|---|---|---|---|---|---|
| 1 | TRAVEL LIFT | $70,000 | $1,000 | 0.75% | $260 | |
| 2 | TRAVEL LIFT | $80,000 | $1,000 | 0.75% | $297 | |
| 3 | GRADALL LIFT TRUCK | $50,000 | $1,000 | 0.75% | $186 | |
| 4 | WIGGINS MARINA BULL | $75,000 | $1,000 | 0.75% | $279 | |
| 5 | CLARK FORK LIFT | $12,000 | $1,000 | 0.75% | $45 | |
| 6 | HYD. ADJ. CRADLE | $22,500 | $1,000 | 0.75% | $84 | |
| 7 | Not Covered | $0 | | 0.00% | $0 | |
| 8 | Not Covered | $0 | | 0.00% | $0 | |
| 9 | Not Covered | $0 | | 0.00% | $0 | |
| 10 | Not Covered | $0 | | 0.00% | $0 | |

Total Premium        $1,151

Schedule of Owned Watercraft                    Actual Cash Value - Co-Insurance 80%

| | Description | Value | D/A | Rate | Premium | Serial Number |
|---|---|---|---|---|---|---|
| 1 | 1983 24' WHALER WITH | $3,000 | $500 | 2.00% | $30 | |
| 2 | 1990 175 HP OB | $0 | | 0.00% | $0 | |
| 3 | NOT COVERED | $0 | | 0.00% | $0 | |
| 4 | NOT COVERED | $0 | | 0.00% | $0 | |
| 5 | NOT COVERED | $0 | | 0.00% | $0 | |
| 6 | NOT COVERED | $0 | | 0.00% | $0 | |
| 7 | NOT COVERED | $0 | | 0.00% | $0 | |
| 8 | NOT COVERED | $0 | | 0.00% | $0 | |
| 9 | NOT COVERED | $0 | | 0.00% | $0 | |
| 10 | NOT COVERED | $0 | | 0.00% | $0 | |

Total Premium        $30

*Declarations*
*Endorsement No.*    *I*

*To be attached to and made part of Policy No.*    <u>CBU 623066</u>    *of the*    *Commercial Union Insurance Company*

*Insuring*    *BEVERLY PORT MARINA, INC.*

IT IS HEREBY UNDERSTOOD AND AGREED THAT THE FOLLOWING SHALL BE NAMED AS MORTGAGEE AND LOSS PAYEE AS RESPECTS PROPERTY INSURANCE - SECTION VI AND EQUIPMENT/TOOLS - SECTION VII:

        BEVERLY NATIONAL BANK, ITS SUCCESSORS
        AND ASSIGNS, ATIMA
        240 CABOT STREET
        BEVERLY, MA 01915

*All other terms and conditions remained unchanged.*

## CREW ENDORSEMENT

It is understood and agreed and in consideration of the premium charged, Coverage Section II, Protection and Indemnity, is extended to include coverage for crew as follows:

Warranted that coverage hereunder is provided for one crew aboard the insured vessel(s) for loss of life of, bodily injury to, or illness of, any person, excluding, however, unless otherwise agreed by endorsement hereon, liability under any Compensation Act to any employee of the Insured, (other than a seaman) or in case of death to his beneficiaries or others. Also, warranted that in the event additional crew are to be covered hereunder, the insured shall give prior notice to this company and pay such additional premium as is required. If the insured shall fail to give prior notice and at the time of loss in respect to crew there are more crew on board, this insurance shall respond only in the proportion that the stated number bears to the number on board at the time of the accident.

All other terms and conditions remain unchanged.

# National Marina Program

## Introduction

The National Marina Program was developed by International Marine Underwriters for the convenience of the marina operator. The Program is a collection of different kinds of coverage which may be important to the marina operator. By choosing the appropriate Coverage Sections, described below, a marina operator can easily assemble a customized program. The Declarations pages will indicate what kinds of coverages are chosen by the particular marina operator under this Program, together with the limits of liability, deductibles, schedules of property and locations insured under each kind of coverage selected. Only those kinds of coverage specifically chosen by the marina operator, and for which the word "COVERED" is indicated and a premium is shown on page 1 of the Declarations, will be provided under the Program.

The liability coverages available through this Program, at the marina operator's option, are designated herein as the following Coverage Sections:

*I. Marina Operators Legal Liability*
*II. Protection and Indemnity*
*III. Commercial General Liability*

The property coverages available through this Program, also at the marina operator's option, are

*IV. Boat Dealers Insurance*
*V. Piers, Wharves, and Docks Insurance*
*VI. Business Property Insurance*
*VII. Equipment/Tools Insurance*
*VIII. Owned Watercraft Insurance*

Each of the Coverage Sections is subject to its own terms, conditions, exclusions and endorsements. These provisions, together with the Declarations for the particular Coverage Section, should be read carefully since they determine rights, duties, limitations and what is and is not covered.

In addition, to the provisions for each Coverage Section, there are General exclusions from Coverage, applicable to all the Coverage Sections selected. These General Exclusions from Coverage are set forth in the section of this Program designated:

*IX. General Exclusions from Coverage (Applicable to all Coverage Sections)*

There are also General Conditions of Coverage, which apply to all the Coverage Sections, in addition to the provisions of each Coverage Section. These General Conditions of Coverage are set forth in the section of this Program designated:

*X. General Conditions of Coverage (Applicable to all Coverage Sections)*

The General Exclusions (Section IX) and the General Conditions (Section X) should also be read care-fully, since they determine rights, duties, limitations and what is and is not covered with respect to all the Coverage Sections selected under this Program.

# Table of Contents

## Marina Operators Liability......3
1. Coverage........................3
2. Exclusion from Coverage.........3
3. Limited Pollution Coverage........4

## Protection & Indemnity...........5
1. Coverage........................5
2. Exclusions from Coverage........5
3. Limited Pollution Coverage........6

## Commercial General Liability 7
1. CGL Clauses ....................7

## Boat Dealers ....................8
1. Coverage........................8
2. Demonstration Warranty..........8
3. Property Covered ...............8
4. Property Not Covered ...........8
5. Territorial Limits...............8
6. Exclusions from Coverage........9
7. Valuation ......................9
8. Repairs ........................9
9. Carrier or Bailee ..............10
10. Unrepaired Damage.............10
11. Abandonment ..................10
12. Reporting and Adjustment......10

## Piers, Wharves, & Docks.......11
1. Coverage........................11
2. Warranty........................11
3. Exclusion from Coverage:........11
4. Repair Costs....................11
5. Valuation ......................11
6. Total Loss......................12
7. Replacement Cost Coverage......12
8. Debris Removal..................12

## Property ........................13
1. Building and Personal Property Clauses.....................13

## Equipment/Tools................14
1. Coverage........................14
2. Property Covered ...............14
3. Property Not Covered ...........14
4. Territorial Limits...............14
5. Exclusions from Coverage........14
6. Total Loss......................15
7. Coinsurance ....................15
8. Waiver of Depreciation .........15
9. Other Recoveries................15
10. Company Options...............15
11. Release of Carrier's Liability ..15
12. Abandonment ..................15
13. Additional Coverages..........15
14. Valuation .....................17
15. Replacement Cost Coverage.....17
16. Definitions....................18

## Owned Watercraft................19
1. Coverage .......................19
2. Territorial Limits ..............19
3. Warranties .....................19
4. Exclusion from Coverage........19
5. Total Loss......................20
6. Constructive Total Loss........20
7. Coinsurance....................20
8. Repair Clause ..................20
9. Unrepaired Damage.............20
10. Valuation.....................20
11. Replacement Cost Coverage.....20

## General Exclusions ............22
1. Radioactive Contamination Exclusion Clause (RACE 10/1/90) .............22
2. War Risk Exclusion .............22
3. Punitive Damages Exclusion .....23
4. Absolute Pollution Exclusion ....23
5. Absolute Asbestos Exclusion.....24
6. Definitions.....................24

## General Conditions.............26
1. Deductible......................26
2. Limits of Liability .............26
3. Claim Costs and Expenses.......26
4. Records and Reports............26
5. Inspections and Surveys .......27
6. Concealment, Misrepresentation or Fraud ..........................27
7. Notice of Loss .................27
8. Protection of Property and Cooperation of the Insured.....................27
9. Payment of Losses..............28
10. Subrogation...................28
11. Impairment of Recovery Rights .28
12. Cancellation ..................28
13. Conformity to Statutes........28
14. Transfer of Legal Rights.......29
15. No Benefit to Bailee ..........29
16. Other Insurance...............29
17. Changes.......................29
18. Coinsurance ..................29
19. Time for Suit .................30
20. Mortgagee and Trustee Interest.30
21. Captions, Titles Clause........31
22. Reporting and Adjustment......31

# CoverageSection I

## *Marina Operators Legal Liability*

### 1. Coverage

Subject to the General Exclusions from Coverage (Section IX) and the General Conditions (Section X) , this Coverage Section insures the legal liability of the Insured as a marina operator for loss or damage to boats, engines, trailers and outboard motors which are in its care, custody or control for purposes of repair, storage, mooring, launching, hauling, fueling, docking or other marina operations, at locations described in the Declarations, or which are being transported overland within 100 miles of the Assured's premises, also including the legal liability of the Insured for loss or damage to the property of others caused by said boats, engines, trailers or outboard motors which are in its care, custody or control.

### 2. Exclusion from Coverage

This insurance does not cover any liability:

2.1  For bodily harm, bodily injury, personal injury, or death;

2.2  For demurrage, loss of time, loss of use, loss of freight, loss of charter and/or similar and/or substituted expenses;

2.3  Assumed under contract express or implied;

2.4  For collision liability, tower's liability or liabilities insured against under the customary forms of hull or protection and indemnity policies arising out of the operation of any watercraft owned or operated by or demise chartered to the Insured or any affiliated or subsidiary concern or party;

2.5  For property owned, leased or entrusted to the Insured for sale;

2.6  For the expense of re-doing work improperly performed by or on behalf of the Insured or the cost of replacement of materials, parts, or equipment furnished in connection therewith;

2.7  For the cost or expense of repairing, replacing or renewing any faulty designed part or parts which cause(s) loss of or damage to the watercraft, or for any expenditure incurred by reason of a betterment or alteration in design;

2.8  For the loss or damaged caused by or resulting from the weight of the load exceeding the registered or rated lifting capacity of any lift device, marine railway, dry-dock, or part thereof;

2.9  For any loss or damage unless discovered prior to or within sixty days of the delivery to owner or his agents or within sixty days after the work is completed, whichever may first occur;

2.10 For wrongful conversion by or infidelity of the Insured or his employees or agents.

## 3. Limited Pollution Coverage

It is understood and agreed that the insurance hereunder, subject to all its terms and conditions, including Exclusion No. 4 of the General Exclusions from Coverage (Section IX), is extended to cover any loss, damage, cost, liability or expense that the Insured shall become liable to pay and shall pay in consequence of the actual or potential discharge, emission, seepage, spillage or leakage upon or into the seas, waters, land or air, of smoke, vapor, soot, fumes, acids, alkalis, oil, fuel, cargo, petroleum products, chemicals or other substances of any kind or nature whatsoever.

Notwithstanding the above or anything contained in this Program, this insurance shall not indemnify the insured for any loss, damage, cost, liability or expense:

3.1  Arising out of an actual or potential discharge, emission, seepage, spillage, or leakage unless caused by fault not constituting willful negligence or willful misconduct within the privity and knowledge of the Insured(s) or his managing officer(s) or managing agent(s);

3.2  Arising out of an actual or potential discharge, emission, seepage, spillage, or leakage into or upon land, the atmosphere or any watercourse, water supply, reservoir or body of water which is not sudden, accidental, unexpected and unintended;

3.3  Arising out of an actual or potential discharge, emission, seepage, spillage, or leakage into or upon land, the atmosphere or any watercourse, water supply, reservoir or body of water, the occurrence of which cannot be identified as commencing at a specific point in time and did not become known to the Insured within 48 hours thereafter;

3.4  Arising out of liability in connection with waste disposal sites and/or the disposal or dumping of any material or waste substance of any nature whatsoever;

3.5  Arising out of fines, penalties or punitive damages resulting from the actual or potential discharge, emission, seepage, spillage or leakage of smoke, vapor, soot, fumes, acids, alkalis, oil, fuel, cargo, petroleum products, chemicals or other substances of any kind or nature whatsoever.

# Coverage Section II

## *Protection and Indemnity*

### 1. Coverage

Subject to the General Exclusions from Coverage (Section IX) and the General Conditions of Coverage (Section X), this Coverage Section insures the legal liability of the Insured for the sums the Insured becomes legally liable to pay with respect to:

1.1  Watercraft operated by the Insured or a competent employee in conjunction with normal business operations;

1.2  Watercraft insured under any Coverage Section of this Program which break away from the premises scheduled in the Declarations;

1.3.1  Watercraft owned by the Insured and rented to third parties;

1.3.2  Watercraft at trade and/or exhibition show but only while afloat.

and on account of:

1.4  Loss of life, or injury to any person;

1.5  Loss of or damage to any other vessel;

1.6  Loss of, or damage to, or expense in connection with any fixed or movable object or property of whatsoever nature;

1.7  Cost or expense of, or incidental to, the removal of wreck of the insured watercraft when such removal is compulsory by law;

1.8  Costs and expenses, incurred with underwriter's approval, for investigating and/or defending any claim or suit against the Insured arising out of a liability or an alleged liability of the Insured.

### 2. Exclusions from Coverage

Notwithstanding the above, this policy does not cover:

2.1  Any loss of, or damage to , or expense in connection with, any property owned by, leased to, or rented to, the Insured;

2.2  Any liability, loss, damage or expense arising with respect to loss of life or injury to any employee of the Insured;

2.3  Any liability, loss, damage or expense assumed by the Insured beyond that imposed by law in the absence of contract;

2.4  Any liability, loss, damage, or expense with respect to watercraft while onshore;

2.5  Any liability, loss, damage or expense arising out of jet skiing or water skiing or any sport or activity in which objects or persons or both are towed;

2.6  Any liability, loss, damage or expense with respect to rental operations, unless the Insured obtains a signed rental agreement in which the renter holds harmless the Insured and the Insured's staff from any liabilities arising

from the use of boats and/or equipment;

2.7 Any liability, loss, damage, or expense arising out of swimming, snorkeling, diving, or similar activities;

2.8 Any liability, loss, damage, or expense arising due to the failure of the Insured to have a competent employee of the Insured at all times in charge of any watercraft being navigated for the purpose of demonstration, delivery, or testing;

2.9 Any liability, loss, damage, or expense arising out of an occurrence where the watercraft used by the Insured was not at all times in compliance with the applicable Federal, State, and local rules and regulations, including any such regulation promulgated by the United States Coast Guard.

## 3. Limited Pollution Coverage

It is understood and agreed that the insurance hereunder, subject to all its terms and conditions, including Exclusion No. 4 of the General Exclusions from Coverage (Section IX), is extended to cover any loss, damage, cost, liability or expense that the Insured shall become liable to pay and shall pay in consequence of the actual or potential discharge, emission, seepage, spillage or leakage upon or into the seas, waters, land or air, of smoke, vapor, soot, fumes, acids, alkalis, oil, fuel, cargo, petroleum products, chemicals or other substances of any kind or nature whatsoever.

Notwithstanding the above or anything contained in this Program, this insurance shall not indemnify the insured for any loss, damage, cost, liability or expense:

3.1 Arising out of an actual or potential discharge, emission, seepage, spillage, or leakage unless caused by fault not constituting willful negligence or willful misconduct within the privity and knowledge of the Insured(s) or his managing officer(s) or managing agent(s);

3.2 Arising out of an actual or potential discharge, emission, seepage, spillage, or leakage into or upon land, the atmosphere or any watercourse, water supply, reservoir or body of water, which is not sudden, accidental, unexpected and unintended;

3.3 Arising out of an actual or potential discharge, emission, seepage, spillage, or leakage into or upon land, the atmosphere or any watercourse, water supply, reservoir or body of water, the occurrence of which cannot be identified as commencing at a specific point in time and did not become known to the Insured within 48 hours thereafter;

3.4 Arising out of liability in connection with waste disposal sites and/or the disposal or dumping of any material or waste substance of any nature whatsoever;

3.5 Arising out of fines, penalties or punitive damages resulting from the actual or potential discharge, emission, seepage, spillage or leakage of smoke, vapor, soot, fumes, acids, alkalis, oil, fuel, cargo, petroleum products, chemicals or other substances of any kind or nature whatsoever.

# Coverage Section III

## *Commercial General Liability*

### *1. CGL Clauses*

1.1   Subject to the General Exclusions from Coverage (Section IX) and the General Conditions to Coverage (Section X), the standard form CGL Clauses (Insurance Services Office Form CG 00 01), as appended, is incorporated herein and shall be effective as shown in the Declarations for this Coverage Section.

1.2   In the event the forms incorporated herein under 1.1 differ from the General Conditions to Coverage (Section X), the forms herein shall be considered paramount and shall override anything to the contrary in the General Conditions to Coverage (Section X).

**COMMERCIAL UNION**

CG0001  01 96

CL182
(1-96)

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we," "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under WHO IS AN INSURED (Section II).

Other words and phrases that appear in quotation marks have special meaning. Refer to DEFINITIONS (Section V).

## SECTION I—COVERAGES

### COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement.**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (Section III); and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS—COVERAGES A AND B.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

      (2) The "bodily injury" or "property damage" occurs during the policy period.

   c. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

2. **Exclusions.**

   This insurance does not apply to:

   a. **Expected or Intended Injury**

      "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

   b. **Contractual Liability**

      "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

      (1) That the insured would have in the absence of the contract or agreement; or

      (2) Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract," reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage," provided:

         (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

         (b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

   c. **Liquor Liability**

      "Bodily injury" or "property damage" for which any insured may be held liable by reason of:

      (1) Causing or contributing to the intoxication of any person;

      (2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

      (3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

      This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

Form No: CG 00 01
01 96
Page 2 of 11

**d. Workers' Compensation and Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

    **(a)** Employment by the insured; or

    **(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract."

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

    **(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

    **(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

    **(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

    **(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

      **(i)** If the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or

      **(ii)** If the operations are to test for, monitor, clean up, remove, contain, treat,

detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

Subparagraph **(d)(i)** does not apply to "bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the fuels, lubricants or other operating fluids are intentionally discharged, dispersed or released, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent to be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor.

Subparagraphs **(a)** and **(d)(i)** do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

**(2)** Any loss, cost or expense arising out of any:

    **(a)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

    **(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**g. Aircraft, Auto or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

    **(a)** Less than 26 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in paragraph f.(2) or f.(3) of the definition of "mobile equipment."

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition or stunting activity.

**i. War**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**j. Damage to Property**

"Property damage" to:

(1) Property you own, rent or occupy;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

**k. Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall of Products, Work or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in LIMITS OF INSURANCE (Section III).

## COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement.**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those

Form No:   CG 00 01
01 96

Page 4 of 11

damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal injury" or "advertising injury" to which this insurance does not apply. We may at our discretion investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS—COVERAGES A AND B.

b. This insurance applies to:

(1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

(2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services;

but only if the offense was committed in the "coverage territory" during the policy period.

2. **Exclusions.**

This insurance does not apply to:

a. "Personal injury" or "advertising injury":

(1) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

(2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured;

(4) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement; or

(5) Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

b. "Advertising injury" arising out of:

(1) Breach of contract, other than misappropriation of advertising ideas under an implied contract;

(2) The failure of goods, products or services to conform with advertised quality or performance;

(3) The wrong description of the price of goods, products or services; or

(4) An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

c. Any loss, cost or expense arising our of any:

(1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**COVERAGE C. MEDICAL PAYMENTS**

1. **Insuring Agreement.**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

2. **Exclusions.**

We will not pay expenses for "bodily injury":

a. To any insured.

b. To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. To a person injured on that part of premises you own or rent that the person normally occupies.

Form No:  CG 00 01
01 96

Page 5 of 11

**d.** To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e.** To a person injured while taking part in athletics.

**f.** Included within the "products-completed operations hazard."

**g.** Excluded under Coverage A.

**h.** Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

## SUPPLEMENTARY PAYMENTS—COVERAGES A AND B

We will pay, with respect to any claim we investigate or settle or any "suit" against an insured we defend:

**1.** All expenses we incur.

**2.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**3.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**4.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $250 a day because of time off from work.

**5.** All costs taxed against the insured in the "suit."

**6.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**7.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit," we will defend that indemnitee if all the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears

to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit."

So long as the above conditions are met, attorneys fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of paragraph **2.b.(2)** of COVERAGE A — BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I — Coverages), such payments will not be deemed to be damages for "bodily injury" and "property damages" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys fees and necessary litigation expenses as Supplementary Payments ends when:

**a.** We have used up the applicable limit of insurance in the payment of judgements or settlements; or

**b.** The conditions set forth above, or the terms of the agreement described in paragraph **f.** above, are no longer met.

## SECTION II—WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to

Form No:   CG 00 01
01 96
Page 6 of 11

the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured:

a. Your "employees," other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:

(1) "Bodily injury" or "personal injury":

(a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

(b) To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of paragraph (1)(a) above;

(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs (1)(a) or (b) above; or

(d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property:

(a) Owned, occupied or used by,

(b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees," any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

b. Any person (other than your "employee"), or any organization while acting as your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

a. "Bodily injury" to a co-"employee" of the person driving the equipment; or

b. "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage B does not apply to "personal injury" or "advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III—LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits."

2. The General Aggregate Limit is the most we will pay for the sum of:

a. Medical expenses under Coverage C;

b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

| Form No: | CG 00 01 |
|---|---|
| | 01 96 |
| Page 7 of 11 | |

c.  Damages under Coverage B.

3.  The Products Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard."

4.  Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal injury" and all "advertising injury" sustained by any one person or organization.

5.  Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

    a.  Damages under Coverage A; and

    b.  Medical expenses under Coverage C

    because of all "bodily injury" and "property damage" arising out of any one "occurrence."

6.  Subject to 5. above, the Fire Damage Limit is the most we will pay under Coverage A for damages because of "property damage" to premises, while rented to you or temporarily occupied by you with permission of the owner, arising out of any one fire.

7.  Subject to 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV—COMMERCIAL GENERAL LIABILITY CONDITIONS

1.  **Bankruptcy.**

    Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2.  **Duties In The Event Of Occurrence, Offense, Claim Or Suit.**

    a.  You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

        (1)  How, when and where the "occurrence" or offense took place;

        (2)  The names and addresses of any injured persons and witnesses; and

        (3)  The nature and location of any injury or damage arising out of the "occurrence" or offense.

    b.  If a claim is made or "suit" is brought against any insured, you must:

        (1)  Immediately record the specifics of the claim or "suit" and the date received; and

        (2)  Notify us as soon as practicable.

        You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

    c.  You and any other involved insured must:

        (1)  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

        (2)  Authorize us to obtain records and other information;

        (3)  Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

        (4)  Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

    d.  No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3.  **Legal Action Against Us.**

    No person or organization has a right under this Coverage Part:

    a.  To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

    b.  To sue us on this Coverage Part unless all of its terms have been fully complied with.

    A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4.  **Other Insurance.**

    If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

    a.  **Primary Insurance**

        This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

    b.  **Excess Insurance**

        This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

(1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(2) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner; or

(3) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Coverage A (Section I).

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit." If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c.  Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5.  Premium Audit.**

**a.**  We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.**  Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.**  The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6.  Representations.**

By accepting this policy, you agree:

**a.**  The statements in the Declarations are accurate and complete;

**b.**  Those statements are based upon representations you made to us; and

**c.**  We have issued this policy in reliance upon your representations.

**7.  Separation Of Insureds.**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.**  As if each Named Insured were the only Named Insured; and

**b.**  Separately to each insured against whom claim is made or "suit" is brought.

**8.  Transfer Of Rights Of Recovery Against Others To Us.**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9.  When We Do Not Renew.**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V—DEFINITIONS

1. "Advertising injury" means injury arising out of one or more of the following offenses:

**a.**  Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**b.**  Oral or written publication of material that violates a person's right of privacy;

**c.**  Misappropriation of advertising ideas or style of doing business; or

**d.**  Infringement of copyright, title or slogan.

2. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment."

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

**a.**  The United States of America (including its territories and possessions), Puerto Rico and Canada;

Form No:  CG 00 01
01 96

Page 9 of 11

b.  International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in **a.** above; or

c.  All parts of the world if:

(1)  The injury or damage arises out of:

(a)  Goods or products made or sold by you in the territory described in **a.** above; or

(b)  The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; and

(2)  The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in **a.** above or in a settlement we agree to.

5.  "Employee" includes a "leased worker." "Employee" does not include a "temporary worker."

6.  "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7.  "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

a.  It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b.  You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a.  The repair, replacement, adjustment or removal of "your product" or "your work"; or

b.  Your fulfilling the terms of the contract or agreement.

8.  "Insured contract" means:

a.  A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b.  A sidetrack agreement;

c.  Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d.  An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e.  An elevator maintenance agreement;

f.  That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or

"property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

(1)  That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road beds, tunnel, underpass or crossing;

(2)  That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a)  Preparing, approving or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change order or drawings and specifications; or

(b)  Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3)  Under which the insured, if an architect, engineer or surveyor, assumes liability for injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

9.  "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker."

10.  "Loading or unloading" means the handling of property:

a.  After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b.  While it is in or on an aircraft, watercraft or "auto"; or

c.  While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto."

11.  "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a.  Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b.  Vehicles maintained for use solely on or next to premises you own or rent;

c.  Vehicles that travel on crawler treads;

d.  Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

Form No: CG 00 01
01 96
Page 10 of 11

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

**12.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**13.** "Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

**e.** Oral or written publication of material that violates a person's right of privacy.

**14.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**15.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

**16.** "Suit" means a civil proceeding in which damages because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

Form No: CG 00 01
01 96

Page 11 of 11

17. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

18. "Your product" means:

    a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

       (1) You;

       (2) Others trading under your name; or

       (3) A person or organization whose business or assets you have acquired; and

    b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

    "Your product" includes:

    a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    b. The providing of or failure to provide warnings or instructions.

    "Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

19. "Your work" means:

    a. Work or operations performed by you or on your behalf; and

    b. Materials, parts or equipment furnished in connection with such work or operations.

    "Your work" includes:

    a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

    b. The providing of or failure to provide warnings or instructions.

Coverage Section IV

_Boat Dealers_

# This Section is Not Covered



Coverage Section V


*Piers, Wharves, & Docks*


# *This Section is Not Covered*

# Coverage Section VI

## *Business Property Insurance*

### 1. Building and Personal Property Clauses

1.1  Subject to the General Exclusions from Coverage (Section IX) and the General Conditions (Section X), the standard form Building and Personal Property Clauses (Insurance Services Office Form CP 00 10), Causes of Loss - Special Form (I.S.O. Form CP 10 30), Commercial Property Coverage Endorsement (CU Form G12226), Commercial Property Coverage Endorsement Extensions Endorsement (CU Form G12227), the Commercial Property Conditions (I.S.O. Form CP 00 90), and if applicable, the Earthquake Form (I.S.O.Form CP 1040), the Business Income Coverage Form (I.S.O. Form CP 00 30) which if attached  shall be deemed to include "Rental Value," as appended, are incorporated herein and shall be effective as shown in the Declarations for this Coverage Section.

1.2  In the event the forms incorporated herein under 1.1 differ from the General Conditions to Coverage (Section X), the forms incorporated herein shall be considered paramount and shall override anything to the contrary in the General Conditions to Coverage (Section X).

**COMMERCIAL UNION**

CF160
(6-95)

CP 00 10   06 95

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION H—DEFINITIONS.

## A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

1. **Covered Property**

   Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.**, and limited in **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

   a. **Building**, meaning the building or structure described in the Declarations, including:

      (1) Completed additions;

      (2) Fixtures, including outdoor fixtures;

      (3) Permanently installed:

         (a) Machinery and

         (b) Equipment;

      (4) Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

         (a) Fire extinguishing equipment;

         (b) Outdoor furniture;

         (c) Floor coverings; and

         (d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

      (5) If not covered by other insurance:

         (a) Additions under construction, alterations and repairs to the building or structure;

         (b) Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

   b. **Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property—Separation of Coverage form:

      (1) Furniture and fixtures;

      (2) Machinery and equipment;

      (3) "Stock";

      (4) All other personal property owned by you and used in your business;

      (5) Labor, materials or services furnished or arranged by you on personal property of others;

      (6) Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

         (a) Made a part of the building or structure you occupy but do not own; and

         (b) You acquired or made at your expense but cannot legally remove;

      (7) Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property of Others.

   c. **Personal Property of Others** that is:

      (1) In your care, custody or control; and

      (2) Located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

      However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

2. **Property Not Covered**

   Covered Property does not include:

   a. Accounts, bills, currency, deeds, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

   b. Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

   c. Automobiles held for sale;

   d. Bridges, roadways, walks, patios or other paved surfaces;

   e. Contraband, or property in the course of illegal transportation or trade;

   f. The cost of excavations, grading, backfilling or filling;

   g. Foundations of buildings, structures, machinery or boilers if their foundations are below:

      (1) The lowest basement floor; or

| Form No: | CP 00 10 |
| | 06 95 |
| Page 2 of 9 | |

**(2)** The surface of the ground, if there is no basement;

h. Land (including land on which the property is located), water, growing crops or lawns;

i. Personal property while airborne or waterborne;

j. Bulkheads, pilings, piers, wharves or docks;

k. Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

l. Retaining walls that are not part of a building;

m. Underground pipes, flues or drains;

n. The cost to research, replace or restore the information on valuable papers and records, including those which exist on electronic or magnetic media, except as provided in the Coverage Extensions;

o. Vehicles or self-propelled machines (including aircraft or watercraft) that:

**(1)** Are licensed for use on public roads; or

**(2)** Are operated principally away from the described premises.

This paragraph does not apply to:

**(1)** Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

**(2)** Vehicles or self-propelled machines, other than autos, you hold for sale; or

**(3)** Rowboats or canoes out of water at the described premises;

p. The following property while outside of buildings:

**(1)** Grain, hay, straw or other crops;

**(2)** Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, signs (other than signs attached to buildings), trees, shrubs or plants (other than "stock" of trees, shrubs or plants), all except as provided in the Coverage Extensions.

**3. Covered Causes of Loss**

See applicable Causes of Loss Form as shown in the Declarations.

**4. Additional Coverages**

**a. Debris Removal**

**(1)** We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

**(2)** The most we will pay under this Additional Coverage is 25% of:

**(a)** The amount we pay for the direct physical loss of or damage to Covered Property; plus

**(b)** The deductible in this policy applicable to that loss or damage.

But this limitation does not apply to any additional debris removal limit provided in the Limits of Insurance section.

**(3)** This Additional Coverage does not apply to cost to:

**(a)** Extract "pollutants" from land or water; or

**(b)** Remove, restore or replace polluted land or water.

**b. Preservation of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if loss or damage occurs within 30 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1000 for your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

No Deductible applies to this Additional Coverage.

**d. Pollutant Clean Up and Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants." But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

Form No:  CP 00 10
06 95
Page 3 of 9

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12 month period of this policy.

5. **Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more or, a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

a. **Newly Acquired or Constructed Property**

(1) You may extend the insurance that applies to Building to apply to:

(a) Your new buildings while being built on the described premises; and

(b) Buildings you acquire at locations, other than the described premises, intended for:

(i) Similar use as the building described in the Declarations; or

(ii) Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

(2) You may extend the insurance that applies to Your Business Personal Property to apply to that property at any location you acquire other than at fairs or exhibitions.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

(3) Insurance under this Extension for each newly acquired or constructed property will end when any of the following first occurs:

(a) This policy expires;

(b) 30 days expire after you acquire or begin to construct the property; or

(c) You report values to us.

We will charge you additional premium for values reported from the date construction begins or you acquire the property.

b. **Personal Effects and Property of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

(1) Personal effects owned by you, your officers, your partners or your employees. This exten-
sion does not apply to loss or damage by theft.

(2) Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

c. **Valuable Papers and Records — Cost of Research**

You may extend the insurance that applies to Your Business Personal Property to apply to your costs to research, replace or restore the lost information on lost or damaged valuable papers and records, including those which exist on electronic or magnetic media, for which duplicates do not exist. The most we will pay under this Extension is $2500 at each described premises, unless a higher limit is shown in the Declarations.

d. **Property Off-Premises**

You may extend the insurance provided by this Coverage Form to apply to your Covered Property, other than "stock," that is temporarily at a location you do not own, lease or operate. This Extension does not apply to Covered Property:

(1) In or on a vehicle;

(2) In the care, custody or control of your salespersons; or

(3) At any fair or exhibition.

The most we will pay for loss or damage under this Extension if $10,000.

e. **Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), signs (other than signs attached to buildings), trees, shrubs and plants (other than "stock" of trees, shrubs or plants), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

(1) Fire;

(2) Lightning;

(3) Explosion;

(4) Riot or Civil Commotion; or

(5) Aircraft.

The most we will pay for loss or damage under this Extension is $1000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the

types or number of items lost or damaged in that occurrence.

Each of these Extensions is additional insurance. The Additional Condition, Coinsurance, does not apply to these Extensions.

## B. EXCLUSIONS AND LIMITATIONS

See applicable Causes of Loss Form as shown in the Declarations.

## C. LIMITS OF INSURANCE

The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs attached to buildings is $1000 per sign in any one occurrence.

The limits applicable to the Coverage Extensions and the Fire Department Service Charge and Pollutant Clean Up and Removal Additional Coverages are in addition to the Limits of Insurance.

Payments under the following Additional Coverages will not increase the applicable Limit of Insurance:

1. Preservation of Property; or
2. Debris Removal; but if:
   a. The sum of direct physical loss or damage and debris removal expense exceeds the Limit of Insurance; or
   b. The debris removal expense exceeds the amount payable under the 25% limitation in the Debris Removal Additional Coverage;

   we will pay up to an additional $10,000 for each location in any one occurrence under the Debris Removal Additional Coverage.

## D. DEDUCTIBLE

We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible, up to the applicable Limit of Insurance, after any deduction required by the Coinsurance condition or the Agreed Value Optional Coverage.

When the occurrence involves loss to more than one item of Covered Property and more than one Limit of Insurance applies, the Deductible will reduce the total amount of loss payable if loss to at least one item is less than the sum of (1) the Limit of Insurance applicable to that item plus (2) the Deductible.

### Example No. 1:

(This example assumes there is no coinsurance penalty.)
Deductible: $250

Limit of Insurance - Bldg. 1:    $60,000
Limit of Insurance - Bldg. 2:    $80,000

Loss to Bldg. 1:    $60,100
Loss to Bldg. 2:    $90,000

The amount of loss to Bldg. 1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Bldg. 1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Bldg. 1:

$60,100
- 250
$59,850 Loss Payable - Bldg. 1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Bldg. 2. Loss payable for Bldg. 2 is the Limit of Insurance of $80,000.

Total amount of loss payable: $59,850 + 80,000 = $139,850

### Example No. 2:

(This example, too, assumes there is no coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example No. 1.

Loss to Bldg. 1:    $70,000
(exceeds Limit of Insurance plus Deductible)
Loss to Bldg. 2:    $90,000
(exceeds Limit of Insurance plus Deductible)

Loss Payable - Bldg. 1:  $60,000 (Limit of Insurance)
Loss Payable - Bldg. 2:  $80,000 (Limit of Insurance)
Total amount of loss payable: $140,000

## E. LOSS CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

1. **Abandonment**

   There can be no abandonment of any property to us.

2. **Appraisal**

   If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

   a. Pay its chosen appraiser; and
   b. Bear the other expenses of the appraisal and umpire equally.

Form No: CP 00 10
06 95
Page 5 of 9

If there is an appraisal, we will still retain our right to deny the claim.

### 3. Duties In The Event Of Loss Or Damage

a. You must see that the following are done in the event of loss or damage to Covered Property:

(1) Notify the police if a law may have been broken.

(2) Give us prompt notice of the loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when and where the loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, cost, values and amount of loss claimed.

(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(8) Cooperate with us in the investigation or settlement of the claim.

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

### 4. Loss Payment

a. In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property, subject to b. below;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality, subject to b. below.

b. The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

c. We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

d. We will not pay you more than your financial interest in the Covered Property.

e. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

f. We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

g. We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

(1) We have reached agreement with you on the amount of loss; or

(2) An appraisal award has been made.

### 5. Recovered Property

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

### 6. Vacancy

a. Description of Terms

(1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in (1)(a) and (1)(b) below:

(a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not

Form No: CP 00 10
06 95

Page 6 of 9

contain enough business personal property to conduct customary operations.

(b) When this policy is issued to the owner of a building, building means the entire building. Such building is vacant when 70% or more of its square footage:

(i) Is not rented; or

(ii) Is not used to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

b. **Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

(a) Vandalism;

(b) Sprinkler leakage, unless you have protected the system against freezing;

(c) Building glass breakage;

(d) Water damage;

(e) Theft; or

(f) Attempted theft.

(2) With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

## 7. Valuation

We will determine the value of Covered Property in event of loss or damage as follows:

a. At actual cash value as of the time of loss or damage, except as provided in **b., c., d., e.** and **f.** below.

b. If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2500 or less, we will pay the cost of building repairs or replacement.

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property. However, the following property will be valued at the actual cash value when attached to the building:

(1) Awnings or floor coverings;

(2) Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

(3) Outdoor equipment or furniture.

c. "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

d. Glass at the cost of replacement with safety glazing material if required by law.

e. Tenant's Improvements and Betterments at:

(1) Actual cash value of the lost or damaged property if you make repairs promptly.

(2) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

(a) Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

(b) Divide the amount determined in **(a)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

(3) Nothing if others pay for repairs or replacement.

f. Valuable Papers and Records, including those which exist on electronic or magnetic media (other than prepackaged software programs), at the cost of:

(1) Blank materials for reproducing the records; and

(2) Labor to transcribe or copy the records when there is a duplicate.

## F. ADDITIONAL CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

## 1. Coinsurance

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

a. We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

(1) Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

Form No: CP 00 10
06 95
Page 7 of 9

**(2)** Divide the Limit of Insurance of the property by the figure determined in step **(1)**;

**(3)** Multiply the total amount of loss, before the application of any deductible, by the figure determined in step **(2)**; and

**(4)** Subtract the deductible from the figure determined in step **(3)**.

We will pay the amount determined in step **(4)** or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example No. 1 (Underinsurance):**

| When: | The value of the property is | $250,000 |
|---|---|---|
| | The Coinsurance percentage for it is | 80% |
| | The Limit of Insurance for it is | $100,000 |
| | The Deductible is | $250 |
| | The amount of loss is | $ 40,000 |

Step **(1)**: $250,000 x 80% = $200,000

(the minimum amount of insurance to meet your Coinsurance requirements)

Step **(2)**: $100,000 ÷ $200,000 = .50

Step **(3)**: $40,000 x .50 = $20,000

Step **(4)**: $20,000 - $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

**Example No. 2 (Adequate Insurance):**

| When: | The value of the property is: | $250,000 |
|---|---|---|
| | The Coinsurance percentage for it is | 80% |
| | The Limit of Insurance for it is | $200,000 |
| | The Deductible is | $250 |
| | The amount of loss is | $ 40,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this Example is adequate and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

**b.** If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**Example No. 3:**

When:   The value of property is:

| Bldg. at Location No.1 | $ 75,000 |
|---|---|
| Bldg. at location No. 2 | $100,000 |
| Personal Property at Location No. 2 | $ 75,000 |
| | $250,000 |
| The Coinsurance percentage for it is | 90% |
| The Limit of Insurance for Buildings and Personal Property at Location Nos. 1 and 2 is | $180,000 |
| The Deductible is | $ 1,000 |
| The amount of loss is: Bldg. at Location No. 2 | $ 30,000 |
| Personal Property at Location No. 2 | $ 20,000 |
| | $ 50,000 |

Step **(1)**: $250,000 x 90% = $225,000

(the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

Step **(2)**: $180,000 ÷ $225,000 = .80

Step **(3)**: $50,000 x .80 = $40,000

Step **(4)**: $40,000 - $1,000 = $39,000

We will pay no more than $39,000. The remaining $11,000 is not covered.

**2. Mortgageholders**

**a.** The term mortgageholder includes trustee.

**b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

**c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

**d.** If we deny your claim because of your acts or because you have failed to comply with the terms of the Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

**(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

| Form No: | CP 00 10 |
| | 06 95 |
| Page 8 of 9 | |

(3) Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Part will then apply directly to the mortgageholder.

e. If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

(1) The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

(2) The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

f. If we cancel this policy, we will give written notice to the mortgageholder at least:

(1) 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

g. If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

## G. OPTIONAL COVERAGES

If shown in the Declarations, the following Optional Coverages apply separately to each item.

### 1. Agreed Value

a. The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

b. If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

c. The terms of this Optional Coverage apply only to loss or damage that occurs:

(1) On or after the effective date of this Optional Coverage; and

(2) Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

### 2. Inflation Guard

a. The Limit of Insurance for property to which this Optional Coverage applied will automatically increase by the annual percentage shown in the Declarations.

b. The amount of increase will be:

(1) The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

(2) The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

(3) The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

Example:

If: The applicable Limit of Insurance is              $100,000

The annual percentage increase is              8%

The number of days since the beginning of the policy year (or last policy change) is              146

The amount of increase is
$100,000 x .08 x 146 ÷ 365 = $3,200

### 3. Replacement Cost

a. Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.

b. This Optional Coverage does not apply to:

(1) Personal property of others;

(2) Contents of a residence;

(3) Manuscripts;

(4) Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

(5) "Stock," unless the including "Stock" option is shown in the Declarations.

c. You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

d. We will not pay on a replacement cost basis for any loss or damage:

Form No:  CP 00 10
06 95
Page 9 of 9

(1) Until the lost or damaged property is actually repaired or replaced; and

(2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

e. We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)** or **(3)**, subject to f. below:

(1) The Limit of Insurance applicable to the lost or damaged property;

(2) The cost to replace, on the same premises, the lost or damaged property with other property:

(a) Of comparable material and quality; and

(b) Used for the same purpose; or

(3) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

f. The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

**H. DEFINITIONS**

1. "Pollutant" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

2. "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.



COMMERCIAL UNION

CF497
(6-95)

CP 10 30   06 95

# CAUSES OF LOSS—SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section F—DEFINITIONS.

## A. COVERED CAUSES OF LOSS

When Special is shown in the Declarations, Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

1. Excluded in Section **B.**, Exclusions; or
2. Limited in Section **C.**, Limitations;

that follow.

## B. EXCLUSIONS

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   **a. Ordinance or Law**

   The enforcement of any ordinance or law:

   (1) Regulating the construction, use or repair of any property; or

   (2) Requiring the tearing down of any property, including the cost of removing its debris.

   This exclusion, Ordinance or Law, applies whether the loss results from:

   (1) An ordinance or law that is enforced even if the property has not been damaged; or

   (2) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

   **b. Earth Movement**

   (1) Any earth movement (other than sinkhole collapse), such as an earthquake, landslide, mine subsidence or earth sinking, rising or shifting. But if earth movement results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

   (2) Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or volcanic action, we will pay for the loss or damage caused by that fire, building glass breakage or volcanic action.

   Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

   (a) Airborne volcanic blast or airborne shock waves;

   (b) Ash, dust or particulate matter; or

   (c) Lava flow.

   All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

   Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

   **c. Governmental Action**

   Seizure or destruction of property by order of governmental authority.

   But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

   **d. Nuclear Hazard**

   Nuclear reaction or radiation, or radioactive contamination, however caused.

   But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

   **e. Utility Services**

   The failure of power or other utility service supplied to the described premises, however caused, if the failure occurs away from the described premises.

   But if the failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

   This exclusion does not apply to the Business Income coverage or to Extra Expense coverage. Instead, the Special Exclusion in paragraph **B.4.a.(1)** applies to these coverages.

   **f. War and Military Action**

   (1) War, including undeclared or civil war;

   (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

   (3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

   **g. Water**

   (1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

   (2) Mudslide or mudflow;

CP 10 30   06 95

Form No:   CP 10 30
06 95
Page 2 of 6

(3) Water that backs up or overflows from a sewer, drain or sump; or

(4) Water under the ground surface pressing on, or flowing or seeping through:

    (a) Foundations, walls, floors or paved surfaces;

    (b) Basements, whether paved or not; or

    (c) Doors, windows or other openings.

But if Water, as described in **g.(1)** through **g.(4)** above, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

2. We will not pay for loss or damage caused by or resulting from any of the following:

   **a.** Artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires.

    But if artificially generated electrical current results in fire, we will pay for the loss or damage caused by that fire.

   **b.** Delay, loss of use or loss of market.

   **c.** Smoke, vapor or gas from agricultural smudging or industrial operations.

   **d.** (1) Wear and tear;

    (2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

    (3) Smog;

    (4) Settling, cracking, shrinking or expansion;

    (5) Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals;

    (6) Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision;

    (7) The following causes of loss to personal property:

      (a) Dampness or dryness of atmosphere;

      (b) Changes in or extremes of temperature; or

      (c) Marring or scratching.

    But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

   **e.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you

or operated under your control.  But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**f.** Continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more.

**g.** Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

    (1) You do your best to maintain heat in the building or structure; or

    (2) You drain the equipment and shut off the supply if the heat is not maintained.

**h.** Dishonest or criminal act by you, any of your partners, employees (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

    (1) Acting alone or in collusion with others; or

    (2) Whether or not occurring during the hours of employment.

    This exclusion does not apply to acts of destruction by your employees (including leased employees); but theft by employees (including leased employees) is not covered.

**i.** Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**j.** Rain, snow, ice or sleet to personal property in the open.

**k.** Collapse, except as provided below in the Additional Coverage for Collapse.  But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

**l.** Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss." But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss," we will pay for the loss or damage caused by that "specified cause of loss."

Form No:   CP 10 30
06 95
Page 3 of 6

**3.** We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a.** Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph **1.** above to produce the loss or damage.

**b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c.** Faulty, inadequate or defective:

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance;

of part or all of any property on or off the described premises.

**4. Special Exclusions**

The following provisions apply only to the specified Coverage Forms.

**a. Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form or Extra Expense Coverage Form**

We will not pay for:

(1) Any loss caused directly or indirectly by the failure of power or other utility service supplied to the described premises, however caused, if the failure occurs outside of a covered building.

But if the failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss resulting from that Covered Cause of Loss.

(2) Any loss caused by or resulting from:

(a) Damage or destruction of "finished stock"; or

(b) The time required to reproduce "finished stock."

This exclusion does not apply to Extra Expense.

(3) Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

(4) Any increase of loss caused by or resulting from:

(a) Delay in rebuilding, repairing or replacing the property or resuming "operations," due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

(b) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations," we will cover such loss that affects your Business Income during the "period of restoration."

(5) Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration."

(6) Any other consequential loss.

**b. Leasehold Interest Coverage Form**

(1) Paragraph **B.1.a.**, Ordinance or Law, does not apply to insurance under this Coverage Form.

(2) We will not pay for any loss caused by:

(a) Your cancelling the lease;

(b) The suspension, lapse or cancellation of any license; or

(c) Any other consequential loss.

**c. Legal Liability Coverage Form**

(1) The following Exclusions do not apply to insurance under this Coverage Form:

(a) Paragraph **B.1.a.**, Ordinance or Law;

(b) Paragraph **B.1.c.**, Governmental Action;

(c) Paragraph **B.1.d.**, Nuclear Hazard;

(d) Paragraph **B.1.e.**, Utility Services; and

(e) Paragraph **B.1.f.**, War and Military Action.

(2) The following additional exclusions apply to insurance under this Coverage Form:

(a) **Contractual Liability**

We will not defend any claim or "suit," or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

(i) Your assumption of liability was executed prior to the accident; and

| Form No: | CP 10 30 |
| | 06 95 |
| Page 4 of 6 | |

(ii) The building is Covered Property under this Coverage Form.

(b) **Nuclear Hazard**

We will not defend any claim or "suit," or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

## C. LIMITATIONS

The following limitations apply to all policy forms and endorsements, unless otherwise stated.

1. We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

   a. Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

   b. Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

   c. The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

      (1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

      (2) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

   d. Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

      However, this limitation does not apply to:

      (1) Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

      (2) Business Income coverage or Extra Expense coverage.

   e. Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

   f. Gutters and downspouts caused by or resulting from weight of snow, ice or sleet.

   g. Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

2. We will not pay more than $500 in any one occurrence for loss of or damage to glass that is part of a building or structure, regardless of the number of panes, plates or similar units of glass. Subject to this $500 aggregate, we will not pay more than $100 for any one pane, plate, multiple plate insulating unit, radiant or solar heating panel, jalousie, louver or shutter.

   However, this limitation does not apply to:

   a. Loss or damage by the "specified causes of loss," except vandalism; or

   b. Business Income coverage or Extra Expense coverage.

3. We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

   a. Valuable papers and records, such as books of account, manuscripts, abstracts, drawings, card index systems, film, tape, disc, drum, cell or other data processing, recording or storage media, and other records.

   b. Animals, and then only if they are killed or their destruction is made necessary.

   c. Fragile articles such as glassware, statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

      (1) Glass that is part of a building or structure;

      (2) Containers of property held for sale; or

      (3) Photographic or scientific instrument lenses.

   d. Builders' machinery, tools and equipment owned by you or entrusted to you, provided such property is Covered Property.

      However, this limitation does not apply:

      (1) If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

      (2) To Business Income coverage or to Extra Expense coverage.

4. The special limit shown for each category, a. through d., is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are:

   a. $2500 for furs, fur garments and garments trimmed with fur.

| Form No: | CP 10 30 |
| | 06 93 |
| Page 5 of 6 | |

b. $2500 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

c. $2500 for patterns, dies, molds and forms.

d. $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

This limitation, **C.4.**, does not apply to Business Income coverage or to Extra Expense coverage.

5. We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

a. Results in discharge of any substance from an automatic fire protection system; or

b. Is directly caused by freezing.

However, this limitation does not apply to Business Income coverage or to Extra Expense coverage.

### D. ADDITIONAL COVERAGE—COLLAPSE

The term Covered Cause of Loss includes the Additional Coverage—Collapse as described and limited in **D.1.** through **D.5.** below.

1. We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Form, if the collapse is caused by one or more of the following:

a. The "specified causes of loss" or breakage of building glass, all only as insured against in this Coverage Part;

b. Hidden decay;

c. Hidden insect or vermin damage;

d. Weight of people or personal property;

e. Weight of rain that collects on a roof;

f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in **D.1.a.** through **D.1.e.**, we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse.

2. If the direct physical loss or damage does not involve collapse of a building or any part of a building, we will

pay for loss or damage to Covered Property caused by the collapse of personal property only if:

a. The personal property which collapses is inside a building; and

b. The collapse was caused by a cause of loss listed in **D.1.a.** through **D.1.f.** above.

3. With respect to the following property:

a. Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

b. Awnings, gutters and downspouts;

c. Yard fixtures;

d. Outdoor swimming pools;

e. Fences;

f. Piers, wharves and docks;

g. Beach or diving platforms or appurtenances;

h. Retaining walls; and

i. Walks, roadways and other paved surfaces;

if the collapse is caused by a cause of loss listed in **D.1.b.** through **D.1.f.**, we will pay for loss or damage to that property only if:

a. Such loss or damage is a direct result of the collapse of a building insured under this Coverage Form; and

b. The property is Covered Property under this Coverage Form.

4. Collapse does not include settling, cracking, shrinkage, bulging or expansion.

5. This Additional Coverage, Collapse, will not increase the Limits of Insurance provided in this Coverage Part.

### E. ADDITIONAL COVERAGE EXTENSIONS

1. **Property In Transit.** This Extension applies only to your personal property to which this form applies.

a. You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 100 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

b. Loss or damage must be caused by or result from one of the following causes of loss:

(1) Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism.

(2) Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the road bed.

| Form No: | CP 10 30 |
|          | 06 95 |
| Page 6 of 6 | |

(3) Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

c. The most we will pay for loss or damage under this Extension is $1000.

This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

2. **Water Damage, Other Liquids, Powder Or Molten Material Damage.** If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

F. **DEFINITIONS**

"Specified Causes of Loss" means the following:

Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole col-

lapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

1. Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

   a. The cost of filling sinkholes; or

   b. Sinking or collapse of land into man-made underground cavities.

2. Falling objects does not include loss or damage to:

   a. Personal property in the open; or

   b. The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

3. Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam.



CP 00 90 11 85

CF 111
(11-85)

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

## A. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Coverage Part is void in any case of fraud by you relating to it. It is also void if you intentionally conceal or misrepresent a material fact concerning:

1. This Coverage Part;

2. The Covered Property; or

3. Your interest in the Covered Property.

## B. CONTROL OF PROPERTY

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

If you violate a condition of this Coverage Part, we will not pay for loss or damage at the involved location. But your coverage will continue for other locations at which the violation does not apply.

## C. INSURANCE UNDER TWO OR MORE COVERAGES

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

## D. LEGAL ACTION AGAINST US

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all of the terms of this Coverage Part; and

2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

## E. LIBERALIZATION

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

## F. NO BENEFIT TO BAILEE

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

## G. OTHER INSURANCE

1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

## H. POLICY PERIOD, COVERAGE TERRITORY

Under this Coverage Part:

1. We cover loss or damage commencing:

   a. During the policy period shown in the Declarations; and

   b. Within the coverage territory.

2. The coverage territory is:

   a. The United States of America;

   b. Puerto Rico; and

   c. Canada.

## I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property or Covered Income.

2. After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

   a. Someone insured by this insurance;

   b. A business firm:

      (1) Owned or controlled by you; or

      (2) That owns or controls you; or

   c. Your tenant.

This will not restrict your insurance.

Copyright, ISO Commercial Risk Services, Inc., 1983



G12226  09 94

**`THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COMMERCIAL PROPERTY COVERAGE ENDORSEMENT

Under the **BUILDING AND PERSONAL PROPERTY COV-ERAGE FORM, CONDOMINIUM ASSOCIATION COVERAGE FORM AND CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM**, the following coverage applies:

I.   Paragraph 5., Coverage Extensions, of Section A - Coverage, is amended to include the following:

### WATER BACK-UP OF SEWERS AND DRAINS

We will pay for the loss or damage caused by or resulting from water that backs up from a sewer or drain. We will not pay more than $50,000 in any one occurrence/annual aggregate.

$500 deductible applies to this Coverage Extension in lieu of the policy deductible stated in the Declarations.

### LOCK REPLACEMENT

You may extend the insurance provided by this coverage part to apply to the cost to repair or replace the door locks or tumblers of your described premises due to the theft of your door keys.

The most we will pay under this Coverage Extension is $500.

No deductible applies to this Coverage Extension.

### FIRE PROTECTION DEVICE RECHARGE

The most we will pay under this Coverage Extension is $1,000 to recharge or refill fire protective devices.

You may extend the insurance provided by this Coverage Extension to apply to your fire protective devices that are permanently installed in buildings at the described premises.

This Coverage Extension only applies when such devices have been discharged while being used to combat a fire.

No deductible applies to this Coverage Extension.

### MONEY AND SECURITIES

You may extend the insurance provided by this coverage part to apply to loss or damage to "money" and "securities" used in your business by a Covered Cause of Loss while:

(1)  At a designated premises;

(2)  While being carried by you to or from a covered location;

(3)  At a bank or savings institution.

Definitions

(1)  "Money" means:

(a)  Currency, coins, and bank notes in current use and having a face value; and

(b)  Travelers checks, register checks, and money orders held for sale to the public.

(2)  "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes:

(a)  Tokens, tickets, revenue, and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

(b)  Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

but does not include "money".

The most we will pay for loss or damage under this Coverage Extension is $2,500 per occurrence, $10,000 annual aggregate.

$250 deductible applies to this Coverage Extension in lieu of the policy deductible stated in the Declarations.

### ORDINANCE OR LAW COVERAGE

This coverage modifies insurance provided under the following:

**Building and Personal Property Coverage Form**

**Condominium Association Coverage Form**

#### Coverage A - Coverage For Loss to the Undamaged Portion of the Building

If a Covered Cause of Loss occurs to covered Building property, we will pay for loss to the undamaged portion of the building caused by enforcement of any ordinance or law that:

(a)  Requires the demolition of parts of the same property not damaged by a Covered Cause of Loss;

(b)  Regulates the construction or repair of buildings, or establishes zoning or land use requirements at the described premises; and

(c)  Is in force at the time of loss.

Coverage A is included within the Limit of Insurance applicable to the covered Building property shown in the Declarations. This is not additional insurance.

If the Replacement Cost Coverage option applies and the property is repaired or replaced on the same or another premises, we will not pay more for loss or damage to Covered Property, caused by enforcement of an ordinance or law, than the lesser of:

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

(a) The amount you actually spend to repair, rebuild, or reconstruct the building, but not for more than the amount it would cost to restore the building on the same premises and to the same height, floor area, style and comparable quality of the original property insured; or

(b) $100,000 per occurrence.

If the Replacement Cost Coverage option applies and the property is not repaired or replaced; or if the Replacement Cost Coverage option does not apply; we will not pay more for loss or damage to Covered Property, caused by enforcement of an ordinance or law, than the lesser of:

(a) The actual cash value of the building at the time of loss; or

(b) $100,000 per occurrence.

## Coverage B - Demolition Cost Coverage

If a Covered Cause of Loss occurs to covered Building property, we will pay the cost to demolish and clear the site of undamaged parts of the property caused by the enforcement of building, zoning or land use ordinance or law.

We will not pay more under Coverage B - Demolition Cost Coverage than the lesser of the following:

(a) The amount you actually spend to demolish and clear the site of the described premises; or

(b) $100,000 per occurrence.

The Coinsurance Additional Condition does not apply to Demolition Cost Coverage.

## Coverage C - Increased Cost of Construction Coverage

If a Covered Cause of Loss occurs to covered Building property to which the Replacement Cost Coverage option applies, we will pay for the increased cost to repair, rebuild, or construct the property caused by enforcement of building, zoning, or land use ordinance or law. If the property is repaired or rebuilt, it must be intended for similar occupancy as the current property, unless required by zoning or land use ordinance or law.

However, we will not pay for the increased cost of construction if the building is not repaired or replaced.

The Coinsurance Additional Condition does not apply to Increased Cost of Construction.

We will not pay under Coverage C - Increased Cost of Construction Coverage:

(a) Until the property is actually repaired or replaced, at the same or another premises; or

(b) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years; and

If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the

most we will pay under Coverage C - Increased Cost of Construction is the lesser of:

(a) The increased cost of construction at the same premises: or

(b) $100,000 per occurrence.

If the ordinance or law requires relocation to another premises, the most we will pay under Coverage C - Increased Cost of Construction is the lesser of:

(a) The increased cost of construction at the new premises; or

(b) $100,000 per occurrence.

### Additional Exclusions Applicable to Coverages A, B, and C

(a) We will not pay under this endorsement for the costs associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, assess the effect of "pollutants".

(b) We will not pay for loss or damage caused directly or indirectly by any earth movement (other than sinkhole collapse), such as an earthquake, landslide, mine subsidence or earth sinking, rising, or shifting. But if loss or damage by fire, building glass breakage, or volcanic action results, we will pay for that resulting loss or damage.

### Deductible

The policy deductible applies to this Coverage Extension.

II. Paragraph 2. under the **CAUSES OF LOSS - SPECIAL FORM** of SECTION C - LIMITATIONS, is amended to the following:

### BUILDING GLASS

If the CAUSES OF LOSS - SPECIAL FORM is shown in the Declarations for Building coverage, the Limitation pertaining to loss or damage to glass that is part of a building or structure does not apply.

III. Paragraph 7.b. under the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**, or Paragraph 8.b. under the **CONDOMINIUM ASSOCIATION COVERAGE FORM** and **CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM**, Valuation of SECTION E - LOSS CONDITIONS, is amended to the following:

If the Limit of Insurance for building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $5,000 or less, we will pay the cost of building repairs or replacement.

Policy deductible applies to this Loss condition.



G12227    09 94

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COMMERCIAL PROPERTY COVERAGE EXTENSIONS ENDORSEMENT

This endorsement modifies insurance under the following:

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM**
**CONDOMINIUM ASSOCIATION COVERAGE FORM**
**CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM**

Paragraphs A.4.b. and 4.c., of ADDITIONAL COVERAGES, are replaced by the following:

**4. b. PRESERVATION OF PROPERTY**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

(1) While it is being moved or while temporarily stored at another location; and

(2) Only if the loss or damage occurs within 30 days after the property is first moved.

**4. c. FIRE DEPARTMENT SERVICE CHARGE**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $15,000 for your liability for fire department service charges:

(1) Assumed by contract or agreement prior to loss; or

(2) Required by local ordinance.

No deductible applies to this Additional Coverage.

Paragraph A.4., of ADDITIONAL COVERAGES, is amended to include the following:

**4. e. PRESERVATION EXPENSE**

If it is necessary to move Covered Property to preserve it from loss by a Covered Cause of Loss, we will pay the actual expense to move the property to safety.

We will also pay any necessary rental fees for the temporary storage at premises of others for a period of 30 days after the property is first moved.

The most we will pay in any one occurrence is $25,000.

**4. f. EXPEDITING EXPENSE**

We will pay the reasonable cost you incur to expedite repairs to Covered Property which has been damaged by a Covered Cause of Loss. This includes payment

of overtime wages and the extra cost of express or other rapid means of transportation.

We will not pay for such costs or expenses caused by the interference by strikers in the rebuilding, repairing, or replacing of the covered property at the location of loss, nor caused by the suspension, lapse, or cancellation of any license, lease, or contract.

The most we will pay in any one occurrence is $25,000.

Paragraph A.5., COVERAGE EXTENSIONS, is replaced by the following:

**5. COVERAGE EXTENSIONS**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more, or a Value Reporting period symbol is shown in the Declarations, you may extend the insurance provided by the Coverage Part as follows:

**a. NEWLY ACQUIRED OR CONSTRUCTED PROPERTY**

(1) You may extend the insurance that applies to Building to apply to:

(a) Your new buildings while being built on the described premises; and

(b) Buildings you acquire at locations, other than the described premises, intended for:

(i) Similar use as the building described in the Declarations; or

(ii) Use as a warehouse.

The most we will pay for loss or damage under the Extension is $500,000 at each building.

(2) You may extend the insurance that applies to Your Business Personal Property to apply to that property at any location you acquire other than at fairs or exhibitions.

The most we will pay for loss or damage under this Extension is $200,000 at each building.

**Includes copyrighted material of Insurance Services Office, Inc., with its permission.**

(3) Insurance under this Extension for each newly acquired or constructed property will end when any of the following first occurs:

    (a) The policy expires;

    (b) 90 days expire after you acquire or begin to construct the property; or

    (c) You report values to us.

**b. PERSONAL EFFECTS AND PROPERTY OF OTHERS**

You may extend the insurance that applies to Your Business Personal Property to apply to:

(1) Personal effects owned by you, your officers, your partners, or your employees.

(2) Personal property of others in your care, custody, or control.

The most we will pay for loss or damage under this Extension is $10,000 at each described premises, but not more than $5,000 to any one person in any one loss. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. VALUABLE PAPERS AND RECORDS - COST OF RESEARCH**

You may extend the insurance that applies to Your Business Personal Property to apply to your costs to research, replace, or restore the lost information on lost or damaged valuable papers and records, including those which exist on electronic or magnetic media, for which duplicates do not exist. The most we will pay under this Extension is $25,000 at each premises and $25,000 off premises, per occurrence. Off premises coverage is limited to 30 days.

**d. PROPERTY OFF-PREMISES**

(1) You may extend the insurance provided by this Coverage Form to apply to your Covered Property that is temporarily at a location you do not own, lease, or operate, or that is in the care, custody, or control of your salespersons. This extension does not apply to Covered Property in or on a vehicle.

The most we will pay for loss or damage under this Extension is $20,000, but not more than $5,000 per salesperson.

(2) You may extend the insurance provided by this Coverage Form to apply to your Covered Property (including property that is in the care, custody, or control of your salespersons) in transit in or on a motor vehicle you own, lease, or operate while between points within the coverage territory and more than 100 feet from the described premises.

Loss or damage must be caused by or result from one of the following Covered Causes of Loss:

    (a) Fire, lightning, explosion, windstorm, hail, riot or civil commotion, or vandalism;

    (b) Vehicle collision, upset, or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the road bed;

    (c) Theft of any entire bale, case, or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry;

    (d) Flood; or

    (e) Earthquake.

The coverage provided under this Extension replaces coverage provided under any other coverage extension applying to property in transit. The most we will pay for loss or damage under this Extension is $5,000 per occurrence.

(3) The annual aggregate for all losses under Property Off-Premises is $20,000.

**e. OUTDOOR TREES, SHRUBS, AND PLANTS**

You may extend the insurance provided by this Coverage Form to apply to your trees, shrubs, and plants (other than "stock" of trees, shrubs, or plants) caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

(1) Fire;

(2) Lightning;

(3) Explosion;

(4) Riot or Civil Commotion;

(5) Aircraft; or

(6) Vehicles which you do not own, operate, or lease.

The coverage provided under this Extension replaces coverage provided under any other coverage extension applying to outdoor trees, shrubs, or plants.

The most we will pay for loss or damage, including debris removal expense, under this Extension is $10,000, but not more than $500 for any one tree, shrub, or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

**f. OUTDOOR SIGNS**

You may extend the insurance provided by this Coverage Form to apply to outdoor signs (attached and unattached) owned by you or others but in your care, custody, or control. Coverage applies to signs on

or away from your premises which pertain to the insured occupancy.

We will insure covered signs described above against any Covered Cause of Loss, but we will not cover loss or damage caused by breakage during transportation unless caused by fire, lightning, collision, derailment, or overturning of a vehicle.

The coverage provided under this Extension replaces coverage provided under any other coverage extension applying to outdoor signs.

The most we will pay for loss or damage, including debris removal expense, under this Extension is $10,000.

g. **FENCES, RADIO AND TELEVISION ANTENNAS AND SATELLITE DISHES**

You may extend the insurance that applies to Building to apply to fences, radio and television antennas, and satellite dishes incidental to your operation located on the described premises.

The coverage provided under this Extension replaces coverage provided under any other coverage extension applying to fences, radio and television antennas, and satellite dishes.

The most we will pay for loss or damage, including debris removal expense, under this Extension is $10,000 for fences, $10,000 for radio and television antennas, and $10,000 for satellite dishes per occurrence.

h. **F.O.B. SHIPMENTS**

You may extend the insurance that applies to Your Business Personal Property to apply to goods you sell to others which are shipped to them at their risk of loss. This extension only applies if you cannot collect the bill of sale because:

(1) The goods have been damaged by a Covered Cause of Loss; and

(2) Your customer has refused or is unable to pay.

The most we will pay for loss or damage under this Extension is $2,500 per occurrence.

i. **MONEY AND CHECKS**

You may extend the insurance that applies to Your Business Personal Property to apply to your money and checks you use in your business if loss or damage is caused by a Covered Cause of Loss while:

(1) They are contained in a building at a location we cover; or

(2) They are being carried to or from a covered location.

We will not cover any loss caused by or resulting from forgery, alterations, the giving or surrendering of checks, or money in exchange or purchase, or accounting or arithmetic errors, or omissions. The most we will pay for loss or damage under this Extension is $2,500 per occurrence.

j. **MONEY ORDERS AND COUNTERFEIT PAPER CURRENCY**

You may extend the insurance provided by this Coverage Form to apply to loss, due to the acceptance in good faith, in exchange for merchandise, money or services, of any post office or express money order, issued or purported to be issued by any post office or express company, if that money order is not paid upon presentation, or due to the acceptance in good faith of counterfeit United States or Canadian paper currency.

Exclusion 2.i. of the Causes of Loss - Special Form does not apply.

The most we will pay for loss or damage under this Extension is $2,500 per occurrence.

CP 00 30 06 95

# BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION G – DEFINITIONS.

## A. COVERAGE

Coverage is provided as described below for one or more of the following options for which a Limit of Insurance is shown in the Declarations:

(i) Business Income including "Rental Value."

(ii) Business Income other than "Rental Value."

(iii) "Rental Value."

If option (i) above is selected, the term Business Income will include "Rental Value." If option (iii) above is selected, the term Business Income will mean "Rental Value" only.

If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to property, including personal property in the open (or in a vehicle) within 100 feet, at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

If you are a tenant, your premises is the portion of the building which you rent, lease or occupy, including:

1.  All routes within the building to gain access to the described premises; and

2.  Your personal property in the open (or in a vehicle) within 100 feet.

1.  **Business Income**

    Business Income means the:

    a.  Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

    b.  Continuing normal operating expenses incurred, including payroll.

2.  **Covered Causes Of Loss**

    See applicable Causes of Loss Form as shown in the Declarations.

3.  **Additional Coverages**

    a.  **Extra Expense.**

        Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

        (1) We will pay any Extra Expense to avoid or minimize the suspension of business and to continue "operations":

            (a) At the described premises; or

            (b) At replacement premises or at temporary locations, including:

                (i) Relocation expenses; and

                (ii) Costs to equip and operate the replacement or temporary locations.

        (2) We will pay any Extra Expense to minimize the suspension of business if you cannot continue "operations."

        (3) We will pay any Extra Expense to:

            (a) Repair or replace any property; or

            (b) Research, replace or restore the lost information on damaged valuable papers and records;

        to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

    b.  **Civil Authority.** We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss. The coverage for Business Income will begin 72 hours after the time of that action and will apply for a period of up to three consecutive weeks after coverage begins.

        The coverage for Extra Expense will begin immediately after the time of that action and will end:

        (1) 3 consecutive weeks after the time of that action; or

        (2) When your Business Income coverage ends;

        whichever is later.

    c.  **Alterations and New Buildings.** We will pay for the actual loss of Business Income you

Copyright, ISO Commercial Risk Services, Inc., 1994

sustain due to direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss to:

(1) New buildings or structures, whether complete or under construction;

(2) Alterations or additions to existing buildings or structures; and

(3) Machinery, equipment, supplies or building materials located on or within 100 feet of the described premises and:

(a) Used in the construction, alterations or additions; or

(b) Incidental to the occupancy of new buildings.

If such direct physical loss or damage delays the start of "operations," the "period of restoration" will begin on the date "operations" would have begun if the direct physical loss or damage had not occurred.

d. **Extended Business Income.**

(1) Business Income other than "Rental Value"

If the necessary suspension of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

(a) Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

(b) Ends on the earlier of:

(i) The date you could restore your "operations," with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

(ii) 30 consecutive days after the date determined in (1)(a) above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

(2) "Rental Value"

If the necessary suspension of your "operations" produces a "Rental Value" loss payable under this policy, we will pay for the actual loss of "Rental Value" you incur during the period that:

(a) Begins on the date property is actually repaired, rebuilt or replaced and tenantability is restored; and

(b) Ends on the earlier of:

(i) The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct physical loss or damage had occurred; or

(ii) 30 consecutive days after the date determined in (2)(a) above.

However, Extended Business Income does not apply to loss of "Rental Value" incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of "Rental Value" must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

4. **Coverage Extension**

If a Coinsurance percentage of 50% or more is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**Newly Acquired Locations**

a. You may extend your Business Income Coverage to apply to property at any location you acquire other than fairs or exhibitions.

b. The most we will pay for loss under this Extension is $100,000 at each location.

c. Insurance under this Extension for each newly acquired location will end when any of the following first occurs:

(1) This policy expires;

(2) 30 days expire after you acquire or begin to construct the property; or

(3) You report values to us.

We will charge you additional premium for values reported from the date you acquire the property.

This Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

B. **EXCLUSION AND LIMITATIONS**

See applicable Causes of Loss Form as shown in the Declarations.

C. **LIMITS OF INSURANCE**

Copyright, ISO Commercial Risk Services, Inc., 1994

CF 169 (6-95)
CP 00 30 06 95

The most we will pay for loss in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The limit applicable to the Coverage Extension is in addition to the Limit of Insurance.

Payments under the following Additional Coverages will not increase the applicable Limit of Insurance:

1. Alterations and New Buildings;

2. Civil Authority;

3. Extra Expense; or

4. Extended Business Income.

## D. LOSS CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

### 1. Appraisal

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### 2. Duties In The Event Of Loss

a. You must see that the following are done in the event of loss:

(1) Notify the police if a law may have been broken.

(2) Give us prompt notice of the direct physical loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when and where the direct physical loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a

Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order of examination.

(5) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(6) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(7) Cooperate with us in the investigation or settlement of the claim.

(8) If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

### 3. Limitation – Electronic Media And Records

We will not pay for any loss of Business Income caused by direct physical loss of or damage to Electronic Media and Records after the longer of:

a. 60 consecutive days from the date of direct physical loss or damage; or

b. The period, beginning with the date of direct physical loss or damage, necessary to repair, rebuild or replace, with reasonable speed and similar quality, other property at the described premises due to loss or damage caused by the same occurrence.

Electronic Media and Records are:

(1) Electronic data processing, recording or storage media such as films, tapes, discs, drums or cells;

(2) Data stored on such media; or

(3) Programming records used for electronic data processing or electronically controlled equipment.

This limitation does not apply to Extra Expense.

### Example No. 1:

A Covered Cause of Loss damages a computer on June 1. It takes until September 1 to replace the computer, and until October 1 to

restore the data that was lost when the damage occurred. We will only pay for the Business Income loss sustained during the period June 1–September 1. Loss during the period September 2–October 1 is not covered.

**Example No. 2:**

A Covered Cause of Loss results in the loss of data processing programming records on August 1. The records are replaced on October 15. We will only pay for the Business Income loss sustained during the period August 1–September 29 (60 consecutive days). Loss during the period September 30–October 15 is not covered.

4. **Loss Determination**

   a. The amount of Business Income loss will be determined based on:

      (1) The Net Income of the business before the direct physical loss or damage occurred;

      (2) The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses.

      (3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

      (4) Other relevant sources of information, including:

         (a) Your financial records and accounting procedures;

         (b) Bills, invoices and other vouchers; and

         (c) Deeds, liens or contracts.

   b. The amount of Extra Expense will be determined based on:

      (1) All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

         (a) The salvage value that remains of any property bought for temporary use during the "period of restoration," once "operations" are resumed; and

         (b) Any Extra Expense that is paid for by

other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

      (2) All necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

   c. **Resumption Of Operations**

      We will reduce the amount of your:

      (1) Business Income loss, other than Extra Expense, to the extent you can resume your "operations," in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

      (2) Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

   d. If you do not resume "operations," or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

5. **Loss Payment**

   We will pay for covered loss within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

   a. We have reached agreement with you on the amount of loss; or

   b. An appraisal award has been made.

E. **ADDITIONAL CONDITION**

**Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

We will not pay the full amount of any loss if the Limit of Insurance for Business Income is less than:

a. The Coinsurance percentage shown for Business Income in the Declarations, times

b. The sum of:

   (1) The Net Income (Net Profit or Loss before income taxes), and

   (2) Operating expenses, including payroll expenses,

   that would have been earned or incurred (had no loss occurred) by your "operations" at the described premises for the 12 months following the inception, or last previous anniversary date, of this policy (whichever is later).

Instead, we will determine the most we will pay using the following steps:

1. Multiply the Net Income and operating expense

CF 169 (6-95)
CP 00 30 06 95

for the 12 months following the inception, or last previous anniversary date, of this policy by the Coinsurance percentage;

2.  Divide the Limit of Insurance for the described premises by the figure determined in step 1.; and

3.  Multiply the total amount of loss by the figure determined in step 2.

We will pay the amount determined in step 3. or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

In determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:

a.  Prepaid freight-outgoing;

b.  Returns and allowances;

c.  Discounts;

d.  Bad debts;

e.  Collection expenses;

f.  Cost of raw stock and factory supplies consumed (including transportation charges);

g.  Cost of merchandise sold (including transportation charges);

h.  Cost of other supplies consumed (including transportation charges);

i.  Cost of services purchased from outsiders (not employees) to resell, that do not continue under contract;

j.  Power, heat and refrigeration expenses that do not continue under contract (if Form CP 15 11 is attached);

k.  All ordinary payroll expenses or the amount of payroll expense excluded (if Form CP 15 10 is attached); and

l.  Special deductions for mining properties (royalties unless specifically included in coverage; actual depletion commonly known as unit or cost depletion -- not percentage depletion; welfare and retirement fund charges based on tonnage; hired trucks).

**Example No. 1 (Underinsurance):**

When:  The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been
$400,000

| | |
|---|---|
| The Coinsurance percentage is | 50% |
| The Limit of Insurance is | $150,000 |
| The amount of loss is | $ 80,000 |

Step 1.: $400,000 x 50% = $200,000

(the minimum amount of insurance to meet your Coinsurance requirements)

Step 2.: $150,000 ÷ $200,000 = .75

Step 3.: $80,000 x .75 = $60,000

We will pay no more than $60,000. The remaining $20,000 is not covered.

**Example No. 2 (Adequate Insurance):**

When:  The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been
$400,000

| | |
|---|---|
| The Coinsurance percentage is | 50% |
| The Limit of Insurance is | $200,000 |
| The amount of loss is | $ 80,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($400,000 x 50%). Therefore, the Limit of Insurance in this Example is adequate and no penalty applies. We will pay no more than $80,000 (amount of loss).

This condition does not apply to the Extra Expense Additional Coverage.

F.  **OPTIONAL COVERAGES**

If shown in the Declarations, the followings Optional Coverages apply separately to each item.

1.  **Maximum Period Of Indemnity**

    a.  The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

    b.  The most we will pay for loss of Business Income is the lesser of:

        (1) The amount of loss sustained during the 120 days immediately following the beginning of the "period of restoration"; or

        (2) The Limit of Insurance shown in the Declarations.

2.  **Monthly Limit Of Indemnity**

    a.  The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

    b.  The most we will pay for loss of Business Income in each period of 30 consecutive days after the beginning of the "period of restoration" is:

        (1) The Limit of Insurance, multiplied by

        (2) The fraction shown in the Declarations for this Optional Coverage.

    **Example:**

    When:  The Limit of Insurance is          $120,000

    The fraction shown in the Declarations for this Optional

Coverage is                    1/4

The most we will pay for loss in each period of 30 consecutive days is:

$120,000 x 1/4 = $30,000

If, in this example, the actual amount of loss is:

| Days  1-30  | $40,000 |
| Days 31-60  | 20,000  |
| Days 61-90  | 30,000  |
|             | $90,000 |

We will pay:

| Days  1-30  | $30,000 |
| Days 31-60  | 20,000  |
| Days 61-90  | 30,000  |
|             | $80,000 |

The remaining $10,000 is not covered.

3. **Business Income Agreed Value**

   a. To activate this Optional Coverage:

      (1) A Business Income Report/Work Sheet must be submitted to us and must show financial data for your "operations":

         (a) During the 12 months prior to the date of the Work Sheet; and

         (b) Estimated for the 12 months immediately following the inception of this Optional Coverage.

      (2) The Declarations must indicate that the Business Income Agreed Value Optional Coverage applies, and an Agreed Value must be shown in the Declarations. The Agreed Value should be at least equal to:

         (a) The Coinsurance percentage shown in the Declarations; multiplied by

         (b) The amount of Net Income and operating expenses for the following 12 months you report on the Work Sheet.

   b. The Additional Condition, Coinsurance, is suspended until:

      (1) 12 months after the effective date of this Optional Coverage; or

      (2) The expiration date of this policy;

      whichever occurs first.

   c. We will reinstate the Additional Condition, Coinsurance, automatically if you do not submit a new Work Sheet and Agreed Value:

      (1) Within 12 months of the effective date of this Optional Coverage; or

      (2) When you request a change in your Business Income Limit of Insurance.

   d. If the Business Income Limit of Insurance is

less than the Agreed Value, we will not pay more of any loss than the amount of loss multiplied by:

   (1) The Business Income Limit of Insurance; divided by

   (2) The Agreed Value.

**Example:**

| When: | The Limit of Insurance is | $100,000 |
|       | The agreed value is       | $200,000 |
|       | The amount of loss is     | $80,000  |

Step (a): $100,000 ÷ $200,000 = .50

Step (b): .50 x $80,000 = $40,000

We will pay $40,000. The remaining $40,000 is not covered.

4. **Extended Period Of Indemnity**

   Under paragraph **A.3.d.**, Extended Business Income, the number "30" in subparagraph **(2)(b)** is replaced by the number shown in the Declarations for this Optional Coverage.

G. **DEFINITIONS**

1. "Finished Stock" means stock you have manufactured.

   "Finished stock" also includes whiskey and alcoholic products being aged, unless there is a Coinsurance percentage shown for Business Income in the Declarations.

   "Finished stock" does not include stock you have manufactured that is held for sale on the premises of any retail outlet insured under this Coverage Part.

2. "Operations" means:

   a. Your business activities occurring at the described premises; and

   b. The tenantability of the described premises, if coverage for Business Income including "Rental Value" or "Rental Value" applies.

3. "Period of Restoration" means the period of time that:

   a. Begins:

      (1) 72 hours after the time of direct physical loss or damage for Business Income coverage; or

      (2) immediately after the time of direct physical loss or damage for Extra Expense coverage;

      caused by or resulting from any Covered Cause of Loss at the described premises; and

   b. Ends on the earlier of:

      (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

Copyright, ISO Commercial Risk Services, Inc., 1994

CF 169 (6-95)
CP 00 30 06 95

**(2)** The date when business is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

**(1)** Regulates the construction, use or repair, or requires the tearing down of any property; or

**(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants."

The expiration date of this policy will not cut short the "period of restoration."

**4.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**5.** "Rental Value" means the:

**a.** Total anticipated rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, and

**b.** Amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be your obligations, and

**c.** Fair rental value of any portion of the described premises which is occupied by you.

Copyright, ISO Commercial Risk Services, Inc., 1994



# Coverage Section VII

## *Equipment/Tools Coverage*

### 1. Coverage

Subject to the General Exclusions from Coverage (Section IX) and the General Conditions (Section X), this Coverage Section insures against all risks of direct physical "loss" of, or damage to, the covered property described below from any external cause, except as provided in the Exclusions hereto.

### 2. Property Covered

This insurance covers the scheduled property of the Insured as shown in the Declarations for this Coverage Section and the equipment and tools of others for which the Insured may be liable. Coverage for owned property is provided in consideration of the premium indicated on the schedule of equipment in the Declaration for this Coverage Section.

### 3. Property Not Covered

The coverage provided hereunder does not apply to:

3.1 Vehicles designed and principally used for highway transportation;

3.2 Aircraft or watercraft;

3.3 Property while airborne;

3.4 Property you have loaned, rented, or leased to others;

3.5 Property while located below the surface of the ground;

3.6 Contraband, or property in the course of illegal transportation or trade.

### 4. Territorial Limits

This insurance covers the property insured hereunder while at the locations named in the Declarations, or the premises of others, or while in transit to or from such locations in conjunction with the Insured's normal business operations.

### 5. Exclusions from Coverage

This insurance does not apply to loss, damage, liability or expense directly or indirectly caused by, or contributed to or resulting from:

5.1 Wear and tear, gradual deterioration, rust, corrosion, dampness of atmosphere, freezing or extremes of temperature;

5.2 An original defect in the property;

5.3 Mechanical or electrical breakdown or failure;

5.4 The weight of a load exceeding the manufacturer's rated lifting capacity;

5.5 Any unexplained loss or shortage disclosed upon taking inventory;

5.6 Infidelity or any dishonest act on the part of the Insured, its employees, or



agents, or any person or persons to whom the property insured may be entrusted (carriers for hire excepted);

5.7 Artificially generated currents in the electrical equipment unless fire or explosion ensues and then only for the loss or damage caused by the ensuing fire or explosion;

5.8 An unexplained disappearance.

## 6. Total Loss

The most the Company will pay for loss or damage to the insured property is the insured value indicated on the schedule of equipment or the amount specified under the Additional Coverages hereto.

## 7.Coinsurance

At the time of loss, the limit of insurance for items scheduled in the Declarations must be insured for their total value.

If not insured for their total value, we will pay only the proportion of any "loss" that the limit of insurance bears to the total value of the scheduled item.

## 8. Waiver of Depreciation

No deduction for depreciation shall be taken on the adjustment of any covered partial loss or damage that does not exceed 20% of the actual cash value of the item described in Declarations.

## 9. Other Recoveries

This Company shall not be liable for any part of loss or damage which has been paid or made good by others.

## 10. Company Options

The Company has the option to:

10.1 Take all or any part of the damaged property at an agreed amount;

10.2 Repair, rebuild or replace it with similar property.

This Company will tell the Insured what the Company will do within 30 days after it has received a signed, sworn statement of loss.

## 11. Release of Carrier's Liability

The Insured by acceptance of this insurance, warrants and agrees that no special agreement will be made releasing or limiting the liability of any carrier or bailee. However, privilege is hereby granted the Insured to accept Ordinary Bills of Lading or Receipts issued by the Carrier, but it is agreed that the Insured shall not enter into any special agreement releasing the Carrier from its Common Law or Statutory liability.

## 12. Abandonment

It is understood and agreed that no acts of the Company or the Insured in recovering, saving, or preserving the property insured shall be considered an acceptance of abandonment.

## 13. Additional Coverages

13.1 Automatic Coverage for Newly Acquired Property

If, during the term of this Coverage Section, the Insured purchases property similar to the equipment described in



Declarations, the Company will automatically cover this equipment for a period of 60 days.

The most the Company will pay in any one loss is the lesser of:

13.1.1 30% of the total limits of Insurance shown in the Declarations; or

13.1.2 $250,000

The Insured agrees to report property within 60 days from the date the property is acquired and to pay any additional premium due. If the Insured does not report such property, coverage will cease automatically 60 days after the date the property is acquired.

13.2 Automatic Coverage for Borrowed, Rented, or Leased Equipment

If during the term of this Coverage Section, the Insured borrows, rents or leases property from others similar to the equipment described in the Declarations, the Company will automatically cover this equipment for a period of 45 days.

The most the Company will pay in any one loss is the lesser of:

13.2.1 30% of the total limits of Insurance shown in the Declarations; or

13.2.2 $100,000

The Insured agrees to report property within 45 days from the date the property is acquired and to pay any additional premium due. If the Insured does not report such property, coverage will cease automatically 45 days after the date the property is borrowed, rented, or leased.

13.3 Limited Pollutant Clean Up and Removal

Subject to all the terms and conditions of this insurance, including Exclusion no. 4 of the General Exclusions from Coverage (Section IX), it is understood and agreed that this Coverage Section is extended to pay the Insured's expense to extract "pollutants" from land or water at the described premises if the discharge or dispersal of the "pollutants" is caused by or results from a covered loss to the equipment/tools insured hereunder that occurs during this policy period. The expenses will be paid only if they are reported to the Company in writing within 180 days of the earlier of:

13.3.1 The date of direct physical loss; or

13.3.2 The end of the policy period.

The most the Company will pay under this Additional Coverage is $10,000 for the sum of all such expenses arising out of a covered loss to the equipment/tools insured hereunder occurring during each separate 12 month period of this policy.

13.4 Fire Department Service Charge

When the fire department is called to save or protect insured property from a covered loss to the equipment/tools insured hereunder, the Company will pay up to $2,500 for the Insured's liability for fire department service charges:

13.4.1 Assumed under contract or agreement prior to loss; or

13.4.2 Required by local ordinance.

No deductible applies to this additional coverage.

13.5 Rental Reimbursement

The Company will pay the Insured's expense to rent equipment when the rental is made necessary by:

13.6.1 A covered "loss" to equipment scheduled in the Declarations; and

13.6.2 Such equipment is needed to continue normal operations; and

13.6.3 You do not have substitute equipment.

The most the Company will pay for "loss" under this Additional Coverage is $2,500 beginning forty-eight hours after the loss or damage has occurred and ending when the property has been replaced, repaired, or when the need no longer exists, whichever occurs first.

13.7 Preservation of Property

If it is necessary to move insured property to preserve it from "loss" covered by this Coverage Section, the Company will pay the actual expense to move the property to safety.

The Company will also pay any necessary rental fees for the temporary storage at premises of others for a period of 10 days after the property has arrived at such temporary location.

The most the Company will pay under this extension is $2,500. No deductible applies to this extension.

14. Valuation

The Company shall not be liable for more than its proportion of the actual cash value of the property damaged or lost at the time any loss or damage occurs, and shall in no event exceed what it would cost to repair or replace the same with material of like kind and quality. In no event shall the Company be liable for any increase in cost of repairs or reconstruction by any law, ordinance, regulation, permit or license regulating construction or repair.

15. Replacement Cost Coverage

If indicated in the Declarations, replacement cost (without deduction for depreciation) replaces actual cash value in the Valuation Clause.

15.1 We will not pay on a replacement cost basis for any loss or damage:

15.1.1 Until the lost or damaged property is actually repaired or replaced; and

15.1.2 Unless the repairs or replacement are made as soon as possible after the loss or damage.

15.2 We will not pay more for loss or damage on a replacement cost basis than the least of:

15.2.1 The insured value applicable to the lost or damaged property;

15.2.2 The cost to replace, on the same premises, the lost or damaged property with other property;

15.2.2.1 Of comparable material and quality, and

15.2.2.2 Used for the same purpose; or

15.3 The amount you actually spent that is necessary to repair or replace the lost or damaged property.

## 16. Definitions

"Loss" means direct and accidental loss or damage.

"Pollutant" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, oil, fuel, cargo, petroleum products, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

# Coverage Section VIII

## *Owned Watercraft Insurance*

### 1. Coverage

Subject to the General Exclusions from Coverage (Section IX) and the General Conditions to Coverage (Section X), this Coverage Section insures the watercraft described in the Declarations for this Coverage Section against all risks of direct physical loss of, or damage to, the watercraft insured from any external cause, except as provided in the Exclusions hereto.

### 2. Territorial Limits

This insurance covers the watercraft insured hereunder.

2.1  While at the insured locations, including adjacent mooring;

2.2  While being navigated on water under its own power and while confined to coastal waters not more than twenty-five (25) miles from the nearest coastal shoreline and inland waters of the United States, the District of Columbia and Canada;

2.3  While in due course of transit within the United States, the District of Columbia, and Canada.

### 3. Warranties

This insurance shall be void unless:

3.1  The watercraft insured are maintained by the Insured in a seaworthy condition at all times during the term of this insurance.

3.2  The watercraft insured are operated by duly qualified persons, as required by federal, state or local regulation.

### 4. Exclusion from Coverage

This insurance does not apply to loss, damage, expense directly or indirectly cause by contributed to or resulting from:

4.1  Wear and tear, gradual deterioration, inherent vice, marine borer damage or, vermin damage;

4.2  An original defect in the property;

4.3  Caused by theft or mysterious disappearance of any part of the insured property unless occurring in conjunction with theft of the entire watercraft or unless there be visible evidence of forced entry.

4.4  Rust, corrosion, dampness of atmosphere, freezing or extremes of temperature;

4.5  Unexplained disappearance;

4.6  Artificially generated current creating a short circuit or other electrical disturbance within an article covered under this section;

4.7  Your neglect to use all reasonable means to save and preserve the prop-



erty at and after any loss or when the property is so endangered.

## 5. Total Loss

The most that this Company will pay for loss of or damage to any one watercraft insured is the value of the watercraft indicated in the Declarations for this Coverage Section, less the deductible shown in the Declarations for this Coverage Section.

## 6. Constructive Total Loss

The watercraft shall not be considered a total or constructive loss unless:

6.1  The watercraft is lost with no reasonable means of recovery; or

6.2  The expense of recovering and repairing the watercraft exceeds the valuation stated in the Declarations.

## 7. Coinsurance
At the time of loss, the limit of insurance for items scheduled in the Declarations must be insured for their total value.

If not insured for their total value, we will pay only the proportion of any loss that the limit of insurance bears to the total value of the scheduled item.

## 8. Repair Clause

Repairs to plywood, fiberglass, plastic, metal or other synthetic material shall be made by applying suitable patches in accordance with good repair practice, to the damaged area.

## 9. Unrepaired Damage

We will not pay for unrepaired damage in addition to a subsequent total loss

sustained during the term of this insurance.

## 10. Valuation
The Company shall not be liable for more than its proportion of the actual cash value of the property damaged or lost at the time any loss or damage occurs, and shall in no event exceed what it would cost to repair or replace the same with material of like kind and quality. In no event shall the Company be liable for any increase in cost of repairs or reconstruction by any law, ordinance, regulation, permit or license regulating construction or repair.

## 11. Replacement Cost Coverage

If indicated in the Declarations, replacement cost (without deduction for depreciation) replaces actual cash value in the Valuation Clause.

11.1  We will not pay on a replacement cost basis for any loss or damage:

    11.1.1  Until the lost or damaged property is actually repaired or replaced; and

    11.1.2  Unless the repairs or replacement are made as soon as possible after the loss or damage.

11.2  We will not pay more for loss or damage on a replacement cost basis than the least of:

    11.2.1 The insured value applicable to the lost or damaged property;

    11.2.2 The cost to replace, on the same premises, the lost or damaged property with other property:

        11.2.2.1 Of comparable material and quality; and



11.2.2.2 Used for the same purpose; or

11.3  The amount you actually spent that is necessary to repair or replace the lost or damaged property.

# Section IX

## *General Exclusions from Coverage Applicable to All Coverage Sections*

Notwithstanding anything to the contrary provided for in any of the Coverage Sections or the General Conditions to Coverage of this Program, the following exclusions from coverage shall be considered paramount and shall override anything stated to the contrary in any of the Coverage Sections and in the General Conditions to Coverage.

### 1. Radioactive Contamination Exclusion Clause (RACE 10/1/90)

In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed to or arising from:

1.1 Ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel;

1.2 The radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof;

1.3 Any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter.

This insurance is subject to the Institute Radioactive Contamination Exclusion Clause 10/1/90 provided that:

If fire is an insured peril, and,

where the subject matter is within the USA, its islands, onshore territories or possessions, and, a fire arises directly or indirectly from one or more of the causes detailed in Sub-Clauses 1.1 and 1.2 of the Institute Radioactive Contamination Exclusion Clause 10/1/90, any loss or damage arising directly from that fire shall, subject to the provisions of this insurance, be covered, EXCLUDING however any loss, damage, liability or expense caused by nuclear reaction, nuclear radiation, or radioactive contamination arising directly or indirectly from that fire.

### 2. War Risk Exclusion

This insurance does not apply to loss, damage, liability or expense directly or indirectly caused by, contributed to or resulting from:

2.1 Hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack:
    2.1.1 By any government or sovereign power (de jure or de facto), or by any authority maintaining or using military, naval or air forces; or

    2.1.2 By military, naval or air forces; or

    2.1.3 By an agent of any such government, power, authority or forces, except when such agent is acting secretly and not in connection with any operation of armed forces



(whether military, naval or air forces) in the country where the property is situated.

2.3   Any weapon of war employing atomic fission or radioactive force whether in time of peace or war;

2.4   Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such occurrence, seizure or destruction under quarantine or customs regulations, confiscation by order of any government or public authority;

### 3. Punitive Damages Exclusion

This insurance does not apply to loss, damage, liability or expense directly or indirectly imposed on the Insured as punitive or exemplary damages, however described and under whatever circumstances.

### 4. Absolute Pollution Exclusion

4.1   This insurance does not apply to any loss, damage, liability or expense that the insured shall become liable to pay and shall pay for "bodily injury", or "property damage" directly or indirectly arising out of, contributed to or resulting from the actual, alleged or threatened "release" of "pollutants" into or upon land,  the atmosphere or any watercourse, water supply reservoir or body of water.

It is further agreed that the intent and effect of this exclusion is to delete from any and all coverages afforded by this insurance (except as provided in 4.5 below) any "occurrence", claim, suit, cause of action, liability, settlement, judgment, defense costs or expenses in

any way arising out of such "release", whether or not such "release" arises out of the activities of the Insured or the activities of others and whether or not such "release" is sudden or gradual and whether or not such "release" is expected, intended, foreseeable, fortuitous, accidental or inevitable, and wherever such "release" occurs.

4.2   It is hereby agreed that this insurance shall not apply to:

4.2.1   "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

4.2.1.1   At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

4.2.1.2   At or from any premises, site or location which is or was at any time used by or for any Insured or others for the handling, storage, disposal, processing or treatment of waste;

4.2.1.3   Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for the Insured or any person or organization for whom you may be legally responsible; or

4.2.1.4   At or from any premises or site or location on which any Insured or any contractors or subcontractors  working directly or indirectly on any Insured's behalf are performing operations:

4.2.1.4.1   If the "pollutants" are brought on or to the premises,



site or location in connection with such operations by such insured, contractor or subcontractor; or

4.2.1.4.2 If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

4.2.1.5    Arising from products manufactured, sold, handled or distributed by or on behalf of the Insured.

4.2.1.6    Arising from operations completed by or on behalf of the Insured.

4.2.2    Any loss, cost or expense arising out of any request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

4.2.3    Any loss, cost or expense arising out of any claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants".

4.5 This exclusion applies to all Coverage Sections;    however, Coverage Sections I, II, VI and VII contain provisions which shall be construed as additional to the terms of this exclusion.


5. Absolute Asbestos Exclusion

This insurance does not apply to loss, damage, liability, or expense (including "bodily injury," "property damage," "personal injury" or "advertising injury" as defined in Coverage Section III) arising out of or caused by:

5.1 Asbestos, asbestos fibers or products containing asbestos or to any obligation of the Insured  to indemnify or contribute with another because of damages arising out of such injury or damage; or

5.2 Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection therewith;

5.3 It is further agreed that the Company shall have no duty or obligation to provide or pay for the investigation or defense of any loss, cost, expense, claim or suit excluded herein.


6. Definitions

"Bodily Injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

"Pollutant" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, oil, fuel, cargo, petroleum products, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

"Property Damage" means :

    A. Physical injury to tangible property, including all resulting use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    B. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the occurrence that caused it.

"Release" means discharge, dispersal, seepage, release or escape of "pollutants".

# Section X

## *General Conditions for Coverage*
## *Applicable to All Coverage Sections*

The following conditions to coverage apply to all Coverage Sections of this insurance program, including endorsements.

### 1. Deductible

1.1 This insurance will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the applicable deductible shown in the Declarations as a "D/A". This insurance will then pay for the loss or damage in excess of the deductible, up to the applicable limit of insurance shown in the Declarations. One "occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

1.2 No deductible applies to Coverage Section III.

### 2. Limits of Liability

2.1 The Limits of the Liability of this Company are the insurance limits stated in the Declarations for each Coverage Section. The limits include all loss, damage and expenses which arise out of one occurrence.

2.2 The Company's liability with respect to all loss, damage or expenses which arise out of any one accident or occurrence shall not exceed the limit indicated in the Declarations regardless of how many separate injuries or claims arise out of such accident or occurrence.

### 3. Claim Costs and Expenses

The cost of defending any suit against the Insured on any claim based on a liability or an alleged liability of the Insured covered by any of the liability Coverage Sections, shall be payable by this insurance if the amount of the claim hereunder exceeds the amount of the deductible shown in the Declarations, but this insurance shall not be liable for the cost or expense of prosecuting or defending any suit unless the same shall have been incurred with the written consent of this Company. This Company, however, reserves the right to conduct the defense of any actions or suits at its own expense and with attorneys of its own choice. The right and duty to defend end when the applicable limits of insurance shown in the Declarations has been exhausted in the payment of judgments and/or settlements and/or claim costs and expenses under the relevant Coverage Section; the costs and expenses of defending any suit against the Insured are included in determining when the applicable limits of insurance have been reached.

### 4. Records and Reports

The Insured agrees to maintain accurate records pertaining to coverages under this insurance program and to report to this Company as specified in the Declarations or applicable Coverage Sections. Such records shall be open to inspection by this Company or their rep-



to inspection by this Company or their representatives at all times during normal business hours during the currency of this policy and for three (3) years following expiration or until final settlement of all claims, whichever is later.

## 5. Inspections and Surveys

This Company has the right but is not obligated to:

5.1  Make inspections and surveys at any time;

5.2  Give you reports on the conditions found; and

5.3  Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. This Company does not make safety inspections nor undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public.

And this Company does not warrant that conditions:

5.4  Are safe or healthful; or

5.5  Give you reports on the conditions found; and

This condition applies not only to this Company, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

## 6. Concealment, Misrepresentation or Fraud

This insurance Program shall be void as, to all interests insured if, whether before or after a loss, any insured hereunder has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interests of the insured therein, or in the case of any fraud or false swearing by any insured hereunder relating thereto.

## 7. Notice of Loss

The Insured shall as soon as practicable report in writing to the Company or its agent every loss, damage or occurrence which may give rise to a claim under this policy and shall also file with the Company or its agent within ninety (90) days from date of discovery of such loss, damage or occurrence, a detailed sworn proof of loss. If claim is made or suit is brought against the Insured, the Insured shall immediately notify the Company and forward to the Company every demand, notice, summons or other legal process.

## 8. Protection of Property and Co-operation of the Insured

In case of loss it shall be necessary and lawful for the Insured, his or their factors, employees and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the property insured hereunder, or any part thereof, without prejudice to this insurance, nor shall the acts of the Insured or Company, in recovery, saving and preserving the property insured in case of loss be considered a waiver or acceptance of abandonment. The expense so incurred shall be borne by the Insured and the Company proportionately to the extent of their respective interests.

The Insured shall cooperate with the Company and upon the Company's request shall aid in securing information, evidence, obtaining of witnesses and in all other matters which the Company may deem necessary in respect to any occurrence as hereunder provided.

## 9. Payment of Losses

All adjusted claims shall be paid or made good to the Insured within sixty (60) days after presentation and acceptance of satisfactory proof of interest and loss at the office of this Company. No loss shall be paid or made good if the Insured has collected the same from others.

## 10. Subrogation

In the event of any payment under this policy the Company shall be subrogated to all the Insured's rights of recovery thereof against any person or entity, and the Insured shall do whatever necessary to secure such rights.

## 11. Impairment of Recovery Rights

If any act or agreement of the Insured, before or after a loss arises, impairs the Insured's right to recover from others, the Company will not cover the loss or damage; nor will the Company cover any loss or damage which the Insured settles or compromises without the written consent of the Company.

## 12. Cancellation

Either the Insured or the Company can cancel this policy at any time.

### 12.1 Cancellation By The Insured

The Insured can cancel this insurance by sending the Company notice of the future date the Insured wants the coverage to end. The Company will then refund any unearned portion of the premium you paid, on a short rate basis.

### 12.2 Cancellation by the Company

The Company can cancel the insurance, or any individual Coverage Section, by sending to the Insured first named in the Declarations, at the address shown on the Declarations, notice of the effective date of cancellation. The Company must do this at least 30 days prior to the cancellation date unless the Company is canceling the insurance because the Insured failed to pay premiums. In that case, the Company is required to give the Insured only 10 days notice. Mailing or delivery of the notice will be proof that the Insured was informed of the cancellation. The Company will also notify any mortgagee shown in the Declarations.

### 12.3 Additional premium may be due and owing to this Company upon cancellation for those Coverage Sections underwritten on a reporting basis, since reports are to be rendered to the date of cancellation.

## 13. Conformity to Statutes

Terms of this insurance which are in conflict with the statutes of the State wherein this insurance is issued are hereby amended to conform to the minimum requirements of such statutes.



## 14. Transfer of Legal Rights

The Insured may not agree to transfer any legal rights or interest the Insured has in this policy without the prior written consent of the Company.

However, if the Insured is an individual and the Insured dies, the Company will provide the following coverage:

14.1  The insured's legal representative, but only with respect to duties as such. That representative will have all your rights and duties under this policy.

14.2  Any person who has proper temporary legal custody of the Insured's property, but only with respect to liability arising out of the maintenance or use of that property and until a qualified legal representative is appointed.

## 15. No Benefit to Bailee

No person or organization, other than the Insured, having custody of Covered Property, will benefit from this insurance.

## 16. Other Insurance

16.1  The Insured may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under any of the Coverage Sections of this Program.  If so, the Company will pay its share of the covered loss or damage.  That share is the proportion that the applicable Limit of Insurance under the pertinent Coverage Section bears to the Limits of Insurance of all insurance covering on the same basis.

16.2  If there is other insurance covering the same loss or damage, other than that described in 16.1 above, the Company will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether the Insured can collect on it or not.  But the Company will not pay more than the applicable Limit of Insurance.

## 17. Changes

This policy contains all the agreements between the Insured and the Company concerning the insurance afforded.  The Insured first named in the Declarations is authorized to make changes in the terms of this Program with the consent of the Company.  This policy's terms can be amended or waived only by endorsement issued by the Company and made part of this insurance Program.

## 18. Coinsurance

If a Coinsurance percentage is shown in the Declarations, the following condition applies:

18.1  The Company will not pay the full amount of any loss if the value of the insured property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, the Company will determine the most the Company will pay using the following steps:

18.1.1  Multiply the value of the insured property at the time of loss by the coinsurance percentage;



18.1.2 Divide the Limit of Insurance of the property by the figure determined in step 18.1.1;

18.1.3 Multiply the total amount of loss, before the application of any deductible, by the figure determined in step 18.1.2; and

18.1.4 Subtract the deductible from the figure determined in step 18.1.3.

The Company will pay the amount determined in step 18.1.4 or the Limit of Insurance, whichever is less. For the remainder, the Insured will either have to rely on other insurance or absorb the loss itself.

18.2 If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

## 19. Time for Suit

19.1   No action shall lie against the Company for the recovery or any liability loss sustained by the Insured unless such action be brought against the Company within one (1) year after the final judgment or decree is entered in the litigation against the Insured, or in case the claim against the Company accrues without the entry of such final judgment or decree, unless such action be brought within one (1) year from the date of the payment of such action.

19.2   No action shall lie against the Company for the recovery of any claim for loss or damage to the Insured's own property (or other property insured on a first-party basis) unless commenced within one (1) year after the calendar date of the happening of the physical loss or damage out of which the claim is said to have arisen.

19.3  Provided however, that where the limitations of time provided for in 19.1 and 19.2 are prohibited by the State wherein this insurance is issued, then and in that event no action under this insurance shall be sustainable unless commenced within the shortest limitation permitted under the laws of such State.

## 20. Mortgagee and Trustee Interest

20.1  If there is loss to any real property covered under any Coverage Section, the Company will pay any mortgagee or trustee named in the Declarations up to his, her or its interest in that property. This provision will apply to all present or future mortgages in the order of precedence of these mortgages.

Regarding the interest of any mortgagee or trustee designated in the Declarations, this insurance will not be invalidated by any of the following:

20.1.1  Any act or neglect by any mortgagor or owner of the property;

20.1.2  Foreclosure or other proceedings, or notice of sale relating to the property;

20.1.3  Change in title or ownership of the property; or

20.1.4  Occupation of the premises for the purposes more hazardous than existed when this insurance took effect.

The mortgagee or trustee must notify the Company of any change of ownership or occupancy, or of any increase in hazard which he, she or it learns about. If required, by the Company, the insurance program will be amended to reflect this change.  If the Insured fails to

pay any premium due because of an increase in hazard, the mortgagee or trustee must pay this premium.

And if the Insured fails to pay any premium due under this policy, the Company has a right to collect the premium from the mortgagee or trustee.

20.2 Mortgagee Interest After a Loss

If the Company pays any loss under this insurance program to a mortgagee, and the Company claims it didn't have a legal duty to make payment to the mortgagor or owner, the Company can take over all the rights of the mortgagee, to the extent of our payment. These rights apply to all the securities that were pledged to secure the mortgage loan.

If the Company declines to do that, the Company is allowed to pay the mortgagee the rest of the principal and the interest on the mortgage.    Then the Company get a full assignment and transfer of the mortgage right away. That means the Company has all the rights the mortgagee had originally. However, an assignment will not impair the right of the mortgagee to recover the full amount of its claim.

## 21. Captions, Titles Clause

Captions, titles and indexes used in this insurance Program are used for ease of reference only, and are not to be used to interpret the terms, conditions, exclusions or limitations of the insurance provided under the program.

## 22. Reporting and Adjustment

Insurance provided under Sections I and III of this policy are subject to the deposit shown in Declarations, and to an annual adjustment of the earned premium at the rates indicated.

The Insured shall report to the Company, or its Agent, within 30 days following the expiry of this insurance, an accurate statement of:

22.1 Total "receipts", excluding revenues from the sale of boats, supplies, ship stores, or brokerage commission;

22.2 Total "sales";

22.3 Total sales value of boats sold on a brokerage basis.

The earned premium shall be calculated by applying the figures reported above to the rates indicated in the Declarations. If the earned premium is less than the deposit premium, and the coverage section is not subject to a minimum premium, the difference shall be refunded to the Insured. If the earned premium exceeds the deposit premium, the amount of such excess shall be paid by the Insured to the Company as an additional premium at the time of filing the report on which the earned premium is due.

"Receipts" means income from dock/slip rental, mooring rental, storage, hauling/launching, fueling, repairs including parts and labor, regatta fees, sailing schools, yacht club membership dues, boat rental, camping fees, cabin rental, gate fees, sub-contractor receipts, tenant rents and all other miscellaneous income.

"Sales" means income from sale of
new and/or used boats and accesso-
ries, ship store sales, boat broker
commissions, restaurant/convenience
store/snack bar/liquor sales.

Volume:      I
Pages:    1-151
Exhibits:     4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                    \*
ACADIA INSURANCE COMPANY,   \*
                                    \*
     Plaintiff              \*
                                    \* Civil Action
            VS              \*
                                    \* No. 02-CV-10153-WGY
BEVERLY PORT MARINA, INC.,\*
and CARLOS JOHNSON,         \*
                                    \*
     Defendants and Third-\*
     Party Plaintiffs       \*
                                    \*
            VS              \*
                                    \*
LESLIE S. RAY INSURANCE     \*
AGENCY, INC.,               \*
                                    \*
     Co-Defendant           \*
                                    \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \*


     DEPOSITION of **FRANK KINZIE**, a witness called

on behalf of the Co-Defendant, taken pursuant to the

Massachusetts Rules of Civil Procedure, before Arlene

Boyer, a Professional Court Reporter and Notary

Public, in and for the Commonwealth of Massachusetts,

at the offices of Melick, Porter & Shea, 28 State

Street, Boston, MA 02109, on Friday, January 9, 2004,

commencing at 10:25 a.m.

6

| | | |
|---|---|---|
| 1 | Q | And since when? |
| 2 | A | 1981. |
| 3 | Q | How many children do you have? |
| 4 | A | Two. |
| 5 | Q | How old are they now? |
| 6 | A | I have a daughter who's 17 and a son who's 9. |
| 7 | Q | Do your kids still live with you at home at 36 |
| 8 | | Washington Street? |
| 9 | A | My daughter is in school, at private boarding |
| 10 | | school, and my son lives at home. |
| 11 | Q | Where does your daughter go to school? |
| 12 | A | Governor Dummer Academy. |
| 13 | Q | What's your occupation? |
| 14 | A | I'm a management consultant. |
| 15 | Q | By whom are you employed? |
| 16 | A | Quantum Associates, Inc. |
| 17 | Q | Who are the principals of that corporation? |
| 18 | A | I'm the sole shareholder of that corporation. |
| 19 | Q | For how long has Quantum Associates, Inc. been a |
| 20 | | corporation? |
| 21 | A | Since 1989. |
| 22 | Q | And Quantum Associates, Inc. is a consulting |
| 23 | | company? |
| 24 | A | That's correct. |

7

| | | |
|---|---|---|
| 1 | Q | What type of consulting work do you do? |
| 2 | A | Principally strategy consulting work. |
| 3 | Q | Who are the clients, generally speaking, of |
| 4 | | Quantum Associates? |
| 5 | A | They'd be large -- mostly large corporations, |
| 6 | | domestic or abroad. |
| 7 | Q | What's your educational background? |
| 8 | A | I have a B.A. from Harvard College, a J.D. and an |
| 9 | | MBA from Harvard Law School and Harvard Business |
| 10 | | School, and a master's in European studies from |
| 11 | | the University of Louvain, L-o-u-v-a-i-n, in |
| 12 | | Belgium. |
| 13 | Q | Did you get the J.D. and the MBA from Harvard as |
| 14 | | part of a dual degree program? |
| 15 | A | Correct. |
| 16 | Q | When did you get the J.D. and MBA? |
| 17 | A | 1981. |
| 18 | Q | Since the time you got your law degree in 1981 |
| 19 | | from Harvard University, have you ever practiced |
| 20 | | as a lawyer? |
| 21 | A | No. |
| 22 | Q | Have you been admitted to any bar? |
| 23 | A | Yes. |
| 24 | Q | Which? |

11

```
 1              in Massachusetts.

 2      Q       What towns in Massachusetts are the eight

 3              properties in?

 4      A       Beverly and Gloucester.

 5      Q       Are these commercial or residential properties?

 6      A       Both.

 7      Q       Can you break it down?

 8      A       Well, there's one residential property in

 9              Gloucester, and the rest of them are commercial.

10      Q       With regard to the Massachusetts properties, do

11              you insure those?

12      A       Yes.

13      Q       Who is primarily responsible between you and your

14              wife for getting the insurance for those

15              Massachusetts real properties?

16      A       I would say we both participate, but my wife is

17              probably primarily responsible for it.

18      Q       Through whom do you get that insurance?

19      A       I believe it's all purchased through Leslie Ray.

20      Q       Who do you know at Leslie Ray Insurance Agency?

21      A       Currently?

22      Q       Yes.

23      A       David Ray.

24      Q       Over time, have you had direct contact with
```

12

1          anyone at Leslie Ray Insurance Agency other than

2          David Ray?

3   A   Yeah.  I've spoken with others there, yes.

4   Q   Who?

5   A   Leslie Ray, Candace Howard, Maureen Kerans, and

6          there may be one or two others whose names I

7          don't recall right now.

8   Q   When is the first time you had any contact of any

9          kind with anyone from Leslie Ray Insurance

10         Agency?

11  A   Probably the mid 1980s, when we began insuring

12         our residential property with them.

13  Q   Did you know anyone at the Ray Agency prior to

14         getting this first piece of insurance in the mid

15         1980s?

16  A   No.  I believe my wife had had contacts with the

17         Ray Agency previously.

18  Q   How did it come to be that you were insuring your

19         home through the Ray Agency in the mid 1980s?

20  A   I believe that's a decision that Sue made,

21         contacted them, and got that insurance quote.

22         And I don't recall if we had someone else before

23         that or not.

24  Q   You weren't involved in that?

13

| | | |
|---|---|---|
| 1 | A | I'm sure I was involved, but I don't think I was |
| 2 | | heavily involved in it. |
| 3 | Q | Was it after that time that you got the first |
| 4 | | type of any commercial insurance through the Ray |
| 5 | | Insurance Agency? |
| 6 | A | Yes. |
| 7 | Q | What was the first type of commercial insurance |
| 8 | | you got through the Ray Agency? |
| 9 | A | I'm not exactly sure.  We had a property in |
| 10 | | Illinois, which was our first commercial |
| 11 | | property, and we do carry insurance on that, and |
| 12 | | I believe that that insurance is through Leslie |
| 13 | | Ray.  And since that was I think our first |
| 14 | | commercial property, that may have been the first |
| 15 | | one that we did through Leslie Ray, but I'm not |
| 16 | | positive. |
| 17 | Q | Can you place that in time relative to when you |
| 18 | | got your homeowners through the Ray Insurance |
| 19 | | Agency? |
| 20 | A | It would be a similar time frame. |
| 21 | Q | From the mid 1980s up through today, can you tell |
| 22 | | me the different types of insurance you've |
| 23 | | obtained through the Leslie Ray Insurance Agency? |
| 24 | A | Homeowners insurance, marina insurance -- various |

14

1      types of marina insurance, I guess -- and

2      Worker's Comp. insurance for both the marina and

3      Quantum Associates.  We talked about residential

4      -- insurance for property, both commercial and

5      residential.  Auto insurance.  That's the only

6      ones I can think of.

7    Q  Did you ever purchase any umbrella insurance of

8      any kind through the Ray Insurance Company?

9    A  Yes.

10   Q  Umbrella insurance relative to what underlying

11     policies, if you know?

12   A  Well, I recall that when we insured a property at

13     15 Ives Street in Beverly that the topic of

14     umbrella insurance came up.  We were very

15     concerned about making sure that we didn't have

16     slip and fall type liability.  Since we had

17     substantial assets outside of that property, we

18     didn't want that kind of liability to potentially

19     impact our other assets, and so we --

20           I remember a discussion with I believe

21     David Ray about commercial umbrella insurance as

22     a way to protect us over all of our property, and

23     I'm not sure whether that umbrella -- I believe

24     that umbrella applied not only to that property,

40

1    think if there were any questions, she would ask

2    me to read it over.

3 Q  Do you have a memory as to when you'd receive an

4    insurance policy at the marina as to whether or

5    not it came from Leslie Ray or directly from the

6    insurance company?

7 A  My recollection is from Leslie Ray, because it

8    normally came with a binder that had Leslie Ray

9    at the top of it.  I would think that would be

10   from Leslie -- in thinking about it, it was

11   probably from Leslie Ray as opposed to the

12   carrier sending it with a Leslie Ray folder on

13   it.

14 Q  Do you have a particular memory of ever reading

15   any of the MOLL policies?

16            MR. PIERCE:  Before the incident?

17            MR. CHAPMAN:  Right.

18 A  I think when we first got the insurance, because

19   the categories were completely new to me, and I

20   knew very little about them, that I would have

21   read through the MOLL just to understand roughly

22   what it was.  But reading insurance policies is

23   fairly thick work, and I don't pretend to be able

24   to contribute much to it, other than just get a

1          boats that are on the water?

2     A    I don't know.  I mean, if it's not in that

3          section, it must be in one of the other sections.

4     Q    That's right, and that's what I'm asking you.  Do

5          you have an understanding as to which section it

6          is that that comes from?

7     A    I'm going to guess perhaps the owned water craft

8          section and/or the protection and indemnity

9          section, because we don't have coverage E, which

10         is piers, ramps, and floats.

11    Q    Do you remember at any time before October of

12         2001 looking at the protection and indemnity

13         coverage to see whether or not Beverly Port

14         Marina was covered for liability exposure arising

15         out of test drives?

16    A    I don't recall looking specifically to answer

17         that question.

18    Q    Did you ever specifically ask anyone at the Ray

19         Insurance Agency for liability coverage for the

20         marina's liability exposure arising out of

21         customer test drives?

22    A    I don't think we specifically asked for separate

23         coverage for that type of liability.  We

24         explained the operations and asked Leslie Ray to





EXHIBIT

Kinzie

7/9/04

EXHIBIT

A

## MARINA OPERATORS LEGAL LIABILITY
## BOAT DEALERS DECLARATIONS

NAME AND ADDRESS OF AGENCY  7241

(978)927-2600

Leslie S Ray Insurance Agency, Inc.
129 Dodge Street
Beverly, MA 01915

NAME AND ADDRESS OF INSURANCE COMPANY

Acadia Insurance Company
One Acadia Commons
P.O.  Box 9010
Westbrook, ME 04098-5010

NAME AND ADDRESS OF INSURED

Beverly Port Marina
43-67 Water Street
Beverly, MA 01915

POLICY NUMBER: MOA 0061540 - 11

POLICY PERIOD
May 22, 2001          to May 22, 2002

12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS SHOWN.

| COVERAGES | DEDUCTIBLE | LIMITS OF INSURANCE | PREMIUM |
|---|---|---|---|
| A. MARINA OPERATORS LEGAL LIABILITY | See Below | $ See Coverage Section | $ 12,451 |
| B. BOAT DEALERS INSURANCE | See Below | $ See Coverage Section | $ 5,040 |
| C. OWNED WATERCRAFT | See Below | $ 30,000 | $ 600 |
| D. PROTECTION AND INDEMNITY | | $ 2,000,000 | $ 1,145 |
| E. PIERS, RAMPS AND FLOATS | | $ | $ |

TOTAL PREMIUM  $  19,236

### COVERAGE A - MARINA OPERATORS LEGAL LIABILITY

| SCHEDULED PREMISES | DEDUCTIBLE | RATE | LIMITS OF INSURANCE - ANY ONE BOAT | COVERAGE A ANY ONE OCCURRENCE |
|---|---|---|---|---|
| 43-67 Water Street, Beverly, MA | $ 2,500 | $ 0.600/mo. | $ 1,000,000 | $ 3,000,000 |

### COVERAGE B - BOAT DEALERS INSURANCE

| SCHEDULED PREMISES | DEDUCTIBLE | RATE | LIMITS OF INSURANCE - ANY ONE BOAT | COVERAGE B ANY ONE OCCURRENCE |
|---|---|---|---|---|
| 43-67 Water Street, Beverly, MA | $ 1,000 | FLAT | $ 500,000 | $ 1,000,000 |

### COVERAGE C - OWNED WATERCRAFT (HULL INSURANCE)

| SCHEDULE OF OWNED WATERCRAFT | DEDUCTIBLE | RATE | LIMITS OF INSURANCE | PREMIUM |
|---|---|---|---|---|
| 83  Boston  Whaler, 24'w/175 hp Outboard | $ 1,000 | $ 2.000 | $ 30,000 | $ 600 |

Company Copy

AI CD 65 01 93

COVERED OPERATIONS - COVERAGE A: Coverage is provided herein only for those operations designated by "X" below:

YES          NO

  X                A.  Repair, alteration or maintenance.
  X                B.  Storage.
  X                C.  Mooring at slips, spaces, buoys or anchorages, rented to others by this insured.
  X                D.  Hauling out or launching not in connection with operations A or B above.
  X                E.  Fueling and miscellaneous servicing of a transient nature.

**TERRITORIAL LIMITS:** It is a condition of this policy that the Insured property be confined within the following limits at all times:

COVERAGE A: As per policy terms.

COVERAGE B: Property on Land: Within 250 miles of Scheduled Premises.

        Property Afloat: Within 250 miles of Scheduled Premises for purposes of testing or demonstration, or within 250 miles of Scheduled Premises for delivery trips.

COVERAGE C: Property on Land: Confined to Scheduled Premises.

        Property Afloat: Within 250 miles of Scheduled Premises.

COVERAGE D: Confined to the navigational restrictions of the vessel involved.

COVERAGE E: Confined to Scheduled Premises.

---

LOSS PAYEE: COVERAGES B, C, D, E, and F - LOSS, IF ANY, PAYABLE TO:

        Beverly National Bank
        240 Cabot Street
        Beverly, MA 01915

---

    This policy is: X Direct Bill      Pay Plan
                _ Agent Billed

---

COVERAGE FORMS

---

The following forms have been attached to this policy at its inception:

AIOM03 (01-99).

Company Copy

Countersignature _____     Date _____

## MARINA OPERATORS LEGAL LIABILITY
## AND BOAT DEALERS POLICY PROVISIONS

This policy provides only those coverages listed below for which there is a specific premium charge and a specific Limit of Insurance shown in the Declarations.

### COVERAGE A - MARINA OPERATORS LEGAL LIABILITY

COVERAGE

In consideration of the premium shown opposite Coverage A on the Declarations Page, the Company agrees to pay on behalf of the Insured, all sums which the Insured shall become obligated to pay by reason of liability imposed upon him by law for loss of or damage to vessels or craft, including all equipment customarily used therewith, the property of others, while in the Insured's care, custody or control for any of the Covered Operations designated on the Declarations Page:

(a)     at any of the Scheduled Premises, or
(b)     while being shifted or moved by land or water within two hundred fifty (250) miles of a Scheduled Premises.
(c)     while performing off premises repair work (not including storage of same) withing two hundred fifty (250) miles of a Scheduled Premises.

The Company shall be liable in respect to Covered Operations only when such operations are being performed, are to be performed or have been performed at the Scheduled Premises shown on the Declarations Page. Adjacent moorings (and anchorages) are considered part of such Scheduled Premises.

This coverage section does not cover any liability:

(1)     For loss of Life, Bodily Injury, or Illness;
(2)     For demurrage, loss of time, loss of use, loss of freight, loss of charter or similar expenses;
(3)     For any loss or damage caused by or resulting from exceeding the registered or rated lifting capacity of any lift device, marine railway or drydock;
(4)     For loss due to infidelity or any act of a dishonest nature on the part of the Insured, his agent or employee, or a sub-contractor hired by the Insured;
(5)     For damage to covered property, which occurred while in the care, custody or control of the Insured, unless discovered by the owner within sixty (60) days of delivery of the property to the owner;
(6)     For loss of or damage to covered property caused by or resulting from ice or freezing as a result of such property being moored or stored afloat;
(7)     For loss of, damage to or expense in connection with any property owned by the Insured;
(8)     For loss, damage or expense caused by any vessel owned by or chartered to the Insured, entrusted or consigned to the Insured for sale, or otherwise in the care, custody or control of the Insured for a purpose other than as related to any of the Coverage A Covered Operations;
(9)     For loss of or damage to the property of others leased or chartered to the Insured, or otherwise in the care, custody or control of the Insured for a purpose other than as related to any of the Coverage A Covered Operations;
(10)    For loss of or damage to the property of others entrusted or consigned to the Insured for sale, unless such property is also in the care, custody or control of the Insured for any of the Coverage A Covered Operations;

caused or provided by the vessel or craft unless damage to some other part or parts of such negligent or faulty other property results from such negligent or faulty workmanship, material or design, in which event the liability of the Company shall then be limited to the amount of such resultant loss, not exceeding, however, the limit specified on the Declarations Page for the Scheduled Premises involved.

LIMIT OF
LIABILITY

Regardless of the number of Insureds, claimants or claims, the limits of the Company's liability under this coverage section, including the cost of legal defense as described under General Conditions, shall be, with respect to any one loss, accident or occurrence, the Limits of Insurance specified on the Declarations Page for each Scheduled Premises; and, subject to the above, the sum specified under "Limits of Insurance" Coverage A, in the aggregate.

DEDUCTIBLE

The deductible shown on the Declarations Page for Coverage A shall be deducted from the total of all claims payable under this coverage section arising out of any one loss, accident or occurrence.

## COVERAGE B - BOAT DEALERS INSURANCE

PROPERTY
COVERED

In consideration of the premium shown opposite Coverage B on the Declarations Page, the Company does insure all boats, motors, trailers and marine supplies owned or controlled by the Insured and offered for sale, or owned by others and entrusted to the Insured for sale, for which the Insured may be held legally responsible, or sold but not delivered.

PROPERTY NOT
COVERED

This coverage section does not insure:

(a)     Property after delivery to customers;
(b)     Property while in the course of manufacture;
(c)     Property of others held for repair, overhaul or storage by the Insured;
(d)     Boats leased or rented to others by the Insured, or sold by the Insured under an installment plan, conditional sale or similar arrangement;
(e)     Boats owned by the Insured which are used in the conduct of the Insured's business;

COVERAGE

The property insured hereunder is covered against all risks of direct physical loss or damage except as may be hereinafter excluded.

This insurance covers while the property is at any of the Scheduled Premises or is within the Territorial Limits afforded for demonstration, testing or delivery, as specified on the Declarations Page.

TERM OF
COVERAGE

This insurance shall attach only when property becomes at the risk of the Insured as dealer and shall continue until delivery to the purchaser, subject to the Territorial Limits stated on the Declarations Page.

EXCLUSIONS

This coverage section does not insure against loss or damage caused by or resulting from:

(1)     Wear and tear, gradual deterioration, inherent vice, vermin, delay or loss of market;
(2)     Corrosion, rust, dampness of atmosphere, ice and/or freezing and extremes of temperature;

A1 OM 03 01 99

o rs to whom the property may be entrusted (carriers for h e excepted) whether or not ch act or acts occurred during the regular hours of employment;

(4) Theft of equipment or marine supplies, unless coincident with theft of the entire boat upon which they were kept or unless there is evidence of forcible entry or forcible removal.

(5) Shortage found upon taking inventory;

(6) Delay or loss of market;

(7) Unexplained disappearance;

(8) Flood, surface water, waves, tides, tidal waves, overflow of any body of water or their spray, all whether wind driven or not. But, direct loss by resulting fire or explosion is covered hereunder;

(9) Processing or work upon the property;

(10) Mechanical breakdown or latent defect in the machinery or hull unless an accident to the vessel ensues and then only for loss or damage to the property insured caused by such ensuing accident, but only if such accident is otherwise covered hereunder.

**VALUATION**

The insured property, subject to the limitations herein and to the Limits of Insurance on the Declarations Page, is and shall be valued at and insured for:

New - The Insured's purchase price, including freight and the cost of installed equipment; as supported by the Insured's records;

Used - The Insured's purchase price or "trade-in" cost, plus the cost of any repairs or refurbishing done by the Insured; as supported by the Insured's records;

Sold Property - The Insured's net selling price after all allowances and discounts;

but no recovery for a Total or Constructive Total Loss shall be had hereunder unless the expense of recovering and repairing the insured property shall exceed the Insured Valuation.

**LIMIT OF LIABILITY**

Notwithstanding the requirement that premium be paid upon the total amount of values as outlined herein, the maximum liability of the Company under this coverage section shall be, with respect to any one loss, accident or occurrence, the Limit of Insurance specified on the Declarations Page for each Scheduled Premises (any one boat, any one occurrence); and, subject to the above, the sum specified under "Limit of Insurance", Coverage B, in the aggregate.

**DEDUCTIBLE**

The deductible shown on the Declarations Page for Coverage B shall be deducted from the total of all claims payable under this coverage section arising out of any one loss, accident or occurrence.

**UNREPAIRED DAMAGE**

In no case shall the Company be liable for unrepaired damage in addition to a subsequent total loss sustained during the term covered by this policy.

## COVERAGE C - OWNED WATERCRAFT (Hull Insurance)

**PROPERTY COVERED**

In consideration of the premium shown opposite Coverage C on the Declarations Page, the Company does insure all vessels owned by the Insured, primarily used in conjunction with the normal conduct of business of a marina operator or boat dealer, which are scheduled on the Declarations Page of this policy. Coverage applies to the hull, machinery and all other equipment generally required to be on board for the operation and maintenance of the vessel.

**DEFINITION OF INSURED**

For purposes of this section only, the definition of insured contained under the General Conditions of this policy, is amended to include "Members of your immediate family that is you, your spouse, the parents of both you and your spouse as well as your children residing with you or your spouse, or anyone operating the vessel with permission of you or your spouse".

**VALUATION**

By agreement between the Insured and the Company, the vessel(s) covered hereunder shall be valued at and insured for the amount shown on the schedule on the Declarations Page.

**COVERAGE**

The property insured hereunder is covered against all risks of physical loss or damage except as may be hereinafter excluded.

AI OM 03 01 99

(1) Wear and tear, gradual deterioration, mechanical breakdown, electrolysis, inherent vice, vermin, marine borers, or repair or replacement of a part in which a latent defect is found;

(2) Theft or mysterious disappearance of equipment or accessories unless occurring in conjunction with theft of the entire vessel or unless there be visible evidence of forcible entry or forcible removal;

(3) Ice or freezing while afloat;

(4) Misappropriation, conversion, infidelity, willful misconduct or any dishonest or illegal act on the part of the Insured or employees of the Insured, whether or not such act or acts occurred during regular hours of employment;

(5) Marring, scratching or denting unless caused by fire, explosion, lightning, theft or attempted theft, windstorm, collision or upset of carrying conveyance, or by a peril of the sea while afloat;

(6) The unseaworthiness of the Insured vessel;

(7) Accidents occurring during land transportation.

**LIMIT OF LIABILITY**

The maximum liability of the Company for any vessel insured here-under shall not exceed the amount of insurance shown on the Declarations Page of this policy.

**DEDUCTIBLE**

The deductible shown on the Declarations Page in the Schedule of Owned Watercrafts shall be deducted from each claim payable under this coverage section arising out of any one loss, accident or occurrence.

**SALVAGE CHARGES**

The Company also agrees to pay salvage charges, where properly and reasonably incurred, not exceeding the amount of insurance on the involved vessel shown on the Declarations Page of this policy. It is specially declared and agreed that no acts of the Company or the insured in recovering, saving or preserving the property insured shall be considered as a waiver or acceptance of abandonment.

**LOSSES**

Insured losses in excess of the deductible appearing on the Declarations Page of this policy are payable without deduction for depreciation.

**TOTAL LOSS**

No recovery for a Total or Constructive Total Loss shall be had hereunder unless the expense of recovering and repairing the insured vessel shall exceed the insured valuation.

In the event of payment for a Total Loss or Constructive Total Loss of an insured vessel, the full annual premium shall be deemed earned.

**UNREPAIRED DAMAGE**

In no case shall the Company be liable for unrepaired damage in addition to a subsequent total loss sustained during the term covered by this policy.

## COVERAGE D - PROTECTION AND INDEMNITY
## MARINA OPERATORS AND BOAT DEALERS

**COVERAGE**

In consideration of the premium shown opposite Coverage D in the Declarations and with respect only to property covered under the Boat Dealers, Marina Operators Legal Liability, or Owned Watercraft Sections of this policy:

(a) Which are being operated IN THE WATER by the Insured or by authorized employees of the Insured in conjunction with the normal conduct of business of a Boat Dealer or Marina Operator, or;

(b) Which may break away from moorings at covered premises;

the Company agrees to pay on behalf of the Insured all sums which the Insured shall become obligated to pay by reason of liability imposed upon him for:

(1) Loss of Life or Bodily Injury to any person;

(2) Loss of or damage to or expense in connection with any fixed or moveable object or property of whatsoever nature;

(3) Costs or expenses of, or incidental to, the removal of the wreck of a covered vessel when such removal is compulsory by law;

AI OM 03 01 99

(1)    An claim arising with respect to any employee of the Insured.

(2)    Any claim arising directly or indirectly under the Longshoremen's and Harborworker's Compensation Act or any worker's compensation act of any state or nation;

(3)    Any loss, damage or expense which may be recoverable in whole or in part under any other Coverage Section;

**LIMIT OF LIABILITY**    The maximum liability of the Company under this Coverage Section, including the cost of legal defense as described herein shall be, with respect to any one loss, accident or occurrence, the Limit of Insurance specified on the Declarations Page.

**DEDUCTIBLE**    The deductible shown on the Declarations Page for Coverage D shall be deducted from the total of all claims payable under this Coverage Section arising out of any one loss, accident or occurrence.

## COVERAGE E - PIERS, RAMPS AND FLOATS

**PROPERTY WE WILL COVERED**

(1)    Piers, ramps, floats, wharves, docks, platforms, gangplanks, pilings, wiring, pipes, ground tackle, moorings, buoys and all other property which forms a part thereof, all while at the location(s) listed in the Piers, Ramps and Floats Section E of the Declarations.

(2)    Debris Removal Expense of covered property caused by or resulting from a covered peril that occurs during the policy period.

**PROPERTY NOT COVERED**    Property covered does not include contraband, or property in the course of illegal transportation or trade.

**LIMITS OF LIABILITY**    Our liability shall not exceed the amount as shown in the Declarations for Piers, Ramps and Floats Section E for any one "loss" casualty or disaster, including salvage charges.

**PERILS INSURED**    Risks of physical loss or damage to property covered, except as provided elsewhere in this form.

**DEDUCTIBLE AMOUNT**    Each claim for "loss" under this form shall be adjusted separately and from the amount of each adjusted claim the deductible sum indicated in the Declarations - Piers, Ramps & Floats Section E shall be deducted.

**EXCLUSIONS**    THIS INSURANCE DOES NOT COVER LOSS, DAMAGE, OR EXPENSE CAUSED BY, RESULTING FROM, CONTRIBUTING TO OR AGGRAVATED BY ANY OF THE FOLLOWING. SUCH LOSS, DAMAGE OR EXPENSE IS EXCLUDED REGARDLESS OF ANY OTHER CAUSE OR EVENT CONTRIBUTING CONCURRENTLY OR IN ANY SEQUENCE TO THE LOSS.

(1)    LOSS OR DAMAGE FROM ICE;

(2)    LOSS BY WEAR, TEAR AND/OR GRADUAL DETERIORATION OR DEPRECIATION, LATENT DEFECT, ANY QUALITY IN THE PROPERTY THAT CAUSES IT TO DAMAGE OR DESTROY ITSELF OR AS A RESULT OF DAMAGE DONE BY MARINE LIFE OR ORGANISMS;

(3)    LOSS IF, AT THE TIME OF LOSS OR DAMAGE, THERE IS ANY OTHER INSURANCE WHICH WOULD ATTACH IF THIS INSURANCE HAS BEEN EXHAUSTED;

(4)    AGAINST MECHANICAL BREAKDOWN; AGAINST LOSS BY ELECTRICITY OTHER THAN LIGHTNING UNLESS FIRE ENSUES AND THEN ONLY FOR LOSS OR DAMAGE BY SUCH ENSUING FIRE;

(5)    LOSS DUE TO FAILURE TO MAINTAIN YOUR PROPERTY IN A STATE OF GOOD REPAIR ACCORDING TO GENERALLY ACCEPTED PRACTICE FOR MARINAS;

TO ANY BODY OR ... ORDINANCE, LAW, REGULATION OR RULING, REGULATING OR PROHIBITING RECONSTRUCTION OR DEMOLITION OF YOUR PROPERTY.

CONDITIONS

(1)    This insurance does not cover loss caused by or resulting from the neglect to use reasonable means to save and preserve the property at any loss.

(2)    We will not be liable beyond the actual cash value of the property covered by this form on the date of disaster.

## GENERAL EXCLUSIONS (applying to all coverage sections)

Notwithstanding the foregoing, this policy does not cover any liability:

(1)    Assumed by the Insured beyond that imposed by law;

(2)    For loss, damage or expense caused by or resulting from strikes, lockouts, labor disturbances, riots, civil commotions or the acts of any person or persons taking part in any such occurrence or disorder;

(3)    For loss, damage or expense caused by or resulting from: (1) hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack; (a) by any government or sovereign power (dejure or de facto), or by any authority maintaining or using military, naval or air forces; or (b) by military, naval or air forces; or (c) by an agent of any such government power, authority or forces; (2) any weapon of war employing atomic fission or radioactive force whether in time of peace or war; or (3) insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an occurrence, seizure or destruction under quarantine or customs regulations, or confiscation by order of any government or public authority;

(4)    For loss, damage or expense caused by or resulting from any nuclear incident, reaction or radiation or any radioactive contamination, all whether controlled or uncontrolled, and whether the loss, damage or expense be proximately or remotely caused thereby, or be in whole or in part caused by, contributed to, or aggravated by the risks and liabilities insured under this policy, and whether based on the Insured's negligence or otherwise;

(5)    For loss, damage, cost, liability, expense, fine or penalty, of any kind or nature whatsoever, imposed on the Insured, directly or indirectly, in consequence of, or with respect to, the actual or potential discharge, emission, spillage or leakage upon or into the seas, waters, land or air, of oil, petroleum products, chemicals or other substances of any kind or nature whatsoever.

## GENERAL CONDITIONS (applying to all coverage sections)

COST OF DEFENSE

The cost of defending any suit against the Insured on any claim based on a liability or an alleged liability of the Insured, covered by this insurance, shall be payable by the Company if the amount of the claim hereunder exceeds the amount deductible under this policy, provided that such costs, fees or expenses of defending any suit are incurred with the prior written consent of the Company. The Company shall have the option of naming the attorneys who shall represent the Insured in the said defense and, if such option is exercised, shall have the exclusive direction and control thereof.

DEFINITION OF INSURED

The word "Insured" includes, in addition to the Insured named in the Declarations, any executive officer, director or stockholder thereof while acting within the scope of his duties as such. If the Insured named in the Declarations is a partnership, any partner therein shall also be included as an Insured under this policy, but only with respect to his liability as such.

AI OM 03 01 99

PROPER RECORDS

Under Coverage A -    of all gross charges or operations covered; and

Under Coverage B -    of all property insured hereunder (including marine supplies) and the values thereof, as well as the number of demonstrations of insured property afloat and the number of deliveries of boats by land or water.

Such records shall be open to examination and audit by the Company during normal business hours.

The term "gross charges" means the gross amount of money charged by or on behalf of the Insured for services performed in conjunction with any Covered Operations. This includes labor and material (such as repair parts, new equipment, cost of fuel and other consumables, etc.)

Under Coverage B, the values recorded shall be calculated according to the Valuation Clause stated therein.

**REPORTING REQUIREMENTS**

Coverage A - If indicated in the Declarations that the premium is a Minimum and Deposit Premium, the Insured, by acceptance of this policy, agrees to report within (30) days after the end of each reporting period shown in the Declarations the total of all gross charges for all Covered Operations. Earned premium hereunder is to be computed by applying the reporting rate shown on the Declarations Page to these gross charges. Earned premium in excess of the Minimum and Deposit Premium is to be immediately due and payable to the Company.

Coverage B - If indicated in the Declarations that the premium is a Minimum and Deposit Premium, the Insured, by acceptance of this policy, agrees to report within (30) days after the end of each reporting period shown in the Declarations the total monthly values at risk hereunder as of the last day of each month. Earned premium hereunder is to be computed by applying the reporting rate shown on the Declarations Page to the monthly values reported. Earned premium in excess of the Minimum and Deposit Premium is to be immediately due and payable to the Company.

**TRANSFER OF INTEREST**

This insurance shall be void in case this policy or the interest insured by any coverage herein shall be sold, assigned, transferred or pledged without the previous consent in writing of this Company.

In respect of any accident or occurrence likely to give rise to a claim under this insurance, the Insured is obligated to and shall take such steps to protect his interests as would reasonably be taken in the absence of this or similar insurance.

In the event of any accident or occurrence which may result in a claim under this policy, the Insured shall give the Company prompt written notice thereof and reasonable opportunity to be represented at survey of the damage. The Insured shall also immediately forward to the Company all communications, processes, pleadings, legal papers or documents relating to such accident or occurrence.

The Insured shall cooperate with the Company and shall not assume any obligations, admit any liability or incur any expense for which the Company may be liable, without prior written approval. Whenever required by the Company, the Insured shall aid in securing information and evidence and obtaining witnesses, and shall cooperate with the Company in all matters which the Company may deem necessary in the defense of any claim or suit or appeal from any judgment in respect of any accident or occurrence as hereinbefore provided.

No claim or demand against the Company under this policy shall be assigned or transferred, and no person, excepting a legally appointed receiver of the property of the Insured, shall acquire any rights against the Company by virtue of this instance without the express written consent of the Company.

maintain, so far as is within his or their control, such protective
Case 1:03-cv-10893-WGY werDocument 20-8 by Filed 11/27/2005 be Page 11 of 12
the time of attachment of this insurance.

No action shall lie against the Company unless such action be
brought within one (1) year after the final judgment or decree is
entered in the litigation against the Insured, or in case the claim
against the Company accrues without the entry of such final
judgment or decree; unless such action be brought within one (1)
year from the date of the payment of such claim; provided, however,
that where such limitation of time is prohibited by the laws of
the State wherein this policy is issued, then and in that event no
action under policy shall be sustainable unless commenced within
the shortest limitation permitted under the laws of such State.

It is expressly understood and agreed that no liability shall
attach under this insurance until the liability of the Insured has
been determined by final judgment against the Insured or by
agreement between the Insured and the claimant with the written
consent of the Company. In the event the Insured shall fail or
refuse to settle any claim, as authorized by the Company, the
liability of the Company under this policy shall be limited to the
amount for which settlement could have been made.

**OTHER INSURANCE**  In the event there is other valid and collectible insurance which
would attach if this insurance had not been effected, this
insurance shall apply only as excess, and in no event as
contributing insurance, and then only after all such other
insurance has been exhausted.

**SUBROGATION**  The Company shall be subrogated to all the rights which the Insured
may have against any other person or entity, in respect of any
claim or payment made under this policy, to the extent of such
payment, and the Insured shall, upon the request of the Company,
execute all documents necessary to secure to the Company such
rights.

Any agreement, contract or act, past or future, express or implied,
by the Insured whereby any right of recovery of the Insured against
any vessel, person or corporation is released, decreased,
transferred or lost which would, on payment of claim by the
Company, belong to the Company but for such agreement, contract or
act, shall render this policy null and void as to the amount of any
such claim, but only to the extent that the Company's right of
subrogation has been impaired thereby. This shall not, however,
affect the right of the Company to retain or recover any premium
paid or due hereunder.

**COST OF PROSECUTION**  The cost and expense of prosecuting any claim in which the Com-
pany shall have an interest by subrogation or otherwise, shall be
divided between the Insured and the Company, proportionately to the
amounts which they would be entitled to receive respectively, if
the suit should be successful.

**CANCELLATION**  This policy may be cancelled at any time at the Insured's request,
or may be cancelled by the Company by mailing notice of
cancellation to the Insured at the address shown in this policy,
stating when, not less than ten (10) days thereafter, such
cancellation shall be effective. Mailing of such written notice
shall be sufficient proof of notice.
In the event of cancellation, premium adjustment shall be made as
follows:

A1 OM 03 01 99

is subject to adjustment at termination, earned premium is to be computed in accordance with the "Reporting Requirements" Clause, based on gross charges earned by the Insured up to the effective date of the cancellation under Coverage A, or based on monthly values at risk under Coverage B, prorated in the last month up to the effective date of cancellation.   Earned premium in excess of the deposit premium is to be immediately due and payable to the Company.   Any unearned portion of the Deposit Premium shall be refunded.

(2)     If it is indicated on the Declarations Page that the premium is a flat annual charge, Return Premium will be allowed as follows:
    (a) If this policy is cancelled by the Insured, Return Premium will be allowed following customary short rate procedures;
    (b) If this policy is cancelled by the Company, pro rata Return Premium will be allowed.

**Under Coverage C, D, E and F:**

(1)     If this policy is cancelled by the Insured, Return Premium will be allowed following customary short rate procedures;
(2)     If this policy is cancelled by the Company, pro rata Return Premium will be allowed.   Minimum Premium to be retained by the Company under all sections combined shall be $250.00.

A1 OM 03 01 99

VOLUME:     I
PAGES:      1 - 241
EXHIBITS:   1 - 31

UNITED STATES DISTRICT COURT

District of Massachusetts


ACADIA INSURANCE COMPANY,      )
          Plaintiff            )
                               )
   VS.                         )
                               )
BEVERLY PORT MARINA, INC.,     )
and CARLOS JOHNSON             )
     Defendants/Third-Party    )   Case No.
     Plaintiffs                )   02-CV-10153
                               )
   VS.                         )
                               )
LESLIE S. RAY INSURANCE        )
AGENCY, INC.,                  )
     Third-Party Defendant.    )


      DEPOSITION OF SUZANNE KINZIE, a witness
called by and on behalf of the Third-Party
Defendant, taken pursuant to the applicable
provisions of the Federal Rules of Civil
Procedure, before Sandra L. Bray, Registered
Merit Reporter, CSR Number 103593, and Notary
Public in and for Commonwealth of Massachusetts,
at the offices of Cianciulli & Ouellette,
163 Cabot Street, Beverly, Massachusetts, on
Friday, December 5, 2003, commencing at
10:06 a.m.

23

1          capacity?

2     A.   In any other capacity than what?

3     Q.   Than what we've already talked about.

4     A.   No.

5     Q.   Now, you know who Carlos Johnson is?

6     A.   Yes.

7     Q.   And Carlos Johnson, as I understand it, became a

8          customer of the marina in the sense of renting a

9          slip at the marina some years prior to his

10         accident on October 1st, 2001, correct?

11    A.   Yes.

12    Q.   And when did you first meet Mr. Johnson?

13    A.   Probably in 1997 would be my best recollection.

14    Q.   Okay.  Has Mr. Johnson ever been employed by

15         Beverly Port Marina, Inc.?

16    A.   Well, that's the question all the attorneys are

17         working on.

18    Q.   Let's set aside the legal issue.

19    A.   Okay.

20    Q.   In your understanding based -- I just want to

21         get your knowledge and your understanding.  As

22         far as you're concerned as the president of

23         Beverly Port Marina, Inc., has your corporation

24         ever employed Mr. Johnson?

HENNESSEY CORP., D/B/A ROBERT H. LANGE CO.

27

1   Q.   And anything beyond that?

2              MR. PIERCE:  Objection.

3   Q.   Any relationship of any kind beyond that other

4        than the fact that you had, you know, a friendly

5        relationship with him on a personal level?

6   A.   Just very friendly.  I mean he was a store

7        customer but still a customer.  Probably a

8        service customer for that matter too, but still

9        a customer.

10  Q.   Okay.  As I understand it, on October 1st,

11       Mr. Johnson was driving a boat which was owned

12       by Beverly Port Marina from an in-water boat

13       show in Boston back to the Beverly Port Marina.

14       Is that fair to say?

15  A.   Yes.

16  Q.   Did Mr. Johnson ask for any kind of payment or

17       any kind of consideration of any kind in

18       exchange for driving the boat from Boston to

19       Beverly?

20  A.   No.

21  Q.   Did you offer any such payment or consideration?

22  A.   No.

23  Q.   Why -- how did it come to be that Mr. Johnson

24       was driving a boat back on October 1st?

HENNESSEY CORP., D/B/A ROBERT H. LANGE CO.

28

1    A.    He asked.

2    Q.    He asked who?

3    A.    Me.

4    Q.    And what exactly did he say?

5    A.    He said, "Can I help you drive a boat back" --

6    Q.    Did he say can I help you --

7    A.    -- "from the boat show?"

8    Q.    Did he say, "Can I help you drive a boat back"

9          or did he say, "Can I help you drive the boat

10         back"?

11   A.    No, he wanted to drive a boat back.

12   Q.    A specific boat?

13   A.    He did not request a specific boat, but he was

14         interested -- he didn't request one to my

15         knowledge.  I should say that.

16   Q.    Just for -- when was it that you had this

17         conversation with Mr. Johnson that you're

18         talking about now?

19   A.    At the boat show.

20   Q.    And so what day was that?

21   A.    What date was that?

22   Q.    Uh-huh.

23   A.    September 29th.  Thirty days in September.

24   Q.    And do you remember what date -- would that have

HENNESSEY CORP., D/B/A ROBERT H. LANGE CO.

42

```
 1   A.   In my office.

 2   Q.   And did he call you on the land line or the cell

 3        phone line?  Do you remember?

 4   A.   I believe I gave him my cell phone -- my cell

 5        phone number, not my cell phone.

 6   Q.   And what was the conversation at that time

 7        between you and Mr. Johnson?

 8   A.   He asked if he could drive a boat back, help

 9        drive a boat back.

10   Q.   And what did you say?

11   A.   Steve was standing in the office.

12   Q.   Steve who?

13   A.   Morrissey, our sales manager.  There were some

14        other people with him.  I said, "Would you like

15        Carlos to help you drive a boat back?"  And he

16        said, "Yes."  So I said, "Yes."

17   Q.   And when you had this telephone call with Carlos

18        on October 1st, at that point in time, did he

19        express an interest in driving any particular

20        boat?

21   A.   No.  It was a quick conversation.  "Can I help

22        you?"  "Yes."  "Where shall I meet you?"  That

23        was it.

24   Q.   Do you have a memory he expressed an interest in
```

HENNESSEY CORP., D/B/A ROBERT H. LANGE CO.

43

1       driving a boat rather than any particular boat?

2   A.  I don't -- can you repeat that?

3   Q.  Yes.  Do you have a clear memory that when you

4       had this brief telephone call that Mr. Johnson

5       expressed an interest in driving a boat back

6       rather than a particular boat?

7   A.  There was no boats discussed on that phone

8       conversation.

9   Q.  Let me ask it a little differently.  Do you have

10      a memory that Mr. Johnson, when you had this

11      phone call with him, did not express an interest

12      in driving a particular boat?

13  A.  Well, of all the boats we had --

14          MR. PIERCE:  Hold it.  What did he

15      express interest about?

16  A.  He didn't name a boat, if that's what you're

17      asking.

18  Q.  That's exactly what I'm asking.

19  A.  Okay.

20  Q.  Now -- and he requested this.  Before answering

21      him, you had a brief discussion with Steve

22      Morrissey; Steve Morrissey told you that it was

23      something he was interested in, so you said to

24      Carlos, "Yes, you can drive a boat back"?  Is

HENNESSEY CORP., D/B/A ROBERT H. LANGE CO.

54

1   A.   A boat that inflates with air.

2   Q.   Did he ever buy a Fast Track (sic)?

3   A.   A Fastec.

4   Q.   I'm sorry.  I'm thinking of the tracking order.

5        A Fastec?

6   A.   I'm not 100 percent sure he bought an

7        inflatable.  There's something in my memory that

8        says yes, but I'm not 100 percent sure, but I'm

9        pretty sure.  Did he buy a Fastec?  No.  He's

10       currently without a boat, so there is hope.

11  Q.   And I understand you became involved with

12       operating a marina -- the Beverly Port Marina,

13       Inc. in fall of 1996, thereabouts, correct?

14  A.   November 1996.

15  Q.   All right.  And so between November 1996 up

16       until October 1st of 2001, in terms of your

17       memory as you sit here today, is it your

18       testimony that there was one time in all those

19       years where Beverly Port Marina had a

20       nonemployee operate one of its boats back from a

21       boat show?

22  A.   Frank Stasioski was not an employee that

23       operated the boats.  I don't remember --

24  Q.   And what was --

HENNESSEY CORP., D/B/A ROBERT H. LANGE CO.

62

1   Q.   Where did you grow up?

2   A.   Long Island.

3   Q.   When did you first move to this area, north of

4        Boston?

5   A.   North of Boston?  In -- I moved around here

6        19- -- I guess after -- during or after 1982.

7   Q.   And what was the first contact you ever had with

8        the Leslie Ray Insurance Agency?

9   A.   Either to insure my cars or insure my house.

10       They have both.  I don't know which one came

11       first.  Probably my cars came first because I

12       didn't own my house, would be my best guess.

13       Actually -- no, I dealt with another insurance

14       company before then, but they did get my cars

15       and my house after that.

16  Q.   And who was the agent that you used before Ray?

17  A.   Felton, Rumbar & Berlin.  I don't know what

18       order their names are in, Berlin, Felton &

19       Rumbar.  Whatever.

20  Q.   What town are they in?

21  A.   They're in the area.  This was in the early

22       '80s.

23  Q.   Do you know if they're still in business?

24  A.   Yes, they are, as far as I know.  I believe they

HENNESSEY CORP., D/B/A ROBERT H. LANGE CO.

64

```
 1          would refer to a purchaser of a home that you
 2          were selling?
 3     A.   Yes.
 4     Q.   And do you still have your personal lines of
 5          insurance, in other words, auto insurance and
 6          homeowner's insurance, with the Ray Agency?
 7     A.   Yes.
 8     Q.   Has that been the case consistently since you
 9          first did that sometime in the 1980s?
10     A.   Yes.  I'm not sure what year it was.  That's why
11          I hesitate, because we're going back a long time
12          ago.  When I brought it over there, it stayed
13          with them.
14     Q.   Just so I'm clear, has there ever been -- I'm
15          talking about your personal auto policy and your
16          homeowner's policy.  Since you first placed
17          those through the Ray Agency, has there been any
18          time from then up until now where you placed
19          those insurance through a different agent?
20     A.   No.
21     Q.   And would you --
22     A.   None that I can recall.  I mean...
23     Q.   Can you quantify how many different home buyers
24          you referred to the Ray Agency?
```

HENNESSEY CORP., D/B/A ROBERT H. LANGE CO.

65

1    A.    No, I can't.

2    Q.    Tell me the different types of insurance you've

3          obtained through the Ray Agency, whether they be

4          personal lines or commercial lines, over time.

5    A.    Personal and commercial lines.

6    Q.    Okay.  So in terms of personal lines, you've

7          told me about your personal auto policies, and

8          that's all the different personal auto policies

9          you've had, correct?

10   A.    I believe so.

11   Q.    And the homeowner's policy, have you insured

12         more than one home --

13   A.    Yes.

14   Q.    -- through the Ray Insurance Agency?  How many?

15   A.    Two, two of my homes.

16   Q.    Right, exactly.  The two homes include the one

17         where you're living now on Washington Street.

18         And what's the address of the other one?

19   A.    Gloucester.

20   Q.    When did you move from Gloucester to Beverly?

21   A.    I didn't move.  I moved for summers or I moved

22         for winters sometimes, but...

23   Q.    Do you still have the Gloucester property?

24   A.    Yes.

174

```
 1   A.    From Hanover?  No.

 2   Q.    Do you have any reason to say that you ever said

 3         that to anyone from Acadia?

 4   A.    No.

 5               MR. PIERCE:  You're talking about

 6         before the accident, Bill?

 7               MR. CHAPMAN:  Right.

 8   Q.    And with regard to Exhibit 4, do you have any

 9         specific reason to say that you did not get that

10         particular letter?

11   A.    No.

12   Q.    Okay.  Number 5 is a letter to you, dated

13         April 6th, 1998.

14               MR. CHAPMAN:  You might as well just

15         stand there.  I've got a few.

16   Q.    Do you remember getting that letter?

17   A.    No.

18   Q.    Do you remember that -- fair to say the letter

19         refers to the boat dealer's coverage that you

20         had purchased as you've already testified to,

21         right?

22   A.    Uh-huh.

23   Q.    Yes?

24   A.    I'm sorry.  Ask the question again?
```

HENNESSEY CORP., D/B/A ROBERT H. LANGE CO.

Acadia Insurance

X-26

MARINA OPERATORS LEGAL LIABILITY
BOAT DEALERS DECLARATIONS

EXHIBIT
S. KINZIE
26
12/5/03

NAME AND ADDRESS OF AGENCY   7241

(978)927-2600

Leslie S Ray Insurance Agency, Inc.
129 Dodge Street
Beverly, MA 01915

NAME AND ADDRESS OF INSURED

Beverly Port Marina
43-67 Water Street
Beverly, MA 01915

NAME AND ADDRESS OF INSURANCE COMPANY

Acadia Insurance Company
One Acadia Commons
P.O.  Box 9010
Westbrook, ME 04098-5010

POLICY NUMBER: MOA 0061540 - 10

POLICY PERIOD
May  22,  2000              to May 22, 2001

12:01 A.M. STANDARD TIME AT YOUR MAILING
ADDRESS SHOWN.

| COVERAGES | DEDUCTIBLE | LIMITS OF INSURANCE | PREMIUM |
|---|---|---|---|
| A. MARINA OPERATORS LEGAL LIABILITY | See Below | $ See Coverage Section | $    9,315 |
| B. BOAT DEALERS INSURANCE | See Below | $ See Coverage Section | $    2,880 |
| C. OWNED WATERCRAFT | See Below | $      30,000 | $      600 |
| D. PROTECTION AND INDEMNITY | | $  2,000,000 | $    1,145 |
| E. PIERS, RAMPS AND FLOATS | | $ | $ |
| | | TOTAL PREMIUM  $    13,940 | |

## COVERAGE A — MARINA OPERATORS LEGAL LIABILITY

| SCHEDULED PREMISES | DEDUCTIBLE | RATE | LIMITS OF INSURANCE – COVERAGE A | |
|---|---|---|---|---|
| | | | ANY ONE BOAT | ANY ONE OCCURRENCE |
| 43-67 Water Street, Beverly, MA | $ 2,500 | $  0.600/mo. | $  1,000,000 | $  3,000,000 |

## COVERAGE B — BOAT DEALERS INSURANCE

| SCHEDULED PREMISES | DEDUCTIBLE | RATE | LIMITS OF INSURANCE – COVERAGE B | |
|---|---|---|---|---|
| | | | ANY ONE BOAT | ANY ONE OCCURRENCE |
| 43-67 Water Street, Beverly, MA | $ 1,000 | FLAT | $   500,000 | $  1,000,000 |

## COVERAGE C — OWNED WATERCRAFT (HULL INSURANCE)

| SCHEDULE OF OWNED WATERCRAFT | DEDUCTIBLE | RATE | LIMITS OF INSURANCE | PREMIUM |
|---|---|---|---|---|
| 1983    Boston    Whaler,   24'w/175   hp Outboard | $ 1,000 | $ 2.000 | $    30,000 | $    600 |

Home Office Copy

AI CD 65 01 93

MOA  0061540 - 10      05/22/00      BYK      06/22/00

**AI OM 03 01 99**

## MARINA OPERATORS LEGAL LIABILITY
## AND BOAT DEALERS POLICY PROVISIONS

This policy provides only those coverages listed below for which there is a specific premium charge and a specific Limit of Insurance shown in the Declarations.

### COVERAGE A - MARINA OPERATORS LEGAL LIABILITY

**COVERAGE**

In consideration of the premium shown opposite Coverage A on the Declarations Page, the Company agrees to pay on behalf of the Insured, all sums which the Insured shall become obligated to pay by reason of liability imposed upon him by law for loss of or damage to vessels or craft, including all equipment customarily used therewith, the property of others, while in the Insured's care, custody or control for any of the Covered Operations designated on the Declarations Page:

(a)    at any of the Scheduled Premises, or
(b)    while being shifted or moved by land or water within two hundred fifty (250) miles of a Scheduled Premises.
(c)    while performing off premises repair work (not including storage of same) withing two hundred fifty (250) miles of a Scheduled Premises.

The Company shall be liable in respect to Covered Operations only when such operations are being performed, are to be performed or have been performed at the Scheduled Premises shown on the Declarations Page. Adjacent moorings (and anchorages) are considered part of such Scheduled Premises.

This coverage section does not cover any liability:

(1)    For loss of Life, Bodily Injury, or Illness;
(2)    For demurrage, loss of time, loss of use, loss of freight, loss of charter or similar expenses;
(3)    For any loss or damage caused by or resulting from exceeding the registered or rated lifting capacity of any lift device, marine railway or drydock;
(4)    For loss due to infidelity or any act of a dishonest nature on the part of the Insured, his agent or employee, or a sub-contractor hired by the Insured;
(5)    For damage to covered property, which occurred while in the care, custody or control of the Insured, unless discovered by the owner within sixty (60) days of delivery of the property to the owner;
(6)    For loss of or damage to covered property caused by or resulting from ice or freezing as a result of such property being moored or stored afloat;
(7)    For loss of, damage to or expense in connection with any property owned by the Insured;
(8)    For loss, damage or expense caused by any vessel owned by or chartered to the Insured, entrusted or consigned to the Insured for sale, or otherwise in the care, custody or control of the Insured for a purpose other than as related to any of the Coverage A Covered Operations;
(9)    For loss of or damage to the property of others leased or chartered to the Insured, or otherwise in the care, custody or control of the Insured for a purpose other than as related to any of the Coverage A Covered Operations;
(10)   For loss of or damage to the property of others entrusted or consigned to the Insured for sale, unless such property is also in the care, custody or control of the Insured for any of the Coverage A Covered Operations;

000466

(3) Misappropriation, conversion, infidelity or any dishonest t on the part of the Insured, ployees of the Insured or ...hers to whom the property may ...e entrusted (carriers for hire excepted) whether or not such act or acts occurred during the regular hours of employment;

(4) Theft of equipment or marine supplies, unless coincident with theft of the entire boat upon which they were kept or unless there is evidence of forcible entry or forcible removal.

(5) Shortage found upon taking inventory;

(6) Delay or loss of market;

(7) Unexplained disappearance;

(8) Flood, surface water, waves, tides, tidal waves, overflow of any body of water or their spray, all whether wind driven or not. But, direct loss by resulting fire or explosion is covered hereunder;

(9) Processing or work upon the property;

(10) Mechanical breakdown or latent defect in the machinery or hull unless an accident to the vessel ensues and then only for loss or damage to the property insured caused by such ensuing accident, but only if such accident is otherwise covered hereunder.

**VALUATION**

The insured property, subject to the limitations herein and to the Limits of Insurance on the Declarations Page, is and shall be valued at and insured for:

New -   The Insured's purchase price, including freight and the cost of installed equipment; as supported by the Insured's records;

Used -   The Insured's purchase price or "trade-in" cost, plus the cost of any repairs or refurbishing done by the Insured; as supported by the Insured's records;

Sold Property -   The Insured's net selling price after all allowances and discounts;

but no recovery for a Total or Constructive Total Loss shall be had hereunder unless the expense of recovering and repairing the insured property shall exceed the Insured Valuation.

**LIMIT OF LIABILITY**

Notwithstanding the requirement that premium be paid upon the total amount of values as outlined herein, the maximum liability of the Company under this coverage section shall be, with respect to any one loss, accident or occurrence, the Limit of Insurance specified on the Declarations Page for each Scheduled Premises (any one boat, any one occurrence); and, subject to the above, the sum specified under "Limit of Insurance", Coverage B, in the aggregate.

**DEDUCTIBLE**

The deductible shown on the Declarations Page for Coverage B shall be deducted from the total of all claims payable under this coverage section arising out of any one loss, accident or occurrence.

**UNREPAIRED DAMAGE**

In no case shall the Company be liable for unrepaired damage in addition to a subsequent total loss sustained during the term covered by this policy.

### COVERAGE C - OWNED WATERCRAFT (Hull Insurance)

**PROPERTY COVERED**

In consideration of the premium shown opposite Coverage C on the Declarations Page, the Company does insure all vessels owned by the Insured, primarily used in conjunction with the normal conduct of business of a marina operator or boat dealer, which are scheduled on the Declarations Page of this policy. Coverage applies to the hull, machinery and all other equipment generally required to be on board for the operation and maintenance of the vessel.

**DEFINITION OF INSURED**

For purposes of this section only, the definition of insured contained under the General Conditions of this policy, is amended to include "Members of your immediate family that is you, your spouse, the parents of both you and your spouse as well as your children residing with you or your spouse, or anyone operating the vessel with permission of you or your spouse".

**VALUATION**

By agreement between the Insured and the Company, the vessel(s) covered hereunder shall be valued at and insured for the amount shown on the schedule on the Declarations Page.

**COVERAGE**

The property insured hereunder is covered against all risks of physical loss or damage except as may be hereinafter excluded.

AI OM 03 01 99

EXCLUSIONS

EXCLUDING, HOWEVER, LIABILITY FOR:

(1)  ...ny claim arising with respec_ to any employee of the Insured.

(2)  Any claim arising directly or indirectly under the Longshoremen's and Harborworker's Compensation Act or any worker's compensation act of any state or nation;

(3)  Any loss, damage or expense which may be recoverable in whole or in part under any other Coverage Section;

LIMIT OF LIABILITY

The maximum liability of the Company under this Coverage Section, including the cost of legal defense as described herein shall be, with respect to any one loss, accident or occurrence, the Limit of Insurance specified on the Declarations Page.

DEDUCTIBLE

The deductible shown on the Declarations Page for Coverage D shall be deducted from the total of all claims payable under this Coverage Section arising out of any one loss, accident or occurrence.

## COVERAGE E – PIERS, RAMPS AND FLOATS

PROPERTY WE WILL COVERED

(1)  Piers, ramps, floats, wharves, docks, platforms, gangplanks, pilings, wiring, pipes, ground tackle, moorings, buoys and all other property which forms a part thereof, all while at the location(s) listed in the Piers, Ramps and Floats Section E of the Declarations.

(2)  Debris Removal Expense of covered property caused by or resulting from a covered peril that occurs during the policy period.

PROPERTY NOT COVERED

Property covered does not include contraband, or property in the course of illegal transportation or trade.

LIMITS OF LIABILITY

Our liability shall not exceed the amount as shown in the Declarations for Piers, Ramps and Floats Section E for any one "loss" casualty or disaster, including salvage charges.

PERILS INSURED

Risks of physical loss or damage to property covered, except as provided elsewhere in this form.

DEDUCTIBLE AMOUNT

Each claim for "loss" under this form shall be adjusted separately and from the amount of each adjusted claim the deductible sum indicated in the Declarations – Piers, Ramps & Floats Section E shall be deducted.

EXCLUSIONS

THIS INSURANCE DOES NOT COVER LOSS, DAMAGE, OR EXPENSE CAUSED BY, RESULTING FROM, CONTRIBUTING TO OR AGGRAVATED BY ANY OF THE FOLLOWING. SUCH LOSS, DAMAGE OR EXPENSE IS EXCLUDED REGARDLESS OF ANY OTHER CAUSE OR EVENT CONTRIBUTING CONCURRENTLY OR IN ANY SEQUENCE TO THE LOSS.

(1)  LOSS OR DAMAGE FROM ICE;

(2)  LOSS BY WEAR, TEAR AND/OR GRADUAL DETERIORATION OR DEPRECIATION, LATENT DEFECT, ANY QUALITY IN THE PROPERTY THAT CAUSES IT TO DAMAGE OR DESTROY ITSELF OR AS A RESULT OF DAMAGE DONE BY MARINE LIFE OR ORGANISMS;

(3)  LOSS IF, AT THE TIME OF LOSS OR DAMAGE, THERE IS ANY OTHER INSURANCE WHICH WOULD ATTACH IF THIS INSURANCE HAS BEEN EXHAUSTED;

(4)  AGAINST MECHANICAL BREAKDOWN; AGAINST LOSS BY ELECTRICITY OTHER THAN LIGHTNING UNLESS FIRE ENSUES AND THEN ONLY FOR LOSS OR DAMAGE BY SUCH ENSUING FIRE;

(5)  LOSS DUE TO FAILURE TO MAINTAIN YOUR PROPERTY IN A STATE OF GOOD REPAIR ACCORDING TO GENERALLY ACCEPTED PRACTICE FOR MARINAS;

000470

MAINTAINING
PROPER RECORDS

The Insured, by the acceptance of this policy, warrants and agrees ) keep a complete and accurate :ord:

Under Coverage A –     of all gross charges for operations covered; and

Under Coverage B –     of all property insured hereunder (including marine supplies) and the values thereof, as well as the number of demonstrations of insured property afloat and the number of deliveries of boats by land or water.

Such records shall be open to examination and audit by the Company during normal business hours.

The term "gross charges" means the gross amount of money charged by or on behalf of the Insured for services performed in conjunction with any Covered Operations.     This includes labor and material (such as repair parts, new equipment, cost of fuel and other consumables, etc.)

Under Coverage B, the values recorded shall be calculated according to the Valuation Clause stated therein.

REPORTING
REQUIREMENTS

Coverage A – If indicated in the Declarations that the premium is a Minimum and Deposit Premium, the Insured, by acceptance of this policy, agrees to report within (30) days after the end of each reporting period shown in the Declarations the total of all gross charges for all Covered Operations. Earned premium hereunder is to be computed by applying the reporting rate shown on the Declarations Page to these gross charges. Earned premium in excess of the Minimum and Deposit Premium is to be immediately due and payable to the Company.

Coverage B – If indicated in the Declarations that the premium is a Minimum and Deposit Premium, the Insured, by acceptance of this policy, agrees to report within (30) days after the end of each reporting period shown in the Declarations the total monthly values at risk hereunder as of the last day of each month. Earned premium hereunder is to be computed by applying the reporting rate shown on the Declarations Page to the monthly values reported. Earned premium in excess of the Minimum and Deposit Premium is to be immediately due and payable to the Company.

TRANSFER OF
INTEREST

This insurance shall be void in case this policy or the interest insured by any coverage herein shall be sold, assigned, transferred or pledged without the previous consent in writing of this Company.

In respect of any accident or occurrence likely to give rise to a claim under this insurance, the Insured is obligated to and shall take such steps to protect his interests as would reasonably be taken in the absence of this or similar insurance.

In the event of any accident or occurrence which may result in a claim under this policy, the Insured shall give the Company prompt written notice thereof and reasonable opportunity to be represented at survey of the damage.     The Insured shall also immediately forward to the Company all communications, processes, pleadings, legal papers or documents relating to such accident or occurrence.

The Insured shall cooperate with the Company and shall not assume any obligations, admit any liability or incur any expense for which the Company may be liable, without prior written approval. Whenever required by the Company, the Insured shall aid in securing information and evidence and obtaining witnesses, and shall cooperate with the Company in all matters which the Company may deem necessary in the defense of any claim or suit or appeal from any judgment in respect of any accident or occurrence as hereinbefore provided.

No claim or demand against the Company under this policy shall be assigned or transferred, and no person, excepting a legally appointed receiver of the property of the Insured, shall acquire any rights against the Company by virtue of this instance without the express written consent of the Company.

AI OM 03 01 99

000472

**Under Coverage A and B:**

(1)    If it is indicated on the Declarations Page that the premium is subject to adjustment at termination, earned premium is to be computed in accordance with the "Reporting Requirements" Clause, based on gross charges earned by the Insured up to the effective date of the cancellation under Coverage A, or based on monthly values at risk under Coverage B, prorated in the last month up to the effective date of cancellation. Earned premium in excess of the deposit premium is to be immediately due and payable to the Company. Any unearned portion of the Deposit Premium shall be refunded.

(2)    If it is indicated on the Declarations Page that the premium is a flat annual charge, Return Premium will be allowed as follows:
(a) If this policy is cancelled by the Insured, Return Premium will be allowed following customary short rate procedures;
(b) If this policy is cancelled by the Company, pro rata Return Premium will be allowed.

**Under Coverage C, D, E and F:**

(1)    If this policy is cancelled by the Insured, Return Premium will be allowed following customary short rate procedures;
(2)    If this policy is cancelled by the Company, pro rata Return Premium will be allowed. Minimum Premium to be retained by the Company under all sections combined shall be $250.00.

Page 1

1

2                    UNITED STATES DISTRICT COURT

3                     DISTRICT OF MASSACHUSETTS

4                  Civil Action No.   05-CV-10883-WGY

5

6

7     LESLIE S. RAY INSURANCE

8     AGENCY, INC., and

9     BEVERLY PORT MARINA, INC.,

10                          Plaintiffs,

11              vs.

12    ACADIA INSURANCE COMPANY,

13                          Defendant.

14

15

16              DEPOSITION OF MATTHEW PEDERSEN, taken

17    pursuant to notice, at the offices of Tompkins, Clough,

18    Hirshon, Langer, P.A., Three Canal Plaza, Portland, Maine,

19    on November 1, 2005, commencing at 10:23 A.M., before Tammy

20    L. Martell, Registered Professional Reporter, a Notary

21    Public in and for the State of Maine.

22

23

24              Downing & Peters Reporting Associates

25         79 Atlantic Place, South Portland, Maine  04106

Matthew Pedersen

Page 6

1    Q.    For -- for who?

2    A.    International Marine Underwriters.

3    Q.    Is International Marine Underwriters an insurance

4    company?

5    A.    It is a trade name under the company of One Beacon

6    Insurance.

7    Q.    And for how long have you been employed by

8    International Marine Underwriter as underwriting

9    supervisor?

10   A.    Approximately 22 months.

11   Q.    What was your last position prior to this underwriting

12   supervisor position?

13   A.    Managing underwriter INAMAR recreational marine.

14   Q.    And for what period of time did you work at INAMAR?

15   A.    36 months.

16   Q.    And what was your position prior to that?

17   A.    Assistant vice-president marine Acadia Insurance

18   Company.

19   Q.    And for what period of time did you work for Acadia?

20   A.    Nine years.

21   Q.    And can you give me the month and year that you

22   started and the month and year that you left?

23   A.    November 2000 -- 1992 to November 2000, and that -- I

24   was only that title for the last five months of that nine

25   years.

Page 7

1    Q.    Why did you leave Acadia?

2    A.    I had an opportunity with another company.

3    Q.    And that was the INAMAR?

4    A.    It was.

5    Q.    What are your current duties and responsibilities as

6    underwriting supervisor for International Marine

7    Underwriters?

8    A.    Underwriting and managing a book of marine insurance

9    accounts.

10   Q.    And when you say marine insurance are you referring to

11   ocean marine coverages?

12   A.    I am.

13   Q.    And would it be fair to say within the category of

14   ocean marine coverages is something called Marina Owners

15   Legal Liability and Boat Dealers insurance?

16   A.    It is.

17   Q.    And are you currently involved with underwriting what

18   I will shorthandedly refer to as MOLL/BD insurance?

19   A.    I am.

20   Q.    Okay.  You understand when I say MOLL/BD I am talking

21   Marina Owners Legal Liability and Boat Dealers?

22   A.    Generally we refer to it as marina operators, but

23   marina owners the same thing.

24   Q.    Okay.  Just for the sake of this deposition since I

25   have been using that term previously can we agree when I

Matthew Pedersen

Page 10

1   A.   I believe they were called interrogatories.

2   Q.   Okay.  Anything else?

3   A.   Nope.

4   Q.   What's your educational background?

5   A.   College.

6   Q.   Where did you go to college?

7   A.   Maine Maritime Academy.

8   Q.   Where is that located?

9   A.   Castine, Maine.

10  Q.   And you got a degree?

11  A.   I did.

12  Q.   What year?

13  A.   1984.

14  Q.   What is the degree in?

15  A.   Nautical science.

16  Q.   Had you worked in the insurance business prior to

17  starting with Acadia in November '92?

18  A.   I did.

19  Q.   And what was your insurance experience prior to

20  Acadia?

21  A.   Immediately prior?

22  Q.   Right.  Let's go backwards in sequence.

23  A.   Marine underwriter CIGNA, C-I-G-N-A.  Do you want --

24  Q.   Yeah, what were the dates for that?

25  A.   I think that was about two years so that would put us

Matthew Pedersen

Page 11

1    back to Octoberish of '89, at which point I had left a

2    managing agency called Switzerland Marine Managers whose

3    paper was North American Specialty.

4    Q.    Okay.

5    A.    I had been there 18 months or two years, I am not sure

6    exactly, and prior to that I was with Royal Insurance

7    Company.

8    Q.    And what was your position at Royal?

9    A.    Marine underwriter.  I was there not even a year.  And

10   prior to that I was at Fireman's Fund Insurance Company as

11   a marine underwriter and that was for two years.

12   Q.    Okay.  So it sounds like your insurance career has

13   always been on the underwriting side, first of all,

14   correct?

15   A.    Correct.

16   Q.    And always on the marine underwriting side?

17   A.    Correct.

18   Q.    And always has involved ocean marine coverages?

19   A.    Correct.

20   Q.    Okay.  And has it always involved MOLL/BD coverages?

21   A.    No.

22   Q.    Okay.  Was there any particular position where you

23   weren't involved in any way with writing MOLL/BD coverages?

24   A.    The position with CIGNA did not involve MOLL/BD

25   coverages.

Matthew Pedersen

Page 12

1    Q.    Okay.   Was that the only one?

2    A.    It was.

3    Q.    Okay.   So all the other positions you have listed

4    involve writing MOLL/BD coverage as an underwriter?

5    A.    I did.

6    Q.    Now, as of -- I want to focus your attention on early

7    2000.   Your position -- you were with Acadia at that time?

8    A.    I was.

9    Q.    Let's take the -- let's focus in on January 2000.   As

10   of that time you were employed by Acadia and what was your

11   title at that time?

12   A.    Director ocean marine.

13   Q.    And at that time there was an ocean marine department

14   at Acadia?

15   A.    There was.

16   Q.    And what office did that operate out of?

17   A.    Westbrook, Maine.

18   Q.    And you were the head of the department?

19   A.    I was.

20   Q.    How many people were in the department at that time?

21   A.    I believe six.

22   Q.    And can you identify those six people?

23   A.    Betsy Kelley, Matt Campbell, Heather Gwarjanski,

24   G-W-A-R, Bret Chase, Jamie the last name started with a P.

25   Q.    We can call her Jamie P if you don't get the last

1  A.    I did not.

2  Q.    Would it be fair to say that when you were the ocean

3  marine underwriter that part of your job was to handle

4  inquiries from agents about Acadia ocean marine coverages?

5  A.    Yes.

6  Q.    Okay.  And that happened from time to time, fair to

7  say?

8  A.    Yes.

9  Q.    And do you remember ever getting any kind of inquiries

10  from the Ray Agency about the features of Acadia ocean

11  marine coverages?

12  A.    No.

13  Q.    And would it be fair to say that part of your job

14  was -- when you had an inquiry from an agent would be to

15  advise the agent about the features of the Acadia ocean

16  marine coverages?

17          MR. LANGER:   Objection to the form.

18  A.    I don't advise.

19  Q.    Well, give me -- what do you mean when you say you

20  don't advise?

21  A.    Advising.  All I do is underwrite.  I am not sure what

22  you mean by advise so I think I didn't answer it correctly.

23  Q.    Okay.  Well, let me -- take a situation where you

24  get -- you are receiving a phone call from an agent and the

25  agent is asking you about -- has a question about Acadia

Page 27

1    ocean marine coverages, give me an example of the type of

2    question that you have fielded from an agent in that

3    regard?

4    A.    What does the policy cover?

5    Q.    Okay.  And how would you answer a question like that?

6    A.    I am putting a copy of the policy in the mail to you

7    right now.

8    Q.    Okay.  And have you ever had a situation where you did

9    that?

10    A.    Probably.

11    Q.    Okay.  And have you ever had a situation where the

12    agent then came back with a question saying I have looked

13    at the policy and I am not sure what the underwriting

14    intention is behind X language?

15    A.    Can you say that again?

16    Q.    Yeah.  Have you ever had a situation where you got a

17    question about what does it cover and you said you are

18    going to put a copy of the policy in the mail --

19    A.    Right.

20    Q.    -- you then send it in the mail to the agent, then the

21    agent gets back in touch with you and says I am looking at

22    the policy, I am -- I have a question about -- specific

23    question about whether this policy does or does not cover

24    something because of the way it is worded, have you ever

25    fielded a question like that?

Matthew Pedersen

Page 35

```
 1    the insured in order for coverage to apply?
 2              MR. LANGER:  Objection, the document speaks for
 3    itself.
 4    A.    Yes.
 5    Q.    That's a fair statement?
 6              MR. LANGER:  Same objection.
 7    A.    Yes.
 8    Q.    Okay.  And was -- did that -- did that condition
 9    relative to the boat being operated on the water by the
10    insured or an authorized employee of the insured, has that
11    or was that condition always in Acadia's form P and I
12    coverage on MOLL/BD insurance during the entire time you
13    worked at Acadia?
14    A.    It was.
15    Q.    Are you familiar with any insurance companies that do
16    not have that condition in their P and I coverage for under
17    MOLL/BD?
18    A.    I am not.
19    Q.    Okay.  Did you play any role in -- do you know who --
20    this is a form that was written by Acadia, right?
21    A.    Yes.
22    Q.    And this is not -- you know what an ISO form is,
23    right?
24    A.    Right.
25    Q.    This is not an ISO form?
```

Page 40

```
 1              MR. LANGER:  Objection, the document speaks for
 2    itself.
 3    A.    Not in these two paragraphs.
 4    Q.    Okay.  All right.  Thank you.  I will take that back.
 5    I am going to show you first of all Exhibit No. 9 from
 6    yesterday's -- yesterday's deposition of Mr. Wirth and I
 7    want to direct your attention to the yacht dealer's marina
 8    operator's application that was attached to this exhibit
 9    which is an affidavit which was authenticated by Mr. Wirth.
10    Handing you this part of this Wirth exhibit do you
11    recognize that document?
12    A.    I do.
13    Q.    Okay.  And what do you recognize that to be?
14    A.    The MOLL/BD application.
15    Q.    Okay.  And when is the last time you saw that
16    document?
17    A.    This very document?
18    Q.    Yes.
19    A.    This morning.
20    Q.    Okay.  This is one of the documents that you looked at
21    to prepare for the deposition?
22    A.    It is.
23    Q.    Okay.  And when is the last time before this morning
24    you saw it?
25    A.    When I spoke to Mr. Langer less than a week ago.
```

Matthew Pedersen

Page 45

1    this particular application did you -- and understanding

2    that it is going to be completed by insureds who are

3    selling boats for recreational use to the public did you

4    have an understanding as to whether the average boat dealer

5    would allow a prospective purchaser of a boat to take the

6    boat for a test drive?

7    A.    Did I have an understanding?

8    Q.    Yes.

9            MR. LANGER:   Objection, foundation and the form.

10   A.    Do you mean did I understand that they did that or did

11   I have an understanding one way or the other?

12   Q.    Any kind of understanding?

13   A.    The understanding was that that was not done.

14   Q.    And just so I am clear understanding that what was not

15   done?

16   A.    Prospective buyers of boats did not demonstrate them.

17   Q.    And what's your basis -- if I understand your

18   testimony correctly you are saying that your understanding

19   is that boat dealers do not allow prospective purchasers to

20   test drive boats?

21   A.    Correct.

22   Q.    Okay.  And what's the basis of that understanding?

23   A.    I have bought seven or eight boats in my life, I have

24   never been allowed to test drive them.  I have been

25   underwriting marine operators policies for almost 20 years,

Matthew Pedersen

Page 46

1    it is not an included coverage.

2    Q.    Okay.  So the basis of your understanding that boat

3    dealers don't allow prospective purchasers of boats to test

4    drive them is based in part on your personal experience in

5    buying boats, correct?

6    A.    In part.

7    Q.    And have you ever heard of any boat dealer in any of

8    your experience personal or professional allowing a

9    prospective purchaser of a boat to take it for a test

10   drive?

11   A.    Not without the -- an employee of the marina on board

12   and in control.

13   Q.    When you say in control what do you mean?

14   A.    Hand on the wheel.

15   Q.    All right.  Have you ever heard in any sense,

16   personal, professional, of a boat dealer allowing a

17   prospective purchaser of a boat to take the wheel on a test

18   drive?

19   A.    No.

20   Q.    In handling the submission Exhibit A to the Wirth

21   affidavit did this tell you the level of Beverly Port

22   Marina's annual boat sales?

23   A.    It does.

24   Q.    And what did it tell you in that respect?

25   A.    That their sales in -- for boat dealers was $2.4

Page 48

```
 1   Q.   And so based on that you understood that Beverly Port

 2   Marina sold $2.4 million worth of boats?

 3   A.   Correct.

 4   Q.   Okay.  Now, did -- did you see any potential for a

 5   liability exposure to Beverly Port Marina arising out of

 6   customer test drives of boats that it -- it offered to the

 7   public for sale?

 8   A.   I did not.

 9   Q.   And that's -- and why did you not?

10          MR. LANGER:  Same objection.

11   A.   It wasn't specified.

12   Q.   Well, it wasn't specified on the application, correct?

13   A.   Correct.

14   Q.   And is there a question on the application relative to

15   whether or not the marina allows customers to take test

16   drives?

17   A.   Yes.

18   Q.   Okay.  Where is that question?

19   A.   Right here.

20   Q.   And you are indicating towards the bottom of that page

21   and which is -- what does the question say?  It is upside

22   down for me, if you could read it out loud.

23   A.   Number of persons who will operate watercraft and

24   their experience.  I will also do you do demonstrations

25   with customers aboard.  Actually, that's the question, not
```



Matthew Pedersen

Page 49

1    the one I first referenced to.

2    Q.    Okay.  So just so the record is clear where is it on

3    the application where Acadia asks a prospective insured

4    whether or not it allows customers to take test drives?

5             MR. LANGER:  Objection to the form of the

6    question.

7    A.    At the bottom of page one.

8    Q.    Okay.  Question number?

9    A.    Four.

10   Q.    Excuse me.  Okay.  And the specific question you are

11   referring to I take it is the question that says do you do

12   demonstrations with customers aboard, fair to say?

13   A.    Correct.

14   Q.    And so it -- fair to say it doesn't specifically ask

15   whether or not the customer -- the customer is allowed to

16   take the wheel, correct?

17            MR. LANGER:  Objection, the document speaks for

18   itself.

19   A.    No.

20   Q.    Okay.  In -- is it your testimony that in your years

21   of experience -- in your years of experience as an ocean

22   marine underwriter that you have never known any boat

23   dealer to allow a customer to take a test drive -- to take

24   the controls of the boat in connection with a test drive of

25   a boat that they were considering buying?

Matthew Pedersen

Page 50

```
 1   A.    It is.

 2   Q.    Okay.  And have you ever either in your personal or

 3   your professional capacity ever heard of any claims under

 4   MOLL/BD coverages arising out of a customer taking a test

 5   drive of a boat?

 6   A.    No.

 7   Q.    Now, at -- in the approximate time period when this

 8   initial submission came in to Acadia relative to Beverly

 9   Port do you recall having any conversations with David Ray

10   with respect to the features of Acadia ocean marine

11   coverages?

12   A.    No.

13   Q.    Do you recall whether or not Dave Ray ever asked you

14   whether Acadia could do better for Beverly Port Marina as

15   compared to the prior Hanover policy that they had?

16              MR. LANGER:  Objection to the form and

17   foundation.

18   A.    I don't.

19   Q.    And the answer is?

20   A.    I don't.

21   Q.    Do you remember -- well -- so if you don't remember

22   him asking you that would it be fair to say you don't

23   remember any answer you gave to a question like that?

24   A.    It would.

25   Q.    Okay.  And whether or not -- do you recall in any
```

Matthew Pedersen

Page 62

1    Q.    Okay.  If there are no notes in the underwriting file

2    regarding a conversation with David Ray during which there

3    was allegedly a discussion regarding a Hanover policy what

4    would that indicate to you?

5          MR. CHAPMAN:  Object.

6    A.    That there was no discussion.

7          MR. LANGER:  I have no other questions.

8          MR. CHAPMAN:  Okay, I have a few follow ups to

9    that.

10         EXAMINATION BY MR. CHAPMAN:

11   Q.    When you looked -- did you look at the underwriting

12   file in connection with preparing for today's deposition?

13   A.    No.

14   Q.    Okay.  And so you are not in a position to say -- or

15   are you in a position to say whether or not the

16   underwriting file contains any notes of any conversations

17   you had with anyone at Leslie Ray?

18   A.    I have looked at some documents.  Whether they were

19   considered the underwriting file or not I am not sure.

20   Q.    And what documents are you referring to?

21   A.    Copy of the application, copy of the quote sheet, copy

22   of underwriting notes, that's it.

23   Q.    Okay.  And those are documents that you looked at in

24   conjunction with Mr. Langer?

25   A.    Yes.

 1

 2                UNITED STATES DISTRICT COURT

 3                 DISTRICT OF MASSACHUSETTS

 4              Civil Action No.  05-CV-10883-WGY

 5

 6

 7    LESLIE S. RAY INSURANCE

 8    AGENCY, INC., and

 9    BEVERLY PORT MARINA, INC.,

10                    Plaintiffs,

11            vs.

12    ACADIA INSURANCE COMPANY,

13                    Defendant.

14

15

16              30(b)(6) DEPOSITION OF ACADIA INSURANCE

17    COMPANY (Theodore Wirth), taken pursuant to notice, at the

18    offices of Tompkins, Clough, Hirshon, Langer, P.A., Three

19    Canal Plaza, Portland, Maine, on October 31, 2005,

20    commencing at 11:08 A.M., before Tammy L. Martell,

21    Registered Professional Reporter, a Notary Public in and

22    for the State of Maine.

23

24           Downing & Peters Reporting Associates

25        79 Atlantic Place, South Portland, Maine  04106

Page 6

1    Q.    What's your home address?

2    A.    67 Austin, A-U-S-T-I-N, Street.

3    Q.    And what's your current occupation?

4    A.    Director of ocean marine underwriting.

5    Q.    And by whom are you employed?

6    A.    Acadia Insurance Company.

7    Q.    What's your educational background?

8    A.    Four years college undergraduate degree.

9    Q.    Where did you go to college?

10   A.    University of Maine.

11   Q.    Which -- which University of Maine?

12   A.    Three semesters Orono and 10 semesters Portland

13   Gorham.

14   Q.    And when did you get your degree?

15   A.    May 1981.

16   Q.    And for how long have you been working for Acadia?

17   A.    Doing the math.  I started February 1st, 2001.

18   Q.    What was your original title when you first came to

19   Acadia?

20   A.    The same as present.

21   Q.    Okay.  And what was your -- if you could take me

22   briefly in order on your job experience from when you get

23   out of -- when you get out of University of Maine up until

24   when you started with Acadia?

25   A.    19 -- January '83 til April '85 personal lines

Page 10

1    Legal Liability and Boat Dealers type coverages?

2    A.    Hmm.  I would say probably 1987.

3    Q.    And what was the nature of that first involvement?

4    A.    Some of those accounts were written by the firm that I

5    worked for.

6    Q.    When were you first involved in a hand -- from a

7    hands-on perspective of placing MOLL/BD policies?

8    A.    1988.

9    Q.    And during the period of time that you worked for

10   Inland/International were there a number of different

11   insurers with which you placed the MOLL/BD policies during

12   your tenure there?

13   A.    Yes.

14   Q.    And can you identify those companies?

15   A.    Yes.

16   Q.    Please do.

17   A.    Hanover Insurance Company, International Marine

18   Underwriters, New Hampshire Insurance Company, CIGNA, AIG,

19   St. Paul.  I believe that's it.

20   Q.    Okay.  Did you ever place any of the MOLL/BD type

21   coverages with CNA?

22   A.    No.

23   Q.    Had you ever placed any insurance with CNA prior to

24   coming to Acadia?

25   A.    Yes.

1   not sure of the date, I know it was in the first half of

2   the 1990s, up until I believe October of 2000.  Either

3   October or November of 2000.

4   Q.    Okay.  And what happened to Matt Pedersen in

5   October-November 2000?

6   A.    He left Acadia to join another insurance company.

7   Q.    And which company was that?

8   A.    CIGNA or INAMAR, I-N-A-M-A-R, all capitals.  They went

9   by both names.

10  Q.    Okay.  When is the last time you talked to Matt

11  Pedersen, if ever?

12  A.    I don't know if it has been this year or not.  It may

13  well have been in 2004 and I believe it was in April at an

14  agents convention.

15  Q.    Have you ever had any conversations with Matt Pedersen

16  about this case or any case arising out of Mr. Johnson's

17  injury?

18  A.    No.

19  Q.    What did you do to prepare for today's deposition?

20  A.    I looked at a copy of our file.

21  Q.    And are there any particular documents that you looked

22  at to prepare for the deposition?

23  A.    No.

24  Q.    When you say our file are you talking about the

25  underwriting file?

Page 26

```
 1    A.    Yes.

 2    Q.    Which underwriting file?

 3    A.    The underwriting file that has this policy.

 4    Q.    Okay.  Well, how do you -- how do you refer to that

 5    file, what do you call it?

 6    A.    The underwriting file.

 7    Q.    For -- but strictly for the ocean marine coverage?

 8    A.    Yes, that's all -- that's all we handle.

 9    Q.    Okay.  During the period of time -- well, if you

10    started in February '01 at some point did you become

11    acquainted with Beverly Port Marina?

12    A.    I remember seeing the name, yes.

13    Q.    When did you first have any kind of hands-on

14    involvement with the Beverly Port Marina MOLL/BD policy?

15    A.    Sometime in the spring of 2001.

16    Q.    Okay.  And what was the -- what was the nature of that

17    involvement?

18    A.    I underwrote the renewal in May of 2001.

19    Q.    And I take it that you have had contact somewhere

20    along the line with people from the Leslie Ray Insurance

21    Agency?

22    A.    Yes.

23    Q.    And who have you talked to -- have you ever -- well,

24    strike that.

25          Have you ever been to the Leslie Ray Insurance
```

Page 30

1    A.    Yes.

2    Q.    Okay.

3    A.    Miscellaneous marine liability and ocean cargo.

4    Q.    Now, you reference commercial hull coverage, is that

5    different from the vessel P and I coverage that you talked

6    about previously?

7    A.    No.

8    Q.    Okay.  Those are -- those are synonymous?

9            MR. LANGER:  Commercial hull and P and I are

10   synonymous?

11   A.    Well, they are two different coverages for a

12   commercial vessel.

13   Q.    Okay.

14   A.    I am differentiating from a yacht or pleasure boat

15   when I say commercial.

16   Q.    Okay.  So if I understand you correctly when you

17   say -- when you gave me commercial hull as a category that

18   would be in essence property coverage for that vessel?

19   A.    I am denoting hull and P and I for commercial boats

20   when I say commercial hull.

21   Q.    Okay.

22   A.    I am using our policy prefixes as a mental jogger,

23   they are C H A which stands for Commercial Hull Acadia.

24   Q.    And generally speaking what types of coverages are

25   available under Acadia's miscellaneous marine liability

1    A.    From my own experience you were never allowed to

2    operate a boat until you had your closing and then it was

3    your boat.

4    Q.    Do you have your own boat?

5    A.    I don't currently.

6    Q.    Have you ever owned a boat?

7    A.    Yes.

8    Q.    And when did you first own a boat?

9    A.    July 1983.

10   Q.    And have you owned a number of boats over time?

11   A.    Yes.

12   Q.    How many?

13   A.    Six.

14   Q.    Did you purchase any of those boats from boat dealers?

15   A.    All six.

16   Q.    Okay.  Did you test drive any of those boats before

17   purchasing them?

18   A.    No.

19   Q.    Okay.  Did you ask to do that?

20   A.    No.

21   Q.    And before -- before Mr. Johnson had his accident in

22   October of '01 had you ever heard of a boat dealer allowing

23   a prospective purchaser to test drive a boat?

24   A.    Never.

25   Q.    Are you aware of any ocean marine insurers that

Page 50

1   authorized employees of the insured or by the insured?

2   A.   I understand that's always been a requirement.

3   Q.   And you are not familiar with any companies that write

4   this type of P and I coverage that don't have that as a

5   requirement?

6   A.   Correct, I am not aware of any other companies that

7   would allow that.  Other companies are consistent with our

8   position.

9   Q.   So the record is clear you are not aware of any other

10  insurance companies that write this type of P and I

11  coverage that do not include the condition for the vessel

12  being operated in the water by the insured or authorized

13  employees?

14  A.   Right, I am not aware of any other -- any company.

15       MR. CHAPMAN:  Okay.  I am going to hand you a CNA

16  form.  I am going to mark this as the first exhibit for Mr.

17  Wirth's deposition.

18       (Exhibit No. 1, CNA Form, marked for identification.)

19       MR. LANGER:  For the record parts of it are

20  highlighted.  Those are not anything that Mr. Wirth has

21  done.  Is that --

22       MR. CHAPMAN:  That's correct.  Yeah, the

23  highlighting is mine.

24       MR. LANGER:  Take your time to read it.

25  Q.   Yeah, and for the record I will say, Mr. Wirth, take

Page 62

```
1    Q.    Has that ever happened in your experience?

2    A.    Not that I recall.

3    Q.    Do you have any understanding as to how many different

4    marinas or boat dealers that Leslie Ray has obtained

5    policies for?

6    A.    No, I don't know that.

7    Q.    So as you sit here today are you aware of any marina

8    or boat dealer other than Beverly Port that Ray obtained

9    insurance for?

10             MR. LANGER:    For Acadia -- through Acadia or

11   through anybody?

12   Q.    Through anybody.

13   A.    I don't know that either.

14   Q.    Insofar or since the time that you have been the

15   director of ocean marine underwriting for Acadia I think

16   you have already testified you -- part of your job is

17   handling questions from Acadia agents about the Acadia

18   ocean marine coverages, correct?

19   A.    Correct.

20   Q.    And you undertake to answer those questions and

21   explain those features to the agents?

22   A.    Yes.

23   Q.    And in answering agent's questions do you -- well,

24   does that part of your job include describing the

25   advantages and disadvantages of Acadia ocean marine
```

Page 63

1    policies?

2    A.    No.

3    Q.    Does it include -- you have already said you are not

4    familiar with situations where you actually received a --

5    an insured's prior policy form, but does that function

6    include discussing in general terms the pros and cons about

7    prior ocean marine policy as compared to what Acadia would

8    be proposed to write?

9    A.    No.

10   Q.    And so that's never happened in your experience?

11   A.    No.

12   Q.    And as a -- as an ocean marine underwriter would it be

13   your testimony that you have never had the understanding

14   that a marina has a liability exposure arising out of

15   customer test drives of boats that are owned by the marina?

16   A.    I have never been aware of that exposure.

17   Q.    Have you ever undertaken any kind of inquiry as to how

18   any of the marinas that you insure operate in that respect?

19            In other words, how does this insured marina

20   conduct test drives?

21   A.    No, I have never had inquiry into that.

22   Q.    Aside from any of the exhibits that we have looked at

23   in today's deposition have you ever become aware of any

24   other ocean marine insurer that would cover the insured

25   marina or boat dealer's liability exposure arising out of

Page 64

1     customer test drives of boats owned by the insured?

2     A.    No, I haven't.

3              MR. CHAPMAN:   Just off the record for a second.

4                 (Discussion off the record.)

5     Q.    I am going to hand you -- I am going to mark as

6     Exhibit 3 and this document appears to be a 10 page fax.

7         (Exhibit No. 3, Application, marked for

8     identification.)

9     A.    It is little writing.

10    Q.    Okay.  Have you ever seen Exhibit 3 before?

11    A.    Yes.

12    Q.    And can you identify what that is?

13    A.    That is a submission to what appears to be the non

14    marine portion of Acadia or from it.

15    Q.    From it to whom?

16    A.    From Acadia's Marlborough office to Matt Pedersen in

17    Maine.

18    Q.    In May of 2000?

19    A.    Yes.

20    Q.    Now, would it be fair to say that from your review of

21    the underwriting documents you have looked at a -- an

22    application was submitted to the Acadia Massachusetts

23    office and then the portion of it or -- or a portion of it

24    was handled in the Massachusetts office and the application

25    was -- or a copy of it was sent up to the Westbrook office

1    A.   This is the only dealership I have ever heard who

2    would allow somebody other than an employee or the insured

3    him or herself to operate a vessel.

4    Q.   Okay.  Well, I understand your understanding in

5    hindsight, but I am asking something a little different

6    from that.  I mean for example you know that an auto dealer

7    typically, you know, the typical auto dealer lets a

8    prospective purchaser of an automobile, motor vehicle, take

9    that vehicle for a test drive?

10   A.   Yes.

11   Q.   Okay.  And you don't see a possibility that a boat

12   dealer could allow a prospective purchaser to take a boat

13   for a test drive?

14          MR. LANGER:  Objection to form and foundation.

15   A.   I would be surprised because we're talking two very

16   different beasts being test driven, and in the case of an

17   automobile the test driver has to demonstrate that they at

18   least have a driver's license which at some point was a

19   demonstration that they were able to operate a motor

20   vehicle safely.  The average boat buyer that I know of has

21   no boating driver's license, there is nothing to

22   demonstrate their ability, therein lies the difference

23   between a boat dealer and a car dealer.

24   Q.   Would it be fair to say you could imagine a situation

25   where a boat dealer would allow a -- say a boat dealer has

Page 96

1    a prior relationship with a purchaser, you know, a person

2    like you who has bought a number of boats from a particular

3    dealer, would it be -- would it be fair to say that you

4    would reasonably believe that a boat dealer in that

5    situation would allow the experienced customer to take a

6    test drive of a boat that they were interested in?

7              MR. LANGER:  Objection to form and foundation.

8    A.    I have no way of knowing that.  My gut tells me they

9    still wouldn't let you take it out.

10   Q.    Have you ever spoken to any boat dealers either in

11   your capacity as director of the ocean marine department or

12   in your personal capacity as to whether they allow

13   customers or prospective customers to test drive boats?

14   A.    No one has ever said to me they would let a customer

15   take a boat out until the closing when it is then the

16   customer's boat.

17   Q.    Well, I am saying have you ever asked any questions

18   like that to any boat dealer?

19   A.    No.

20   Q.    And you are saying that out of all the different

21   policies you have written there has been no situation where

22   an Acadia agent has raised a question with regard to

23   liability exposure for a boat dealer arising out of test

24   drives?

25   A.    Correct.

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ACADIA INSURANCE )
COMPANY, )
           Plaintiff )
    v. )
 )
BEVERLY PORT MARINA, )
INC. and )
CARLOS JOHNSON, )
           Defendants )

CIVIL ACTION
NO. 02-CV-10153-WGY

## AFFIDAVIT OF THEODORE G. WIRTH

Theodore G. Wirth, first being duly sworn, deposes and says as follows:

1.     My name is Theodore G. Wirth, and I am employed by Acadia Insurance Company (hereinafter "Acadia"), the Plaintiff in the above-captioned matter, as the Director of Ocean Marine Underwriting. I have under my custody and control the records relating to Beverly Port Marina, Inc. (hereinafter "Beverly"). The following Affidavit is based on my knowledge and from records which are kept in the ordinary course of business by Acadia, and which were made at or near the time of the occurrence or activities by, or from information transmitted by, a person with knowledge of the facts set forth in the records. These records are kept in the ordinary course of business by Acadia pursuant to its regular practice of making such records.

2.     Acadia issued to Beverly the Marina Operators Legal Liability and Boat Dealers Policy in May, 2000, and renewed that policy in May, 2001, in reliance upon Beverly's insurance application, a copy of which is attached hereto as **Exhibit A**.

3.     In issuing the said policy, Acadia specifically relied, *inter alia,* on Beverly's statement that only three persons at the marina, all with "good experience," would be



operating watercraft, in response to the question (at the bottom of page 2 of the application), "Number of persons who will operate watercraft and their experience."

4.    The May 2000 policy and May 2001 renewal policy were duly delivered to the insured upon issuance.

5.    At no time after delivery of the policies (which clearly limit liability coverage in connection with the insured's watercraft to claims arising from vessels "being operated IN THE WATER by the Insured or by authorized employees of the Insured") and before the claims of Carlos Johnson had arisen, was Acadia ever contacted by or on behalf of Beverly to request additional liability coverage.

6.    Acadia's firm and unwavering practice is not to write protection and indemnity (liability) coverage for the operation of marinas' or boat dealers' vessels by anyone other than authorized employees or the principals/proprietors of the marinas/boat dealers.

7.    The reason for this underwriting rule (which I understand is generally followed in the industry) is that without such a limitation, it would not be possible to quantify the risk.

SIGNED under pains and penalties of perjury this /3th day of December, 2002.

Theodore G. Wirth

2

STATE OF MAINE
CUMBERLAND, ss.

December _13_, 2002

    Personally appeared the above-named Theodore G. Wirth and swore that the foregoing Affidavit is true.

Before me,

RUTH COVELL
Notary Public, Maine
My Commission Expires
July 26, 2008

Notary Public

## CERTIFICATE OF SERVICE

    I, Leonard W. Langer, Esq., hereby certify that on December _17_, 2002, I caused a true copy of the within AFFIDAVIT OF THEODORE G. WIRTH to be mailed by First Class Mail, postage prepaid, to Thomas J. Muzyka, Esq., Clinton & Muzyka, One Washington Mall, Suite 1400, Boston, MA, 02108, counsel for Beverly Port Marina, Inc., and to Stephen Ouellette, Esq., Cianciulli & Ouellette, 163 Cabot St., Beverly, MA 01915, counsel for Carlos Johnson.

Leonard W. Langer, Esq.

Tompkins, Clough, Hirshon
    & Langer, P. A.
Three Canal Plaza
P. O. Box 15060
Portland, ME 04112-5060
    207-874-6700

AffidWirth.doc

3

EXHIBIT

A

TO: MATT PEDERSEN 3 PAGES

# Yacht Dealers / Marina Operators Application

Name of Applicant: ~~ABC~~ Beverly Port Marina   If accepted, coverage desired beginning: 5/25/00 19

Address: 43-67 Water Street

City: Beverly MA 01915   State:   Zip:

Contact and telephone number for Loss Control Inspection: Sue Kinzie   978-232-3300

Present Insurer: Hanover

Loss Payee: Beverly National Bank

Address: 240 Cabot Street

City: Beverly MA 01915   State:   Zip:

## General

1. Operator's Experience In Business: + 4 yrs

2. Type of construction:   No feet above high water mark:

What is the general condition of buildings?   Are buildings sprinklered?  ☒Yes ☐No   RACK AND

Is there a snow removal plan in effect, including rooftops? ☒Yes ☐No   SERVICE

3. Outside storage? ☒Yes ☐No

4. What types of protection systems are currently in use?

☒Fire Alarm (type):   ☒Burglar Alarm (type):

☒Central Station   ☐Watchman   ☒Flood Lights   ☒Fencing   ☐Dog

Distance to Fire Hydrant: 500'   Distance to Fire Station: 1

5. Has any company refused or canceled any similar insurance applied for or in force during the past three years? ☐Yes ☒No

If yes, give details:

6. List losses for last three years with dates and amounts:

## Yacht Dealers

1. List major brands sold:   boats: Pro-Line, Quicksilver

outboard motors: Mercury

2. Indicate average monthly values for the past year   $ ____   inside   2.4 M.l total.

$ ____   outside

Indicate peak inventory last 12 months:

Average value on any one vessel $ ____   Maximum value on any one vessel $ ____

3. Limits desired:

$ 850,000   on any one vessel.   — alternative quote – $1,000,000
$ 500,000   while in transit by land.
$ 500,000   while on exhibit at:
$ ____   while on premises at:
$ ____   while on premises at:
$ ~~850~~   in any one casualty.

4. Estimated number of Boat Shows / Exhibitions per year? 2   Do you exhibit in the water? ☒Yes ☐No

Do you do demonstrations with customers aboard? ☒Yes ☐No   How Often? incidental

A TRUE COPY
ATTEST: _Theodore H Wint_

000418

Sales - Boat dealer - 2.4 million
Storage /Mooring - 977,000
Operations /repairs - $349,000

## Marina Operators Legal Liability

Limit desired: 3,000,000.       Deductible desired:

**1. Ship Repairers.** ☑ Repairs   ☐ Alterations   ☑ Maintenance   ☐ restoration

Type of vessels repaired? Generally pleasure boats

Type of work: Fiberglassing 1 %   Engine 90 %   Electrical 5 %   General Repairs 5 %
     Spray painting %   Welding % 

Value of Vessels.     Average $ 40,000    Maximum $ 500,00

     Gross Receipts Last 2 Years   $ 349,000 .19     $   19

Are trial runs performed after work is completed? ☑ Yes ☐ No

**2. Storage.**

Value of Vessels Stored:    Average $ 20,00    Maximum $ 115,00

Number of Vessels Stored:   Inside: 100   Outside: 25   In water: 25

     Gross Receipts last 2 years   $ 977,000 .19     $   19

Number of Storage Buildings:   Construction: Steel

Type of storage: On Cradles %   Jack stands 70 %   In Racks 25 %   On Trailers 5 %

Is hold harmless agreement obtained? ☑ Yes ☐ No

Are all buildings secured against illegal entry? ☑ Yes ☐ No   If yes, how: Central

Are all buildings sprinklered? ☐ Yes ☑ No   Not office

**3. Docking and Mooring.**

Number of slips Available: 250   Maximum Value of Vessel $ 500,000   Average Value $ 40,00   May increase to $1,000,00

Number of Moorings Available: 0

     Gross Receipts Last 2 Years   $   19     $   19

Describe maintenance schedule on docks and moorings: Require 0 annual inspections 2 maint per

**4. Fueling**

     Gross Receipts Last 2 Years   $   19     $   19

Fire extinguishers present: ☐ Yes ☐ No   Who does fueling? ☐ Marina Employee   Boat Owner

**5. Hauling and Launching (Other than in connection with Shiprepairers or Storage)**

Type of Lifts: 2 travel & fork lift   Rated Capacity: 35 tons    Tons: 35 / 15 / 15

Is regular maintenance performed on equipment? ☑ Yes ☐ No   Frequency: checked daily - fluids, tires

Approx. Number of Vessels Handled per Year 500   Maximum Value $ 500,00   Average Value $ 40,000

     Gross Receipts Last 2 Years   $   19     $   19

## Protection and Indemnity

Limit of Liability.   Yacht Dealers $ 2,000,00   Marina Operators $ 2,000,00   Medical payments: $2,000 included

Deductible Desired?

Number of persons who will operate watercraft and their experience: 3 - good experience - nearly all within harbor

Ⓐ Fuel - Estimated receipts for year - $0.00 due to permit problems w/ Environmental Police

000419

04/04/00 08:31 FAX ... @Case 05-cv-1088 ... Exhibit B Arcadia Insurance ... filed ... 07/2008 ... Page 5 of 6

## Piers, Ramps and Floats Coverage

1. Brief description of property to be insured: _Piers/docks_

2. Type of construction: Wood, Concrete, Steel? _w/ frame_   Fixed or Floating? _all floating - 9 feet tide_

   Year(s) of construction: _Mid 60's → 70's_

   Separate Fuel Dock?  ☐ Yes  ☒ No         Electricity on docks? ☒ Yes  ☐ No

3. Briefly describe the maintenance program: _Maintained daily, checked weekly_

4. Briefly describe firefighting capabilities at pier: _fuel dock, fire ept on all piers_
   _suppression system_

5. Is any property removed from water during winter? ☐ Yes ☒ No

6. Has any company refused or canceled any similar coverage applied for in force during the past three years?  ☐ Yes ☒ No

   If yes, give details:

7. Value of the docks. (include breakdown between Piers, Ramps and Floats) _$300,000_

8. Deductible $

## Owned Watercraft

No. of persons operating watercraft and their experience? _5  - good experience - mostly in harbor_

Description of boats to be insured:

| Trade Name | Use of Boat | Year Built | Length | H.P. | Value | Fuel | Material of Hull |
|---|---|---|---|---|---|---|---|
| 83 _Boston whaler_ | ☐ rental ☒ workboat | 83 | 24 | 175 | $3000 | _GAS_ | _Fiberglass_ |
| | ☐ rental ☐ workboat | | | | $ | | |
| | ☐ rental ☐ workboat | | | | $ | | |
| | ☐ rental ☐ workboat | | | | $ | | |

Describe usage of boats: _General - Boston - Cape Ann [ mostly harbor_

Protection & Indemnity Limit Desired:  ☐ $100,000   ☐ $300,000   ☐ $500,000   ☒ $1,000,000

Navigation area of above vessel(s): _in harbor - occasional Cape Ann to Boston_

Lay up period: From _12/1_ 12:01 A.M. To _3/1_ 12:01 A.M.    Deductible $ _1000_

I hereby declare that I personally have read this application and I declare that the statements made are true. I understand that this is not a binder of insurance.

Applicant's Signature

Agency

Address

Agency Code                                             Date

Agency Agreement

Agent's name    Leslie S. Ray
Insurance Agency, Inc.

Agent's address    129 Dodge Street

Beverly, MA  01915

This Agreement is made this 23 day of Dec. , 1997
by and between the Agent indicated above and the Company(ies)
designated below.

☒ Acadia Insurance Company
☒ Berkley Regional Insurance Company
☒ Firemen's Insurance Company of Washington, D.C.
which Company(ies) shall be hereinafter referred to as the
"Company." Notwithstanding the foregoing it is hereby
acknowledged that any liability of each of the preceding
companies is several and not joint and this Agreement is
respectively made with each such Company.

When used in this Agreement the term "Agent" means one or more
persons and any business entity licensed by a state to act as a
representative of the Company, directly or through legally
authorized personnel, in negotiating, servicing or effecting policies
of insurance issued in the name of the Company. The terms "you"
and "your" mean the Agent; the terms "we," "us," and "our" mean
the Company.

The above-designated parties hereby agree to the following terms:

## I. Authority/Responsibility

A.  The Agent is an independent contractor, not an employee of
the Company, exercising exclusive and independent control
of the Agency. The Agent may represent more than one
company.

B.  Authority is hereby granted to solicit, receive, bind, execute,
and transmit proposals for insurance contracts (including
bonds) to the Agent subject to the written guidelines
issued by the Company. Agent agrees to forward to the
Company written copies of applications, binders, policies,
endorsements, and certificates within five (5) business days
after execution or issuance. Agent will promptly report all
claims to the Company Home Office or its authorized
representative.

C.  The Agent is hereby granted authority to collect, receive, and
provide receipts for premiums as herein provided.

D.  All Agent records pertaining to Company business shall be
available for inspection by the Company. All Company
records pertaining to the business of the Agent shall be
available for Agent's inspection. All powers of attorney,
policies, company seals, and other supplies, manuals,
documents, and forms provided to the Agent by the Company
shall remain Company property and shall be promptly
returned to the Company on demand.

E.  The Company reserves the right to cancel (subject to state
law) at any time any policy or bond placed by the Agent with
the Company.

## EXHIBIT
## L

## II. Commissions

A.  The Company will pay the Agent commissions at the rates
specified in the Commission Schedule which may be
amended from time to time by the Company. The Company
will give at least 90 days notice of proposed revisions of
these rates. The Company will not propose rate revisions at
intervals of less than one year.

B.  Whenever the Company refunds premiums on insurance, the
Agent shall refund the commission to the Company at the
same rate of commission as was paid on that insurance,
regardless of whether the refund occurs during or after the
termination of this Agreement.

C.  The terms of this Agreement shall not prohibit the negotiation
of special commission rates on individual policies by express
mutual agreement between Agent and Company.

## III. Direct Bill

A.  The Agent is responsible for the prompt submission of
completed applications or original policies to the Company,
including the initial premium, without deduction of
commission, on those policies requiring payment with the
application.

B.  The Company will be responsible for preparation of all
polices, endorsements, renewals, and collection of all direct
bill premiums.

C.  The Company will clearly, and prominently, identify Agent
by name when transmitting policies, endorsements, premium
and collection notices.

D.  Commissions on premiums shall be paid to Agent no later
than 30 days after the end of the month in which the
premiums are received by the Company. Such commissions
shall be offset by Company for any return commissions due
from Agent.

E.  In the event of termination of the Agreement, the Company
will, at the Agent's request, furnish a list of policyholders
with the expiration dates of the policies.

F.  The Company will not use its records of direct billed business
placed by the Agent with the Company, to solicit insured(s)
for other lines of insurance, products or services without the
prior approval of the Agent, unless the Company becomes
entitled to control the expirations.

## IV. Agency Bill

A.  Agent shall hold as a fiduciary trust, all premiums collected
by or paid to Agent for insurance issued in Company's name,
separate and apart from any money belonging to the Agent.
Agent shall pay Company all such premiums due according
to the terms of this Agreement. All premiums are the
property of the Company and commissions payable to the
Agent are debts owned by the Company. Keeping an account

with the Agent on our books is only a record of business transacted and neither the keeping of such an account, nor the privilege of deducting commissions from such premiums shall be deemed to waive the understanding of that trust.

3.  Premiums that have been determined by audits, retro adjustments, and interim reports will be fully earned. The Agent shall exert diligence to collect such premiums.

4.  Any credit extended by the Agent shall be the sole risk of the Agent. The Agent has no authority whatsoever to finance premiums with any entity as an Agent of the Company. In securing financing for policies or bonds written under this Agreement, the Agent will act only as the representative of the insured, and the Company will not be responsible for any representations made on its behalf.

## V.  Premium Accounting

1.  Itemized statements of money due shall be prepared monthly by the Company, or when agreed upon, by the Agent. The statement is to be received by the Agent or by the Company no later than the 15th day following the account month reported.

3.  All premium balances due the Company shall be paid no later than 45 days after the end of the account month for which the statement was prepared.

2.  ...e omission of any items from a monthly statement shall not affect the responsibility of either party to account for and pay all amounts due the other.

2.  If Agent fails to collect any premiums in accordance with this Agreement, or if Agent is relieved of the responsibility as specifically provided in item E of this section below:

1.  Company shall have the right to collect those premiums in any manner it may see fit;
2.  no commissions shall be paid on any such premiums collected by the Company;
3.  such action by Company shall not relieve Agent of any liability under this Agreement to pay the Company all other premiums due; and
4.  the Agent will have no further responsibility for collection of these premiums.

Company will relieve Agent from responsibility for payment due to inability to collect earned premiums disclosed by audits providing the following:
1.  written request for relief is made by Agent within 45 days from the end of the month in which the audit or report bill is rendered;
2.  Agent has issued a bill for such additional premiums and has made genuine and reasonable attempts to collect those premiums, including written demand for payment; and
3.  failure of Agent to give the Company such notice shall constitute acceptance by the Agent of responsibility to pay such premiums.

## VI.  Ownership of Expirations

A.  The use and control of expirations and the records thereof, including insurance which was submitted by the Agent pursuant to the Company billing procedures, shall be Agent's property and left in the Agent's undisputed possession provided that the Agent has paid and continues to pay to the Company any and all premiums due in accordance with this Agreement.

B.  In the event that the Agent fails to pay the Company any and all premiums due in accordance with this Agreement, the use and control of all expirations, and all right, title, and interest in and to the records thereof, including insurance which was submitted by Agent pursuant to the Company billing procedures, shall be vested in the Company.

C.  Any difference of opinion with respect to Agent's liability to Company shall not affect the ownership of expirations clause provided the Agent promptly furnished acceptable collateral security equal to the disputed amount, to be held by the Company until the difference is resolved. Company shall have the authority to utilize the collateral to the extent necessary to cover the indebtedness, interest, and expenses due the Company as finally resolved.

D.  The Company may, at its discretion, sell at private and public sale such expirations and records, and if sufficient money is not realized to fully discharge Agent's indebtedness to the Company, Agent shall remain liable for the balance of the money owned to the Company. Any amount realized by the Company is excess of the Agent's indebtedness, after deduction of the expenses of selling such expirations and records, shall be returned to the Agent.

E.  Notwithstanding anything to the contrary, nothing in this section shall interfere with the Company's obligation to renew polices containing contractual renewal guarantees or which must be renewed by order of governmental authority, and the Agent shall be entitled to receive commissions on such policies at the prevailing rate of commission then in effect, unless the Company is furnished with a written designation of another Agent signed by the insured.

## VII.   Indemnification

The Company shall defend and indemnify the Agent against liability, including reasonable cost of defense and settlements, imposed on it by law for damages caused by acts or omissions of the Company, provided the Agent has not caused or contributed to such liability by its own acts or omissions. The Agent agrees, as a condition to such indemnification, to notify the Company promptly of any claim or suit against it and to allow the Company to make such investigation, settlement or defense thereof as the Company deems prudent.

## VIII. Sale of Agency

A. This Agreement shall not be assigned by the Agent.

B. The Agent agrees to give at least 60 days advance written notice to the Company of any pledging or granting of a security interest in the business of its expirations. The Agent agrees to give notice when reasonably practicable with respect to substantial sale (i.e. change in ownership of more than 40%), transfer, merger or consolidation. Upon receipt of this notice the Company may at it's sole discretion:

1. Approve the assignment of this Agreement to the successor;

2. Execute new agreement with the successor; or

3. Terminate this Agreement as provided in the "Termination" section of this Agreement.

C. There shall not be any interruption in service to policyholders upon the sale or transfer of the Agent's business.

## IX. Termination/Suspension

A. Subject to requirements which may be imposed by law, this Agreement shall terminate:

1. Automatically if any public authority cancels or declines to renew the Agent's license or certificate of authority, or

2. Upon either party giving at least 90 days written notice in advance to the other; or

3. Immediately upon either party giving written notice to the other in the event of abandonment, fraud, insolvency or gross and willful misconduct on the part of such other party.

B. If the Agent is delinquent, in either accounting or payment of monies due the Company, the Company may, by notice to the Agent, immediately suspend or terminate the Agent's authority to: submit, issue, or bind any new or renewal business, or change any existing policy during the suspension or termination. This provision shall not apply to routine differences in accounting records of the Agent and the Company which are minor in amount and do not involve premiums collected and willfully withheld by the Agent.

C. The Company may at its discretion suspend rather than terminate this agreement for violation of the provisions of this Agreement. In the event of suspension the Company agrees to make every effort to work with the Agent on a mutually agreed upon plan of rehabilitation for a period of 90 days to one year depending on the reasons for suspension. Such plan will specify what the Agent must do to avoid termination and how the Company intends to assist the Agent to avoid termination.

D. In the event of termination of the Agreement:

1. The Agent's records, use and control of expirations, including direct billed business shall remain in the undisputed possession of the Agent, provided the Agent has then rendered and continues to render timely accounts and payments of all amounts due the Company, or provides security acceptable to the Company. Otherwise, the records, use, control and ownership of all expirations of business placed with the Company shall become vested in the Company.

2. The Company may retain all commissions, or any other funds which are or may become payable to the Agent, and apply same against the Agent's indebtedness to the Company.

3. If in disposing of such records and expirations the Company does not realize sufficient money to discharge in full the Agent's debt to the Company, the Agent shall remain liable for the balanced of such indebtedness. Fees and any other expenses incurred in the collection of premiums for these polices shall be added to me debt. Any amount realized in excess of the debt, less expenses of disposing of such records and expirations, shall be returned to the Agent.

4. Should it become necessary for the Company to institute legal action to enforce an arbitration award to achieve compliance with the arbitration provisions of the agreement, Agent agrees to pay all reasonable costs of such actions, including attorneys' fees and interest.

E. In the event this Agreement is terminated, the method of accounting will be automatically changed to Company statements and all future premium payments hall be paid no later than 45 days after the end of the account month for which the statement was prepared.

F. In the event of termination, the Company agrees to notify all direct bill policyholders of the Company's intents not to renew. This notice shall be forwarded directly the policy holder 30 days prior to renewal or such other time as required by law. The notice to the policyholder shall make no reference to the reasons for the termination of the Agreement. The Agent will receive a copy of the letter to be sent to all insureds.

## X. Changes in Agreement

A. This agreement may be revised at any time by mutual written agreement of the Agent and the Company.

B. Revisions of this Agreement and Commission schedule, unless otherwise mutually agreed to by the Company and the Agent, will be communicated to the Agent in writing by the Company representative 90 days in advance of the change.

## XI. Arbitration

In the event of any dispute arising out of or under this Agreement between the Agent and the Company, both agree to submit such dispute to arbitration, and the expenses will be borne equally by the Company and the Agent.

A.   There will be three arbitrators, one will be selected by the Company, one will be selected by the Agent and a third will be selected by those two arbitrators.

B.   The decision of the arbitrators will be final and binding on all parties hereto.

## XII.   Designation of Agent by Policyholder

If a conflict exists as to which Agent or Broker represents an existing or prospective policyholder with respect to any insurance matter subject to this Agreement, the policyholder's written statement designating his agent or broker shall control.

## XIII.   Conditions

A.   The provisions of this Agreement shall not apply to business administered by underwriting associations, syndicates, pools, plans, or other non-voluntary programs.

B.   The Agent shall not broadcast, publish or distribute advertisements or other matter referring to the Company or the Company's contract of insurance without first securing the Company's written approval.

C.   The Agent has no authority to admit liability on the part of the Company in any manner or make any payments on behalf of the Company, except in accordance with specific claim settlement authority extended to the Agent in writing.

D.   The Company will credit the Agent's experience records for subrogation and salvage recoveries received in computing the Agent's loss ratios.

E.   The Company shall not be responsible for any expenses incurred by the Agent, on his behalf or on behalf of the Company, unless specifically authorized by the Company in writing.

## XIV.   Effective Date and Term

This Agreement supersedes any and all previous Agreements, written or oral, and together with the attached Commission Schedule, represents the complete and exclusive Agreement between the Company and the Agent. This Agreement shall be effective on __12/23/97__ and shall continue in full force and effect until amended, terminated, or superseded.

or

shall be effective on _____ and shall remain in full force and effect to a term of (      ) months, unless earlier amended, terminated or superseded.

Witness: _____

Agent:  Leslie S. Ray
        Insurance Agency, Inc.

By: _____

Title: _____

Witness: _____

Company:    ☒  Acadia Insurance Company
            ☒  Berkley Regional Insurance Company
            ☒  Firemen's Insurance Company of
               Washington, D.C.

By: _____

Title:  President



Acadia Insurance

# First Amendment to Agency Agreement

Agent's name: Leslie S. Ray Insurance Agency, Inc.

Agent's address: 129 Dodge Street

Beverly, MA 01915

This First Amendment to Agency Agreement is made this 23rd day of December, 1997, by and between the Agent indicated above and the Company(ies) designated below.

- ☒ Acadia Insurance Company
- ☒ Berkley Regional Insurance Company
- ☒ Firemen's Insurance Company of Washington, D.C.

which Company(ies) shall be hereinafter referred to as the "Company."

The above designated parties agree to amend the Agency Agreement executed between the parties as of the 23rd day of December, 1997.

## I. Premium Accounting

Section V(B) of the Agency Agreement is amended to read as follows: "All premium balances due the Company shall be paid no later than forty-five (45) days after the end of the account month for which the statement was prepared, except that, with respect to policies written in the Commonwealth of Massachusetts, all premium balances due the company shall be paid no later than fifty (50) days after the end of the account month for which the statement was prepared."

## II. Miscellaneous

A. This First Amendment becomes effective immediately upon execution by both parties to this agreement.

B. This First Amendment contains the entire agreement between the parties with respect to the subject matter of this First Amendment.

C. In all other respects, the Agency Agreement previously identified is hereby ratified and confirmed and shall remain in full force and effect.

Witness:

Agent: Leslie S. Ray Insurance Agency, Inc.

By:

Title:

Witness: [signature]

Company:
- ☒ Acadia Insurance Company
- ☒ Berkley Regional Insurance Company
- ☒ Firemen's Insurance Company of Washington, D.C.

By: [signature: Richard A. Sawyer]

Title: President

# Profit Sharing Agreement

☒ Acadia Insurance Company
☒ Berkley Regional Insurance Company
☒ Firemen's Insurance Company of Washington, D.C.

Each of the Insurance Companies designated above, severally and hereinafter called the Company, provide this Profit Sharing Agreement based upon the profits of the business written and produced through the agency as shown by the Home Office records of the Company for each contingent period and during the time this agreement is in force; the first such period beginning on January 1, 1994 and ending on December 31, 1994 and each calendar year thereafter.

The Company agrees to pay the Agency a Profit Sharing Payout calculated by the Company in accordance with the formula set forth below and subject to the terms and conditions of this Agreement. This payout is in addition to any commissions payable pursuant to the Agency Agreement.

## Minimum Volume Requirement
Profit sharing payments shall not be payable to the Agency for any profit sharing year unless the Agency's Written Premiums for the year are at least TWO HUNDRED THOUSAND DOLLARS ($200,000); otherwise this agreement will be inoperative.

## Eligible Business
The provisions of this agreement do not pertain to premium production of Mass Marketing, all Retrospectively Rated Risks, Risks of Special Classes mutually agreed upon between Company and Agency, Excess and Surplus Lines, Auto Insurance Plans, Auto Reinsurance Facility Business, Workers' Compensation Plans or Pools or any other Pools, Associations or other involuntary business.

For the purpose of this agreement, the profit on the business produced by the Agency during the year under consideration shall be a combination of the business of all companies designated herein.

## Definitions
Profit Sharing Year means the calendar year for which the Company calculates the Agency as eligible for a profit commission, and/or growth bonus.

Written Premium means the insurance premiums recorded by the Company on the Agency's Eligible Business during the Profit Sharing Year less premiums returned as a result of cancellation or adjustment.

Commission Earned means the commission percentage shown on the producer results times the written premium also shown on the producer results report

Outgo means the sum of the following items:
1. Loss and Loss Expenses Incurred as defined below.
2. Commissions earned by the Agency.

Premiums Earned represent the actual premiums earned on the Agency's eligible business during the Profit Sharing Year as shown by the records of Company, less premiums charged off by the Company.

Profit Sharing Payout means the amount payable to Agency under this agreement as calculated pursuant to the formula set forth above.

Losses and Loss Expenses Incurred means the sum of:
1. losses and loss adjustment expenses paid during the Profit Sharing Year less any recoveries for salvage or subrogation realized by the Company during the Profit Sharing Year.
2. case reserves outstanding at the end of the Profit Sharing Year minus case reserves outstanding at the beginning of the Profit Sharing Year,
3. the reserves established by the Company for the development of known claims during the Profit Sharing Year,
4. the reserves established by the Company for loss adjustment expenses as established by the Company during the Profit Sharing Year. However, loss adjustment expenses are limited to a maximum of $100,000 for any one loss.

The profit sharing payout due the Agency under this agreement shall be determined by the following formula.

| Profit Sharing Year Income | |
|---|---|
| Premiums earned | $ _____ |
| Profit Sharing Year Outgo | |
| Losses & Loss Expense Incurred | $ _____ |
| Commissions Earned | $ _____ |
| Total OUTGO | $ _____ |

| Current Year Net Profit or Loss | |
|---|---|
| Premiums Earned Less Total Outgo | $ _____ |
| Profit Sharing % as per Table 1 | _____ % |
| Profit Sharing Amount Due Agency | $ _____ |
| Growth Bonus _____ % | $ _____ |
| Less Delinquency Charges _____ % | $ _____ |
| Net Profit Sharing Amount Due | $ _____ |
| Less Profit Sharing Guarantee _____ % | $ _____ |
| Profit Sharing Payout | $ _____ |

## Growth Bonus

If the agency has produced an annual growth in Written premiums of $50,000 or more (excluding mass marketing and retrospectively rated policies, special classes agreed upon between company and agency, excess and surplus lines, and all involuntary business and comparing the current years written premium to the previous year's written premiums), the Net Profit Sharing Amount due calculated above shall be multiplied by the Growth Bonus percentage displayed in Table 2.

In the event the business of two or more agencies is combined during the profit sharing year through sale, merger, consolidation or otherwise, the annual growth in Written Premium shall be calculated by comparing the current years written premium for the combined Agency with the previous year's Written Premium volume of the various separate Agencies.

## Stop Loss

Incurred losses shall be limited to the first $100,000 of a loss or losses as a result of a single event or any occurrence which causes a loss or a series of losses during the calendar year. This limitation applies only to an event or occurrence that occurs on or after the effective date of this agreement. If salvage recovery or adjustment of reserve on a loss in excess of the amount stated above reduces the loss below the loss limitation amount, a credit shall be allowed equal to the difference between the loss limitation amount and the loss as recorded on the Company's books at the end of the calendar year in which salvage was recovered or adjustment of reserve was made.

## General Provisions

If a Profit Sharing Plan Payout is due pursuant to this agreement, the Company will remit it to the Agent within 90 days after the end of the year if all premiums and other current indebtedness for the Profit Sharing Year have been paid. No charge or deduction for Profit Sharing payout shall be made or claimed by the Agency in his accounts, and is payable only by the Company check.

If the Agency is delinquent in the payment of any monies due the Company or in rendering an account current statement, any amount due the Agency under this Agreement will not be paid to the Agency. When the delinquency has been eliminated, payment of monies due the Agency under this Agreement will be adjusted to reflect any unreimbursed costs incurred by the Company in collecting any delinquent amounts. In addition, the Company may apply any monies due under this Agreement against any other amounts due Company by the Agency, including but not limited to, any costs of collection incurred by Company.

For each occasion that the Agency is delinquent in payment of any monies due Company during the Profit Sharing Agreement period, exceeding the credit terms as set in the Agency Agreement, the final Profit Sharing Amount Due the Agency will be reduced by 10%.

Minor differences between the Agency's and Company's records or an honest difference of opinion with respect to balances owed to the Company shall not constitute delinquency under this provision.

This agreement shall continue in force until terminated in writing by either party or by termination of the agency agreement. If terminated by the Company, the Company agrees to continue the benefits of this agreement through the full contingent period during which written notice of termination is given to the Agency. If terminated by the Agency, or if any public authority cancels or declines to renew the Agency's license or certificate of authority, the Company's obligation to compute a Profit Sharing Payout due or to pay such amount under this agreement ceases immediately.

In the event of a change in Agency ownership during the Profit Sharing Year, any Share Payout earned during that plan period shall be payable by the company to the Agency owner shown on the Company records at the close of that period. Unless otherwise agreed in writing, for the purpose of computing profit sharing, the purchaser receives credit for all the premiums and is charged with all the losses of the purchased Agency for that current year ending December 31.

Neither this agreement, nor any rights hereunder shall be assignable, but the agreement may be altered or amended by the Company by written instrument to that effect, any such revision to be effective on and after January 1 of the next contingent year.

The Agency will not be eligible for any payment pursuant to this agreement in any Profit Sharing Year unless the Agency has fully complied with the Agency Agreement and all other rules and regulations of the Company.

This Agreement is the complete and final agreement of the parties and it supersedes any other profit sharing agreement between the parties.



## Arbitration

In case of misunderstanding as to the interpretation or application of any provision of this agreement which the Company and the Agency are unable to resolve, the disagreement shall be submitted to arbitration at the request of either party in the following manner:

1. The party requesting arbitration shall so notify the other party in writing, and shall specify the question or questions to be arbitrated.

2. Within fifteen (15) days after receipt of such notification, the Company and the Agency shall each select an arbitrator and give the name and address thereof to the other.

3. The two arbitrators shall promptly select a competent and disinterested party as a third arbitrator.

4. The decision of any two of the three arbitrators so chosen shall be final and conclusive to both the Company and the Agency. The decision shall be in writing and a copy thereof given to both the Company and the Agency within sixty (60) days after the request for arbitration.

5. All arbitration expenses shall be borne equally by the Company and the Agency.

## Amendment

1. This agreement may be amended at any time by a written agreement signed by both parties.

2. The Company may amend this agreement at any time after giving the Agency thirty (30) days advance written notice of the proposed change.

In Witness Whereof, this Profit Sharing Agreement is signed

this        day of        ,19

Agency        Leslie S. Ray
              Insurance Agency, Inc.

For Agency

Company Representative    *Richard A. Sawyer*

Title        President

## Table 1

### Profit Sharing Percentage

| Written Premium* | | Net Profit Percentage | | | | |
|---|---|---|---|---|---|---|
| | | 20% to 25% | 25.1% to 30% | 30.1% to 35% | 35.1% to 40% | Over 40% |
| $50,000 to | $499,999 | 4% | 5% | 6% | 7% | 8% |
| $500,000 to | $749,999 | 5% | 6% | 7% | 8% | 9% |
| $750,000 to | $999,999 | 6% | 7% | 8% | 9% | 10% |
| $1,000,000 to | $1,499,999 | 8% | 9% | 10% | 11% | 12% |
| $1,500,000 to | $1,999,999 | 9% | 10% | 11% | 12% | 13% |
| Over $2,000,000 | | 10% | 10% | 12% | 13% | 14% |

*Include premiums from mass marketing and retrospectively rated risks.

## Table 2

### Premium Growth Bonus

| Growth in Voluntary Premium Written | Growth Multiplier |
|---|---|
| Less than $50,000 | 1.05 |
| $50,000 to $149,999 | 1.10 |
| $150,000 to $299,999 | 1.125 |
| $300,000 to $499,999 | 1.175 |
| Over $500,000 | 1.20 |

Case 1:05-cv-10863-WGY   Document 25-13   Filed 11/07/2005   **Acadia Insurance**

**Profit Sharing
Guarantee**

between Acadia Insurance Company
Leslie S. Ray
Agency Insurance Agency, Inc.
and the Companies listed on the Profit Sharing Plan

As of September 30 of each year, a computation shall be made under this agreement using September 30 as the end of the current year and disregarding for this computation, the Annual Minimum Volume Requirements. This computation will include the growth bonus.

If on this basis there is a Net Profit Sharing amount due the Agency, the Company guarantees to pay the Agency at least this amount, provided that it meets the Minimum Volume Requirements by the end of the year. Otherwise there shall be no guarantee by the Company hereunder.

In consideration for such guarantee, there will be a charge equivalent to fifteen percent (15%) of the Agency's Net Profit Sharing Amount including the growth bonus as of September 30.

As of the end of such year, the normal computation shall be made under this Profit Sharing Agreement. The Company shall then pay the Agency the greater of the amount guaranteed or the amount determined by the foregoing normal computation, in each case less the consideration owed by the Agency for the guarantee.

The Agency may terminate this Profit Sharing Guarantee by giving notice to the Company on or before August 31 of the year in which such termination is to be effective. Having elected to terminate the Profit Sharing Guarantee, however, it is understood that these Profit Sharing Guarantee provisions will not be reinstated for that profit sharing year. The Profit Sharing Guarantee may be reinstated for future profit sharing years if the Agency requests such reinstatement in writing prior to August 31 of that Profit Sharing Year.

In Witness Whereof, this addendum is signed this

_____ day of _____ ,19___

Leslie S. Ray
Agency Insurance Agency, Inc.

For Agency _____

Company Representative _Richard A. Sawyer_

Title        President

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

SUPERIOR COURT
CIVIL ACTION
NO.

* * * * * * * * * * * * * * * * * * * * * * *
                                           *
BEVERLY PORT MARINA, INC., and             *
LESLIE S. RAY INSURANCE                    *
AGENCY, INC.,                              *
       plaintiffs,                         *
                                           *
v.                                         *
                                           *
ACADIA INSURANCE COMPANY                   *
    defendant                              *
                                           *
* * * * * * * * * * * * * * * * * * * * * * *

## COMPLAINT OF THE PLAINTIFFS, BEVERLY PORT MARINA, INC. and LESLIE S. RAY INSURANCE AGENCY, INC. AGAINST THE DEFENDANT, ACADIA INSURANCE COMPANY

NOW COME the plaintiffs, Beverly Port Marina, Inc. and Leslie S. Ray Insurance

Agency, Inc., and set forth their Complaint against the defendant, Acadia Insurance

Company, as follows:

PARTIES

1.     The plaintiff, Beverly Port Marina, Inc. ("BPM"), is a corporation existing under

and by virtue of the laws of the Commonwealth of Massachusetts with a principal place of

business at 43 Water Street, Beverly, Essex County, Massachusetts.

2.      The plaintiff, Leslie S. Ray Insurance Agency, Inc. ("LRIA"), is a corporation existing under and by virtue of the laws of the Commonwealth of Massachusetts with a principal place of business at 129 Dodge Street, Beverly, Essex County, Massachusetts.

3.      The defendant, Acadia Insurance Company ("Acadia"), is authorized and licensed to transact the business of an insurance company in this Commonwealth.  Acadia is domiciled in the State of Maine and has a principal place of business at One Acadia Commons, Westbrook, Maine.

<u>VENUE</u>

4.      Venue is proper in this Court pursuant to Superior Court Admin. Dir. 03-1.

<u>FACTS</u>

5.      This action arises out of serious injuries, including but not limited to paraplegia, which were sustained by the Defendant, Carlos Johnson ("Johnson"), in waters off Boston Harbor on October 1, 2001.

6.      On or about October 30, 2001, Johnson filed suit against BPM in the Superior Court of Essex County, Massachusetts, Docket Number ESCV2001-02037, alleging , *inter alia*, that he was lawfully aboard and operating a vessel owned by BPM as a potential purchaser of the vessel and/or as an agent or employee of BPM at the time of the alleged injury.

7.      In or about May of 2000, Acadia issued a one-year renewable Marina Operator's Legal Liability Boat Dealer's Policy (Policy No. MOA 0061540-11) ("Policy") to BPM, through the Leslie S. Ray Insurance Agency, Inc. ("LRIA").  The Policy was renewed in May of 2001 for a period of one year.  The renewal policy was in effect at the time of

Johnson's accident on October 1, 2001. Insofar as LRIA obtained these policies for BPM at the request of BPM, LRIA owed a duty to BPM to use reasonable care in the performance of that agency.

8.     At all relevant times, prior to, during and after Johnson's accident, LRIA and Acadia were parties to an "Agency Agreement".

9.     Under the Agency Agreement, Acadia granted LRIA the authority to, "solicit, receive, bind, execute, and transmit proposals for insurance contracts (including bonds)" to and for Acadia.

10.    The Agency Agreement further provides that Acadia "will be responsible for preparation of all policies, endorsements, renewals, and collection of all direct bill premiums."

11.    The Agency Agreement further provides that Acadia "shall defend and indemnify [LRIA] against liability, including reasonable cost of defense and settlements, imposed on it by law for damages caused by acts or omissions of [Acadia], provided [LRIA] has not caused or contributed to such liability by its own acts or omissions."

12.    At all relevant times, as the insured under a policy of insurance issued by Acadia and procured through LRIA, BPM was a third-party beneficiary of the Agency Agreement. As an insured which purchased Acadia insurance from an Acadia agent, BPM had a rightful and foreseeable expectation of Acadia performing its duties owed under the agency agreement. Further, it was reasonably foreseeable to Acadia that an insured such as BPM would be harmed by Acadia's failure to properly perform its obligations as the insurer under the Agency Agreement.

13.    On or about January 29, 2002, following the assertion of the Johnson claim against BPM, Acadia filed suit in the United States District Court for the District of Massachusetts ("federal case") seeking a declaration that it had "no duty to defend and/or indemnify [BPM] under [the Policy] in connection with claims of Johnson.."

14.    Prior to LRIA's appearance in the federal case, and before any significant discovery had been taken on the insurance issues (including the production of LRIA's and Acadia's underwriting files, and depositions of various LRIA employees), that court allowed, on or about July 25, 2003, Acadia's Motion for Summary Judgment, holding, based on the narrow issues raised up to that time, that coverage was not afforded by the written Acadia policy relative to the claims against BPM by Johnson.

15.    Post-summary judgment discovery (which Acadia participated in, notwithstanding the allowance of its summary judgment motion) reflected that at the time Acadia issued the Policy, it knew or should have known that BPM was significantly involved in the sale of boats to the public, and its business operations involved the test-driving of vessels by prospective buyers and that BPM required liability coverage relative to this exposure.

16.    Acadia was negligent, and/or negligently misunderstood the existence and availability of liability coverage to marinas like BPM relative to claims arising from accidents such as the one involving Johnson.

17.    Acadia made material misrepresentations to LRIA with regard to the existence and availability of liability coverage to marinas like BPM relative to claims arising from accidents such as the one involving Johnson.

18.    Acadia knew or reasonably should have known that LRIA and BPM would reasonably rely on Acadia's representations with regard to marina insurance and that LRIA and BPM would be harmed if Acadia misrepresented that required liability coverage did not exist when, in fact, it did exist.

19.    Acadia knew or reasonably should have known that LRIA and BPM would reasonably rely on Acadia's superior experience and expertise as an underwriter of marine insurance policies and that LRIA and BPM would be harmed if Acadia was negligent with respect to the availability or significance of certain marine coverages which were applicable to BPM's business operations.

20.    Acadia was negligent with respect to its underwriting of the BPM policy, its handling of the Johnson claim, and with respect to marina and marine insurance in general.

21.    On or about March 31, 2004, Johnson settled all his claims for seven hundred and fifty thousand dollars ($750,000.00).  Of that amount, three hundred and seventy five thousand dollars ($375,000.00) was paid by BPM and the remaining three hundred and seventy-five thousand dollars ($375,000.00) was paid on behalf of LRIA.  LRIA and BPM each incurred significant legal expenses in connection with the Johnson claims.   Prior to this settlement, Acadia was served with written notice of the proposed new claims against it, and was invited to participate in the Johnson settlement.   Acadia declined to do so.

22.    Acadia's negligence, breaches, misrepresentations, and other actionable conduct proximately caused BPM and LRIA to sustain damages, including (a) having to face uninsured exposures relative to the Johnson claim, (b) the respective loss payments made

to Johnson, and (c) significant legal fees and expenses incurred by BPM and LRIA in

connection with the various preceding actions.

## COUNT I
### BPM v. ACADIA
### Third Party Beneficiary - Contract

23.     The plaintiffs repeat and reaver the allegations set forth in paragraphs 1-22 as if

fully set forth herein.

24.     As the insured under a marine insurance policy issued by Acadia through its agent,

LRIA, BPM was a third party beneficiary of the promises and duties owed by Acadia to

LRIA. Acadia breached its Agency Agreement with LRIA by its actionable conduct

outlined above. That breach proximately caused BPM to sustain damages.

WHEREFORE, BPM prays that this Honorable Court enter Judgment in its favor

against Acadia for the full amount of BPM's damages, together with interest, costs, and

attorneys fees.

## COUNT II
### BPM v. ACADIA
### Third Party Beneficiary - Tort

25.     The plaintiffs repeat and reaver the allegations set forth in paragraphs 1-22 as if

fully set forth herein.

26.     Acadia owed a duty to LRIA as its agent to use reasonable care in its

communications with and representations to LRIA with regard to the nature and scope of

available marine insurance, to underwrite the BPM risk with reasonable care, and to

process and handle claims arising under the BPM policy with reasonable care.

27.    As the insured under a marine insurance policy issued by Acadia through its agent,

LRIA, BPM was a third party beneficiary of the tort-based duties owed by Acadia to

LRIA. Acadia breached these duties by its actionable conduct outlined above. Such

breaches proximately caused BPM to sustain damages.

WHEREFORE, BPM prays that this Honorable Court enter Judgment in its favor

against Acadia for the full amount of BPM's damages, together with interest, costs, and

attorneys fees.

<div align="center">

**COUNT III**
BPM v. ACADIA
<u>Negligence</u>

</div>

28.    The plaintiffs repeat and reaver the allegations set forth in paragraphs 1-22 as if

fully set forth herein.

29.    Acadia owed a duty to BPM as the insured to use reasonable care in its

communications with and representations to BPM and/or its agents with regard to the

nature and scope of available marine insurance, to underwrite the BPM risk with

reasonable care, and to process and handle claims arising under the BPM policy with

reasonable care.

30.    Acadia breached its duties owed to BPM by its actionable conduct outlined above.

Such breaches proximately caused BPM to sustain damages.

WHEREFORE, BPM prays that this Honorable Court enter Judgment in its favor

against Acadia for the full amount of BPM's damages, together with interest, costs, and

attorneys fees.

## COUNT IV
### BPM v. ACADIA
Implied Covenant of Good Faith and Fair Dealing

31.    The parties repeat and reaver the allegations set forth in paragraphs 1-22 as if fully set forth herein.

32.    As the insurer which issued the referenced marine liability insurance policy to BPM, Acadia owed a duty of good faith and fair dealing to BPM incidental to the rights and responsibilities spelled out in the written contract.  This duty included but was not limited to the duty of acting as a reasonable and prudent insurer of marine insurance policies, of using reasonable care in its communications with and representations to BPM and/or its agents with regard to the nature and scope of available marina insurance, to underwrite the BPM risk with reasonable care, and to process and handle claims arising under the BPM policy with reasonable care.

33.    Acadia breached its duties owed to BPM by its actionable conduct outlined above. Such breaches proximately caused BPM to sustain damages.

WHEREFORE, BPM prays that this Honorable Court enter Judgment in its favor against Acadia for the full amount of BPM's damages, together with interest, costs, and attorneys fees.

## COUNT V
### BPM v. ACADIA
Negligent Misrepresentation

34.    The plaintiffs repeat and reaver the allegations set forth in paragraphs 1-22 as if fully set forth herein.

35.    Acadia negligently misrepresented the nature and scope of available marina

insurance to BPM, its agents, servants, and/or employees.  Such misrepresentations include

but are not limited to the misrepresentation that liability insurance did not exist and was

not available in the market to cover claims such as the Johnson claim.  BPM reasonably

relied on the misrepresentations of Acadia, to its detriment, and BPM sustained damages as

a result.

WHEREFORE, BPM prays that this Honorable Court enter Judgment in its favor

against Acadia for the full amount of BPM's damages, together with interest, costs, and

attorneys fees.

## COUNT VI
### BPM v. ACADIA
Intentional Misrepresentation

36.    The plaintiffs repeat and reaver the allegations set forth in paragraphs 1-22 as if

fully set forth herein.

37.    Acadia intentionally misrepresented the nature and scope of available marina

insurance to BPM, its agents, servants, and/or employees.  Such misrepresentations include

but are not limited to the misrepresentation that liability insurance did not exist and was

not available in the market to cover claims such as the Johnson claim.  Acadia made such

misrepresentations in order to keep the BPM account and premium dollars, and to prevent

BPM from purchasing insurance through other insurers which did offer the required

coverage.  BPM reasonably relied on the misrepresentations of Acadia, to its detriment,

and BPM sustained damages as a result.

WHEREFORE, BPM prays that this Honorable Court enter Judgment in its favor against Acadia for the full amount of BPM's damages, together with interest, costs, and attorneys fees.

### COUNT VII
### BPM v. ACADIA
### Chapter 93A §§ 2 and 11

38.    The plaintiffs repeat and reaver the allegations set forth in paragraphs 1-37 as if fully set forth herein.

39.    By virtue of the foregoing actionable conduct, actions, inactions, errors, and omissions, Acadia violated Chapter 93A §2, and BPM sustained damages as a result.

40.    By virtue of the foregoing conduct, Acadia also violated G.L. c. 176D §3, including but not limited to the following subsections thereof: (1) - pertaining to misrepresentations as to the benefits, advantages, conditions, terms, nature, or effect of the insurance policy and/or the type of insurance at issue; (2) - pertaining to false information and advertising generally; (5) - pertaining to knowing false statements and entries of material fact in any book, report, or statement of any person, or knowingly omitting to make a true entry of material fact; (9) - relative to unfair claim settlement practices, including but not limited to (a) misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue, (d) refusing to pay claims without conducting a reasonable investigation based upon all available information; (11) - relative to misrepresentations in regard to insurance applications for the purpose of obtaining money or other benefit.

41.    BPM hereby asserts a claim against Acadia to recover its damages caused by all of the foregoing conduct, pursuant to G.L.c. 93A §11.

WHEREFORE, BPM prays that this Honorable Court enter Judgment in its favor against Acadia for the full amount of BPM's actual damages, together with interest, costs, attorneys fees, and an award of double or treble damages pursuant to §§ 2 and 11 of Chapter 93A.

## COUNT VIII
### LRIA v. ACADIA
<u>Breach of Contract</u>

42.    The plaintiffs repeat and reaver the allegations set forth in paragraphs 1-22 as if fully set forth herein.

43.    Acadia breached its Agency Agreement with LRIA by its actionable conduct outlined above.  That breach proximately caused LRIA to sustain damages.

WHEREFORE, LRIA prays that this Honorable Court enter Judgment in its favor against Acadia for the full amount of LRIA's damages, together with interest, costs, and attorneys fees.

## COUNT IX
### LRIA v. ACADIA
<u>Negligence</u>

44.    The plaintiffs repeat and reaver the allegations set forth in paragraphs 1-22 as if fully set forth herein.

45.    Acadia owed a duty to LRIA as its agent to use reasonable care in its role as underwriter of marine insurance policies, in its communications with and representations to LRIA with regard to the nature and scope of available marine insurance, to underwrite the BPM risk with reasonable care, and to process and handle claims arising under the BPM policy with reasonable care.

46.    Acadia breached these duties and such breaches proximately caused LRIA to sustain damages.

WHEREFORE, LRIA prays that this Honorable Court enter Judgment in its favor against Acadia for the full amount of LRIA's damages, together with interest, costs, and attorneys fees.

## COUNT X
### LRIA v. ACADIA
### Implied Covenant of Good Faith and Fair Dealing

47.    The plaintiffs repeat and reaver the allegations set forth in paragraphs 1-22 as if fully set forth herein.

48.    By virtue of its contractual relationship with LRIA, Acadia owed a duty of good faith and fair dealing to LRIA incidental to the rights and responsibilities spelled out in the Agency Agreement. This duty included but was not limited to the duty of using reasonable care in its role as underwriter of marine insurance policies, in its communications with and representations to LRIA with regard to the nature and scope of available marina insurance, to underwrite the BPM risk with reasonable care, and to process and handle claims arising under the BPM policy with reasonable care.

49.    Acadia breached its duties owed to LRIA by its actionable conduct outlined above. Such breaches proximately caused LRIA to sustain damages.

WHEREFORE, LRIA prays that this Honorable Court enter Judgment in its favor against Acadia for the full amount of LRIA's damages, together with interest, costs, and attorneys fees.

## COUNT XI
### LRIA v. ACADIA
#### Negligent Misrepresentation

50.    The plaintiffs repeat and reaver the allegations set forth in paragraphs 1-22 as if

fully set forth herein.

51.    Acadia negligently misrepresented the nature and scope of available marina

insurance to LRIA.   Such misrepresentations include but are not limited to the

misrepresentation that liability insurance did not exist and was not available in the market

to cover claims such as the Johnson claim.  Furthermore, Acadia knew or should have

known that such misrepresentation would keep LRIA from placing the BPM account with

another insurer providing the required coverage.  LRIA reasonably relied on the

misrepresentations of Acadia, to its detriment, and LRIA sustained damages as a result.

       WHEREFORE, LRIA prays that this Honorable Court enter Judgment in its favor

against Acadia for the full amount of LRIA's damages, together with interest, costs, and

attorneys fees.

## COUNT XII
### LRIA v. ACADIA
#### Intentional Misrepresentation

52.    The plaintiffs repeat and reaver the allegations set forth in paragraphs 1-22 as if

fully set forth herein.

53.    Acadia intentionally misrepresented the nature and scope of available marina

insurance to LRIA.  Such misrepresentations include but are not limited to the

misrepresentation that liability insurance did not exist and was not available in the market

to cover claims such as the Johnson claim.  Acadia made such misrepresentations in order

to keep the BPM account and premium dollars, and to prevent BPM from purchasing insurance through other insurers which did offer the required coverage. LRIA reasonably relied on the misrepresentations of Acadia, to its detriment, and LRIA sustained damages as a result.

WHEREFORE, LRIA prays that this Honorable Court enter Judgment in its favor against Acadia for the full amount of LRIA's damages, together with interest, costs, and attorneys fees.

### COUNT XIII
### LRIA v. ACADIA
### Chapter 93A §§ 2 and 11

54.    The plaintiffs repeat and reaver the allegations set forth in paragraphs 1-53 as if fully set forth herein.

55.    By virtue of the foregoing actionable conduct, actions, inactions, errors, and omissions, Acadia violated Chapter 93A §2, and LRIA sustained damages as a result.

56.    By virtue of the foregoing conduct, Acadia also violated G.L. c. 176D §3, including but not limited to subsections: (1) thereof, pertaining to misrepresentations as to the benefits, advantages, conditions, terms, nature, or effect of the insurance policy and/or the type of insurance at issue; (2) thereof, pertaining to false information and advertising generally; (5) thereof, pertaining to knowing false statements and entries of material fact in any book, report, or statement of any person, or knowingly omitting to make a true entry of material fact; (9) thereof, relative to unfair claim settlement practices, including but not limited to (a) misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue, (d) refusing to pay claims without conducting a reasonable investigation

based upon all available information; (11) thereof, relative to misrepresentations in regard to insurance applications for the purpose of obtaining money or other benefit.

57.    LRIA hereby asserts a claim against Acadia to recover its damages caused by all of the foregoing conduct, pursuant to G.L.c. 93A §11.

WHEREFORE, LRIA prays that this Honorable Court enter Judgment in its favor against Acadia for the full amount of LRIA's actual damages, together with interest, costs, attorneys fees, and an award of double or treble damages pursuant to §§ 2 and 11 of Chapter 93A.

JURY DEMAND:    The plaintiffs demand trial by jury on all counts so triable.

BEVERLY PORT MARINA, INC. and
LESLIE S. RAY INSURANCE AGENCY,
INC.
By its attorneys:

William D. Chapman, BBO# 551261
Stephen D. Eldridge, BBO# 651855
Melick, Porter & Shea, LLP
28 State Street
Boston MA 02109
(617) 523-6200

Date: 3/24/05

EXHIBIT

A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 01-CV-

ACACIA INSURANCE )
COMPANY, )
               Plaintiff )
   v. )
                           )
BEVERLY PORT MARINA, INC. )
                           )
    and )
                           )
CARLOS JOHNSON, )
               Defendants )

### COMPLAINT FOR DECLARATORY JUDGMENT
### PURSUANT TO 28 U.S.C. § 2201, ET SEQ. AND F.R. CIV. P. 57

NOW COMES the Plaintiff, Acadia Insurance Company, by and through its

counsel, Tompkins, Clough, Hirshon & Langer, P.A., and Tucker, Heifetz & Saltzman, and

as and for its Complaint for Declaratory Judgment states as follows:

### JURISDICTION

1.     This is an action brought pursuant to the Court's admiralty jurisdiction,

28 U.S.C. § 1333, and is a matter within the meaning of Rule 9(h), F.R.Civ.P.

### VENUE

2.     Venue is properly laid in this Court pursuant to 28 U.S.C. §1391(b), in that

Defendant Beverly Port Marina, Inc. ("Beverly") is a Massachusetts corporation with its

principal place of business in Beverly, Massachusetts, and Defendant Carlos Johnson

("Johnson") is a resident of Danvers, Massachusetts.

## PARTIES

3.    Plaintiff Acadia Insurance Company ("Acadia") is, and at all times relevant this matter was, a corporation duly authorized to transact business in the Commonwealth of Massachusetts.

4.    Defendant Beverly is a corporation duly organized and existing pursuant to the laws of the Commonwealth of Massachusetts, with a principal place of business in the Town of Beverly, County of Essex and Commonwealth of Massachusetts.

5.    Defendant Johnson is a resident of the Town of Danvers, County of Essex and Commonwealth of Massachusetts.

## CLAIM FOR RELIEF

6.    This is an action brought pursuant to 28 U.S.C. § 2201, et seq., and Rule 57, F.R.Civ.P., in which Acadia seeks a declaration that it has no duty to defend and/or indemnify Beverly under certain insurance policies issued by Acadia to Beverly in connection with claims of Johnson as described below.

## COUNT I

7.    Acadia repeats and realleges its allegations contained in Paragraphs 1 through 6, above, with the same force and effect as if more fully set forth herein.

8.    Acadia issued to Beverly in May, 2000, a Marina Operator's Legal Liability Boat Dealer's Policy, renewed in May, 2001, by Policy No. MOA 0061540-11, for a policy period from May 22, 2001 to May 22, 2002. A copy of the policy is attached hereto as Exhibit "A".

9.    Johnson has instituted a civil action against Beverly for personal injuries allegedly resulting from an accident on or about October 1, 2001 while Johnson was allegedly in the employ of Beverly and aboard a vessel owned by Beverly.

2

10. Said civil action is currently pending in the Essex County Superior Court,

Docket No. 01-2037-B. A copy of the Complaint is attached hereto as Exhibit "B".

11. Beverly has demanded that Acadia defend and indemnify it in connection

with the said civil action.

12. Pursuant to the terms and conditions of the aforesaid policy of insurance,

Acadia is not obligated either to defend or indemnify Beverly in the said action.

WHEREFORE, Plaintiff, Acadia Insurance Company, prays for a judgment

declaring that Acadia is not obligated to defend and/or indemnify Beverly with respect to

any and all claims in the civil suit commenced by Johnson, and for such other and further

relief as this honorable Court deems just and proper.

## COUNT II

13. Acadia repeats and realleges its allegations contained in Paragraphs 1

through 12, above, with the same force and effect as if more fully set forth herein.

14. Acadia issued to Beverly in May, 2000, a commercial general liability

policy, renewed in May, 2001, by Policy No. CPA 0061462-11 for a policy period from

May 22, 2001 to May 22, 2002. A copy of the policy is attached hereto as Exhibit "C".

15. Pursuant to the terms and conditions of the aforesaid policy of insurance,

Acadia is not obligated either to defend or indemnify Beverly in the said action.

WHEREFORE, Plaintiff, Acadia Insurance Company, prays for a judgment

declaring that Acadia is not obligated to defend and/or indemnify Beverly with respect to

any and all claims in the civil suit commenced by Johnson, and for such other and further

relief as this honorable Court deems just and proper.

## COUNT III

16. Acadia repeats and realleges its allegations contained in Paragraphs 1

through 15 above with the same force and effect as if more fully set forth herein.

3

17.    Acadia issued to Beverly in May, 2000, a commercial umbrella policy, renewed in May, 2001, by policy No. CUA 0061463-11 for a policy period from May 22, 01 to May 22, 2002. A copy of the policy is attached hereto as Exhibit "D".

18.    Pursuant to the terms and conditions of the aforesaid policy of insurance, Acadia is not obligated either to defend or indemnify Beverly in the said action.

WHEREFORE, Plaintiff, Acadia Insurance Company, prays for a judgment declaring that Acadia is not obligated to defend and/or indemnify Beverly with respect to any and all claims in the civil suit commenced by Johnson, and for such other and further relief as this honorable Court deems just and proper.

DATED at Portland, Maine, this _2/st_ day of January, 2002.

ACADIA INSURANCE COMPANY

By its Counsel:

_Marshall J. Tinkle_
Marshall J. Tinkle, Esq.        BBO 565513

Tompkins, Clough, Hirshon
   & Langer, P. A.
Three Canal Plaza
P. O. Box 15060
Portland, ME 04112-5060
   207-874-6700

_James T. Scamby_
James T. Scamby, Esq.        BBO 629144

Tucker, Heifetz & Saltzman
Three School St.
Boston, MA 02108
   617-557-9696

ComplaintDeclJdgmt.doc

4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.
02-10153 WGY

ACADIA INSURANCE
COMPANY,
                    Plaintiff,

VS.

BEVERLY PORT MARINA, INC.
and
CARLOS JOHNSON,
                    Defendants.



EXHIBIT

B

DEFENDANT, BEVERLY PORT MARINA, INC.'S ANSWER
TO PLAINTIFF'S COMPLAINT FOR DECLARATORY JUDGMENT
PURSUANT TO 28 U.S.C. § 2201, ET SEQ. and F.R.CIV.P.57
and
COUNTERCLAIM FOR DECLARATORY JUDGMENT, BREACH
OF CONTRACT, AND FOR VIOLATION OF CHAPTERS 93A AND 176D
OF THE MASSACHUSETTS GENERAL LAWS

Now comes the defendant, Beverly Port Marina, Inc., in

the above entitled action, by and through its undersigned

counsel, Clinton & Muzyka, P.C., and submits its Answer to

Plaintiff's Complaint for Declaratory Judgment pursuant to 28

U.S.C. § 2201, et seq. and F.R.Civ.P.57 as follows:

JURISDICTION

1.    The defendant denies the allegations contained in

      Paragraph 1.

VENUE

2.    The defendant admits the allegations contained in

      Paragraph 2.

## PARTIES

3.  The defendant is without personal knowledge or
    information sufficient to form a belief as to the truth
    of the allegations contained in Paragraph 3 and
    therefore denies same.

4.  The defendant admits the allegations contained in
    Paragraph 4.

5.  The defendant is without personal knowledge or
    information sufficient to form a belief as to the truth
    of the allegations contained in Paragraph 5 and
    therefore denies same.

## CLAIM FOR RELIEF

6.  Paragraph 6 contains allegations of law and relief claim
    to which a response is not required, but to the extent
    that a response is required, the defendant denies all
    the allegations contained therein.

## COUNT I

7.  The defendant reiterates and reaffirms its answers to
    the allegations set forth in Paragraphs 1 through 6
    inclusive and incorporates same as if fully set forth
    herein.

8.  The defendant admits the allegations contained in
    Paragraph 8 to the extent that they exist.   The

defendant denies that Exhibit "A" is a complete copy of the referenced insurance policy.

9.  The defendant neither admits or denies the description of the civil action contained in Paragraph 9 and states that the Complaint which is attached as Exhibit "B" speaks for itself.

10. The defendant admits the allegations contained in Paragraph 10.

11. The defendant admits the allegations contained in Paragraph 11.

12. The defendant denies the allegations contained in Paragraph 12.

   **WHEREFORE**, Defendant, Beverly Port Marina, Inc., prays for a judgment declaring that Acadia Insurance Company is obligated to defend and indemnify Beverly Port Marina, Inc. with respect to all claims in the civil suit commenced by Carlos Johnson, and for such other and future relief this Honorable Court deems just and proper.

## COUNT II

13. The defendant reiterates and reaffirms its answers to the allegations set forth in Paragraphs 1 through 12 inclusive and incorporates same as if fully set forth herein.

4

14.  The defendant admits the allegations contained in
     Paragraph 14 to the extent that they exist.  The
     defendant denies that Exhibit "C" is a complete copy of
     the referenced insurance policy.

15.  The defendant is without personal knowledge or
     information sufficient to form a belief as to the truth
     of the allegations contained in Paragraph 15 and
     therefore denies same.

     **WHEREFORE,** Defendant, Beverly Port Marina, Inc., prays
for a judgment declaring that Acadia Insurance Company is
obligated to defend and indemnify Beverly Port Marina, Inc.
with respect to all claims in the civil suit commenced by
Carlos Johnson, and for such other and future relief this
Honorable Court deems just and proper.

                        COUNT III

16.  The defendant reiterates and reaffirms its answers to
     the allegations set forth in Paragraphs 1 through 15
     inclusive and incorporates same as if fully set forth
     herein.

17.  The defendant admits the allegations contained in
     Paragraph 17 to the extent that they exist.  The
     defendant denies that Exhibit "D" is a complete copy of
     the referenced insurance policy.

5

18.    The defendant is without personal knowledge or

information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 18 and

therefore denies same.

**WHEREFORE,** Defendant, Beverly Port Marina, Inc., prays

for a judgment declaring that Acadia Insurance Company is

obligated to defend and indemnify Beverly Port Marina, Inc.

with respect to all claims in the civil suit commenced by

Carlos Johnson, and for such other and future relief this

Honorable Court deems just and proper.

### AFFIRMATIVE DEFENSES

Now comes the defendant and incorporates the following

Affirmative Defenses into each Count of its Answer as more

fully appears below.

**AND FURTHER ANSWERING AND AS A COMPLETE AND SEPARATE**

**DEFENSE,** the defendant says that this action is premature.

**AND FURTHER ANSWERING AND AS A COMPLETE AND SEPARATE**

**DEFENSE,** the defendant says that Acadia is estopped from

prosecuting this Declaratory Judgment action based upon its

conduct and investigation activities.

**AND FURTHER ANSWERING AND AS A COMPLETE AND SEPARATE**

**DEFENSE,** the defendant says that Acadia has waived its right

to prosecute this Declaratory Judgment action based upon its

conduct and investigation activities.

AND FURTHER ANSWERING AND AS A COMPLETE AND SEPARATE DEFENSE, the defendant says that there exist factual disputes that need to be resolved prior to this determination and request for declaration by Acadia.

AND FURTHER ANSWERING AND AS A COMPLETE AND SEPARATE DEFENSE, the defendant says that the subject insurance policies issued by Acadia fail to define employee and are ambiguous on their face.

AND FURTHER ANSWERING AND AS A COMPLETE AND SEPARATE DEFENSE, the defendant says that it reserves the right to raise additional affirmative defenses as discovery progresses.

WHEREFORE, Defendant, Beverly Port Marina, Inc., prays for a judgment declaring that Acadia Insurance Company is obligated to defend and indemnify Beverly Port Marina, Inc. with respect to all claims in the civil suit commenced by Carlos Johnson, and for such other and future relief this Honorable Court deems just and proper.

## COUNTER-CLAIM

Now comes the defendant, Beverly Port Marina, Inc., in the above-entitled action, by and through its undersigned counsel, Clinton & Muzyka, P.C., and asserts its Counterclaim against the plaintiff, Acadia Insurance Company, as follows.

## PARTIES

1.   Beverly Port Marina, Inc. (hereinafter referred to as "Beverly Port") is a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts with a usual place of business at 43 Water Street, Beverly, MA. 01915.

2.   Acadia Insurance Company (hereinafter referred to as "Acadia"), upon information and belief, is a corporation duly organized and existing under law and authorized to transact business in the Commonwealth of Massachusetts with a usual place of business at One Acadia Commons, Westbrook, ME. 04098-5010.

## FACTS

3.   In May of 2000, Acadia issued a one-year renewable Marina Operator's Legal Liability Boat Dealer's Policy (Policy No. MOA 0061540-11).  The policy was renewed in May of 2001 and, at all material times herein, was in full force and effect.

4.   The section of the policy entitled "COVERAGE D – PROTECTION AND INDEMNITY MARINA OPERATORS AND BOAT DEALERS" provides:

"In consideration of the premium shown opposite Coverage D in the Declarations and with respect to only to property covered under the Boat Dealers, Marina Operators Legal Liability, or Owned Watercraft Sections of this policy:

8

    (a)   Which are being operated IN THE WATER by the
            Insured or by authorized employees of the Insured
            in conjunction with the normal conduct of business
            of a Boat Dealer or Marina Operator, or;
    (b)   Which may break away from moorings at covered
            premises;

the company agrees to pay on behalf of the Insured all
sums which the Insured shall become obligated to pay by
reason of liability imposed upon him for:

    (1)   Loss of life or Bodily Injury to any person;
    (2)   Loss of or damage to or expense in connection with
            any fixed or moveable object or property of
            whatsoever nature;
    (3)   Costs or expenses of, or incidental to, the removal
            of the Wreck of a covered vessel when such removal
            is compulsory by law;

5.   The specific exclusions that apply to the aforementioned

coverage state:

EXCLUDING, HOWEVER, LIABILITY FOR:

    (1)   Any claim arising with respect to any employee of
            the Insured.
    (2)   Any claim arising directly or indirectly under the
            Longshoremen's and Harborworker's Compensation Act
            or any worker's compensation act of any state or
            nation;
    (3)   Any loss, damages or expense which may be
            recoverable in whole or in part under any other
            Coverage Section.

6.   On or about October 30, 2001, Carlos Johnson commenced

an action in the Essex Superior Court alleging that, at

the time he sustained personal injuries, he was a Jones

Act seaman in the employ of the Beverly Port.  He has

also alleged, in the alternative, that he was lawfully

aboard and operating a Beverly Port vessel at the time
of his injury.

7. On November 15, 2001, Acadia issued a Reservation of
Rights letter to Beverly Port on the issue of coverage
for the action commenced by Carlos Johnson. Acadia
maintained therein that that there was no coverage for
the counts in the Complaint alleging seaman status i.e.
Jones Act negligence, Unseaworthiness and Maintenance &
Cure. Acadia also contended that, based upon its
investigation, Carlos Johnson was operating a vessel
owned by Beverly Port at the time of the incident and
that the coverage only applied to "property being
operated in the water by the Insured or an authorized
employee." Acadia agreed to provide a defense under a
Reservation of Rights because of the possibility that
the policy will afford coverage based upon the evidence
at trial. *A copy of the Reservation of Rights letter is
attached hereto as Exhibit "A".*

8. On November 29, 2001, Beverly Port, through its counsel,
requested a meeting with Mr. Patrick O'Toole, the Ocean
Marine Specialist handling this matter on behalf of
Acadia. The purpose of the meeting was to discuss the
coverage issue in general and in particular the vague
and ambiguous language of the policy exclusions.

9.   On November 30, 2002, Mr. O'Toole on behalf of Acadia refused to meet and discuss the coverage issue and indicated a preference to proceed with a Declaratory Judgment action.

## COUNT I
## Breach of Contract and Declaratory Judgment

10.   Beverly Port reiterates and alleges the allegations contained in Paragraph Nos. 1 through 9 inclusive and incorporates same by reference herein.

11.   This counter-claim is filed pursuant to 28 U.S.C. § 2201, et. seq. and Rule 57, F.R.Civ.P. in which Beverly Port seeks a declaration that Acadia has a duty to defend and to indemnify Beverly Port under the Marina Operator's Legal Liability policy issued by Acadia in connection with the claims of Carlos Johnson as described herein.  This counter-claim also seeks attorney's fees and costs for breach of contract by Acadia.

12.   The parties entered into a valid and enforceable contract for insurance in May of 2000.  The contract was renewed in May of 2001 and, at all material times herein, was in full force and effect.

13.   The contract requires Acadia to defend and indemnify Beverly Port for all sums which the Insured shall become

11

legally obligated to pay for personal injuries sustained by third parties.

14. There are no applicable exclusions or coverage limiting provisions which warrant denial of coverage concerning the Carlos Johnson claim.

15. Acadia has breached its contract by denying coverage, by instituting a Declaratory Judgment, by exposing its Insured to financial liability, and by causing its Insured to incur expenses in defending this Declaratory Judgment action.

16. As a result of Acadia's actions, Beverly Port was forced to engage counsel and defend and prosecute this Declaratory Judgment at its own expense.

**WHEREFORE**, the Counterclaim plaintiff, Beverly Port Marina, Inc., prays that this Honorable Court enter Judgment in its favor finding coverage under the policy and award it costs and reasonable attorney's fees for defending and proceeding forward with defense of this action.

## COUNT II
## Violation of Chapters 93A & 176D of the Massachusetts General Laws

17. Beverly Port reiterates and alleges the allegations contained in Paragraph Nos. 1 through 9 inclusive and incorporates same by reference herein.

12

18.  At all material times herein, Acadia was engaged in
     trade or commerce, specifically insuring risks in the
     Commonwealth of Massachusetts.

19.  Upon information and belief, Acadia has denied coverage
     under policies issued to Beverly Port and has issued a
     Reservation of Rights letter when coverage is clear for
     the Carlos Johnson claims of personal injury and where
     there is no applicable exclusion, which actions
     constitute an unfair or deceptive act or practice within
     the meaning of G.L.c. 93A and G.L.c. 176D.

20.  Upon information and belief, Acadia failed to conduct a
     thorough investigation into the factual circumstances
     and legal authority controlling policy coverage for the
     underlying action (i.e. Carlos Johnson's claim for
     personal injury) which constitutes an unfair or
     deceptive practice within the meaning of G.L.c. 93A and
     G.L.c. 176D.

21.  Upon information and belief, Acadia issued a policy of
     insurance to Beverly Port which misrepresented the class
     of insurance and the true nature of the coverage which
     constitutes an unfair or deceptive act or practice
     within the meaning of G.L.c. 93A and G.L.c. 176D.

22.  Upon information and belief, Acadia willfully and
     knowingly performed a coverage investigation without

identifying the nature of the investigation to Beverly

Port which constitutes an unfair or deceptive act or

practice within the meaning of G.L.c. 93A and G.L.c.

176D.

23. As a result of the above-described unfair or deceptive

acts or practices, Beverly Port has sustained injury,

including but not limited to, expenses incurred in

defending and proceeding forthwith with this action.

**WHEREFORE**, the Counterclaim plaintiff, Beverly Port

Marina, Inc., prays that this Court:

   (1)    enter Judgment in its favor against the
          plaintiff;

   (2)    award damages to it in an amount
          determined by the Court;

   (3)    treble such amount as provided by
          G.L.c.93A and G.L.c. 176D;

   (4)    award interest, costs and attorney fees in
          defending and proceeding forthwith with
          this action, and

   (5)    award such other relief as this Court
          deems just and proper.


   *The defendant counter-claimant demands trial by
jury on all issues and claims to which a trial by jury
is permitted.*

14

By its attorneys,

**CLINTON & MUZYKA, P.C.**

Thomas J. Muzyka
BBO NO. 365540
One Washington Mall
Suite 1400
Boston, MA 02108
(617) 723-9165

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by hand, mail, facsimile this _____



Acadia Insurance

November 15, 2001

Beverly Port Marina, Inc.
Attn: Sue and Frank Kinzie
43-67 Water Street
Beverly, MA 01915

**VIA FACSIMILE AT 978-332-3499 &**
**VIA FEDERAL EXPRESS - OVERNIGHT DELIVERY**

| | | |
|---|---|---|
| RE: | Our Insured: | Beverly Port Marina, Inc. |
| | Policy # | MOA 0061540-11 |
| | | CPA 0061462-11 & |
| | | CUA 0061463-11 |
| | Claimant: | Carlos Johnson |
| | Claim # | 5117185 |
| | Date of Loss: | 10/1/01 |

Dear Mr. and Ms. Kinzie:

Thank you for forwarding the summons and complaint recently filed by Carlos Johnson against Beverly Port Marina. We have reviewed the allegations in the complaint, and unfortunately, our position as to coverage remains unchanged.

The complaint does, however, make explicit the allegation that Mr. Johnson was an employee of Beverly Port Marina. In Count I, which seeks recovery under the Jones Act, Mr. Johnson alleges that on or about October 1, 2001, he "was in the employ of the defendant, Beverly Port Marina, Inc. as a seaman aboard the M/V UNNAMED." This allegation is incorporated by reference in the remaining four counts of the complaint. While this does not comport with our understanding of the facts of the case, we are obligated to consider the allegations as set forth in the complaint in determining whether Acadia has a duty to defend the Beverly Port Marina in this matter. We have therefore reviewed each of the above-referenced Acadia policies to determine whether there would be coverage, if the allegation of employee status were proven.

We also note that there is a seeming inconsistency within the complaint. The first three counts of the complaint (Jones Act Negligence, Unseaworthiness, and Maintenance and Cure) can be maintained only if Mr. Johnson was an employee of the Beverly Port Marina. Counts IV and V, on the other hand, are brought in negligence. Under Massachusetts' law, an employee may not sue his or her employer in negligence for

Acadia Insurance Companies
One Acadia Commons  P.O. Box 9010  Westbrook, Maine 04098-5010
207 772-4300  800 773-4300  Auto: 207 772-1170  800 870-1170  Fax: 207 772-6104
www.acadiainsurance.com

A Berkley Company

Exhibit "A"

work-related injuries. Although these counts incorporate by reference the allegation that Mr. Johnson was an employee of the Beverly Port Marina at the time of this incident, we have also reviewed the Acadia policies to determine whether there would be coverage if Mr. Johnson was *not* an employee. We will address each of these policies in order.

## Marina Operators Legal Liability and Boat Dealers Policy

We call your attention to the following language of the COVERAGE D – PROTECTION AND INDEMNITY section of this policy:

> In consideration of the premium shown opposite Coverage D in the Declarations, and with respect only to property covered under the Boat Dealers, Marina Operators Legal Liability, or Owned Watercraft Sections of this policy:
>
> (a)    Which are being operated IN THE WATER by the Insured or by authorized employees of the Insured in conjunction with the normal conduct of business of a Boat Dealer or Marina Operator; or
>
> (b)    Which may break away from moorings at covered premises;

This section further provides that:

> the Company agrees to pay on behalf of the Insured all sums which the Insured shall become obligated to pay by reason of liability imposed upon him for:
>
> (1)    Loss of Life or Bodily Injury to any person;
>
> (2)    Loss of or damage to or expense in connection with any fixed or moveable object or property of whatsoever nature;
>
> (3)    Costs or expenses of, or incidental to, the removal of the wreck of a covered vessel when such removal is compulsory by law;

EXCLUDING, HOWEVER, LIABILITY FOR:

> (1)    Any claim arising with respect to any employee of the Insured.
>
> (2)    Any claim arising directly or indirectly under the Longshoremen's and Harborworker's Compensation Act or any worker's compensation act of any state or nation...

It is Acadia's position that these Exclusions would operate to bar coverage under this Policy. If Mr. Johnson was acting as an employee of Beverly Port Marina, as alleged in the complaint, then the two exclusions referenced above would operate to bar coverage. If, on the other hand, Mr. Johnson was *not* acting as an employee, there would still be no coverage because of the particular facts of this case. Our understanding, which is consistent with the facts set forth in the complaint, is that Mr. Johnson was operating a vessel owned by the Beverly Port Marina at the time of the incident. As set forth above,

this coverage applies *only* with respect to covered property being operated in the water by the Insured or an authorized employee.

Mr. Johnson's claims, as set forth in Counts IV and V of his complaint, allege negligence on the part of the Beverly Port Marina. He claims that particular acts and omissions of the Marina were negligent, including its failure to ensure that he was properly instructed and supervised; failing to supervise him; and failing to ensure that he would not be placed in a dangerous situation. These specific claims, standing alone, do not alter our coverage position as set forth herein.

There is, however, a vague, broadly-worded claim in both Counts IV and V that the Beverly Port Marina was negligent "in other respects that will be shown at trial." Depending upon the factual basis for these claims, which is unknown at this time, there is at least the possibility that this policy may afford coverage. To that end, under a full reservation of rights, Acadia will furnish the Beverly Port Marina with a defense in this case. An explanation of this will be set forth in greater detail at the conclusion of this letter.

### Commercial General Liability Policy

The **SECTION I – COVERAGES, COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** portion of the policy reads, under **Exclusions**:

    d.    **Workers' Compensation And Similar Laws**

        Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

    e.    **Employer's Liability**

        "Bodily Injury" to:

        (1)    An "employee" of the insured arising out of and in the course of:

            (a)    Employment by the insured; or

            (b)    Performing duties related to the conduct of the insured's business; or

        (2)    The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

E.    Aircraft, Auto, Or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto," or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

This exclusion does not apply to:

(1)    A watercraft while ashore on premises you own or rent;

(2)    A watercraft that you do not own that is:

    (a)    Less than 26 feet long; and

    (b)    Not being used to carry persons or property for a charge;

(3)    Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4)    Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5)    "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Paragraph f. (2) or f. (3) of the definition of "mobile equipment."

This policy excludes coverage for Mr. Johnson's claims regardless of whether he is found to be an employee. As an employee, Exclusions (d) and (e) would operate to bar coverage for his claims. As a non-employee, Exclusion (g) would foreclose the possibility of coverage because his claims concern bodily injury arising out of the Beverly Port Marina's ownership, maintenance, use or entrustment to others of watercraft that it owns.

Commercial Umbrella Policy

The Umbrella Policy Exclusions state that this insurance does not apply to:

2.    Liability Imposed on the Insured

    a.    Under any workers compensation, unemployment compensation or disability benefits law, occupational disease or any similar law...

5.  Bodily injury or property damage arising out of the ownership, maintenance, use or entrustment to others of any watercraft owned or operated by or rented or loaned to any insured. Use includes operation and loading and unloading.

This exclusion does not apply to:

a.  A watercraft while ashore on premises you own or rent;

b.  A watercraft that you do not own that is:

(1)  Less than 50 feet long; and

(2)  Not being used to carry persons or property for charge;

c.  Bodily injury to any of your employees arising out of and in the course of their employment by you;

d.  The extent that you are obligated to pay damages by reason of the assumption of liability in an insured contract or agreement.

Finally, this policy contains an Employers' Liability Following Form Endorsement, which modifies the Commercial Umbrella Liability Coverage Part as follows:

Except to the extent coverage is provided in the "underlying policies" as listed in the Schedule of Underlying Insurances for the full limit shown, this insurance does not apply to "bodily injury," "personal injury," sickness, disease, disability or shock including death at any time resulting therefrom, and, if arising out of the foregoing, mental anguish or mental injury, sustained by:

1.  An employee of the insured arising out of and in the course of employment by the insured; or

2.  The spouse, child, parent, brother or sister of that employee as a consequence of 1. above.

Like the Commercial General Liability policy, this policy excludes coverage for Mr. Johnson's claims regardless of whether he is found to be an employee of Beverly Port Marina. If he is an employee, coverage for his claims is barred by Exclusion 2(a) and the Employers' Liability Following Form Endorsement. If he is not an employee, coverage for his claims is precluded by Exclusion 5.

We believe that the facts of this case will ultimately cause this claim to be excluded by the terms of the various policies. Because the plaintiff has, however, alleged general negligence against the Beverly Port Marina, it is possible – though not, in our view, probable – that some of the allegations in the lawsuit, if proven true, could result in a claim that would be covered under the Marina Operators Legal Liability and Boat Dealers Policy. It remains Acadia's position that if Mr. Johnson is found to have been an employee of Beverly Port Marina at the time of this incident, then none of the three policies provides coverage for his claims. It remains Acadia's position that regardless of his status as an employee or non-employee, there is no coverage for his claims available under either the Commercial General Liability or Commercial Umbrella policies.

To provide you, our insured, with the benefit of any doubt regarding interpretation of the complaint, and to protect both your rights and ours under the policy, we have decided to provide you with an interim defense of the suit, at our expense, despite the fact that we believe these claims to be excluded. This defense will be undertaken under a full and complete reservation of rights, including, but not limited to, the right to deny coverage for both defense and indemnity of the claim.

At the same time, however, because we believe the claims to be excluded, we intend to seek a judicial determination of the applicability of the Acadia policies to Mr. Johnson's claims. The method for seeking such a determination is through a judicial proceeding called a Declaratory Judgment action. Acadia will be initiating such an action shortly, and I, through counsel, will be handling the file for this coverage-related action. Our Marlborough, Massachusetts office will handle the claim for costs of defending Mr. Johnson's suit against you, under the Marina Operators Legal Liability and Boat Dealers Policy. Please direct any questions you may have related to the defense of the suit to the Massachusetts office.

To summarize, Acadia Insurance Company will assume the reasonable and necessary costs of defense of the lawsuit against you, under the Marina Operators Legal Liability and Boat Dealers Policy, with those costs to be paid and administered through our Massachusetts office. For the reasons cited above, however, and for each of the reasons set forth in our earlier correspondence of October 19 and October 25 of this year, Acadia Insurance Company reserves each and all of its rights under the policies, and under applicable law, including the right to deny coverage. Further, in order to determine the nature and extent of any possible coverage under the Acadia policies, we will be initiating a Declaratory Judgment action to request judicial review.

Please be advised that nothing set forth in this letter is to be construed as a waiver or relinquishment of any right or rights of the Acadia Insurance Company, its agents, servants, employees, or attorneys, whether specified within this letter or not, and no act or acts of the Acadia Insurance Company, its agents, servants, employees, or attorneys is to be so construed. Acadia expressly reserves the right to rely upon such additional policy terms, conditions, and exclusions as may be applicable.

Finally, please be advised that in issuing this response, Acadia has constrained itself to the information that you have provided, including the complaint. New or additional information could impact Acadia's decision in this matter, so I would ask you to provide such information to the extent that it exists. If new or different factual allegations arise, or if the Plaintiff files an amended complaint, we would want to review that information. Acadia expressly reserves the right to amend or supplement this response, or to issue a further response, based upon the discovery of new or additional information.

Thank you for the opportunity to review this claim. If you have any questions regarding the ongoing review of coverage issues, please give me a call. For questions regarding defense of Mr. Johnson's claim, please contact Greg Putnam in our Marlborough office, at 1-888-665-1170. Mr. Putnam is out until next Monday, and in his absence, Jim Coderre of that office has already contacted Mr. Johnson's attorney, David Smith, and received an extension to answer the complaint until December 8.

Sincerely,

Patrick O'Toole
Ocean Marine Specialist


cc:    Leslie Ray Insurance Agency

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 02-10153-WGY

ACADIA INSURANCE COMPANY,
    Plaintiff,

VS.

BEVERLY PORT MARINA, INC.
and
CARLOS JOHNSON,
    Defendants



EXHIBIT

C

AFFIDAVIT OF SUZANNE G. KINZIE

    I, Suzanne G. Kinzie, being duly sworn under oath
hereby depose and say as follows:

    1.    I am the President of Beverly Port Marina, Inc.

    2.    Beverly Port Marina, Inc. is a corporation which
provides marina services to the commercial and recreational
boating industry, including but not limited to, in-water
and shore storage, service and repairs to vessels, sales of
equipment and fuel, and sales of new and used vessels.

    3.    As part of the sale of new vessels, prospective
buyers are permitted to test drive vessels which Beverly
Port Marina, Inc. is authorized to sell.  Beverly Port
Marina, Inc. also exhibits vessels at boat shows, including
the In-Water Boston Boat Show held annually at the World
Trade Center in Boston, Massachusetts.  The boats are
delivered to and from the Boston In-Water Boat Show by sea.

2

4.    Carlos Johnson, a sailor and yacht owner, slip lessee at the Beverly Port Marina, Inc., and attendee of the 2001 Boat Show, viewed a number of boats at the Boat Show, including Beverly Port Marina, Inc.'s Monterey 298S Bowrider, which was being offered for sale.

5.    On October 1, 2001, Beverly Port Marina, Inc. was returning 17 boats from the 2001 In-Water Boston Boat Show by navigating the boats by sea from Boston to its facility in Beverly, Massachusetts.  Mr. Johnson telephoned to ask whether he could drive one of the Beverly Port Marina, Inc.'s boats to the marina after the show.  Since he appeared interested in the Monterey 298S Bowrider, he was authorized to drive it back to the marina as part of the flotilla of other Beverly Port Marina, Inc. boats.

6.    During the trip to Beverly, he allegedly sustained personal injuries onboard the boat.

7.    As President of Beverly Port Marina, Inc., I engaged the services of Leslie S. Ray Insurance Agency, Inc. to provide the necessary insurances to cover all of Beverly Port Marina, Inc.'s operations and property.

8.    When Beverly Port Marina, Inc. commenced selling vessels to customers, the insurance coverage was modified to include a Boat Dealers coverage.  At that time, I explained the activities involved in being a boat dealer to David Ray of Leslie S. Ray Insurance Agency, Inc. so that

3

he could determine the appropriate insurance coverage. This included liability for customers and vessels while at the marina, while being test driven by customers, and while at, to, or from boat shows within 250 miles of Beverly, Massachusetts.

9.    Upon explaining the marina's operation and practices, including allowing customers to test drive boats and the need to move boats to and from boat shows, Mr. David Ray advised that he was able to bind the coverage and to protect Beverly Port Marina, Inc. from potential risks of liability.

As a result, Leslie S. Ray Insurance Agency, Inc. forwarded policies of insurance to Beverly Port Marina, Inc. consisting of a Marina Operations Legal Liability and Boat Dealers Policy; a Commercial General Liability Policy; and a Commercial Umbrella Policy issued by Acadia Insurance Company for the period May 22, 2000 to May 22, 2001.  The same policies were renewed with Acadia Insurance Company for the period May 22, 2001 to May 22, 2002.

10.   As a result of representations made to me by Mr. David Ray, I understood Beverly Port Marina, Inc. was properly insured for personal injuries sustained by non-employee customers operating vessels owned by Beverly Port Marina, Inc. and held for sale.

4

11.    In the Civil Action entitled "Carlos Johnson v. Beverly Port Marina, Inc.", commenced in Essex Superior Court bearing Docket Number 01-2037-B, Mr. Johnson alleges that he is an employee of Beverly Port Marina, Inc.  As the defendant in that case, Beverly Port Marina, Inc. is contesting the status of employee since Mr. Johnson was not hired to transport the vessel, was not paid by Beverly Port Marina, Inc., and at no time was employed by Beverly Port Marina, Inc. for any purposes.  This litigation is still pending and I understand the status of Mr. Johnson's relationship with Beverly Port Marina, Inc. has not been determined.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 23rd DAY OF OCTOBER, 2002.

By:  _Suzanne G Kinzie_
     **Suzanne G. Kinzie**
     President - Beverly Port Marina Inc.


CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by hand/by mail/overnight mail/facsimile on 10/24/02

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ACADIA INSURANCE COMPANY,
      Plaintiff,

CIVIL ACTION
NO: 02-10153-WGY

VS.

BEVERLY PORT MARINA, INC. and
CARLOS JOHNSON,
      Defendants.



**EXHIBIT**

D

DEFENDANT, BEVERLY PORT MARINA, INC.'s, SUPPLEMENTAL
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY
JUDGMENT

Now comes the defendant, Beverly Port Marina, Inc.,
in the above-entitled action, by and through its
undersigned counsel, Clinton & Muzyka, P.C., and in
accordance with this Honorable Court's instruction
respectfully submits its Supplemental Memorandum of Law in
Support of its Motion for Summary Judgment.

I.    SATEMENT OF MATERIAL FACTS

    1.    The defendant is a corporation that provides
marina services to the commercial and
recreational boating industry including, but not
limited to, in-water and shore storage, service
and repairs to vessels, sales of equipment and
fuel, and sales of new and used vessels. ¶2 of
*Affidavit of Suzanne Kinzie attached hereto as
Exhibit A.*

    2.    As part of the sale of new vessels, prospective
buyers are permitted to test-drive the vessels
the defendant is authorized to sell. The
defendant also exhibits vessels at boat shows,

RECEIVED
DEC 27 2002

2

including the annual In-Water Boston Boat Show at the World Trade Center in Boston, Massachusetts. ¶3 *of Exhibit A.*

3.  Carlos Johnson, a sailor, yacht owner, slip lessee at the defendant's facility, and attendee of the In-Water Boat Show, viewed a number of vessels at the 2001 show including a Monterey 298S Bowrider, which the defendant was offering for sale. ¶4 *of Exhibit A.*

4.  On October 1, 2001, the defendant was returning 17 boats from the show by navigating them from Boston to its facility in Beverly, Massachusetts. Mr. Johnson telephoned the defendant and requested to drive one of the vessels to the marina following the show. Since he appeared interested in the Monterey 298S Bowrider, he was authorized by the defendant to drive it back to the marina as part of the flotilla of the defendant's other vessels. ¶5 *of Exhibit A.*

5.  During the return trip to the defendant's facility, Mr. Johnson allegedly sustained personal injuries onboard the vessel. ¶6 *of Exhibit A.*

6.  The defendant previously engaged the services of Leslie S. Ray Insurance Agency, Inc. to provide the necessary insurances to cover all of its operations and property. ¶7 *of Exhibit A.*

7.  When the defendant started selling vessels to customers, the insurance coverage was modified to include a Boat Dealers coverage. ¶8 *of Exhibit A.*

8.  At that time, the defendant's President explained the operations of a boat dealer to David Ray of Leslie S. Ray Insurance Agency, Inc. so that he could determine the necessary insurance. This included liability for customers and vessels while stored at the marina, and liability for customers test-driving the vessels for sale within 250 miles of the defendant's facility. ¶8 *of Exhibit A.*

3

9.  Upon explaining the marina's operation and practice of allowing prospective buyers to test-drive vessels offered for sale, the insurance agent advised that he would be able to bind the coverage and protect Beverly Port Marina, Inc. from potential risks of liability.  ¶9 of Exhibit A.

10.  By correspondence dated May 26, 2000, the insurance agent advised the defendant, in pertinent part, that the "Acadia Insurance Company contract provides liability coverage for boat operations and delivery of boats up to 250 miles from your premises."  ¶5 of *Second Affidavit of Thomas J. Muzyka attached hereto as Exhibit B*.

11.  The insurance agent forwarded a Marina Operators Legal Liability and Boat Dealers Policy, a Commercial General Liability Policy, and a Commercial Umbrella Policy all of which were issued by the plaintiff for the period May 22, 2000 to May 22, 2001.  These policies were subsequently renewed for a one-year period.  ¶9 *of Exhibit A*.

12.  The Commercial General Liability Policy provided coverage for personal injuries and property damage, as well as other coverages including personal and advertising injury.  The policy excluded coverage for personal injuries sustained by the insured's employees and also contained a watercraft exclusion.

13.  The Commercial Umbrella Policy essentially provided the same coverages as the Commercial General Liability Policy, and also contained a watercraft exclusion.

14.  In November 2000, the plaintiff issued a one-year Automobile Policy to the defendant. Between May 200 and the present, the plaintiff has collected approximately $83,000.00 in premiums.  ¶5 *of Exhibit B*.

15.  As a result of representations made the insurance agent, the defendant understood that

4

it was properly insured for personal injuries sustained by customers operating vessels that it offered for sale. ¶10 of Exhibit A.

## II.  ARGUMENT

The defendant submits that the MOLL policy should properly provide coverage for the personal injuries sustained by Carlos Johnson.

Coverage A of the MOLL policy provides coverage for *property damage* to third-party's vessels and property while in the defendant's care, custody and control.

Coverage B provides all risk coverage for *property damage* to the defendant's inventory offered for sale (i.e. vessels and marine supplies) including and during *vessel demonstrations, testing or delivery*.

Coverage C provides hull or *property damage* coverage for the defendant's listed vessels, including machinery and all other equipment onboard, for the operation and maintenance of the vessel.

Coverage D is the only section of the MOLL policy providing *liability protection* for damages sustained by third parties. This includes personal injuries.  The policy provides in pertinent part:

COVERAGE    In consideration of the premium shown opposite Coverage D in the Declarations and with respect only to property covered under the Boat Dealers, Marina Operators Legal Liability, or Owned Watercraft Sections of this policy:

5

    (a)   Which are being operated IN THE WATER by the Insured or by authorized employees of the Insured in conjunction with the normal conduct of business of a Boat Dealer or Marina Operator, or;

    (b)   Which may break away from moorings at covered premises;

the Company agrees to pay on behalf of the Insured all sums which the insured shall become obligated to pay by reason of liability imposed upon him for:

    (1)   Loss of Life or Bodily Injury to any person;

    (2)   Loss of or damage to or expense in connection with any fixed or moveable object or property of whatsoever nature;

    (3)   Costs of expenses of, or incidental to, the removal of the wreck of a covered vessel when such removal is compulsory by law;

**EXCLUSIONS**    EXCLUDING, HOWEVER, LIABILITY FOR:

    (1)   Any claim arising with respect to any employee of the Insured;

    (2)   Any claim arising directly or indirectly under the Longshoremen's and Harborworker's Compensation Act or any worker's compensation act of any state or nation;

    (3)   Any loss, damage or expense which may be recoverable in whole or in part under any other Coverage Section;

## A.   OBJECTIVELY REASONABLE INSURED

    The Supreme Judicial Court has held that an insurance policy should be construed in light of "what an objectively reasonable insured, in reading the relevant policy language, would expect to be covered." *Hakim v. Massachusetts Insurers' Insolvency Fund*, 424 Mass. 275,

6

282 ((1997), see also *Hazen Paper Co. v. United States Fidelity & Guar. Co.*, 407 Mass. 689 (1990) and *Ruggerio Ambulance Serv., Inc. v. National Garage Mut. Ins. Co.*, 430 Mass. 794 (2000).

An objectively reasonable insured reading the MOLL policy would not interpret Coverages A, B, and C to provide protection for personal injuries arising from marina operations.  Under Coverage A, there is a specific exclusion "for loss of Life, Bodily Injury, or Illness."

An objectively reasonable insured would also not interpret Coverages B and C to provide coverage for personal injuries arising from the marina operations because each section is limited to property damage or hull insurance.

However, an *objectively reasonable insured should interpret Coverage D to afford coverage for personal injuries arising from the operations identified in Coverage B*.  Coverage B provides for **property damage** coverage arising out vessel demonstrations, testing and delivery.  It does not contain a specific exclusion for personal injuries.  Because there is no exclusion in Coverage B, there is no prohibition against extending coverage for personal injuries arising out of vessel demonstrations, testing and delivery.

7

Coverage D specifically and intentionally provides for protection for liability risk, including personal injuries "to any person."  There is no specific exclusion contained in Coverage D for liabilities arising out of vessel demonstrations, testing and delivery.

Because there is a specific and intentional providing of liability coverage for personal injuries and because there is no specific exclusions, *an objectively reasonable insured would interpret Coverage D as providing coverage for the personal injury arising from the operations identified in Coverage B.*  The coverage provided in Coverage B in conjunction with the lack of exclusion in Coverage D, provides "internal documentary support for the insured's interpretation."  *Marston v. American Employers Ins. Co.*, 439 F.2d 1035 (1st Cir. 1971).

There is no dispute that the intent of the MOLL policy is to protect the defendant from vicarious liability.  There is no question that the defendant may be vicariously liable for the acts of its customers or agents.  Based upon an objectively reasonable interpretation of the policy provisions, coverage should be properly found for Mr. Johnson's injuries.  An objectively reasonable interpretation of the policy is consistent with the intent of the policy, to wit, to

8

provide coverage for situations where the defendant may be held vicariously liable.

B.    REASONABLE EXPECTATION DOCTRINE

The defendant further submits that, based upon the circumstances of this matter, a reasonable marina operator would expect coverage for Mr. Johnson's injuries.

Through Leslie S. Ray Insurance Company, the plaintiff issued a complete package policy for the defendant's business operations.  This consisted of four (4) policies.  The purpose of issuing a package policy, with the exception of Worker's Compensation which the plaintiff does not underwrite, was to properly *protect the insured against all liabilities arising from the operation of its business.*

Before the policies were issued, the plaintiff was fully aware that vessel demonstrations, testing and delivery were part of the overall operations of the assured marina.  This is demonstrated by the fact that Mrs. Kinzie described all of the Boat Dealer operations in which a customer would purchase a vessel to plaintiff's insurance agent.  The Yacht Dealers/Marina Operators Application[1] provided to the plaintiff confirms that the

---

[1] The defendant has attached hereto as Exhibit "C" a copy of the Yacht Dealers/Marina Operators Application.  This document is not in Beverly Port Marina, Inc.'s president's handwriting, nor in the documents

9

plaintiff was aware that vessel demonstrations were performed in the ordinary course of its business, and that customers would be onboard for those demonstrations.

The plaintiff issued CGL and Umbrella polices which provide for liability coverage arising from personal injuries.  These policies are, however, limited by specific watercraft exclusions.  The only policy addressing watercraft liabilities arising out of the operations of the marina, including vessel demonstrations, testing and delivery, is the MOLL policy.  It is not unreasonable for the defendant to expect that the only policy addressing watercraft related liability would provide coverage for the risks associated with its operations, including vessel demonstrations, testing and delivery.  This is a sound, logical business expectation when one package policy is provided for all the anticipated risks.

This is especially true given the fact that (1) Coverage B addresses the property risks associated with vessel demonstrations, testing and delivery, (2) Coverage D does not specifically exclude liabilities associated with vessel demonstrations, testing and delivery, and (3)

produced by Leslie S. Ray Insurance Agency, Inc.  It is unsigned and undated.  It is presumably a document authored by an employee of either Leslie S. Ray Insurance Agency, Inc., or Acadia Insurance Company.

10

the insurance agent represented that the policy included "liability coverage for boat operations." Based upon the totality of the circumstances, the defendant properly expected and relied to its detriment that there would be coverage for Mr. Johnson's injuries. See, *Davenport Peters Co. v. Royal Globe Ins. Co.*, 490 F.Supp. 286 (1980) citing *Marston v. American Employers Ins. Co.*, 439 F.2d 1035 (1st Cir. 1970) (recognizing the reasonable expectation doctrine).

## C.    DETRIMENTAL RELIANCE

The defendant further submits that the plaintiff is estopped from denying coverage because of the representations of its agent, Leslie S. Ray Insurance Agency. A licensed agent is considered a representative of an insurance company[2]. The agent's authority gives rise to a principal-agency relationship in which an insurance company can be held responsible for the actions of its agents. *New England Acceptance Corp., v. American Manufactures, Mutual Ins. Co.*, 4 Mass.App.Ct. 172 (1976). An insurance company is generally required to pay the claims of an insured and then move against the agent for

---

[2] The defendant has attached hereto as Exhibit "D" a copy of the Agency Agreement between Leslie S. Ray Insurance Agency, Inc. and Acadia Insurance Company.

11

indemnification. *Franchi v. Stella*, 42 Mass.App.Ct. 251 (1997).

Insurance agents are liable for failing to obtain insurance when they are requested to procure a particular type of policy and fail to obtain the appropriate coverage. *Rae v. Air-Speed, Inc.*, 386 Mass. 187 (1982). "When the insured makes an agreement with a broker calling for the purchase of particular coverage, the insured may reasonably rely on the broker's superior expertise and may assume that the broker has performed his duty." *Campione v. Wilson*, 422 Mass. 185, 195 (1996); see also *R.E. Levellee Woodworking, Inc. v. Costello*, 14 Mass.L.Rptr. 300 (2002).

In the case *sub judice*, the defendant advised the plaintiff's agent, Leslie S. Ray Insurance Agemcy, of the Boat Dealer risks associated with the selling of vessels, which included vessel demonstrations, testing and delivery. Shortly after obtaining this information, Mr. Ray represented that he would be able to bind the coverage and protect the defendant from the risks associated with the selling of Boat Dealer vessels. He later confirmed in writing that the MOLL policy he intended to secure "provides liability coverage for boat operations and delivery of boats up to 250 miles from your premises."

12

Based upon the plaintiff's agent's oral and then written representations concerning the "binding" of coverage, Beverly Port Marina, Inc. believed, to its detriment, that coverage for the potential risks associated with selling vessels was in place.

The defendant has submitted an Affidavit of its President, which satisfies the necessary elements of detrimental reliance[3]. The plaintiff has not offered any evidence to refute the allegations contained in that Affidavit. The defendant submits that, based upon the Affidavit and the defendant's previously submitted material facts that have not been rebutted, the plaintiff as a matter of law is estopped from denying coverage based upon the representations of its authorized agent.

## III. CONCLUSION

For the aforementioned reasons, the defendant respectfully requests that this Court find that the MOLL policy, under the present circumstances, provides coverage to the defendant for the injuries sustained by Mr. Johnson, that the defendant's insurance expectations are

---

[3] "The basis of an estoppel is a representation . . . intended to induce a course of action on the part of the person to whom the representation is made, and where, as a consequence, there is detriment to the person relying on the representation and taking the action." *Capozzi's Case*, 4 Mass.App.Ct. 342 (1976) quoting *DeSisto's Case*, 351 Mass. 348 (1966), *Cellucci v. Sun Oil Co.*, 2 Mass.App.Ct. 722 (1974).

13

reasonable, that the plaintiff is estopped from denying coverage, and that the defendant be required to provide a defense pursuant to the provisions of the MOLL policy.

In the alternative the defendant submits that, if there are insufficient facts to support a finding of coverage or material facts remain, then the parties should be permitted to conduct discovery.  The plaintiff has presented several Affidavits concerning the basis of its decisions (i.e. statements relied upon and its custom and practice in underwriting policies) in issuing the policies to the defendant.  The defendant should properly be allowed to cross-examine the Affiants before a determination is made concerning coverage.

Similarly, both parties have submitted correspondence from the insurance agent.  The plaintiff submitted the Yacht Dealers/Marina Operators Application and the defendant submitted a May 26, 2002 correspondence confirming the existence of liability coverage for the marina.  The parties should properly have an opportunity to depose the insurance agent, and any other person connected with the decision and issuance of the MOLL policy.  This is especially true in light of the representations made by both parties concerning the request for coverage.

14

**WHEREFORE**, the defendant, Beverly Port Marina, Inc.,
prays that this Honorable Court conclude that the MOLL
policy provides coverage for Mr. Johnson's injuries.  If
there are insufficient facts to conclude that coverage
exists, then the defendant prays that the parties be
allowed to properly conduct discovery.

By its attorneys,

**CLINTON & MUZYKA, P.C.**

Thomas J. Muzyka
BBO NO. 365540
Kenneth M. Chiarello
BBO NO 639274
One Washington Mall
Suite 1400
Boston, MA 02108
(617) 723-9165

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above
document was served upon the attorney of record
for each party by: hand  mail  overnight mail
facsimile  on _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

> **EXHIBIT**
>
> F

ACADIA INSURANCE COMPANY )
)
      Plaintiff, )
)
      v. )    CIVIL ACTION
)    NO. 02-10153-WGY
BEVERLY PORT MARINA, INC., )
)
and )
)
CARLOS JOHNSON )
)
      Defendants. )
)

## MEMORANDUM AND ORDER

YOUNG, C.J.                                July 25, 2003

    After consideration of the Supplemental Memoranda submitted by both parties, this Court holds that the doctrine of essential operations does not extend insurance coverage to the Beverly Port Marina, Inc. (the "Marina") for the personal injuries incurred by Carlos Johnson.  Accordingly, this Court ALLOWS Acadia Insurance Company's Motion for Summary Judgment [Docket No. 24] and DENIES the Marina's Motion for Summary Judgment [Docket No. 28].

    SO ORDERED.



WILLIAM G. YOUNG
CHIEF JUDGE



$5\mathscr{8}$



# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ACADIA INSURANCE COMPANY, )
  Plaintiff, )
   )   CIVIL ACTION
v. )   NO.: 02-CV-10153-WGY
   )
BEVERLY PORT MARINA, INC., )
  Defendant, )
and )
   )
CARLOS JOHNSON, )
  Defendant and Third-Party )
  Defendant. )
   )
v. )
   )
LESLIE S. RAY INSURANCE )
AGENCY, INC., )
  Third-Party Defendant. )

## THIRD-PARTY DEFENDANT, CARLOS JOHNSON'S COMPLAINT FOR DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. 2201, ET. SEQ. AND F.R.CIV.P. 57 AGAINST THIRD-PARTY DEFENDANT, LESLIE S. RAY INSURANCE AGENCY, INC.

NOW COMES the Third-Party Plaintiff, Carlos Johnson, by and through his Counsel and for his Complaint for Declaratory Judgment states as follows:

## PARTIES

1. The Plaintiff, Acadia Insurance Company (Acadia), has commenced a declaratory judgment action against Defendant Beverly Port Marina, Inc. (BPM) and Defendant/Third Party Plaintiff Carlos Johnson (Johnson). See Exhibit "1" attached hereto.

2. Defendant/Third Party Plaintiff Johnson is a resident of Danvers, Massachusetts.

thirdpartycomplaint.doc

3.   Defendant BPM is a Massachusetts corporation with a principal place of business located at Water Street, Beverly, Massachusetts.

4.   Leslie S. Ray Insurance Agency, Inc. (Ray) is a Massachusetts corporation with a principal place of business located at 129 Dodge Street, Beverly, Massachusetts.

<div align="center">JURISDICTION</div>

5.   This is an action brought pursuant to the Court's admiralty jurisdiction, 28 U.S.C. §1333, and is a matter within the meaning of Rule 9(h), F.R.Civ.P.

<div align="center">VENUE</div>

6.   Venue is properly laid in this Court pursuant to Rule 28 U.S.C. §1391(b), in that Third-Party Defendant is a Massachusetts corporation.

<div align="center">FACTS</div>

7.   BPM was provided with various insurance quotes by Ray from 1996 through to the May 2002.

8.   Ray bound various insurance coverage for BPM's benefits from 1996 through to the May of 2002.

9.   Ray informed BPM in May of 2000 that Acadia's insurance coverage provided liability coverage for boat operations and delivery up to 250 miles, including out of state, from BPM's only facility in Beverly, Massachusetts.

10.  As a result of Ray's representations, BPM selected the coverage offered by Acadia.

11.  Ray did not bind coverage for claims involving a Jones Act seamen, maintenance and cure, unseaworthiness, or any other marine employment based claims.

12.  Ray knew that BPM wanted to obtain proper insurance for the benefit of its employees.

13.    Ray knew that BPM wanted to be able to operate its vessels outside of the state of Massachusetts.

14.    Ray knew that BPM was engaged in selling boats at various boat shows to individuals from outside of Massachusetts.

15.    Ray is either an agent of BPM or Acadia.

16.    Johnson has filed suit in Superior Court of the Commonwealth of Massachusetts in an action captioned *Johnson v. Beverly Port Marina, Inc.*, Civil Action No.: 01-2037 (state court action). See Exhibit "B" of Exhibit "1" attached hereto.

17.    Johnson was an intended beneficiary of insurance policies that were issued or should have been issued to BPM.

<div align="center">COUNT I</div>

18.    Third-Party Plaintiff restates and realleges paragraphs 1 through 17 as if fully set forth herein.

19.    Ray had a duty to bind appropriate marine insurance coverage for the benefit of BPM's employees while said employees were operating vessels that were engaged in interstate commerce.

20.    Ray also had a duty to bind appropriate marine insurance coverage for the benefit of BPM for losses incurred while potential customers or other permissive users were operating BPM's vessels.

21.    Ray was negligent in that it breached its duty by failing to procure appropriate marine insurance to provide coverage for injuries sustained by a master or crew member of a vessel engaged in interstate commerce.

22.   Ray was also negligent in that it also breached its duty by failing to procure appropriate marine insurance to provide coverage for injuries sustained by a potential customer or other permissive users while operating a BPM vessel.

23.   As a result of Ray's negligence, Johnson has been harmed in that appropriate insurance coverage will not be available to satisfy any judgment or award for most if not all of his claims raised in the state court action.

WHEREFORE, Third-Party Plaintiff, Carlos Johnson, prays for a judgment declaring that in the event Acadia is found to be not obligated to defend and/or indemnify BPM with respect to any and all claims in the civil suit commenced by Johnson as Johnson is an intended beneficiary of said insurance, that Ray be declared to have negligently failed to procure appropriate insurance for BPM and as such must indemnify Beverly Port Marina, Inc. with respect to any and all claims in the civil suit commenced by Johnson, and for such other and further relief as this Honorable Court deems just and proper.

### COUNT II

24.   Third-Party Plaintiff restates and realleges paragraphs 1 through 23 as if fully set forth herein.

25.   Ray promised BPM that the insurance coverage supplied by Acaida provided insurance for all boat operations and delivery up to 250 miles, including out of state, from BPM's only facility in Beverly, Massachusetts.

26.   Ray breached that promise by failing to procure the appropriate marine insurance coverage.

27.   Johnson was an intended beneficiary of that Ray's promise.

thirdpartycomplaint.doc

28.    As a result of Ray's breach, Johnson, is harmed in that there will not be appropriate

insurance coverage to satisfy any judgment, award, for most if not all of his claims raised

in the state court action.

WHEREFORE, Third-Party Plaintiff, Carlos Johnson, prays for a judgment declaring that

in the event Acadia is found to be not obligated to defend and/or indemnify BPM with respect to

any and all claims in the civil suit commenced by Johnson, that Ray be declared to have

breached an implied promise to procure appropriate insurance for BPM and as such must

indemnify Beverly Port Marina, Inc. with respect to any and all claims in the civil suit

commenced by Johnson as Johnson is an intended beneficiary of said insurance, and for such

other and further relief as this Honorable Court deems just and proper.

Respectfully submitted
Carlos Johnson
By his attorneys

David S. Smith, Esq.
BBO# 634865
Cianciulli & Ouellette
163 Cabot Street
Beverly, MA 01915
(978) 922-9933

CERTIFICATE OF SERVICE

I, David S. Smith, attorney for the defendant herein caused the foregoing document to be served upon the
plaintiff's attorney, Leonard Langer, Esq. Tompkins, Clough, Hirshon & Langer, P.A. Three Canal Plaza, P.O. Box
15060 Portland, ME 04112-5060, BPM's attorney Thomas Muzyka Clinton & Muzyka One Washington Square
Mall Suite 1400 Boston, Massachusetts 02108-2603, Leslie S. Ray Insurance Agency, Inc. 129 Dodge Street,
Beverly, Massachusetts 01915 by regular mail, postage prepaid, this 25th day of April, 2003.

David S. Smith, Esq.

thirdpartycomplaint.doc

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
EXHIBIT
   G
```

| | |
|---|---|
| ACADIA INSURANCE COMPANY,<br>Plaintiff | )<br>)<br>) |
| v. | )<br>) |
| BEVERLY PORT MARINA, INC.,<br>Defendant | )<br>)<br>) |
| and | )<br>) |
| CARLOS JOHNSON,<br>Defendant and Third-Party<br>Plaintiff | )<br>)<br>)<br>) |
| v. | )<br>) |
| LESLIE RAY INSURANCE AGENCY,<br>Third-Party Defendant | )<br>) |

02-CV-10153 WGY

DEFENDANT/THIRD-PARTY PLAINTIFF BEVERLY PORT MARINA, INC.'S THIRD
PARTY COMPLAINT AGAINST LESLIE S. RAY INSURANCE AGENCY, INC.

Defendant/third-party plaintiff Beverly Port Marina, Inc. ("BPM") hereby asserts this

third-party complaint against Leslie S. Ray Insurance Agency, Inc. ("Ray") seeking a judgment

that Ray, an insurance agent, was <u>inter alia</u>, negligent, in that it obtained insurance for BPM that

was inadequate to cover claims made against BPM in a separate lawsuit pending against BPM.

PARTIES

1. BPM is a Massachusetts corporation with a principal place of business in Beverly,

Massachusetts.

2. Defendant Ray is a Massachusetts corporation with a principal place of business in

Beverly, Massachusetts.

## JURISDICTION AND VENUE

3. Jurisdiction is proper in this Court pursuant to the Court's admiralty jurisdiction, 28 U.S.C. §1333.

4. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b).

## FACTS

5. BPM owns and operates a marina located in Beverly, Massachusetts.

6. Ray is in the business of operating an insurance agency in Beverly, Massachusetts.

7. In the spring of 2000, BPM contacted Ray to determine if Ray was interested in and capable of handling the insurance for BPM's business and operations.

8. Ray, through its employees, agents and/or officers, represented to BPM that it was experienced in the field of obtaining insurance for marinas. Ray further represented to BPM that it could obtain insurance for BPM covering all of BPM's insurance needs.

9. In the spring of 2000, Ray obtained insurance for BPM through Acadia Insurance Company and others. Ray represented to BPM that the Acadia and other insurance policies would cover all of BPM's insurance needs and potential claims.

10. On October 1, 2001, Carlos Johnson was injured while transporting a BPM boat from a boat show back to the BPM facility.

11. Johnson has brought claims against BPM arising out of his injuries (the "Underlying Action"). The Underlying Action is currently pending in Essex Superior Court, C.A. No. 01-2037-B.

2

12. Before Johnson filed the Underlying Action, BPM notified Ray of Johnson's incident, and Ray placed BPM's various insurance carriers on notice of Johnson's potential claim.

13. Shortly thereafter, Acadia notified BPM that Acadia believed it had no obligation to defend or indemnify BPM in the Underlying Action. Nevertheless, Acadia undertook BPM's defense in the Underlying Action under a reservation of rights.

14. Subsequently, Acadia filed this action seeking a declaration from this court that it had no obligation to defend or indemnify BPM. After cross-motions for summary judgment were filed, the Court ruled that Acadia had no obligation to defend or indemnify BPM.

15. Shortly after the court issued its ruling, Acadia withdrew its defense of BPM in the Underlying Action and a related action. Thus, BPM is now left without any insurance coverage for the Underlying Action.

16. The failure of Ray to obtain sufficient insurance to cover BPM in the Underlying Action was both negligent and a breach of contract.

## COUNT I
## NEGLIGENCE/ERRORS AND OMISSIONS

17. The defendant/third party plaintiff repeats and realleges the allegations contained in paragraphs 1 through 16 of the complaint.

18. Defendant Ray was negligent by, without limitation, (a) misrepresenting its expertise, (b) failing to obtain insurance for BPM for all potential claims; and ©) failing to inform BPM that it was not covered for certain types of claims.

19. As a result of defendant Ray's negligence, BPM has been severely harmed.

3

COUNT II
BREACH OF CONTRACT

20.  The defendant/third party plaintiff repeats and realleges the allegations contained in paragraphs 1 through 19 of the complaint.

21.  Ray and BPM entered into a contract whereby Ray agreed to obtain appropriate insurance for BPM.

22.  Ray breached its contract with BPM by, without limitation, (a) misrepresenting its expertise, (b) failing to obtain insurance for BPM for all potential claims; and ©) failing to inform BPM that it was not covered for certain types of claims.

23.  As a result of Ray's breach of contract, BPM has been severely harmed.

WHEREFORE, third-party plaintiff Beverly Port Marina, Inc. hereby prays that this Court, after hearing,

1.  Award all damages BPM has suffered;

2.  Require Ray to pay to BPM all of BPM's damages, including, without limitation, its attorneys' fees and costs expended in the defense of the Underlying Action, as well as any payments BPM may make to Johnson, if any;

3.  Award BPM attorneys' fees, interest and costs; and

4.  Award such other relief as the Court deems just.

4

## JURY DEMAND

The defendant/third party plaintiff hereby demands a trial by jury on all issues so triable.

BEVERLY PORT MARINA, INC.,
By its attorneys,

Robert R. Pierce (BBO#549172)
Pierce & Mandell, P.C.
11 Beacon Street, Suite 800
Boston, MA 02108
(617) 720-2444

5

## CERTIFICATE OF SERVICE

I, Robert R. Pierce hereby certify that on this 17th day of September, 2003, I have served the foregoing Defendant Beverly Port Marina, Inc.'s Motion for Leave to File Third-Party Complaint, and proposed Third-Party Complaint, upon the following counsel of record by first class mail, postage prepaid:

William D. Chapman, Esq.
Melick, Porter & Shea, LLP
28 State Street
Boston, MA 02109-1775

Leonard W. Langer, Esq.
Tompkins, Clough Hishon & Langer, PA
Three Canal Plaza
PO Box 15060
Portland, ME 04112-5060

David S. Smith, Esq.
Cianciulli & Ouellette
163 Cabot Street
Beverly, MA 01915



Robert R. Pierce

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

ACADIA INSURANCE CO.

V.                                    CIVIL ACTION NO. 02-10153-WGY

BEVERLY PORT MARINA, INC., and
LESLIE RAY INSURANCE AGENCY

# F I N A L   J U D G M E N T

YOUNG, Ch. J                                    MARCH 23, 2005

AFTER HEARING THIS DATE, IT IS HEREBY ORDERED:

FINAL JUDGMENT IS HEREBY ENTERED IN FAVOR OF THE

PLAINTIFF, ACADIA INSURANCE COMPANY.

SO ORDERED.

WILLIAM G. YOUNG
CHIEF U. S. DISTRICT JUDGE

BY:

/s/ Mary   H. Johnson
Deputy Clerk