# Exhibit A

Page 1

```
 1
 2            UNITED STATES DISTRICT COURT
 3             DISTRICT OF MASSACHUSETTS
 4            Civil Action No. 05-CV-10883-WGY
 5
 6
 7   LESLIE S. RAY INSURANCE
 8   AGENCY, INC., and
 9   BEVERLY PORT MARINA, INC.,
10            Plaintiffs,
11        vs.
12   ACADIA INSURANCE COMPANY,
13            Defendant.
14
15
16        30(b)(6) DEPOSITION OF ACADIA INSURANCE
17   COMPANY (Charles Hamblen), taken pursuant to notice dated
18   October 17, 2005, at the offices of Tompkins, Clough,
19   Hirshon & Langer, P.A., Three Canal Plaza, Portland, Maine,
20   on October 27, 2005, commencing at 11:10 A.M., before Tammy
21   L. Martell, Registered Professional Reporter, a Notary
22   Public in and for the State of Maine.
23
24        Downing & Peters Reporting Associates
25     79 Atlantic Place, South Portland, Maine  04106
```

Page 2

```
 1   APPEARANCES:
 2   For the Plaintiffs:
 3        William D. Chapman, Esq.
 4   Melick, Porter & Shea, LLP, 28 State Street,
 5   Boston, Massachusetts 02109 - (617) 523-6200
 6
 7   For the Defendant:
 8        Leonard W. Langer, Esq.
 9   Tompkins, Clough, Hirshon & Langer, Three Canal Plaza,
10   P.O. Box 15060, Portland, Maine 04112-5060 - (207) 874-6700
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                     INDEX
 2                                  PAGE
 3   EXAMINATION BY MR. CHAPMAN                5
 4
 5
 6                   EXHIBITS
 7   NO.  DESCRIPTION                      PAGE
 8   1   Notice of Taking Deposition Of Acadia    4
 9       Insurance Company
10   2   Pages From Website              10
11   3   Agency Agreement               20
12   4   Binding Authority Document           35
13   5   Supplemental Interrogatory Answers      52
14   6   Acadia's Answers To Interrogatories     52
15
16
17
18        (The exhibits were retained by Mr. Chapman.)
19
20
21
22
23
24
25
```

Page 4

```
 1        CHARLES HAMBLEN, having been sworn by the Notary
 2   Public, was examined and deposed as follows:
 3        (Exhibit No. 1, Notice of Taking Deposition Of Acadia
 4   Insurance Company, marked for identification.)
 5        MR. LANGER:  Just for the record Acadia Insurance
 6   Company has received a 30(b)(6) notice of deposition,
 7   Mr. --
 8        MR. CHAPMAN:  And I have just -- I don't want to
 9   interrupt you, Len.
10        MR. LANGER:  Okay.
11        MR. CHAPMAN:  But I have taken the liberty of
12   marking that as Exhibit 1.
13        MR. LANGER:  Okay, fine.
14        MR. CHAPMAN:  And it sounds like you are going to
15   do what I was going to try to do to start with anyway so if
16   you want to make reference to that or if you got that --
17   yours looks a little different, though.  Is that the way it
18   comes over on the e-mail, different font maybe?  I am
19   assuming it is the same text.
20        MR. LANGER:  Yeah.  What has been marked as
21   Exhibit 1, which is the notice of taking deposition, Acadia
22   has designated Mr. Hamblen to testify with regard to
23   paragraph five of Schedule A which is the terms of the
24   agency agreement and the agency relationship between Leslie
25   Ray Insurance Agency and Acadia.
```

1 (Pages 1 to 4)

Page 13

1 particular department or person that's in charge of
2 maintaining the website?
3 A. I would guess our IT department does.
4 Q. Okay. And is the IT department located in Westbrook?
5 A. Yes, it is.
6 Q. Do -- do you know whether -- when the website is
7 updated or changed do you know if there is any place where
8 Acadia maintains copies of the different versions of the
9 website as it has been over time?
10 A. I don't know.
11 Q. And how many employees does Acadia Insurance Company
12 have currently?
13 A. Roughly 370.
14 Q. And roughly how many employees did it have back in the
15 '99 to 2000 time frame?
16 A. Probably close to 400.
17 Q. So it has been roughly the -- roughly the same size in
18 terms of employees from '99 to the present?
19     MR. LANGER: Objection to the form of the
20 question.
21 Q. You can still answer.
22 A. Yes.
23 Q. Okay. And as -- are you familiar with the
24 organizational structure of the company in terms of the
25 various underwriting departments and functions --

Page 14

1 underwriting functions of the company?
2     MR. LANGER: I am going to object. Bill, he is
3 here to talk about the agency agreement and the agency
4 relationship. That's what you asked, not the
5 organizational structure or the financial structure of the
6 company. He has given you his background and I think we
7 need to stay with the agency agreement, which is what he is
8 produced for.
9     MR. CHAPMAN: Sure, all right, I am just -- if
10 I -- I am going to ask questions about the organizational
11 structure of the company obviously insofar as it pertains
12 to the different underwriting departments that are involved
13 in this case. If you want me to defer that question to
14 Mr -- Mr. Wirth, I am happy to do that.
15     MR. LANGER: Again we have produced and will
16 produce people dealing with the various -- the 17
17 categories that you have asked about and they can answer
18 questions about those areas. I don't see any category
19 dealing with the general corporate makeup of Acadia or its
20 general financial structure --
21     MR. CHAPMAN: Well, I --
22     MR. LANGER: -- and therefore I am going to
23 object. I mean he is here to answer specific questions.
24     MR. CHAPMAN: I don't -- I don't want to ask
25 about the financial structure, but I do think that it is --

Page 15

1 it is reasonably within these categories and -- and just by
2 way of simple background to get the organization of the
3 different underwriting operations.
4     MR. LANGER: Well, I will let him answer some
5 basic questions but --
6     MR. CHAPMAN: That's -- and that's -- that's all
7 I have in mind at this point.
8     MR. LANGER: Yep.
9 Q. I am -- all I am trying to find out here is Acadia
10 underwrites different types of insurance coverage, correct?
11 A. Yes.
12 Q. Okay. For example commercial property and liability
13 would be one?
14 A. Very broad, but yes.
15 Q. Yeah, sure. And -- and all these questions are broad,
16 I am just trying to get an overview of -- of the different
17 types of insurance Acadia writes. Workers' compensation?
18 A. Yes.
19 Q. Okay. Umbrella liability?
20 A. Yes.
21 Q. The -- and there are certain specialty lines of
22 insurance that Acadia writes?
23 A. Yes.
24 Q. Okay. And one of those would be the type of insurance
25 that's at issue in this case which is marine -- marina

Page 16

1 operators legal liability, correct?
2 A. We call it ocean marine department specialty.
3 Q. Okay. All right. And -- and that's where I was
4 trying to take us. How many different -- the ocean marine
5 department is a department unto itself?
6 A. Yes.
7 Q. And how many different underwriting departments does
8 Acadia have?
9 A. We have really two specialty departments today, ocean
10 marine and inland marine.
11 Q. And are there other underwriting departments that deal
12 with the non specialty lines of insurance?
13 A. There are branches, we have six branches.
14 Q. Okay. And what are the six branches?
15 A. Located in Maine, New Hampshire, Vermont, Connecticut,
16 New York. Have I got six there?
17 Q. That's fine.
18 A. Maine, New Hampshire, Vermont, Connecticut, Mass.
19 Q. And are the underwriting departments broken down --
20 they are broken down by state rather than by category of
21 underwriting?
22 A. By state.
23 Q. Okay. So in other words your -- your Mass.
24 underwriting department deals with underwriting of whatever
25 type of coverage that's written out of the Mass. office,

4 (Pages 13 to 16)

Page 37

1  A.  Our current VP of commercial lines.
2  Q.  Which is who?
3  A.  Jane Gordon.
4  Q.  Now, does -- well, do you know if Acadia had
5  guidelines that specifically pertained to Marina Operators
6  Legal Liability and Boat Dealers coverage?
7  A.  I do not know.
8  Q.  Do you know if they do now?
9  A.  I do not know.
10  Q.  The person that would know that you would expect would
11  be someone involved with the underwriting of those
12  different types of coverage?
13  A.  Yes.
14  Q.  And do you know if Jane Gordon was also the person who
15  would have been responsible for sending guidelines to
16  Leslie Ray back in 99-2000 time frame?
17  A.  She was not with the company at that time.
18  Q.  So who would that person have been there?
19  A.  Gary Hall.
20  Q.  Right.  And when did Gary Hall -- when did he last
21  function as the VP of commercial lines?
22  A.  I believe he left the company two years ago.
23  Q.  Okay.  And it has been Jane Gordon since then?
24  A.  Yeah, I guess.
25  Q.  Now, was Leslie Ray authorized to bind all lines of

Page 38

1  insurance that Acadia wrote or just some?
2  A.  I am not sure, but pretty much any time we have -- we
3  appoint an agent they are given full authority for the
4  business we write.
5  Q.  And was Acadia writing -- and just to shorthand it
6  rather than saying Marina Operators Legal Liability and
7  Boat Dealers coverage I am just going to shorthand that to
8  say MOLL or -- M-O-L-L or MOLL/BD.  Was Acadia writing
9  MOLL/BD coverage back in 1997?
10      MR. LANGER:  What do you mean by BD again?
11      MR. CHAPMAN:  Boat dealers.
12  A.  We were writing ocean marine business at that time.
13  Everything under the ocean marine business I am not sure.
14  Q.  Okay.  So on that last answer if we look at the page
15  of Exhibit 2 entitled our products you see there is a
16  category on this page for ocean marine under the
17  specialty -- specialty lines of insurance?
18  A.  Mm-hmm.
19  Q.  Yes?
20  A.  Yes.
21      MR. LANGER:  Answer yes or no.
22      THE DEPONENT:  Yes.
23  Q.  And the three -- the four different bullet points
24  under that, namely yachts, marina operators legal
25  liability, boat dealers, parenthesis, inventory and vessel

Page 39

1  builders risk, those are different types of ocean marine
2  coverages that Acadia offers currently?
3  A.  Yes.
4  Q.  Okay.  And now that we have looked at this do you --
5  do you know whether those different types of coverage were
6  also being written in 1997?
7  A.  I do not know that.
8  Q.  What does -- what does this mean when it says
9  specialty lines?
10  A.  It is a internal name.  We have our branches which is
11  our typical broad insurance coverage and we have unique
12  coverages which we call specialty lines who write only
13  those specific types of risks.
14  Q.  Okay.  So a specialty line that's a type of coverage
15  that's a little more unusual than the general type of
16  coverage?
17      MR. LANGER:  Objection to the form of the
18  question.  You can answer it if you can.
19  A.  I think we try to hire expertise because it is a
20  unique coverage.
21  Q.  Okay.  For example out of the -- currently out of the
22  gross annual premium written by Acadia how much of it is
23  comprised of ocean marine coverage?
24      MR. LANGER:  Objection.  I am instructing him not
25  to answer.  I don't think that has any relevance to this

Page 40

1  case and it is proprietary information.
2      MR. CHAPMAN:  Well, I -- I -- I have a
3  significant problem with an instruction not to answer on
4  that, Len.  I can -- I can understand you wanting to object
5  for the record, but I have a -- a real problem with an
6  instruction not to answer on that.
7      MR. LANGER:  How is it relevant to this case?
8      MR. CHAPMAN:  It is -- it is certainly relevant
9  to this case because -- and I think I am entitled to
10  inquire in terms of how this type of coverage fits in with
11  the other types of coverage because of the fact that it is
12  a specialty line and -- and it goes to the -- the legal
13  duties we're alleging in this case.
14      MR. LANGER:  Well --
15      MR. CHAPMAN:  And it -- and, you know, I -- I
16  think an instruction not to answer on that question is
17  completely inappropriate.  If you want to say -- I
18  understand that Mr. Hamblen is here on the agency issue.
19  If -- if -- I mean I think if he knows the answer to that
20  or if he has a -- an estimation of it he should give it.
21  If -- if you want to defer that question to the -- someone
22  in the underwriting -- your underwriting witness I can
23  accept that, but I can't accept an instruction not to
24  answer.
25      MR. LANGER:  What was the question again?

10 (Pages 37 to 40)

Page 57

1  agents who are limited in terms of the lines of insurance
2  they can write?
3  A.  Yes, several.
4  Q.  Okay.  And -- and how does that -- does that
5  limitation become incorporated into the agency agreement?
6        MR. LANGER:  Again I am going to object.  I think
7  you are beyond the scope.  He has answered what Leslie
8  Ray's authority was.  What other agents can and can't do I
9  think is irrelevant.  If you can answer the question, you
10 can answer the question.
11 A.  I am not sure.
12 Q.  Okay.  And does Acadia -- does Acadia do anything to
13 verify that a -- an agent such as Leslie Ray has experience
14 and knowledge in the different lines of insurance that it
15 writes?
16 A.  I don't believe so.
17 Q.  Do you know if Acadia did anything before signing the
18 agency agreement to determine what experience or knowledge
19 Leslie Ray had with respect to MOLL or boat dealer
20 coverage?
21 A.  I don't know.
22 Q.  Do you have any reason to say that any inquiry like
23 that was made by Acadia to Leslie Ray?
24 A.  I don't know.
25 Q.  Do you know if Acadia has made any inquiry like that

Page 58

1  at any time to Leslie Ray?
2  A.  I don't know.
3  Q.  You have already testified that in connection with
4  signing up a Acadia agent the people who are typically
5  going to be involved in that are the -- someone from
6  marketing and someone at your level, correct?
7  A.  Typically.
8  Q.  Okay.  Would -- now, if -- is there any -- well,
9  strike that.
10       If you are signing up an agent like Leslie Ray
11 who is going to be authorized to write all the lines of
12 insurance including the ocean marine coverages does the
13 personal interaction part of the process ever involve
14 having anyone from ocean marine claims or underwriting
15 visit with the prospective agent?
16 A.  I suppose it could, I am not aware of that happening.
17 Q.  Okay.  That's not part of Acadia's practice?
18 A.  Not typically that I am aware of.
19 Q.  Right.  Well, are you aware of any specific occasions
20 where an ocean marine underwriter or claims person meets
21 with a prospective agent as part of the process of signing
22 up a new agent?
23 A.  I think in two cases we have agents who are ocean
24 marine specific only, at that point I would think the ocean
25 marine department would have met with them, but in other

Page 59

1  instances don't know.
2  Q.  So for an agent like Leslie Ray who was not ocean
3  marine specific the practice of Acadia would be to not have
4  an ocean marine underwriter conduct a personal visit?
5        MR. LANGER:  Objection, it has been asked and
6  answered.
7  Q.  Is that fair to say?
8        MR. LANGER:  I still object.  I think he said he
9  didn't know, but if that's not your answer go ahead.
10 A.  No, I -- I don't know.
11 Q.  Okay.  Do you have any particular experience in
12 dealing with the MOLL/BD coverages either from an
13 underwriting or claims perspective?
14 A.  No.
15 Q.  In connection with becoming an Acadia agent such as
16 Leslie Ray how does Acadia see to it that the agent becomes
17 familiar with the different coverages that Acadia offers?
18 A.  I don't know.
19 Q.  Who would know that?
20 A.  Underwriting.
21 Q.  So that's not part of -- typically part of the
22 original process of signing up an agent?
23 A.  No.
24 Q.  If I understand that correctly the way it would
25 typically work is in the case of like Leslie Ray's is the

Page 60

1  agent would do the application, you would go through the
2  original process as you have already testified to and then
3  once they became an agent they would then have an
4  opportunity to get information from whatever different
5  underwriting lines --
6  A.  Yes.
7  Q.  -- they were interested in, is that how it works?
8  A.  I am not exactly sure how it works, but we don't share
9  with them until we decide to appoint them at which time --
10 Q.  Okay.
11 A.  -- somebody would show them what the underwriting
12 process is.
13 Q.  And generally speaking what does -- we have already
14 established that generally the agents will send in
15 applications and try to write business for Acadia lines of
16 insurance, what -- what under an agency agreement does
17 Acadia do for the agent?
18       MR. LANGER:  I object to the form of the
19 question.  You can answer it if you understand it.
20 A.  Yeah, I am -- it is not clear.
21 Q.  In your own words what are Acadia's duties and
22 responsibilities to the agent under an agency agreement
23 like Exhibit 3?
24       MR. LANGER:  Objection, calls for a legal
25 conclusion.  To the extent you can answer other than as a

15 (Pages 57 to 60)

# Exhibit B

Page 1

```
 1
 2              UNITED STATES DISTRICT COURT
 3               DISTRICT OF MASSACHUSETTS
 4             Civil Action No.  05-CV-10883-WGY
 5
 6
 7   LESLIE S. RAY INSURANCE
 8   AGENCY, INC., and
 9   BEVERLY PORT MARINA, INC.,
10            Plaintiffs,
11        vs.
12   ACADIA INSURANCE COMPANY,
13            Defendant.
14
15
16          30(b)(6) DEPOSITION OF ACADIA INSURANCE
17   COMPANY (Theodore Wirth), taken pursuant to notice, at the
18   offices of Tompkins, Clough, Hirshon, Langer, P.A., Three
19   Canal Plaza, Portland, Maine, on October 31, 2005,
20   commencing at 11:08 A.M., before Tammy L. Martell,
21   Registered Professional Reporter, a Notary Public in and
22   for the State of Maine.
23
24          Downing & Peters Reporting Associates
25        79 Atlantic Place, South Portland, Maine  04106
```

Page 2

```
 1   APPEARANCES:
 2   For the Plaintiffs:
 3           William D. Chapman, Esq.
 4   Melick, Porter & Shea, LLP, 28 State Street,
 5   Boston, Massachusetts 02109 - (617) 523-6200
 6
 7   For the Defendant:
 8           Leonard W. Langer, Esq.
 9   Tompkins, Clough, Hirshon & Langer, Three Canal Plaza,
10   P.O. Box 15060, Portland, Maine 04112-5060 - (207) 874-6700
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

INDEX

```
                                          PAGE
EXAMINATION BY MR. CHAPMAN                    4
EXAMINATION BY MR. LANGER                   130
EXAMINATION BY MR. CHAPMAN                  131
               EXHIBITS
NO.  DESCRIPTION                          PAGE
 1   CNA Form                         50
 2   New Hampshire Insurance Company P and I Form   55
 3   Application                      64
 4   Final Audit Report              71
 5   Request For Loss Control Survey        74
 6   Loss Control Survey          74
 7   Unidentified Document            82
 8   A.M. Best Underwriting Selection      97
 9   Affidavit Of Theodore Wirth       102
10   Interrogatory Answers           110
11   Unidentified Document          111
12   E-Mail                  113
13   Memorandum             118
14   Business Owners Programs Manual      118
15   E-Mail               120
16   E-Mail               120
17   E-Mail                123
18   Letter From Mr. O'Toole, 1/30/03      123
```

Page 4

