# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BEVERLY PORT MARINA, INC. | ) | |
| and LESLIE S. RAY INSURANCE | ) | |
| AGENCY, INC., | ) | Civil Action No. 1:05-cv-10883-WGY |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ACADIA INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SU7MMARY JUDGMENT

NOW COMES Defendant, Acadia Insurance Company ("Acadia"), by and through its counsel, Tompkins, Clough, Hirshon & Langer, P.A., and submits the following Reply Memorandum in support of its Motion for Summary Judgment.

## ARGUMENT

Plaintiffs have failed to offer evidence to contest any of the facts set forth in Acadia's Statement of Material Facts. It thus remains undisputed that, for example, Acadia was never told that Beverly Port allowed customers to operate its boats; that Acadia was not otherwise aware that Beverly Port allowed such a practice; that Acadia was not aware of *any* boat dealers that allowed such a practice (even if such dealers had "significant" sales); that Acadia was never asked to insure Beverly Port for this practice; that no one else had previously asked Acadia for such coverage; and that if Acadia had been asked, it would have refused, in conformity with the practice in the industry, as this

is not a risk that Acadia ever insures against.  *See* Defendant's Statement of Material Facts ("DSMF") ¶¶42-44, 47-48, 52-56, 58-66.

Plaintiffs contend, nevertheless, that Acadia *should have* taken steps to find out whether Beverly Port let customers operate its boats and then should have provided liability coverage for such a practice.  They tacitly concede that Acadia had no such duty either under its agency agreement or under any applicable law.  Instead, they assert that Acadia voluntarily undertook such a duty.  They repeatedly insist that Acadia "undertook to evaluate Beverly Port's insurance needs," "undertook to assist and advise Leslie Ray in the evaluation of Beverly Port's needs," "made recommendations related to coverage," and undertook "to provide insurance which fulfilled those needs."  *See* Plaintiff's Opposition at 5, 6, 8, 9.  Unfortunately for Plaintiffs, the record is barren of any evidence to support these assertions.

Significantly, nothing in Plaintiffs' Statement of Additional Material Facts describes such an "undertaking"; the closest they come is in the allegations that David Ray said "he would like the assistance of Acadia in understanding the coverages and exposures of Beverly Port" and "Acadia agreed to provide such assistance."  *See* Plaintiffs' Statement of Additional Material Facts ("PSMF") ¶¶8-9, citing Ray Dep. at 55-56.  Yet even this watered-down statement is not supported by the record citation. What David Ray actually claimed is that Matthew Pedersen said something to the effect that "he would assist me with my questions and concerns."  *See* Ray Dep. at 56.[1]  This is

---

[1] For the record, Acadia disagrees, in whole or in part, with PSMF ¶¶8-12, 17-19, 21, and 23-27.  Other statements are highly misleading or irrelevant.  Specific statements in the PSMF which mischaracterize the evidence or are based on inadmissible evidence are addressed *infra*.

a far cry from volunteering to investigate and to fulfill Beverly Port's undisclosed insurance needs.

Plaintiffs rely on a line of cases indicating that an insured may have a cause of action for an insurance agent's breach of undertaking, in "special circumstances of assertion, representation and reliance." *See McCue v. Prudential Insurance Co. of America*, 371 Mass. 659, 661, 358 N.E.2d 799, 801 (1976); *Rapp v. Lester L. Burdick, Inc.*, 336 Mass. 438 , 442, 146 N.E.2d 368 (1957); *Schwartz v. Travelers Indemnity Co.,* 50 Mass. App. Ct. 672, 680, 740 N.E.2d 1039 (2001). First of all, this line of cases does not apply to claims of an insurance agent against the underwriter. There may be a special relationship of trust and reliance between an insurance "applicant and an insurance adviser," *see McCue*, 371 Mass. at 802; but the relationship between an insurance agent and the carrier is not analogous. An insurance agent cannot expect to rely on the carrier's advice as to the applicant's insurance needs, any more than a real estate broker representing a prospective buyer would rely on a seller's advice concerning the needs of the broker's customer.

It is important to recall that, unlike the plaintiff in *McCue*, Beverly Port has not sued Acadia based on the dereliction of its agent. Since Beverly Port settled its claims against Leslie Ray, it has waived and released any claim against Acadia predicated on the fault of the agent. *Elias v. Unisys Corp.*, 410 Mass. 479, 573 N.E.2d 946 (1991). But Plaintiffs now deny that Leslie Ray did anything wrong at all. Rather, they claim that Acadia was solely responsible for ascertaining Beverly Port's undisclosed insurance needs, and that Acadia let them down. Massachusetts courts have not recognized such a

direct reliance claim against an insurance company, with whom the applicant had virtually no unmediated contact.

Secondly, even if the *Rapp/McCue* line of cases applied to claims by an insured and its insurance advisor against the carrier, these cases require "special circumstances" beyond the typical dealings among underwriters, agents, and applicants for insurance. Thus, in *Rapp* the Supreme Judicial Court held that a finding for the insurance company and its agent was required as a matter of law. *Rapp,* 336 Mass. at 441. The court found no "special circumstances of assertion, representation and reliance" that would demonstrate that the agent was "purporting to create a present legal obligation" beyond "the usual acts of solicitation and application." *Id.* at 442-43. *Accord*, *Rogers v. State Mutual Life Assurance Co.*, 349 Mass. 774, 212 N.E.2d 231 (1965). Absent such "special circumstances," an insurer has no fiduciary duty to act in a certain manner. *See Szymanski v. Boston Mutual Life Insurance Co.*, 56 Mass. App. Ct. 367, 381-82, 778 N.E.2d 716, 27 (2002); *Baldwin Crane Equipment Corp. v. Riley & Rielly Insurance Agency*, 44 Mass. App. Ct. 29, 32, 687 N.E.2d 1267 (1997). The seeking out of insurance business does not constitute special circumstances that go beyond the usual acts of solicitation. *Szymanski*, 56 Mass. App. Ct. at 382. Absent such special circumstances, an insurer, as a matter of law, has no heightened duty of disclosure. *Id.* at 381-82.

In *McCue*, the court relied on a number of special circumstances that are not present in the instant case, including the following:

a)      A continuing relationship had existed between the insureds and the insurer over a period of twenty-eight years.

b)      Throughout that time, the insurer's agents made monthly visits to the

insureds "to attend to their insurance needs."

c)    At the time the insurer's agent started urging the insureds to buy the coverage in question, the insureds held seven different policies with the insurer.

d)    The nature and duration of the insureds' relationship with the insurer created a climate of reliance.

e)    The insurer expressly warranted: "We will do everything possible to expedite the processing of the application."

f)    The insurer's agent "did not properly handle the application procedure."

g)    The insurer's agent repeatedly told the insureds that he expected their policy to issue by a specific date but failed to advise them of an internal procedural rule whereby the insurer delayed processing and ultimately rejected the insureds' application, through no fault of the insureds.

h)    On the day before the rejection, the agent was still assuring the insureds that the policy was about to take effect.

*McCue,* 371 Mass. at 660-63.

There is no evidence of anything like that here. The only relevant assertion or representation that Acadia is alleged to have made is a vague indication that the underwriter would assist the agent with his questions or concerns. Such a statement does not suggest anything beyond the run-of-the-mill working relationship between an underwriter and insurance agent. It certainly does not suggest an undertaking to assume the duties of a broker in ascertaining the needs of his customer. Even a broker "in the absence of guidance from his client, is under no general duty to obtain insurance

5

coverage for the client that the broker believes the client should have" or "to become a full-fledged insurance advisor or consultant, in the absence of additional compensation for such advice." *Beliveau v. Stein*, 18 Mass. L. Rep. 273, 2004 Mass. Super. LEXIS 368 *9-10. There is no evidence that Leslie Ray agreed to assume such duties and, *a fortiori*, no evidence that Acadia knew of them and agreed to take them over from Leslie Ray.

Rather, according to David Ray, Acadia at most agreed only to help him with his questions or concerns. Since Mr. Ray also admits that he never raised any questions with Acadia as to whether the liability coverage in Acadia's policy was broad enough for Beverly Port's operations, *see* DSMF ¶43, it is difficult to see how Acadia could possibly have breached its alleged undertaking.

Plaintiffs further assert that Mr. Ray relied on Acadia's expertise (PSMF ¶10), but, again, this is not supported by the record citation. *See* Ray Dep. at 167. Furthermore, a statement by a plaintiff that he was relying on the defendant's advice, without more, does not create a jury question. *Szymanski*, 56 Mass. App. Ct. at 382. As a matter of law, "a business relationship between a broker and customer does not become a general fiduciary relationship merely because an uninformed customer reposes trust in a broker who is aware of the customer's lack of sophistication," *Patsos v. First Albany Corp.*, 433 Mass. 323, 335, 741 N.E.2d 841 (2001); and there is even less reason to infer such a relationship between a broker and an insurer.

Despite Plaintiffs' insistence on Acadia's "superior expertise," Leslie Ray was scarcely unsophisticated in these matters. It is undisputed that Leslie Ray had previously procured similar insurance both for Beverly Port and for other marina operators and boat dealers. DSMF ¶¶4-8. The policies Leslie Ray had previously procured for these

customers, from both Commercial Union and Hanover, contained language almost identical to the insuring agreement in Acadia's P & I coverage part.  DSMF ¶¶33-38.

Furthermore, notwithstanding Plaintiffs' emphasis on the "specialized" nature of this sort of coverage, there was nothing abstruse about the clause in question.  Nor are we dealing with an exclusion "buried" in the policy.  Rather, the first paragraph of the P & I coverage part states that liability coverage would be provided as to vessels owned by Beverly Port and operated "by the Insured or by authorized employees of the Insured." DSMF ¶33.  As this Court has previously found, this paragraph clearly and unambiguously indicates that there is no coverage if one of Beverly Port's vessels is operated by anyone other than Beverly Port or an authorized employee.  Leslie Ray had the policy for at least a year before the 2001-2002 renewal.  Why would Leslie Ray need Acadia to explain policy language that was self-evident?

For that matter, Beverly Port likewise had the policy for at least a year; and there is no reason to believe that Frank Kinzie, a graduate of Harvard Law School and Harvard Business School, lacked the ability to understand simple contractual language.  Mr. Kinzie was aware (unlike Acadia) that Beverly Port was allowing customers to operate its vessels.  In the absence of an *express undertaking* by Acadia, Beverly Port had no reason to rely on Acadia to make sure the policy fulfilled its undisclosed insurance needs.