```
 1        THEODORE WIRTH, having been sworn by the Notary
 2   Public, was examined and deposed as follows:
 3          EXAMINATION BY MR. CHAPMAN:
 4   Q.  Good morning, Mr. Wirth.  My name is Bill Chapman, I
 5   represent the plaintiffs in this case Beverly Port Marina,
 6   Inc., and Leslie Ray Insurance Company.  I am going to be
 7   taking your deposition today.  Before we get too far here I
 8   just want to tell you please try to make all your responses
 9   verbal responses because the court reporter can't take down
10   body language.
11   A.  Yes.
12   Q.  So if you can answer questions yes or no or otherwise,
13   but we do need a verbal response.  If you could also wait
14   until I am finished with the question before you start your
15   answer that way the record doesn't get jumbled up.
16   A.  Okay.
17   Q.  And if you don't understand any of my questions,
18   please just say so and I will be happy to rephrase or
19   repeat or whatever is necessary to get a clear
20   understanding on the written record, okay?
21   A.  Yes.
22   Q.  If you want to take a break at any time -- this
23   probably will take a few hours anyway so it is not an
24   endurance contest, you know, if you ever want to take a
25   break or men's room or whatever just -- just let me know,
```

1 (Pages 1 to 4)

Page 29

1   A.  That's his nickname, Leon's.
2   Q.  Okay.
3   A.  It is Leon M., I believe.
4   Q.  As part of your job when you were at
5 Inland/International would you ever go to the Charlestown
6 office for any reason?
7   A.  Yes.
8   Q.  How often would you do that?
9   A.  One-two times a year on average.
10   Q.  Now, the four people that you have in your department
11 currently, the ocean marine department, I take it they deal
12 strictly with -- well, what -- what different types of
13 MOLL/BD coverages does Acadia write currently?
14       They write the kind of coverage that we have in
15 front of us here, right, as reflected in O'Toole Exhibit
16 11, correct?
17   A.  Correct.
18   Q.  And does Acadia also write vessel P and I coverage
19 currently?
20   A.  Yes.
21   Q.  What other types of ocean marine policies does your
22 department write currently?
23   A.  Commercial hull, yachts or pleasure boats, marina
24 operator's slash boat dealers.
25   Q.  And that's the MOLL/BD that we have referred to?

Page 30

1   A.  Yes.
2   Q.  Okay.
3   A.  Miscellaneous marine liability and ocean cargo.
4   Q.  Now, you reference commercial hull coverage, is that
5 different from the vessel P and I coverage that you talked
6 about previously?
7   A.  No.
8   Q.  Okay.  Those are -- those are synonymous?
9       MR. LANGER:  Commercial hull and P and I are
10 synonymous?
11   A.  Well, they are two different coverages for a
12 commercial vessel.
13   Q.  Okay.
14   A.  I am differentiating from a yacht or pleasure boat
15 when I say commercial.
16   Q.  Okay.  So if I understand you correctly when you
17 say -- when you gave me commercial hull as a category that
18 would be in essence property coverage for that vessel?
19   A.  I am denoting hull and P and I for commercial boats
20 when I say commercial hull.
21   Q.  Okay.
22   A.  I am using our policy prefixes as a mental jogger,
23 they are C H A which stands for Commercial Hull Acadia.
24   Q.  And generally speaking what types of coverages are
25 available under Acadia's miscellaneous marine liability

Page 31

1 policies?
2   A.  We have two, Wharfinger's, W-H-A-R-F-I-N-G-E-R,
3 apostrophe S, and Ship Repairers Legal Liability or SRLL.
4   Q.  And under the yachts/pleasure boat category does
5 Acadia offer property coverage for pleasure boats as well
6 as liability coverage arising out of the operation of those
7 boats?
8   A.  Yes.
9   Q.  And is that liability coverage also referred to as P
10 and I coverage?
11   A.  Yes.
12   Q.  And out of the marina insureds that sold boats as part
13 of their operation prior to the time you came to Acadia did
14 you ever become aware of any claims under any of those
15 policies that arose out of customer test drives of boats
16 for sale?
17   A.  No.
18   Q.  Did you ever have any -- well, when you were working
19 for a wholesaler placing those coverages was it ever part
20 of your -- was it something you looked for to find out
21 whether or not a -- a marina insured that sold boats or a
22 prospective insured allowed customers to test drive their
23 boats?
24   A.  I never made the inquiry.
25   Q.  Okay.  Is there a reason why not?

Page 32

1   A.  From my own experience you were never allowed to
2 operate a boat until you had your closing and then it was
3 your boat.
4   Q.  Do you have your own boat?
5   A.  I don't currently.
6   Q.  Have you ever owned a boat?
7   A.  Yes.
8   Q.  And when did you first own a boat?
9   A.  July 1983.
10   Q.  And have you owned a number of boats over time?
11   A.  Yes.
12   Q.  How many?
13   A.  Six.
14   Q.  Did you purchase any of those boats from boat dealers?
15   A.  All six.
16   Q.  Okay.  Did you test drive any of those boats before
17 purchasing them?
18   A.  No.
19   Q.  Okay.  Did you ask to do that?
20   A.  No.
21   Q.  And before -- before Mr. Johnson had his accident in
22 October of '01 had you ever heard of a boat dealer allowing
23 a prospective purchaser to test drive a boat?
24   A.  Never.
25   Q.  Are you aware of any ocean marine insurers that

8 (Pages 29 to 32)

Page 33

1  covered a marina or boat dealer's liability exposure under
2  P and I coverage or otherwise arising out of customer test
3  drives of boats?
4  A.  Not aware of any.
5  Q.  As you sit here today are you aware of any insurers
6  that cover that?
7  A.  I am not.
8  Q.  Have you ever seen any CNA forms for example that --
9  for P and I that do not contain the condition that you see
10 in the Acadia policy relative to the boat being operated in
11 the water by an insured or an authorized employee of an
12 insured?
13 A.  I can't recall.
14 Q.  During the period of time that you have been employed
15 as the director of ocean marine underwriting at Acadia --
16 first of all, how many Mass. agents -- Massachusetts agents
17 do you work with currently?
18 A.  I couldn't give you a number as I don't know.
19 Q.  Can you estimate it?
20       MR. LANGER:  Don't guess.  If you know or can
21 give a reasonable estimation that's fine.
22 A.  I couldn't put a number to it.
23 Q.  Okay.
24 A.  The bulk of my business is with one agent in that
25 state.

Page 34

1  Q.  Okay.  And who is the agent?
2  A.  Smithwick, S-M-I-T-H-W-I-C-K, space Mariners
3  M-A-R-I-N-E-R-S.
4  Q.  That's the agency that Mr. O'Toole works for
5  currently?
6  A.  Yes, it is.
7  Q.  And does Smithwick Mariners have an office in
8  Massachusetts?
9  A.  Yes, it does.
10 Q.  Do you know in what town?
11 A.  New Bedford.
12 Q.  And does Acadia have any boat dealer coverages written
13 through the Smithwick Mariners agency?
14 A.  Not that I am aware of.
15 Q.  Would you agree that ocean marine coverages are a
16 specialty line of insurance for Acadia?
17       MR. LANGER:  Objection, form, foundation.  You
18 can answer.
19 A.  We're known as a specialty line within the company.
20 One of the specialty lines.
21 Q.  What are the other specialty lines?
22 A.  Inland marine, bonds and surety and excess.  Some are
23 known as Acadia, others are known as Berkley, and some are
24 known as Monitor.
25 Q.  And as the director of the ocean marine department one

Page 35

1  of your roles is to work with Acadia agents --
2  A.  Yes.
3  Q.  -- on those coverages, correct?
4  A.  Yes, it is.
5  Q.  And to handle questions from agents about the
6  coverage?
7  A.  Yes.
8  Q.  And to correspond in writing with the agents, writing
9  or e-mail or otherwise?
10 A.  Yes.
11 Q.  Okay.  How would -- generally speaking how would you
12 describe the average agent's familiarity with ocean marine
13 coverages?
14       MR. LANGER:  Objection, foundation.
15 A.  It varies.
16 Q.  Okay.  So describe how it varies?
17 A.  Some agents know quite a bit, others know very little.
18 Q.  Would it be fair to say that the majority of agents --
19 Acadia agents are -- are in the category of generally being
20 unfamiliar with ocean marine coverages?
21       MR. LANGER:  Objection to the form and the
22 foundation of the question.
23 A.  I don't know.
24 Q.  Can you quantify how many agents seem knowledgeable
25 about ocean marine coverages as compared to how many don't?

Page 36

1  A.  No.
2  Q.  Can you give that to me either in terms of a number or
3  percentage of the agents that you deal with?
4       MR. LANGER:  Objection.  He just said he can't do
5  that.
6  A.  No.
7  Q.  In the conversations that you have had over time with
8  David Ray did you ever get a sense as to what his
9  familiarity was with ocean marine coverages offered by
10 Acadia?
11       MR. LANGER:  Objection, foundation.
12 A.  No.
13 Q.  In the conversations that you had with Candy Howard
14 did you get a sense as to what her familiarity was with
15 Acadia's ocean marine coverages?
16       MR. LANGER:  Same -- same objection.
17 A.  No.
18 Q.  Do you recall any particular questions that either of
19 them asked you about Acadia's ocean marine coverages at any
20 time?
21 A.  Yes.
22 Q.  And what do you recall?
23 A.  Mr. Ray after the fact asking me if we could cover on
24 a blanket basis nonemployees operating inventory boats.
25 Q.  Do you recall ever having any conversations with him

Page 53

1　particular form a condition to liability coverage relative
2　to a vessel being operated by an insured or an authorized
3　employee of an insured?
4　A.　I did not --
5　　　　MR. LANGER:　Same objection as before.
6　A.　I did not see that.
7　Q.　Okay.　Now, would it be your position as an ocean
8　marine underwriter for Acadia that the Acadia MOLL/BD
9　policy that we have as O'Toole Exhibit No. 11 would not
10　cover a boat dealer in a situation where a third-party
11　customer was taking a boat owned by the insured on a test
12　drive, that it would not cover the marina's liability
13　exposure to that third-party test drive?
14　　　　MR. LANGER:　Objection, the document speaks for
15　itself, and you are calling for a legal conclusion.　You
16　can answer what your understanding may be.
17　A.　I understand that the boat has to be in the control of
18　the insured or his employee.
19　Q.　So the answer to that question would therefore be no
20　your understanding is that the Acadia policy would not
21　cover that liability exposure, is that what you are saying?
22　A.　Correct.
23　Q.　Okay.　And if the Acadia policy had the language that
24　we just looked at in Wirth Exhibit No. 1 would that
25　language in this Exhibit 1 exclude -- strike that.

Page 54

1　　　　If the Acadia policy contained the language in
2　Wirth Exhibit No. 1 would Exhibit 1 cover a situation where
3　an employee -- I'm sorry, cover a situation where a
4　third-party test driver was injured while test driving a
5　vessel owned by the insured?
6　　　　MR. LANGER:　Objection to form and foundation of
7　the question, it seeks a legal conclusion, it is an
8　improper hypothetical.
9　Q.　Can you give us your understanding?
10　A.　I don't know, we don't have the entire policy there.
11　Q.　What I am asking you to assume is if you had the
12　language that you see in exhibit -- Wirth Exhibit No. 1 as
13　the insuring agreement for Acadia, the Acadia MOLL/BD
14　coverage, would -- would that language cover a situation
15　where a prospective customer was injured during a test
16　drive?
17　　　　MR. LANGER:　Same objection as before, it has
18　been asked and answered.　If you can answer the question,
19　you can.
20　A.　My whole point of reference is my policy.
21　Q.　Right, and now I am asking you to change your point of
22　reference.　I am just -- I am just saying -- I am just
23　saying if we assume that the language in Exhibit 1 was in
24　O'Toole Exhibit No. 11 instead of the P and I language that
25　is in O'Toole Exhibit 11 would that language cover a

Page 55

1　situation where a marina customer was injured during a test
2　drive?
3　　　　MR. LANGER:　Same objection as before.　If you
4　can answer it, go ahead.
5　A.　It appears it would not be excluded.
6　　　　MR. CHAPMAN:　Okay.
7　　　　(Exhibit No. 2, New Hampshire Insurance Company P and
8　I Form, marked for identification.)
9　Q.　Okay.　I am going to show you Wirth Exhibit No. 2
10　which is a -- I will represent to you is a New Hampshire
11　Insurance Company P and I form.　And, again, for the record
12　this does have some highlighting on it, the highlighting is
13　mine.
14　A.　Okay.
15　Q.　Okay.　You have had an opportunity to go through that
16　Exhibit 2 in detail?
17　A.　Yes.
18　Q.　Okay.　And have you ever seen that particular New
19　Hampshire Insurance Company form prior to today?
20　A.　It looks familiar to me.
21　Q.　And is that a form you remember using and being
22　involved with when you were working at
23　Inland/International?
24　A.　Yes.
25　Q.　And is that a -- do you recognize this as a New

Page 56

1　Hampshire Insurance Company P and I form for yacht dealers
2　that you used -- that you used in place during the period
3　of time you were with Inland/International?
4　A.　That seems familiar to me, but I can't say it is the
5　exact form.
6　Q.　Now, having reviewed this in detail do you see a
7　condition to P and I coverage relative to the boat being
8　operated in the water by an insured or authorized employee
9　of the insured?
10　A.　Yes.
11　Q.　Okay.　And where do you see that?
12　A.　The definitions section.
13　Q.　Okay.　And would you read the language that you are
14　referring to?
15　A.　Yacht dealer operations means the sale, demonstration,
16　exhibition or delivery of any private pleasure watercraft
17　by the insured or his employees which is either stock for
18　sale or property sold by the insured while such pleasure
19　watercraft is afloat.
20　Q.　Okay.　So that language doesn't refer to a requirement
21　or a condition that the liability arise out of the
22　insured's or the authorized employee's operation of the
23　boat on the water, does it?
24　　　　MR. LANGER:　Objection, the document speaks for
25　itself, to the extent it is calling for a legal conclusion.

14 (Pages 53 to 56)

Page 61

1  Q.  Okay.  So you are not in a position to say whether or
2  not any such conversation happened?
3  A.  Correct, I have no way of knowing that ever happened.
4  Q.  And you have no understanding as to what Mr.
5  Pedersen's response to that inquiry by Dave Ray might have
6  been?
7  A.  Again, I don't know.  I don't know if it was asked.
8  As such I can't give you an answer.
9  Q.  In reviewing the underwriting files that you looked at
10  did you see any evidence that Acadia obtained the prior
11  MOLL/BD coverage that was in effect through Hanover
12  Insurance Company?
13  A.  Are you asking did I see an old Hanover policy?
14  Q.  Not necessarily.  I am asking if you saw any
15  suggestion, which is broader than seeing the policy itself,
16  that Acadia had received a Hanover policy?
17  A.  No, I did not get that.
18  Q.  And in terms of your role as director of ocean marine
19  underwriting is that something that happens on occasion,
20  namely that in -- in receiving a request to potentially
21  provide insurance to a marina that you will get a prior
22  policy from an agent and you are asked to comment on it in
23  terms of the scope of that policy as compared to what
24  Acadia might provide?
25  A.  No, that's not common at all.

Page 62

1  Q.  Has that ever happened in your experience?
2  A.  Not that I recall.
3  Q.  Do you have any understanding as to how many different
4  marinas or boat dealers that Leslie Ray has obtained
5  policies for?
6  A.  No, I don't know that.
7  Q.  So as you sit here today are you aware of any marina
8  or boat dealer other than Beverly Port that Ray obtained
9  insurance for?
10  MR. LANGER:  For Acadia -- through Acadia or
11  through anybody?
12  Q.  Through anybody.
13  A.  I don't know that either.
14  Q.  Insofar or since the time that you have been the
15  director of ocean marine underwriting for Acadia I think
16  you have already testified you -- part of your job is
17  handling questions from Acadia agents about the Acadia
18  ocean marine coverages, correct?
19  A.  Correct.
20  Q.  And you undertake to answer those questions and
21  explain those features to the agents?
22  A.  Yes.
23  Q.  And in answering agent's questions do you -- well,
24  does that part of your job include describing the
25  advantages and disadvantages of Acadia ocean marine

Page 63

1  policies?
2  A.  No.
3  Q.  Does it include -- you have already said you are not
4  familiar with situations where you actually received a --
5  an insured's prior policy form, but does that function
6  include discussing in general terms the pros and cons about
7  prior ocean marine policy as compared to what Acadia would
8  be proposed to write?
9  A.  No.
10  Q.  And so that's never happened in your experience?
11  A.  No.
12  Q.  And as a -- as an ocean marine underwriter would it be
13  your testimony that you have never had the understanding
14  that a marina has a liability exposure arising out of
15  customer test drives of boats that are owned by the marina?
16  A.  I have never been aware of that exposure.
17  Q.  Have you ever undertaken any kind of inquiry as to how
18  any of the marinas that you insure operate in that respect?
19     In other words, how does this insured marina
20  conduct test drives?
21  A.  No, I have never had inquiry into that.
22  Q.  Aside from any of the exhibits that we have looked at
23  in today's deposition have you ever become aware of any
24  other ocean marine insurer that would cover the insured
25  marina or boat dealer's liability exposure arising out of

Page 64

1  customer test drives of boats owned by the insured?
2  A.  No, I haven't.
3     MR. CHAPMAN:  Just off the record for a second.
4     (Discussion off the record.)
5  Q.  I am going to hand you -- I am going to mark as
6  Exhibit 3 and this document appears to be a 10 page fax.
7     (Exhibit No. 3, Application, marked for
8  identification.)
9  A.  It is little writing.
10  Q.  Okay.  Have you ever seen Exhibit 3 before?
11  A.  Yes.
12  Q.  And can you identify what that is?
13  A.  That is a submission to what appears to be the non
14  marine portion of Acadia or from it.
15  Q.  From it to whom?
16  A.  From Acadia's Marlborough office to Matt Pedersen in
17  Maine.
18  Q.  In May of 2000?
19  A.  Yes.
20  Q.  Now, would it be fair to say that from your review of
21  the underwriting documents you have looked at a -- an
22  application was submitted to the Acadia Massachusetts
23  office and then the portion of it or -- or a portion of it
24  was handled in the Massachusetts office and the application
25  was -- or a copy of it was sent up to the Westbrook office

16 (Pages 61 to 64)

Page 65

1  for the purpose of underwriting the MOLL/BD coverage?
2  A.  It appears as such.
3  Q.  Okay.  And is that typically the way things would work
4  in a situation where a -- an insured was -- an insured in
5  Massachusetts say was getting GL, business, auto, other
6  types of coverage --
7  A.  It could work that way.
8  Q.  -- in addition to the MOLL/BD coverage?
9  A.  It could --
10      MR. LANGER:  Objection to the form of the
11  question.
12  A.  It could work that way.
13  Q.  Okay.  And when you look at Wirth Exhibit 3 does the
14  application reflect that Beverly Port Marina was involved
15  in boat sales?
16  A.  Yes.
17  Q.  Okay.  And what part of Exhibit 3 reflects that?
18      MR. LANGER:  Can I see the page?  I can't see it.
19  A.  It is page seven of 10 on this fax.
20  Q.  Okay.
21  A.  Or it is known as the commercial general liability
22  section.
23  Q.  Okay.  And what specifically -- what specific entry or
24  information are you referring to when you say that the
25  application reflects that Beverly Port Marina did boat

Page 66

1  sales?
2  A.  Under schedule of hazards in the column known as
3  classification the word boat dealers.
4  Q.  And under the classification there is a number there?
5  A.  Yes.
6  Q.  There are actually -- there is a number typed in and
7  then there is a number, the number is scratched out with
8  another number written in?
9  A.  Yes.  A different class code.
10  Q.  Okay.  Do you know whose handwriting is on that
11  particular page?
12  A.  I do not.
13  Q.  Based upon your understanding of how these
14  applications are handled do you have an understanding as to
15  whose handwriting that is?
16      MR. LANGER:  Objection, that's asked and
17  answered.
18  A.  Applications come from the agents.
19  Q.  Right.  Well --
20  A.  As such I would expect they would be completed by the
21  agent.
22  Q.  Okay.  Do you see any reason to believe that the
23  handwriting on that particular page was put on there by
24  someone in the Acadia underwriting department after the
25  application arrived?

Page 67

1      MR. LANGER:  Objection.
2  A.  I have no way of knowing that.
3  Q.  Okay.  Do you know what the -- the class code column
4  there, what does that refer to?
5  A.  A numeric code to denote an activity of the business
6  is my understanding.  We don't utilize it in my department.
7  Q.  You don't utilize class codes?
8  A.  Nope.
9  Q.  Do you know where that particular class code for boat
10  dealers comes from?
11  A.  A document that many companies call a commercial lines
12  manual, I believe, or a CLM for short.
13  Q.  And does that page seven of 10 of this fax does this
14  reflect the Beverly Port's annual boat dealer sales?
15  A.  It appears to, yes.
16  Q.  Okay.  And what does it reflect in that respect?
17      MR. LANGER:  Objection.  The document speaks for
18  itself.
19  A.  Next to the words boat dealers there is an S for sales
20  and then the number 669,447.
21  Q.  Okay.  So your interpretation of that particular page
22  if you had been -- if you had been the person receiving
23  that in May of 2000 would have been that Beverly Port
24  Marina had annual sales or was representing that it had
25  annual sales of boats for sale in the $669,000 range?

Page 68

1  A.  Yes.
2  Q.  Thanks.  Does -- when -- when the ocean marine
3  department handles an application like what we see in Wirth
4  Exhibit No. 3 do these class codes have any significance?
5      MR. LANGER:  Objection to the form, foundation of
6  the question.
7  A.  The application has little significance for me.
8  Q.  Why do you say that?
9  A.  We have our own specific application.
10  Q.  And that is -- in other words you are -- you are
11  referring to a -- a non Accord form?
12  A.  Correct.
13  Q.  And you are referring to a form that Acadia drafted
14  and published?
15  A.  Yes.  I don't know if they drafted it, but that's
16  where it came from.
17  Q.  Okay.  There is some kind of -- the Acadia logo is on
18  this form?
19  A.  I don't know if our logo is on it or not.
20  Q.  Okay.
21  A.  But I know it is not Accord.
22  Q.  Did -- was the Acadia -- the specific Acadia
23  application ever completed by or on behalf of Beverly Port
24  Marina?
25  A.  There is one in the file.  I don't know who completed

**Page 69**

1    it.
2    Q. And there is just one for the initial policy period?
3    A. Yes.
4    Q. And what was -- now, during the renewal, which was in
5    May of 2001, correct?
6    A. Yes.
7    Q. Did Acadia require a renewal application to be sent
8    in?
9    A. No.
10    Q. What were the -- well, strike that.
11       What was the protocol for renewal from the
12    perspective of the underwriting department?
13    A. An inquiry into the marina operator's receipts for the
14    coming year, coming policy period, as well as a projection
15    of the monthly average inventory of the boat dealer
16    section.
17    Q. Was that inquiry done in this case for the May '01
18    renewal?
19    A. Yes, I believe it was.
20    Q. And who did it?
21    A. I think it was Candy Howard. I made the inquiry and I
22    think it was Candy Howard of the agency that responded to
23    me.
24    Q. And what is the protection and indemnity coverage
25    rated based upon?

**Page 70**

1       MR. LANGER: Which protection and indemnity
2    coverage are you talking about?
3    Q. That Acadia wrote for Beverly Port Marina?
4    A. The two exposures, three in this case, marine
5    operators, the boat dealers, and one owned vessel.
6    Q. So in other words Beverly Port Marina's premium for
7    protection and indemnity coverage was based in part upon
8    the extent of their boat sales?
9    A. I will split hairs, it was based in part upon their
10    average monthly inventory value in dollars.
11    Q. And monthly inventory of what, boats for sale?
12    A. Yes.
13    Q. Okay. And that was a -- this policy was an auditable
14    policy?
15       MR. LANGER: Which policy are you talking about?
16    Q. The MOLL/BD that Beverly Port Marina had?
17    A. It was an adjustable policy.
18    Q. Meaning what in your words?
19    A. Meaning an estimation was given to the underwriter of
20    the marina receipts and the average monthly dealer value, a
21    rate was assigned, deposit premium was calculated, and at
22    some point after the expiration of that 12 months a report
23    would be made from the insured stating what their actual
24    marina receipts were and what their actual monthly
25    inventory values were. The rates would be applied, those

**Page 71**

1    numbers would be compared to the deposit, if more was owed
2    then more was charged, an adjustment.
3    Q. And based on your review of the underwriting documents
4    are you aware whether the first MOLL/BD policy with Beverly
5    Port was adjusted?
6    A. I don't know if it was.
7    Q. Okay. Are you aware whether the actual boat dealer
8    sales or -- the inventory amount for the first year was
9    more or less than what was reflected in the initial
10    submission?
11    A. I don't know.
12       (Exhibit No. 4, Final Audit Report, marked for
13    identification.)
14    Q. I show you what's been marked as Wirth Exhibit No. 4.
15    Do you recognize what Exhibit 4 is?
16    A. Yes.
17    Q. And what is that?
18    A. It is a final audit report.
19    Q. A final audit report relative to Beverly Port Marina's
20    MOLL/BD policy for the first policy year?
21    A. Yes.
22    Q. And --
23    A. Well, no. I'm sorry. There wasn't a marine policy,
24    it was a package policy.
25    Q. Okay, all right. Does this audit report reflect what

**Page 72**

1    the actual sales were during that first policy year?
2    A. It appears to.
3    Q. Okay. What does it reflect from that respect?
4       MR. LANGER: Objection to the extent you are
5    going beyond the fact that the document speaks for itself.
6    A. It looks like boat sales of 2.4 million, storage and
7    moorage receipts of $1,275,777, and boat repair and service
8    receipts of $76,331.
9    Q. But this final report indicates to you that during
10    that first year of the policy Beverly Port Marina in fact
11    sold $2.4 million worth of boats to purchasers?
12    A. Actual exposure is 2,062,251.
13    Q. Okay. Oh, I see, I see what you are referring to.
14    The $2.4 million is what they estimated --
15    A. Yes.
16    Q. -- before the policy went into effect --
17    A. I believe so.
18    Q. -- in terms of what their boat sales were going to be
19    and then the year went by and in fact during that first
20    policy year the document reflects that Beverly Port sold in
21    the neighborhood of $2 million worth of boats to
22    purchasers?
23    A. Yes.
24    Q. Now, based on that because the estimated exposure for
25    boat sales was higher than what the actual exposure turned

18 (Pages 69 to 72)

Page 73

1  out to be would it be your expectation that that particular
2  difference generated a premium credit to Beverly Port
3  Marina?
4  A.  It appears as such.
5  Q.  And does the document reflect what that premium credit
6  was?
7  A.  Not for the boat dealer activity alone.
8  Q.  Okay.  It does reflect a credit for all the coverages
9  added together?
10 A.  No.
11 Q.  Okay.
12 A.  It reflects an additional premium due.
13 Q.  I see what you are saying.  It is hard to read those
14 things upside down.
15 A.  Sure.
16         (Discussion off the record.)
17 Q.  I think I can take this back.
18 A.  Sure.
19 Q.  Do you recognize any of the handwriting on Exhibit 4?
20 A.  I do not.
21 Q.  How about on the second page?
22 A.  I do not.
23 Q.  Do you know how -- do you know who signed off on that
24 okay reference?
25 A.  I do not.

Page 74

1  Q.  Okay.  And you don't recognize that handwriting on the
2  third page?
3  A.  No.
4         (Exhibit No. 5, Request For Loss Control Survey,
5  marked for identification.)
6         (Exhibit No. 6, Loss Control Survey, marked for
7  identification.)
8  Q.  I am going to hand you Wirth Exhibits 5 and 6
9  together.  Take whatever time you need to review those, but
10 my question will be can you identify what first of all
11 Exhibit 5 is?
12 A.  Yes.
13 Q.  What's Exhibit 5?
14 A.  A request for a loss control survey.
15 Q.  What's the purpose of that document?
16        MR. LANGER:  Objection foundation.
17 A.  An underwriter is requesting that loss control go to
18 the insured or speak with the insured and look at some
19 aspect of the policy.
20 Q.  And when you look at Exhibit 5 what particular
21 underwriter made that request?
22 A.  Molly Welsh.
23 Q.  And what was Molly Welsh's position at the time
24 reflected in the documents which is May of 2000?
25        MR. LANGER:  Objection, the document speaks for

Page 75

1  itself.
2  A.  It says requesting underwriter.  I don't know Ms.
3  Welsh.
4  Q.  Okay.  Have you ever met Molly Welsh?
5  A.  No, I have not.
6  Q.  Is it your understanding that at one point she worked
7  in the ocean marine underwriting department?
8  A.  No, she did not.
9  Q.  Okay.  Did she work in the commercial underwriting
10 department?
11 A.  I believe she did, but I don't know with certainty.
12 Q.  And back in May of -- May and June of 2000 did Acadia
13 have a loss control department?
14 A.  Yes, I believe they did.
15 Q.  And what was the purpose of the loss control
16 department?
17 A.  To perform loss control duties we have with the
18 company.
19 Q.  So specifically speaking what does the loss control
20 department do?
21 A.  I am not a loss control person so I can't say all of
22 the things they do.
23 Q.  Okay.  Generally speaking what's your understanding of
24 what the loss control department function is?
25 A.  They can check what's known as ITV or insurance to

Page 76

1  value of buildings, they can look for the general condition
2  of the premises.
3         MR. LANGER:  I am going to object on the basis
4  that he has not been designated to deal with non marine
5  matters which you are clearly going into with on this.  If
6  he has knowledge he can certainly answer it, but it is
7  beyond the scope of what he is designated for.
8  Q.  Okay.  All right.  So I do want to find out --
9  A.  Sure.
10 Q.  -- your understanding of what the loss control
11 department does.
12 A.  They can look at -- I am trying to think of the word
13 for it.  Ergonomics for people at a work station, perhaps
14 help eliminate anything that could lead to a repetitive
15 motion type of injury, they could make sure that insured's
16 drivers are wearing their seat belts when operating
17 commercial vehicles, and I imagine they would look for the
18 obvious things like a big can of burning cigarette butts
19 next to a gas tank.
20 Q.  Okay.  Would it be fair to say that from your
21 perspective the Acadia loss control department is involved
22 with ascertaining, identifying, verifying liability and
23 property exposures under Acadia policies?
24        MR. LANGER:  Objection, foundation.
25 A.  I believe that they are asked to, yes, that's what

19 (Pages 73 to 76)

Page 77

1  they do.
2  Q.  Okay.  And the loss --
3  A.  For the property and the casualty.
4  Q.  Okay.  The -- loss -- the loss control department
5  does conduct surveys of insureds that have MOLL and BD
6  coverages, don't they?
7  A.  They do from time to time.
8  Q.  And you can see from Exhibit 6 that they did in this
9  case, correct?
10  A.  Yes.
11  Q.  And now what does a loss control survey typically
12  involve?
13        MR. LANGER:  Objection, foundation.
14  A.  I don't know if there is a typical survey.  It is
15  specific to the insured or applicant in question.
16  Q.  Have there been occasions where you ordered loss
17  control surveys?
18  A.  There have been a few, not many.
19  Q.  And in the situations where you have ordered loss
20  control surveys have those been of or relative to marinas
21  or boat dealers?
22  A.  No, they are usually boat builders.
23  Q.  In the situations where you have ordered those surveys
24  do you give the person who is going to conduct the survey
25  any kind of information as to what it is in particular that

Page 78

1  you are interested in?
2  A.  If the loss control person asks us for what it is they
3  do we'll tell them.
4  Q.  So have there been situations where you have just
5  generally requested a loss control survey and other
6  situations where you have said I need a survey and I also
7  want the following questions or issues I have addressed?
8  A.  Yes.
9  Q.  Now, you can see that this Exhibit 6 reflects that the
10  actual loss control survey was done by who?
11  A.  Grettyl it looks like Lewit.
12  Q.  Okay.  Do you know Grettyl Lewit?
13  A.  I do not.
14  Q.  To your knowledge have you ever met her?
15  A.  I don't believe I ever have.
16  Q.  And do you know if Grettyl Lewit is still with the
17  company?
18  A.  I believe she is, but I don't think her name is Lewit
19  anymore.
20  Q.  Okay.  What's her last name now?
21  A.  I don't know.
22  Q.  Do you know what office she works out of?
23  A.  I believe it is the Marlborough office.
24  Q.  Now, if you look at Wirth Exhibit 6 does it reflect
25  that Grettyl Lewit understood that Beverly Port Marina was

Page 79

1  in part in the business of boat sales?
2        MR. LANGER:  Objection, document speaks for
3  itself, foundation.
4  A.  Yes, I would say she knew that.
5  Q.  And that reference is contained on the first page of
6  the exhibit --
7  A.  Yes.
8  Q.  -- in the bottom paragraph there?
9  A.  Yes.
10  Q.  Okay.  Now, if Grettyl Lewit was -- strike that.
11        Since Beverly Port had MOLL/BD coverage with
12  Acadia or was going to have that coverage with Acadia when
13  this survey was done would -- would it be your expectation
14  that part of that loss control survey would involve looking
15  at MOLL/BD exposures?
16  A.  No, that would not be an expectation.
17  Q.  Okay.  And why do you say that?
18  A.  It is a property casualty company.
19  Q.  You mean Acadia is a property casualty company?
20  A.  That's their focus, yes.
21  Q.  In other words their focus is not on MOLL/BD
22  insurance?
23  A.  Correct.
24  Q.  Do you know if there is any kind of guideline or
25  protocol whereby the loss control survey will not look for

Page 80

1  MOLL/BD exposures even relative to an insured that is
2  getting MOLL/BD coverage?
3        MR. LANGER:  Objection, foundation, form of the
4  question.
5  A.  I don't understand your question.
6  Q.  All right.  Well, if we had a -- an insured or a
7  prospective insured that was going to have a loss control
8  survey done in May of 2000 was there any kind of guideline
9  whereby if the -- that loss control survey would not
10  involve looking at the MOLL/BD exposures?
11        MR. LANGER:  Objection, form and foundation.
12  A.  I have no idea.
13  Q.  And in connection with the ocean marine underwriting
14  department's role does -- in the usual course would --
15  would the ocean marine underwriting department receive a
16  copy of a loss control survey like this?
17  A.  As a matter of routine?
18  Q.  Right.
19  A.  Not in my opinion, no.
20  Q.  Okay.  So it sounds like there are situations where
21  the ocean marine department would receive a survey like
22  this and situations where they wouldn't?
23  A.  Yes.
24  Q.  Okay.  Is there any particular, you know, situation
25  where the ocean marine department is going to get a loss

20 (Pages 77 to 80)

Page 89

1      MR. LANGER: Objection to form and foundation of
2  the question.
3  A.  They are the only ones that I know that rank insurance
4  companies, that's all that I am aware of.
5  Q.  And to your knowledge insurance companies refer to and
6  rely on those rankings?
7      MR. LANGER: Objection foundation.
8  A.  I don't know if they rely on them.  I am sure they
9  refer to them, I don't know if they rely on them.
10 Q.  And do you know if the A.M. Best rankings of insurance
11 companies are significant to for example state insurance
12 departments?
13     MR. LANGER: Objection foundation, also form.
14 You may answer.
15 A.  I have no idea.
16 Q.  Have you ever -- as far as you know does A.M. Best
17 have a website?
18 A.  I don't know.
19 Q.  What, if any, underwriting guidelines has Acadia
20 published specifically with respect to MOLL/BD insurance?
21     MR. LANGER: Objection to foundation.
22 A.  I don't know if it ever has.
23 Q.  Currently when you are underwriting a MOLL/BD
24 insurance policy are there any particular written
25 guidelines that you follow whether published by Acadia or

Page 90

1  anyone else?
2  A.  No.
3  Q.  And so if there aren't any written guidelines are
4  there any guidelines that you follow with respect to
5  underwriting MOLL/BD insurance?
6  A.  No.
7  Q.  How is it that you make -- well, does an Acadia -- do
8  you have knowledge with respect to the authority of an
9  Acadia agent to bind MOLL/BD insurance?
10 A.  They can't.
11 Q.  Okay.  And what's the basis of your understanding in
12 that respect?
13 A.  A portion of their agency contract I believe specifies
14 that.
15 Q.  Have you ever been involved with negotiating, dealing
16 with agency contracts in any way?
17 A.  I have not.
18 Q.  Okay.  Your understanding is that the agency -- the
19 typical Acadia agency agreement precludes the agent from
20 binding MOLL/BD coverage?
21 A.  Yes, that's what I understand.
22 Q.  And so therefore the decision whether to accept or
23 reject a proposed MOLL/BD risk is up to the Acadia ocean
24 marine underwriting department?
25 A.  Correct.

Page 91

1  Q.  Okay.  When -- is there -- is there any kind of
2  writing whatsoever that articulates the criteria for
3  accepting or rejecting MOLL/BD risk?
4  A.  No.
5  Q.  Okay.  When you are making a decision to accept or
6  reject or otherwise with respect to a proposed MOLL/BD risk
7  what do you look for?  What criteria do you -- do you
8  apply?
9  A.  I look at what activities they are engaged in, I will
10 look at their receipts if it is a marina, I will look at
11 their average monthly inventory if it is a boat dealer, I
12 will look to see if they have had coverage before and what
13 their loss experience has been, and one more thing I would
14 look at is years in business.
15 Q.  And you have looked at the original submission that
16 came in for Beverly Port in the Acadia ocean marine
17 underwriting file?
18 A.  Yes.
19 Q.  Now, if you had been the person handling that did you
20 see any red flags in that ocean marine submission?
21     MR. LANGER: Objection to form.
22 A.  No.
23 Q.  Okay.  So in other words applying the criteria that
24 you just named would -- if you had been handling the
25 original Beverly Port Marina submission can you tell me

Page 92

1  whether or not that's something that you would have
2  accepted or rejected?
3  A.  I would have been -- I would have questioned the fact
4  that I believe the Kinzies were new to this activity,
5  relatively new, and at that point I would ask what staff
6  had been carried over from the former ownership who were in
7  let's say a yard manager capacity, and I would be looking
8  to see that the day-to-day operations would be headed up by
9  somebody with suitable experience.