Plaintiffs' reliance theory is not helped by their allegation that Leslie Ray "asked the Acadia underwriter if he could provide a better ocean marine policy for Beverly Port than the marina had in the past.  PSMF ¶12.  For one thing, the statement is inaccurate: according to David Ray, he asked for the *same* or better coverages.   Ray Dep. at 58. Second, Plaintiffs do not allege any promise by Acadia to comply.  Third and most

significantly, it is undisputed that Acadia's coverage was in fact the same or better than the previous coverages, *see* DSMF ¶20, and, more particularly, that the prior policies issued by Commercial Union and Hanover would have afforded no greater coverage for the Carlos Johnson claim than the Acadia policy. *See* DSMF ¶¶ 35-38.

The only other evidence Plaintiffs cite to show "special circumstances of assertion, representation and release" is Acadia's loss control survey. Plaintiffs offer no evidence as to the purpose or scope of the survey, but baldly assert that Acadia conducted the survey to make sure Beverly Port's insurance needs would be met. This assertion not only is devoid of evidentiary support, but also is demonstrably false.

In fact, the loss control survey had nothing to do with the marina operators/boat dealers coverage. It was commissioned by the commercial lines underwriting department, in connection with the commercial liability and property coverage. No one in the ocean marine underwriting department even saw the survey report. *See* accompanying Affidavit of Grettyl Benisch, ¶3, attached hereto as Exhibit "A".

The loss control survey was not conducted in order to evaluate Beverly Port's insurance needs. Such a survey is not intended to benefit the insured. Rather, as its name implies, its purpose is to limit the insurer's exposure and potential losses in the event coverage is provided. This was explained to Beverly Port at the commencement of the survey. *Id.,* ¶4. Moreover, in the commercial general liability policy issued to Beverly Port, Acadia expressly disclaimed any intent to benefit the insured or any obligation to make recommendations to the insured by conducting such a survey. *See* accompanying Affidavit of Leonard W. Langer, attached hereto as Exhibit "B", and Exhibit A attached thereto. *See also Great American Insurance Co. v. Wexler Insurance Agency, Inc.*, 2000

8

U.S. Dist. LEXIS 6592, *14 (C.D. Cal. 2000) (purpose of loss control survey is to verify that information in insured's application is correct and to examine risk factors); *Patton v. Simone*, 1993 Del. Super. LEXIS 40, *2 (loss control survey intended "to assess the hazards involved with the premises so [insurer] could properly price and underwrite the risk").

Loss control surveys are conducted routinely in the insurance industry. Under Plaintiffs' theory, any such survey implies an obligation by the insurer to ascertain and provide coverage for all of the insured's potential risks. There is no support for this extraordinary proposition. *See, e.g., Gray v. Rider*, 510 So. 2d 209 (Ala. 1987) (as matter of law, three loss control surveys did not create a duty on part of insurer); *Wurst v. National Oil & Supply Co., Inc.*, 780 S.W.2d 97, 102 (Mo. App. 1989) (insurer entitled to judgment as matter of law, in absence of evidence of insurer's intent to benefit insured through its loss control surveys).

Besides failing to offer any evidence that Acadia voluntarily assumed a duty to investigate Beverly Port's insurance needs, Plaintiffs face other insurmountable obstacles as well: They have failed to show that even if Acadia had assumed such a duty, (a) Acadia should have specifically inquired as to whether Beverly Port allowed customers to operate its boats (a practice of which Acadia had had no prior inkling), (b) Acadia would have then had a duty to provide coverage for the risks entailed in that practice or, alternatively, a duty to warn Plaintiffs of a "gap" in coverage, or (c) Beverly Port, if so warned, could have and would have obtained such coverage elsewhere.[2] In short, Plaintiffs cannot show that the alleged breach of duty caused their damages.

---

[2] Plaintiffs do not argue that if Beverly Port was so warned, it would have altered its practice of allowing customers to operate its boats. In fact, even after Beverly Port was informed that there was no liability

The "proof" Plaintiffs offer on these issues consists entirely of inadmissible documents. These include an excerpt from what Plaintiffs refer to as a "CNA policy" (Plaintiffs' Exhibit G); excerpts from what is purported to be a "Best's Underwriting Guide," with miscellaneous materials by or about the alleged publisher (Plaintiffs' Exhibit I); and a purported excerpt from a manual called "Ocean Marine Insurance" (Plaintiffs' Exhibit K). No witness has identified or authenticated these documents; and no one in Acadia's ocean marine underwriting department has expressed any familiarity with them. For example, both Theodore Wirth and Matthew Pedersen testified they had never encountered "Best's Underwriting Guide," nor can any witness for Plaintiffs identify it. *See* Wirth Dep. at 97, attached hereto as Exhibit "D"; Pedersen Dep. at 53, attached hereto as Exhibit "E". Because these documents lack an evidentiary foundation, and to the extent they constitute hearsay not falling within any recognized exception, they are inadmissible and cannot be considered for summary judgment purposes. *See Prado Alvarez v. R. J. Reynolds Tobacco Co.*, 405 F.3d 36, 41 n. 5 (1st. Cir. 2005); *Gorski v. New Hampshire Dep't of Corrections*, 290 F.3d 466, 475 (1st Cir. 2002). Therefore, these materials, together with Plaintiffs' references to them, should be stricken.[3]

Furthermore, Plaintiffs are impermissibly attempting to use putative guidebooks as a substitute for expert testimony. These documents are being offered solely for the purpose of suggesting what an insurer ought to do in furnishing boat dealers' insurance, which clearly falls under the domain of expert opinion. By order dated October 27, 2005 (and reconfirmed by order of November 28, 2005), Plaintiffs are barred from introducing

---

coverage, it continued to let customers operate its boats, changing its practice only in August of 2003. *See* S. Kinzie Dep. at 237-238, attached hereto as Exhibit C.

[3] A separate motion to strike is unnecessary. *See Perez v. Volvo Car Corp.*, 247 F.3d 303, 314-15 (1st Cir. 2001).

any expert testimony. They cannot circumvent these orders by offering expert opinion in the form of written guides, which would never be a proper substitute for expert witness testimony anyway, being subject neither to cross-examination nor to the requirements of Rules 702 and 803(18), F.R. Evid., or Rule 26(a)(2), F.R. Civ. P.

Finally, even if these documents were considered, they do nothing to support Plaintiffs' allegations. To begin with, it is impossible to tell from the face of the "CNA policy" excerpt whether coverage is actually provided for claims arising from a customer-operated vessel; whether such coverage applied to a boat dealer like Beverly Port; or whether such coverage was available in 2000 or 2001. Even if it was, it is sheer speculation that Leslie Ray, which had no relationship with CNA, would have found out about such coverage, that it would have been able to procure such coverage, or that Beverly Port would have purchased such coverage. What we do know is that after the Carlos Johnson claim arose, when Leslie Ray was asked for the first and only time to procure such coverage, Leslie Ray did an extensive investigation and concluded that such coverage was simply not available anywhere. DSMF ¶¶58-66.

As for the "underwriting guide" (which Acadia has never used), it emphatically does not say, contrary to Plaintiffs' assertion, that an underwriter "must" determine whether an employee will be present during a boat demonstration or whether the customer will be operating the vessel. *See* PSMF ¶26. Rather, the cited excerpt acknowledges at the outset that the industry norm is to exclude such coverage. It then cautions that if an underwriter chooses to deviate from the norm, it should, for its *own* protection, learn as much as it can about the extent of its exposure and be fully cognizant of the risks inherent in such coverage. Of course, it is precisely because these risks are so

difficult to quantify that most (if not all) companies, including Acadia, refuse to offer

such coverage. *See* DSMF ¶¶62-66.

Similarly, the "Ocean Marine Insurance" excerpt does not even address customer-

operator vessels. It merely mentions customer injuries on a demonstration ride and an

employee's negligent operation. Simply because a boat dealer sells a number of boats

and conducts demonstrations "with customers aboard," it does not follow that an

underwriter aware of these facts would have reason to believe that customers were

allowed to *operate* the dealers' vessels. *See* DSMF ¶¶45-53.

In opposing summary judgment, it is incumbent on Plaintiffs to establish the

existence of a triable issue which is both genuine and material. *Pagano v. Frank*, 983

F.2d 343, 347 (1st Cir. 1993), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-

48 (1986). An issue is "genuine" if it "may reasonably be resolved in favor of either

party," *Maldonado-Denis v. Castillo-Rodrigues*, 23 F.3d 579, 581 (1st Cir. 1994), and

"material" if the fact has "the capacity to sway the outcome of the litigation under the

applicable law," *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st

Cir. 1995). This showing "requires more than effusive rhetoric and optimistic surmise."

*Hennessy v. City of Melrose*, 194 F.3d 237, 251 (1st Cir. 1999). A summary judgment

motion will not be defeated by evidence that is "merely colorable" or "not significantly

probative." *Anderson*, 477 U.S. at 249-50. In other words, the "evidence illustrating the

factual controversy cannot be conjectural or problematic; it must have substance in the

sense that it limns differing versions of the truth which a factfinder must resolve at an

ensuing trial." *I.V. Services of America, Inc. v. Inn Development & Management, Inc.*,

182 F.3d 51, 56 (1st Cir. 1999), quoting *Mack v. Great Atlantic & Pacific Tea Co.*, 871

F.2d 179, 181 (1ˢᵗ Cir. 1989).  Moreover, the Court must ignore "conclusory allegations, improbable inferences, and unsupported speculation."  *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1ˢᵗ Cir. 2002).  Under these standards, Plaintiffs clearly have failed to meet their burden of showing a genuine issue of material fact.

Lastly, there is no merit to Plaintiffs' argument that the Court should deny the Motion for Summary Judgment under Rule 56(f).  Plaintiffs have not made a proper motion under Rule 56(f); and even if their invocation of that rule is treated as a Rule 56(f) motion, it would have to be denied as both untimely and without any reasonable basis.

## CONCLUSION

The Court should strike paragraphs 9, 10, and 12 of Plaintiffs' Statement of Additional Material Facts as unsupported by the record citations.  The Court should further strike Plaintiffs' Exhibits G, I, and K as inadmissible and strike the paragraphs of the PSMF that rely on them (i.e., PSMF ¶¶25-27).  The remaining allegations are insufficient to raise any genuine issue of material fact as to whether Acadia voluntarily undertook a duty to investigate and to fulfill Beverly Port's insurance needs, whether Acadia breached such an assumed duty, or whether any such breach proximately caused Plaintiffs' damages.  Consequently, the Court should grant Acadia's Motion for Summary Judgment and enter judgment in favor of Acadia on all remaining claims.