10 Q.  Having looked at that original submission are there
11 any other questions you think you would have raised?
12 A.  No.
13 Q.  And did you -- in looking at the underwriting file did
14 you see whether -- well, the person who handled the
15 original ocean marine submission was Matt Pedersen,
16 correct?
17 A.  Yes.
18 Q.  And did you see whether or not he raised any kind of
19 underwriting issues?
20 A.  I don't recall.
21 Q.  And if you do -- if you are raising an underwriting
22 issue in response to a submission how typically do you do
23 that?
24 A.  I will address that with the agent --
25 Q.  Okay.

23 (Pages 89 to 92)

Page 93

1   A. -- submitting the risk.
2   Q. And which can happen how, is that a phone call to the
3   agent typically, is it an e-mail, is it a fax, is it a
4   letter?
5   A. It could be an e-mail, could be a phone call, could be
6   a fax, could be a combination of those. I can say it would
7   not be a letter going through the post.
8   Q. There is no kind of requirement in the ocean marine
9   underwriting department that an underwriting issue be
10  raised in any particular form?
11  A. There is not.
12  Q. And if you had been handling this original submission
13  for Beverly Port Marina and you saw that they were
14  projecting $2.4 million in annual boat sales would it have
15  occurred to you to raise a question as to how they would
16  demonstrate their boats for sale vis-a-vis prospective
17  customers?
18  A. No, it wouldn't.
19  Q. From your perspective if you are handling a boat
20  dealer with projected $2.4 million in annual sales is --
21  would it be fair to say that there is a significant
22  liability risk attendant to the demonstration of a boat for
23  sale?
24      MR. LANGER: Objection, form and foundation.
25  A. There is liability; however, looking at my own

Page 94

1   circumstances as a consumer somebody from the boat
2   dealership would take me out in a boat if I wanted to go on
3   it before buying it. I would not be allowed to operate the
4   vessel.
5   Q. Okay. Now, again you are going back to your personal
6   experience --
7   A. Right.
8   Q. -- in purchasing of boats that you have bought?
9   A. Correct.
10  Q. Are you aware of any kind of standard in the boat
11  dealer industry that provides that in terms of doing a
12  demonstration of a boat for sale that the customer is not
13  allowed to operate it, it has to be operated by the marina
14  or dealer itself?
15      MR. LANGER: Objection to foundation.
16  A. I don't know what their standards are.
17  Q. Okay. Are you aware of any kind of governmental
18  regulation or law that provides that?
19  A. I have no idea.
20  Q. And are you saying it is -- it would be beyond your
21  comprehension that a boat dealer offering a boat for sale
22  might allow a prospective customer to test drive a boat
23  that they were interested in?
24      MR. LANGER: Objection, that's argumentative,
25  also as to the form.

Page 95

1   A. This is the only dealership I have ever heard who
2   would allow somebody other than an employee or the insured
3   him or herself to operate a vessel.
4   Q. Okay. Well, I understand your understanding in
5   hindsight, but I am asking something a little different
6   from that. I mean for example you know that an auto dealer
7   typically, you know, the typical auto dealer lets a
8   prospective purchaser of an automobile, motor vehicle, take
9   that vehicle for a test drive?
10  A. Yes.
11  Q. Okay. And you don't see a possibility that a boat
12  dealer could allow a prospective purchaser to take a boat
13  for a test drive?
14      MR. LANGER: Objection to form and foundation.
15  A. I would be surprised because we're talking two very
16  different beasts being test driven, and in the case of an
17  automobile the test driver has to demonstrate that they at
18  least have a driver's license which at some point was a
19  demonstration that they were able to operate a motor
20  vehicle safely. The average boat buyer that I know of has
21  no boating driver's license, there is nothing to
22  demonstrate their ability, therein lies the difference
23  between a boat dealer and a car dealer.
24  Q. Would it be fair to say you could imagine a situation
25  where a boat dealer would allow a -- say a boat dealer has

Page 96

1   a prior relationship with a purchaser, you know, a person
2   like you who has bought a number of boats from a particular
3   dealer, would it be -- would it be fair to say that you
4   would reasonably believe that a boat dealer in that
5   situation would allow the experienced customer to take a
6   test drive of a boat that they were interested in?
7       MR. LANGER: Objection to form and foundation.
8   A. I have no way of knowing that. My gut tells me they
9   still wouldn't let you take it out.
10  Q. Have you ever spoken to any boat dealers either in
11  your capacity as director of the ocean marine department or
12  in your personal capacity as to whether they allow
13  customers or prospective customers to test drive boats?
14  A. No one has ever said to me they would let a customer
15  take a boat out until the closing when it is then the
16  customer's boat.
17  Q. Well, I am saying have you ever asked any questions
18  like that to any boat dealer?
19  A. No.
20  Q. And you are saying that out of all the different
21  policies you have written there has been no situation where
22  an Acadia agent has raised a question with regard to
23  liability exposure for a boat dealer arising out of test
24  drives?
25  A. Correct.

24 (Pages 93 to 96)

Page 97

1    (A short break was taken.)
2    (Exhibit No. 8, A.M. Best Underwriting Selection,
3    marked for identification.)
4    Q.  When you look at Exhibit 8 is that the same Best
5    underwriting selection that Mr. Langer has shown you that
6    you testified to earlier?
7    A.  I have not seen this.
8    Q.  Okay.  When you look at -- have you ever seen any Best
9    underwriting guideline like this before?
10   A.  No.
11   Q.  And when you look at this particular document your
12   testimony is in the ocean marine department this is not
13   something that you receive or subscribe to in the usual
14   course of the ocean marine underwriting business at Acadia?
15   A.  Correct.
16   Q.  And how does this exhibit compare to what Mr. Langer
17   showed you?
18       MR. LANGER:  Objection.  For the record what I
19   showed him was the answers to interrogatories that quotes
20   what purported to be some of Best's underwriting
21   guidelines.
22       MR. CHAPMAN:  Okay.
23   Q.  So your testimony is you have never seen this
24   particular exhibit before today, correct?
25   A.  Correct.

Page 98

1    Q.  And this type of exhibit is not something that you use
2    in the course of underwriting ocean marine risks for
3    Acadia, correct?
4    A.  Correct.
5    Q.  I am going to read a couple of things from this and I
6    am going to ask you if from your vantage point as a -- as
7    an underwriter of ocean marine coverages you agree or
8    disagree.
9        MR. LANGER:  I am going to object to the extent
10   that you are trying to get him to adopt any type of
11   material in this.  You have shown it to him, he said he
12   didn't recognize it, he doesn't rely upon it or anything
13   like it, and therefore under the rules of evidence the
14   inquiry should stop so I am going to -- I object.  You can
15   ask the question.
16       MR. CHAPMAN:  All right.  This -- excuse me, off
17   the record.
18       (Discussion off the record.)
19   Q.  Back on, sorry for interruption again.  The page two
20   under general liability it says although the basic policy
21   normally excludes coverage for demonstration of watercraft
22   this coverage can be added.  From your perspective as an
23   ocean marine underwriter and from your perspective as
24   someone who has sold boat dealer and MOLL policies as a
25   wholesaler would you agree or disagree with that statement?

Page 99

1        MR. LANGER:  I object to the extent that this
2    deals with a general liability policy, he is not being
3    offered for that.  If you are asking him based on his
4    experience unrelated to the 30(b)(6), then you can answer.
5        MR. CHAPMAN:  Well, let me just say for the
6    record we have a differing interpretation of this document
7    then, but can you answer the question?
8    A.  Based on my own experience a GL underwriter would not
9    add that.
10   Q.  And based upon your experience would a MOLL/BD
11   underwriter add that?
12   A.  Coverage for demonstrations?
13   Q.  Right.
14   A.  Yes, but subject to the boat being operated by the
15   insured or his employee.
16   Q.  And the document states that the underwriter should
17   know whether boats are demonstrated or tested on or away
18   from the premises and whether an employee experienced in
19   boat control and water safety is present.  From your
20   perspective as an ocean marine underwriter and someone who
21   has sold MOLL/BD policies as an underwriter do you -- would
22   you agree or disagree that those are things that the
23   underwriter of ocean marine coverages should know?
24       MR. LANGER:  Object, it has been asked and
25   answered.

Page 100

1    A.  If we should know that boats could be demonstrated?
2    Q.  That you should know whether boats are demonstrated on
3    or away from the premises and whether an employee
4    experienced in boat control and water safety is present --
5        MR. LANGER:  Same objection.
6    Q.  -- during the demonstration?
7    A.  I wouldn't say employee present, I would say in
8    control of the boat.
9    Q.  And if I understand you correctly you are saying you
10   wouldn't determine -- as an ocean marine underwriter you
11   wouldn't determine whether an employee was present during
12   the demonstration because you would assume that an employee
13   was present during the demonstration?
14   A.  Correct.  I would assume that the employee was in
15   control of the boat, not present.
16   Q.  In control meaning what, being on board the boat or
17   being --
18   A.  Physically operating the vessel at the controls.
19   Q.  So when it says all -- down at the bottom of that
20   paragraph all these possibilities must be considered would
21   it be your testimony that you would disagree that you need
22   to consider the possibility of whether an employee is
23   present during a demonstration or test of a boat for sale?
24       MR. LANGER:  Same objection as before.  Where are
25   you pointing to?

25 (Pages 97 to 100)

# Exhibit C

# ORIGINAL

1

2                    UNITED STATES DISTRICT COURT

3                     DISTRICT OF MASSACHUSETTS

4                  Civil Action No.  05-CV-10883-WGY

5

6

7      LESLIE S. RAY INSURANCE

8      AGENCY, INC., and

9      BEVERLY PORT MARINA, INC.,

10                      Plaintiffs,

11             vs.

12      ACADIA INSURANCE COMPANY,

13                      Defendant.

14

15

16             DEPOSITION OF MATTHEW PEDERSEN, taken

17      pursuant to notice, at the offices of Tompkins, Clough,

18      Hirshon, Langer, P.A., Three Canal Plaza, Portland, Maine,

19      on November 1, 2005, commencing at 10:23 A.M., before Tammy

20      L. Martell, Registered Professional Reporter, a Notary

21      Public in and for the State of Maine.

22

23

24             Downing & Peters Reporting Associates

25           79 Atlantic Place, South Portland, Maine  04106

Page 18

1   Agency, had placed any ocean marine products yet through
2   Acadia?
3   A.   At the time of my visit I don't remember.
4   Q.   Is there any way you would have of identifying when
5   that visit was?
6   A.   No.
7   Q.   And this was a visit that you made to Leslie Ray's
8   office?
9   A.   I did.
10  Q.   And on behalf of Acadia were you the only person or
11  did you go with someone else?
12  A.   I believe I was alone.
13  Q.   Do you remember where Ray's office was at that time?
14  A.   I am guessing it was in Beverly.
15  Q.   And how long did the meeting last?
16  A.   30-40 minutes.
17  Q.   And what was discussed during that meeting?
18  A.   That we had an ocean marine department at Acadia, that
19  our products included those that I listed before, that we
20  were the leading underwriter of those products in Maine,
21  New Hampshire and Vermont, and I hoped to be able to help
22  him with his marine insurance needs in the future.
23  Q.   Do you have any memory as to how this meeting came to
24  be?
25  A.   I probably called Mr. Ray and set up an appointment to

Page 19

1   come visit and introduce myself.
2   Q.   And how is it that you had targeted Ray as someone to
3   go visit?
4   A.   They were a newly appointed agent of the company.
5   Q.   If I suggested to you that they were appointed as an
6   Acadia agent in 1997 would that be consistent with your
7   memory?
8   A.   It sounds right.
9   Q.   Were you ever involved in any way with agency
10  agreements?
11  A.   No.
12  Q.   I will show you the -- I will show you Hamblen Exhibit
13  No. 3 reflecting that Ray was appointed in December 1997,
14  do you see that?
15  A.   I do.
16  Q.   And with reference to that particular date would that
17  help you to tell me when it was that you made this one
18  visit to the Leslie Ray Agency?
19  A.   It could.
20  Q.   In other words, could you -- having seen that date
21  could you specify any further as to when you -- what your
22  best testimony would be as to when you made that visit to
23  the Ray Agency?
24  A.   This is in December 1997, I left the company in
25  November of 2000, obviously it was sometime in that period.

Page 20

1   Q.   Mm-hmm.
2   A.   But honestly the company had gone into Massachusetts
3   and appointed pages of agents, it would have taken months
4   to visit them all at one day a month.
5   Q.   Okay.
6   A.   While also visiting my agents in my current agency
7   plan so I would squeeze them in as I could.  I honestly
8   don't remember exactly when.  It could have been the next
9   month, it could have been the month before I left the
10  company, I honestly don't remember.
11  Q.   Okay.  Okay.  Was there -- when did Acadia first start
12  writing these coverages in Massachusetts, the ocean marine
13  coverages, as far as you can recall?
14  A.   The same time it started writing all coverages --
15  commercial lines coverage.
16  Q.   And when was that?
17  A.   I don't know.  I don't remember.
18  Q.   Sometime in the late 19 -- latter half of the 1990s?
19  A.   I think they were all appointed at the same time,
20  there was no staggering appointment process.  There might
21  have been, but it wasn't that a long process.  I suspect
22  within a six-month period the entire agency plan was in
23  place.
24  Q.   Okay.  So would this agency agreement having this in
25  front of you help you to testify as to when Acadia started

Page 21

1   writing coverages in Massachusetts?
2   A.   Well, with this agent it was clearly December 23rd,
3   '97.
4   Q.   Okay.
5   A.   With another agent it could have been November 23rd,
6   '97, but it was probably all the agents were --
7   Q.   That's what I am saying, roughly in this, within a
8   matter of months --
9   A.   It appears that Acadia was licensed in Massachusetts
10  sometime in the third quarter of 1997, but it could have
11  been licensed the first quarter, I don't -- wasn't involved
12  with that.
13  Q.   Okay.  Now, when you -- back to this 30 to 40 minute
14  long meeting you had with Dave Ray at the Ray Agency do you
15  remember -- take this back.  Do you remember having any
16  contact with Mr. Ray about the agency's experience with
17  placing ocean marine coverages?
18  A.   I do not.
19  Q.   Do you remember what Dave Ray said to you -- did you
20  have an understanding that before this meeting that he had
21  ever been involved with placing any kind of ocean marine
22  coverages with any company?
23  A.   Did I have an understanding?
24  Q.   Right.
25  A.   I don't remember.

6 (Pages 18 to 21)

Page 22

1  Q.  Do you remember having an impression as to what his
2  level of experience with ocean marine coverages was?
3  A.  No.
4  Q.  Would it be fair to say that in terms of when you were
5  the director of ocean marine underwriting for Acadia when
6  you would make these visits with the agent would it be fair
7  to say that your level of experience and knowledge with
8  respect to ocean marine -- marine coverages was greater
9  than that of the average agent?
10        MR. LANGER:  Objection.
11  A.  Not necessarily.
12  Q.  Okay.  But typically would that be a fair statement?
13        MR. LANGER:  Same objection.
14  A.  Not necessarily.
15  Q.  Okay.  Out of all the agents that you personally dealt
16  with that were Acadia agents what percentage of them would
17  you say was -- were familiar with ocean marine coverages?
18        MR. LANGER:  Objection, foundation.
19  A.  Can you repeat that?
20  Q.  When you were working for Acadia and dealing with
21  Acadia agents can you tell me what percentage of those
22  agents were familiar with ocean marine coverages?
23  A.  Exactly?
24  Q.  No, just your best -- your best estimate.
25        MR. LANGER:  Same objection.

Page 23

1  A.  20 percent.
2  Q.  Okay.  With the remaining 80 percent appearing to be
3  unfamiliar, fair to say?
4  A.  Less familiar.
5  Q.  Okay.  And ocean marine coverages are a specialty
6  insurance coverage, correct?
7        MR. LANGER:  Objection to the form of the
8  question.
9  A.  Yes.
10  Q.  And -- and when I say specialty coverage -- well, in
11  your -- in your parlance how would you define specialty
12  coverage?
13  A.  Something outside of the mainstream commercial lines
14  product line.
15  Q.  All right.  And when you say mainstream commercial
16  lines product lines can you give me some examples of types
17  of insurance coverage that would be within that mainstream?
18  A.  Property, general liability, auto, workers' comp.
19  Q.  Do you remember -- going back to the meeting with Dave
20  Ray at Leslie Ray do you remember anything that Dave Ray
21  said to you during that meeting either about the agency or
22  his experience or what types of business they wrote or
23  anything?
24  A.  I do not.
25  Q.  Okay.  Would you be able to describe Dave Ray

Page 24

1  physically in terms of what he looks like?
2  A.  I can't remember.  I wouldn't recognize him if he was
3  sitting next to me.
4  Q.  Do you have any recollection as to -- well, strike
5  that.  I think you answered that in differences.
6        Were there any other marketing responsibilities
7  you had -- you had when you were working as the director of
8  ocean marine underwriting with Acadia?
9  A.  No.
10  Q.  And when you were working for Acadia did Acadia have a
11  marketing website for agents?
12  A.  We had a website.  I am not sure what its purpose was,
13  but we had a website.
14  Q.  Are you aware that there is currently a restricted --
15  Acadia maintains a restricted website for agents to use
16  that has to do with marketing?
17  A.  I am.
18  Q.  Okay.  And do you know if they had that restricted
19  agents website back when you were at Acadia?
20  A.  I believe that they did, but at the time I left it had
21  not been up and running all that long and in fact the
22  majority of that section was what we would call nowadays
23  under construction and yet to be developed.
24  Q.  Okay.  When you were at Acadia was -- did the website
25  refer in any way to the ocean marine coverages?

Page 25

1  A.  No.
2  Q.  Did you have any role -- by the time you left was it
3  the intention of Acadia as far as you know to have that
4  website for the -- for the agents address and market ocean
5  marine products?
6  A.  To the best of my recollection what was planned for
7  that website was the ability for an agent to go in and
8  print off applications.
9  Q.  And when you say applications you are talking about
10  the special application that Acadia's ocean marine
11  department had?
12  A.  I am.
13  Q.  Do you recall that the website either contained or was
14  going to contain any kind of description about the
15  features, the pros and cons, what it covered, what it
16  didn't cover, of the ocean marine coverages?
17  A.  What was the question?
18  Q.  Okay, it was a -- I will try it again.  I will try to
19  rephrase it.  Do you remember if the website was -- either
20  did get into or was planned to get into the -- an
21  explanation of the features of Acadia ocean marine
22  coverages?
23  A.  No and no.
24  Q.  Did you ever have any role of any kind in putting
25  together any kind of content for that agent website?

7 (Pages 22 to 25)

Matthew Pedersen

Page 38

1  part of the original form and were added by plaintiff's
2  counsel.
3      MR. CHAPMAN: Right, yeah, for the record the
4  highlighting is mine.
5      MR. CHAPMAN: So the question is have you ever
6  seen this form before?
7      THE DEPONENT: I have not.
8  Q.  Okay. Would -- when you look at the form -- take a
9  minute to look at this. And actually I will take a -- I
10  will take a two minute break to let you do that. If you
11  would look at this form and once you have had a chance to
12  go through that my question is going to be do you see in
13  this particular form, and -- and again not asking you for
14  legal condition but the way you would interpret this form
15  as an underwriter of ocean marine coverage, okay, do you
16  see the condition to this coverage relative to being the
17  boat being operated on the water by an insured or an
18  authorized employee of the insured, okay?
19      MR. LANGER: And I am going to object on the
20  basis of form and foundation and if this is part of a
21  larger policy that he provided the opportunity to review
22  the entire policy.
23      MR. CHAPMAN: Okay. All right. So take a
24  second.
25      (A short break was taken.)

Page 39

1  A.  Can you repeat your question?
2  Q.  Yes. My question is having looked at this form do you
3  see the -- do you see a condition in this coverage
4  analogous to -- strike that.
5      When you look at this CNA form is there a
6  condition in this form relative to the boat being operated
7  on the water by the insured or an authorized employee of
8  the insured?
9      MR. LANGER: Same objection as before, seeks a
10  legal conclusion, document speaks for itself, and I believe
11  it is part of a larger policy that has not been provided.
12  A.  I can't answer the question because I don't have this
13  coverage form.
14  Q.  And what are you referring to?
15  A.  Well, under definitions it refers to the insured boat
16  being any boat insured under any of the following coverage
17  forms attached to this policy and there is not only those
18  coverage forms but there is, quote, unquote, this policy,
19  so I don't have the rest of the policy and without that I
20  don't think I can answer the question.
21  Q.  Okay. Let me direct -- let me direct your attention
22  to the insuring agreement on page one of the form and my
23  question will just be limited to this, do you see that
24  condition in that language, the language that's highlighted
25  on page one?

Page 40

1      MR. LANGER: Objection, the document speaks for
2  itself.
3  A.  Not in these two paragraphs.
4  Q.  Okay. All right. Thank you. I will take that back.
5  I am going to show you first of all Exhibit No. 9 from
6  yesterday's -- yesterday's deposition of Mr. Wirth and I
7  want to direct your attention to the yacht dealer's marina
8  operator's application that was attached to this exhibit
9  which is an affidavit which was authenticated by Mr. Wirth.
10  Handing you this part of this Wirth exhibit do you
11  recognize that document?
12  A.  I do.
13  Q.  Okay. And what do you recognize that to be?
14  A.  The MOLL/BD application.
15  Q.  Okay. And when is the last time you saw that
16  document?
17  A.  This very document?
18  Q.  Yes.
19  A.  This morning.
20  Q.  Okay. This is one of the documents that you looked at
21  to prepare for the deposition?
22  A.  It is.
23  Q.  Okay. And when is the last time before this morning
24  you saw it?
25  A.  When I spoke to Mr. Langer less than a week ago.

Page 41

1  Q.  Okay. Did he -- I can see him gearing up here, I will
2  try to prevent.
3      Under what -- were you alone when you saw this
4  document a week ago?
5  A.  No.
6  Q.  Okay. You were with Mr. Langer?
7  A.  I was.
8  Q.  Okay. And when you look at this is this the original
9  submission for MOLL/BD coverage that came in for Beverly
10  Port?
11      MR. LANGER: Do you mean original in the sense it
12  was the first or are you asking him whether this is the
13  original document?
14      MR. CHAPMAN: No, okay.
15  Q.  Is this a fair copy of Beverly Port Marina's original
16  submission for MOLL/BD coverage?
17      MR. LANGER: Same objection to form.
18  A.  I don't know.
19  Q.  Okay. Do you -- do you see your handwriting anywhere
20  on the document?
21  A.  No.
22      MR. LANGER: Check all the pages.
23  A.  No.
24  Q.  Okay. Do you see any -- do you have any memory of
25  handling this particular submission when it came in to

11 (Pages 38 to 41)

# Exhibit D

PERIOD 10881-6
10-27-05 Tim
F. L.

# Agency Agreement

Agent's name  **·Leslie S. Ray**
**Insurance Agency, Inc.**

Agent's address  **129 Dodge Street**

**Beverly, MA  01915**

This Agreement is made this 23 day of Dec. , 1997
by and between the Agent indicated above and the Company(ies)
designated below.

☒ Acadia Insurance Company
☒ Berkley Regional Insurance Company
☒ Firemen's Insurance Company of Washington, D.C.
which Company(ies) shall be hereinafter referred to as the
"Company." Notwithstanding the foregoing it is hereby
acknowledged that any liability of each of the preceding
companies is several and not joint and this Agreement is
respectively made with each such Company.

When used in this Agreement the term "Agent" means one or more
persons and any business entity licensed by a state to act as a
representative of the Company, directly or through legally
authorized personnel, in negotiating, servicing or effecting policies
of insurance issued in the name of the Company. The terms "you"
and "your" mean the Agent; the terms "we," "us," and "our" mean
the Company.

The above-designated parties hereby agree to the following terms:

## I.  Authority/Responsibility

A. The Agent is an independent contractor, not an employee of
the Company, exercising exclusive and independent control
of the Agency. The Agent may represent more than one
company.

B. Authority is hereby granted to solicit, receive, bind, execute,
and transmit proposals for insurance contracts (including
bonds) to the Company subject to the written guidelines
issued by the Company. Agent agrees to forward to the
Company written copies of applications, binders, policies,
endorsements, and certificates within five (5) business days
after execution or issuance. Agent will promptly report all
claims to the Company Home Office or its authorized
representative.

C. The Agent is hereby granted authority to collect, receive, and
provide receipts for premiums as herein provided.

D. All Agent records pertaining to Company business shall be
available for inspection by the Company. All Company
records pertaining to the business of the Agent shall be
available for Agent's inspection. All powers of attorney,
policies, company seals, and other supplies, manuals,
documents, and forms provided to the Agent by the Company
shall remain Company property and shall be promptly
returned to the Company on demand.

E. The Company reserves the right to cancel (subject to state
law) at any time any policy or bond placed by the Agent with
the Company.

**EXHIBIT**

L

## II.  Commissions

A. The Company will pay the Agent commissions at the rates
specified in the Commission Schedule which may be
amended from time to time by the Company. The Company
will give at least 90 days notice of proposed revisions of
these rates. The Company will not propose rate revisions at
intervals of less than one year.

B. Whenever the Company refunds premiums on insurance, the
Agent shall refund the commission to the Company at the
same rate of commission as was paid on that insurance,
regardless of whether the refund occurs during or after the
termination of this Agreement.

C. The terms of this Agreement shall not prohibit the negotiation
of special commission rates on individual policies by express
mutual agreement between Agent and Company.

## III.  Direct Bill

A. The Agent is responsible for the prompt submission of
completed applications or original policies to the Company,
including the initial premium, without deduction of
commission, on those policies requiring payment with the
application.

B. The Company will be responsible for preparation of all
polices, endorsements, renewals, and collection of all direct
bill premiums.

C. The Company will clearly, and prominently, identify Agent
by name when transmitting policies, endorsements, premium
and collection notices.

D. Commissions on premiums shall be paid to Agent no later
than 30 days after the end of the month in which the
premiums are received by the Company. Such commissions
shall be offset by Company for any return commissions due
from Agent.

E. In the event of termination of the Agreement, the Company
will, at the Agent's request, furnish a list of policyholders
with the expiration dates of the policies.

F. The Company will not use its records of direct billed business
placed by the Agent with the Company, to solicit insured(s)
for other lines of insurance, products or services without the
prior approval of the Agent, unless the Company becomes
entitled to control the expirations.

## IV.  Agency Bill

A. Agent shall hold as a fiduciary trust, all premiums collected
by or paid to Agent for insurance issued in Company's name,
separate and apart from any money belonging to the Agent.
Agent shall pay Company all such premiums due according
to the terms of this Agreement. All premiums are the
property of the Company and commissions payable to the
Agent are debts owned by the Company. Keeping an account

with the Agent on our books is only a record of business transacted and neither the keeping of such an account, nor the privilege of deducting commissions from such premiums shall be deemed to waive the understanding of that trust.

3. Premiums that have been determined by audits, retro adjustments, and interim reports will be fully earned. The Agent shall exert diligence to collect such premiums.

4. Any credit extended by the Agent shall be the sole risk of the Agent. The Agent has no authority whatsoever to finance premiums with any entity as an Agent of the Company. In securing financing for policies or bonds written under this Agreement, the Agent will act only as the representative of the insured, and the Company will not be responsible for any representations made on its behalf.

## V.  Premium Accounting

A. Itemized statements of money due shall be prepared monthly by the Company, or when agreed upon, by the Agent. The statement is to be received by the Agent or by the Company no later than the 15th day following the account month reported.

B. All premium balances due the Company shall be paid no later than 45 days after the end of the account month for which the statement was prepared.

C. The omission of any items from a monthly statement shall not affect the responsibility of either party to account for and pay all amounts due the other.

D. If Agent fails to collect any premiums in accordance with this Agreement, or if Agent is relieved of the responsibility as specifically provided in item E of this section below:

1. Company shall have the right to collect those premiums in any manner it may see fit;
2. no commissions shall be paid on any such premiums collected by the Company;
3. such action by Company shall not relieve Agent of any liability under this Agreement to pay the Company all other premiums due; and
4. the Agent will have no further responsibility for collection of these premiums.

E. Company will relieve Agent from responsibility for payment due to inability to collect earned premiums disclosed by audits providing the following:
1. written request for relief is made by Agent within 45 days from the end of the month in which the audit or report bill is rendered;
2. Agent has issued a bill for such additional premiums and has made genuine and reasonable attempts to collect those premiums, including written demand for payment; and
3. failure of Agent to give the Company such notice shall constitute acceptance by the Agent of responsibility to pay such premiums.

## VI. Ownership of Expirations

A. The use and control of expirations and the records thereof, including insurance which was submitted by the Agent pursuant to the Company billing procedures, shall be Agent's property and left in the Agent's undisputed possession provided that the Agent has paid and continues to pay to the Company any and all premiums due in accordance with this Agreement.

B. In the event that the Agent fails to pay the Company any and all premiums due in accordance with this Agreement, the use and control of all expirations, and all right, title, and interest in and to the records thereof, including insurance which was submitted by Agent pursuant to the Company billing procedures, shall be vested in the Company.

C. Any difference of opinion with respect to Agent's liability to Company shall not affect the ownership of expirations clause provided the Agent promptly furnished acceptable collateral security equal to the disputed amount, to be held by the Company until the difference is resolved. Company shall have the authority to utilize the collateral to the extent necessary to cover the indebtedness, interest, and expenses due the Company as finally resolved.

D. The Company may, at its discretion, sell at private and public sale such expirations and records, and if sufficient money is not realized to fully discharge Agent's indebtedness to the Company, Agent shall remain liable for the balance of the money owned to the Company. Any amount realized by the Company is excess of the Agent's indebtedness, after deduction of the expenses of selling such expirations and records, shall be returned to the Agent.

E. Notwithstanding anything to the contrary, nothing in this section shall interfere with the Company's obligation to renew polices containing contractual renewal guarantees or which must be renewed by order of governmental authority, and the Agent shall be entitled to receive commissions on such policies at the prevailing rate of commission then in effect, unless the Company is furnished with a written designation of another Agent signed by the insured.

## VII.   Indemnification

The Company shall defend and indemnify the Agent against liability, including reasonable cost of defense and settlements, imposed on it by law for damages caused by acts or omissions of the Company, provided the Agent has not caused or contributed to such liability by its own acts or omissions. The Agent agrees, as a condition to such indemnification, to notify the Company promptly of any claim or suit against it and to allow the Company to make such investigation, settlement or defense thereof as the Company deems prudent.

## VIII.  Sale of Agency

A.   This Agreement shall not be assigned by the Agent.

B.   The Agent agrees to give at least 60 days advance written notice to the Company of any pledging or granting of a security interest in the business of its expirations. The Agent agrees to give notice when reasonably practicable with respect to substantial sale (i.e. change in ownership of more than 40%), transfer, merger or consolidation. Upon receipt of this notice the Company may at it's sole discretion:

   1.   Approve the assignment of this Agreement to the successor;

   2.   Execute new agreement with the successor; or

   3.   Terminate this Agreement as provided in the "Termination" section of this Agreement.

C.   There shall not be any interruption in service to policyholders upon the sale or transfer of the Agent's business.

## IX.  Termination/Suspension

A.   Subject to requirements which may be imposed by law, this Agreement shall terminate:

   1.   Automatically if any public authority cancels or declines to renew the Agent's license or certificate of authority, or

   2.   Upon either party giving at least 90 days written notice in advance to the other; or

   3.   Immediately upon either party giving written notice to the other in the event of abandonment, fraud, insolvency or gross and willful misconduct on the part of such other party.

B.   If the Agent is delinquent, in either accounting or payment of monies due the Company, the Company may, by notice to the Agent, immediately suspend or terminate the Agent's authority to: submit, issue, or bind any new or renewal business, or change any existing policy during the suspension or termination. This provision shall not apply to routine differences in accounting records of the Agent and the Company which are minor in amount and do not involve premiums collected and willfully withheld by the Agent.

C.   The Company may at its discretion suspend rather than terminate this agreement for violation of the provisions of this Agreement. In the event of suspension the Company agrees to make every effort to work with the Agent on a mutually agreed upon plan of rehabilitation for a period of 90 days to one year depending on the reasons for suspension. Such plan will specify what the Agent must do to avoid termination and how the Company intends to assist the Agent to avoid termination.

D.   In the event of termination of the Agreement:

   1.   The Agent's records, use and control of expirations, including direct billed business shall remain in the undisputed possession of the Agent, provided the Agent has then rendered and continues to render timely accounts and payments of all amounts due the Company, or provides security acceptable to the Company. Otherwise, the records, use, control and ownership of all expirations of business placed with the Company shall become vested in the Company.

   2.   The Company may retain all commissions, or any other funds which are or may become payable to the Agent, and apply same against the Agent's indebtedness to the Company.

   3.   If in disposing of such records and expirations the Company does not realize sufficient money to discharge in full the Agent's debt to the Company, the Agent shall remain liable for the balanced of such indebtedness. Fees and any other expenses incurred in the collection of premiums for these polices shall be added to me debt. Any amount realized in excess of the debt, less expenses of disposing of such records and expirations, shall be returned to the Agent.

   4.   Should it become necessary for the Company to institute legal action to enforce an arbitration award to achieve compliance with the arbitration provisions of the agreement. Agent agrees to pay all reasonable costs of such actions, including attorneys' fees and interest.

E.   In the event this Agreement is terminated, the method of accounting will be automatically changed to Company statements and all future premium payments hall be paid no later than 45 days after the end of the account month for which the statement was prepared.

F.   In the event of termination, the Company agrees to notify all direct bill policyholders of the Company's intents not to renew. This notice shall be forwarded directly the policy holder 30 days prior to renewal or such other time as required by law. The notice to the policyholder shall make no reference to the reasons for the termination of the Agreement. The Agent will receive a copy of the letter to be sent to all insureds.

## X.  Changes in Agreement

A.   This agreement may be revised at any time by mutual written agreement of the Agent and the Company.