Dated at Portland, Maine this 21ˢᵗ day of December, 2005.

Acadia Insurance Company

By its counsel:

/s/   Leonard W. Langer

/s/   Marshall J. Tinkle
(BBO# 565513)

TOMPKINS, CLOUGH, HIRSHON
  & LANGER, P.A.
Three Canal Plaza
P. O. Box 15060
Portland, ME  04112-5060
  (207) 874-6700
lwlanger@tchl.com


## **CERTIFICATE OF SERVICE**

     I, Leonard W. Langer, hereby certify that on December 21, 2005, I electronically filed the within document with the Clerk of the Court using the CM/ECF system which will send a notification of such filing(s) to the following:  William D. Chapman, Esq., Melick, Porter & Shea, LLP, 28 State Street, Boston, MA  02109 counsel for Plaintiffs Beverly Port Marina, Inc. and Leslie S. Ray Insurance Agency.

                             /s/   Leonard W. Langer_____


Acadia/BPM
Acadia's Reply Memo re Mot Sum J

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

BEVERLY PORT MARINA, INC.    )
and LESLIE S. RAY INSURANCE    )
AGENCY, INC.,    )   Civil Action No. 1:05-cv-10883-WGY
    )
          Plaintiffs   )
    )
          vs.   )
    )
ACADIA INSURANCE COMPANY,    )
    )
          Defendant   )
    )

## <u>AFFIDAVIT OF LEONARD W. LANGER</u>

Leonard W. Langer, first being duly sworn, deposes and says as follows:

1.    My name is Leonard W. Langer, and I am an attorney practicing law in Portland, Maine. I am a member of the law firm of Tompkins, Clough, Hirshon & Langer, P.A.

2.    I represented Acadia Insurance Company in the action captioned *Acadia Insurance Company v. Beverly Port Marina, Inc. and Carlos Johnson v. Leslie S. Ray Insurance Company, Inc.,* Docket No. 02-CV-10153-WGY, in the United States District Court for the District of Massachusetts.

3.    Attached hereto as **Exhibit A** is a true copy of Acadia's commercial general liability policy issued to Beverly Port Marina, Inc. ("Beverly Port"), as produced by Beverly Port in the aforementioned litigation as part of its response to Acadia's First Request for Production of Documents (BP 00472 – BP 00513).

4.    This policy included Common Policy Conditions (BP 00494) (attached hereto as **Exhibit B** for ease of reference). Section D of the Common Policy Conditions

is captioned **"Inspections And Surveys."** Subsection 1.a states that Acadia has the right

to make "inspections and surveys at any time." Subsection 2 further states in part:

> We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged.

Date:  December 21, 2005

/s/    Leonard W. Langer

STATE OF MAINE
CUMBERLAND, ss                          December 21, 2005

Personally appeared the above-named Leonard W. Langer and made oath that the foregoing Affidavit is based on his personal knowledge and is true.

Before me,

/s/  Karen Belton
Notary Public, State of Maine

My commission expires: 8/26/06

2

## CERTIFICATE OF SERVICE

I, Leonard W. Langer, hereby certify that on December 21, 2005, I electronically filed the within document with the Clerk of the Court using the CM/ECF system which will send a notification of such filing(s) to the following:  William D. Chapman, Esq., Melick, Porter & Shea, LLP, 28 State Street, Boston, MA  02109 counsel for Plaintiffs Beverly Port Marina, Inc. and Leslie S. Ray Insurance Agency.

/s/  Leonard W. Langer

TOMPKINS, CLOUGH, HIRSHON & LANGER, P.A.
Three Canal Plaza
P. O. Box 15060
Portland, ME  04112-5060
(207) 874-6700
lwlanger@tchl.com

Acadia/BPM
Aff'd LWL 12.21.05

3

# EXHIBIT A

To Affidavit of
Leonard W. Langer
December 21, 2005

# COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS
## (SINGLE LIMITS)

Policy No.
CPA 0061462 - 11

Issued By:
Acadia Insurance Company

Named Insured and Address

Agent Name and Address    7241
(978)927-2600

Beverly Port Marina, Inc.
43-67 Water Street
Beverly, MA 01915

Leslie S Ray Insurance Agency, Inc.
129 Dodge Street
Beverly, MA 01915

## LIMITS OF INSURANCE

| | | |
|---|---|---|
| General Aggregate Limit (Other Than Products-Completed Operations) | $ | 2,000,000 |
| Products-Completed Operations Aggregate Limit | $ | 2,000,000 |
| Personal & Advertising Injury Limit | $ | 1,000,000 |
| Each Occurrence Limit | $ | 1,000,000 |
| Fire Damage Limit | $ | 250,000 Any One Fire |
| Medical Expense Limit | $ | 5,000 Any One Person |

Form of Business: _ Individual _ Partnership _ Joint
X Organization (Other than Partnership or Joint Venture)

Retroactive Date (CG0002 Only)

Coverage A of this Insurance does not apply to "bodily injury" or "property damage" which occurs before the Retroactive Date, if any, shown below:

Retroactive Date: None    (Enter Date or "None" if no Retroactive Date applies.)

Location of all Premises You Own, Rent or Occupy:

Beverly, MA

Endorsements Attached To This Coverage Form:

CG2151 (09-89), AICG50 (06-92), AICG93 (06-98), CG0001 (07-98), CG0057 (09-99),
CG2147 (07-98), CG2503 (03-97), CG2504 (03-97).

BP 00472

AI CD 38 06 92

## COMMERCIAL GENERAL LIABILITY SCHEDULE

Policy No.  0061462-11    Named Insured:  Beverly Port Marina, Inc.

| Classification | Code No. | Premium Basis | Rate | Advance Premium PR/CO | Premium All Other |
|---|---|---|---|---|---|
| Loc# 1 | | | | | |
| Boat Dealers | 10101 | s) 2,400,000 | 1.291 | | 3,098 |
| | | | 1.165 | 2,796 | |
| Loc# 1 | | | | | |
| Boat Storage and Moorage - Products-completed operations are subject to the General Aggregate Limit. | 10105 | s) 977,000 | 12.332 | | 12,048 |
| Loc# 1 | | | | | |
| Boat Repair and Servicing | 91235 | p) 160,000 | 11.242 | | 1,799 |
| | | | 4.223 | 676 | |
| Loc# 2 | | | | | |
| Dwellings - one - family (lessor's risk only) - Products-completed operations are subject to the General Aggregate Limit. | 63010 | t) 1 | 129.070 | | 129 |

BP 00473

AI CD 38 06 92

CPA  0061462 - 11        05/22/01        JAS   06/06/01

# COMMERCIAL GENERAL LIABILITY SCHEDULE

Policy No.  0061462-11    Named Insured:  Beverly Port Marina, Inc.

| Classification | Code No. | Premium Basis | Rate | Advance PR/CO | Premium All Other |
|---|---|---|---|---|---|
| Loc# 2 | | | | | |
| Buildings or Premises - bank or office - mercantile or manufacturing Maintained by the insured (Lessor's risk only) (Other than Not-For-Profit) - Products-completed operations are subject to the General Aggregate Limit. | 61217 | a) 750 | 67.218 | | 50 |

BP 00474

AI CD 38 06 92                    Page 2

CG 00 01 07 98

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION V - Definitions.

## SECTION I - COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

      (2) The "bodily injury" or "property damage" occurs during the policy period.

   c. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

2. **Exclusions**

   This insurance does not apply to:

   a. **Expected Or Intended Injury**

      "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

   b. **Contractual Liability**

      "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

      (1) That the insured would have in the absence of the contract or agreement; or

      (2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

         (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

BP 00475

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

c. **Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

d. **Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

e. **Employer's Liability**

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

f. **Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated,

BP 004

Copyright, Insurance Services Office, Inc., 1997
CG 00 01 07 98

disposed or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids, are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed

by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

g. Aircraft, Auto Or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

BP 00477

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

    (a) Less than 26 feet long; and

    (b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

h. Mobile Equipment

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

i. War

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

j. Damage To Property

"Property damage" to:

(1) Property you own, rent, or occupy;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III - Limits Of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

k. Damage To Your Product

"Property damage" to "your product" arising out of it or any part of it.

l. Damage To Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

m. Damage To Impaired Property Or Property Not Physically Injured

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

BP 00478

(1) A defect, or _ency, inadequacy or dan_rous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

n. **Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

o. **Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III - Limits Of Insurance.

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

1. **Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described Section III - Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A And B.

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

2. **Exclusions**

This insurance does not apply to:

a. "Personal and advertising injury":

(1) Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

(2) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

(3) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(4) Arising out of a criminal act committed by or at the direction of any insured;

(5) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement;

(6) Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

(7) Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement";

**BP 00479**

(8) Arising out of the wrong description of the price of goods, products or services stated in your "advertisement";

(9) Committed by an insured whose business is advertising, broadcasting, publishing or telecasting. However, this exclusion does not apply to Paragraphs 14.a., b. and c. of "personal and advertising injury" under the Definitions Section; or

(10) Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

b. Any loss, cost or expense arising out of any:

(1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

## COVERAGE C MEDICAL PAYMENTS

1. Insuring Agreement

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the accident; and

(3) The injured person submits to examination, at our choice as often as we reasonably require.

b. We will make these payments regardle of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

2. Exclusions

We will not pay expenses for "bodily injury":

a. To any insured.

b. To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. To a person injured on that part of premises you own or rent that the person normally occupies.

d. To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. To a person injured while taking part in athletics.

f. Included within the "products-completed operations hazard".

g. Excluded under Coverage A.

h. Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

## SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

BP 00 00

Copyright, Insurance Services Office, Inc., 1997

CG 00 01 07 98

c. Cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All costs taxed against the insured in the "suit".