B.   Revisions of this Agreement and Commission schedule, unless otherwise mutually agreed to by the Company and the Agent, will be communicated to the Agent in writing by the Company representative 90 days in advance of the change.

## XI. Arbitration

In the event of any dispute arising out of or under this Agreement between the Agent and the Company, both agree to submit such dispute to arbitration, and the expenses will be borne equally by the Company and the Agent.

A.  There will be three arbitrators, one will be selected by the Company, one will be selected by the Agent and a third will be selected by those two arbitrators.

B.  The decision of the arbitrators will be final and binding on all parties hereto.

## XII. Designation of Agent by Policyholder

If a conflict exists as to which Agent or Broker represents an existing or prospective policyholder with respect to any insurance matter subject to this Agreement, the policyholder's written statement designating his agent or broker shall control.

## XIII. Conditions

A.  The provisions of this Agreement shall not apply to business administered by underwriting associations, syndicates, pools, plans, or other non-voluntary programs.

B.  The Agent shall not broadcast, publish or distribute advertisements or other matter referring to the Company or the Company's contract of insurance without first securing the Company's written approval.

C.  The Agent has no authority to admit liability on the part of the Company in any manner or make any payments on behalf of the Company, except in accordance with specific claim settlement authority extended to the Agent in writing.

D.  The Company will credit the Agent's experience records for subrogation and salvage recoveries received in computing the Agent's loss ratios.

E.  The Company shall not be responsible for any expenses incurred by the Agent, on his behalf or on behalf of the Company, unless specifically authorized by the Company in writing.

## XIV. Effective Date and Term

This Agreement supersedes any and all previous Agreements, written or oral, and together with the attached Commission Schedule, represents the complete and exclusive Agreement between the Company and the Agent. This Agreement shall be effective on __12/23/97__ and shall continue in full force and effect until amended, terminated, or superseded.

or

shall be effective on _____ and shall remain in full force and effect to a term of (       ) months, unless earlier amended, terminated or superseded.

Witness: _____

Agent:    Leslie S. Ray
          Insurance Agency, Inc.

By: _____

Title: _____

Witness: _____

Company:    ☒  Acadia Insurance Company
            ☒  Berkley Regional Insurance Company
            ☒  Firemen's Insurance Company of
               Washington, D.C.

By: _____

Title:    President

7/1/97



First Amendment to
Agency Agreement

| | |
|---|---|
| Agent's name: | Leslie S. Ray Insurance Agency, Inc. |
| Agent's address: | 129 Dodge Street |
| | Beverly, MA  01915 |

This First Amendment to Agency Agreement is made this
__23rd__ day of __December__ , 19 97
by and between the Agent indicated above and the Company(ies)
designated below.

☒ Acadia Insurance Company
☒ Berkley Regional Insurance Company
☒ Firemen's Insurance Company of Washington, D.C.
which Company(ies) shall be hereinafter referred to as the
"Company."

The above designated parties agree to amend the Agency
Agreement executed between the parties as of the
__23rd__ day of __December__ , 1997

| | |
|---|---|
| Witness: | |
| Agent: | Leslie S. Ray Insurance Agency, Inc. |
| By: | |
| Title: | |
| | |
| Witness: | |
| Company: | ☒ Acadia Insurance Company |
| | ☒ Berkley Regional Insurance Company |
| | ☒ Firemen's Insurance Company of Washington, D.C. |
| By: | _Richard A. Sawyer_ |
| Title: | President |

## I.  Premium Accounting

Section V(B) of the Agency Agreement is amended to read as
follows: "All premium balances due the Company shall be paid
no later than forty-five (45) days after the end of the account
month for which the statement was prepared, except that, with
respect to policies written in the Commonwealth of
Massachusetts, all premium balances due the company shall be
paid no later than fifty (50) days after the end of the account
month for which the statement was prepared."

## II.  Miscellaneous

A.  This First Amendment becomes effective immediately
    upon execution by both parties to this agreement.

B.  This First Amendment contains the entire agreement
    between the parties with respect to the subject matter
    of this First Amendment.

C.  In all other respects, the Agency Agreement previously
    identified is hereby ratified and confirmed and shall remain
    in full force and effect.

9/97



# Profit Sharing Agreement

☑ Acadia Insurance Company
☑ Berkley Regional Insurance Company
☑ Firemen's Insurance Company of Washington, D.C.

Each of the Insurance Companies designated above, severally and hereinafter called the Company, provide this Profit Sharing Agreement based upon the profits of the business written and produced through the agency as shown by the Home Office records of the Company for each contingent period and during the time this agreement is in force; the first such period beginning on January 1, 1994 and ending on December 31, 1994 and each calendar year thereafter.

The Company agrees to pay the Agency a Profit Sharing Payout calculated by the Company in accordance with the formula set forth below and subject to the terms and conditions of this Agreement. This payout is in addition to any commissions payable pursuant to the Agency Agreement.

## Minimum Volume Requirement
Profit sharing payments shall not be payable to the Agency for any profit sharing year unless the Agency's Written Premiums for the year are at least TWO HUNDRED THOUSAND DOLLARS ($200,000); otherwise this agreement will be inoperative.

## Eligible Business
The provisions of this agreement do not pertain to premium production of Mass Marketing, all Retrospectively Rated Risks, Risks of Special Classes mutually agreed upon between Company and Agency, Excess and Surplus Lines, Auto Insurance Plans, Auto Reinsurance Facility Business, Workers' Compensation Plans or Pools or any other Pools, Associations or other involuntary business.

For the purpose of this agreement, the profit on the business produced by the Agency during the year under consideration shall be a combination of the business of all companies designated herein.

## Definitions
Profit Sharing Year means the calendar year for which the Company calculates the Agency as eligible for a profit commission, and/or growth bonus.

Written Premium means the insurance premiums recorded by the Company on the Agency's Eligible Business during the Profit Sharing Year less premiums returned as a result of cancellation or adjustment.

Commission Earned means the commission percentage shown on the producer results times the written premium also shown on the producer results report

Outgo means the sum of the following items:
1. Loss and Loss Expenses Incurred as defined below.
2. Commissions earned by the Agency.

Premiums Earned represent the actual premiums earned on the Agency's eligible business during the Profit Sharing Year as shown by the records of Company, less premiums charged off by the Company.

Profit Sharing Payout means the amount payable to Agency under this agreement as calculated pursuant to the formula set forth above.

Losses and Loss Expenses Incurred means the sum of:
1. losses and loss adjustment expenses paid during the Profit Sharing Year less any recoveries for salvage or subrogation realized by the Company during the Profit Sharing Year,
2. case reserves outstanding at the end of the Profit Sharing Year minus case reserves outstanding at the beginning of the Profit Sharing Year,
3. the reserves established by the Company for the development of known claims during the Profit Sharing Year,
4. the reserves established for loss adjustment expenses as established by the Company during the Profit Sharing Year. However, loss adjustment expenses are limited to a maximum of $100,000 for any one loss.

The profit sharing payout due the Agency under this agreement shall be determined by the following formula.

| Profit Sharing Year Income | |
|---|---|
| Premiums earned | $ _____ |
| Profit Sharing Year Outgo | |
| Losses & Loss Expense Incurred | $ _____ |
| Commissions Earned | $ _____ |
| Total OUTGO | $ _____ |
| | |
| Current Year Net Profit or Loss | |
| Premiums Earned Less Total Outgo | $ _____ |
| Profit Sharing % as per Table 1 | _____ % |
| Profit Sharing Amount Due Agency | $ _____ |
| Growth Bonus _____ % | $ _____ |
| Less Delinquency Charges _____ % | $ _____ |
| Net Profit Sharing Amount Due | $ _____ |
| Less Profit Sharing Guarantee _____ % | $ _____ |
| Profit Sharing Payout | $ _____ |

## Growth Bonus

If the agency has produced an annual growth in Written Premiums of $50,000 or more (excluding mass marketing and retrospectively rated policies, special classes agreed upon between company and agency, excess and surplus lines, and all involuntary business and comparing the current years written premium to the previous year's written premiums), the Net Profit Sharing Amount due calculated above shall be multiplied by the Growth Bonus percentage displayed in Table 2.

In the event the business of two or more agencies is combined during the profit sharing year through sale, merger, consolidation or otherwise, the annual growth in Written Premium shall be calculated by comparing the current years written premium for the combined Agency with the previous year's Written Premium volume of the various separate Agencies.

## Stop Loss

Incurred losses shall be limited to the first $100,000 of a loss or losses as a result of a single event or any occurrence which causes a loss or a series of losses during the calendar year. This limitation applies only to an event or occurrence that occurs on or after the effective date of this agreement. If salvage recovery or adjustment of reserve on a loss in excess of the amount stated above reduces the loss below the loss limitation amount, a credit shall be allowed equal to the difference between the loss limitation amount and the loss as recorded on the Company's books at the end of the calendar year in which salvage was recovered or adjustment of reserve was made.

## General Provisions

If a Profit Sharing Plan Payout is due pursuant to this agreement, the Company will remit it to the Agent within 90 days after the end of the year if all premiums and other current indebtedness for the Profit Sharing Year have been paid. No charge or deduction for Profit Sharing payout shall be made or claimed by the Agency in his accounts, and is payable only by the Company check.

If the Agency is delinquent in the payment of any monies due the Company or in rendering an account current statement, any amount due the Agency under this Agreement will not be paid to the Agency. When the delinquency has been eliminated, payment of monies due the Agency under this Agreement will be adjusted to reflect any unreimbursed costs incurred by the Company in collecting any delinquent amounts. In addition, the Company may apply any monies due under this Agreement against any other amounts due Company by the Agency, including but not limited to, any costs of collection incurred by Company.

For each occasion that the Agency is delinquent in payment of any monies due Company during the Profit Sharing Agreement period, exceeding the credit terms as stated in the Agency Agreement, the final Profit Sharing Amount Due the Agency will be reduced by 10%.

Minor differences between the Agency's and Company's records or an honest difference of opinion with respect to balances owed to the Company shall not constitute delinquency under this provision.

This agreement shall continue in force until terminated in writing by either party or by termination of the agency agreement. If terminated by the Company, the Company agrees to continue the benefits of this agreement through the full contingent period during which written notice of termination is given to the Agency. If terminated by the Agency, or if any public authority cancels or declines to renew the Agency's license or certificate of authority, the Company's obligation to compute a Profit Sharing Payout due or to pay such amount under this agreement ceases immediately.

In the event of a change in Agency ownership during the Profit Sharing Year, any Share Payout earned during that plan period shall be payable by the company to the Agency owner shown on the Company records at the close of that period. Unless otherwise agreed in writing, for the purpose of computing profit sharing, the purchaser receives credit for all the premiums and is charged with all the losses of the purchased Agency for that current year ending December 31.

Neither this agreement, nor any rights hereunder shall be assignable, but the agreement may be altered or amended by the Company by written instrument to that effect, any such revision to be effective on and after January 1 of the next contingent year.

The Agency will not be eligible for any payment pursuant to this agreement in any Profit Sharing Year unless the Agency has fully complied with the Agency Agreement and all other rules and regulations of the Company.

This Agreement is the complete and final agreement of the parties and it supersedes any other profit sharing agreement between the parties.



## Arbitration

In case of misunderstanding as to the interpretation or application of any provision of this agreement which the Company and the Agency are unable to resolve, the disagreement shall be submitted to arbitration at the request of either party in the following manner:

1. The party requesting arbitration shall so notify the other party in writing, and shall specify the question or questions to be arbitrated.

2. Within fifteen (15) days after receipt of such notification, the Company and the Agency shall each select an arbitrator and give the name and address thereof to the other.

3. The two arbitrators shall promptly select a competent and disinterested party as a third arbitrator.

4. The decision of any two of the three arbitrators so chosen shall be final and conclusive to both the Company and the Agency. The decision shall be in writing and a copy thereof given to both the Company and the Agency within sixty (60) days after the request for arbitration.

5. All arbitration expenses shall be borne equally by the Company and the Agency.

## Amendment

1. This agreement may be amended at any time by a written agreement signed by both parties.

2. The Company may amend this agreement at any time after giving the Agency thirty (30) days advance written notice of the proposed change.

In Witness Whereof, this Profit Sharing Agreement is signed

this          day of          ,19

Agency    Leslie S. Ray
          Insurance Agency, Inc.

For Agency

Company Representative    *Richard P. Sawyer*

Title    President

## Table 1

### Profit Sharing Percentage

| Written Premium* | | Net Profit Percentage | | | | |
|---|---|---|---|---|---|---|
| | | 20% to 25% | 25.1% to 30% | 30.1% to 35% | 35.1% to 40% | Over 40% |
| $50,000 to | $499,999 | 4% | 5% | 6% | 7% | 8% |
| $500,000 to | $749,999 | 5% | 6% | 7% | 8% | 9% |
| $750,000 to | $999,999 | 6% | 7% | 8% | 9% | 10% |
| $1,000,000 to | $1,499,999 | 8% | 9% | 10% | 11% | 12% |
| $1,500,000 to | $1,999,999 | 9% | 10% | 11% | 12% | 13% |
| Over $2,000,000 | | 10% | 10% | 12% | 13% | 14% |

*Include premiums from mass marketing and retrospectively rated risks.

## Table 2

### Premium Growth Bonus

| Growth in Voluntary Premium Written | Growth Multiplier |
|---|---|
| Less than $50,000 | 1.05 |
| $50,000 to $149,999 | 1.10 |
| $150,000 to $299,999 | 1.125 |
| $300,000 to $499,999 | 1.175 |
| Over $500,000 | 1.20 |

**Acadia Insurance**

Profit Sharing
Guarantee

between   Acadia Insurance Company
and   Leslie S. Ray
Agency  Insurance Agency, Inc.
and the Companies listed on the Profit Sharing Plan

As of September 30 of each year, a computation shall be made under this agreement using September 30 as the end of the current year and disregarding for this computation, the Annual Minimum Volume Requirements. This computation will include the growth bonus.

If on this basis there is a Net Profit Sharing amount due the Agency, the Company guarantees to pay the Agency at least this amount, provided that it meets the Minimum Volume Requirements by the end of the year. Otherwise there shall be no guarantee by the Company hereunder.

In consideration for such guarantee, there will be a charge equivalent to fifteen percent (15%) of the Agency's Net Profit Sharing Amount including the growth bonus as of September 30.

As of the end of such year, the normal computation shall be made under this Profit Sharing Agreement. The Company shall then pay the Agency the greater of the amount guaranteed or the amount determined by the foregoing normal computation, in each case less the consideration owed by the Agency for the guarantee.

The Agency may terminate this Profit Sharing Guarantee by giving notice to the Company on or before August 31 of the year in which such termination is to be effective. Having elected to terminate the Profit Sharing Guarantee, however, it is understood that these Profit Sharing Guarantee provisions will not be reinstated for that profit sharing year. The Profit Sharing Guarantee may be reinstated for future profit sharing years if the Agency requests such reinstatement in writing prior to August 31 of that Profit Sharing Year.

In Witness Whereof, this addendum is signed this

_____ day of _____ ,19 ___

Agency   Leslie S. Ray
Insurance Agency, Inc.

For Agency _____

Company Representative _Richard P. Sawyer_

Title   _President_

Exhibit E

tabbies A

Not a Binder

TO: MATT PEDERSEN 3 PAGES.

## Yacht Dealers / Marina Operators Application

| | |
|---|---|
| Name of Applicant: ~~The~~ Beverly Port Marina | If accepted, coverage desired beginning: 5/27/00 19 |
| Address: 43-67 Water Street | |
| City: Beverly MA 01915 | State: Zip: |
| Contact and telephone number for Loss Control Inspection: Sue Kinzie 978-232-3300 | |
| Present Insurer: Hanover | |
| Loss Payee: Beverly National Bank | |
| Address: 240 Cabot Street | |
| City: Beverly MA 01915 | State: Zip: |

**General**

1. Operator's Experience in Business: + 4 yrs

2. Type of construction:      No. feet above high water mark:

    What is the general condition of buildings?    Are buildings sprinklered? ☑Yes ☐No   RACK AND SERVICE

    Is there a snow removal plan in effect, including rooftops? ☑Yes ☐No

3. Outside storage? ☑Yes ☐No

4. What types of protection systems are currently in use?

    ☑Fire Alarm (type):          ☑Burglar Alarm (type):

    ☑Central Station ☐Watchman ☑Flood Lights ☑Fencing ☐Dog

    Distance to Fire Hydrant: 500'    Distance to Fire Station: 1

5. Has any company refused or canceled any similar insurance applied for or in force during the past three years? ☐Yes ☑No

If yes, give details:

6. List losses for last three years with dates and amounts:

**Yacht Dealers**

1. List major brands sold: boats: Pro-Line, Quicksilver

    outboard motors: Mercury

2. Indicate average monthly values for the past year $   inside 2.4 mil total.

    $   outside

    Indicate peak inventory last 12 months:

    Average value on any one vessel $    Maximum value on any one vessel $

3. Limits desired:

    $ 850,000 on any one vessel. — alternative quote - $1,000,000

    $ 500,000 while in transit by land.

    $ 500,000 while on exhibit at:

    $   while on premises at:

    $   while on premises at:

    $ 850 in any one casualty.

4. Estimated number of Boat Shows / Exhibitions per year? 2   Do you exhibit in the water? ☑Yes ☐No

    Do you do demonstrations with customers aboard? ☑Yes ☐No   How Often? Incidental

A TRUE COPY
ATTEST: _Theodore M Writ_

Acadia Insurance

*Sales - Boat dealer - 2.4 Million*
*Storage / Mooring - 972,000*
*Operations / repairs - $349,000*

## Marina Operators Legal Liability

Limit desired: 3,000,000.    Deductible desired:

1. Ship Repairers:    Repairs    ☑Alterations    ☑Maintenance    ☐restoration

Type of vessels repaired? Generally pleasure boats

Type of work:    Fiberglassing / %    Engine 90 %    Electrical 5 %    General Repairs 5 %
                 Spray painting / %    Welding , %

Value of Vessels.    Average $ 40,000    Maximum $ 500,000

Gross Receipts Last 2 Years    $ 349,000 .19    $ ___ 19

Are trial runs performed after work is completed?    ☑Yes ☐No

2. Storage

Value of Vessels Stored:    Average $ 20,000    Maximum $ 115,000

Number of Vessels Stored:    Inside: 100    Outside: ~~Boat~~ 24 □In water: 25

Gross Receipts last 2 years    $ 977,000 .19    $ ___ 19

Number of Storage Buildings:    Construction: Steel

Type of storage:    On Cradles / %    Jack stands 70 %    in Racks 25 %    On Trailers 5 %

Is hold harmless agreement obtained?    ☑Yes ☐No

Are all buildings secured against illegal entry?    ☑Yes ☐No    If yes, how: Central

Are all buildings sprinklered?    ☐Yes ☑No    • Not office.

3. Docking and Mooring

                                                                    May increase to $1,000,000
Number of slips Available: 250    Maximum Value of Vessel $ 500,000    Average Value $ 40,000
Number of Moorings Available: 7

Gross Receipts Last 2 Years    $ ___ 19    $ ___ 19

Describe maintenance schedule on docks and moorings: Required annual inspections
                                                                    2 maint per

4. Fueling

Gross Receipts Last 2 Years    $ ___ 19    $ ___ 19

Fire extinguishers present: ☐Yes ☐No    Who does fueling? ☐Marina Employee , Boat Owner

5. Hauling and Launching (Other than in connection with Shiprepairers or Storage)

Type of Lifts: 2 travel & fork lift    Rated Capacity: 35 tons    Tons: 35 / 15 / 15

Is regular maintenance performed on equipment?    ☑Yes ☐No    Frequency: checked daily - fluids, tires.

Approx. Number of Vessels Handled per Year: 500    Maximum Value $ 500,000    Average Value $ 40,000

Gross Receipts Last 2 Years    $ ___ 19    $ ___ 19

Protection and Indemnity

Limit of Liability:    Yacht Dealers $ 2,000,000    Marina Operators $ 2,000,000    Medical payments: $2,000 included

Deductible Desired?

Number of persons who will operate watercraft and their experience:    3 - good experience - newly all
                                                                            within harbor

Ⓐ Fuel - Estimated receipts for year - $0.00
   due to ~~the~~ permit problems and Environmental
   Police

Yacht Dealers / Marina Operators Application rev. 1/93

Page 1 of 3

000419

**Piers, Ramps and Floats Coverage**

1. Brief description of property to be insured: Piers/docks

2. Type of construction: Wood, Concrete, Steel? wl foam     Fixed or Floating? all floating - 9 foot tide

   Year(s) of construction: Mid 80's → 70's

   Separate Fuel Dock?  : Yes  ☒No        Electricity on docks? ☒Yes  ..No

3. Briefly describe the maintenance program: Maintained daily, checked weekly

4. Briefly describe firefighting capabilities at pier: fuel dock — fire ext on all piers + suppression system

5. Is any property removed from water during winter? ☐ Yes ☒No

6. Has any company refused or canceled any similar coverage applied for in force during the past three years?  ☐ Yes ☒No

   If yes, give details:

7. Value of the docks: (include breakdown between Piers, Ramps and Floats)  $300,000

8. Deductible $

**Owned Watercraft**

No. of persons operating watercraft and their experience?  5 — good experience — mostly in harbor

Description of boats to be insured:

| Trade Name | Use of Boat | | Year Built | Length | H.P. | Value | Fuel | Material of Hull |
|---|---|---|---|---|---|---|---|---|
| 83 Boston whaler | ☐ rental  ☒workboat | | 83 | 24' | 175 | $3000 | GAS | ~~$100~~ Fiberglass |
|  | ☐ rental  ☐workboat | | | | | $ | | |
|  | ☐ rental  ☐workboat | | | | | $ | | |
|  | ☐ rental  ☐workboat | | | | | $ | | |

Describe usage of boats:  General — Boston — Cape Ann / Mostly harbor —

Protection & Indemnity Limit Desired: ☐ $100,000   ☐ $300,000   ☐ $500,000   ☒ $1,000,000

Navigation area of above vessel(s):  In harbor — occasional Cape Ann to Boston

Lay up period:  From 12/1, 12:01 A.M. To 3/1  12:01 A.M.        Deductible $ 1000

I hereby declare that I personally have read this application and I declare that the statements made are true. I understand that this is not a binder of insurance.

Applicant's Signature

Agency

Address

Agency Code                                      Date

# Exhibit F

# LOSS CONTROL SURVEY REPORT

**INSURED:**  Beverly Port Marina, Inc.

**LOCATION SURVEYED:**  11-25/43-67 Water Street, Beverly, MA 01915

**TEL. NO.:**  978-232-3300

**POLICY NO(S)./EXP. DATE:**  Prospect ( Exp. 5/22/00)

**AGENT:**  Leslie S. Ray Insurance Agency

**INTERVIEWED/TITLE:**  Frank Kinzie, Managing Director, Part owner

**SURVEY DATE:**  May 10, 2000

**REPORT COVERS:**  Property, Liability

**REQUESTED BY:**  Molly Welsh

**SURVEYED BY:**  Grettyl Lewit

| Post-it® Fax Note | 7671 | Date 1-8-01 | # of pages ► 5 |
|---|---|---|---|
| To *Pat* | | From *Jami Clemeier* | |
| Co./Dept. | | Co. *Acadia* | |
| Phone # | | Phone # | |
| Fax # *207-828-2566* | | Fax # | |

## SUMMARY REPORT

### NOTE TO UNDERWRITER:

Molly, here is the written follow up to the verbal left for you. Operations have stayed the same since purchasing this in 1996. No operations have been sold or discontinued and what was previously running prior to the purchase by the current owner is what remains the same.

### BUSINESS HISTORY:

This marina has been around since the 1970's. The current owners, Mr. And Mrs. Kinzie purchased the marina in November of 1996 from a bankruptcy auction. The current president is the wife of the couple, Sue Kinzie. Both she and her husband are active in the business on a daily basis. This is the only location which is open 7 days a week year round 8:30 am to 5:30 pm. Gross annual sales not available at the time of survey.

### OPERATIONS:

Non-union company. Operations include leasing slips, boat sales, a marine store, a fuel dock, and other services such as boat repair mechanical routine maintenance. Breakdown on this was not available at the time of survey however, some detailed information was. The owner has 250 slips which rent anywhere from $89.00 a foot to $102.00 a foot in the busy summer season. In addition to the boat slips there is a rack building for storage in the winter which has 100 spots.



EXHIBIT
6
10-31-05  TLM

000181

Employees include as low as 10 in the winter and up to 25 in the summer. There are no restaurants on premises currently.

The marina was an operating marina when the current owners bought it and not much has changed in the way of operations. The owner and his wife live approximately 6 blocks from the marina and it's a very hands on operation.

In the winter the yard can store approximately 220 boats in addition to the 100 in the building. T

## MANAGEMENT RESPONSE/CONTROLS:

Contact was friendly and receptive all questions. Proactive attitude towards safety show.

## RECOMMENDATIONS:

None at this time.

## LOSS EXPERIENCE:

An operator forgot to set the brake on one of the two marine forklifts and it rolled into a rack and did some damage to the rack and the boat and the forklift itself. This happened a year ago last spring. Second incident in the last three years happened about a month ago in which a boat was launched without a plug in it. The owner had taken the plug out and the owner thought the yard person had put it back in and the yard person thought the owner had, and the boat was launched without. The owner is filing a claim against the marina however, as noted in the attached agreement and highlighted by the hold harmless, the owner Mr. Kinzie has been told that he will not be responsible and it was not the yards' responsibility.

## LOSS CONTROL CONCLUSION:

Satisfactory.

## SERVICE PLANNED:

None at this time.

## ATTACHMENTS:

Photographs.

## LIABILITY

The marina store on premises sells typical boat supplies such as oils, some paints, cleaning supplies, block and tackle. The fuel dock has five dispensers with two hoses each. There is

someone on duty at all times for full serve. Services also include sanding bottoms of the boats, painting, compound wax, some minor electrical, on occasion some fiberglass, but mostly routine maintenance. There are some subcontractors on a 1099 independent who work in the yard for the contact. The subcontractors may do such items as bottom paint, casual labor on a seasonal basis. Some fiberglass, canvas, and electrical would also be typical of a sub. Certificates of insurance from both liability and worker's comp are obtained. A minimum $3 million liability is required. No sole proprietors allowed. Certificates are updated constantly.

The slips are wood for the top portion and the underneath are foam flotation. Some are plastic encased, that's what the company is moving towards and the slips are updated constantly. The mooring chains include some new pilings as well as steel on top of each dock. Self repair on all of these in-house ongoing.

Very little transportation by the insured on other boats. They have a hydraulic trailer and they may transport 4 to 5 boats per season for their customer, the largest being a 30 foot sailboat at the top end. They would transport boats for the Bayside Expo, or the Boat Show with Portland, ME. There is a world trade center exposition which they actually drove some boats to. The largest size boat that they would move on a transit basis would be 100 feet and typically the largest boat at the slips would be 53 feet. There are no planned routes needed for anything less than 8' 6" and typically they would not transport larger than this. However, on occasion if they did need to do a transport they would get the route specified and permission through the towns transporting.

Boat storage outside the building is 60% shrink wrapped which is another service offered by the insured. The boats are stored on jack stand and chain with a block under the keel as well to balance and ensure no tipping. The entire facility is fenced in and there have been no problems with theft or vandalism.

For their slip holders they offer a boathouse which has washing machines and showers. There are metal keys for the customers for the bath and shower and other areas that are general use.

The fuel pump include two 89 octane, two 93 grade and one diesel. There is above ground fuel tanks, one 6000 gallon and two 4000 gallon all installed around 1988/89. Contact indicates that this marina was the first to have above ground fuel tanks in MA. Data is compiled on the computer each night to keep track of how much fuel has been pumped and what is left in the tank. Filled as needed.

The company has a storage contract with all people renting slips. There is a hold harmless agreement also and a copy of this contract is attached.

## PROPERTY

Location # 1 - 11-25 Water Street - was built about 1988-89. This is a steel butler building which stores boats. The exterior walls are approximately 40' high. The building is approximately 140' by 120'. There are two bay doors, one on each end. The boats are stored on steel rack systems four levels high. The building is sprinklered and there are sprinklers in between each rack. The system

is a dry foam system installed for the purpose of the occupancy. The building is not heated except for the sprinkler room which has electric heat. No service is done in this building. It is for boat storage only and the sprinkler system is winterized and tested once a year. During this test it is filled with anti-freeze up to the first level.

The building sits on a cement slab. The building is secured with a full security system including motion detection which rings to an outside monitoring company. There are pull boxes throughout the building as the building is tied into the fire department.

Building # 2 - 43-67 Water Street. This building is really in 3 sections. The first section is a small bathhouse approximately 1200 square feet on each of two floors. The first floor of this section is concrete block and the second floor is wood frame. The roof is wood frame. The bathhouse utilizes the showers, laundry, etc. To the right of this attached is a two story showroom and maintenance portion of the building. This is the same construction, concrete block on the first floor and wood frame on the second floor. The roof is metal truss. 5000 square feet for each floor. Maintenance on the first floor and showroom on the second floor.

Directly to the right of this is the office portion of the building. The second floor is office and the first floor is the marina store. Approximately 2500 square feet on each of the floors. The first floor is concrete block, the second floor is wood frame and a metal roof. The last portion of the building has an office on the first floor which is leased out to a yacht Realtor and an apartment on the second floor. Approximately 750 square feet on each floor. In this building there is a security system in the showroom and service bay with motion detection. The company is looking to put in cameras all around the facility as well. The service bay and the showroom have a wet sprinkler system which is being installed and should be done by the end of summer.

Electric heat in all portions of the building. There is a basement under the apartment office section, approximately 700 square feet of basement space. Most of the rest of the building is on a slab. The maintenance portion of the building has a waste oil burner.

The apartment is leased to an employee who lives and works at the facility. Small one bedroom apartment.

Security gates on all the docks.

The facility has two travel lifts both of 35 ton capacity and both identical. In addition there are two 12 ton marina lifts. Besides the two marina forklifts there is one Clark forklift utilized.

Other special hazards include three fuel lines all with fire valves and safety shut offs which run out to the pump stations. There are fire extinguishers on all the docks.

All walking and working surfaces in and around the facility were noted to be in good condition. A little bit hectic presently as they are putting a lot of boats in the water and just opening operations for the season however, all in all no problems on the premises.

l:\may00\bevport\czp

# Exhibit G



G-43810-B
(Ed. 09/98)

# WATERCRAFT LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing the insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section F – DEFINITIONS.

## A. COVERAGE

### 1. Insuring Agreement

We will pay those sums which you shall become legally obligated to pay as damage because of "bodily injury" or "property damage" to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided under Additional Coverages.

This insurance applies only to "bodily injury" and "property damage" which results because of the operation, maintenance, use or servicing of an "insured boat" while such boat is afloat.

### 2. Additional Coverages

#### a. Supplementary Payments

We will pay, with respect to any claim or "suit" we defend:

(1) All expenses we incur;

(2) The cost of bonds to release attachments, but only for bond amounts within the applicable Limit of Insurance. We do not have to furnish these bonds;

(3) All reasonable expenses you incur at our request to assist us in the investigation or defense of the claim or "suit." Including actual loss of earnings up to $100 a day because of time off from work;

(4) All cost taxed against you in the "suit";

(5) Pre-judgment interest awarded against you on that part of the judgment we pay. If we make an offer to pay the applicable Limit of Insurance, we will not pay any pre-judgment interest based on that period of time after the offer;

(6) All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court that part of the judgment that is within the applicable Limit of Insurance;

These payments will not reduce the Limits of Insurance.

#### b. Wreck Removal

We will pay the cost of removing the wreck of an "insured boat" when such removal is required by law.

## B. EXCLUSIONS

This insurance does not apply to:

### 1. Contractual

"Bodily injury" or "property damage" assumed under contract or otherwise in extension of the liability imposed upon you by law.

### 2. Owned Property

Physical damage to property owned, leased or used by you.

### 3. Workers' Compensation

Any obligation for which the insured or the insured's insurer may be held liable under any workers compensation, disability benefits or unemployment compensation law or any similar law.

### 4. Employee Indemnification and Employer's Liability

"Bodily injury" to:

a. An employee of the insured arising out of and in course of employment by the insured; or

b. The spouse, child, parent, brother or sister of that employee as a consequence of paragraph a. above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

### 5. Pollution

a. "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time;



EXHIBIT

Wirth #1
10-31-05  TW

b.  Any loss, cost or expense arising out of any:

(1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

(2) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants."

## C.  TERRITORIAL LIMITS

This Insurance applies only:

1.  Within the Continental United States of America, the District of Columbia and Canada (excluding Alaska); and

2.  Coastal waters not more than twelve (12) miles from the nearest shoreline and inland waters of the Continental United States, the District of Columbia and Canada (excluding Alaska).

## D.  LIMITS OF INSURANCE

The most we will pay for "loss" in any one "occurrence" is the applicable Limit of Insurance shown in the Boat Dealers Coverage Form Supplemental Schedule.

## E.  DEDUCTIBLE

We will not pay for "loss" in any "occurrence" until the amount of the adjusted "loss" before applying the applicable Limits of Insurance exceeds the Deductible shown in the Boat Dealers Coverage Form Supplemental Schedule. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

## F.  ADDITIONAL CONDITIONS

The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions:

1.  Bankruptcy

Bankruptcy or Insolvency of the Insured or of the Insured's estate will not relieve us of our obligation under this Coverage Form.

2.  Duties in the Event of Occurrence, Claim or Suit

a.  You must see to it that we are notified promptly of an "occurrence" which may result in a claim;

b.  If a claim is made or "suit" is brought against you, you must see to it that we receive prompt written notice of the claim or "suit";

c.  You and any others Involved must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation, settlement or defense of the claim or "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the Insured because of "loss" or damage to which this Insurance may also apply;

d.  No Insured will, except at their own cost voluntarily make a payment, assume any obligation, or incur any expense without our consent.

## G.  DEFINITIONS

1.  "Loss" means accidental loss or damage;

2.  "Insured boat" means any boat insured under any of the following Coverage Forms attached to this policy:

a.  Boat Dealers Coverage Form;

b.  Marina Operators Coverage Form;

c.  Work Boat Coverage Form; or

d.  Rental Boat Coverage Form;

3.  "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed;

4.  "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time;

5.  "Property damage" means:

a.  Physical injury to tangible property, including all resulting loss of use of that property; or

b.  Loss of use of tangible property that is not physically injured;

6.  "Suit" means a civil proceeding in which damages because of "bodily injury" or "property damage" to which this insurance applies are alleged. "Suit" includes an arbitration proceeding alleging such damages to which you must submit or submit with our consent;

7.  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

# Exhibit H

Page 1