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

a. We have used up the applicable limit of insurance in the payment of judgments or settlements; or

b. The conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

BP 00481

Copyright, Insurance Services Office, Inc., 1997

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured:

a. Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:

(1) "Bodily injury" or "personal and advertising injury":

(a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

(b) To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of Paragraph (1)(a) above;

(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph (1)(a) or (b) above; or

(d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property:

(a) Owned, occupied or used by,

(b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

b. Any person (other than your "employee"), or any organization while acting as your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

BP 00482

Copyright, Insurance Services Office, Inc., 1997

CG 00 01 07 98

a. "Bodily injury" to co-"employee" of the person during the equipment; or

b. "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III - LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

a. Medical expenses under Coverage C;

b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

c. Damages under Coverage B.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because

of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

a. Damages under Coverage A; and

b. Medical expenses under Coverage C

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

BP 00483

(1) How, when and where the "oc-
currence" offense took
place;

(2) The names and addresses of any
injured persons and witnesses;
and

(3) The nature and location of any
injury or damage arising out
of the "occurrence" or of-
fense.

b. If a claim is made or "suit" is
brought against any insured, you
must:

(1) Immediately record the specif-
ics of the claim or "suit" and
the date received; and

(2) Notify us as soon as practi-
cable.

You must see to it that we receive
written notice of the claim or
"suit" as soon as practicable.

c. You and any other involved insured
must:

(1) Immediately send us copies of
any demands, notices, sum-
monses or legal papers re-
ceived in connection with the
claim or "suit";

(2) Authorize us to obtain rec-
ords and other information;

(3) Cooperate with us in the in-
vestigation or settlement of
the claim or defense against
the "suit"; and

(4) Assist us, upon our request,
in the enforcement of any
right against any person or
organization which may be
liable to the insured because
of injury or damage to which
this insurance may also ap-
ply.

d. No insured will, except at that
insured's own cost, voluntarily
make a payment, assume any obli-
gation, or incur any expense,
other than for first aid, without
our consent.

3. Legal Action Against Us

No person or organization has a right
under this Coverage Part:

a. To join us as a party or other-
wise bring us into a "suit" ask-
ing for damages from an insured;
or

b. To sue us on this Coverage Part
unless all of its terms have been
fully complied with.

A person or organization may sue us
to recover on an agreed settlement or
on a final judgment against an in-
sured obtained after an actual trial;
but we will not be liable for damages
that are not payable under the te...
of this Coverage Part or that are ...
excess of the applicable limit of in-
surance. An agreed settlement means
a settlement and release of liability
signed by us, the insured and the
claimant or the claimant's legal
representative.

4. Other Insurance

If other valid and collectible insur-
ance is available to the insured for
a loss we cover under Coverages A or
B of this Coverage Part, our obliga-
tions are limited as follows:

a. Primary Insurance

This insurance is primary except
when b. below applies. If this
insurance is primary, our obliga-
tions are not affected unless any
of the other insurance is also
primary. Then, we will share with
all that other insurance by the
method described in c. below.

b. Excess Insurance

This insurance is excess over:

(1) Any of the other insurance,
whether primary, excess, con-
tingent or on any other basis:

(a) That is Fire, Extended
Coverage, Builder's Risk,
Installation Risk or sim-
ilar coverage for "your
work";

(b) That is Fire insurance for
premises rented to you or
temporarily occupied by
you with permission of the
owner;

(c) That is insurance pur-
chased by you to cover
your liability as a tenant
for "property damage" to
premises rented to you or
temporarily occupied by
you with permission of the
owner; or

(d) If the loss arises out of
the maintenance or use of
aircraft, "autos" or wa-
tercraft to the extent not
subject to Exclusion g. of
Section I - Coverage A -
Bodily Injury And Property
Damage Liability.

(2) Any other primary insurance
available to you covering lia-
bility for damages arising

BP 00484

of the premi... ...or operations for which you ...ave been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

c. Method Of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

5. Premium Audit

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and

payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

6. Representations

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

7. Separation Of Insureds

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

8. Transfer Of Rights Of Recovery Against Others To Us

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

9. When We Do Not Renew

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

SECTION V - DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market seg-

BP 00485

ments about your goods, products or services for the purpose of attracting customers or supporters.

2. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in a. above; or

   c. All parts of the world if:

      (1) The injury or damage arises out of:

         (a) Goods or products made or sold by you in the territory described in a. above; or

         (b) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; and

      (2) The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by:

   a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

   b. Your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

      Paragraph f. does not include that part of any contract or agreement:

      (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

      (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

BP 00486

Copyright, Insurance Services Office, Inc., 1997   CG 00 01 07 98

(a) Preparing approving or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicle whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

BP 00487

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Your product" means:

a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

BP 00488

      (2) Others     trading  under  your
          name; or

      (3) A person or organization whose
          business  or  assets  you  have
          acquired; and

b. Containers (other than vehicles),
   materials,     parts  or  equipment
   furnished  in  connection  with  such
   goods or products.

"Your product" includes:

a. Warranties or representations made
   at any time  with respect to the
   fitness, quality, durability, per-
   formance or use of "your product";
   and

b. The  providing  of  or  failure to
   provide warnings or instructions.

"Your product" does not include vend-
ing machine or other property rented
to or located for the use of others
but not sold.

21. "Your work" means:

a. Work  or  operations  performed by
   you or on your behalf; and

b. Materials,     parts  or  equipment
   furnished  in  connection  with  such
   work or operations.

"Your work" includes:

a. Warranties or representations made
   at  any  time  with respect to the
   fitness, quality, durability, per-
   formance  or  use of "your work";
   and

b. The  providing  of  or  failure to
   provide warnings or instructions.

BP 00489

CG 21 51 09 89

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDMENT OF LIQUOR LIABILITY EXCLUSION - EXCEPTION FOR SCHEDULED ACTIVITIES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

Description of Activity(ies):

None

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

Exclusion c. of COVERAGE A (Section I) is replaced by the following:

c. "Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you:

(1) Manufacture, sell or distribute alcoholic beverages;

(2) Serve or furnish alcoholic beverages for a charge whether or not such activity:

(a) Requires a license;

(b) Is for the purpose of financial gain or livelihood; or

(3) Serve or furnish alcoholic beverages without a charge, if a license is required for such activity.

However, this exclusion does not apply to "bodily injury" or "property damage" arising out of the selling, serving or furnishing of alcoholic beverages at the specific activity(ies) described above.

Copyright, Insurance Services Office, Inc., 1989

BP 00490

CG 21 51 09 89

AI CG 50 06 92

## ASBESTOS EXCLUSION

This policy does not apply to bodily injury, property damage, or personal injury arising out of:

1. Inhaling, ingesting or prolonged physical exposure to asbestos or goods containing asbestos; or

2. The use of asbestos in constructing or manufacturing any good, product or structure; or

3. The removal of asbestos from any good, product or structure; or

4. The manufacture, transportation, storage or disposal of asbestos or goods or products containing asbestos; or

5. Any product manufactured, sold, handled or distributed by or on behalf of the insured which contains asbestos.

The coverage afforded by the policy does not apply to payment for the investigation or defense of any loss, injury or damage or any cost, fine or penalty or for any expense or claim or suit related to any of the above.

BP 00491

AI CG 93 06 98

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

DAMAGE BY FIRE, LIGHTNING, EXPLOSION,
SMOKE AND SPRINKLER LEAKAGE

This endorsement modifies insurance provided under the following:

COMMERICAL GENERAL LIABILITY COVERAGE PART

DAMAGE BY FIRE, LIGHTNING, EXPLOSION, SMOKE AND SPRINKLER LEAKAGE

If damage by fire to premises rented to you is not otherwise excluded from this
Coverage Part, the word "fire" is changed to "fire, lightning, explosion, smoke or
leakage from automatic fire protective systems" where it appears in:

1.   The LIMITS OF INSURANCE  section of the DECLARATIONS;.

2.   The last paragraph of  SECTION I -COVERAGE A; and

3.   Paragraph b.(2) of SECTION IV, 4.

BP 00492


AI CD 80 06 98

## COMMERCIAL INTERLINE FORMS DECLARATIONS

Policy No.
CPA 0061462-11

Issued By:
Acadia Insurance Company

Named Insured and Address

  Beverly Port Marina, Inc.
  43-67 Water Street
  Beverly, MA 01915

Agent Name and Address    7241
  (978) 927-2600

  Leslie S Ray Insurance Agency, Inc.
  129 Dodge Street
  Beverly, MA 01915

Policy Period: From May 22, 2001    to May 22, 2002    12:01 a.m. Standard Time
at your mailing address shown above.

Forms applicable to the Specific Lines of Business stated on Forms:

IL0017 (11-98), IL0021 (04-98), IL0108 (11-85).

BP 00493

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc., 1998

IL 00 21 04 98

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

NUCLEAR ENERGY LIABILITY EXCLUSION
ENDORSEMENT
(Broad Form)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS POLICY
COMMERCIAL AUTO COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY NEW YORK DEPARTMENT OF
  TRANSPORTATION
UNDERGROUND STORAGE TANK POLICY

1.  The insurance does not apply:

    A.  Under any Liability Coverage, to "bodily injury" or "property damage:"

        (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

        (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    B.  Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

    C.  Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material," if:

        (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

        (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

        (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2.  As used in this endorsement:

    "Hazardous properties" includes radioactive, toxic or explosive properties;

    "Nuclear material" means "source material," "Special nuclear material" or "by-product material;"

    "Source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

BP 00495

Copyright, Insurance Services Office, Inc., 1997

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor;"

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility."

"Nuclear facility" means:

(a) Any "nuclear reactor;"

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste;"

(c) Any equipment or device used fc the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste;"

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"Property damage" includes all forms of radioactive contamination of property.

Copyright, Insurance Services Office, Inc., 1997

BP 004

IL 00 21 04 98

IL 01 08 11 85

## MASSACHUSETTS
### TENANT RELOCATION EXPENSE

This endorsement is required by Massachusetts law.

This policy provides relocation expense benefits as follows:

1. **Relocation Expense**

   When a rented living quarters in a building covered by this policy is made uninhabitable as a result of a loss by fire, this policy covers relocation expense incurred by the tenant or lawful occupant to relocate to other living quarters in the shortest possible time.

2. **Definitions**

   A. "Relocation expense" means documented, reasonable and necessary:

   (1) Costs of packing, insuring, storing and carting household goods;

   (2) Costs of securing new utility services less refunds from discontinued services at the damaged premises;

   (3) Costs of searching for other quarters;

   (4) Costs of disconnecting and reconnecting household appliances;

   (5) Additional living expenses while searching for or awaiting possession of other quarters or the restoration of existing quarters;

   commencing with the date of damage to the covered building and not limited by the expiration date of this policy.