```
 1                  Volume: I
                   Pages: 1-200
 2                 Exhibits: 1-17
 3        UNITED STATES DISTRICT COURT
 4        DISTRICT OF MASSACHUSETTS
 5
 6   BEVERLY PORT MARINA, INC., AND
     LESLIE S. RAY INSURANCE AGENCY,
 7   INC.,
          Plaintiffs     Docket No.
 8     vs.               CA 1:05-CV-10883
                             WGY
 9
     ACADIA INSURANCE COMPANY,
10        Defendant
11
12
13        DEPOSITION OF DAVID L. RAY, a
     witness called by and on behalf of the Defendant,
14   taken pursuant to the Federal Rules of Civil
     Procedure, before Heidi B. Stutz, Certified
15   Shorthand Reporter No. 146599S and Notary Public in
     and for the Commonwealth of Massachusetts, at the
16   offices of Yasi & Yasi, Two Salem Green, Salem,
     Massachusetts, on Wednesday, November 2, 2005,
17   commencing at 10:29 a.m.
18
19
20
21
22
23
24
```

Page 2

```
 1   APPEARANCES:
 2        WILLIAM D. CHAPMAN, ESQ.
          Melick, Porter & Shea, LLP
 3        28 State Street
          Boston, Massachusetts 02109
 4          on behalf of the Plaintiffs
 5        LEONARD W. LANGER, ESQ.
          Tompkins, Clough, Hirshon & Langer, P.A.
 6        Three Canal Plaza
          P.O. Box 15060
 7        Portland, Maine 04112-5060
            on behalf of the Defendant
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1                    I N D E X
 2
     WITNESS:      DIRECT CROSS REDIRECT RECROSS
 3
 4   DAVID L. RAY        4    194
 5
 6   EXHIBITS:        DESCRIPTION        PAGE
 7    1    Insurance Proposal dated 12/20/96  82
 8    2    Policy 11/22/96-5/22/97           88
 9    3    Policy 5/22/97-5/22/98            96
10    4    Letter dated 10/5/98             100
11    5    Comparison of insurance
               coverages & premiums          114
12
13    6    Memo dated 5/26/00              117
14    7    E-mail dated 11/6/01            138
15    8    E-mail dated 11/6/01            138
16    9    E-mail dated 11/7/01            138
17   10    Fax dated 11/6/01               140
18   11    Fax dated 11/8/01               140
19   12    Handwritten notes              144
20   13    Fax dated 11/6/01               144
21   14    Letter dated 11/9/01            144
22   15    Letter dated 11/20/01           148
23   16    Complaint                      158
24   17    Plaintiff's Answers to          180
               Interrogatories
```

Page 4