   "Relocation expense" does not mean:

   (1) Loss caused by the termination of a lease or other agreement;

   (2) Security deposits or other payments made to the landlord or lessor of other quarters;

   (3) Down payments, legal fees and closing costs incidental to the purchase of other quarters.

   B. "Rented Living Quarters" means a room, suite of rooms or apartment rented as a single residential unit by one or more persons.

   "Rented Living Quarters" does not mean one or more rooms occupied by one or more persons as roomers in a hotel, motel, public or private lodging or rooming house where the premises are occupied on a transient basis.

3. **Limit of Liability**

   The liability for relocation expense under this policy is limited to not more than $750 for a rented living quarters.

4. **No Deductible**

   The deductible provisions of this policy do not apply to the relocation expense benefits.

5. **Other Insurance**

   A. If at the time of loss, the tenant or lawful occupant has other insurance that covers relocation expense, we shall not be liable for any loss under this coverage until the liability of such other insurance has been exhausted.

   B. If you have other insurance that covers relocation expense, payment under this policy will be prorated with such insurance for the smaller of the incurred relocation expense or $750 all after application of the other insurance of the tenant or lawful occupant.

6. **Loss Settlement**

   The claims for all persons occupying the rented living quarters will be settled with and payment made to the tenant or lawful occupant renting the quarters from the building owners, or lessor.

All other provisions of this policy remain unchanged.

BP 00497

Copyright, Insurance Services Office, Inc., 1985
Copyright, ISO Commercial Risk Services, Inc., 1985

IL 01 08 11 85

# ADVISORY NOTICE TO POLICYHOLDERS
## Multistate Property Revision Effective 03/01/01

This is a summary of the major changes in your Commercial Property Coverage Part. No coverage is provided by this summary nor can it be construed to replace any provision of your policy. You should read your policy and review your declaration page for complete information on the coverages you are provided. If there is any conflict between the policy and this summary, THE PROVISIONS OF THIS POLICY SHALL PREVAIL.

Some of the language of the new policy has been restated and repunctuated for clarity and readability but with no change in coverage intent.

The areas within the policy that broaden, reduce or clarify coverage are highlighted below. The material is organized by individual coverage forms and endorsements; however, not all coverage forms or endorsements are included in a particular policy.

**NOTE TO INSURERS:** Each insurer should consider its present underwriting and claims procedures, and the implications of the revised policy language on these procedures, in deciding what items to classify in its Policyholders' Notice as coverage broadenings or reductions.

## PROPERTY DAMAGE COVERAGE FORMS

I. CLARIFICATION OR PROCEDURAL CHANGES

- REPLACEMENT COST OPTIONAL COVERAGE

  In form CP 00 10, this Optional Coverage is revised to clarify that replacement cost coverage applies to tenants' improvements and betterments if the conditions of coverage are met.

  In form CP 00 17, this Optional Coverage is revised to clarify that replacement cost coverage applies to personal property owned indivisibly by all unit owners, and to fixtures, improvements, alterations and appliances within a unit if such property is covered in the policy.

  In forms CP 00 10, CP 00 17 and CP 00 18, this Optional Coverage is revised to more explicitly convey that the insured is not required to rebuild on the original premises, but the replacement cost is limited to the cost that would have been incurred in rebuilding at the original location.

- DEBRIS REMOVAL LIMIT OF INSURANCE (CP 00 10, CP 00 17, CP 00 18, CP 00 20, CP 00 80, CP 00 99)

  The Debris Removal Additional Coverage is revised to clarify the provisions governing the amount of coverage, and to incorporate the excess limit which is currently found in the Limits of Insurance clause. Examples are added to illustrate how the amount of coverage is determined.

BP 00498

- LIMITED LIABILITY COMPANIES (CP 00 10, CP 00 17, CP 00 18, CP 00 40, CP 00 70, CP 00 99, CP 10 30)

  In various coverage forms the Personal Effects and Property of Others coverage extension are revised to recognize members, managers and Limited Liability Companies.

  Additionally, in CP 00 40 and CP 00 70 the Additional Insureds and Newly Acquired Organizations coverage extensions are revised to recognize Limited Liability Companies.

- LOSS PAYMENT CONDITION (CP 00 10, CP 00 17, CP 00 18, CP 00 20, CP 00 80, CP 00 99)

  Language is added to the Loss Payment Loss Condition to clarify that determination of value is subject to the applicable Valuation Condition or any provision which amends or supersedes it.

- VACANCY PROVISION (CP 00 10, CP 00 17, CP 00 18, CP 00 70, CP 00 99)

  The language of the Vacancy Condition is revised to:

  - Clarify that rented space must be used to conduct customary operations, if a condition of vacancy is to be avoided.
  - Restate the percentage threshold for vacancy under an owner's policy, with no change in the actual threshold.
  - Add reference to the total square footage.
  - Add references to a general lessee, lessee, sub-lessee and building owner, in various parts of the provision which relates to an owner's policy.

- DEDUCTIBLE CLAUSE (CP 00 10, CP 00 17, CP 00 18, CP 00 20, CP 00 80, CP 00 99)

  The first paragraph of the Deductible clause is revised to elaborate on the interaction between this clause and the Coinsurance Condition in determining loss payment.

  The second paragraph of the Deductible clause, which deals with losses to more than one item of insurance in one occurrence, is revised to clarify that the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

- INSPECTION AND SURVEYS CONDITION (CP 00 99)

  The Inspection And Surveys Condition in CP 00 99, the Standard Property Policy, is revised to clarify that the condition does not apply to inspections, surveys, reports or recommendations made relative to certification of boilers, pressure vessels or elevators under state or municipal statutes, ordinances or regulations.

- NEWLY ACQUIRED PROPERTY (CP 00 40)

  The phrase "the total of all" is deleted from the Newly Acquired Property Coverage Extension, thus clarifying the intent that there is building coverage up to $250,000 at each building covered under the Extension, and coverage up to $100,000 for personal property at each building.

BP 00

NT CP 00 2

is covered only if the Special Causes of Loss Form applies, provided such Form has not been endorsed to exclude theft).

- PROPERTY OFF-PREMISES (**CP 00 10, CP 00 17, CP 00 18, CP 00 99**)

   The Property Off-Premises Coverage Extension is revised to include limited coverage for stock, property at a storage location leased mid-term and property at a fair, trade show or exhibition.

## III. POTENTIAL REDUCTION OF COVERAGE

- COLLAPSE COVERAGE (**CP 00 20, CP 00 70, CP 10 20, CP 10 30**)

   Under the Additional Coverage - Collapse, a definition of collapse is introduced to explicitly set forth the intended coverage.

   The definition requires an abrupt falling down or caving in of the building or part of the building. The definition affects losses caused by hidden decay, hidden insect or vermin damage, or use of defective materials or methods in construction, remodeling or renovation. Other causes of loss named in the Collapse Additional Coverage are not affected by the definition of collapse because they are covered by the policy irrespective of whether there is a collapse.

   **NOTE TO INSURERS:** The introduction of a definition of collapse is intended to avoid varying interpretations of the meaning of collapse. The definition is faithful to policy intent. In jurisdictions where case law has interpreted collapse to include imminent collapse or structural impairment, this definition may represent a reduction in coverage. Such assessment depends on the specifics of the case law and the facts of each loss.

## BUSINESS INTERRUPTION COVERAGE FORMS

## I. CLARIFICATION OR PROCEDURAL CHANGES

- TIME ELEMENT - SUSPENSION OF OPERATIONS (CP 00 30, CP 00 32, CP 00 50)

   A definition of the term suspension is introduced. Suspension of operations includes the slowdown or cessation of your business activities.

- BUSINESS INCOME - SALES VALUE OF PRODUCTION (CP 00 30, CP 00 32)

   The coverage grant in the business income forms is revised to state explicitly that, for manufacturing risks, net income includes the net sales value of production.

- EDITORIAL CHANGE TO **CP 00 30** and **CP 00 32**

   The text of the Extended Period of Indemnity option is revised to make reference to subparagraphs (1)(b) and (2)(b) of the Extended Business Income grant since the Extended Period of Indemnity option is intended to apply to both rental value ((2)(b)) and other-than-rental-value ((1)(b)).

BP 00501

## II. BROADENING OF COVERAGE

- SUPPLEMENTARY PAYMENTS - LOSS OF EARNINGS (CP 00 40, CP 00 70)

  The maximum daily payment for loss of earnings under the Supplementary Payments provision is being increased from the current $100 to $250 to more adequately recognize the earnings of many professions.

- ADDITIONAL COVERAGE - INCREASED COST OF CONSTRUCTION (CP 00 10, CP 00 17)

  A new coverage, Increased Cost of Construction (ICC), is added under Additional Coverages. The ICC is a limited coverage for the increased cost of complying with building codes following covered damage to a building that is insured on a Replacement Cost basis. The ICC provides a limit of $10,000 or 5% of the Limit of Insurance applicable to the building, whichever is less. For buildings insured under a blanket Limit, the 5% is applied to the value of the building as of time of loss. ICC coverage applies only to the repair, rebuilding or replacement of damaged parts of the building. NOTE: More comprehensive coverage for Ordinance Or Law exposures can be provided by means of an optional endorsement, CP 04 05.

- REPLACEMENT COST OPTIONAL COVERAGE - PERSONAL PROPERTY OF OTHERS (CP 00 10, CP 00 17, CP 00 18)

  An option is added to extend Replacement Cost coverage to the personal property of others. The extension may be selected only when Replacement Cost coverage also applies to the Building and/or Business Personal Property insured under the policy.

- NEWLY ACQUIRED OR CONSTRUCTED PROPERTY COVERAGE EXTENSION (CP 00 10, CP 00 17, CP 00 18, CP 00 99)

  The Newly Acquired or Constructed Property Coverage Extension is revised to:
  - equate the start of the 30-day coverage period (and the inception date for calculation of premium) with the start of construction of covered property;
  - add coverage for business personal property at a newly constructed or acquired building at the insured location;
  - specify that the business personal property itself may be insured property or newly acquired property (e.g., acquisition of another firm's inventory); and
  - add coverage for newly acquired business personal property at the described building insured under the policy.

  CAUTION: The Extension does not apply to:
  - property at a fair, trade show or exhibition; or
  - personal property temporarily in the insured's possession either in the course of installing or performing work on such property or in the course of manufacturing or wholesaling activities.