```
 1               P R O C E E D I N G S
 2   Whereupon:
 3            DAVID L. RAY,
 4   having been satisfactorily identified and duly sworn
 5   by the Notary Public, was examined and testified as
 6   follows:
 7            DIRECT EXAMINATION
 8   BY MR. LANGER:
 9     Q.   Good morning, Mr. Ray.  Could you please
10   state your name and address?
11     A.   My name is David L. Ray.  I live at 39
12   Belcher Street in Essex, Massachusetts.
13            MR. CHAPMAN:  Len, the usual
14   stipulations, reserving all objections except as to
15   form until trial, reserve motions to strike until
16   trial?
17            MR. LANGER:  That would be fine.
18     Q.   Mr. Ray, my named is Leonard Langer.  I
19   represent Acadia Insurance Company in an action that
20   has been brought by Beverly Port Marina, Inc. and
21   the Leslie S. Ray Insurance Agency, Inc. against
22   Acadia Insurance Company which is now pending in the
23   United States District Court for the District of
24   Massachusetts.
```

1 (Pages 1 to 4)

d4616416-b87a-49c3-9346-419fd4d93268

Page 53

1    Q.  The question, Mr. Ray, is if there are no
2  notes of any conversations with Mr. Pedersen in the
3  Leslie Ray's file regarding coverages for Beverly
4  Port Marina prior to May of 2000, would that
5  indicate to you that no conversations had taken
6  place?
7              MR. CHAPMAN:  Object.
8    Q.  That's a yes or no answer.
9              MR. CHAPMAN:  Objection.
10             THE WITNESS:  Can I answer that
11 question?
12             MR. CHAPMAN:  Go ahead.
13   A.  That is not an indication.  There were
14 many phone calls that took place between myself and
15 Matt Pedersen.
16   Q.  Would you agree with me that if the phone
17 calls had involved material questions of coverage
18 for the Beverly Port Marina operation, would you
19 have taken notes on those types of issues?
20             MR. CHAPMAN:  Objection.
21   A.  Yes.  Depends on your definition of
22 "material."
23   Q.  What's your definition of "material"?
24   A.  Let me state that Matt and I had many

Page 54

1  conversations regarding the general operations of
2  Beverly Port Marina.  Matt reviewed with me
3  generally the coverages provided under the then
4  current Hanover Insurance Company policy.
5    Q.  Is this prior to May of 2000?
6    A.  This would be prior to the placement of
7  business, which I believe was on May 22nd of 2000.
8    Q.  Would that have occurred --
9    A.  So this would have been in the time period
10 30 to 60, possibly 90 days prior to the placement of
11 that coverage in May of 2000.
12   Q.  So this would be in the spring of 2000?
13   A.  Yes.
14   Q.  Had you had any conversations with Mr.
15 Pedersen regarding Beverly Port Marina prior to the
16 spring of 2000?
17   A.  Yes.  We would have had a discussion
18 regarding the possible placement of Beverly Port
19 Marina's insurance with Acadia.  Again, when Matt
20 and I met, Matt was trying to build his department,
21 so he was asking me what opportunities we had for
22 him and Beverly Port Marina was on that list.  He
23 wanted to write Beverly Port Marina.
24   Q.  But did you discuss -- I think you already

Page 55

1  said you didn't discuss with him any specifics about
2  the coverage during those early conversations or
3  contacts.  Is that correct?
4    A.  That is correct.  I gave him a general
5  description of the size and scope of Beverly Port
6  Marina's business, but we did not get into any
7  specific underwriting at that time.
8    Q.  Do you believe that you did get into
9  specific underwriting questions in the spring of
10 2000?
11   A.  Absolutely.
12   Q.  And can you recall, as best you can, what
13 you told Mr. Pedersen in the spring of 2000 leading
14 up to Beverly Port being written by Leslie Ray with
15 Acadia as opposed to Hanover?
16   A.  I can clearly recall a discussion with
17 Matt Pedersen where we discussed the fact that the
18 Leslie Ray Insurance Agency, and that includes
19 myself, were not expert in the field of ocean
20 marine, that this was really my first personal
21 venture into providing coverage for a sizable
22 marina, and that I would like his assistance in
23 understanding some of the coverages and exposures
24 that Beverly Port Marina may have.

Page 56

1    Q.  And what was Mr. Pedersen's response?
2    A.  Matt Pedersen and I had a positive
3  back-and-forth working relationship.  His response,
4  although obviously I cannot provide a quotation on
5  this, certainly was that he would assist me with my
6  questions and concerns.
7    Q.  Did you ever provide Mr. Pedersen any
8  written sort of questions or queries regarding any
9  coverages or exposures that you thought would be
10 important to writing Beverly Port Marina?
11   A.  I don't believe so, aside from the
12 application and any information that may have gone
13 along with the submission of the application.
14   Q.  Did you ever provide Matt Pedersen or
15 anybody at Acadia with copies of existing policies
16 that had been written for Beverly Port Marina?
17   A.  I may have, but I can't recall if I did or
18 not.
19   Q.  If you had sent Mr. Pedersen or anybody
20 else at Acadia copies of existing ocean marine
21 policies, would there be copies of the
22 correspondence in your file?
23   A.  Yes.
24             May I state something?

14 (Pages 53 to 56)

d4616416-b87a-49c3-9346-419fd4d93268

Page 57

1   Q.   Sure.
2        A.   I'm not so sure there was really a need to
3   send the Hanover policies to Matt.  I believe that
4   Matt is a pretty capable and expert underwriter in
5   that field and being the capable and expert
6   underwriter that he is, he has or at that time
7   anyway he had a very good understanding, an
8   excellent understanding of his competition, Hanover
9   being one of Acadia's competitors.  We certainly
10  would have had a discussion on the telephone,
11  with my Beverly Port Marina file open and the
12  Hanover coverages or policy in front of me with Matt
13  asking me certain specific questions regarding that
14  policy.
15            MR. LANGER:  I'll move to strike as
16  nonresponsive.
17            MR. CHAPMAN:  Motions to strike are
18  reserved.
19            MR. LANGER:  I understand.  Doesn't
20  mean I can't make one.
21       Q.   Mr. Ray, I would like your best
22  recollection of the specifics of any conversation
23  you had with Matt Pedersen regarding either existing
24  coverages for Leslie Ray or questions you had with

Page 58

1   Mr. Pedersen regarding coverages being offered by
2   Acadia.
3        A.   Well, that happened over five years ago.
4   It's hard to bring those specifics back to mind.
5   But I clearly remember discussing the coverages in
6   the Hanover policy with Matt Pedersen and discussing
7   with him the importance of him providing the same or
8   better coverages.  And obviously discussing pricing,
9   as well.
10       Q.   Can you remember any of the specific
11  topics of the conversations you had with regard to
12  the Hanover policy vis-a-vis the Acadia policy?
13       A.   Are you asking me what some of the
14  differences between the two policy forms may be?
15       Q.   I'm asking about any of the specifics you
16  can recall about the coverages between either the
17  Hanover policy or the Acadia policy or general
18  questions you had about the Acadia policy.
19            MR. CHAPMAN:  I'm sorry, Len, are
20  you asking him for his memory of conversations or
21  his understanding of differences?
22            MR. LANGER:  No, I'm asking for the
23  specifics regarding his conversations with Mr.
24  Pedersen.

Page 59

1        A.   Matt and I discussed the coverages in the
2   Hanover policy.  It was important to me that if Matt
3   was going to give me a proposal and if this business
4   was going to be placed with Acadia Insurance Company
5   that Matt review those coverages with me so that I
6   had a clear understanding.  Marine underwriting is
7   not my expertise.  And if there were any material
8   differences between the Hanover Insurance Company
9   form and the Acadia form, that I know about those so
10  that I can present those to the Kinzies.
11       Q.   Did you go through the Hanover form page
12  by page, line by line with Mr. Pedersen?
13       A.   I did not.
14       Q.   Can you recall any specific issue that was
15  raised either by you or by Mr. Pedersen in either of
16  the policies that you felt was important?
17       A.   No specific issues that would be
18  detrimental to placing coverage with Acadia
19  Insurance Company.  Matt had a good understanding of
20  the Hanover Insurance Company form.  He was able to,
21  he was able to communicate any issues or differences
22  within the Acadia farm or Hanover form.
23       Q.   But you can't remember any of the
24  specifics that you discussed?

Page 60

1        A.   I don't think that there were any, there
2   wasn't anything material or alarming that he brought
3   up.
4        Q.   Did he ever indicate to you that there
5   were various coverages that the Acadia form didn't
6   cover that the Hanover policy did cover?
7        A.   I don't recall him saying that.
8        Q.   Did he indicate to you that there were any
9   coverages that the Acadia policy did cover that the
10  Hanover did not?
11       A.   I was left with the general impression
12  that the Acadia form was of a broader nature than
13  the Hanover coverage form, but with it being
14  five years, I can't recall the specifics.
15       Q.   Other than the conversations you had in
16  this spring 2000 time period, fair to say you had
17  not had any other discussions with Mr. Pedersen or
18  anybody else at Acadia regarding specifics of ocean
19  marine coverages offered by Acadia?
20       A.   That's fair to say.
21       Q.   And I think you said you were not aware
22  that anybody else at Leslie Ray was talking with
23  anybody at Acadia about ocean marine policies during
24  that time period.

15 (Pages 57 to 60)

d4616416-b87a-49c3-9346-419fd4d93268

Page 165

1    Q.  Miss Kerans was deposed on behalf of
2  Leslie Ray in the other litigation, is that correct?
3    A.  As I understand, she was.
4    Q.  Did you attend that deposition?
5    A.  No, I did not.
6    Q.  Have you ever spoken to Maureen Kerans at
7  any time from when she left the Leslie Ray agency up
8  to today?
9    A.  I don't believe so.
10    Q.  What better counsel do you think that Mr.
11  Pedersen should have given you regarding Acadia's
12  policy language?
13    A.  I really turned to Matt as a novice in
14  the, certainly in trying to place some marina
15  insurance coverage.  Matt and I had, as I had
16  testified before, many conversations regarding
17  marina operator's legal liability.  I looked to him
18  as someone that could help educate me in how to
19  assist my clients in the best way possible.  That's
20  what I would have liked to do.
21        MR. LANGER:  Move to strike as
22  nonresponsive.
23    Q.  Specifically what better counsel do you
24  think he should have given you with regard to policy

Page 166

1  language, which is what you just told me you thought
2  he should have done?
3    A.  Matt was aware that the -- Matt and
4  Gretyl, I believe your loss control person, were
5  aware that Beverly Port Marina was selling a
6  substantial number of boats.  I would have hoped
7  that Matt could have counseled me on the type of
8  exposure that can exist that is uncovered under
9  Acadia's insurance policy, but that is, but there
10  was an exposure that existed in Beverly Port
11  Marina's normal course of operations.
12    Q.  And what exposure was that?
13    A.  And that was the exposure of offering test
14  drives to potential boat owners.
15    Q.  The exposure you're talking about is not
16  providing test drives, it's allowing customers to
17  operate vessels without any Beverly Port employee on
18  board, isn't that really what Mr. Johnson's
19  situation was?
20        MR. CHAPMAN:  Objection.
21    A.  Mr. Johnson's situation was he did operate
22  that boat without anybody on board.
23    Q.  Is it your understanding that Acadia is
24  taking the position that their policy doesn't cover

Page 167

1  a situation where there is an employee on board the
2  vessel?
3    A.  Can you say that again?  I'm sorry.
4    Q.  Is it your position that Acadia's policy
5  wouldn't cover a situation where a Beverly Port
6  employee was operating the vessel which gave rise to
7  an injury to a potential customer on the vessel?
8        MR. CHAPMAN:  Objection.  Legal
9  conclusion, form.
10        MR. LANGER:  Just asking for his
11  understanding.
12        MR. CHAPMAN:  Personally, I didn't
13  follow the question.
14        THE WITNESS:  I didn't, either.
15        MR. CHAPMAN:  Okay.  And let me say,
16  again, if you -- it doesn't necessarily matter if I
17  don't follow it, but if you don't follow it, you
18  definitely want to tell him that.
19    A.  I'm sorry, I didn't follow the question.
20    Q.  Is it your testimony that you believe that
21  Acadia's policy doesn't cover incidents involving
22  test-driving of vessels in general?
23        MR. CHAPMAN:  Object.  Same
24  objections.

Page 168

1    A.  I know that Acadia's policy does not cover
2  -- strike that.  I want to think how I need to
3  respond to that because the question is confusing to
4  me.
5        MR. CHAPMAN:  Well, if it's
6  confusing to you, you can ask him to rephrase it.
7    A.  I'd just ask you again to repeat that.
8    Q.  Is it your understanding or is it your
9  position in conjunction with your testimony
10  regarding the fact that Acadia should have provided
11  you better counsel that Acadia's policy does not
12  cover injuries to people involved in test-driving or
13  demonstrating Beverly Port's vessels?
14        MR. CHAPMAN:  Object.
15    A.  It's my understanding that Acadia's policy
16  does not provide coverage in those situations.
17    Q.  And would you agree with me that
18  Commercial Union's policy wouldn't cover those
19  situations, either?
20        MR. CHAPMAN:  Object.  Same
21  objections.
22    A.  Once again, I think we've gone over that
23  and we've read each of the policy forms, so just
24  referring back to testimony, I stand by my previous

42 (Pages 165 to 168)

d4616416-b87a-49c3-9346-419fd4d93268

Page 169

1  answers that both Commercial Union and Hanover would
2  not respond to that type of situation, if I'm
3  understanding your question correctly.
4      Q.  Other than the -- is it your position that
5  because Beverly Port Marina had sales of
6  $2.4 million, that Acadia knew or should have known
7  that Beverly Port was allowing customers to
8  test-drive their vessels without a Beverly Port
9  employee being on board?
10         MR. CHAPMAN:  Objection.  Is that
11  your representation of how the coverage works?
12  Because that's not what your Acadia witnesses said.
13         MR. LANGER:  I'm asking him a
14  question.  And he can answer it one way or the
15  other.
16         MR. CHAPMAN:  All right.  Well,
17  objection.
18      A.  I'm confused by it, too.  I'd like you to
19  ask it one more time, please.
20      Q.  Is it your position --
21         MR. LANGER:  Why don't you read it
22  back rather than my trying to redo it?
23         (The previous question was read
24            back by the reporter.)

Page 170

1         MR. CHAPMAN:  Object.  Go ahead.
2      A.  Regardless of the sales volume of Beverly
3  Port Marina, I should have been made aware of the
4  gap in coverage.  It's clear to me that Acadia knew
5  that the Kinzies were selling a substantial volume
6  of boats.  It's clear that Matt Pedersen had a good
7  idea about that because of the volume that he saw on
8  the application.  It's clear that the loss control
9  person from Acadia knew that from visiting with
10  Beverly Port Marina and having an extensive
11  conversation with the Kinzies regarding their
12  operation and witnessing the operation and taking
13  photographs of it.  Frankly, I feel very let down
14  and disappointed in Acadia for not bringing that gap
15  in coverage to my attention.
16         MR. LANGER:  Move to strike as
17  nonresponsive.
18      Q.  Let me ask you again, Mr. Ray, listen to
19  the question.  Do you believe that because Beverly
20  Port -- excuse me, strike that.
21         Do you believe that because Acadia
22  knew or should have known that there was
23  $2.4 million worth of sales, that Acadia should have
24  known that Beverly Port was allowing its customers

Page 171

1  to operate its vessels without a Beverly Port
2  employee being on board?
3         MR. CHAPMAN:  Objection.
4      Q.  Is that your position?
5         MR. CHAPMAN:  Objection.
6      A.  If that's a yes or no question, the answer
7  is no.  But I'd like to respond further.
8      Q.  Well, that was the answer then.
9         MR. CHAPMAN:  Do you not want him to
10  respond further?
11         MR. LANGER:  No, I don't want him to
12  respond further.  Every time he responds further
13  it's not responsive.
14         MR. CHAPMAN:  I'll ask him.
15      A.  You're making an assumption that my
16  response is nonresponsive, whatever that means.
17      Q.  Let me read you what is paragraph 15 of
18  this complaint.  It says that "Acadia knew or should
19  have known that Beverly Port Marine was
20  significantly involved in the sale of boats to the
21  public and that its business operations involved the
22  test-driving of vessels by prospective buyers and
23  that Beverly Port Marine required liability coverage
24  relative to this exposure."  Do you believe that's

Page 172

1  an accurate representation?
2      A.  I absolutely do.
3      Q.  Now, I'm trying to distinguish a
4  situation, Mr. Ray, between a situation where an
5  employee of a marina takes a customer for a
6  test-drive in a vessel where the marina employee
7  operates the vessel and a situation where the marina
8  grants a customer permission to go out and
9  test-drive the boat without any marina employee
10  being on board.  Do you understand that distinction?
11      A.  I do.
12      Q.  And is it your position that Acadia knew
13  or should have known for some reason that Beverly
14  Port was allowing its customers to test-drive the
15  vessels all by themselves?
16         MR. CHAPMAN:  Objection.  Go ahead.
17      A.  It is my position that Acadia should have
18  known that.
19      Q.  Why do you think Acadia should have known
20  that just by the volume of sales that Beverly Port
21  had?
22      A.  That is not the reason why they should
23  have known that.
24      Q.  Okay.  Why should they have known that?

43 (Pages 169 to 172)

d4616416-b87a-49c3-9346-419fd4d93268

# Exhibit I

**Best's**
**Underwriting Guide**

sic code 5551 Boat Dealers

# Marine Dealers

| Line | Best's Hazard Index | Underwriting Comments |
|---|---|---|
| Automobile Liability | 4 | Depends on extent of delivery service. |
| General Liability | 6 | |
| Product Liability — Completed Operations | 6 | |
| Workers' Compensation | 4 | |
| Crime | 6 | |
| Fire and E. C. | 6 | Higher if fuel is stored on premises. |
| Business Interruption | 3 | |
| Inland Marine | 6 | |

Low 1-3, Medium 4-6, High 7-9, Very High 10

## Related Classifications

Automobile Repair Shops

Marinas

Service Stations — Gasoline and Oil

## Special Exposures

Damage from natural elements to boats stored outdoors

Fuel sales

In-water boat demonstrations

## RISK DESCRIPTION

In 1984 there were approximately 16,000 marine dealers in the United States selling and servicing inboard and outboard motors and boats, "jet-drives," sailboats, houseboats and boat trailers. These pleasure boat retailers also may sell navigational aids — such as radar and sonar devices and ship-to-shore communications equipment — and anchors, life jackets and other marine accessories. In addition, recreational water-sports equipment — such as water skis and ice-sailing and windsurfing equipment — may be sold and serviced.

Dealers typically are located in coastal areas or in proximity to lakes or other waterways. They may be small one- or two-person operations, or larger firms employing 10 or more workers. Many marine dealerships are family owned and operated and have been in business for a number of years at established locations.

Dealers sell new and used boats and perform repairs and service inside and outside warranty. Firms may be the exclusive dealer or distributor for one manufacturer, or they may sell a variety of manufacturers' equipment and accessories. Because most boats are sold in early spring and summer, and most repairs are done during the fall and winter months, inventory is likely to be highest in the early part of the year.

Many dealers sell and service other types of outdoor sports equipment, such as snowmobiles, skis, motor scooters, mopeds and other all-terrain vehicles. Some dealers store customers' property in off-season periods.

Marine dealers may rent boats and equipment; dealers with waterfront locations may provide rental docking space, and most offer fuel service. (Refer to the write-ups on Marinas and Service Stations — Gasoline and Oil for a discussion of the hazards inherent in those activities.)

Boats are displayed in boat houses, showrooms or open yards and at docks. In-water demonstrations may be provided.

The repair and service operation is similar to that found in an automobile repair shop. Motor parts are repaired or replaced, and hulls are repaired, cleaned and finished. (Refer to Automobile Repair Shops.)

Dealers may sponsor contests or rating races to establish the quality of the products they handle. Displays at boat shows and conventions are a regular part of some dealers' operations.

The marine pleasure boat industry is in constant flux with the state of the economy and is subject to seasonal shifts. The Marine Retailers Association of America is the national professional trade organization; local or coastal associations also exist.

Copyright 1985 by A. M. Best Company, Inc.  All rights reserved    4/85 Revision



EXHIBIT
8

## MATERIALS AND EQUIPMENT

Inventory of boats, motors and other recreational vehicles, parts and accessories; fuels, oils, greases; cleaning, painting and polishing liquids; grinders, drills, lathes, hand tools, welding equipment, sprayers, electronic testing gear; chain hoists, winches, cranes fitted with slings; water tanks; boat trailers.

### Automobile Liability

The primary exposure is boat pickup and delivery service, where provided by the dealer. Boats are transported on trailers that are hitched to pickup trucks, vans or automobiles. Are hitches routinely checked for secure mounting onto the towing vehicle, as well as for safe, operational electrical connections for brake lights and directional signals? Are boats double-checked for stability before and during transit? If the boat or mast extends beyond the end of the trailer, it must be flagged.

Only competent drivers should be charged with transporting responsibilities. The distance traveled could be considerable; determine the radius of operation. Do drivers ever transport boats at night? If so, the exposure is increased.

The condition of vehicles and the maintenance program are important factors. MVRs should be obtained on all drivers.

Because of the gray area surrounding loading and unloading, it is desirable to write Automobile Liability and General Liability coverages in the same company for the same limits.

### General Liability

The hazards common to any retail operation are present. Additional exposures in some cases are doing business at water's edge and, when demonstrating boats or equipment, taking the customer on water.

Poorly designed store layout, congested display areas, loose or worn floor coverings, littered or slippery floors, stairs with inadequate handrails or worn treads, and inadequate lighting inside and outside the building are the most frequent causes of losses. Sidewalks, parking lots and outside display areas in poor repair can produce falls. Falls also may occur on wet or slippery docks. Customers may be injured while climbing into or out of watercraft or all-terrain vehicles on display.

Although the basic policy normally excludes coverage for demonstration of watercraft, this coverage can be added. If it is, the underwriter should know whether boats are demonstrated or tested on or away from the premises and whether an employee experienced in boat control and water safety is present. Are all of those involved provided with life jackets? Tests and demonstrations present a hazardous potential; gasoline vapors may cause an explosion; the boat may become grounded, capsize or sink; it may collide with another vessel or a fixed object; an individual may fall within the boat or fall overboard. All of these possibilities must be considered; and it is important to remember that admiralty law differs from ordinary law.

The presence of gasoline, oil, resins and other flammable solvents presents a fire hazard. Refer to comments under Fire and E.C.

Is the public allowed in the repair shop? This area has a high potential for accidents and injuries and should be off limits to customers.

Does the dealer sponsor races? Does the firm participate in boat shows or conventions? The extent of these exposures should be determined.

Does the dealer rent boats or other recreational equipment?

Where pickup and delivery of boats is offered, General Liability and Automobile Liability coverages ideally should be written in the same company for the same limits.

### Product Liability and Completed Operations

Product liability and completed operations must be underwritten with extreme care.

Does all merchandise sold comply with U.S. Coast Guard specifications where applicable?

The underwriter must identify the manufacturers of all watercraft, equipment, parts and accessories in the inventory.

Serious claims may arise if sales personnel fail to warn customers of hazards, or if they make exaggerated statements about a craft's performance capabilities.

Improper repairs on a hull, engine or accessories present a serious loss potential. Is all work inspected to ensure that it meets proper standards? Are all engines adjusted before they are released to the customer?

Does the dealer provide any guarantee or warranty of work performed on the premises?

### Workers' Compensation

Do employees act as crew persons operating a boat in the water? Employees injured while in the water or getting into or off a boat may be covered by the Jones Act. Under this federal law there is no limit on the amount an employee may recover, and lawsuits may be extremely expensive to defend. Employer negligence, unseaworthiness of a vessel, plus absolute liability for "maintenance, care and wages for disability" (including illness incurred during a voyage) are among the potential claims.

Refer to comments under General Liability for the hazards associated with tests and demonstrations.

Due care must be taken while employees are climbing into or out of boats at docks or on land; a ladder may be necessary if the boat is chocked. Falls may occur on wet or slippery docks. The failure of ropes and cables can cause serious injury. Employees may suffer strains, sprains, back injuries and hernias while moving and lifting equipment.

Employees who pick up and deliver boats are exposed to vehicular accidents.

Consideration must be given to the hazards in the repair shop. (Refer to Automobile Repair Shops for a further discussion.)

### Crime

The popularity of the products and the ease of disposal make them a target for thieves.

Boats and trailers often are displayed in open lots adjoining the building. This situation increases the possibilty of loss, particularly for dealers located in suburban or outlying areas not frequently or regularly patrolled by police. Night lighting is essential. Steel posts embedded at intervals throughout the lot and the use of chains and locks to connect several pieces of equipment make removal more difficult and may deter thieves.

Employees in the service area have access to parts and equipment, which are easily disposed of; tight inventory control is necessary. Are references checked on all personnel prior to employment?

Purchases and services generally are paid for by check. Are check signing, bank deposits, bank statement reconciliation and petty cas

disbursements all the responsibility of one employee? This practice is undesirable.

#### Business Interruption

Inventory should be easily replaced. Determine the anticipated time to repair or rebuild the premises.

If the dealer is the exclusive distributor for a particular manufacturer whose products represent a substantial portion of sales volume, consideration should be given to the time required to obtain replacements from the manufacturer. In the event of a loss to that manufacturer, could similar products be obtained from another manufacturer? Components and parts from one company may not be compatible with those of another supplier.

#### Inland Marine

Equipment Dealers' policies routinely exclude coverage for watercraft; this type of coverage may be added by endorsement. These policies generally are written on an ''all risks'' basis. Special attention must be paid to exposures to loss on the water if such is not excluded. If boats are demonstrated on the water, experienced operators are essential.

A bailee exposure is likely. The care of the property, whether it is stored outdoors, and the general protection from crime and vandalism are pertinent. (See also Marinas.)

Expensive boats and marine equipment may be damaged in transit. If Trip Transit coverage is to be provided, the underwriter should determine the amount of delivery activity; the average value of the property in transit; the distance the property is to be hauled; and whether loading and unloading are to be covered.