- NON-OWNED DETACHED TRAILERS (CP 00 10, CP 00 17, CP 00 18, CP 00 99)

  This new Coverage Extension provides limited coverage on non-owned detached trailers. Coverage is based on contractual responsibility and is provided in the amount of $5,000, unless a higher limit is shown in the Declarations. The Coverage Extension is subject to the Causes of Loss Form that applies to the insured's business personal property (therefore, theft

BP 00500

## II. BROADENING OF COVERAGE

- **TENANTS' PREMISES (CP 00 30, CP 00 32, CP 00 50)**

    With respect to insureds who occupy part of a building, the meaning of premises is expanded to include any area within the building or on the site at which the tenant's premises are located, if that area services, or is used to gain access to, the tenant's premises.

- **ALTERATIONS, NEW BUILDINGS AND NEW LOCATIONS (CP 00 30)**

    The following are extended to apply to Extra Expense coverage: Additional Coverage - Alterations And New Buildings and Coverage Extension - Newly Acquired Locations.

## III. REDUCTION OF COVERAGE

- **MAXIMUM PERIOD OF INDEMNITY OPTIONAL COVERAGE (CP 00 30)**

    When this option is made applicable to the policy, recovery for loss of business income <u>and extra expense</u> is limited to the amount of such loss or expense sustained during the 120 days following property damage, subject to the Limit of Insurance. Previously, this option applied only to business income loss.

### CHANGES IN GLASS COVERAGE

**NOTE TO INSURERS:** The Glass Coverage Form, CP 00 15, and Glass Coverage Schedule, CP 19 15, are withdrawn. The effect on coverage varies in accordance with the scenarios which follows.

- The Commercial Property Coverage Part includes coverage for glass that is part of a building or part of business personal property, if the building or business personal property qualifies as Covered Property. The covered causes of loss for such property are determined by the Causes of Loss Form that applies to Covered Property.

    - If your previous policy did <u>not</u> include Glass Coverage Form CP 00 15, then either explanation (A) or (B) applies:

      (A) If the Covered Property is subject to the Causes of Loss - Basic Form (CP 10 10) or Causes of Loss - Broad Form (CP 10 20), coverage is broadened in that the vandalism causes of loss no longer contains an exception for glass property. Under CP 10 20 , coverage is **also reduced,** in that the $500 Additional Coverage - Breakage of Glass (applicable to causes of loss not otherwise covered under CP 10 20) is eliminated.

      (B) If the Covered Property is subject to the Causes of Loss - Special Form (CP 10 30), coverage on glass is **broadened.** Coverage under CP 10 30 is expanded to include glass breakage caused by a cause of loss that is not otherwise excluded, and damage caused by chemicals applied to glass. [The coverage for glass breakage is accomplished by removal of a previous limitation.] The new edition of CP 10 30 also includes an Additional Coverage Extension pertaining to temporary plates and removal of obstructions.

BP 00502

o   If your previous policy included Glass Coverage Form CP 00 15 and Covered Property is
    subject to the Causes of Loss - Special Form (CP 10 30) under your new policy, the
    following disclosure applies: Coverage for glass breakage is reduced in that CP 10 30
    does not cover earthquake or flood. But if your policy is endorsed to cover earthquake
    and flood (separate endearments), then glass coverage under the new policy is
    substantially equivalent to the old.

NOTE: The Broken Or Cracked Glass Exclusion Form is editorially revised to accommodate the
new means of writing coverage on glass.


## CAUSES OF LOSS FORMS

I. CLARIFICATION OR PROCEDURAL CHANGES

o   EARTH MOVEMENT EXCLUSION (CP 10 10, CP 10 20, CP 10 30, CP 00 70, CP 00 99)

    The Earth Movement Exclusion is revised to separate the various types of earth movement
    into different paragraphs, and to provide some detail on the terms earth sinking, rising and
    shifting, including explicit reference to soil conditions, the action of water, and settling.

o   WATER DAMAGE NAMED PERIL (CP 10 20)

    The Water Damage peril is revised to clarify that it is intended to respond only to losses
    which involve the breaking apart or cracking of an on-premises system or on-premises
    appliance. The description of water damage under the Additional Coverage - Collapse is
    revised to follow suit.

    This peril is also revised to specify that coverage does not include discharge or leakage from
    roof drains, gutters, downspouts or similar fixtures or equipment. Such equipment is not
    considered to be a covered system under the terms of this peril.

o   SPECIFIED CAUSES OF LOSS (CP 10 30)

    In the Causes of Loss - Special Form, the definition of "specified causes of loss" (named
    perils which apply under certain circumstances) is revised to clarify that water damage
    relates to the breaking apart or cracking of an on-premises system or on-premises appliance.

o   SPECIAL FORM LIMITATION ON VALUABLE PAPERS AND RECORDS (CP 10 30)

    This limitation does not apply to prepackaged software programs.

o   EXCLUSIONS (CP 10 10, CP 10 20, CP 10 30, CP 00 70, CP 00 99)

    Language is added in the section of the form pertaining to exclusions, to emphasize that
    exclusions apply whether the loss event results in widespread damage or affects a substantial
    area.

o   EXCLUSION OF NEGLECT (CP 10 10, CP 10 20, CP 10 30, CP 00 70, CP 00 99)

BP 00503

To complement and reinforce the Duties In The Event of Loss Or Damage condition in the coverage forms, which requires the insured to take all reasonable steps to protect the Covered Property from further damage, an exclusion pertaining to neglect is introduced.

- CORPORATIONS AND LIMITED LIABILITY COMPANIES (CP 10 30)

The exclusion pertaining to dishonest and criminal acts is revised to recognize members, officers and managers.

## II. BROADENING OF COVERAGE

- WEIGHT OF ICE, SNOW AND SLEET (CP 10 20, CP 10 30)

Coverage is no longer precluded for loss or damage to gutters and downspouts caused by the weight of ice, snow or sleet.

- PROPERTY IN TRANSIT (CP 10 30)

Named perils coverage for personal property in transit, in or on a motor vehicle owned, leased or operated by the insured, is increased to $5,000.

- TIME ELEMENT PERIOD OF INDEMNITY CANCELLATION OF CONTRACT (CP 10 10, CP 10 20, CP 10 30)

An exception (applicable to Business Income coverage forms) allows coverage for loss of business income related to suspension, lapse or cancellation of a license, lease or contract, if the suspension, lapse or cancellation was directly caused by a covered suspension of the insured's operations. The exception is revised to extend coverage to apply during an Extended Business Income period and any applicable optional extension.

## ENDORSEMENTS

## I. CLARIFICATION OR PROCEDURAL CHANGES

- **CP 13 60** REPORT OF VALUES

The instructions contained in CP 13 60 are revised to refer to <u>this report</u> instead of <u>this endorsement.</u>

- **CP 04 15** ENDORSEMENT: DEBRIS REMOVAL ADDITIONAL INSURANCE

In the underlying coverage forms, the language concerning debris removal is deleted from the Limits of Insurance clause and incorporated into the Debris Removal Additional Coverage. This change in format necessitates editorial changes to optional endorsement CP 04 15, which allows an increase in the amount of debris removal coverage.

- **CP 12 11** BURGLARY AND ROBBERY PROTECTIVE SAFEGUARDS

BP 00504

The endorsement is revised to eliminate information pertaining to an obsolete Underwriters
Laboratories classification system.  Further, the endorsement no longer refers to
Underwriters Laboratories certification since there are many organizations that evaluate
alarm systems.

- CP 11 20 BUILDERS RISK - COLLAPSE DURING CONSTRUCTION

Paragraph references are revised due to Format changes in the Causes of Loss forms.

- CP 01 53 COLLAPSE CHANGES (WITHDRAWN)

This endorsement corrects paragraph references in the 1995 edition of CP 00 20 and CP 00 70.
It is not applicable to the new edition of the forms.

- CP 10 37 RADIOACTIVE CONTAMINATION

The word "or" in paragraphs A.1. and B.1. of the endorsement is replaced by the word
"including", thereby appropriately connecting the sub-paragraph on "resultant" damage to
the description which precedes it.

- CP DS 01 COMMERCIAL PROPERTY COVERAGE PART SUPPLEMENTAL
  DECLARATIONS (replaces CP 12 05 11 85)
  CP DS 02 COMMERCIAL PROPERTY COVERAGE PART RENEWAL
  ENDORSEMENT (replaces CP 12 40 11 85)
  CP DS 03 STANDARD PROPERTY POLICY RENEWAL ENDORSEMENT (replaces
  CP 12 99 07 88)
  CP DS 04 REPORTED, ACQUIRED, INCIDENTAL LOCATIONS SCHEDULE (replaces
  CP 19 13 07 88)
  CP DS 05 LEGAL LIABILITY COVERAGE SCHEDULE (replaces CP 19 40 11 85)
  CP DS 06 EARTHQUAKE - VOLCANIC ERUPTION COVERAGE SCHEDULE (replaces
  CP 19 45 08 99)
  CP DS 07 LEASEHOLD INTEREST COVERAGE SCHEDULE (replaces CP 19 60 11 85)

  A new forms naming convention (prefix "DS") is introduced to identify forms which are in
  the category of declarations or schedules.

- CP 15 24 MINING PROPERTIES - BUSINESS INCOME

A Schedule and accompanying footnote are added to the endorsement.  The Schedule enables
selection of the appropriate coverage option provided by the endorsement: No Underground
Coverage, Limited Underground Coverage or Broad Underground Coverage.

- CP 15 08 BUSINESS INCOME FROM DEPENDENT PROPERTIES - BROAD FORM
  CP 15 09 BUSINESS INCOME FROM DEPENDENT PROPERTIES - LIMITED FORM
  CP 15 31 ORDINANCE OR LAW - INCREASED PERIOD OF RESTORATION
  CP 15 34 EXTRA EXPENSE FROM DEPENDENT PROPERTIES

  To recognize that the term suspension is now a defined term, these endorsements are revised
  to add quotation marks to the word suspension (in the phrase suspension of operations).

II.  BROADENING OF COVERAGE                                          BP 00505

• **CP 10 65 AND CP DS 65** FLOOD COVERAGE ENDORSEMENT AND SCHEDULE

An optional endorsement is introduced to provide flood coverage. Refer to insurer or agent for additional information.

• **CP 04 60** VACANCY CHANGES

This new, optional endorsement enables modification of the threshold for determining vacancy of a premises.