#### Fire and E.C.

Oils, grease and flammable liquids (e.g., gasoline) may be responsible for a fire or contribute to its rapid spread. Liquids used to clean motors and refinish hulls may be highly flammable or explosive. Where is this work performed? Is there exposure to open flames or heat? Sparks from welding may ignite flammable or explosive liquids or other combustible materials. The fire hazard is increased if grass and weeds are not kept trimmed.

Boats stored outdoors are subject to wind damage. They may be vandalized; parts may be stolen. The presence of a fence may act as a deterrent.

The moral hazard is an important underwriting consideration. What does an analysis of the financial report reveal? Are there any factors that might affect the dealer's ability to continue a successful operation? According to a study prepared by the Boating Industry Association, skilled workers are the leading purchasers of outboard motors and boats. A high level of unemployment among skilled workers in a given area may result in a decline in sales, and a previously lucrative market may be closed.

---

> A financial report and an analysis of prior losses are necessary to underwrite this class. If repairs are performed, an inspection is strongly recommended.

---

Copyright 1983 by A. M. Best Company, Inc.  All rights reserved

**Marine Dealers**

Best's
Underwriting Guide

# Underwriter's Check List

Does the dealer provide boat pickup and delivery? If so, are drivers experienced in handling boat trailers?

Does merchandise sold meet U.S. Coast Guard standards?

What manufacturers are represented?

Are boats demonstrated in the water?

To what extent does the insured participate in trade shows and exhibitions?

Is repair work performed on the premises?

What other types of recreational equipment are sold?

Is fuel stored and sold on the premises?

What safeguards are employed to detect theft of merchandise stored outdoors?

We would like to express our sincere thanks to the following for their technical assistance:
Marine Retailers Association of America

4/85 Revision    Copyright 1985 by A.M. Best Company, Inc. All rights reserved



## A.M. Best Company is...

- A worldwide insurance-rating and information agency with more than 100 years of history. The company was founded in 1899 by Alfred M. Best. Offices are located in the United States, the United Kingdom and Hong Kong.

- The largest and longest-established company devoted to issuing in-depth reports and financial-strength ratings about insurance organizations. Its flagship publication and database, Best's Insurance Reports, offers the largest coverage of insurers and reinsurers in the United States, Canada, the United Kingdom and worldwide of any interactive rating organization.

- An issuer of fixed-instrument debt ratings that cover bonds, notes, securitization products and other financial instruments issued by insurers and reinsurers. Its debt and commercial paper ratings are used by capital-market issuers and professionals worldwide.

- A publisher of books, directories, CD-ROM products and Internet-based services pertaining to the insurance industry. Products focus on insurance company financial information, underwriting information, providers of legal representation and claims adjusting services to the insurance industry, and company-specific or industry-wide analytical information in the United States, Canada, Europe, Middle East and Asia insurance markets.

- The longest-running, largest and most-recognized source for insurance news. Articles generated by A.M. Best's news staff are published in *Best's Review* magazine, *BestWeek*, through its real-time news channels and distributed via more than a dozen international information distributors.

- The premier source for regulatory statement financial information. Best's Statement File products and reports are the industry standard for reliable, accurate and comprehensive statement-source information about insurance organizations operating in the United States and Canada.

A.M. Best has job openings in both Oldwick and London.

Return to the Top

---

Customer Service | Product Support | Member Center | Contact Info | Careers
About A.M. Best | Site Map | Privacy Policy | Security | Terms of Use | Legal & Licensing

Case 1:05-cv-10883-WGY    Document 22-10    Filed 12/12/2005    Page 7 of 9

Copyright © 2004 A.M. Best Company, Inc. All rights reserved.
A.M. Best Worldwide Headquarters, Ambest Road, Oldwick, New Jersey, 08858, U.S.A.



# A.M. Best Company

Ambest Road
OLDWICK, NEW JERSEY 08858
908-439-2200

**The Insurance Information Source**

**www.ambest.com**

## Best's Underwriting Guide Classifications

Battery Manufacturing — Wet Cell
Beauty Salon and Barber Shop Suppliers
Beauty Salons and Barber Shops
   *see also...*
   Nail Salons
*Beauty Schools...see*
   Vocational-Technical Schools — Public and Private
Bed and Breakfast Inns
*Bed Stores...see*
   Mattress and Waterbed Stores
   Furniture Stores
*Bedding — Down...see*
   Down and Feather Products Manufacturing
*Beekeeping...see*
   Apiaries — Commercial
*Beer and Ale Brewing...see*
   Breweries
   Craft Breweries, Microbreweries, and Brewpubs
*Beer and Ale Distributors...see*
   Beverage Distributors
*Beet Sugar Production...see*
   Sugar Manufacturing (Beet and Cane)
Beverage Distributors
*Beverage Manufacturing...see*
   Bottled Water Production and Delivery
   Bottling — Soft Drinks
   Breweries
   Craft Breweries, Microbreweries and Brewpubs
   Distilleries
   Fruit Juice Manufacturing
   Milk Products Manufacturing
   Wineries
*Bicycle Delivery Services...see*
   Messenger & Courier Services
Bicycle Manufacturing
*Bicycle Messenger Services...see*
   Messenger & Courier Services
Bicycle Shops — Sales and Service
*Billboard Companies...see*
   Advertising Companies — Outdoor
Billiard Halls
Bingo Halls
*Birth Control Manufacturing...see*
   Condom Manufacturing
*Blacksmiths...see*
   Ornamental Metalworking
*Blasting Operations...see*
   Demolition Contractors
   Excavation Contractors
*Blimp Advertising...see*
   Aerial Advertising
Blood Banks
Boarding Homes
*Boarding Kennels...see*
   Animal Hospitals
   Dog Obedience Schools
   Kennels — Boarding
*Boarding Schools...see*
   Schools — Elementary — Public and Private
   Schools — Secondary — Public and Private
*Boarding Stables...see*
   Stables and Riding Academies
*Boat Dealers...see*
   Marine Dealers
Boat Manufacturing — Fiberglass Hull
*Boat Yards...see*

Marinas
*Boats — Fishing...see*
   Charter Boat Fishing
Body Piercing Studios
*Body Repair Shops, Automobile...see*
   Automobile Body Repair Shops
Boiler Maintenance Contractors
Book Publishing
*Bookbinding...see*
   Commercial Bookbinding
*Bookkeeping Firms...see*
   Accounting Firms
Bookstores — Retail
   *see also...*
   Comic-Book Stores
*Boot Camps...see*
   Correctional Facilities — Public and Private
*Boot Manufacturing...see*
   Shoe Manufacturing
*Boot Repairing...see*
   Shoe Repair Shops
Botanical Gardens
*Bottle Manufacturing...see*
   Glassware Manufacturing
*Bottled Gas Dealers...see*
   Liquefied Petroleum (LP) Gas Retailing
Bottled Water Production and Delivery
*Bottling — Fruit Juices...see*
   Fruit Juice Manufacturing
Bottling — Soft Drinks
*Bounty Hunters...see*
   Bail Bondsmen
*Boutiques — Clothing...see*
   Bridal Shops
   Clothing Stores
   Thrift Stores and Resale Shops
Bowling Centers
Box Manufacturing — Corrugated
Box Manufacturing — Paperboard
*Box Spring Manufacturing...see*
   Mattress and Box Spring Manufacturing
*Boys' Clothing Makers...see*
   Apparel Manufacturing
*Brake Repair Shops...see*
   Auto Repair Shops and Oil Change Centers
*Brandy Distilling...see*
   Wineries
*Brazing...see*
   Welding, Brazing and Cutting
*Breast Care Centers ...see*
   Mammography Centers
Breeding Farms — Horses
Breeding Farms — Ratite Birds
Breeding Farms — Small Animals
Breweries
   *see also...*
   Craft Breweries, Microbreweries, and Brewpubs
Brick Manufacturing
*Bricklayers...see*
   Mason Contractors
*Bridal Consultants...see*
   Wedding Consultants
Bridal Shops
*Broadcasting...see*
   Cable Television System Operators
   Radio Broadcasting Stations

Copyright 2005 (c) A.M. Best Company. All rights reserved.



The Insurance Information Source

www.ambest.com

# A.M. Best Company

Ambest Road
OLDWICK, NEW JERSEY 08858
908-439-2200

## Best's Underwriting Guide Classifications

Fur Garment Manufacturing
Furniture Manufacturing — Wood
Gear Manufacturing
Glass Manufacturing
Glassblowing Operations
Glassware Manufacturing
Gun Manufacturing
Ice Cream and Frozen Dessert Manufacturing
Ice Manufacturers and Distributors
Industrial Gas Manufacturing
Ink Manufacturing
Jam and Jelly Manufacturing
Jewelry Manufacturing
Juvenile Furniture
Lamp Manufacturing — Electric
Leather Goods Manufacturing — Apparel
Leather Goods Manufacturing — Non-Apparel
Manufactured Home Producers
Maple Syrup Producers
Mattress and Box Spring Manufacturing
Meat Packing Plants
Meat Products Processing
Metal Stamping/Fabricating Operations
Monument Manufacturers and Retailers
Neon Sign Manufacturers
Nut Manufacturing
Ornamental Metalworking
Paint Manufacturing
Pasta Manufacturing
Pesticide Manufacturing
Pet Food Manufacturing
Pharmaceutical Manufacturing
Pickle Processing Plants
Plastics Fabricating and Finishing
Plastics Molding, Forming and Extruding
Plywood Manufacturing
Portable Scientific Instruments Manufacturing
Pottery Manufacturing — Household and Industrial
Poultry — Processing
Precast Concrete Products Manufacturing
Pulp and Paper Mills
Rendering
Sawmills and Planing Mills
Screw Machine Products Manufacturing
Seed Processors
Semiconductor Manufacturing
Sheet Metal Work
Shoe Manufacturing
Silversmiths
Skate Manufacturing
Smokeless Tobacco Manufacturing
Snack Food Manufacturing
Soap and Detergent Manufacturing
Spice, Herb and Extract Processing
Spray Equipment Manufacturing
Steel Manufacturing
Tanneries
Textile Mills — Finishing and Coating
Textile Mills — Yarn Spinning and Weaving
Tire Manufacturing
Tool and Die Shops
Toy Manufacturing
Trading Card Companies
Wallcovering Manufacturing
Wire Manufacturing
Wire Rope Manufacturing and Fabricating

Writing Instruments Manufacturing
*Manufacturing Equipment — Installation and Repair...see*
    Millwrights
*Map Making...see*
    Computer-Aided Mapping Services
Maple Syrup Producers
*Marathons...see*
    Special Events — Individual Athletic Contests
*Marble Setting...see*
    Mason Contractors
    Tile and Marble Contractors
Marinas
Marine Dealers
Marketing Research Firms
Marriage and Family Counseling Services
Martial Arts Schools
Mason Contractors
*Mass Transit Systems — Buses...see*
    Public Bus Companies
Massage Therapists
*Matchmakers...see*
    Dating Services
*Materials Recovery Facilities...see*
    Recycling Collection Centers
*Maternity Shops...see*
    Clothing Stores
Mattress and Box Spring Manufacturing
Mattress and Waterbed Stores
    see also...
    Furniture Stores
*Mausoleums...see*
    Cemeteries and Memorial Parks
*Meat Meal Manufacturing...see*
    Pet Food Manufacturing
    Rendering
Meat Packing Plants
    see also...
    Meat Products Processing
    Poultry — Processing
    Rendering
Meat Products Processing
*Medevacs...see*
    Air Ambulance Services
Media Storage Centers
*Mediation Firms...see*
    Alternative Dispute Resolution Firms
*Medical Clinics...see*
    Emergency Centers (Freestanding)
Medical Equipment Dealers - Wholesale and Retail
*Medical Illustrators...see*
    Demonstrative Evidence Firms
*Medical Imaging Centers...see*
    Mammography Centers
    X-ray Laboratories — Medical
Medical Laboratories
Medical Services:
    Acupuncturists
    Adult Daycare Facilities
    Air Ambulance Services
    Alternative Health Centers/Practitioners
    Ambulance Services and Rescue Squads
    Animal Hospitals
    Assisted Living Facilities
    Audiologists
    Audiometric Testing Companies
    Blood Banks

# Exhibit J

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  | | CIVIL ACTION |
|---|---|---|
| | | NO. 02-10153-WGY |

ACADIA INSURANCE          )
COMPANY,                      )
                  Plaintiff    )
                           )
   v.                     )
                           )
BEVERLY PORT MARINA, INC.  )
                           )
    and                  )
                           )
CARLOS JOHNSON,        )
               Defendants  )

### PLAINTIFF ACADIA INSURANCE COMPANY'S ANSWERS TO INTERROGATORIES PROPOUNDED BY DEFENDANT, BEVERLY PORT MARINA, INC.

NOW COMES Plaintiff, Acadia Insurance Company ("Acadia"), and pursuant to Rule 33 of the Federal Rules of Civil Procedure, answers Defendant Beverly Port Marina, Inc.'s Interrogatories as follows:

1.    Please state your name, residential address, age, social security number, business relationship to Acadia Insurance Company, and your current position with Acadia Insurance Company.

**ANSWER:**   Patrick O'Toole, 31 Stockbridge Drive, Yarmouth, Maine, Employee, Ocean Marine Claims Specialist.  Acadia objects to that portion of Interrogatory No. 1 which seeks Mr. O'Toole's age and social security number on the grounds that such information is not relevant to either a defense or claim being made in this case.

EXHIBIT

Wirth 10

10-31-05  JLM

PENGAD 800-631-6989

2.    Please identify by name, address and company title all individuals, including but not limited to underwriters, who were responsible for drafting and issuing Marina Operator Legal Liability Policies to Beverly Port Marina from 1995 to the present.

**ANSWER:**    Matthew Pederson, Former Director – Ocean Marine, and Ted Wirth, current Director – Ocean Marine.

3.    Please identify by name, residential address and company title all individuals who were involved with the claims adjusting of all claims submitted by Beverly Port Marina to Acadia Insurance Company from 1995 to the present.

**ANSWER:**

a)    Shirley Nichols
      Claim Representative

b)    Patrick O'Toole
      Ocean Marine Claims Specialist

c)    Greg Putnam
      Claim Representative

Acadia objects to that portion of Interrogatory No. 3 which seeks the residential addressed of Acadia's employees on the grounds that such information is not relevant to either a defense or claim being made in this case.

4.    Please identify all files maintained by Acadia Insurance Company concerning Beverly Port Marina, including but not limited to, underwriting files, claims files, correspondence files, broker files, and any other files together with the identity of the custodian of those files from 1995 to the present.

**ANSWER:**    Ocean Marine Underwriting File, Commercial Package Underwriting File, Claim Files:

a)    Claim file # 5104265 – Claimant Richard Chamberlain, Date of Loss 10/16/00

2

b)     Claim file # 5105243 – Claimant Richard Chamberlain, Date of Loss 10/16/00

c)     Claim file # 5107095 – Claimant Richard Chamberlain, Date of Loss 11/10/01

d)     Claim file # 5111216 – Claimant Thomas Mulcahy, Date of Loss 4/14/01

e)     Claim file # 5117185 – Claimant Carlos Johnson, Date of Loss 10/1/01

f)     Claim file # 7008045 – Claimant Richard Chamberlain, Date of Loss 10/16/01

g)     Claim file # 7013205 – Claimant Carlos Johnson, Date of Loss 10/1/01

The custodian of the ocean marine underwriting files is the Ocean Marine Underwriter, currently Ted Wirth.

The custodian of the commercial package underwriting file is the Commercial Lines Underwriter handling agency business from Leslie Ray Agency, currently Pam Reiniger.

The custodian of claim files # 5104265, 5105243, 5107095, 7008045 and 5111216 is Acadia Insurance Company and its authorized claim department personnel. These files are closed, inactive, and stored.

The custodian of claim file # 5117185 is the Ocean Marine Claim Specialist, currently Patrick O'Toole.

The custodian of claim file # 7013205 is the assigned Massachusetts Casualty Claim Representative, currently Greg Putnam.

5.     Please describe and identify all manuals, memoranda, directives, instructions, guidelines or other writings within Acadia Insurance Company for the purpose of issuing policies for Marina Operator Legal Liability, Marina Risks, and Protection and Indemnity coverage.

3

**ANSWER:**    These policies are issued by our Ocean Marine Department. Ocean Marine insurance is an unregulated line, so there are no written manuals or guidelines for issuing policies. Ocean Marine policies are issued at the discretion of the Director - Ocean Marine.

6.    Please identify all manuals, memoranda, directives, instructions, guidelines or other writings concerning claims adjusting and handling generally and specifically for maritime risks covered by Marina Operator Legal Liability, Maritime Personal Injuries, and Protection and Indemnity coverage.

**ANSWER:**    A number of industry manuals exist and are used as reference materials by Acadia ocean marine claim handlers. These are published legal and claim-handling reference works. They include Ocean Marine Insurance by Flitner and Brunck, Marine Insurance: Ocean and Inland, by Rodda, and other industry writings, as well as relevant statutes and published maritime decisions. To the extent there are additional manuals, memoranda, directives, instructions, guidelines or other writings, Acadia objects to the identification of such documents on the grounds that such documents are proprietary to Acadia. Acadia will consider production of such information upon the entry of an appropriate confidentiality agreement in this case.

7.    Please identify with specificity every individual who was involved in the investigation, internal review, the collaborate effort in drafting, and the author of any and all parts of Acadia Insurance Company's letter dated November 15, 2001 to Beverly Port Marina, a copy of which is attached hereto as Exhibit "A".

**ANSWER:**    The referenced letter was written by Patrick O'Toole, with review and editing assistance from Acadia' legal counsel. The "internal review" of the letter consisted of discussion with and approval by Acadia's Claim Director, Claire Mullaney, as well a roundtable discussion with other directors and examiners, including Claire

4

Mullaney, Ellen Barnett, Barbara Taylor, Arthur Kane and Anthony Doman. There was no "investigation" of the referenced letter. There was, however, an investigation of the facts which formed the basis of the letter which was conducted by Patrick O'Toole. Other parties "involved in" that investigation were Suzanne Kinzie, and Joseph Grenier of Beverly Port Marina, Inc.

8.    Please state every factual basis upon which Acadia Insurance Company denied coverage under the Marina Operator Legal Liability policy issued to Beverly Port Marina, Policy No. MOA 0061540-11 concerning the injury to Carlos Johnson on October 1, 2001.

**ANSWER:**    The facts and allegations of the case, as revealed in our investigation and relied upon to form our coverage position, are set forth in their entirety in the letters from Patrick O'Toole to Beverly Port Marina, dated October 15, 2001, October 19, 2001, and November 15, 2001. Copies of those letters have already been provided to Beverly Port Marina, Inc. Acadia reserves the right to supplement this interrogatory upon the completion of discovery in this case.

9.    Please state every legal authority upon which Acadia Insurance Company relies for denying coverage under the Marina Operator Legal Liability policy issued to Beverly Port Marina, Policy No. MOA 0061540-11 concerning the injury to Carlos Johnson on October 1, 2001.

**ANSWER:**    Acadia objects to Interrogatory No. 9 on the grounds that it seeks legal conclusions, and matters beyond the scope of Rule 26, F.R.Civ.P. Without waiving such objection, Acadia's coverage position was determined in large part by analyzing the facts and allegations in the underlying claim and lawsuit, in the context of the contracts of insurance between Acadia Insurance Company and Beverly Port Marina.

5

10.    Please state every section, clause, exclusion, and/or provision upon which Acadia Insurance Company relied upon for denying coverage under the Marina Operator Legal Liability policy issued to Beverly Port Marina, Policy No. MOA 0061540-11 concerning the injury to Carlos Johnson on October 1, 2001.

**ANSWER:**    The relevant policy provisions are detailed in the correspondence referenced in the Answer to Interrogatory number 8.

11.    Please identify all statements or conversations between any employee of Acadia Insurance Company investigating the October 1, 2001 injury to Carlos Johnson and any employee of Beverly Port Marina from October 1, 2001 to the present.

**ANSWER:**    Upon information and belief, the only Acadia employee who had such conversations with employees of Beverly Port Marina regarding this case was Patrick O'Toole, who spoke by telephone with Suzanne Kinzie on October 12, 2001. Mr. O'Toole met with Suzanne Kinzie on October 15, 2001 at Beverly Port Marina, and hand-delivered the letter dated October 15, 2001, which is referenced in the Answer to Interrogatory number 8. Mr. O'Toole waited while Ms. Kinzie read the letter. Ms. Kinzie thereupon indicated her understanding that the coverage for the claim was in question and under investigation. Mr. O'Toole then asked to take a recorded statement, but Ms. Kinzie declined. She then introduced Mr. O'Toole to Joseph Grenier, who agreed to provide a recorded statement of the facts underlying Mr. Johnson's claim.

Mr. O'Toole again spoke by telephone with Suzanne Kinzie on October 24, 2001. Additional discussions may have occurred with her on the phone, but there are no records of such conversations, nor does Mr. O'Toole have any specific memory of those conversations.

6

12.    Please identify by date, location and individual all investigations performed by Acadia Insurance Company concerning coverage issues involving Carlos Johnson's injury of October 1, 2001 and Beverly Port Marina policy(s) coverage for such injury.

**ANSWER:**    Please see Acadia's prior answers to Interrogatories.

13.    Regarding each expert witness whom you expect to testify at trial, please state the full name and address of all such expert witnesses, the subject matter on which each such expert may be expected to testify, the substance of all facts to which any such expert is expected to testify, the contents of all opinions to which each expert is expected to testify and a summary of the grounds for each opinion to which each such expert is expected to testify.

**ANSWER:**    Acadia has been informed by its counsel that no decision has been made at this time as to who may be called as an expert witness in this case on behalf of Acadia. Such information will be provided pursuant to the Scheduling Order when it is issued by the Court in this matter.

AS TO OBJECTIONS:

Leonard W. Langer, Esq.

DATED at Portland, Maine, this _15th_ day of May, 2002.

ACADIA INSURANCE COMPANY

By: _____

Patrick O'Toole, Ocean Marine Claims Specialist

7

STATE OF MAINE
CUMBERLAND, SS.

May _15_, 2002

Personally appeared the above-named Patrick O'Toole, in his said capacity, and swore that the above Answers to Interrogatories are true to the best of his knowledge, information and belief, and where based upon his information and belief, he believes them to be true.

Before me,

_Ruth R. Covell_
Notary Public

My Commission Expires _____

RUTH COVELL
Notary Public, Maine
My Commission Expires
July 26, 2008

## CERTIFICATE OF SERVICE

I, Leonard W. Langer, hereby certify that on May 15, 2002, I caused a true copy of the within Plaintiff's Answers to Defendant Beverly Port Marina's Interrogatories to be mailed by First class Mail, postage prepaid, to Thomas J. Muzyka, Esq., Clinton & Muzyka, P.C., One Washington Mall, Suite 1400, Boston, MA 02108, counsel for Defendant Beverly Port Marina, Inc., and to Stephen M. Ouellette, Esq., Cianciulli & Ouellette, 163 Cabot Street, Beverly, MA 01915, counsel for Defendant Carlos Johnson.

_Leonard W. Langer, Esq._

Acadia/BPM/Acadia's AnswersIntrgtrs.doc

# Exhibit K

THE INSURANCE LIBRARY
156 STATE STREET
BOSTON, MA 02109

# Ocean Marine Insurance

## Volume II

**ARTHUR L. FLITNER, CPCU**
*Director of Curriculum*
*Insurance Institute of America*

**ARTHUR E. BRUNCK**
*Marine Insurance Consultant*



Second Edition • 1992

INSURANCE INSTITUTE OF AMERICA
720 Providence Road, Malvern, Pennsylvania 19355-0716

## 170—Ocean Marine Insurance

### Liability Exposures

Like most other dealers holding merchandise for sale to the public, boat dealers regularly have customers on their premises. Thus, boat dealers are exposed to liability for bodily injury or property damage arising out of conditions in their premises. Because they sell merchandise, dealers are also exposed to products liability resulting from injuries caused by the dealer's products after they are sold. A dealer who performs repair work is also exposed to liability arising out of completed operations. For the most part, such liability exposures are insurable under commercial general liability (CGL) insurance. (See Chapter 11 regarding CGL coverage for completed operations liability.)

However, because CGL policies usually exclude liability arising out of the ownership, maintenance, use, loading, or unloading of watercraft while afloat, boat dealers policies usually provide protection and indemnity insurance to cover that exposure. To illustrate this exposure, assume that a customer is injured while on a demonstration ride on one of the dealer's boats, or that an employee's negligent operation while delivering a boat results in collision damage to another watercraft. If the dealer becomes legally liable for the injury or damage, P&I insurance will indemnify the dealer for resulting damages and expenses, subject of course to the exclusions, limit of insurance, and other provisions.

In most respects, such P&I coverage is likely to resemble the P&I forms described in Chapter 8. However, injury to employees of the dealer is ordinarily excluded from the P&I coverage of a boat dealers policy. The employees of a boat dealer are principally shore employees whose occupational injuries are normally subject to the applicable state workers compensation law or perhaps the LHWCA, depending on the work being performed. In addition, because some of these employees may operate boats on behalf of the dealer, it is conceivable that they might, if injured in these activities, qualify for maritime remedies such as the Jones Act. If excluded under the P&I policy, this incidental crew liability exposure can be insured in part by endorsing the dealer's Workers Compensation and Employers Liability Policy with the Maritime Coverage (or Jones Act) Endorsement.

Another liability exposure faced by most boat dealers is damage to property in the dealer's care, custody, or control for purposes of servicing, repair, or storage. This exposure is not usually covered under CGL or P&I insurance, and requires a bailee liability coverage like that provided to ship repairers or marina operators.

### Payment of Premium

Dealers policies are often written on a reporting basis because the value of a dealer's merchandise can fluctuate considerably during the

---

policy period. Premiums are thus charged on the basis of actual values reported by the dealer. Such reports may be made monthly, quarterly, or at any other interval agreed upon.

To discourage the dealer from underreporting values in order to obtain a lower premium, reporting policies ordinarily contain a *full value reporting (or "honesty") clause*. Such a clause states that the dealer can recover no greater proportion of any loss, even a partial one, than the amount of the last report of values to the actual values at the time the last report was made. And, of course, the dealer cannot collect more than the applicable limit of insurance, even if it might be less than the values last reported for purposes of determining premium.

In some instances, perhaps in the case of a dealer doing a relatively small volume of business, the policy may be issued on a nonreporting basis for a premium determined in advance of the policy period. Although the insurer may reserve the right to audit the dealer's books at the end of the policy period to adjust the premium accordingly, the dealer will not be required to submit regular reports during the policy period.

When insurance is written on a nonreporting basis, it is ordinarily subject to an 80 percent or higher coinsurance clause. Thus, the dealer can recover only that portion of any loss that the amount of insurance carried bears to 80 percent (or other stipulated percentage) of the actual value of covered property at the time of loss.

### Valuation Provisions

The valuation clause of a boat dealers policy is different from the usual valued approach of hull policies. For example, the valuation clause of one boat dealers policy reads as follows:

Property insured hereunder shall be valued at:
(a) As to new property—the cost price to the Insured plus shipping charges and assembly costs actually incurred and;
(b) As to used property—the actual cost to the Insured either through outright purchase or as an allowance in trade-in plus the costs of repairs actually performed;
(e) As to used property on consignment to the Insured—the actual cash value;

but this Company's liability shall be limited to the cost and expense of repairing or replacing any damaged part or parts, including forwarding charges, labor and installation charges necessary to repair or restore the damaged property to its original condition, but not in excess of the above valuation nor in excess of the cost to replace the property whichever is the lesser.

### Underwriting

The primary underwriting factors for boat dealers policies include the following:

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 1:05-cv-10883-WGY

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
* * *
BEVERLY PORT MARINA, INC., and     \*
LESLIE S. RAY INSURANCE     \*
AGENCY, INC.,     \*
    \*