• **CP 17 98** CONDOMINIUM COMMERCIAL UNIT OWNERS CHANGES - STANDARD PROPERTY POLICY

The Newly Acquired Property Coverage Extension in endorsement CP 17 98 is being revised to:
• revise the provision which currently limits coverage at each building to the lesser of 10% of the Business Personal Property Limit or $100,000. Instead, coverage will be provided up to $100,000 at each building;
• specify that the business personal property at the newly acquired location may be insured property that has been relocated to that location, or newly acquired business personal property (e.g., acquisition of another firm's inventory); and
• add coverage for newly acquired business personal property at the described premises.

CAUTION: This Coverage Extension does not apply to personal property of others that is temporarily in the insured's possession in the course of installing or performing work on such property or in the course of manufacturing or wholesaling activities.

• **CP 04 01** BRANDS AND LABELS

Under the terms of this optional endorsement, the insured may stamp "salvage" on merchandise that is being taken by the insurer, or remove the brands or labels, subject to certain conditions. CP 04 01 is revised to include coverage for costs incurred by the insured in performing the aforementioned activity. This coverage does <u>not</u> increase the applicable Limit of Insurance.

• **CP 15 32** ENDORSEMENT: CIVIL AUTHORITY (TIME ELEMENT)

This new, optional endorsement pertains to Business Income and Extra Expense coverage. The endorsement provides the option of replacing the three-week Civil Authority coverage period with a coverage period of 60, 90 or 180 days.

• **CP 15 25** BUSINESS INCOME - EDUCATIONAL INSTITUTIONS

An Extension of Recovery Period <u>Option</u> is added to CP 15 25, triggered via the Schedule. This option covers loss of business income sustained during "X" months following physical restoration of the property. This option is presented in Endorsement CP 15 25 as an alternative to the endorsement's more limited Extended Business Income coverage.

In addition:
• The Schedule is expanded to accommodate entry of a description of each school term in an annual period, to clarify intended coverage; and
• The term <u>suspension</u>, now a defined term when used in the phrase suspension of operations, is enclosed in quotation marks.

BP 00506

© Insurance Services Office, Inc., 2000

NT CP 00 2

### III. POTENTIAL REDUCTION OF COVERAGE

- **CP 14 30** OUTDOOR TREES, SHRUBS AND PLANTS
  **CP 14 40** - OUTSIDE SIGNS
  **CP 14 50** - RADIO OR TELEVISION ANTENNAS

These endorsements are revised to emphasize that applicable policy provisions affect coverage provided under the endorsements. Particularly relevant exclusions from the underlying forms are incorporated into the endorsements.

**NOTE TO INSURERS:** The revisions are intended to clarify coverage but could have the effect of reducing coverage, depending on a company's previous interpretation.

### IV. POTENTIAL CHANGE IN COVERAGE

- **CP 04 05** ORDINANCE OR LAW COVERAGE
  **CP 04 38** FUNCTIONAL BUILDING VALUATION ENDORSEMENTS

Under these endorsements, Ordinance or Law coverage is related to property damage losses. Property damage may involve both covered causes of loss and excluded causes of loss. As revised, these endorsements include a section outlining the circumstances under which Ordinance or Law coverage is and is not triggered. Further, the revised endorsements describe proportionate loss payment for Ordinance or Law losses for the situation where the underlying property damage losses were caused by covered and excluded causes of loss.

**NOTE TO INSURERS:** This change may reduce, broaden or result in no change in coverage, based on an individual insurer's present claims handling practices.

BP 005 

CG 00 57 09 99

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDMENT OF INSURING AGREEMENT - KNOWN INJURY OR DAMAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART (OCCURRENCE VERSION)

Paragraph 1. Insuring Agreement of Section I - Coverages A - Bodily Injury And Property Damage Liability is replaced by the following:

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      (2) The "bodily injury" or "property damage" occurs during the policy period; and

      (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occur-

rence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

      (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

      (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

      (3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

   e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

BP 00508

Copyright, Insurance Services Office, Inc., 1998

CG 00 57 09 99

CG 21 47 07 98

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability:

This insurance does not apply to:

"Bodily injury" to:

(1) A person arising out of any:

  (a) Refusal to employ that person;

  (b) Termination of that person's employment; or

  (c) Employment-related practices, policies, acts or omissons, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs (a),(b), or (c) above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

B. The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

This insurance does not apply to:

"Personal and advertising injury" to:

(1) A person arising out of any:

  (a) Refusal to employ that person;

  (b) Termination of that person's employment; or

  (c) Employment-related practices, policies, acts or omissons, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs (a), (b), or (c) above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

BP 00509

Copyright, Insurance Services Office, Inc., 1997

CG 21 47 07 98

CG 25 03 03 97

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## DESIGNATED CONSTRUCTION PROJECT(S)
### GENERAL AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

SCHEDULE

Designated Construction Projects:

All Projects

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

A. For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under COVERAGE A (SECTION I), and for all medical expenses caused by accidents under COVERAGE C (SECTION I), which can be attributed only to ongoing operations at a single designated construction project shown in the Schedule above:

   1. A separate Designated Construction Project General Aggregate Limit applies to each designated construction project, and that limit is equal to the amount of the General Aggregate Limit shown in the Declarations.

   2. The Designated Construction Project General Aggregate Limit is the most we will pay for the sum of all damages under COVERAGE A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard", and for medical expenses under COVERAGE C regardless of the number of:

      a. Insureds;

      b. Claims made or "suits" brought; or

      c. Persons or organizations making claims or bringing "suits".

   3. Any payments made under COVERAGE A for damages or under COVERAGE C for medical expenses shall reduce the Designated Construction Project General Aggregate Limit for that designated construction project. Such payments shall not reduce the General Aggregate Limit shown in the Declarations nor shall they reduce any other Designated Construction Project General Aggregate Limit for any other designated construction project shown in the Schedule above.

   4. The limits shown in the Declarations for Each Occurrence, Fire Damage and Medical Expense continue to apply. However, instead of being subject to the General Aggregate Limit shown in the Declarations, such limits will be subject to the applicable Designated Construction Project General Aggregate Limit.

B. For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under COVERAGE A (SECTION I), and for all medical expenses caused by accidents under COVERAGE C (SECTION I), which cannot be attributed only to ongoing operations at a single designated construction project shown in the Schedule above:

   1. Any payments made under COVERAGE A for damages or under COVERAGE C for medical expenses shall reduce the amount available under the General Aggregate Limit or the Products-Completed Operations Aggregate Limit, whichever is applicable; and

   2. Such payments shall not reduce any Designated Construction Project General Aggregate Limit.

BP 00510

C. When coverage for liability arising out of the "products-completed operations hazard" is provided, any payments for damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard" will reduce the Products-Completed Operations Aggregate Limit, and not reduce the General Aggregate Limit, nor the Designated Construction Project General

Copyright, Insurance Services Office, Inc., 1996

Aggregate Limit.

D. If the applicable designated construction project has been abandoned, delayed, or abandoned and then restarted, or if the authorized contracting parties deviate from plans, blueprints, designs, specifications or timetables, the project will still be deemed to be the same construction project.

E. The provisions of Limits Of Insurance (SECTION III) not otherwise modified by this endorsement shall continue to apply as stipulated.

BP 00511

 Copyright, Insurance Services Office, Inc., 1996  CG 25 03 03 97

CG 25 04 03 97

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

DESIGNATED LOCATION(S) GENERAL AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

SCHEDULE

Designated Location(s):

All Locations

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

A. For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under COVERAGE A (SECTION I), and for all medical expenses caused by accidents under COVERAGE C (SECTION I), which can be attributed only to operations at a single designated "location" shown in the Schedule above:

1. A separate Designated Location General Aggregate Limit applies to each designated "location", and that limit is equal to the amount of the General Aggregate Limit shown in the Declarations.

2. The Designated Location General Aggregate Limit is the most we will pay for the sum of all damages under COVERAGE A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard", and for medical expenses under COVERAGE C regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

3. Any payments made under COVERAGE A for damages or under COVERAGE C for medical expenses shall reduce the Designated Location General Aggregate Limit for that designated "location". Such payments shall not reduce the General Aggregate Limit shown in the Declarations nor shall they reduce any other Designated Location General Aggregate Limit for any other designated "location" shown in the Schedule above.

4. The limits shown in the Declarations for Each Occurrence, Fire Damage and Medical Expense continue to apply. However, instead of being subject to the General Aggregate Limit shown in the Declarations, such limits will be subject to the applicable Designated Location General Aggregate Limit.

B. For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under COVERAGE A (SECTION I), and for all medical expenses caused by accidents under COVERAGE C (SECTION I), which cannot be attributed only to operations at a single designated "location" shown in the Schedule above:

1. Any payments made under COVERAGE A for damages or under COVERAGE C for medical expenses shall reduce the amount available under the General Aggregate Limit or the Products-Completed Operations Aggregate Limit, whichever is applicable; and

2. Such payments shall not reduce any Designated Location General Aggregate Limit.

C. When coverage for liability rising out of the "products-completed operations hazard" is provided, any payments for damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard" will reduce the Products-Completed Operations Aggregate Limit, and not reduce the General Aggregate Limit nor the Designated Location General Aggregate Limit.

For the purposes of this endorsement, the Definitions Section is amended by the addition of the following definition:

BP 00512

Copyright, Insurance Services Office, Inc., 1996

"Location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway, or right-of-way of a railroad.

E. The provisions of Limits Of Insurance (SECTION III) not otherwise modified by this endorsement shall continue to apply as stipulated.

BP 00513

Copyright, Insurance Services Office, Inc., 1996

CG 25 04 05 97

# EXHIBIT B

To Affidavit of
Leonard W. Langer
December 21, 2005

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc., 1998

EXHIBIT B

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

BEVERLY PORT MARINA, INC.   )
and LESLIE S. RAY INSURANCE   )
AGENCY, INC.,                  )   Civil Action No. 1:05-cv-10883-WGY
                             )
          Plaintiffs   )
                             )
       vs.              )
                             )
ACADIA INSURANCE COMPANY,   )
                             )
         Defendant   )
                             )

## <u>AFFIDAVIT OF GRETTYL BENISCH</u>

Grettyl Benisch, first being duly sworn, deposes and says as follows:

1.     My name is Grettyl Benisch[1], and I am employed by Acadia Insurance Company (hereinafter "Acadia"), the Defendant in the above-captioned matter, as a loss control representative in Acadia's Marlborough, Massachusetts office. This Affidavit is based on my personal knowledge.