    Plaintiffs,     \*
v.     \*
    \*
ACADIA INSURANCE COMPANY,     \*
    \*
    Defendant.     \*
    \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OPPOSITION OF BEVERLY PORT MARINA, INC. AND LESLIE S. RAY INSURANCE AGENCY, INC. TO ACADIA INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

Acadia Insurance Company's ("Acadia") motion for summary judgment must be denied. Acadia, in the pursuit of business and profits, set itself apart from other insurers by undertaking to provide special advice and services, both to Leslie Ray Insurance Agency, Inc. ("Leslie Ray") and Beverly Port Marina, Inc. ("Beverly Port"). This case is not about whether insurers generally owe a duty to advise, but rather whether the facts support the conclusion that special circumstances of assertion, representation, and reliance exist from which a reasonable jury could conclude that Acadia voluntarily assumed broader duties, and its negligent performance of those duties resulted in harm to the plaintiffs. This is a viable legal theory under Massachusetts law. *See, e.g., McCue v. The Prudential Insurance Co. of America,* 371 Mass. 659, 358 N.E.2d 799 (1976). As explained below, Acadia marketed itself as a specialist in marine underwriting and expressly undertook to play a leading role in the evaluation of Beverly Port's insurance needs and

the crafting of a policy which would address those needs. Having undertaken to examine

Beverly Port's operations and loss exposures, Acadia failed to consider all the risks, despite the

fact that *Best's Underwriting Guide* - an industry standard - explicitly cautions underwriters to

consider the very exposure that underlies this lawsuit. As a result, the policy which Acadia

issued incorporated a significant, undisclosed gap in coverage. In short, summary judgment must

be denied because the record before this Court demonstrates the existence of disputed material

facts.

## STATEMENT OF ADDITIONAL MATERIAL FACTS

1.   Acadia writes specialty lines of insurance, including ocean marine. See 30(b)(6) deposition of Acadia - Charles Hamblen ("Hamblen Dep."), p. 15-16, Exhibit A; 30(b)(6) of Acadia - Theodore Wirth ("Wirth Dep.") p. 34, Exhibit B; Deposition of Matthew Pedersen ("Pedersen Dep."), p. 23, Exhibit C.

2.   Acadia has a specialty underwriting department for ocean marine lines. Hamblen Dep., p. 16, Exhibit A.

3.   Acadia hired experts in ocean marine underwriting because it is a unique coverage. Hamblen Dep., p. 39, Exhibit A.

4.   Acadia entered into an Agency Agreement with Leslie Ray in 1997. Exhibit D.

5.   Acadia's custom and practice when entering into an agency agreement with an agency did not include verifying that the agency, such as Leslie Ray, had experience and knowledge in different lines of insurance written by Acadia. Hamblen Dep., p. 57, Exhibit A.

6.   Acadia, through its director of ocean marine underwriting, Matthew Pedersen, marketed their ocean marine lines to Leslie Ray. Pedersen Dep., p. 18, Exhibit C; Deposition of David Ray ("Ray Dep."), p. 53-54, Exhibit H.

7.   When Matthew Pedersen marketed Acadia's ocean marine specialty lines to Leslie Ray, he informed them that Acadia was the leading underwriter of ocean marine products in Maine, New Hampshire, and Vermont. Pedersen Dep., p. 18., Exhibit C.

8.   David Ray informed Matthew Pedersen that Leslie Ray did not have expertise in ocean marine insurance and that he would like the assistance of Acadia in understanding the coverages and exposures of Beverly Port. Ray Dep., p. 55, Exhibit H.

2

9.  Acadia agreed to provide such assistance.  Ray Dep., p. 56, Exhibit H.

10.  David Ray relied upon Acadia's expertise, as marketed to him, in ocean marine insurance.  Ray Dep., p. 167, Exhibit H.

11.  Given Acadia's expertise, Ray expected Pedersen to provide counsel on the potential exposures, and on the limitations on coverage for such exposures.  Ray Dep., p. 166, Exhibit H.

12.  David Ray of Leslie Ray asked the Acadia underwriter if he could provide a better ocean marine policy for Beverly Port than the marina had in the past.  Ray Dep., p. 58, Exhibit H.

13.  The application submitted to Acadia indicated that Beverly Port conducted demonstrations with customers aboard.  Exhibit E.

14.  An agent of Acadia, such as Leslie Ray, did not have authority to bind Marine Ocean Legal Liability/Boat Dealers coverage.  Wirth Dep., p. 90, Exhibit B.

15.  The decision regarding whether to accept or reject a proposed risk is up to the Acadia ocean marine underwriting department.  Wirth Dep., p. 90, Exhibit B.

16.  In underwriting a proposed ocean marine risk, the underwriter reviews the receipts if the insured is a marina, the average monthly inventory if the insured is a boat dealer, prior coverage, loss history and years in business.  Wirth Dep., p. 91, Exhibit B.

17.  The Beverly Port application indicated it was involved in substantial boat sales.  Wirth Dep., p. 65, Exhibit B.

18.  Acadia knew that Beverly Port's boat sales for the first policy year with Acadia were in excess of two million dollars.  Wirth Dep., p. 71-72, Exhibit B; Exhibit E.

19.  Acadia undertook to ascertain, identify, and verify liability and property exposures under Acadia policies.  Wirth Dep., p. 76-77, Exhibit B.

20.  Acadia surveyed Beverly Port's waterside operations on May 10, 2000.  Exhibit F.

21.  Acadia's survey indicated that Beverly Port engaged in a substantial boat sale business.  Exhibit F.

22.  The Acadia underwriting department never inquired into an insured marina's exposure for customer test drives.  Wirth Dep., p. 63, Exhibit B.

23.  At the time the Beverly Port policy was renewed, the underwriter did not inquire about

whether the marina allowed customers to test drive their boats despite the marina's substantial boat sale business. Wirth Dep., p. 31, Exhibit B.

24.    Leslie Ray was not informed of the lack of coverage for customer test drives, even though Acadia knew or should have known of the potential exposure given its knowledge of Beverly Port's sales volume and the information obtained during its survey, including an extensive conversation with the owners and witnessing and photographing the marina's operation. Wirth Dep., p. 53, Exhibit B; Ray Dep., p. 169-70, Exhibit H.

25.    CNA Insurance Marine Ocean Legal Liability/Boat Dealers policy did not exclude coverage for a situation where a prospective customer was injured during a test drive. Wirth Dep., p. 54-55, Exhibit B; O'Toole, p. 11, Exhibit G; Pedersen Dep., p. 38-40, Exhibit C.

26.    The *Best's Underwriting Guide* state that an underwriter must determine whether an employee will be present during a boat demonstration. Wirth Dep. p. 100, Exhibit B; Exhibit I.

27.    Contrary to Best's Underwriting Guide, the Acadia underwriter did not consider that an employee might not be present for a boat test drive. Wirth Dep., p. 100, Exhibit B.

## STANDARD OF REVIEW

Summary judgment is rarely granted on the merits of a negligence action. *Foley v. Matulewicz*, 17 Mass. App. Ct. 1004, 1005, 459 N.E. 2d 1262, 1263 (Mass. App. 1984). "It is well settled that 'Rule 56 authorizes summary judgment *only* where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, that no genuine issue remains for trial.'" *Peckham v. Ronrico Corp.*, 171 F. 2d 653 (1ˢᵗ Cir. 1949), *quoting Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S. Ct. 724 (1944) (emphasis added). Summary judgment must be denied if there is "the slightest doubt as to the facts." *Arenas v. United States*, 322 U.S. 419, 434 (64 S. Ct. 1090 (1944). The defendant bears the burden to show that there is no genuine issue of fact as to any of the issues raised even though it does not bear the burden at trial. *Berrios v. Perchik*, 20 Mass. App. Ct. 930, 933, 479 N.E. 2d 695, 696

4

(Mass. App. 1985).

## ARGUMENT

I.    **ACADIA UNDERTOOK TO EVALUATE BEVERLY PORT'S INSURANCE NEEDS, TO PROVIDE INSURANCE WHICH FULFILLED THOSE NEEDS, AND NEGLIGENTLY FAILED TO DO SO.**

Under Massachusetts law, insurance companies that hold themselves out to be specialists can be held liable when an insured relies on assertions, representations, and advice offered by the company. *See, e.g., McCue v. The Prudential Insurance Co. of America,* 371 Mass. 659, 358 N.E. 2d 799 (1976); *Rapp v. Lester L. Burdick, Inc.*, 336 Mass. 438, 146 N.E. 2d 368 (1957); *Schwartz v. The Travelers Indemnity Company*, 50 Mass. App. Ct. 672, 680, 740 N.E. 2d 1039 (2001). This principle of expanded liability applies to insurance companies acting through their agents and employees. *See McCue*, 371 Mass. at 661-62. In *McCue*, the court found that the special circumstances warranting recovery arose from the relationship between Prudential's agents and the insured. *Id.* at 661-63. In the context of the relationship, the reliance on assertions, representations, and advice proffered by Prudential, through its agent, was justified and warranted the imposition of liability against the company for the negligent failure to advise the insureds of the terms and status of their application. *Id.* at 662. The court stated: "In this highly competitive business...with the complexity of the varied types of insurance existing today, it has been recognized that applicants frequently do in fact rely upon a company's representatives. The courts have been unwilling to permit the companies to assert as a defense the inadequate or improper performance of these representatives." *Id. (quoting Sullivan v. John Hancock Mut. Life Ins. Co.,* 342 Mass. 649, 654, 174 N.E. 2d 771, 774 (1961); *see also Schwartz v. The Travelers Indemnity Co.,* 50 Mass. App. Ct. at 681; *Smith v. Mancuso Nowak Ins. Co.,*1996 Mass. Super.

LEXIS 572, *2, *citing McCue*, 371 Mass. at 659 (1976).

Whether special circumstances of assertion, representation, and reliance exist is generally

a jury question. *Belliveau v. Stein,* 2004 WL 2070900, 2-4 (Mass. Super. 2004), *citing McCue,*

371 Mass. at 661. Under the circumstances of this case, the plaintiffs have produced sufficient

evidence that such special circumstances of assertion, representation, and reliance existed

between Acadia and Beverly Port.

Acadia knew that Beverly Port and Leslie Ray were relying upon it to conduct a thorough

evaluation of Beverly Port's insurance needs, and to use its specialized knowledge and expertise

in ocean marine insurance to provide a policy which adequately addressed those needs. Acadia

made a special trip to Beverly Port Marina's waterside boat sales and marina facilities in order to

assess Beverly Port's insurance needs and exposures. Acadia took the affirmative step of

conducting a comprehensive risk evaluation of Beverly Port Marina, including an inspection,

observation of the marina and its operation, and interviews with the principals. Through this loss

evaluation and inspection and the information provided on the application, Acadia learned the

details of Beverly Port's business in order to provide the appropriate insurance to address its

risks. Acadia made recommendations to the insured through its agent, Leslie Ray. Leslie Ray

and Beverly Port relied upon Acadia's special expertise in ocean marine specialty lines and boat

dealers coverage and upon Acadia's representations of expertise. Acadia can be held liable when

Beverly Port relied upon its assertions, representations, and advice. *See McCue,* 371 Mass. at

659.

Additionally, Acadia voluntarily undertook to ensure it was providing appropriate

coverage by conducting a loss survey. It is a well established principle that a duty voluntarily

6

assumed must be discharged with due care. *Davis v. Westwood Group*, 420 Mass. 739, 746, 652

N.E. 2d 567, 571 (1995). "If a person voluntarily assumes a duty or undertakes to render services

to another that should have been seen as necessary for her protection, that person may be liable

for harm caused because of the negligent performance of this undertaking." *Id., quoting Thorson*

*v. Mandell,* 402 Mass. 744, 748, 525 N.E. 2d 375 (1988).

As noted above, Acadia took voluntary, affirmative steps to sell insurance to Beverly

Port. It went to Beverly Port's facility, conducted a loss evaluation and interviewed the

principals. The Acadia underwriting file reflects that Acadia understood and appreciated Beverly

Port's operations. Before the loss, Acadia knew that Beverly Port's annual boat dealer sales were

in the $2,000,000 range - and thus Acadia knew or should have known that there was a

substantial, potential "test drive" liability exposure arising from operation of Beverly Port boats

in the water by third parties that at the very least should have been explored during the

underwriting process. Acadia specifically recognized that Beverly Port was engaged in the

business of boat sales, and that in this regard it would transport its boats by water to boat shows

in Boston. Despite these facts, neither the initial Loss Control Survey Report, dated May 10,

2000, nor any other underwriting material addressed Beverly Port's exposures relative to test

drives or third parties' operation of its boats.

In failing to inquire about, evaluate, and advise Beverly Port regarding the risks presented

by customer test drives, Acadia ignored industry standards. The *Best's Underwriting Guide*

specifically instruct underwriters to explore this potential exposure with the insured in order to

appreciate the risk. With regard to risks which are pertinent to boat dealers, *Best's* underwriting

guide provides, that:

Boats are displayed in boat houses, showrooms or open yards and at docks. In-water demonstrations may be provided.... Displays at boat shows and conventions are a regular part of some dealers' operations.

The hazards common to any retail operation are present. Additional exposures in some cases are doing business at water's edge and, when demonstrating boats or equipment, taking the customer on water.

Although the basic policy normally excludes coverage for demonstration of watercraft, this coverage can be added. If it is, *the underwriter should know* whether boats are demonstrated or tested on or away from the premises and whether an employee experienced in boat control and water safety is present.... Tests and demonstrations present a hazardous potential: ... an individual may fall within the boat or may fall overboard. All of these possibilities *must be considered*; and it is important to remember that admiralty law differs from ordinary law.

Does the dealer sponsor races? Does the firm participate in boat shows or conventions? The extent of these exposures *should be determined*. (Emphasis added).

(Exhibit I)

At no time during the two policy periods leading up to Mr. Johnson's accident did Acadia address these underwriting issues in any way. Yet, without addressing these underwriting issues, Acadia made recommendations related to coverage, and issued a policy which excluded those risks from coverage without informing Beverly Port of this gap in coverage. In doing so, Acadia negligently failed to fulfill the duties which it had expressly undertaken to perform, leaving Beverly Port exposed to a substantial and undisclosed risk. When that risk materialized, Acadia relied upon the policy language to deny coverage for the loss. While the Court has already agreed that Acadia is not liable to Beverly Port on the language of the policy itself, it has not ruled - and should not rule - that Acadia bears no responsibility for the absence of coverage. Instead, the jury should be permitted to determine whether Acadia undertook to assist and advise Beverly Port in the evaluation of its insurance needs and whether it breached that duty under the circumstances presented here.

8

II.    **ACADIA UNDERTOOK TO ASSIST AND ADVISE LESLIE RAY IN THE EVALUATION OF BEVERLY PORT'S INSURANCE NEEDS, AND IN PROVIDING COVERAGE TO MEET THOSE NEEDS, AND NEGLIGENTLY FAILED TO DO SO.**

In addition to undertaking to assist and advise the insured, Beverly Port, Acadia also agreed to provide assistance and advice to the agent, Leslie Ray, regarding the evaluation of Beverly Port's insurance needs and the availability of coverage to meet those needs. As part of its business strategy, Acadia held itself out as a company that specialized in ocean marine specialty lines, including boat dealers coverage. In an effort to establish a relationship with Leslie Ray and induce Leslie Ray to place its customers' insurance with Acadia, Acadia touted its specialization and expertise to Leslie Ray. Acadia even conducted a personal visit by its director of ocean marine underwriting, Matthew Pedersen, to market its ocean marine lines to Leslie Ray. When Matthew Pedersen marketed Acadia's ocean marine specialty lines to Leslie Ray, he informed David Ray that Acadia specialized in ocean marine insurance and was the leading underwriter of ocean marine products in Maine, New Hampshire, and Vermont.

During this marketing meeting, David Ray informed Matthew Pedersen that Leslie Ray did not have expertise in ocean marine insurance and that he would need to rely upon the expertise of Acadia in understanding the coverages and exposures of his insureds, specifically Beverly Port. David Ray relied upon Acadia's expertise, as marketed to him, when he undertook to obtain insurance for Beverly Port. Given Acadia's expertise and the assurances given to him by Matthew Pedersen regarding Acadia's expertise, Ray expected Pedersen to provide counsel on Beverly Port's existing exposures, as well as any exposures that could exist that would be uncovered. Leslie Ray expected Acadia to provide appropriate insurance coverage for its customers. Acadia knew or should have known Leslie Ray lacked experience in ocean marine

9

insurance. Leslie Ray relied upon Acadia's representations regarding its expertise in ocean marine specialty lines and boat dealers coverage.

Leslie Ray was not an expert in the field of ocean marine underwriting and relied upon the recommendations of the specialist, Acadia. Because of the special circumstances of assertion, representation, and reliance which existed between Acadia and Leslie Ray, Acadia can be liable to Leslie Ray for the harm it caused when it breached its duty to provide sufficient insurance coverage for Beverly Port.

Had Acadia informed Leslie Ray of Beverly Port's exposure associated with customer test drives and the gap in coverage under Acadia's policy, Leslie Ray could have explored obtaining full coverage for Beverly Port with another company so as to avoid the exposure for both Leslie Ray and Beverly Port arising out of the personal injury claim of Carlos Johnson. The question of whether Acadia breached its duty, and whether that breach caused damage to Leslie Ray as a result of Beverly Port not having insurance in place to cover the Johnson claim, is a question for the jury.

Questions of fact exist as to whether Acadia breached the duty it voluntarily undertook. As set forth above, industry standards reflect that Acadia should have recognized and investigated the very exposure that underlies this suit, yet it failed to do so. Acadia should have learned of the gap in coverage through its underwriting and expertise and advised the agent and insured of this gap in order for the potential exposure to be addressed through additional insurance. Having induced Leslie Ray to rely upon its assistance as a means of attracting new business, Acadia negligently performed the tasks which it had undertaken, and then abandoned Leslie Ray to suffer the consequences of its own failures. At the very least, questions of fact

10

preclude the entry of summary judgment on Leslie Ray's negligence claims.

### III.    ACADIA BREACHED ITS AGENCY CONTRACT WITH LESLIE RAY.

Questions of fact exist regarding whether Acadia breached its agency contract with Leslie

Ray.  In Massachusetts, every contract incorporates an implied covenant of good faith and fair

dealing by the parties in its performance.  *See Anthony's Pier Four, Inc. v. HBC Assocs.,* 411

Mass. 451, 473, 583 N.E. 2d 806 (1991); *Cadle Co. v. Vargas,* 55 Mass. App. Ct. 361, 366, 771

N.E. 2d 179 (2002); Restatement (Second) of Contracts § 205 (1979).  This duty "translates into

an 'implied term' or condition of the contractual arrangement.  'Good faith performance or

enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency

with the justified expectations of the other party.' " (Citations omitted.) *Cadle Co., supra* at 366.

"Good faith and fair dealing is the understanding between the parties 'that neither party shall do

anything that will have the effect of destroying or injuring the right of the other party to receive

the fruits of the contract.'" (citations omitted).  *Tufankjian v. Rockland Trust Co.,* 57 Mass. App.

Ct. 173, 177, 782 N.E.2d 1, 5  (Mass. App. Ct. 2003), quoting *Anthony's Pier Four, Inc., supra* at

471-72.

At the very least, Acadia's contractual obligations to deal fairly and in good faith with Leslie

Ray should preclude it from exploiting Leslie Ray's limited experience with the specialized field

of ocean marine insurance by inducing Leslie Ray to rely upon its advice and assistance, and then

leaving the agent to suffer the consequences of Acadia's own failure to adequately assess and

respond to Beverly Port's insurance needs.

As discussed above, Acadia actively sought to solicit business from Leslie Ray, encouraging

Leslie Ray to place marine policies with Acadia and assuring Leslie Ray that it would evaluate

Beverly Port's coverage needs. Having induced Leslie Ray to rely upon its greater experience

and expertise, Acadia failed to adequately evaluate the insured's potential exposures, and issued

a policy which did not provide sufficient coverage for such exposures, without informing Leslie

Ray of the limitations on the scope of coverage. Whether Acadia breached the implied covenant

of good faith and fair dealing under the circumstances is a question for the jury.

Moreover, the Acadia-Leslie Ray Agency Agreement, dated December 23, 1997, requires that

Acadia "shall defend and indemnify the Agent (Leslie Ray) against liability, including reasonable

cost of defense and settlements, imposed on it by law for damages caused by acts or omissions of

the Company, provided that the Agent has not caused or contributed to such liability by its own

acts or omissions." Leslie Ray was sued for not offering or obtaining "necessary and available"

coverage for Beverly Port. If Leslie Ray did not offer or obtain such coverage, the sole cause of

its failure was its reliance upon Acadia to fulfill its promises and to properly perform its

underwriting function. The claims which Leslie Ray had to defend in the Johnson action were

precisely the sort contemplated by the indemnification provision of the Agency Agreement.

Here, it was the conduct of the principal that caused the harm to the third party as a result

of Acadia's negligent underwriting of this policy and its negligence in fulfilling its duties under

the contract and the duties it voluntarily undertook. Agency and contract law requires that the

principal exonerate the agency for the tortious conduct of its principal. "An agent who does not

play a part in the tortious conduct of his principal, and who lacks knowledge of the principal's

misconduct, is not liable for harm resulting to third persons." *O'Brien v. Christensen*, 422 Mass.

281, 290, 662 N.E. 2d 205, 211 (1996), *citing* Restatement (Second) of Agency § 350 (1958).

Acadia's failure to exonerate Leslie Ray for its exposure resulting from Acadia's conduct, as

contemplated by the indemnification agreement, is a breach of good faith and fair dealing. *See*

*Tufankjian*, 57 Mass. App. Ct. at 177; *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. at

473; *Cadle Co.*, 55 Mass. App. Ct. at 366; Restatement (Second) of Contracts § 205 (1979).

Questions of fact for the jury exist on whether Acadia breached its contract with Leslie Ray and

on whether it breached its implied duty of good faith and fair dealing when it failed to exonerate

Leslie Ray for its loss arising out of the Johnson claim.

## IV.     EXPERT TESTIMONY IS UNNECESSARY TO ESTABLISH ACADIA'S LIABILITY.

As discussed above, the evidence demonstrates that Acadia undertook to evaluate Beverly

Port's insurance needs and to provide a policy which addressed those needs, and that it induced

Beverly Port and Leslie Ray to rely upon its expertise in doing so.  Nevertheless, Acadia admits it

failed to contemplate a significant potential risk of loss, and issued a policy which did not cover

that risk, without ever informing either the insured or the agent of the absence of coverage.

Under these circumstances, a lay jury could properly conclude that Acadia failed to perform the

duty which it undertook, and is therefore liable for negligence and/or breach of contract.  This

conclusion requires no specialized knowledge, and expert testimony is wholly unnecessary.

Moreover, evidence of industry practice can be offered in lieu of expert testimony to establish

that Acadia failed to exercise due care in its underwriting of Beverly Port Marina.  *Palmi v.*

*Metropolitan Prop. & Casualty Ins. Co.*, 60 Mass. App. Ct. 1114, 802 N.E. 2d 1069 (Mass. App.

Ct. 2004).  The trial court in *Palmi* stated that the plaintiffs must present expert testimony or a

professional to testify as to that practice, to explain to a jury what a reasonable insurer would

have done. *Palmi v. Metropolitan*, 2000 WL 33170997 (Mass. Super. 2000), *citing Hartford*

*Cas. Ins. Co.*, 417 Mass. 115, 121; 628 N.E. 2d 14, 18 (1994).

13

Here, the plaintiffs will offer underwriting guidelines for "Boat Dealers" to establish the

industry standard for underwriters of "Boat Dealers." *Best's Underwriting Guide's* underwriting

classification for "Boat Dealers" indicates that the liability risk associated with third-party

operation of a boat dealer's vessels, and/or test drives, is one which is specifically understood in

the marine insurance underwriting industry. As set forth above, *Best's Underwriting Guide's*

underwriting classification for "Boat Dealers" provides that this very risk should have been

addressed by Acadia during the underwriting process, specifically noting that the "*the*

*underwriter should know* whether boats are demonstrated or tested on or away from the premises

and whether an employee experienced in boat control and water safety is present. (Exhibit I)

Acadia has acknowledged its reliance on industry manuals, including *Ocean Marine*

*Insurance* by Flitner and Brunck. See Answers to Interrogatories, Exhibit J. *Ocean Marine*

*Insurance*, one of the industry manuals referenced by Acadia, offers underwriting guidelines with

respect to underwriters of "Boat Dealers" policies. It states that "boat dealers policies usually

provide protection and indemnity insurance" to cover the exposure to liability arising out of the

use of a watercraft while afloat. Arthur L. Flitner & Arthur E. Brunck, *Ocean Marine Insurance*,

Vol. 2, p. 170, Exhibit K. Of particular interest is that the authors used the very exposure that

underlies this suit as an example of a risk to be addressed during the underwriting process:

> Assume that a customer is injured while on a demonstration ride on
> one of the dealer's boats, or that an employee's negligent operation
> while delivering a boat results in collision damage to another
> watercraft. If the dealer becomes legally liable for the injury or
> damage, P&I insurance will indemnify the dealer for resulting
> damages and expenses...

(Exhibit K)

Thus, even if evidence of industry standards were necessary to establish Acadia's liability,

14

there is ample evidence of industry practice which establishes that Acadia breached its duty to appropriately underwrite the Beverly Port risk and identify the liability exposures to Beverly Port.[1]

## V. THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BE DENIED PURSUANT TO RULE 56(f).

The plaintiffs are unable to fully oppose the defendant's motion at this time because they have not yet had the opportunity to depose Grettyl (Lewitt) Benisch, an underwriter for Acadia. Ms. Benisch participated in the loss assessment at Beverly Port and in the drafting of the loss prevention analysis. Shortly before the defendant filed its motion for summary judgment the deposition of Ms. Benisch was cancelled at the defendant's request, as she was reportedly ill. It has been rescheduled for December 15, 2005. As such, the plaintiffs respectfully request that this Court deny the defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56(f). In the alternative, the plaintiffs request that the Court grant them the opportunity to supplement this opposition following the deposition of Ms. Benisch and after a review of the transcript.

---

[1]The plaintiffs' expert, Craig Stanovich, was prepared to offer testimony consistent with the industry standards reflected in *Best's Underwriting Guide* and Flitner and Brunck's *Ocean Marine Insurance*. However, the Court previously allowed Acadia's Motion to Preclude Stanovich's testimony, based upon the plaintiffs' purported failure to comply with the scheduling order. The plaintiffs maintain that they complied with the parties' understanding of the order, and once again urge the Court to reconsider its ruling on this issue.

<u>CONCLUSION</u>

For the foregoing reasons, the plaintiffs, Beverly Port and Leslie Ray, respectfully request

that the defendant's motion for summary judgment be denied.

> LESLIE RAY INSURANCE AGENCY, INC. and
> BEVERLY PORT MARINA, INC.,
> By their attorneys,
>
>
> /s/ Kerry D. Florio
> William D. Chapman, BBO#551261
> Kerry D. Florio, BBO#647489
> Melick, Porter & Shea, LLP
> 28 State Street
> Boston MA 02109
> (617) 523-6200

CERTIFICATE OF SERVICE: I hereby certify that the foregoing was electronically served on

counsel of record for Acadia Insurance Company, on this date: 12/12/05