2.     I conducted a loss control survey at Beverly Port Marina on May 10, 2000, and thereafter prepared the loss control survey report which is attached as Exhibit F to the Opposition of Beverly Port Marina, Inc. and Leslie S. Ray Insurance Agency, Inc. to Acadia Insurance Company's Motion for Summary Judgment.

3.     The loss control survey for Beverly Port Marina was requested by Molly Welsh, then of Acadia's commercial lines underwriting department. As indicated in my report, the loss control survey was in connection with commercial liability and property

---

[1] In May, 2000 I was known as Grettyl Lewit. I have since changed my name to Grettyl Benisch.

coverage. It had nothing to do with marina operators' or boat dealers' coverage, which is handled by Acadia's ocean marine department in Westbrook, Maine. I had no contact whatsoever with anyone in the ocean marine underwriting department with respect to this loss control survey. I did not send a copy of my report to anyone in ocean marine underwriting, nor was I asked to do so.

4.      I did not conduct the loss control survey in order to evaluate Beverly Port Marina's insurance needs. A loss control survey is not intended to benefit the insured. Rather, as its name implies, its purpose is to limit the insurer's exposure and potential losses in the event coverage is provided. If the loss control survey is unsatisfactory, then coverage may not be offered in the first place. I explained this, in essence, to Frank Kinzie of Beverly Port Marina when I began my survey.

5.      I did not send a copy of the loss control survey report to either Beverly Port Marina or Leslie S. Ray Insurance Agency, Inc. It is not Acadia's policy to provide such reports either to the insured or the agent. They are intended for Acadia's internal use only.

6.      During the course of my inspection at Beverly Port Marina on May 10, 2000, I specifically asked Frank Kinzie to describe for me all of Beverly Port Marina's off-premises activities. The information he provided is contained in the third paragraph of page 3 of my loss control survey. Mr. Kinzie never mentioned any type of demonstrations of boats for sale, whether in-the-water or otherwise.

7.      It was not part of my loss control survey to inquire whether Beverly Port Marina allowed customers to operate its boats. This was well beyond the scope of my survey. Furthermore, I have never heard of a boat dealer allowing a customer to test drive a boat.

2

Signed under pains and penalties of perjury this 20th day of December, 2005.

/s/ Grettyl Benisch____

## CERTIFICATE OF SERVICE

I, Leonard W. Langer, hereby certify that on December 21, 2005, I electronically filed the within document with the Clerk of the Court using the CM/ECF system which will send a notification of such filing(s) to the following: William D. Chapman, Esq., Melick, Porter & Shea, LLP, 28 State Street, Boston, MA 02109 counsel for Plaintiffs Beverly Port Marina, Inc. and Leslie S. Ray Insurance Agency.

/s/ Leonard W. Langer_____

TOMPKINS, CLOUGH, HIRSHON & LANGER, P.A.
Three Canal Plaza
P. O. Box 15060
Portland, ME 04112-5060
(207) 874-6700
lwlanger@tchl.com

Acadia/BPM
Aff'd G. Benisch

3

# EXHIBIT C

```
                               VOLUME:    I
                               PAGES:     1 - 241
                               EXHIBITS:  1 - 31


          UNITED STATES DISTRICT COURT

           District of Massachusetts



ACADIA INSURANCE COMPANY,    )
         Plaintiff           )
                             )
    VS.                      )
                             )
BEVERLY PORT MARINA, INC.,   )
and CARLOS JOHNSON           )
     Defendants/Third-Party  )   Case No.
     Plaintiffs              )   02-CV-10153
                             )
    VS.                      )
                             )
LESLIE S. RAY INSURANCE      )
AGENCY, INC.,                )
    Third-Party Defendant.   )
```

        DEPOSITION OF SUZANNE KINZIE, a witness
called by and on behalf of the Third-Party
Defendant, taken pursuant to the applicable
provisions of the Federal Rules of Civil
Procedure, before Sandra L. Bray, Registered
Merit Reporter, CSR Number 103593, and Notary
Public in and for Commonwealth of Massachusetts,
at the offices of Cianciulli & Ouellette,
163 Cabot Street, Beverly, Massachusetts, on
Friday, December 5, 2003, commencing at
10:06 a.m.

1   A.   September 2002?  I can't remember who was in in

2        2002.

3   Q.   And the February 2002, you can't remember Silva

4        being involved in that either?

5   A.   I can't remember if he was -- whether he was,

6        no.

7   Q.   You just told Mr. Smith that your -- if I

8        understand it correctly, you're no longer

9        allowing nonemployees to drive boats to or from

10       boat shows; is that fair to say?

11  A.   Since the judge ruled, yes.

12  Q.   And are we talking about a policy of Beverly

13       Port Marina that's gone into effect after Judge

14       Young made his ruling in October of 2003?

15  A.   It's not a policy.  We just don't allow it.

16  Q.   Is that the same thing as a policy if you don't

17       allow it?

18            MR. PIERCE:  It doesn't have to be

19       written to be policy, Sue.

20  A.   Sure.

21  Q.   And was there no such policy up until August of

22       2003?

23  A.   I don't believe so.

24  Q.   So up until August of 2003, you would still have

HENNESSEY CORP., D/B/A ROBERT H. LANGE CO.

238

1        permitted -- in terms of a policy, still have

2        permitted a nonemployee to bring a boat to or

3        from a boat show?

4                  MR. PIERCE:   Objection.

5    A.   I believe we were insured, yes.

6    Q.   Do you remember with regard to any of your

7        policies that covered any of the marina

8        exposures ever going to Leslie Ray and trying to

9        get limits either increased or decreased for any

10       reason, any of the policy limits?

11   A.   Don't recall.  Oh, I'm sorry.  Getting limits

12       increased?

13   Q.   Right, policy limits.

14   A.   Yes.  As the business grew, we had to increase

15       our numbers.

16   Q.   Okay.  Can you give me a specific example of how

17       you requested any kind of increase in policy

18       limits?

19   A.   When Leslie Ray agents came to the office to

20       renew our policies, they always wanted our past

21       numbers and our projections.  At that time when

22       numbers increased, I would think Leslie Ray

23       would recommend to increase limitations.

24   Q.   Well, for example, had the number of employees

HENNESSEY CORP., D/B/A ROBERT H. LANGE CO.

# EXHIBIT D

Page 1

1

2                    UNITED STATES DISTRICT COURT

3                    DISTRICT OF MASSACHUSETTS

4                 Civil Action No.  05-CV-10883-WGY

5

6

7    LESLIE S. RAY INSURANCE

8    AGENCY, INC., and

9    BEVERLY PORT MARINA, INC.,

10                    Plaintiffs,

11            vs.

12   ACADIA INSURANCE COMPANY,

13                    Defendant.

14

15

16            30(b)(6) DEPOSITION OF ACADIA INSURANCE

17   COMPANY (Theodore Wirth), taken pursuant to notice, at the

18   offices of Tompkins, Clough, Hirshon, Langer, P.A., Three

19   Canal Plaza, Portland, Maine, on October 31, 2005,

20   commencing at 11:08 A.M., before Tammy L. Martell,

21   Registered Professional Reporter, a Notary Public in and

22   for the State of Maine.

23

24            Downing & Peters Reporting Associates

25        79 Atlantic Place, South Portland, Maine  04106

1           (A short break was taken.)

2       (Exhibit No. 8, A.M. Best Underwriting Selection,

3   marked for identification.)

4   Q.   When you look at Exhibit 8 is that the same Best

5   underwriting selection that Mr. Langer has shown you that

6   you testified to earlier?

7   A.   I have not seen this.

8   Q.   Okay.  When you look at -- have you ever seen any Best

9   underwriting guideline like this before?

10  A.   No.

11  Q.   And when you look at this particular document your

12  testimony is in the ocean marine department this is not

13  something that you receive or subscribe to in the usual

14  course of the ocean marine underwriting business at Acadia?

15  A.   Correct.

16  Q.   And how does this exhibit compare to what Mr. Langer

17  showed you?

18          MR. LANGER:  Objection.  For the record what I

19  showed him was the answers to interrogatories that quotes

20  what purported to be some of Best's underwriting

21  guidelines.

22          MR. CHAPMAN:  Okay.

23  Q.   So your testimony is you have never seen this

24  particular exhibit before today, correct?

25  A.   Correct.

# EXHIBIT E

Page 1

1

2                    UNITED STATES DISTRICT COURT

3                     DISTRICT OF MASSACHUSETTS

4                  Civil Action No.   05-CV-10883-WGY

5

6

7     LESLIE S. RAY INSURANCE

8     AGENCY, INC., and

9     BEVERLY PORT MARINA, INC.,

10                    Plaintiffs,

11              vs.

12    ACADIA INSURANCE COMPANY,

13                    Defendant.

14

15

16              DEPOSITION OF MATTHEW PEDERSEN, taken

17    pursuant to notice, at the offices of Tompkins, Clough,

18    Hirshon, Langer, P.A., Three Canal Plaza, Portland, Maine,

19    on November 1, 2005, commencing at 10:23 A.M., before Tammy

20    L. Martell, Registered Professional Reporter, a Notary

21    Public in and for the State of Maine.

22

23

24              Downing & Peters Reporting Associates

25         79 Atlantic Place, South Portland, Maine   04106

Page 53

1   Q.   What is A.M. Best?

2   A.   A rating organization.

3   Q.   And is A.M. Best a recognized authority in the

4   insurance business?

5           MR. LANGER:  Objection, form and foundation.

6   A.   Depends what you mean by authority.

7   Q.   Okay.  Are they a recognized authority with respect to

8   rating different insurance companies?

9           MR. LANGER:  Objection.

10   A.   Yes.

11   Q.   And are they a recognized authority in any other sense

12   that you are aware of?

13           MR. LANGER:  Objection.

14   A.   Not to my knowledge.

15   Q.   All right.  Are you aware whether or not A.M. Best

16   publishes underwriting guidelines?

17   A.   I am not.

18   Q.   Have you ever seen any underwriting guidelines

19   published by A.M. Best?

20           MR. LANGER:  Objection, he just said he wasn't

21   aware.

22   Q.   Okay, so the answer to that question is no?

23   A.   Yes.

24   Q.   I am going to show you Ted Wirth Exhibit No. 8 from

25   yesterday and have you ever seen that document before just